UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,
       Plaintiff,

       v.

ONE STAR CLASS SLOOP SAILBOAT
BUILT IN 1930 WITH HULL NUMBER
NAMED "*FLASH II*,"
       Defendant.

Civil Action No.

05 CV 10192

## VERIFIED COMPLAINT FOR FORFEITURE IN REM

The United States of America, by its attorney, Michael J. Sullivan, United States Attorney for the District of Massachusetts, in a civil action of forfeiture pursuant to Title 21, United States Code, Section 881(a)(6), alleges that:

1.    This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1345, 1355, and 1356.  Venue is appropriate pursuant to 28 U.S.C. § 1395.

2.    The in rem Defendant Property is now, and, during the pendency of this action, will be within the jurisdiction of this Court.

3.    The Defendant Property consists of one Star Class Sloop Sailboat built in 1930 with hull number 721, named "*Flash II*" and once owned by President John F. Kennedy and Joseph P. Kennedy (the "Sailboat").

4.    As detailed in the Affidavit of United States Drug Enforcement Administration Special Agent Gregg A. Willoughby, attached hereto as Exhibit A, and incorporated herein by reference, the United States has probable cause to believe that

the Sailboat constitutes property derived from proceeds obtained, directly or indirectly, as the result of narcotics distribution, in violation of the provisions of Title 21 of the United States Code (the "Controlled Substances Act").

5.      The Sailboat is, therefore, subject to seizure and forfeiture to the United States of America, pursuant to 21 U.S.C. § 881(a)(6) and (b).

WHEREFORE, the United States of America prays:

1.      That a warrant and monition, in the form submitted herewith, be issued to the United States Marshal for the District of Massachusetts commanding him to give notice to all interested parties to appear and show cause why the forfeiture should not be decreed;

2.      That judgment of forfeiture be decreed against the Sailboat;

3.      That thereafter, the Sailboat be disposed of according to law; and

4.      For costs and all other relief to which the United States may be entitled.

                                    Respectfully submitted,
                                    MICHAEL J. SULLIVAN
                                    United States Attorney

                            By: _Shelbey D. Wright_
                                    SHELBEY D. WRIGHT
                                    Assistant U.S. Attorney
                                    1 Courthouse Way, Suite 9200
                                    Boston, MA 02210
                                    (617) 748-3100

Dated: 2|1|05

<u>VERIFICATION</u>

I, United States Drug Enforcement Administration Special Agent Gregg A. Willoughby, state that I have read the foregoing Verified Complaint for Forfeiture <u>In</u> <u>Rem</u> and the Affidavit, attached as Exhibit A, and that the contents thereof are true to the best of my knowledge, information and belief.

_____
Gregg A. Willoughby,
Special Agent
U.S. Drug Enforcement Administration

Dated: *2/1/05*

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.                                        Boston

Then personally appeared before me the above-named Gregg A. Willoughby, Special Agent, United States Drug Enforcement Administration, who acknowledged the foregoing to be true to the best of his knowledge, information and belief, on behalf of the United States of America.

Subscribed to and sworn to before me this __1st__ day of February, 2005.

_____
Lisa J. Talbot
Notary Public
My commission expires: 5/29/09

LISA J. TALBOT
Notary Public
Commonwealth of Massachusetts
My Commission Expires
May 29, 2009

N:\LTalbot\wright\Sailboat (Flash II)\Complaint for Forfeiture.wpd

## EXHIBIT A

### AFFIDAVIT OF SPECIAL AGENT GREGG A. WILLOUGHBY

I, Gregg A. Willoughby, being duly sworn, depose and state as follows:

### I.   INTRODUCTION

1.   I am a Special Agent with the United States Drug Enforcement Administration ("DEA"), and have been so employed for twelve years.  As a Special Agent of the DEA, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2.   I am currently assigned to the DEA's Boston Field Division.  During my employment at the DEA, I have participated in hundreds of investigations relating to the distribution of controlled substances, including cocaine, cocaine base, heroin, marijuana, methamphetamine, and other illegal drugs.  I have received extensive training in the aspects of narcotics investigations.  I have sworn out numerous affidavits in support of search warrants, arrest warrants and other applications.  Since approximately August of 1997, I have been assigned to the

