UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05 CV 10192 RWZ

UNITED STATES OF AMERICA,

        Plaintiff,

v.

ONE STAR CLASS SLOOP SAILBOAT
BUILT IN 1930 WITH HULL NUMBER 721,
NAMED "*FLASH II*,"

        Defendant.

**MEMORANDUM IN SUPPORT OF CLAIMANT KERRY SCOTT LANE'S
MOTION (I) TO SET ASIDE DEFAULT JUDGMENT OF FORFEITURE AND
(II) FOR LEAVE TO FILE VERIFIED CLAIM AND ANSWER TO COMPLAINT**

Claimant Kerry Scott Lane, M.D. ("Dr. Lane") files this memorandum in support of his

motion pursuant to 18 U.S.C. § 983(e) and Fed. R. Civ. P. 55(c) and 60(b) to set aside default

judgment of forfeiture, and for leave to file a Verified Statement and Answer to the Complaint

pursuant to Rule C(6) of the Supplemental Rules for Certain Admiralty and Maritime Claims

("Supp. Rule").

Dr. Lane's Affidavit filed herewith, together with the purchase receipt and other

documents attached thereto, firmly establish that Dr. Lane is an innocent, and lawful owner of

the subject sailboat named "*Flash II*" (the "Sailboat").  Although Dr. Lane learned that the

Sailboat had been seized in October 2004, he could not come forward at that time; and he had no

notice that the Government subsequently commenced this forfeiture action in February 2005.

Yet, at the time it filed this action, the Government knew that "[a]nother person, possibly a

doctor…," invested money to purchase the Sailboat.  *See Affidavit of Special Agent Gregg A.*

*Willoughby, ¶ 16*.  In light of these mitigating factors, Dr. Lane should not be dispossessed of his valuable interest in the Sailboat by reason of his excusable failure to timely file a Verified Statement and Answer to the Complaint.  Accordingly, the default judgment of forfeiture should be set aside, and leave should be granted to allow Dr. Lane to defend his ownership claim on the merits.

## I.    FACTS AND PROCEDURAL HISTORY

### A.    <u>Facts Establishing Dr. Lane's Lawful Ownership Of The Sailboat</u>

In the Summer of 1996, Dr. Lane was introduced to Gregory "Ole Anderson" via a mutual acquaintance.  *Affidavit of Kerry Scott Lane ("Lane Affidavit"), ¶ 2*.  At the time, Ole Anderson was seeking an investor to purchase and fund the restoration of the Sailboat.  *Lane Affidavit, ¶ 2*.  In exchange for Dr. Lane's financial support, Dr. Lane was to share in the profits of any future sale.  *Lane Affidavit, ¶ 2*.

Later in the Summer of 1996, Dr. Lane, with his then girlfriend, and Ole Anderson, traveled to Fort Lauderdale, Florida, to inspect the Sailboat at a marine emporium known as "Sailorman."[1]  *Lane Affidavit, ¶ 3*.  On or about July 12, 1996, Dr. Lane provided a cashier's check in the amount of $5,000.00 as a deposit for the purchase of the Sailboat.  *Lane Affidavit, ¶ 4; Purchase Receipt, Lane Affidavit, Exhibit 2*.  Dr. Lane subsequently provided a cashier's check in the amount of $20,000.00 toward the purchase of the Sailboat.  *Lane Affidavit, ¶ 4*.[2]

---

[1] Attached to the Lane Affidavit as Exhibit 1 is a copy of a photograph of Dr. Lane (right) standing with Ole Anderson (left) in front of the Sailboat in a storage garage at Sailorman.  A Sailorman sign can be seen in the lower right corner of the photograph.

