UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          |
                                   |
                    Plaintiff,     |
              v.                   |          Civil Action # 05-10192 RWZ
                                   |
ONE STAR CLASS SLOOP SAILBOAT      |
BUILT IN 1930 WITH HULL NUMBER     |
721, NAMED "FLASH II",             |
                                   |
                    Defendant.     |
_____|
                                   |
KERRY SCOTT LANE,                  |
                                   |
                    Claimant.      |
_____|

**CLAIMANT'S MOTION FOR LEAVE TO FILE A REPLY TO
THE GOVERNMENT'S OPPOSITION TO
CLAIMANT'S RULE 59(e) MOTION TO ALTER/AMEND
ORDER DENYING HIS MOTION TO VACATE DEFAULT JUDGMENT**

Claimant, Kerry Lane, M.D., through undersigned counsel, hereby requests leave to file the attached reply brief and exhibits, pursuant to Local Rule 7.1(b)(3).

The reply memorandum is made necessary by the fact that the government's opposition misconstrues Claimant's argument, and fails to address the key issue: what efforts, if any, it took to locate Dr. Lane and serve process upon him. Claimant's reply and its exhibits contain recently uncovered evidence and leads the government should have followed in attempting to locate Dr. Lane. Because Claimant's counsel have been so pressed for time to move to vacate the default judgment, and then to move to alter/amend the order denying that motion, their investigation did not bear fruit earlier.

Claimant also notes that in his Reply, he asks the Court to allow him to conduct

1

discovery of the issues of what efforts, if any, the government made to locate him.  He also notes

that, since he intends to appeal if this motion is denied, it will best serve the interests of judicial

economy to fully develop the factual record now, rather than require a remand for this purpose.

Pursuant to Local Rule 7.1(a)(2), Claimant has faxed letters to opposing counsel, stating

that he intended to file this motion for leave to file a reply, and that if his attorney Eric Goldberg

did not hear from them by 10:00 a.m. this morning he would assume that they objected.  Time

being of the essence, Claimant has proceeded in the filing of this motion.

                              Respectfully submitted,
                              Kerry Scott Lane, MD,

                              By his attorneys,


                              _____ s/Eric B. Goldberg
                              Jeffrey P. Allen (BBO# 015500)
                              Eric B. Goldberg (BBO# 564398)
                              Seegel Lipshutz & Wilchins, P.C.
                              Wellesley Office Park
                              20 William Street, Suite 130
                              Wellesley, MA 02481
                              (781) 237-4400

                              Brenda Grantland, Esq.
                              Law Office of Brenda Grantland
                              20 Sunnyside Suite A-204
                              Mill Valley, CA 94941
                              (415) 380-9108
                              (Pro hac vice application pending)

## CERTIFICATE OF SERVICE

I, Eric B. Goldberg, do hereby certify that I have electronically served the foregoing on
the counsel of record listed below:

Shelbey D. Wright, Esq.
Assistant U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA 02210

2

J. Thomas Kerner, Esq.
230 Commercial Street
First Floor
Boston, MA 02109

s/Eric B. Goldberg

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Civil Action # 05-10192 RWZ |
| ONE STAR CLASS SLOOP SAILBOAT BUILT IN 1930 WITH HULL NUMBER 721, NAMED "FLASH II", | |
| Defendant. | |
| KERRY SCOTT LANE, | |
| Claimant. | |

**POINTS AND AUTHORITIES IN REPLY TO
THE GOVERNMENT'S OPPOSITION TO
CLAIMANT'S RULE 59(e) MOTION TO ALTER/AMEND
ORDER DENYING HIS MOTION TO VACATE DEFAULT JUDGMENT**

Claimant, Kerry Lane, M.D., replies to the government's Opposition to his Motion to Alter/Amend as follows:

The government's Opposition to Claimant's Rule 59(e) motion was filed a day late, and without an accompanying motion for leave to late file. Counsel for the government did not contact Claimant's counsel to request an extension of time or to seek consent to the late filing. For that reason alone, the court should disregard the Opposition and rule in Claimant's favor.

Even if the Opposition is considered on its merits, however, it is not persuasive.

