# United States Court of Appeals
## For the First Circuit

No. 06-1089

UNITED STATES OF AMERICA,

Plaintiff, Appellee,

v.

ONE STAR CLASS SLOOP SAILBOAT BUILT IN 1930 WITH HULL NUMBER 721,
NAMED "FLASH II",

Defendant in Rem.

KERRY SCOTT LANE,

Claimant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Boudin, Chief Judge,
Selya, Circuit Judge,
and Saris,* District Judge.

Brenda Grantland for appellant.
Shelby D. Wright, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.

August 16, 2006

---

*Of the District of Massachusetts, sitting by designation.

**SELYA, Circuit Judge.** In this case, the government initiated a forfeiture proceeding against a prized sailboat, once owned by the late John F. Kennedy, and secured a default judgment that obliterated the ownership interest of Dr. Kerry Scott Lane. Arguing that the government gave him inadequate notice of the forfeiture action, Lane asked the district court for relief from the judgment. See Fed. R. Civ. P. 60(b). The court refused. Lane now appeals.

After careful consideration, we conclude that the court below did not adequately consider the sufficiency of the notice as it pertained to Lane's interest in the sailboat. Consequently, we vacate the order denying the Rule 60(b) motion and remand for further proceedings. We take no view on the ultimate outcome of those proceedings.

We state the facts rather tentatively. The district court did not hold an evidentiary hearing and, therefore, we piece together an account from the affidavit in support of the original forfeiture complaint, the affidavits and other papers proffered in support of Lane's Rule 60(b) motion, and the relatively few undisputed facts.

The FLASH II is a sailing vessel once owned by the late John F. Kennedy. Lane's ownership interest in it dates back to 1996, when Ole Anderson learned of the craft's impending sale at auction. Desirous of restoring the sailboat for resale but lacking

the wherewithal to make the initial purchase, Anderson convinced Chuck Fitzgerald and another (faceless) investor to back his bidding. The auction was held in Monticello, Florida, and Anderson made the high bid ($18,500). Due to the Kennedy connection, the sale created a flurry of publicity. The press coverage identified Fitzgerald as the purchaser.

Subsequent to the auction, Fitzgerald discovered that the FLASH II did not have any hull number. Worried that this void would make it difficult to prove the sailboat's provenance, he decided to abandon ship. Anderson agreed to put together a syndicate to acquire Fitzgerald's interest and, on July 12, 1996, Fitzgerald executed a handwritten agreement to sell his interest in the sloop to "the consortium headed by Ole Anderson" for $22,000.[2] Lane contributed $5,000 to join the consortium.

The new owners initially stored the sailboat at Lane's Florida home. They then moved it to a shipyard in Marblehead, Massachusetts (Marblehead Trading). Once the FLASH II had been restored, the consortium exhibited it at various nautical museums and shows. Anderson did the bulk of the restoration work and managed the promotional activities; Lane, however, continued to pour money into the project, contributing, over time, roughly $70,000 in additional capital.

---

[2] Although the language of the agreement suggests divestiture of Fitzgerald's entire interest in the FLASH II, he apparently retained a one percent interest in future profits.

On December 4, 1997, Anderson prepared a handwritten agreement setting forth how profits from an anticipated sale of the FLASH II would be divided. That document listed Lane, Fitzgerald, Anderson, Anderson's mother, and two other investors[3] as owners of the sloop. Under its terms, Lane was to receive one-sixth of the net profits (after payment of expenses and reimbursement of capital advances).

Despite this spadework, the FLASH II continued to remain property of the consortium. Anderson purportedly rejected a prospective buyer's bid of around $800,000 for the sloop, believing he could sell it for a figure in excess of $1,000,000.

Unbeknownst to Lane when he first invested in the FLASH II, Anderson's entrepreneurial pursuits apparently extended beyond marine restorations. In December of 2003, the Drug Enforcement Administration (DEA) interviewed a cooperating witness (the CW) who identified Anderson as a member of a large-scale marijuana-trafficking enterprise. The CW also reported that Anderson had talked him into investing close to $15,000 in marijuana profits into the FLASH II restoration project. He added that "[a]nother person, possibly a doctor or dentist, also invested roughly the same amount" to help finance the acquisition and restoration of the sloop. The CW did not identify this investor by name.

