UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Civil Action # 05-10192 RWZ |
| ONE STAR CLASS SLOOP SAILBOAT BUILT IN 1930 WITH HULL NUMBER 721, NAMED "FLASH II", | |
| Defendant. | |
| KERRY SCOTT LANE, M.D. | |
| Claimant. | |

## CLAIMANT KERRY LANE'S RESPONSE TO THE GOVERNMENT'S STATEMENT OF FACTS

1.  During the course of a DEA investigation, the DEA learned that Gregory "Ole" Anderson had purchased the Flash II sailboat previously owned by John F. Kennedy, using drug proceeds.  Affidavit of Gregg Willoughby, Exhibit 1 hereto, ¶ 1.

    Dr. Lane does not have first-hand knowledge of what the DEA learned during its investigation.  However, the phraseology of this paragraph falsely suggests that Anderson purchased the sailboat with his own drug proceeds.  There is no evidence that Anderson ever invested any of his own money in the sailboat.  Rather the government's theory is  that the CW "loaned" Anderson between $15,000 and $20,000 in drug proceeds which Anderson allegedly invested in the sailboat, and that the CW forgave the loan in exchange for Anderson's silence, after Anderson was prosecuted for transporting 1,200 pounds of marijuana for the CW.  See U.S. Statement of Facts ¶¶ 10-12. [USDocReqResp pp. 20, 22, 34-35, 55.]

1

2.      Willoughby interviewed the cooperating witness in an effort to understand whether anyone other than Ole Anderson had an ownership interest in the Flash II.  Exhibit 1, ¶ 2.

Dr. Lane does not dispute that Willoughby interviewed the CW about ownership of the

sailboat, but the questions the thoroughness of his questioning and follow-up investigation.

3.      The CW told Willoughby that Ole Anderson initially purchased the Flash II, and that the CW had invested cash in the Flash II at Ole Anderson's request.  Exhibit 1, ¶ 3.

Admitted, except that the CW said that he "loaned" money to Anderson to buy the boat –

not that he bought a share of the consortium.  This suggests he was not an investor but a

lienholder at best. [USDocReqResp ¶ 59].  The loan was paid back by Anderson, in exchange for

Anderson's silence after he got caught transporting marijuana for the CW.  [USDocReqResp ¶¶

20, 22, 34-35, 55.]

4.      The CW told Willoughby that another person had also invested in the Flash II.  Exhibit 1, ¶ 3.  That person was possibly a doctor or a dentist.  Id.

Admitted.

5.      Based on the information from the CW, Willoughby therefore understood that there had initially been three owners to the Flash II: Ole Anderson, the CW, and this unknown third person.  Exhibit 1, ¶ 4.

Since Dr. Lane has not been able to depose Willoughby, he cannot say what Willoughby

believed.  But any such beliefs could not be reasonable since he did not follow up on the obvious

leads he encountered during his investigation.

6.      Ole Anderson provided the CW with documentation showing that Ole Anderson had bought the Flash II from Ouida Ehler.  Exhibit 1, ¶ 5.

It may be that Anderson provided such documentation to the CW, but the alleged bill of

sale from Ouida Ehler is of questionable authenticity.  Wire service articles from the time of the

sale – including the AP article which claimant Crosby gave AUSA Wright on March 10, 2005[1]

[USDocReqResp pp. 103-05] – show that Chuck Fitzgerald, of Sailorman New and Used Marine

Emporium, Ft. Lauderdale, FL, purchased the Flash II at an auction on June 29, 1996.[2]  The

document the government claims is the bill of sale [USDocReqResp p. 79] is made out to Ole

Anderson and is dated August 2, 1996 – 34 days <u>after</u> the auction.

7.    Anderson had documentation showing that he owned the boat and that it had previously
       been owned by John F. Kennedy.  Id.

       Anderson did not "own" the boat by himself – again the government is relying on the

highly questionable bill of sale.  Lane admits Anderson had documentation that the boat was

previously owned by John F. Kennedy.

8.    Ole Anderson also provided a letter from Senator Edward M. Kennedy and an article
       describing Ole Anderson's restoration of the boat.  See Id.

       Admitted.

9.    None of this documentation included the name of any purchaser or investor other than
       Ole Anderson.  Id.

       Lane cannot say what documentation Ole gave the CW.  However, Ole Anderson and

attorney Robert Harper had plenty of documentation naming Dr. Lane and other members of the

consortium that owned the Flash II.  If the CW owned an interest, he should have received these

documents too.

10.   The CW told Willoughby that he had surrendered his interest in the Flash II to Ole
       Anderson after Ole Anderson was arrested on drug charges in 2001. Exhibit 1, ¶ 6.

_____

[1]  This was about  two months before the government filed its motion for entry of default
[Docket # 12, 5-4-2005].

[2]  The article, which is dated June 30, 1996, states the auction occurred on Saturday.  The
prior Saturday was June 29.

Admitted. This proves that the CW no longer owned any interest in the sailboat by the time the government seized it – if he ever held an ownership interest, as opposed to an unsecured debt to Ole Anderson for the money he "loaned" Anderson to buy the boat. Since there is no evidence that Ole Anderson ever invested any of his own money in the Flash II, once the CW surrendered his interest, there was no basis for forfeiture of the sailboat. Proceeds could no longer be traced into the boat once the loan was repaid.

11. Ole Anderson had been arrested while transporting 1200 pounds of marijuana partially owned by the CW. Id. Ole Anderson threatened to expose the CW's role in the crime unless the CW provided him with funds. Id.

Dr. Lane does not dispute this.

12. The CW paid Ole Anderson more than one hundred thousand dollars in cash and loans for his silence, and he also surrendered his interest in the Flash II. Id.

Dr. Lane has no knowledge of this but does not dispute it.

13. During the investigation, the DEA arranged meetings and telephone calls between the CW and Ole Anderson which were consensually recorded. Exhibit 1, ¶ 7.

Dr. Lane has no knowledge of this but does not dispute it.

14. During the consensually recorded conversations, Ole Anderson confirmed his ownership of the Flash II, and he expressed interest in selling the boat. Exhibit 1, ¶ 7.

Dr. Lane cannot dispute what Anderson told the CW.