1

DEA's Cross Border Initiative ("CBI") Task Force in Lowell, MA. This task force includes representatives from a variety of federal, state and local law enforcement agencies, including the DEA, the Massachusetts State Police, the Lowell, Massachusetts Police Department, the Wilmington, Massachusetts Police Department, the Haverhill, Massachusetts Police Department, the Salem, New Hampshire Police Department, and the Essex County, Massachusetts Sheriff's Department.

3.    During the course of my employment with the DEA, I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, transport, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics trafficking activities.

4.    In addition to my training, I have had extensive experience in the investigation of the activities of narcotics traffickers. Since joining the DEA, I have participated in hundreds of narcotics investigations as a case agent and in subsidiary roles. I have debriefed numerous defendants, informants, and witnesses who had personal knowledge about narcotics trafficking activities and the operation of narcotics

trafficking organizations. I personally have participated in almost all aspects of narcotics trafficking investigations, including but not limited to conducting surveillance, acting in undercover capacities, using confidential informants, executing arrest and search warrants, and conducting court-authorized wire and electronic surveillance.

5. Based upon my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics trafficking activities.

6. Specifically, I am familiar with the manner in which narcotics traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking. I also am familiar with the manner in which narcotics traffickers use telephones, coded or slang-filled telephone conversations, pagers, coded pager messages, and other means to facilitate their illegal activities.

7. I also am familiar with the vernacular of users and distributors of controlled substances and the methods by which

3

such persons attempt to disguise the subjects of their conversations and operations.

8.    I submit this Affidavit in support of a Complaint for Forfeiture *in Rem* against the Star Class Sloop Sailboat built in 1930 with hull number 721, named "*Flash II*" and once owned by President John F. Kennedy and Joseph P. Kennedy (hereafter, the "Sailboat"). According to the information set forth below, I have probable cause to believe that the Sailboat, which is currently owned, in whole or in part, by Gregory Olaf Anderson, constitutes property derived from proceeds Anderson obtained, directly or indirectly, as the result of narcotics distribution, in violation of the provisions of Title 21 of the United States Code (the "Controlled Substances Act") and, therefore, that it is subject to seizure and forfeiture pursuant to 21 U.S.C. § 881(a)(6) and (b), as property obtained, directly or indirectly, as a result of such violations.

9.    Since in or about February 2004, I have participated in an investigation of Gregory Olaf Anderson, a/k/a "Ole Anderson", a/k/a "Lance" (hereafter, "Ole" or "Anderson") and others, by the DEA, for distribution of marijuana. This Affidavit does not contain every detail I and other law enforcement personnel have

4

learned during the course of this investigation, but rather is intended to demonstrate probable cause for forfeiture.

10.   The information contained in this Affidavit is based upon my own personal observations, as well as observations of other officers and agents, made during the investigation, and information provided by a cooperating witness (hereafter referred to as the "CW").   The CW is deemed to be reliable and accurate because it was in a position to have personal knowledge of the information it has provided and much of the information it has provided has been corroborated by independent investigation.   The CW has also provided information in other related investigations that has proved to be accurate and reliable.   Specifically, the CW's information has led to indictments of other marijuana traffickers, the conviction of at least one other trafficker and to the seizure of large amounts of marijuana and U.S. currency. To the best of my knowledge and belief, the CW has not provided any false information.