[2] Dr. Lane has been informed by the East Atlantic Office of Sun Bank, Delray Beach, Florida, that the Bank does not retain copies of checks for longer than seven years.  *Lane Affidavit, ¶ 4*. However, attached to Dr. Lane's Affidavit as Exhibit 3 is a copy of a handwritten agreement dated July 12, 1996, signed by Chuck Fitzgerald, owner of Sailorman.  At a minimum, this

Several days later, Ole Anderson arranged for the delivery of the Sailboat to Dr. Lane's home at 621 Andrews Avenue, Delray Beach, Florida, where it was stored for the next several months before it was delivered for winter storage to the Marblehead Trading Company, in Marblehead, Massachusetts. *Lane Affidavit,* ¶ 5.[3]

Throughout 1997, substantial work was done to restore the Sailboat while it was kept in Marblehead. *Lane Affidavit,* ¶ 6. Dr. Lane invested approximately $50,000.00 toward restoration, shipping, promotions and lodging in connection with his and Ole Anderson's efforts to refurbish the Sailboat and prepare it for sale. *Lane Affidavit,* ¶ 7.

In the Summer of 1997, the Sailboat was displayed at the Museum of Yachting in Newport, Rhode Island. *Lane Affidavit,* ¶ 8; *News Article, Lane Affidavit, Exhibit 4.*

In the Fall of 1999, the Sailboat was taken to the 45th Street Armory in Manhattan to be auctioned. *Lane Affidavit,* ¶ 9. Dr. Lane paid for transportation fees and housing expenses for Ole Anderson and others. *Lane Affidavit,* ¶ 9. The Sailboat failed, however, to meet the minimum reserve. *Lane Affidavit,* ¶ 9.

After the failed auction in 1999, the Sailboat was returned to Dr. Lane's garage in Delray Beach, Florida. *Lane Affidavit,* ¶ 10. In 2000, the Sailboat was shipped to Boston to be exhibited on the aircraft carrier, U.S.S. John F. Kennedy. It was then shipped to Marblehead for storage. *Lane Affidavit,* ¶ 10.

---

document evidences Mr. Fitzgerald's agreement to sell his interest in the Sailboat to Ole Anderson and other investors, including Dr. Lane, for the sum of $22,000.00. Dr. Lane's $20,000.00 check was used at least in part to satisfy the agreement with Mr. Fitzgerald. *Lane Affidavit*, ¶ 4.

[3] Attached as Exhibit 4 to the Lane Affidavit is a photocopy of a photograph of Dr. Lane standing next to the Sailboat at his garage after delivery from Sailorman.

In December 2001, Ole Anderson telephoned Dr. Lane and requested that they meet for lunch. *Lane Affidavit, ¶* 11. During their meeting, Ole Anderson informed Dr. Lane that he was to be incarcerated for drug trafficking. *Lane Affidavit, ¶* 11. Dr. Lane had absolutely no knowledge of Ole Anderson's criminal activities. *Lane Affidavit, ¶* 11. Ole Anderson assured Dr. Lane at that time that the Sailboat would remain safely stored in Marblehead. *Lane Affidavit, ¶* 11.

In October 2004, Ole Anderson telephoned Dr. Lane, and informed him that the Sailboat had been seized from the Marblehead storage facility by the Drug Enforcement Agency. *Lane Affidavit, ¶* 12. Although Ole Anderson offered to identify Dr. Lane as the owner of the Sailboat, Dr. Lane requested that he not be identified at the time because Dr. Lane was about to start a new position at a Massachusetts hospital, and was still in the credentialing process. *Lane Affidavit, ¶* 13. Dr. Lane was afraid that his professional reputation would be damaged by publicity of his unwitting association with a convicted drug trafficker, and he could not risk losing the employment opportunity. *Lane Affidavit, ¶* 13.

Dr. Lane recently discovered that in February and March 2005, unbeknownst to him at the time, the Boston Herald published a Notice of Libel commanding all with interest in the Sailboat to state their claim. *Lane Affidavit, ¶* 14. Although Ole Anderson had earlier alerted Dr. Lane regarding the initial seizure (at a time when Dr. Lane was concerned about revealing his identity), Ole Anderson never informed Dr. Lane that the United States had commenced this action, or that Dr. Lane faced losing his interest in the Sailboat. *Lane Affidavit, ¶* 14. The drug activities giving rise to the boat's seizure and this forfeiture action occurred – by Agent Willoughby's own admission – some time between 2001 and 2004, five to eight years *after* Dr. Lane purchased the Sailboat. *Lane Affidavit, ¶* 15; *Willoughby Affidavit*.