Once again the government mis-characterizes the facts and Claimant's arguments. The government argues on page 1 that Claimant has not demonstrated excusable neglect. However,

1

Claimant's Motion to Alter/Amend relies primarily on Rule 60(b)(4) ("the judgment is void"), and secondarily on Rule 60(b)(1) ("surprise").  If Dr. Lane had been served with the complaint and failed to timely file an answer, he would have had to show excusable neglect – but not when the judgment is void for lack of Due Process notice.  By relying on the excusable neglect standard, the government tries to shift the burden to the Claimant, when in fact they have the burden of showing they made reasonable efforts to locate him and serve process on him.   Also on page 1 the government argues Dr. Lane "purposefully disregarded his *obligation* to come forward with a claim... until well after the deadlines set forth in Rule C(6)."  In fact, the obligation to come forward with a claim does not arise until after the government has given Constitutionally sufficient notice.

On page 2, the government again mis-characterizes its burden of giving Constitutionally sufficient notice, implying that "notice of the government's intention to forfeit" would suffice. The First Circuit made it clear in *United States v. Gonzalez-Gonzalez*, 257 F.3d 31 (1st Cir. 2001) that the government must give notice of the actual forfeiture proceedings, once they are commenced, and that merely giving notice that they intended to file forfeiture proceedings later would not suffice.  Certainly in a garden variety tort case, telling someone "I'm going to sue" does not substitute for serving process on them once the suit is filed, and certainly would not entitle the plaintiff to a default judgment.

Until the claimant receives notice of actual pending forfeiture proceedings, he cannot be expected to guess which court it would be filed in, or what the case number is, or what the deadline for responding to the lawsuit would be.  Without this information he would lack the information needed to file a claim and answer to the complaint.

The government claims on page 2 that "the evidence is undisputed that the government knew only that there may be another interested party, but did not know that party's identity or whereabouts." That is not true. The government has not submitted any evidence to support that contention – and Claimant adamantly disputes it. The central factual dispute in this case is whether the government conducted a reasonable investigation to locate him and serve him process. Claimant contended in his Rule 59(e) motion that had the government scratched the surface of the leads known to them they would have found Dr. Lane. As Claimant shows below, there are numerous trails that should have led to Dr. Lane's identity, had the government bothered to explore them. See part II below.

The government also mis-characterizes the facts on pages 2-3 by labeling Dr. Lane an "unknown party" and his interest in the sailboat "unidentified ownership interests." Page 9 of the Complaint shows the government knew of the doctor's interest in the sailboat. It has not revealed what efforts, if any, it took to discover his name and whereabouts and serve him process.

## ARGUMENT

The central issue in this case is whether the government gave Dr. Lane constitutionally adequate notice. As Claimant stated in his Motion to Alter/Amend:

> It is axiomatic that valid service of process must be obtained before a default or default judgment may be entered. *Maryland State Firemen's Ass'n v. Chaves*, 166 F.R.D. 353, 354 (D.Md. 1996). In forfeiture cases, as in garden variety civil cases, if the notice given turns out to be insufficient under the Due Process clause or relevant statutes or court rules, the judgment of forfeiture is void. *United States v. Giraldo*, 45 F.3d 509, 512 (1st Cir. 1995). Void forfeitures must be set aside under Rule 60(b)(4).
>
> Under the forfeiture statutes and case law, a person whose interest in the property is known to the government is entitled to actual service of the complaint, and

3

mere published notice will not suffice unless the government demonstrates that it has exhausted all reasonable avenues in the attempt to locate and serve the interested party. The Dept. of Justice acknowledges this in its forfeiture manual:

> To satisfy due process, *notice must be "reasonably calculated" to apprize interested parties of the pendency of the action*; to satisfy [19 U.S.C. §] 1607, notice must be published for three successive weeks and *written notice must be sent to any person appearing to have an interest in the property*.

*Civil and Criminal Forfeiture Procedure*, p. I-18 (emphasis added). "[F]ailure to send notice to person appearing to have an interest in the property violates due process." *Id*., citing *United States v. Marolf*, 973 F.Supp. 1139 (C.D. Cal. 1997).

Motion to Alter/Amend p. 6.

**I. Dr. Lane was "a person appearing to have an interest in the property" and thus was entitled to service of process if his whereabouts could be ascertained with reasonable effort**

The Affidavit of Special Agent Gregg A. Willoughby, incorporated in the forfeiture complaint, acknowledged that at least one other person "possibly a doctor or dentist, also invested [in the sailboat]." Complaint p. 9. This information came from the government's own confidential informant (CI). This put the government on notice that at least one other person owned interests in the sailboat, and created a duty to take reasonable efforts to locate them and serve them with process in the forfeiture case. To constitute "reasonable efforts" – "[t]he means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 313-14 (1950).