---

[3] The agreement identified those investors as Homer Earnest and Eddie Crosby. Lane argues, without contradiction, that the Eddie Crosby named in the agreement is actually Harry Crosby.

-4-

The CW's investment was short-lived. He complained that, in 2001, under a threat that Anderson would reveal his role in the drug-trafficking operation, he ceded to Anderson his entitlement to profits from any future sale of the FLASH II. The gist of this tale was confirmed when, at the DEA's instigation, the CW met face to face with Anderson in Beverly, Massachusetts, on September 27, 2004. During that audience, Anderson made it pellucid that, from his point of view, the CW no longer had any ownership interest in the FLASH II.

To make a tedious tale tolerably terse, the DEA concluded, based on its investigation, that the FLASH II constituted property derived from the proceeds of narcotics distribution and seized the sloop from the Marblehead Trading yard. See 21 U.S.C. § 881(a)(6) (providing for civil forfeiture of property traceable to the avails of drug trafficking). Anderson called Lane in October of 2004 to report the seizure. Although Anderson offered to identify Lane as an owner, Lane beseeched him not to do so because he (Lane) was in the midst of a credentialing process at a new hospital and feared that publicity about his association with a reputed drug-trafficker would jeopardize his prospects (Lane claims that he did not realize at the time that his own interest in the sailboat might be at risk). Lane did request, however, that Anderson keep him apprised of any further developments.

On February 1, 2005, the government filed a civil forfeiture complaint against the FLASH II. It supported the complaint with the affidavit of a DEA agent. That affidavit set forth a narrative account of what the CW had told the DEA at a series of meetings. Based on that recital, the district court found probable cause for forfeiture and issued a preliminary order instructing the government to arrest the vessel, publish notice of the intended forfeiture, and notify Ole Anderson, Ralph Anderson (of Marblehead Trading), Harry Crosby,[4] and any other persons who claimed an interest in the FLASH II of the pendency of the action.

The government published notices of intent to forfeit in the Boston Herald on February 15, February 22, and March 1, 2005 and served the above-named individuals by certified mail. Lane was not personally served and claims not to have seen the published notices.

Crosby was the only person who filed an answer to the forfeiture complaint. As to all other interested parties, the government moved for an entry of default. See Fed. R. Civ. P. 55(a); see also Fed. R. Civ. P. Supp. R. C(6)(a)(i)(A) (requiring interested parties to file verified claims of interest "within 30 days after the earlier of (1) the date of service of the Government's complaint or (2) completed publication of notice under

---

[4]Crosby, unlike Lane, had come forward, identified himself to the government in the wake of the seizure, and eventually filed a timely claim of ownership.

-6-

Rule C(4)"). The clerk of court obliged on June 3, 2005. Seventeen days later, Crosby and the government (who had negotiated a settlement) jointly moved for the entry of a default judgment of forfeiture. See Fed. R. Civ. P. 55(b).

Lane claims that, notwithstanding his request that he be kept apprised, he never heard from Anderson. His efforts to contact Anderson drew a blank. In frustration, he set up a search alert to identify any internet postings containing the words "John F. Kennedy/FLASH II." He asserts that he first learned of the judicial forfeiture action in late June of 2005, when this alert led him to an article stating that the government had forfeited the sailboat and was planning to sell it at auction.

Lane promptly contacted Marblehead Trading and, on July 1, 2005, received for the first time a copy of the entry of default. He immediately began hunting for counsel. On July 15, 2005 — before Lane's newly retained counsel had acclimated herself — the district court granted the motion for entry of a default judgment.

Lane promptly filed a motion to vacate the judgment, see Fed. R. Civ. P. 60(b), asseverating that he was an innocent part-owner of the FLASH II and that the government had failed to take reasonable steps to notify him of the institution of the forfeiture proceeding. The district court denied the motion without a hearing, stating simply that "[b]ecause claimant admittedly knew of

-7-

the seizure and deliberately declined to disclose his interest, none of the grounds for vacating a judgment under Rule 60(b) apply." Following an unsuccessful motion to alter or amend the order, see Fed. R. Civ. P. 59(e), Lane prosecuted this appeal.

Lane's most compelling argument is that the district court abused its discretion when it rejected his motion to vacate without any inquiry into whether the government provided him adequate notice of the civil forfeiture proceeding.[5] The government counters that it was unaware of Lane's identity so notice by publication sufficed to assuage any legitimate concerns. We explore this battleground.