15. After DEA seized the Flash II, Willoughby undertook searches of commercial databases and the internet, looking for information about the Flash II. Exhibit 1, ¶ 8.

Dr. Lane does not dispute this, but obviously Willoughby's searches were superficial, if not intentionally gerrymandered to avoid finding the identities of innocent owners. The government knew about the June 29, 1996 auction, at which Sailorman purchased the Flash II –

at least since Kerner's March 10, 2005 letter. [USDocReqResp pp. 103-05.]  A Nexis search of

wire service newspaper articles regarding the purchase of the Flash II would have turned up a

number of wire service articles about Sailorman purchasing the sailboat the 1996 auction.

16.    Willoughby also arranged for Lexis property databases to be searched.  Exhibit 1, ¶ 8.

That may be true, but we doubt that there is any Lexis property database that covers

historic relics such as this.

17.    None of these searches provided any information about any additional owners of the
Flash II beyond Ole Anderson. Exhibit 1, ¶ 8.

This may be true, but Willoughby's searches appear superficial and not aimed at locating

other owners.  Willoughby knew a doctor was the major investor, and had plenty of leads he

could have followed which would have led to Dr. Lane – yet chose not to pursue them.

18.    At the time of the seizure of the Flash II, Willoughby met with Ralph Anderson, the
owner of Marblehead Trading Company.  Exhibit 1, ¶ 9.

Admitted.  Willoughby apparently did not interview any other Marblehead employees,

who would be more likely to know Dr. Lane since they dealt with the public.

19.    Ralph Anderson is not related to Ole Anderson.  Exhibit 1, ¶

Unknown but irrelevant.

20.    Marblehead had received the Flash II in 1996 and worked on it and stored it for extensive
periods of time from then until its seizure in 2004. Exhibit 1, ¶ 9.

Admitted.

21.    During Willoughby's conversation with Ralph Anderson, it was clear to Willoughby that
he recognized Ole Anderson as the only owner of the Flash II. Exhibit 1, ¶ 10.

Dr. Lane can not guess what Willoughby thought, but he did not make reasonable efforts

to determine ownership before jumping to such a conclusion.  Willoughby failed to ask Ralph

Anderson to look at Marblehead's records for leads to other owners. Those records show the

invoices generally went to attorney Robert Harper. [Marblehead pp. 6, 27, 29, 39, 41, 54, 60, 62,

80, 82, 96, 98, 116, 118, 123, 126, 137, 139.]  The government admits that, during the October

13, 2004 raid when the sailboat was seized, Willoughby did not ask who owned the sailboat, or

request documents from Marblehead's files that would have provided leads to the owners.

[Usanswrogs ¶ 2; USDocReqResp pp. 61-62.]

22.    When Willoughby introduced himself and explained that the DEA was seizing the boat,
       Ralph Anderson said "Poor Ole" and noted that Ole was always involved in some kind of
       scam. Exhibit 1, ¶ 10.

       This is inadmissible hearsay as well as irrelevant.  It should be stricken.

23.    Ralph Anderson provided Willoughby with a contact address for Ole Anderson from his
       files.  Exhibit 1, ¶ 11.

       Admitted – but this shows that Willoughby could have asked for other contacts listed  in

Marblehehead's files if he had been serious about locating other owners.

24.    Willoughby knew from the CW that the Flash II had been put up for auction in the late
       1990s.  Exhibit 1, ¶ 12.

       Admitted.  The Flash II was put up for auction twice in the late 1990s – in 1996 and 1998.

Had Willoughby run a Nexis database search for newspaper articles, he would have found wire

articles saying the Flash II was purchased at the June 29, 1996 auction by Chuck Fitzgerald at

Sailorman New and Used Marine Emporium in Fort Lauderdale Florida. [USDocReqResp p.

105.] A simple 411 call would have provided the phone number for Sailorman.  Had Willoughby

called Sailorman, he would have learned that Dr. Kerry Lane was the purchaser of Sailorman's

interest. [FitzgeraldAff2.]

25.     Willoughby learned during the course of database research that the auction had been

undertaken by Guernsey's.  Exhibit 1, ¶ 12.

Admitted.  Had Willoughby asked Guernsey's for contact information for the persons

placing the sailboat up for auction, he should have been directed to attorney Robert Harper, who

represented the consortium.

26.    Willoughby contacted Arlan Ettinger, the President of Guernsey's and arranged for him to
       appraise the Flash II.  Exhibit 1, ¶ 12.

       Admitted.

27.    Willoughby talked with Ettinger about the auction of Kennedy memorabilia that the Flash
       II had been placed in in March of 1998.  Exhibit 1, ¶ 12.

       Admitted.

28.     Ettinger told Willoughby that during that auction, he had dealt exclusively with, and
       contracted with, Ole Anderson.  Exhibit 1, ¶ 12.

       Dr. Lane cannot say what Ettinger told Willoughby, but attorney Robert Harper

represented the consortium in relation to Guernsey's 1998 auction.  Guernsey's file from the

1998 auction should have included correspondence from Harper with Harper's contact

information.  It is understandable that Ettinger himself may have dealt only with Ole Anderson,

since Ole managed the promotion and marketing efforts for Flash II.

29.     After the seizure of the Flash II, Willoughby read an article in the Boston Globe by
       Shelley Murphy, noting that the boat was subject to forfeiture.  Exhibit 1, ¶ 13.

       Irrelevant.

30.     In the article, Ole Anderson was quoted as saying a doctor was the boat's primary owner,
       but that Anderson would not identify the doctor.  Exhibit 1, ¶ 13.

       Admitted.  This corroborated what the CW said about a doctor being an investor in the

sailboat. [Complaint p. 12 ¶ 16.]   This fact was significant enough to make it into Willoughby's

police report [USDocReqResp p. 62], and shows Willoughby should have been making efforts to locate this doctor.

31.    Sometime afterward, Willoughby learned from AUSA Shelbey Wright that an individual had come forward regarding ownership of the Flash II.  Exhibit 1, ¶ 14.

        Admitted.

32.    AUSA Wright provided Willoughby with the individual's name, Harry Crosby, for notification purposes.  Exhibit 1, ¶ 14.

        Admitted.