## Overview of the Investigation

11.   During numerous interviews from December 2003 to the present, the CW provided detailed information relative to "its" marijuana trafficking organization to me, other agents and police

5

officers participating in the investigation of a large-scale
marijuana trafficking organization in Massachusetts.  The CW
stated that "it" used to distribute large amounts of marijuana to
several customers in Massachusetts.  The CW identified several of
"its" criminal associates that sold, purchased and otherwise
assisted the CW in "its" marijuana trafficking.  Specifically,
the CW stated that "it" purchased up to 3,000 pounds of marijuana
on a monthly basis from suppliers in Arizona and elsewhere over a
period of several years.  The CW then had individuals transport
the marijuana from Arizona to Massachusetts where the CW would
then distribute the marijuana to several customers.  The CW
identified "Ole Anderson", a/k/a "Lance", as one of the CW's
marijuana transporters.  On February 20, 2004, the CW stated that
"Ole" Anderson was currently residing in Florida.  The CW also
stated that Anderson served approximately one year in an Arizona
prison for a conviction related to transporting the CW's
marijuana.  I later confirmed from Arizona state criminal history
records and with the Arizona Department of Corrections that
Anderson was arrested on or about December 3, 2001, for
transporting and/or selling marijuana (approximately 1,322

pounds). Anderson was convicted of that charge and sentenced to serve one and a half years in an Arizona state prison.

12. In October and/or November 2003, Anderson contacted the CW. Anderson told the CW that he had met someone in prison who was able and willing to supply him and the CW with large amounts of marijuana and that the supplier was willing to deliver the marijuana to any location that he and the CW wanted it to be delivered. Anderson also asked about selling marijuana to some of the CW's customers based in Massachusetts.

13. On or about April 5, 2004, the CW placed a call to Anderson's cell phone and received an answer from Anderson. During the call, the CW refers to Anderson by his nickname, "Lance". Also during their call (which was not recorded), Anderson asked the CW to call him back within a week. On April 12, 2004, the CW called Anderson again and recorded the call. During the call, Anderson, in cryptic terms, indicated that he had not spoken with his potential marijuana supplier and that he needed a little more time. Anderson also told the CW that he wanted to try and sell "Kennedy's" boat and that he was planning on traveling to Marblehead, Massachusetts (where the boat was stored), in or around May 2004, to take the boat out of storage

7

to ready it for sale and to look for possible parties interested in purchasing it.

14. On April 12, 2004, the CW stated that it first met Anderson several years ago through Anderson's older brother, Jim Anderson (hereafter, "Jim Anderson"). The CW used to buy small amounts of marijuana (user amounts) for a friend at that time from Jim Anderson. The CW only knows Anderson by the nicknames "Ole Anderson" and "Lance". The CW described Anderson as a white male from Florida, approximately 55 years old, approximately 5'10" tall and 180 lbs., with blondish hair and blue eyes. On May 3, 2004, the CW identified a photograph obtained from the Arizona Department of Corrections of Gregory Olaf Anderson displayed in an array, as the person the CW knew as "Ole Anderson" and "Lance".

15. The CW stated that "it" used to transport marijuana from Texas to Massachusetts for Joseph Milo and Paul Nicolo. After a while, the CW began investing "its" own money into the marijuana business. The CW started purchasing marijuana from Mark Wojciechowski (the Texas-based marijuana supplier at the time) in addition to what the CW transported to Massachusetts for Milo and Nicolo. One of the individuals the CW sold "its"

8

marijuana to was Jim Anderson in Florida. According to the CW, Jim Anderson used to purchase between 20 and 100 pounds of marijuana from the CW at a time for approximately $900 to $1,000 per pound. On one or more occasions, Anderson actually picked up the marijuana from the CW on behalf of his brother, Jim Anderson. The CW also learned from Anderson that he [Anderson] maintained marijuana customers in New Hampshire and possibly the Virginia area. The CW reported to me that Anderson had long been involved in smuggling marijuana and that Anderson knew that the CW's primary form of income was from the sale of marijuana.

16. Around the time the CW supplied Jim Anderson with marijuana, Anderson purchased a sailboat previously owned by President John F. Kennedy. According to the CW (which the CW learned from Anderson), President Kennedy sailed that boat in races off of Hyannis, Massachusetts. Although the CW did not know how much Anderson paid for the boat, the CW stated that "it" invested approximately $12,000 to $15,000 in cash at Anderson's request. Another person, possibly a doctor or dentist, also invested roughly the same amount. The CW stated that the money "it" and the other investor invested covered the purchase price and materials Anderson used to repair and refurbish the Sailboat.