4

In late June 2005, Dr. Lane learned for the first time through a newspaper article that the Sailboat was to be auctioned. *Lane Affidavit, ¶* 16. Dr. Lane retained the undersigned counsel in early July, and instructed counsel to move quickly to restore his lawful interest in the Sailboat. *Lane Affidavit, ¶* 16.

Dr. Lane would have come forward and timely complied with the filing requirements of Supp. Rule C(6) to assert his lawful interest in the Sailboat had he known of the filing of this action. *Lane Affidavit, ¶* 17.

## B.    <u>Procedural History</u>

The United States commenced this forfeiture action on February 1, 2005. According to the docket sheet, the Complaint was served on three putative owners, Ralph Anderson, Ole Anderson, and Harry E. Crosby. Mr. Crosby filed a Verified Statement and Answer on or about March 1, 2005. On May 31, 2005, the Court (Zobel, J.) entered an Order granting the United States' Motion for Entry of Default with respect to Ralph and Ole Anderson. The Clerk entered the defaults on June 3, 2005. Upon motion by the United States, the Court (Zobel, J.) entered Judgment and an Order of Forfeiture on July 15, 2005. The United States and Crosby reached an agreement whereby the United States is to receive two-thirds, and Crosby is to receive one-third, of the sales proceeds. All other possible claimants, including Dr. Lane, are deemed to be in default.

## II.    ARGUMENT

Dr. Lane is entitled to the relief sought pursuant to 18 U.S.C. § 983(e), which provides in relevant part as follows:

> [a]ny person entitled to written notice in any nonjudicial civil
> forfeiture proceeding under a civil forfeiture statute who does not
> receive such notice may file a motion to set aside a declaration of

> forfeiture with respect to that person's interest in the property,
> which motion shall be granted if (A) the Government knew, or
> reasonably should have known, of the moving party's interest and
> failed to take reasonable steps to provide such party with notice;
> and (B) the moving party did not know or have reason to know of
> the seizure within sufficient time to file a timely claim.

18 U.S.C. § 983(e)(1). Here, the Government knew that another person (a doctor or dentist)

contributed funds to purchase the Sailboat. *See Affidavit of Special Agent Gregg A. Willoughby,*

*¶ 16.* Nonetheless, the Government failed to take reasonable steps to provide Dr. Lane with

written notice of the commencement of civil forfeiture proceedings. Special Agent

Willoughby's Affidavit filed in support of the forfeiture Complaint fails to indicate what, if any,

steps were taken to obtain Dr. Lane's identity, or whether any reasonable effort was made to

locate him. "Notice by publication is not sufficient with respect to an individual whose name

and address are known or easily ascertainable." *Garcia v. Meza*, 235 F.3d 287, 292 (7th Cir.

2000) (quoting *Robinson v. Hanrahan*, 409 U.S. 38, 40 (1972)).

Although Dr. Lane learned from Mr. Anderson that the Sailboat had been seized in

October 2004, he could not come forward at that time for fear of losing his employment

opportunity. Thus, because Dr. Lane had no knowledge that the Government had commenced

this action in February 2005, he did not have sufficient time to file a timely claim. In light of

these mitigating circumstances, the declaration of forfeiture should therefore be set aside in

accordance with 18 U.S.C. 983(e).

Dr. Lane further seeks relief from entry of a default judgment in accordance with Fed. R.