4

**II.   The government did not make reasonable efforts to locate Dr. Lane and serve him with process – or else they would have found him**

**A.   The government cannot rely upon Anderson to notify the other co-owners**

The DOJ manual acknowledges that it is the government's duty to provide "notice of the pendency of the action" – not merely notice of its intention to file forfeiture proceedings later. *Civil and Criminal Forfeiture Procedure*, U.S. Dept. of Justice, Asset Forfeiture and Money Laundering Section (January 2004), p. I-20 ("there is no due process violation if claimant had actual notice, but Government must show he had notice of the forfeiture proceeding, not just notice of the seizure.")  Thus, the "actual notice" the government relies upon – the October 14, 2004 phone call from Anderson – *which occurred four months before the forfeiture proceedings were filed* – could not arguably suffice.

Case law is clear: service of process on one claimant does not excuse the failure to serve notice on other claimants believed to have an interest in the property, especially when the person given notice may "have an interest in not informing the owner."  *Towers v. City of Chicago*, 173 F.3d 619, 628-29 (7th Cir. 1999).  See also *Schluga v. City of Milwaukee*, 101 F.3d 60, 62 (7th Cir. 1996) (due process was violated when the government knows who the real owner is, and knows the record owner may not notify the real owner, yet only gives notice to the record owner.)

If Anderson was actually given notice of the forfeiture proceedings,[1] the government had

---

[1]  The record shows service of process of the judicial forfeiture Complaint was made upon Anderson by certified mail.  However, the February 18, 2005 return receipt was signed by Bernice Byrd – not Ole Anderson.  See exhibits to Government's Motion for Default page 10.

every reason to know it did not serve Anderson's self interest to notify Dr. Lane and the other investors.

If – as the government claims – Anderson declined to identify Dr. Lane to them, that means Anderson must have met with the DEA or prosecutors after the sailboat was seized.  If so, this suggests Anderson was trying to cut a deal with the federal prosecutors to avoid criminal prosecution for the drug trafficking activity with the CI, mentioned in the Complaint.  If Anderson was attempting to extricate himself from federal authorities by cooperating with them, he would have a huge interest in ensuring that the other co-owners not be given notice.  After all, the larger the pool of funds the government would recover from the forfeiture of the sailboat, the more likely Anderson would be given leniency, or not prosecuted, for his new offense.

### B.    Dr. Lane's failure to come forward earlier does not excuse the government from its failure to give him notice

The government's attitude that, since Dr. Lane did not come forward and contact DEA or the U.S. Attorney's Office on his own, it could skip over its responsibility of trying to locate and serve him ignores standard operating procedures.  The fact that the person did not come forward and identify himself does not substitute for the requirement that the government serve notice of the forfeiture proceedings, and give owners of interests in the property the right to be heard before judgment is entered.

Courts have even required the government to make reasonable efforts to serve notice on fugitives from justice.

Even fugitives may be entitled to efforts at personal notice.  See *United States v. Rodgers, 108 F.3d 1247, 1253-54 (10th Cir. 1997)* (declaring attempted notice to

fugitive unreasonable when sent to invalid address and not sent to known residence).

*Gonzalez-Gonzalez*, 257 F.3d at 36:

Case law requires the government to check DMV records and other public records databases – including the rolls of prisoners in government custody – looking for the names and addresses of the people who they believe might own interests. In this day and age, the internet is another source commonly used by someone desirous of actually locating a person.

### C. It is not too late for Dr. Lane to come forward and assert his interest

The government implies on page 1 of its Opposition that since Dr. Lane did not come forward and claim his interest within the deadlines allowed for persons actually given constitutionally adequate notice, then it was too late for him to come forward now. That is certainly not the case. There would be no need for a Civil Rule 60(b) if motions to vacate default judgments would be too late if filed after the default. Rule 60(b) gives defaulting parties a reasonable time, up to one year, to come forward and seek to vacate the default. However, there is no deadline if the judgment is void for failure to give constitutionally adequate notice. *United States v. One Toshiba Color TV*, 213 F.3d 147 (3rd Cir. 2000).