An order granting or denying a Rule 60(b) motion ordinarily engenders review for abuse of discretion. See, e.g., Karak v. Bursaw Oil Corp., 288 F.3d 15, 19 (1st Cir. 2002). However, a motion that seeks to vacate a judgment as void under subsection (4) of Rule 60(b) typically engenders de novo review. See, e.g., M & K Welding, Inc. v. Leasing Partners, LLC, 386 F.3d 361, 365 (1st Cir. 2004). Lane invokes both of these standards of review. We assume, arguendo — favorably to the government — that an abuse of discretion standard applies.

Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims sets forth the procedural matrix that applies

---

[5]Although Lane has advanced other assignments of error, we need not reach any of them.

to judicial forfeitures initiated under 21 U.S.C. § 881. See 28 U.S.C. § 2461(b). The published notices in this case sufficed to satisfy the government's obligations under that rule. See Fed. R. Civ. P. Supp. R. C(4) (stating that the government must "give public notice of the action and arrest in a newspaper designated by court order and having general circulation in the district"). But the imperatives of Supplemental Rule C(4) neither trump nor displace the constitutional requirement that the government afford an individual notice sufficient to satisfy the demands of due process before confiscating that individual's property through the instrumentality of a judicial forfeiture. See United States v. James Daniel Good Real Prop., 510 U.S. 43, 62 (1993); United States v. Approximately 2,538.85 Shares of Stock, 988 F.2d 1281, 1284 n.4 (1st Cir. 1993). Thus, if the circumstances called for something more than notice by publication, the judgment of forfeiture, insofar as it pertains to Lane's interest in the FLASH II, would be suspect and he might well be entitled to relief. See United States v. Giraldo, 45 F.3d 509, 512 (1st Cir. 1995); Echevarria-Gonzalez v. Gonzalez-Chapel, 849 F.2d 24, 28 (1st Cir. 1988).

The question of whether the government provided an interested party constitutionally sufficient notice before effecting a forfeiture entails a case-specific inquiry that hinges, in the first instance, on the information available to the putative claimant. A putative claimant's actual knowledge of a forfeiture

proceeding can defeat a subsequent due process challenge, even if the government botches its obligation to furnish him with notice. See Gonzalez-Gonzalez v. United States, 257 F.3d 31, 36 (1st Cir. 2001); Whiting v. United States, 231 F.3d 70, 74 (1st Cir. 2000). Pressing this point, the government emphasizes Lane's concession that he knew of the initial seizure of the sailboat long before the institution of the forfeiture action. The district court's denial of Lane's Rule 60(b) motion appears to have been premised on this theory.

The difficulty, however, is that a claimant's knowledge of a seizure, without more, is insufficient to defeat a challenge premised on an absence of actual notice. In such situations, due process entails "advance notice-in-fact of forfeiture proceedings, as opposed to notice-in-fact of seizure."[6] Gonzalez-Gonzalez, 257 F.3d at 38. And although Lane was aware of the seizure as early as October of 2004, there is no evidence in the thin record presently before us that suggests he knew of the judicial forfeiture action until _after_ the entry of default.

---

[6]The fact that Lane asked Anderson not to mention his ownership interest to the DEA does not defeat the operation of this principle. Cf. Gonzalez-Gonazlez, 257 F.3d at 35-36 (finding that a property owner was entitled to the government's reasonable efforts to provide him notice of a section 881 forfeiture even though he had fled to avoid criminal charges arising from the same drug allegations). That fact may, however, bear on the reasonableness of the government's actions (a subject to which we shortly shall turn).

-10-

This is not to say that actual notice is required in every case and under every set of circumstances. It is not. See Tulsa Prof'l Collection Servs., Inc. v. Pope, 485 U.S. 478, 490 (1988); Whiting, 231 F.3d at 76. But the absence of actual notice of the forfeiture proceeding means that an inquiring court must look beyond Lane's knowledge of the seizure and consider whether, given the totality of the circumstances, the published announcements (which Lane claims not to have seen) satisfied the government's obligation to provide Lane with some constitutionally sufficient notice.