33.     Willoughby had understood from the debriefing of the CW that there was one other owner to the sailboat.  Exhibit 1, ¶ 15.

        What Willoughby believed or assumed is not known, but Dr. Lane challenges the reasonableness of his beliefs and the thoroughness of his investigation.  Willoughby is a trained investigator, with a public duty to thoroughly investigate leads and seek out truth before making accusations and representations in court documents that could cause several hundred thousand dollars' in damages to innocent citizens' private property rights.  It was not reasonable for Willoughby to make any such assumptions without asking followup questions of witnesses or asking to peruse their documents.

34.    When AUSA Wright told Willoughby about the claim, Willoughby assumed that it meant that the other owner had come forward. Exhibit 1, ¶ 15.

        This is not a reasonable assumption.  Unless someone asked Crosby if he was the doctor identified in the complaint, it was not reasonable to assume that he was.  Had the government asked Crosby that question he would have identified Dr. Lane as the doctor/investor. [Gov.Ex. 3 Crosby Aff. ¶ 4.]

35.    Willoughby knew that the new claimant would have to provide documentation to prove

his ownership.  Exhibit 1, ¶ 15. However, determinations of the validity of claims is done, at least initially, at the U.S. Attorney's Office, so Willoughby did not seek information about the documentation.  Exhibit 1, ¶ 15.

Both Willoughby and Wright had a public duty to thoroughly investigate their case before

bringing a forfeiture case, and to provide notice to all owners who could be determined with due

diligence.  They both disregarded their responsibilities.

36.    It never occurred to Willoughby to contact Harry Crosby and ask him about other owners of the Flash II.  Exhibit 1, ¶ 16.

This shows either gross negligence or deliberate indifference.

37.    Willoughby had never received any indication that there was more than one unknown owner.  Therefore, it simply did not occur to Willoughby that Crosby could provide information about "the doctor."  Exhibit 1, ¶ 16.

False.  Willoughby learned twice – once from the CW and again from Ole Anderson's

hearsay statement in the Boston Globe article – that a doctor was the primary owner of Flash II.

Willoughby even noted Ole's statement in his investigative report. [USDocReqResp pp. 5,  40.]

When Crosby came forward and filed a claim, the government was not free to assume that

Crosby was that doctor/investor without asking him.  Had they asked Crosby they would have

found out not only that Crosby was not a doctor, but that Crosby knew the doctor's name. [Gov.

Ex. 3 - CrosbyAff ¶ 4.]

38.    Willoughby recently contacted the Massachusetts Board of Medicine to determine when Lane's credentialing process had been completed.  Exhibit 1, ¶ 17. The Massachusetts Board of Medicine records show the following:  Dr. Kerry S. Lane (Anaesthesiologist) renewed his Massachusetts license on 5/21/05.  Exhibit 1, ¶ 17.

The credentialing process Dr. Lane referred to in his October 2004 phone conversation

with Ole Anderson was the credentialing process for Dr. Lane's new position at St. Anne's

hospital in Fall River, Massachusetts, which ended in December 2004.  It had nothing to do with

his Massachusetts medical license, which is renewed every two years by the payment of dues, without any credentialing process. The government could not reasonably have misconstrued Dr. Lane's statements about undergoing the credentialing process at his new job to involve his renewal of his Massachusetts medical license. [LaneAff1 ¶ 13, LaneAff2 ¶ 1; LaneAff3 ¶ 9.]

39.   Mass Board of Medicine told Willoughby that the licenses are good for 2 years and are renewed on the doctor's birthday. Exhibit 1, ¶ 17.

Admitted but irrelevant.

40.   Harry Crosby ("Crosby") purchased an interest in a Star Class Sloop Sailboat Built in 1930 with Hull Number 721, named Flash II, (hereinafter "Flash II") in 1996. Affidavit of Harry E. Crosby, attached as Exhibit 2, at 1.

Admitted.

41.   Crosby purchased one quarter interest in the Flash II for $5,250, and these funds, along with funds from an individual by the name of Chuck Fitzgerald ("Fitzgerald") were used by Gregory "Ole" Anderson ("Ole Anderson") to purchase the Flash II at auction. Exhibit 2, at 2.

Dr. Lane does not dispute Crosby's claim that he contributed $5,250, along with Chuck Fitzgerald's $14,000, to purchase of Flash II at the 1996 auction – but disputes the shares Crosby thereby obtained.

42.   Fitzgerald sought to sell his interest in the Flash II and Crosby invested another $5,000, which he understood brought his interest in the Flash II to one-third. Exhibit 2, at 3.

Dr. Lane disputes this. The record does not contain any documentation corroborating Crosby's claim that he paid an additional $5,000, or any contracts establishing what percentage he owned after making that investment.

43.   Around the time Fitzgerald sought to sell his interest in the Flash II, Crosby came to understand that a doctor who lived somewhere in Florida, whose name was Kerry Lane ("Dr. Lane"), had also invested money in the Flash II. Exhibit 2, at 4.

Admitted.

44.     Crosby met Dr. Lane only one time, at the unsuccessful auction of the Flash II by
        Guernseys in 1998; however, Crosby does not know, and has never known, Dr. Lane's
        address.  Exhibit 2, at 5.

        Admitted.  It is irrelevant that Crosby did not know Dr. Lane's address or phone.  The

DEA could have gotten it from the Florida Board of Medicine website or the DEA's own

database of doctors with DEA certificates to prescribe controlled substances – both of which

required doctors to keep their contact information current. [LaneAff3 ¶ 5.]

45.     Crosby stated that Ole Anderson made all of the arrangements related to the 1998
        Guernseys auction and did all the paperwork for the 1998 auction.  Exhibit 2, at 6.

        Ole Anderson probably made most of the arrangements, since he was the manager of the

Flash II for the consortium.  However, attorney Robert Harper represented the consortium in

relation to the auction (for which he was to be compensated 5% of the net proceeds) and Harper's

contact information should have been in the Guernseys file. [LaneDocReqResp pp. 12-13, 31-

32.]

46.     As far as Crosby knew, all documents related to the Flash II were exclusively in Ole
        Anderson's name.  Exhibit 2, at 6.