9

Anderson told the CW that he was going to refurbish the boat and sell it for a significant profit based on the Sailboat's association with President Kennedy and its historical value. The CW understood that "it" and the other investor were each to receive 20 percent of the profit. The CW stated that the money "it" invested was proceeds from "its" marijuana sales to Jim Anderson and other customers. The CW stated that Anderson brought the boat to an auction in New York a few years ago and received a bid of approximately $800,000 for the Sailboat. Anderson turned down the offer, believing that he could sell the boat for $1,000,000 or more. The CW stated that Anderson purchased the boat somewhere on the west coast of Florida and that he has documents authenticating that the Sailboat was once owned by President Kennedy.

17. In or around 2001, the CW lost one of "its" drivers (marijuana transporters) and hired Anderson as a replacement. At the time, the CW was purchasing as much as 3,000 pounds of marijuana from individuals known by the CW as "The Reverend", and "Cowboy" [identified as Michael Twarog] and/or from suppliers known by Mark Wojciechowski [one of whom was identified as Luis Dominguez]. Wojciechowski was a close associate of the CW's and

10

assisted the CW in almost every aspect of the CW's marijuana
business, as well as broker marijuana sales between the CW and
Wojciechowski's suppliers.  The CW could not recall the exact
timing of hiring Anderson but believed it was in the time period
of the CW's transition from buying marijuana from "Cowboy" and
"The Reverend".  The CW stated that "it" negotiated to pay
Anderson a set fee of $40,000 (possibly up to $50,000) per
marijuana load Anderson transported.  The CW also had Edward
Parker driving a second truck (transporting marijuana and money)
for the CW at the time Anderson was hired.  The marijuana the CW
obtained in Arizona was divided into two loads and transported by
Anderson and Parker in two pick-up trucks from Arizona to
Massachusetts.  The CW estimated that Anderson transported
between four and eight loads of marijuana, ranging from
approximately 800 pounds to 1,200 pounds each load, from Arizona
to Massachusetts for the CW.  Anderson's role as one of The CW's
transporters ended when he [Anderson] was arrested by local law
enforcement authorities in Arizona on or about December 3, 2001.
The CW stated that Anderson was stopped shortly after leaving
Tucson with 1,200 pounds of the CW's and Wojciechowski's
marijuana.  The other pick-up truck, driven by Parker,

11

successfully delivered 1,200 pounds of marijuana to the CW in Massachusetts. According to the CW, part of the 1,200 pounds in Anderson's truck was owned by Wojciechowski. It should be noted that Edward Parker was arrested in November 2003, in Iowa, transporting approximately 1,325 pounds of marijuana in the back of a pick-up truck. The CW admitted that the marijuana Parker was transporting at that time was owned by the CW and that Parker was driving it (what the CW believed to be 1,200 pounds) from Arizona to the CW in Massachusetts. Additionally, based on the CW's information and cooperation, Mark Wojciechowski was arrested in Tucson, Arizona in January 2001, transporting approximately 601 pounds of marijuana. Furthermore, Michael Twarog and four others were arrested in Tucson in March 2004, in relation to the seizure of approximately 2,000 pounds of marijuana.

18.    After Anderson was arrested in December 2001, he spoke with the CW and implied that he would inform the police about the CW unless the CW paid him. The CW agreed to pay Anderson [for his silence] and detailed that "it" paid Anderson the $40,000 in United States currency for Anderson's transportation fee, an additional $50,000 cash for Anderson's silence, and Anderson's defense attorney's fee, which was approximately $20,000. The CW

12

also gave up the right to "its" twenty percent share of the profit from Anderson's sale of President Kennedy's Sailboat, as well as other concessions.   The CW had also loaned Jim Anderson approximately $20,000, and forgave that loan on behalf of Anderson.