Civ. P. 55(c) and 60(b). *See United States v. $23,000 in United States Currency*, 356 F.3d 157,

164 (1ˢᵗ Cir. 2004) (application of Rules 55(c) and 60(b) to set aside default judgment in civil

forfeiture action). Rule 55(c) provides that "[f]or good cause shown the court may set aside an

entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b)."  Rule 60(b)(1), the provision relevant here, "allows the court, where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control."  *United States v. $23,000 in United States Currency*, 356 F.3d 157, 164 (1st Cir. 2004) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'Ship*, 507 U.S. 380 (1993)).  "[W]hile other factors play an important role in the 'excusable neglect' analysis, the reason-for-delay factor will always be critical to the inquiry…"  *United States*, 356 F.3d at 164 (quoting *Hospital Del Maestro v. Nat'l Labor Relations Bd.*, 263 F.3d 173, 175 (1st Cir. 2001)).[4]

In *Flush-Metal*, the Court relieved a claimant from the harsh consequences of a default judgment notwithstanding his failure to timely file a verified statement and answer pursuant to Supp. Rule C(6).  The claimant, Mr. Wu, plead guilty to a charge of manufacturing drug paraphernalia.  Unlike Dr. Lane, Mr. Wu actually received notice of the forfeiture complaint brought against his bank accounts, but claimed that he did not respond to the complaint by filing a verified statement or answer because he was "preoccupied with the then-pending criminal action and with the prospect of losing his personal liberty and neglected to mention to his lawyer that he was served in the forfeiture action the day after his arrest.  Wu point[ed] out further that he [was] not fluent in English and as a result did not understand the nature of the forfeiture case."  *Id*. at *4.  On the basis of these mitigating factors, the Court found "that Wu's default was

---

[4] As a threshold matter, Dr. Lane has standing to bring this motion despite his excusable failure to file the appropriate documents in light of his undeniable ownership interest in the Sailboat. *See United States of America for the Use of Flush-Metal Partition Co., Inc. v. Bank of New York*, 1991 U.S. Dist. LEXIS 18269 ("*Flush-Metal"*) (citing *Mercado v. The U.S. Customs Service*, 873 F.2d 641 (2nd Cir. 1989)).

not willful, but the result of excusable neglect." *Id*. at *5. The Court found no prejudice to the government having determined that Wu presented meritorious defenses to the forfeiture complaint with regard to certain of the seized bank accounts.

In the case at bar, the United States plainly will not be prejudiced by the allowance of Dr. Lane's motion; and the policies underlying the time limitations of Rule C(6) will not be thwarted. Dr. Lane is certain to succeed on the merits of his defenses. There can be no question that Dr. Lane has a lawful ownership interest in the Sailboat.[5] Furthermore, Dr. Lane's ownership interest (that of a doctor or dentist) was made known to Special Agent Willoughby. *See Willoughby Affidavit*, ¶ 16. Like Mr. Wu, Dr. Lane was concerned by events in his life that strongly militated against coming forward when he first learned that the Sailboat had been seized. At that point in time, well before the United States filed this action, Dr. Lane could not risk jeopardizing his hospital employment through publicity of his unwitting association with a convicted drug trafficker.

For reasons known only to Ole Anderson, Anderson failed to subsequently alert Dr. Lane to the filing of the Complaint, and never told Dr. Lane that his rights in the Sailboat could be lost. Unlike Mr. Wu who received notice of the Complaint against his bank accounts but sat on his hands, Dr. Lane never had the opportunity to take appropriate and timely action. Notice by publication in the Boston Herald failed to reach Dr. Lane, and he should not be dispossessed of his interest in the Sailboat on the basis of his failure to stumble across that notice in the light of

---

[5] The Associated Press reported on July 20, 2005, that Mr. Crosby, the only other claimant to come forward, purportedly paid only $10,000 for a share of the Sailboat. In light of Dr. Lane's substantial financial contribution toward the purchase and restoration of the Sailboat totaling approximately $70,000.00, the one-third interest in the sales proceeds granted to Mr. Crosby under the terms of his settlement with the United States constitutes a gross financial windfall to which Mr. Crosby plainly is not entitled.

his meritorious defenses to the Complaint, and the significant mitigating factors underlying his delay in coming forward. Dr. Lane's effort to bring this motion promptly after learning about this action is further evidence that he would have timely responded in accordance with Rule C(6) had he known to do so.