In *United States v. Marolf*, 173 F.3d 1213 (9th Cir. 1999), a claimant challenging the constitutional adequacy of an administrative forfeiture notice, filed his motion for the return of property five years after the seizure of the property, and after the government's statute of limitations had run for forfeiting the property. Marolf received payment for the fair market value of his property plus attorneys fees under the Equal Access to Justice Act. *United States v.*

*Marolf*, 277 F.3d 1156 (9th Cir. 2001) (the government's conduct in failing to give notice to

Marolf was unjustified and was itself a sufficient basis to support the fee award.)

If five years is not an unreasonable delay, certainly Dr. Lane's Rule 60(b) motion – filed

only eight days after the default judgment was entered – was filed within a reasonable time.

**III.   The government had many leads they could have explored to identify and locate Dr.
Lane, but did not bother investigating them**

There were many avenues the government should have explored, if they were "desirous

of actually informing" the "doctor or dentist" identified by the CI as a co-owner of the sailboat.

It does not appear that the government made any efforts at all – much less "reasonable efforts" to

locate the co-owners of the seized sailboat.

The Complaint itself contains clues which would have led to Dr. Lane's identity had the

government conducted a reasonable investigation.

The Complaint states that on September 27, 2004, while cooperating with the agent to set

up Anderson, the CI obtained certain documents from Anderson, including a bill of sale dated

August 2, 1996 showing the boat was purchased at the auction from Ouida M. Ehler.  Claimant's

investigation shows that the auction generated a lot of publicity, including AP and UPI wire

service articles.  See Ex. A, Affidavit of Chuck Fitzgerald, paragraph 7; Ex. B, AP article

"Dealer wins JFK Sailboat With $18,500 Bid at Auction"; Ex. C, AP article "Boat that JFK

Sailed As Teen Gets New Owner."  All three of these articles state that the buyer of the sailboat

at the auction was Chuck Fitzgerald at Sailorman Used Marine Gear Emporium in Ft.

Lauderdale, Florida.  Had the government contacted Sailorman, the trail would have led directly

to Dr. Kerry Lane.

The CI himself was a source of information that should have led to Dr. Lane. The Complaint states that the CI, at one time at least, owned an interest in the boat, although the facts are unclear whether it was an ownership interest or an unsecured lien. If the CI had an interest in the boat after 1997, he should have periodically received the same documents from Ole Anderson that Dr. Lane received.

Of particular evidentiary value is the handwritten contract signed by Ole Anderson dated 12/4/1997 – Exhibit D. This document shows the relative interests in the property owned by various investors as of 12/4/1997. At that time, this sailboat was put up for auction – with the knowledge and consent of the investors, who expected to share the profits if it sold. Before the anticipated auction, Anderson negotiated a complex agreement with all of the investors, and drew up Exhibit D, showing what portion of the proceeds of sale each person would get. See Exhibit D. Dr. Lane got a copy of this document, as, presumably, everybody else did. If the CI owned an interest in the sailboat in December, 1997, he should have received this document too.

Eddie Crosby, the claimant who was actually served process in this case, is listed Ex. D. It is clear from the tenor of the language in the document, particularly paragraphs E and F on the second page, that both Eddie Crosby and Kerry Lane were involved in negotiating the terms of this document, to safeguard their competing interests. Clearly Crosby would have insisted on having a copy of this document.

It is not known what documents Crosby provided the government to prove his interest in the sailboat, but certainly this would have been the best evidence of the various shares as of

9

12/4/97. Since this document clearly notes Kerry Lane's name and his share of the investment, Crosby knew of Dr. Lane's identity.

Claimant's counsel contacted attorney Robert Harper, who acted as an agent in the proposed sale of the boat in 1997, and he remembered seeing a document signed by Anderson, naming the persons who owned interests in the sailboat and stating the formula for allocating the proceeds of the sale among them. Robert Harper was also Ole Anderson's attorney – for a number of years, including 2004, when the boat was seized. Had the government contacted Harper and asked for information about the other owners of the sailboat, Harper could have retrieved his file from storage (as he has promised to do for us).

The government has not submitted a single affidavit attesting to the efforts it employed to locate the other co-owners of this sailboat. Since Claimant is challenging the Constitutional sufficiency of notice, the government has the burden of proving that the efforts it made to locate Dr. Lane were constitutionally sufficient. The government's failure to detail its efforts to locate this doctor or dentist that the CI identified as a co-owner suggests that the efforts were minimal – or that agents ignored obvious clues.