In cases involving the absence of actual notice, the result of the ensuing inquiry does not depend on whether the government actually attempted individually to contact each and every party in interest but, rather, on whether the government's attempt to provide notice is, under all the circumstances, reasonably designed to apprise the parties in interest of the currency of the forfeiture action. See Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950); Gonzalez-Gonzalez, 257 F.3d at 36; United States v. One Urban Lot Located at 1 Street A-1, 885 F.2d 998-99 (1st Cir. 1989). This depends, in turn, on what information was reasonably available to the government when it commenced the forfeiture proceeding.

While every case is different and context can be all-important, this paradigm means, in general, that when the

government knows or easily can ascertain the identity and whereabouts of a potential claimant, reasonableness requires the government, at a minimum, to take easily available steps in its attempt to notify the claimant.[7] See Tulsa Prof'l Collection Servs., 485 U.S. at 491; Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 798 n.4 (1983); Lombard v. United States, 356 F.3d 151, 155 (1st Cir. 2004). When, however, a potential claimant's name or whereabouts are unknown and, practically speaking, unavailable, notice by publication can serve as a satisfactory surrogate. See Mullane, 339 U.S. at 317; Approximately 2,538.85 Shares of Stock, 988 F.2d at 1285; One Urban Lot, 885 F.2d at 998.

The hard cases are those in which an interested party's name or whereabouts were not actually known to the government but may or may not have been reasonably ascertainable. In those

---

[7]The government asserts that the Supreme Court's recent decision in Jones v. Flowers, 126 S. Ct. 1708 (2006), diluted its obligation to take additional steps when providing notice. That assertion overlooks the fact-specific nature of the inquiry. Although the Court suggested that the government would not have been expected to search telephone records or income tax rolls to locate a missing owner, that finding was made in light of the fact that the case involved a tax sale and state law required the taxpayer to keep his address updated. See id. at 1719. Given that requirement, it was reasonable for the government to assume that the address on file was correct, even though the certified mailing sent to that location was returned unclaimed. Moreover, the Jones Court did not conclude that government's obligations were fulfilled as soon as it sent the initial notice; instead, it held that the government was required to take some reasonable follow-up measures (e.g., posting notice on the front door or resending the notice by regular mail) when it learned its initial attempt had failed. See id.

instances, an inquiring court must look to "the practicalities and peculiarities of the case." Mullane, 339 U.S. at 314. The rule of thumb is that the government, in endeavoring to identify and locate potential claimants, must exercise a degree of diligence commensurate with the particular circumstances — but it need not undertake endless or impractical investigations in the hope of finding a needle in a haystack. See id. at 317-18.

In this case, it is undisputed that the government knew there was an additional investor ("possibly a doctor or dentist") but did not know the investor's name. There is no exact formula for determining the quantum of diligence due an unidentified yet potentially ascertainable claimant. Rather, the court must consider the circumstances, balance the interests of the government and the individual, and determine whether, on the whole of the record, the government's efforts were reasonable. See Tulsa Prof'l Collection Servs., 485 U.S. at 484.

The case law makes it clear that the government's burden is not a heavy one. The government is not required to engage in a sprawling, open-ended investigation to identify and track down unidentified, but potentially interested, parties. See, e.g., Chemetron Corp. v. Jones, 72 F.3d 341, 346 (3d Cir. 1995). If, however, the government has easy access to a lead that it knows (or reasonably should know) is potentially fruitful, it has some duty to elicit the available information and take reasonable action in

response to it. See Small v. United States, 136 F.3d 1334, 1338 (D.C. Cir. 1998); cf. Gonzalez-Gonzalez, 257 F.3d at 38 (suggesting that the government's failure to act upon available information might result in a due process violation). The extent of the required follow-up will, of course, vary with the nature of the lead, the costs of pursuing the lead, and the idiosyncrasies of the case. If a person using the lead could easily identify and locate the potential claimant, eschewing further inquiry and relying on secondary measures (such as notice by publication) may be unreasonable, or out of step with due process, or both. See, e.g., Small, 136 F.3d at 1338 (finding that if the government possesses a "piece of information that a reasonable person would use to locate the claimant," it is constitutionally obliged to try "unless it would be burdensome to do so"); cf. Plemons v. Gale, 396 F.3d 569, 577 (4th Cir. 2005) (noting that there may be situations in which personal service is not constitutionally required because reasonable follow-up efforts would be unlikely to yield results).