        Dr. Lane can not dispute what Crosby knew or believed.  The sailboat was not titled or

registered as a car or house would be.

47.     Crosby understood that Ole Anderson turned down an offer for the Flash II that came out
        of the 1998 auction.  Exhibit 2, at 7.  Ole Anderson did not consult with Crosby in
        advance of rejecting the offer, as Crosby understood that Ole Anderson had the right to do
        what he wanted as far as the Flash II went.  Exhibit 2, at 7.

        Dr. Lane admits the first sentence, and denies the rest.  Ole Anderson, Dr. Lane, Crosby

and attorney Robert Harper were all present in person at the Guernsey's auction. [Gov. Ex. 3 -

11

CrosbyAff ¶ 5; HarperAff ¶ 4; LaneAff3 ¶ 4.]  If Crosby "understood that Ole Anderson had the

right to do what he wanted as far as the Flash II went" (an incredible statement given the fact that

Crosby attended the auction in person and yet is now claiming he didn't know what percentage

he would get if it sold) – that was not Dr. Lane's understanding.  Dr. Lane  obtained contracts

and legal documents evidencing his interest. [LaneDocReqResp ¶ 31-32.]  If Crosby chose not to

demand such documentation – which seems unlikely given the  documentation with Crosby's

name on it which Dr. Lane received – that was Crosby's own negligence.

48.     Ole Anderson showed the Flash II at various times, in order to garner publicity so that the
        Flash II would get a greater price, and the Flash II was transported between Florida and
        Massachusetts for that purpose.  Exhibit 2, at 8.

        Admitted.  When Flash II was transported to Florida it was stored at Dr. Lane's house in

Delray Beach, Florida. [LaneAff1 ¶ 2.]  A document in Marblehead's file showing the interstate

transport of Flash II from West Palm Beach to Marblehead was one such transfer from storage at

Dr. Lane's house. [Marblehead p. 111.]

49.     Crosby was not familiar with the Marblehead Trading Company, and understood that Ole
        Anderson knew people in Massachusetts, and that is how Anderson came to choose the
        storage place for the Flash II.  Exhibit 2, at 9.

        That may be true, since Crosby claims he took a "hands-off" approach to his investment.

Dr. Lane was familiar with Marblehead, and contributed the money to pay Marblehead's bills.

[LaneDocReqResp pp. 19-28; LaneAff1 ¶¶ 4, 6-7.]

50.     In about 2001, Ole Anderson went to jail for drug activity.  Ole Anderson was in jail for
        about a year.  Exhibit 2, at 10.

        Admitted.

51.     In approximately October 2004, Ole Anderson called Crosby and told him that the Flash
        II had been seized by the United States Drug Enforcement Administration ("DEA").

Exhibit 2, at 11.

Admitted.

52.     Ole Anderson called Crosby either the day of the seizure or the day after.  Exhibit 2, at 11.  Ole Anderson told Crosby that he had been caught up with something with a DEA informant, and the DEA had seized the boat.  Anderson suggested that Crosby hire a lawyer.  Id.

Dr. Lane does not dispute this.

53.     At the time of the initial telephone call from Ole Anderson to Crosby about the DEA seizure, Crosby understood from talking with Ole Anderson that the DEA had taken the Flash II, and that it was not coming back to Crosby unless he got a lawyer to pursue it. Exhibit 2, at 12.

Dr. Lane does not dispute this.

54.     Crosby also understood from Ole Anderson at the time of that initial telephone call that Ole Anderson was planning to leave the country in order to avoid pursuit by the DEA. Exhibit 2, at 12.

Dr. Lane does not dispute this.

55.     During the initial phone call, Ole Anderson told Crosby that he was going to call Dr. Lane and tell him about the seizure of the Flash II as well.  Exhibit 2, at 12.

Dr. Lane does not dispute this.

56.     Ole Anderson and Crosby spoke several times over the next few days, after the initial telephone conversation, and during one of those conversations, Ole Anderson told Crosby that Ole Anderson had spoken to Dr. Lane and Dr. Lane did not want to be involved. Exhibit 2, at 13.

Dr. Lane has no knowledge of what Ole Anderson told Crosby, but this statement is

inadmissible hearsay.

57.     Ole Anderson also told Crosby that Dr. Lane had a job interview where the DEA activity surrounding the Flash II was taking place, and that Dr. Lane did not want anything to do with it.  Exhibit 2, at 13.

Again, this is inadmissible hearsay.  If that is what Anderson told him, it is also

inaccurate.  Dr. Lane did tell Anderson he did not want adverse publicity to interfere with the

credentialing process at Lane's new job.  Dr. Lane completed the credentialing process at St.

Anne's Hospital in Fall River, Massachusetts in early December 2004. [LaneAff3 ¶ 9.]

58.    Crosby then contacted an attorney about the seizure of the Flash II based on the
       information he had received from Ole Anderson.  Exhibit 2, at 14.

       Dr. Lane does not dispute this, but it is irrelevant.

59.    Crosby's attorney filed a timely claim with the government for Crosby's share of the
       Flash II.  Exhibit 2, at 14.  The documents that Crosby supplied to the government at the
       time of his claim are attached to Exhibit 2.

       Dr. Lane does not dispute this, but it is irrelevant.

60.    Ralph Anderson ("Ralph Anderson") is the owner of Marblehead Trading Company.
       Affidavit of Ralph Anderson, attached as Exhibit 3, at 1.

       Dr. Lane does not dispute this.

61.    In the fall of 1996, Ralph Anderson received delivery of the Flash II from Ole Anderson.
       Exhibit 3, at 2.

       Dr. Lane does not dispute this.

62.    Ole Anderson hired Ralph Anderson's company to restore the Flash II.  Exhibit 3, at 3.

       Dr. Lane does not dispute this.

63.    Ralph Anderson performed a substantial amount of work on the Flash II to restore it.
       Exhibit 3, at 4.

       Marblehead – not Ralph Anderson – performed a substantial amount of work to restore

Flash II.

64.    Initially, the invoices for the restoration of the Flash II were sent to Ole Anderson
       directly, but later, Ralph Anderson sent them to an attorney's office at Ole Anderson's
       request.  Exhibit 3, at 4.