19.   In or around October or November 2003, the CW was contacted by Anderson.   Anderson had recently been released from prison in Arizona after serving about one year.   During their conversation, Anderson told the CW that he had met and befriended a Mexican National (Anderson did not provide a name) while in prison.   Anderson explained that the Mexican National was part of a large marijuana trafficking organization capable of supplying the CW with marijuana.   Anderson further detailed that the Mexican National would deliver the marijuana to any location in the United States without having to receive the payment until time of delivery, which, at that time, the entire payment would be due.   Anderson told the CW that the Mexican supplier was due to be released from prison in or around the end of March or beginning of April 2004.   The CW told Anderson that "it" was retiring from the marijuana business at which time Anderson asked that the CW turn "its" marijuana customers over to him.

13

20. On May 3, 2004, I and other law enforcement agents met with the CW. During the meeting, the CW stated that "it" had placed a call to "Ole" Anderson (now identified as Gregory Olaf Anderson) on Anderson's cell phone on April 30, 2004. Anderson did not answer and the CW left a message on Anderson's voice-mail. The CW placed another call to Anderson on the morning of May 3, 2004, and had a lengthy conversation with him. In summary, the CW spoke with Anderson about Anderson's Sailboat. Anderson told the CW that the boat's name was "*Flash II*" and that it was built in 1930. The Sailboat is a "Star", which Anderson described as an Olympic class racing Sailboat. Anderson further detailed that President Kennedy and his brother Joe Kennedy purchased the boat in 1934. President Kennedy sold the boat in 1942 just before he shipped out to the Pacific theater during World War II. Anderson also informed the CW that he was storing the boat at the Marblehead Trading Company in Marblehead, Massachusetts. Anderson told the CW that he is still trying to sell the Sailboat and that he is asking $1.2 million for it, although willing to negotiate. Anderson told the CW that he believed he could get $1 million or more based on the sales of other JFK-related items. Anderson stated that he displayed the

14

Sailboat on the deck of the Aircraft Carrier "*John F. Kennedy*" during the tall ships tour in Boston approximately four years ago.  Also during the call, Anderson stated that he was traveling "down there" (which the CW understood from past conversations to mean Cuba) on June 1st and that he didn't think that he would be able to make it to Massachusetts until August.  Anderson stated that he wanted to go to Marblehead to complete some work on the Sailboat in order to prepare it for sale.  The CW and Anderson agreed to contact each other after Anderson returned [from Cuba].  The call between the CW and Anderson on May 3rd was consensually recorded.

21.  On September 27, 2004, the CW met with Anderson in Beverly, Massachusetts.  During their meeting, Anderson told the CW that he had paid the CW back for the CW's cash contribution to the Sailboat.  Anderson said that he paid the CW back for everything the CW had loaned him to originally purchase the Sailboat.  Anderson explained that the CW originally loaned him between $15,000 and $20,000 to purchase the boat and that he [Anderson] paid the CW back over the course of making two "trips" [transporting marijuana] for the CW.  Anderson told the CW that he had made a total of four "trips" [transporting marijuana] for

15

the CW. According to the CW and as detailed earlier, Anderson

transported between 800 pounds to 1,200 pounds of marijuana

(approximately) during each trip for the CW. Anderson told the

CW that he is asking $1.2 million for the Sailboat but is willing

to accept $900,000. During the meeting, Anderson also gave the

CW photo-copies of documents that he [Anderson] said authenticate

the Sailboat having once been owned by President Kennedy. The

documents include news articles, documents from International

Star Class Yacht Racing Association, photographs, a letter dated

August 6, 1997, addressed to Mr. Ole Anderson from United States

Senator Edward M. Kennedy, and a bill of sale documenting that G.

Olaf Anderson purchased the boat from Ouida M. Ehler on August 2,

1996, in consideration of $10.00, and "other good and valuable

consideration." After the meeting, the CW turned these documents

over to me. The CW and Anderson also discussed the possibility

of completing future marijuana business. Anderson told the CW

that he was not successful at contacting the marijuana supplier

he met while serving his prison term in Arizona. Anderson also

said that he still has marijuana customers in New Hampshire and

Florida and asked whether the CW was able to deliver marijuana to

16

Florida.   The meeting between the CW and Anderson on September 27, 2004, was consensually recorded.