In light of these factors, and the general policy favoring hearings on the merits over default judgments, *see Wright & Miller* § 2857, at 159, this Court should find that Dr. Lane's default was not willful, but the result of excusable neglect. Leave should therefore be granted allowing Dr. Lane to file the appropriate papers in accordance with Supp. Rule C(6). "Nothing in [Rule C(6)] imposes a time limit on the exercise of [the Court's] discretion" to grant Dr. Lane's request for additional time to respond to the Government's Complaint. S*ee United States of America v. 1982 Yukon Delta Houseboat, et al.*, 774 F.2d 1432, 1435-36 (9th Cir. 1985).

## III.    CONCLUSION

For the above reasons, claimant Kerry Scott Lane, M.D. respectfully requests the Court to set aside the default judgment of forfeiture, void the parties' Stipulation of Settlement, and grant Dr. Lane leave to file a Verified Statement and Answer in accordance with Supp. Rule C(6).

Respectfully submitted,
Kerry Scott Lane, M.D.,
By his attorneys,


_____s/Eric B. Goldberg_____
Jeffrey P. Allen (BBO# 015500)
Eric B. Goldberg (BBO# 564398)
Seegel Lipshutz & Wilchins, P.C.
Wellesley Office Park
20 William Street, Suite 130
Wellesley, MA 02481
Dated:  July 27, 2005                                   (781) 237-4400

9

## <u>CERTIFICATE OF SERVICE</u>

I, Eric B. Goldberg, do hereby certify that I have this 27th day of July, 2005, served the foregoing, via first class mail, postage prepaid, to the counsel of record listed below:

Shelbey D. Wright, Esq.
Assistant U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA 02210

J. Thomas Kerner, Esq.
230 Commercial Street
First Floor
Boston, MA 02109

_____s/Eric B. Goldberg_____
Eric B. Goldberg

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05 CV 10192 RWZ

UNITED STATES OF AMERICA,

        Plaintiff,

v.

ONE STAR CLASS SLOOP SAILBOAT
BUILT IN 1930 WITH HULL NUMBER 721,
NAMED "*FLASH II*,"

        Defendant.

## <u>AFFIDAVIT OF KERRY SCOTT LANE, M.D.</u>

I, Kerry Scott Lane, M.D., do under oath depose and say as follows:

1.      I reside at 750 Davol Street, Apt. 924, Fall River, Massachusetts. I make this affidavit based upon personal knowledge in support of my claim of ownership of the subject sailboat, *Flash II* (the "Sailboat").

2.      In the Summer of 1996, I was introduced to Gregory "Ole Anderson" via a mutual acquaintance. At the time, Ole Anderson was seeking an investor to purchase and fund the restoration of the Sailboat. It was agreed at the outset that in exchange for my financial support, I would share in the profits of any future sale.

3.      Later in the Summer of 1996, I traveled with my then girlfriend and Ole Anderson to Fort Lauderdale, Florida, to inspect the Sailboat at a marine emporium known as "Sailorman." Attached as Exhibit 1 is a true and accurate copy of a photograph of me (right) standing with Ole

1

Anderson (left) in front of the Sailboat in a storage garage at Sailorman. A Sailorman sign can be seen in the lower right corner of the photograph.