If the Court does not vacate the default judgment, Claimant intends to appeal. In order to develop the record for appeal, Claimant seeks discovery on the factual issues regarding the government's efforts to obtain notice.

Respectfully submitted,
Kerry Scott Lane, MD,

By his attorneys,

10

          s/Eric B. Goldberg
Jeffrey P. Allen (BBO# 015500)
Eric B. Goldberg (BBO# 564398)
Seegel Lipshutz & Wilchins, P.C.
Wellesley Office Park
20 William Street, Suite 130
Wellesley, MA 02481
(781) 237-4400

Brenda Grantland, Esq.
Law Office of Brenda Grantland
20 Sunnyside Suite A-204
Mill Valley, CA 94941
(415) 380-9108
(Pro hac vice application pending)

Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

        Plaintiff,

v.

ONE STAR CLASS SLOOP SAILBOAT
BUILT IN 1930 WITH HULL NUMBER
721, NAMED "FLASH II",

        Defendant.

KERRY SCOTT LANE, M.D.,

        Claimant.

Civil Action # 05-10192 RWZ

## AFFIDAVIT OF CHUCK FITZGERALD

I, Chuck Fitzgerald, do under oath depose and say as follows:

1. I am the owner of Sailorman New and Used Marine Emporium, Ft. Lauderdale,

Florida.

2. I currently own a 1% interest in the sailboat "Flash II." My interest in the sailboat

dates back to the purchase of the sailboat at the auction in June 1996.

3. I first heard about the pending auction of the sailboat when Ole Anderson came to me

with an ad in from the Miami Herald saying the JFK Star boat was going up for auction in the

Florida Panhandle. Anderson asked me if I would invest $10,000 to buy the boat. That $10,000

he requested later turned out to be a request for $11,000 to bid on the boat. The original

agreement was that Anderson would go to the auction and buy it for $11,000 or less, and we

1

would fix it up and resell it. In return I would get three times my investment back and then half of anything beyond that. Anderson would get the other half.

4. Anderson did not invest any of his own money in the sailboat at that time. He didn't have any money. I did not go to the auction with Anderson. On his way to the auction, Anderson spent the night in an attorney's house on the West Coast of Florida - around Sarasota. Anderson was concerned that $11,000 might not be a high enough bid to win the auction, so he contacted me and said this attorney wanted to put $5,000 in it, so we could bid up to $16,000. I was not too happy that my percentage would be diluted, but I went along with it to make sure we would win the bid. I do not know the name of the attorney who invested the $5,000.

5. At the Auction the bidding went to $18,500, plus there was another 10% buyer's premium on top of $18,500. Anderson called me and asked me to wire the rest of the money and I did.

6. Eventually the boat came back to my business, Sailorman's New and Used Marine Emporium in Ft. Lauderdale, Florida, on an expensive trailer which I had to pay for as well. I went into the boat looking for hull numbers and there were none. I knew this would make it hard for us to prove the boat was authentic. The second way to prove it was JFK's boat was to establish an unbroken trail of registrations. There was a break in the trail, so we could not show it irrefutably belonged to JFK. Ole suggested they put the hull numbers in it, and I refused. Because we didn't have irrefutable proof it belonged to JFK, I told Anderson I was going to sell it and get my money back out of it before the coals turned cold. Anderson offered to buy it from me. I asked him why he didn't buy it in the first place, and Anderson said he didn't have the money. Anderson said would put together a group of investors and buy out my interest for

2

$22,500 or $23,000. I gave him 2 weeks to do that. During that two weeks, Anderson brought Dr. Kerry Lane to Sailorman to see the boat and talk about buying my interest. I kept the documentation showing Dr. Lane was one of the investors who bought out my interest (or the majority of it). After Dr. Lane bought out my interest, I was to retain 1% interest in the sailboat, and didn't have to contribute any more to the cost and upkeep of the boat.