Here, the parties dispute the ease with which the government could have pinpointed Lane's identity and status as a part-owner of the FLASH II. Lane argues that the extensive publicity concerning the original sale of the sloop at auction and the information related by the CW made his identity easily ascertainable and, at a minimum, required the government to engage

-14-

in some follow-up efforts to unmask his identity.[8] The government has a different viewpoint. While it concedes that the CW's tale alerted it to the possibility that there was another investor ("possibly a doctor or dentist"), it contends that this designation was too vague to allow it to take any effective action and that it had no duty to undertake what it describes as the burdensome task of engaging in an open-ended search for the mysterious investor.

The record, as it stands, is of little assistance. In the district court, the government submitted no affidavits, declarations, or other materials of evidentiary quality describing what it knew or what (if any) efforts it undertook to identify or locate potential owners of the FLASH II. By like token, the district court made no inquiry into these matters and made no findings with respect to them. The court's order denying the motion to vacate the default judgment appears to have relied exclusively on Lane's cognizance of the sailboat's seizure and his decision to go to ground at that juncture. But these facts alone will not suffice to defeat his insufficiency-of-notice challenge if the government, knowing of the existence of an unnamed investor and having ready access to easily explored leads to that investor's identity, simply buried its head in the sand.

---

[8]Lane offers a multiplicity of scenarios, but it would serve no useful purpose to dwell on them.

Let us be perfectly clear. Where, as here, the government does not know the name of a potential claimant, it need not take heroic measures to identify him. Cf. Jones v. Flowers, 126 S. Ct. 1708, 1719 (2006) (suggesting that the government would not need to search phone records or income tax rolls to locate missing owner before proceeding with tax sale when state law required the taxpayer to keep his address updated). But when the claimant's identity may be easily ascertained through minimal effort, the government cannot eschew these efforts. See, e.g., Foehl v. United States, 238 F.3d 474, 480 (3d Cir. 2001) (finding the government's attempt to provide notice insufficient when it failed to check with four "obvious sources" to ascertain the claimant's address). Here, for example, the government could at least have asked Crosby, with whom it was in contact, if he knew the names of his fellow investors, or it could have made similar inquires at Marblehead Trading (the locus from which the sloop was seized).[9] Perhaps the government did make such inquiries — but the record is silent on what steps, if any, it took.

We can go no further. Given the fact-specific nature of the question and the opacity of the record, additional proceedings

---

[9]The record indicates that either such inquiry might have borne fruit. Crosby, after all, presumably had a copy of the December 1997 profit-sharing agreement that listed the owners of the FLASH II, and Lane claims (without contradiction at this point) that both he and his association with the sloop were well-known at Marblehead Trading.

in the district court are required. See <u>Tulsa Prof'l Collection Servs.</u>, 485 U.S. at 491. Hence, we vacate the order denying Lane's Rule 60(b) motion and remand for further proceedings to determine whether plainly indicated and easily accomplished efforts, undertaken with reasonable diligence during the relevant time frame, would have led the government directly to Lane. See <u>id.</u>; <u>Mennonite Bd. of Missions</u>, 462 U.S. at 798 n.4.

We leave the matter of how to proceed to the district court. It may, if it chooses, proceed exclusively by proffer, conduct an evidentiary hearing, or handle the matter in some other fashion. It also will have to consider the other factors that bear on the determination of motions for relief from judgment. <u>See</u>, <u>e.g.</u>, <u>Karak</u>, 288 F.3d at 19. If the district court finds either that Lane had actual notice of the forfeiture proceeding or that his identity and whereabouts were not readily ascertainable by the government with minimal effort, that will be the end of the matter. If, however, the court finds that Lane had no notice in fact of the forfeiture action, that the government's efforts to identify him were nonexistent or otherwise insufficient under the circumstances, and that Lane has satisfied the other prerequisites for Rule 60(b) relief,[10] Lane's motion would have to be granted and the forfeiture

---

[10] Although notice of seizure is not tantamount to notice of forfeiture, <u>see</u> text <u>supra</u>, the fact that Lane had notice of the seizure and the further fact that Lane asked Anderson not to disclose his name are not necessarily irrelevant to the final outcome of the Rule 60(b) motion. The government remains free to

judgment, as it pertains to his interest in the FLASH II, would have to be set aside.

**Vacated and remanded.   No costs.**

---

argue, for example, that equitable considerations — especially any prejudice that it may have suffered through delay or concealment by Lane — should be taken into consideration.