       False.  Marblehead's quarterly invoices for storage were sent to Ole Anderson, but except

for one invoice in 1998 [Marblehead p. 112], those were all dated after 2000. [Marblehead pp. 112, 160-63, 166-67, 172-74, 176-77, 179, 181-82.] Marblehead's invoices for repairs were all sent to attorney Robert Harper, beginning November 26, 1996. [Marblehead pp. 6, 27, 29, 39, 41, 54, 60, 62, 80, 82, 96, 98, 116, 118, 123, 126, 137.]

65.   All invoices were eventually paid by Ole Anderson or his attorney, with the exception of payments made by Viking Capital Investment, H.E. Crosby, and Blue Moon, Ltd. Exhibit 3, at 5.

        False. Although Ole Anderson or Robert Harper may have been the payor on most of the checks, Dr. Lane supplied the money that Anderson and Harper used to pay the invoices.

66.   Ralph Anderson has never received a payment from Dr. Lane. Exhibit 3, at 6.

        False. The payments would not go to Ralph Anderson, but to Marblehead. Dr. Lane paid at least one cashiers check directly to Marblehead, made out to Marshall Chapman. [LaneDocReqResp p. 22, second check down.] Although the payor on the cashiers' check was listed as "Ole Anderson," that was to identify the payment for Marblehead's files; Dr. Lane's handwritten notation "from KSL for JFK boat" appears on the check.

67.   Ralph Anderson understood Ole Anderson to be the owner of the Flash II. Exhibit 3, at 7.

        It is not known what Ralph Anderson "understood" – but Marblehead's files contain invoices mailed to attorney Robert Harper. Had anyone contacted Harper, he would have told them that Dr. Lane was the primary investor in the sailboat. [HarperAff ¶ 3.]

68.   From 1996 until the Flash II was seized from Ralph Anderson's shipyard by the DEA in October of 2004, Ralph Anderson never dealt with anyone else claiming an ownership interest in the Flash II. Exhibit 3, at 8.

        Ralph Anderson was the owner of Marblehead, which had several employees. Since Ole Anderson was responsible for management of the sailboat, he would generally be the one dealing

with Marblehead.  Dr. Lane called Marblehead several times over the years, but generally dealt

with a woman.  He also may have spoken to Marblehead employee Marshall Chapman.

[LaneAff3 ¶ 2.]

69.  Prior to the seizure of the Flash II from Ralph Anderson's shipyard, Ralph Anderson had never heard of a doctor claiming an ownership interest in the Flash II.  Exhibit 3, at 10.

Immaterial.  Dr. Lane had never heard of Ralph Anderson either, although he knew of

Marblehead.

70.  Ralph Anderson was present when the Flash II was seized from his shipyard by the DEA.  Exhibit 3, at 11.  He received a <u>copy of the seizure warrant.  Id</u>. at 9, and attachment thereto.

Dr. Lane does not dispute this.

71.  Ralph Anderson received a telephone call about the Flash II within a month after the Flash II was seized from his shipyard by the DEA.  The call was from an individual that did not wish to be identified and did not give Ralph Anderson his name.  The caller identified himself as a doctor and said that he was part owner of the Flash II.  Exhibit 3, at 12.

Dr. Lane denies making any such call.  Although Dr. Lane did call Marblehead from time

to time, he does not remember calling Marblehead during that time frame, and he is not sure he

ever spoke to Ralph Anderson at all.  When Dr. Lane called Marblehead, he generally spoke to a

woman. [LaneAff3 ¶ 2.]  This is inadmissible hearsay and must be stricken.

Furthermore, any phone call to Marblehead made shortly after the seizure of the sailboat

is immaterial to the issues on remand.  The forfeiture action was not pending then, so any

information given to Dr. Lane at that time would not substitute for notice of the forfeiture

proceedings.

72.  The individual calling Ralph Anderson asked where the boat had been taken, and Ralph Anderson told him that the Flash II had been seized by the DEA.  Exhibit 3, at 12.

See response to paragraph 71.

73.    Ralph Anderson told the caller that he should call the DEA to find out where the Flash II had been taken.  Exhibit 3, at 12.

See response to paragraph 71.

74.    The caller told Ralph Anderson that he could not call the DEA because the caller did not want the DEA to know where the caller was.  Exhibit 3, at 12.

See response to paragraph 71.  The content of this statement suggests the caller was

actually Ole Anderson, since Ole disappeared (apparently a fugitive from justice) immediately

thereafter.  Dr. Lane would never have told them he did not want the DEA to know where he

was.  He was a licensed medical doctor with a DEA certificate to prescribe medication, whose

contact information was on file with the DEA at all times. [LaneAff3 ¶ 5.]

75.    Ralph Anderson stated that the caller then asked him more questions about the Flash II, and Ralph Anderson again told the caller to call DEA.  The caller again responded to Ralph Anderson that he could not call the DEA.    Exhibit 3, at 12.

See responses above paragraphs 71 and 74.

76.    Finally, Ralph Anderson told the caller that DEA had the Flash II, and he should call the DEA if he wanted more information.    Exhibit 3, at 12.

Denied.  See responses above paragraphs 71 and 74.

77.    Even though the caller did not leave Ralph Anderson with any identifying information, Ralph Anderson provided the caller with the name and phone number of Ralph Anderson's lawyer.  Exhibit 3, at 13.

Denied.  See responses above paragraphs 71 and 74.  Dr. Lane got the phone number of

Marblehead's lawyer from Marblehead in the last week of June 2005, and called attorney

Kenneth Lindauer immediately.  No one gave him the name of Marblehead's lawyer until the last

week of June 2005. [LaneAff3 ¶ 3.]

17

78.    Ralph Anderson stated that he received documents from the agents that seized the Flash II indicating who they were and how to contact them, but since the caller did not leave any information on how Ralph Anderson could him, Ralph Anderson could not forward this information to the caller.    Exhibit 3, at 14.

Not disputed but irrelevant.  No third party who receives notice has a duty to provide

notice to other parties, and the government is not relieved of its obligation to provide notice to all

owners by its notice to some owners.

79.    Ralph Anderson received notice regarding the forfeiture of the Flash II and filed the documents in his file regarding the Flash II.    Exhibit 3, at 15.