22.   On September 28, 2004, the CW spoke with Anderson by telephone.   During their conversation, Anderson told the CW that he originally paid $20,000 for the Sailboat and that the bill of sale only reflects $10.00 because of "tax" reasons.   Anderson also said that he intends to keep the boat stored at the Marblehead Trading Company.   The call between the CW and Anderson on September 28th was consensually recorded.

23.   Based on the facts outlined in this Affidavit, I have probable cause to believe that the Star Class Sloop Sailboat built in 1930 with hull number 721, named "*Flash II*" and once owned by President John F. Kennedy and Joseph P. Kennedy is subject to seizure and forfeiture to the United States pursuant 21 U.S.C. § 881(a)(6) and (b), because it constitutes property constituting or derived from proceeds obtained, directly or indirectly, as the result of violations of Title 21.

GREGG A. WILLOUGHBY
Special Agent
United States Drug Enforcement
Administration

17

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1.  Title of case (name of first party on each side only)  United States of America v. One Star Class Sloop
    Sailboat Built in 1930 with Hull Number 721, Named "FLASH II"

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local
    rule 40.1(a)(1)).

    ___    I.     160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    XX     II.    195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,          Also complete AO 120 or AO 121
                  740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.           for patent, trademark or copyright cases

    ___    III.   110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                  315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                  380, 385, 450, 891.

    ___    IV.    220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
                  690, 810, 861-865, 870, 871, 875, 900.

    ___    V.     150, 152, 153.

3.  Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this
    district please indicate the title and number of the first filed case in this court.

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                             YES ☐          NO ☒

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28
    USC §2403)

                                                             YES ☐          NO ☒

    If so, is the u.s.a. or an officer, agent or employee of the u.s. a party?

                                                             YES ☐          NO ☐

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 usc §2284?

                                                             YES ☐          NO ☒

7.  Do all of the parties in this action, excluding governmental agencies of the united states and the commonwealth of
    massachusetts ("governmental agencies"), residing in massachusetts reside in the same division? - (See local rule 40.1(d)).

                                                             YES ☐          NO ☐
    n/a

        A.     If yes, in which division do all of the non-governmental parties reside?

               Eastern Division ☐         Central Division ☐              Western Division ☐

        B.     If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental
               agencies, residing in Massachusetts reside?

               Eastern Division ☐         Central Division ☐              Western Division ☐

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes,
    submit a separate sheet identifying the motions)
    n/a                                                      YES ☐          NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME  Shelbey D. Wright, Assistant U.S. Attorney

ADDRESS  1 Courthouse Way, Suite 9200, Boston, MA 02210

TELEPHONE NO. (617) 748-3100

(Cover sheet local.wpd - 09/12/02)

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

United States of America v.

## DEFENDANTS

One Star Class Sloop Sailboat Built in 1930 With Hull Number 721, Named "FLASH II"

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Shelbey D. Wright, Assistant U.S. Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA  02210  (617) 748-3100

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

**PERSONAL INJURY**
- ☐ 362 Personal Injury – Med. Malpractice
- ☐ 365 Personal Injury – Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

### PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence
**HABEAS CORPUS:**
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

### FORFEITURE/PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☒ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS – Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Government seeks forfeiture of Defendant Sailboat pursuant to 21 U.S.C. § 881(a)(6).

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE
2/1/05

SIGNATURE OF ATTORNEY OF RECORD
Shelbey D. Wright

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## TRANSMITTAL

FILED
IN CLERK'S OFFICE

Once case is assigned,
please forward to Civil
Docketing, U.S. Attorney's
Office.

U.S. DISTRICT COURT
DISTRICT OF MASS.

**CLERK OF COURT:**

**RE:** __United States of America__ **vs.** __One Star Class Sloop Sailboat Built in__
__1930 with Hull Number 721, Named "FLASH II"__

**PLEASE DESIGNATE:**

Court Number: _____

Date Filed: ___February 1, 2005_._____

Assistant U.S. Attorney: _Shelbey D. Wright_____