4.     On or about July 12, 1996, I provided a cashier's check in the amount of $5,000.00 as a deposit for the purchase of the Sailboat. Attached as Exhibit 2 is a true copy of a Sailorman invoice dated July 12, 1996, confirming Sailorman's receipt of my $5000.00 payment. I subsequently provided a cashier's check in the amount of $20,000.00 toward the purchase of the Sailboat. I am informed by the East Atlantic Office of Sun Bank, Delray Beach, Florida, that the Bank does not retain copies of checks for longer than seven years. However, attached hereto as Exhibit 3 is a true copy of a handwritten agreement dated July 12, 1996, signed by Chuck Fitzgerald, owner of Sailorman, memorializing Mr. Fitzgerald's agreement to sell his interest in the Sailboat to Ole Anderson and other investors, including myself, for the sum of $22,000.00. It is my recollection at this time that my $20,000.00 check was used at least in part to satisfy the agreement with Mr. Fitzgerald.

5.     Several days later, Ole Anderson arranged for the delivery of the Sailboat to my home at 621 Andrews Avenue, Delray Beach, Florida, where it was stored for the next several months before it was delivered for winter storage to the Marblehead Trading Company, in Marblehead, Massachusetts. Attached as Exhibit 4 is a true and accurate copy of a photograph of myself standing next to the Sailboat in my garage after delivery from Sailorman.

6.     Throughout 1997, substantial work was done to restore the Sailboat while it was kept in Marblehead.

2

7.    I invested approximately $50,000.00 toward restoration, shipping, promotions and lodging in connection with my and Ole Anderson's efforts to refurbish the Sailboat and prepare it for sale. I am diligently searching for canceled checks relating to these payments.

8.    In the Summer of 1997, the Sailboat was displayed at the Museum of Yachting in Newport, Rhode Island. Attached as Exhibit 5 is an August 1997 Associated Press article appearing in *SouthCoast Today* reporting that the Sailboat would be on display at the Museum.

9.    In the Fall of 1999, the Sailboat was taken to the 45th Street Armory in Manhattan where it was to be auctioned. I paid for transportation fees and housing expenses for Ole Anderson and others. The Sailboat failed to meet the minimum reserve, however.

10.    After the failed auction in 1999, the Sailboat was returned to my garage in Delray Beach, Florida. In 2000, the Sailboat was shipped to Boston to be exhibited on the aircraft carrier, U.S.S. John F. Kennedy. It was then shipped to Marblehead for storage.

11.    In December 2001, Ole Anderson telephoned me, and requested that we meet for lunch. During their meeting, Ole Anderson informed me that he was to be incarcerated for drug trafficking. I had absolutely no knowledge of Ole Anderson's criminal activities. Ole Anderson assured me at that time that the Sailboat would remain safely stored in Marblehead.

12.    In October 2004, Ole Anderson telephoned me, and informed me that the Sailboat had been seized from the Marblehead storage facility by the Drug Enforcement Agency.

13.    Although Ole Anderson offered to identify me as the owner of the Sailboat, I requested that he not do so at the time because I was about to start a new position at a Massachusetts hospital, and I was still in the credentialing process. I was afraid that my

3

professional reputation would be damaged by publicity of my unwitting association with a convicted drug trafficker, and I could not risk losing the employment opportunity.

14.     I recently discovered that in February and March of 2005, unbeknownst to me at the time, the Boston Herald published a Notice of Libel commanding all with interest in the Sailboat to state their claim. Ole Anderson never informed me that the United States had commenced this action, or that I faced losing my interest in the Sailboat.

15.     The drug activities giving rise to the boat's seizure and this forfeiture action occurred – by Agent Willoughby's own admission – some time between 2001 and 2004, five to eight years *after* I provided Ole Anderson with the funds needed to buy and restore the Sailboat.

16.     In late June 2005, I learned for the first time through a newspaper article that the Sailboat was to be auctioned. I retained an attorney in early July, and I instructed counsel to move as quickly as possible to restore my lawful interest in the Sailboat.

17.     I would have come forward and timely complied with the filing requirements to assert my lawful interest in the Sailboat had I known of the filing of this action.

SIGNED UNDER THE PENALTIES OF PERJURY THIS __29th__ DAY OF JULY, 2005

_Kerry Scott Lane MD_

Kerry Scott Lane, M.D.