7. The sale of the boat at auction generated lots of publicity. UPI and AP announced that Sailorman was buying the Kennedy boat. I kept the newspaper clippings framed on my wall. One clipping, an AP Wire article entitled "Boat Buyer Gets Piece of Kennedy Past" published Sunday June 30, 1996, in *Florida News* specifically mentions "Chuck Fitzgerald, Sailorman New and Used Marine Emporium, Ft. Lauderdale" as the purchaser and uses the terms "Flash II" and "sailboat." I believe all of the articles mention Sailorman as buyer, but cannot tell because of the way the articles were framed overlapping each other. I believe if the government had run a newspaper article search for the time frame of the 1996 auction, and put in the words "Flash II" or Kennedy sailboat, they would have found these articles I have on my wall, and it would have alerted them to the fact that I was one of the original purchasers.

8. The government has never contacted me about the boat, or interviewed me. Had they contacted me I would have told them I sold most of my interest to Dr. Kerry Lane, and would have provided them with the documentation.

9. I did not get notice of the forfeiture proceedings either. Had they notified me, I would have gone to court to fight for my interest. I want to be reimbursed for my 1% interest in the boat.

SIGNED UNDER THE PENALTIES OF PERJURY THIS _14th_ DAY OF

SEPTEMBER, 2005.

CHUCK FITZGERALD

4

Exhibit B



The Associated Press

SOLD: Ole Anderson packs the sail of Flash II, the 22-foot, Star Class boat sailed by John F. Kennedy to victory in the 1936 Atlantic Coast Championship, after making the winning bid of $18,500 Saturday at the Don Ehler estate auction in Monticello.

# Dealer wins JFK sailboat
# with $18,500 bid at auction

The Associated Press

MONTICELLO — When John F. Kennedy raced sailboats as a teenager, one of his prized boats was a Star Class sloop named Flash II.

The future president skippered the sleek 22-footer to an Atlantic Coast Championship in 1938 as a 19-year-old member of the Nantucket Sound Star Fleet.

Six decades later, far from Cape Cod, its mast broken and its white paint weathered, the boat brought $18,500 at auction Saturday at a Florida Panhandle farm.

The buyer, Chuck Fitzgerald, owner of Sailorman Used Marine Gear Emporium in Fort Lauderdale, will restore the 66-year-old wooden craft, said Ole Anderson, who bid on Fitzgerald's behalf.

"We are delighted the yacht is in such good condition after her years in storage and look forward to giving the boat the tender love and care she deserves to bring her back to 100 percent Bristol quality," Fitzgerald said in a statement.

Anderson said, "She's very good. She has a tiny bit of dry rot around the keel, which I expected."

The price didn't approach the $453,500 paid for Kennedy's oak rocking chair or $722,500 paid for his golf clubs at the auction of Jacqueline Kennedy Onassis' estate in April.

But it was a big jump from the $300 the late Don Ehler paid for the boat in 1963 in Clearwater — with no idea who the former owner was.

Ehler, who died in April, kept the boat in a shed since 1972 when he

> "I guarantee you this is a piece of history. Don't miss out."
>
> TOMMY ROWELL, auctioneer

retired from St. Petersburg-based Florida Power Corp. and moved from the Tampa Bay area to rural northern Florida.

"I guarantee you this is a piece of history. Don't miss out," auctioneer Tommy Rowell urged the crowd.

The boat sat on a trailer under live oak trees in the dusty yard full of farm gear, vehicles, tools, grass-chewing horse, and other sale items.

In less than five minutes the price ran up to $18,500 and Anderson made the winning bid.

"That was really a plus for somebody got it that is going to preserve it and keep it as a special thing. Don would be pleased with that," said Ehler's widow, Ouida Ehler.

Despite the price, she said, "It's kind of sad selling something that meant a lot to him."

The Kennedy family, not looking for sailboats, didn't try to buy the Star. "They sold it originally and moved on to other boats," said Melodie Miller, a family spokeswoman in Washington, D.C.

Kennedy sold the boat in 1942 and it went through at least three other owners before Ehler.

Ehler discovered its history when he read the 1956 yearbook of the International Star Class Yacht Racing Association, which the group dedicated to the slain president. Kennedy was assassinated Nov. 22, 1963.

The boat, built in 1936, was bought in 1934 by John F. Kennedy and his older brother, Joseph P. Kennedy, confirmed Diane Dorr, executive secretary of the Star association in Glenview, Ill.

Star records show John F. Kennedy sailed Flash II to a four-minute victory in the 1938 Atlantic Coast race, she said.

According to the John F. Kennedy Library in Boston, Mass., Kennedy continued his sailing success. He won a MacMillan Cup Race at Harvard University in 1938 at Annapolis, Md., defeating, among other future America's Cup winning skippers Bus Mosbacher and Robert Bavier Jr.