Dr. Lane does not dispute this but it is irrelevant.

80.    Ralph Anderson had no way of contacting to person who had called him claiming to be a part owner of the Flash II.    Exhibit 3, at 16.

Dr. Lane does not dispute this but it is irrelevant.  Ralph Anderson had no duty to give

notice, and the government's service of notice on him did not absolve the government from its

duties to ascertain ownership and service notice on all persons believed to own an interest in the

property.

81.    Ralph Anderson has never known Dr. Lane and has never had dealings with anyone other than Ole Anderson regarding the Flash II.    Exhibit 3, at 17.

Immaterial.  Ralph Anderson himself may never have spoken to anyone other than Ole

Anderson, but it is indisputable that Marblehead's records show attorney Thomas Harper as the

contact person with regard to the Flash II.

82.    J. Thomas Kerner ("Atty. Kerner") is an attorney licensed to practice in Massachusetts. Affidavit of J. Thomas Kerner, attached as Exhibit 4, at 1.

Dr. Lane does not dispute this but it is irrelevant.

83.    Atty. Kerner was retained in the fall of 2004 by Crosby, with regard to Crosby's interest in the Flash II that had been seized by the DEA.  Exhibit 4, at 2.

Dr. Lane does not dispute this but it is irrelevant.

84.     Shortly after being retained by Crosby, Atty. Kerner performed a Google search on November 5, 2004 for information about the Flash II.  Exhibit 4, at 3.

Dr. Lane does not dispute this but it is irrelevant.

85.     In response to that Google search, Atty. Kerner obtained an article from the Boston Globe dated October 14, 2004, which stated that the Flash II had been seized by the DEA. Exhibit 4, at 4.

Dr. Lane does not dispute this but it is irrelevant.  Dr. Lane did not see that article until he

pulled it up on a search on June 27, 2005. [LaneHardDrive p. 1.]

86.     The article that Atty. Kerner located through the Google search further stated that the government was seeking to forfeit the Flash II, and the article contained a quote by U.S. Attorney Michael J. Sullivan regarding the importance of the "seizure and forfeiture of assets allegedly gained from drug proceeds."  Exhibit 4, at 4.

Dr. Lane does not dispute this but it is irrelevant, since Dr. Lane did not see the article

until June 27, 2005.  Publication of this article does not substitute for the government's duty to

give due process notice to persons having ownership interests in the property *of the pendency of*

*forfeiture proceedings that might affect their interests*.   There were no forfeiture proceedings

pending at the time that article was published.

87.     The article further stated "If the government wins its forfeiture case, then it will probably sell the boat to the highest bidder," attributing the statement to U.S. Attorney Sullivan. Exhibit 4, at 5.

See the response to paragraph 86 above.

88.     Atty. Kerner performed the same Google search on September 6, 2005, and again obtained this same Boston Globe article.  Exhibit 4, at 6.

Irrelevant.

19

89.     After Atty. Kerner read the Boston Globe article, he contacted the U.S. Attorney's Office and spoke with Assistant U.S. Attorney Shelbey Wright ("AUSA Wright").  Atty.  Kerner told AUSA Wright that he represented an owner of the Flash II.  Exhibit 4, at 7.

Irrelevant.

90.     AUSA Wright took Kerner's name and address and Kerner's client's name, and she told Kerner that she would add his client's name to the notification list.  Exhibit 4, at 8.

Irrelevant.

91.     In due course, approximately February 14, 2005, Atty. Kerner received a copy of the Complaint and Warrant & Monition.  Exhibit 4, at 9.

Irrelevant.

92.     Lisa J. Talbot is a Paralegal Specialist in the Asset Forfeiture Unit of the United States Attorney's Office for the District of Massachusetts.  Affidavit of Lisa J. Talbot ("Talbot"), attached as Exhibit 5, at 1.

Admitted.

93.     In approximately late June, 2005, Dr. Lane phoned the United States Attorney's office concerning the forfeiture of the Flash II.  The call was transferred to Talbot, and she spoke with Dr. Lane.  Exhibit 5, at 2.

Admitted, but it was on Friday July 1, 2005, not late June.

94.     Dr. Lane told Talbot that he was part owner of the Flash II, and wanted to know what he could do to get his fair share of the proceeds of the sale of the Flash II, because he had heard that the Flash II was being forfeited and sold by the United States.  Exhibit 5, at 3.

Dr. Lane called the U.S. Attorney's Office on Friday July 1, 2005 and was connected to

paralegal Lisa Talbot.  If he told her he had heard the Flash II was being forfeited and sold by the

U.S., his knowledge of the possibility it was being forfeited and sold had just come to his

attention that week (Monday June 27 through Friday July 1).  Over the weekend of June 25-26,

Dr. Lane's long time friend, a police officer, explained to him the forfeiture process, spurring Dr.

Lane to  investigate upon his return home on Sunday.  Dr. Lane's hard drive shows he saved a

20

copy of the Boston Herald article to his hard drive on Monday June 27 – indicating that was the

date he ran a Google search and found the October 2004 article. See Lane Statement of Facts ¶¶

32-36.

95.    Talbot told Dr. Lane that the Court had entered a Notice of Default against anyone making a claim to the Flash II, and that the Flash II was being turned over to the United States for forfeiture, but if Dr. Lane thought that he had standing to contest the forfeiture, he should get find an attorney.  Exhibit 5, at 4.

    Admitted.

96.    Dr. Lane told Talbot that he didn't want to spend $5,000 for an attorney and not get anything in return.  Exhibit 5, at 5.

    This mischaracterizes the conversation.  Dr. Lane was outraged that the government

wouldn't simply accept his representations and negotiate in good faith regarding his innocent

owner interest without requiring him to hire an attorney first.  The claim that Lane would not get

anything in return was Talbot's spin on the conversation.  Dr. Lane had no reason to believe he

would not win, since he was innocent and had documentation of his interest.  [LaneAff3 ¶ 6.]

97.    Talbot explained that the Court had issued a Default, and asked why Dr. Lane hadn't come forward sooner to file a claim to the Flash II.  Exhibit 5, at 6.

    True.