# EXHIBIT 1



# EXHIBIT 2

# SAILORMAN

350 East State Road 84
FORT LAUDERDALE, FLORIDA 33316
(954) 522-6716
FAX (954) 760-7686
1-800-523-0772

| CUSTOMER'S ORDER NO. | | PHONE | | | DATE 7/12/96 |
|---|---|---|---|---|---|
| NAME | | | | | |
| ADDRESS | | | | | |
| CITY | | STATE | | ZIP | |

| SOLD BY | CASH | C.O.D. | CHARGE | ON ACCT. | MDSE. RET'D | PAID OUT | REPAIR |
|---|---|---|---|---|---|---|---|

| QTY. | PART NO. | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|---|
| | | received from Kerry Scott | | |
| | | cashiers check # 1767 | | |
| | | for $5000.00 | | |
| | | received from Gregory C. Anderson | | |
| | | cashier's check # 1767 | | |
| | | $5000.00 | | |

No return on new items after 14 days and used items after 3 days

RECEIVED BY _____

TAX

TOTAL

All claims and returned goods
MUST be accompanied by this bill.

*Thank You!*

# EXHIBIT 3

I, Chuck Fitzgerald, have agreed to sell my interest in the Star Class Boat, # 721, to the Consortium headed by Ole Anderson for the sum of $22,000.

I will hold all monies paid to me by Mr. Anderson, or the Consortium members, until July 26, 1996. If AT THAT TIME MR. Anderson and the Consortium have not paid me the entire $22,000, I will refund All money paid & held by me to MR. Anderson and the members of the Consortium.

7/12/96

# EXHIBIT 4



# EXHIBIT 5

Go see a Play or a Comedy or a ...



# Kennedy boat comes to Museum of Yachting

*By The Associated Press*
     NEWPORT, R.I. -- A sailboat owned for six years by John F. Kennedy has come to the Museum of Yachting.

     Kennedy's Star Class sailboat will be on display inside until the end of the month.
     The Flash II was built in 1930 by H.B. Atkin of Long Island, N.Y., who sailed it for three years. In 1934, the builder sold the boat to Kennedy and his brother Joseph P. Kennedy Jr.

     The brothers sailed the boat until 1940. Joseph was killed in 1944 during World War II and the boat was sold to a sailor in Maine.
     The sailboat changed hands three more times, always remaining registered in the Northeast, before the late D. William Ehler registered with the Tampa Bay fleet in 1964. Ehler reportedly paid $300 for the boat.
     Three years after Kennedy was assassinated, Boston lawyer Joseph Gargin, a close advisor to the Kennedy family, inquired about buying the Starr Class boat in the family's name.
     "When we had to inform them that this was not the boat in which John F. Kennedy had once created a sensation by winning a race of the Atlantic Coast Championship by four minutes, they lost interest," wrote C. Stanley Oglivy, executive vice president of the Starr Class association in 1966.
     From 1972 to 1996, when Ehler died, the boat languished in a shed.
     Last year, Ole Anderson of Delray Beach, Fla., bought the boat at auction for $19,800, according to a report in Soundings, a national boating magazine.
     A buyer and restorer of collectible cars, Anderson told Soundings that he spent $60,000 removing layers of fiberglass and replacing rotted wood.
     Anderson wants to sell the boat for more than the $772,500 Arnold Schwarzenegger paid at auction for a set of President Kennedy's golf clubs.
     The boat arrived two weekends ago by trailer.
     The museum is known for restoring historically important vessels and sailing them whenever possible, but it's unlikely the museum will ever own or sail Flash II again.
     "The owner has no intention of putting the boat in the water," says museum spokesman Matt Gineo.

| -Top- | -Home- | -Digest- | -Index- | -Staff- | **new**Stan |
|-------|--------|----------|---------|---------|-------------|
| • Please mail any comments to Newsroom@S-T.com | | | | | |

http://www.southcoasttoday.com/daily/08-97/08-19-97/a03sr018.htm      7/21/2005