Ehler offered to sell his Star to the family in 1965, but received a polite decline on behalf of Jacqueline Kennedy.

"The 'Victura,' another boat which the late President and his family used for many, many years being donated to the Library, and family feels, at this time, that boat will be adequate representation of his sailing interests," said the reply signed by her secretary, Pamela Turnure.

Exhibit C



Ole Anderson packs up the sail of the Flash II on Saturday after an auction in Monticello.

He made the winning bid — $18,500 — for the boat, once owned by John F. Kennedy, on behalf of Fort Lauderdale marine gear dealer Chuck Fitzgerald.

Fitzgerald will restore the 66-year-old wooden craft, Anderson said.

ASSOCIATED PRESS

# Boat that JFK sailed as teen gets new owner

ASSOCIATED PRESS

MONTICELLO — When John F. Kennedy raced sailboats as a teenager, one of his prized boats was a Star Class sloop named Flash II.

The future president skippered the sleek 22-footer to an Atlantic Coast Championship in 1936 as a 19-year-old member of the Nantucket Sound Star Fleet.

Its mast broken and its white paint weathered, the boat brought $18,500 at auction Saturday at a Florida Panhan-

dle farm.

The buyer, Chuck Fitzgerald, owner of Sailorman Used Marine Gear Emporium in Fort Lauderdale, will restore the 66-year-old wooden craft, said Ole Anderson, who bid on Fitzgerald's behalf.

"We are delighted the yacht is in such good condition after her years in storage and look forward to giving the boat the tender love and care she deserves to bring her back to 100 percent Bristol quality," Fitzgerald said in a statement.

Anderson said, "She's very good.

She has a tiny bit of dry rot around the keel, which I expected."

The price was a big jump from the $300 the late Don Ehler paid for the boat in 1963 in Clearwater — with no idea who the former owner was.

Ehler discovered its history when he read the 1964 yearbook of the International Star Class Yacht Racing Association, which the group dedicated to the slain president.

Ehler, who died in April, had kept the boat in a shed since 1972 when he retired and moved from the Tampa Bay area to rural northern Florida.

Exhibit D

This Statement is a summary of total investment dollars and terms of repayment to all investors in FLASH II, Star Boat #721. This statement supercedes any and all previous statements.

A. — When FLASH II is sold and all Fees, Costs, and any other expenses incurred by the sale have been paid, Mr. Robert A. Harper, Atty., will receive 5% of the net Proceeds. The remainder will be [Figure #1]

B — [Figure #1] will be paid out in this manner:

Eddie Crosby — $11,000
Kerry Lane — $60,000
Jean Anderson — $10,000
$81,000 Total

[Figure #2 will be Figure #1 minus $81,000]

C — [Figure #2] will be paid out in this manner:

Eddie Crosby — $10,000
Kerry Lang — $10,000
Jean Anderson — $10,000
Ole Anderson — $32,000
Marblehead Trading Co — $14,500
Gary Milo — $18,000 ($16,000)
(954) 764-7154 Pete + Carole Walker — $12,000
Homer Earnest — $2,000
Jim Anderson — $2,000
$108,000 Total

12/4/97
Gregory Olf Anderson

[Figure #3 will be Figure #2 minus $108,000]

D — [Figure #3] will be paid at in this manner:

| | | |
|---|---|---|
| EDDIE CROSBY — | 16.6 | % |
| KERRY LANE — | 30.0 | % |
| JOAN ANDERSON — | 10.0 | % |
| mr/mrs Homer Earnest — | 1.0 | % |
| Chuck Fitzgerald — | 1.0 | % |
| OLE ANDERSON | $41.4 | % |
| | 100.0 | % |

E — EDDIE CROSBY WILL BE PAID 16.6% IN ADDITION TO
his $11,000 payment in Section B

F — KERRY LANE WILL BE PAID $60,000 OR 30% of
FIGURE 3, whichever sum is greater. His initial
payment of $60,000 in Section B will be deducted
from his 30% should the 30% figure be greater than $60K.

G — JOAN ANDERSON WILL BE PAID $10,000 OR 10% of
Figure 3, whichever sum is greater. Her initial
payment of $10,000 in section B will be deducted
from her 10% should the 10% figure be greater than $10K.

12/4/97

Gregory Olaf Anderson