98.    Dr. Lane told Talbot that he didn't come forward sooner because of two reasons:  1) He was going through the accreditation process at his new place of employment, and didn't want them to know of his possible affiliation with a criminal (Ole Anderson); and, 2) Dr. Lane stated that he hadn't come forward sooner because he was under the impression that the Flash II would be donated to the Smithsonian when it was forfeited, and if the Flash II was going to be donated to the Smithsonian, Dr. Lane said that he would just let it go to the museum.  Exhibit 5, at 7.

    Again this mischaracterizes the conversation.  Dr. Lane may have told her that when Ole

Anderson advised him about the sailboat seizure, he had told Anderson not to give out his name

to the press because he (Dr. Lane) was undergoing the credentialing process at his new place of

employment. However, Part 2 is false. Although Dr. Lane may have asked if the government

was trying to sell the sailboat to the Smithsonian, he did not agree to give up his interest if that

were to occur. Dr. Lane had always been hoping a major museum would buy the sailboat and put

it on public display. However, if it were to go to such a buyer, Dr. Lane expected his share of the

proceeds of sale. There was no reason Dr. Lane would have bothered calling the U.S. Attorney's

Office when he learned about the forfeiture case if his intent was to give the sailboat away for

free. [LaneAff3 ¶ 7.]

99.     Dr. Lane explained to Talbot that since he had found out that the Flash II was going to be
        sold by the government after the forfeiture was finalized, he decided that he would come
        forward claiming an ownership interest in the Flash II, to see if he could get some of the
        proceeds from the sale of the Flash II. Exhibit 5, at 8.

        This is mis-characterizes the conversation. The forfeiture had not in fact been finalized

when he called the U.S. Attorney's Office on July 1, 2005.

100.    Talbot asked Dr. Lane if he had any concrete documentation indicating an ownership
        interest in the Flash II, i.e. title documents, etc., and Dr. Lane said that he did not.
        Exhibit 5, at 9.

        False. Lisa Talbot told him his documentation might not be credible, seemingly trying to

discourage him from intervening in the litigation. Dr. Lane had plenty of documentation of his

interest, so he never would have told her he had none. [LaneAff3 ¶ 6.]

101.    Talbot then again explained to Dr. Lane that if he truly felt that he had an ownership
        interest in the Flash II, he would need to get an attorney, as the Court would need
        documentation before it would consider his claim of ownership. Exhibit 5, at 9.

        Admitted.

102.    Dr. Lane again indicated to Talbot that he didn't want to spend $5,000 for an attorney
        when he may not get anything in return. Exhibit 5, at 10.

22

This is a mischaracterization. Dr. Lane protested that he should not be required to hire an attorney before having the government consider his documentation of ownership and his innocent owner status in good faith. He never said he would get nothing in return. [LaneAff3 ¶ 6.]

103. Dr. Lane then told Talbot that he had a hand written agreement on his personal stationary that he could send the Court for verification that the Flash II belonged to him. Exhibit 5, at 10.

True, except the handwritten agreement is not on his personal stationery.

[LaneDocReqResp pp. 31-32.]

104. At that point, Talbot responded that she wasn't sure how credible the Court would find hand-written notes on Dr. Lane's personal stationary, and she again re-iterated that Dr. Lane should find an attorney if he wanted to pursue this issue. Exhibit 5, at 11.

True, except the hand-written contract was not "hand-written notes on Dr. Lane's personal stationery." Ms. Talbot's words seem to be aimed at discouraging Dr. Lane from filing a claim.

105. In Answers to Interrogatories, Kerry Lane testified that Ole Anderson phoned Dr. Lane or either October 13th, 14th, or 15th, 2004, and told Dr. Lane that the Flash II had been seized. Claimant Kerry Scott Lane's Answers to the United States' First Set of Interrogatories, attached as Exhibit 6, at Int. No. 3.

True.

106. Dr. Lane testified that Ole Anderson kept saying that he had been "set up" and that the police were going to prosecute him again. Dr. Lane's states that his attitude at that time was "I don't want to get involved in your problems." Dr. Lane did not want Ole Anderson's to become Dr. Lane's problems. Exhibit 6, at Int. No. 3.

True.

107. Dr. Lane told Ole Anderson, during this same phone call, that Dr. Lane did not want his name in the press. Dr. Lane also told Ole Anderson not to tell the police about Dr. Lane, because he did not want the police coming to Dr. Lane's new job asking questions while Dr. Lane was trying to get through the credentialing process. Further, Dr. Lane said to

Ole Anderson that he did not want the newspaper publicity connecting Dr. Lane's name to a drug dealer while Dr. Lane's credentialing process was going on. Exhibit 6, at Int. No. 3.

True. But Dr. Lane also told Ole Anderson to keep him apprised of any new developments. [LaneAff2 ¶ 1.] Dr. Lane's credentialing process was over in early December 2004, and after that he had no problem with publicity. [LaneAff3 ¶ 9.]

108.    Dr. Lane states that he set up a Google alert that would keep him apprised of any legal action concerning the Flash II. Exhibit 6, at Int. No. 5.

True – Dr. Lane believed his Google alert would keep him apprised of any new developments. However, if he set up the Google alert after the Boston Globe article came out, that article would not turn up on the Google alert, since Google alerts generally only send out bulletins about articles published that day. A Google search on the other hand brings up articles published previously. [LaneAff3 ¶ 10.]

109.    Lane now states that he first became aware of the potential for forfeiture after he told a childhood friend that the Flash II had been seized. Exhibit 6, at Int. No. 6. The friend, who had been on a drug task force, told Lane to act immediately, because the boat might be sold. Id. Lane called Marblehead Trading Company, and then called Marblehead's lawyer. Marblehead's lawyer then faxed Lane the notice of default in the forfeiture case. Id.

True – but there is no inconsistency between this and his statement set out in paragraph 110. There is a difference between (1) knowing of a seizure, (2) "first becoming aware of the potential for forfeiture" and (3) knowing that a forfeiture proceeding is pending. In the interrogatory the government asked when he "first became aware of the potential for forfeiture", and he answered that question. Dr. Lane learned of the seizure of the sailboat in October 2004. On June 25, 2005, while visiting with a friend who is a police officer, he discussed the seizure of the sailboat, and his friend explained that the boat might be undergoing forfeiture proceedings

and urged him to look into it.  After returning home from work on  Monday, June 27, Dr. Lane

located the Boston Globe article from October 2004 which mentioned the possibility of future

forfeiture proceedings.  Having had the forfeiture process explained to him by his friend over the

weekend, he knew he had to immediately take action to defend his property – which he did.

110.    Previously, Lane filed an affidavit with the Court stating that he first learned of the
        forfeiture when he received an article from his "google alert."  Docket Entry 20-4 at ¶3.

        This is partially true, but the government fails to distinguish between "first [becoming]

aware of the potential for forfeiture" and first learning of this pending forfeiture proceeding. See

response to paragraph 109 above.

111.    Lane stated in that affidavit that after his phone call with Ole Anderson, he "immediately
        began searching on the internet for any information about what was going on."  Id. He
        claimed he set up a Google alert and read through hundreds of search results and "found
        no references to the whereabouts of the boat." Id.  He stated that "Months passed with no
        word."  Id.  According to that affidavit, "The first I ever heard of a forfeiture case against
        the boat was an article from my Google alert in late June 2005. Immediately began
        looking for a lawyer and raising money for legal fees.  On June 30 I contacted
        Marblehead, and their lawyer faxed me the Notice of Default."  Id.

        True, except that it now appears Dr. Lane found the old Boston Globe article as a result of

a Google search instead of a  Google alert.  [LaneAff3 ¶ 9.]

112.    In a different affidavit, Lane stated that "In late June 2005, I learned for the first time
        through a newspaper article that the Sailboat was to be auctioned."  Docket Entry 17, at
        page 4, ¶16.

        This is correct.  The article Dr. Lane saved to his hard drive on June 27, 2005 is the

October 2004 Boston Globe article by Shelley Murphy, in which the U.S. Attorney stated that

forfeiture proceedings would be filed in the future and that, if forfeited, the sailboat would be

sold to the highest bidder. [LaneAff3 ¶ 9; USDocReqResp pp. 101-02.]

113.    Dr. Lane states that in trying to locate the article that alerted him to the possibility that the

Flash II would be forfeited, he searched his hard drive and was only able to find an e-mail from a girlfriend dated August 28, 2005, which had attached to it the October 13, 2004 Boston Globe article by Shelley Murphy.  Exhibit 6, at Int. No. 5.  He later refers to the email as having been dated September 28, 2005.  Exhibit 6, at Int. No. 10.

This was correct at the time he submitted that affidavit, but further searches of his hard drive have finally turned up the article. [LaneAff3 ¶ 9; LaneHardDrive p. 1.]  The email from his girlfriend is an irrelevant document, because Dr. Lane had already filed his motion to vacate default by the time Dr. Lane got the email.  If there was a discrepancy in the date of the irrelevant email, it was a typographical error.

114.  Dr. Lane stated that he expected Ole Anderson to contact him if any new developments occurred regarding the Flash II, as Ole Anderson had always been reliable in keeping Dr. Lane informed about matters relevant to the Flash II.  Exhibit 6, at Int. No. 7.

True.

115.  Dr. Lane confirmed that he had no contact with Ole Anderson after Ole Anderson's phone call to Dr. Lane in October, 2004.  Exhibit 6, at Int. No. 15.

True, although there might have been a second phone conversation with Ole Anderson later that day or the next day; Dr. Lane's recollection is unclear on this point.  After mid-October 2004, Dr. Lane never heard from Ole Anderson again. [LaneAnsRogs ¶ 3.]

116.  Dr. Lane stated that he was not sure whether he had ever met or talked to Crosby.  Dr. Lane further stated that because Ole Anderson was the manager of the Flash II, everything went through Ole Anderson, and all of his communications were with Ole Anderson rather than the other investors.  Exhibit 6, at Int. No. 18.

True.  At the time he wrote his declaration, Dr. Lane was not sure that he had ever met or talked to Crosby.  Although he remembered meeting three or four people Ole Anderson brought with him to Guernsey's auction in 1998, at the time Dr. Lane answered his interrogatories he was not certain Crosby was among them.  [LaneAff3 ¶ 4.]

117.    Lane's Responses to Requests for Admissions, attached as Exhibit 7, state that he is not sure whether Ole Anderson told him that the DEA had seized the boat.

Correct.  Ole Anderson told Dr. Lane that the sailboat had been seized, but Dr. Lane was not sure whether Ole told him the seizure was by the DEA.

118.    United Press International picked up the press release and included a story on its UPI News wire on October 14, 2004.  Exhibit 8.

Irrelevant.  Press releases and newspaper articles do not substitute for notice.  There is no evidence Dr. Lane saw these articles or press releases, and even if he had, they could not substitute for notice of forfeiture proceedings which had not yet been filed.

119.    The UPI wire story noted that the Flash II had been owned by John F. Kennedy and was confiscated from Gregory "Ole" Anderson in the hope of auctioning it off to the highest bidder.  Exhibit 8.

Irrelevant.  See response to paragraph 118.

120.    The news wire included the quote from the U.S. Attorney stating that the "seizure and forfeiture of assets" from drug dealers is critical for deterrence.  The same article was included in the UPI "Quirks in the News" wire for October 16, 2004.  Exhibit 8.

Irrelevant.  See response to paragraph 118.

121.    The United States Attorney's Office issued a press release. The release is attached at Exhibit 9.

Irrelevant.  See response to paragraph 118.

122.    The feature article from the Boston Globe is attached as Exhibit 10.

Incorrect. It was Government Exhibit 11.

Respectfully submitted,
Kerry Scott Lane, MD,

By his attorneys,

27

_____/s/ Brenda Grantland_____
Brenda Grantland, Esq.
Law Office of Brenda Grantland
20 Sunnyside Suite A-204
Mill Valley, CA 94941
(415) 380-9108
Pro hac vice


_____/s/ Eric B. Goldberg_____
Jeffrey P. Allen (BBO# 015500)
Eric B. Goldberg (BBO# 564398)
Seegel Lipshutz & Wilchins, P.C.
Wellesley Office Park
20 William Street, Suite 130
Wellesley, MA 02481
(781) 237-4400