UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,　　|
　　　　　　　　　　　　　　　　|
　　　　　　　Plaintiff,　　　　|
　　　　v.　　　　　　　　　　　|　　Civil Action # 05-10192 RWZ
　　　　　　　　　　　　　　　　|
ONE STAR CLASS SLOOP SAILBOAT　|
BUILT IN 1930 WITH HULL NUMBER　|
721, NAMED "FLASH II",　　　　|
　　　　　　　　　　　　　　　　|
　　　　　　　Defendant.　　　　|
_____|
　　　　　　　　　　　　　　　　|
KERRY SCOTT LANE, M.D.　　　|
　　　　　　　　　　　　　　　　|
　　　　　　　Claimant.　　　　|
_____|

**CLAIMANT KERRY SCOTT LANE'S STATEMENT OF FACTS**

**Sailorman/Chuck Fitzgerald**

1.　　The Flash II was purchased at auction on 6-29-96 by Chuck Fitzgerald, owner of

Sailorman New and Used Marine Emporium, Ft. Lauderdale, Florida.  The auction was

widely reported in newspapers, and the articles all stated that Chuck Fitzgerald of

"Sailorman" in Ft. Lauderdale was the successful purchaser.  [LaneDocReqResp pp. 1-2.]

2.　　Ole Anderson traveled to the auction to bid on the Flash II on Chuck Fitzgerald's behalf.

Chuck Fitzgerald gave him $11,000 to bid on the sailboat. [FitzgeraldAff1 ¶ 3.]  Another

investor, whose name was unknown to Fitzgerald contributed approximately $5,000

[FitzgeraldAff1 ¶ 4.]   Based on the timing in his documentation, this other investor was

apparently Harry E. Crosby, who contributed $5,250. [Gov. Ex. 3 - Crosby Aff. ¶ 2.]

Fitzgerald gave Ole permission to bid up to $18,5000 and provided additional funds to

1

cover the higher bid and the 10% buyer's premium. [FitzgeraldAff1 ¶ 5.]  Ole Anderson did not invest any of his own money in the purchase. [FitzgeraldAff1 ¶ 4.]

3.    The boat was shipped to Sailorman's shipyard in Ft. Lauderdale, where Fitzgerald and Anderson inspected it and determined that there was no hull number on the boat. Thinking that would make it difficult to establish authenticity, Fitzgerald told Anderson he wanted his interest bought out within 2 weeks.   Having no money himself, Anderson agreed to put together a group of investors to buy out Fitzgerald's interest for approximately $23,000.  [FitzgeraldAff1 ¶ 6.]

4.    Ole Anderson began putting together plans for "the consortium" which would buy out Fitzgerald's interest, and had contracts drawn up which the consortium participants signed, evidencing their investments and shares. [LaneDocReqResp pp. 8-10, 12-13, 15-16.]

5.    Dr. Lane and Ole Anderson traveled to Sailorman shipyard and met with Chuck Fitzgerald in person on July 12, 1996, when Dr. Lane paid the first $5,000 installment to Fitzgerald toward the purchase of Sailorman's interest.  [LaneDocReqResp pp. 6-8.]  In the ensuing weeks, Dr. Lane paid an additional $20,000 to Ole Anderson to finish buying out Sailorman's interest and begin restoring the sailboat. [LaneAff1 ¶ 4.]

6.    Discovery revealed that, on March 10, 2005 – after this forfeiture case was filed and served on others, but not on Dr. Lane – AUSA Shelbey Wright received a letter from Thomas Kerner, the attorney for claimant Crosby, which included a copy of a newspaper article showing Chuck Fitzgerald was the purchaser of the Flash II at the June 1996 auction. [USDocReqResp pp. 107-109.]  The article names Chuck Fitzgerald's business –

Sailorman, in Ft. Lauderdale, Florida.  [USDocReqResp p. 109.]

7.      The government did not contact Sailorman or otherwise follow up on the lead.

[Usanswrogs  ¶ 9.]

8.      Sailorman is still located in Ft. Lauderdale, Florida, and has a listed telephone number.

[We ask the court to take judicial notice:  a call to 411 will turn up the phone number.]

9.      No government agent ever contacted Sailorman to determine who owned interests in the

sailboat. [FitzgeraldAff2.]  Had they contacted Sailorman, Chuck Fitzgerald could have

told them that Dr. Lane bought out Sailorman's interest in the sailboat (minus 1% interest

which Fitzgerald retained.)  [FitzgeraldAff1 ¶¶ 6, 8.]  Fitzgerald has retained his

documentation from the sale, including a copy of the cashier's check Dr. Lane gave him,

listing the full name "Kerry Scott Lane."  Fitzgerald also could have told them that Dr.

Lane was a medical doctor in Florida, and the agent could find his current contact

information by contacting the Florida Medical Board.  [FitzgeraldAff2.]

**Attorney Robert Harper**

10.      Attorney Robert A. Harper represented the consortium and acted as the exclusive agent

for the Flash II. [LaneDocReqResp p. 12 ¶ 3.]  His involvement began immediately after

the auction, with a 7-3-96 letter to Sotheby's auction house on Harper's letterhead, stating

he represented the owner. [LaneDocReqResp p. 5.]  Harper issued a press release on his

stationery [Marblehead p. 8], which Marblehead sent out a modified version of on 11-26-

96 [Marblehead 8-15.]  The handwritten contract dated 12-4-97 –  outlining the formula

for computing what each investor and lienholder would be paid if the sailboat sold at the

March, 1998 Guernsey's auction – showed Harper was representing the consortium as an

3

agent with regard to the auction in exchange for 5% of the net proceeds.
[LaneDocReqResp pp. 31-32.]

11.    Guernsey's auction house should have had Harper's name listed as a contact person – but we have not pursued that lead yet.

12.    Robert Harper was also the key contact person listed in Marblehead's records regarding Flash II.  Most of the invoices in Marblehead's file for the Flash II are addressed to Robert Harper at his Tallahassee law office address.  [Marblehead pp. 6, 27, 29, 39, 41, 54, 60, 62, 80, 82, 96, 98, 116, 118, 123, 126, 137.]  Marblehead's file also contained the press release written by  Harper, a shorter version of which was sent out by Marblehead to news outlets on 11-27-96. [Marblehead pp. 8-9.]

13.    Robert Harper knew Dr. Kerry Lane was the primary investor in the Flash II.  Harper met Dr. Kerry Lane, as well as claimant Harry Crosby, at the March 1998 Guernsey's auction in New York City.  Had the government contacted Harper, he would have provided contact information, or at least would have told them Dr. Lane was a medical doctor in Florida.  From there, the government could have gotten Lane's current contact information from the Florida Board of Medicine. [HarperAff ¶ 3.]

14.    No government agent asked Harper for information about the owners of Flash II [Usanswrogs ¶ 1; HarperAff ¶ 3] – despite the fact that Harper was engaged in discussions with the Boston U.S. Attorney's Office in connection with the criminal investigation of Ole Anderson. [HarperAff ¶ 2.]

**Marblehead Trading Company/ Ralph Anderson**

15.    When the government seized the Flash II from Marblehead Trading Company, agents

4

interviewed the owner of the company, Ralph Anderson, but apparently never questioned

any other Marblehead employees. [USDocReqResp pp. 4-5.]

16.    During the interview with Ralph Anderson (the owner), the agents never asked Ralph

Anderson for the identities of owners of the sailboat, and failed to request the documents

from Marblehead's file. [Usanswrogs ¶ 2.]

17.    Had the government subpoenaed Marblehead's file immediately after the seizure, rather

than last month in response to this motion on remand, it would have seen immediately

that attorney Robert Harper was listed as the contact person for the Flash II on most of

Marblehead's invoices. See paragraph 12 above.

18.    Whatever assumptions the agent may have made from Ralph Anderson's statement that

Ole Anderson was the person he always dealt with in regard to the Flash II, that does not

establish ownership. Since Ole Anderson was responsible for management of the Flash II

under the contracts with the consortium members [LaneDocReqResp p. 10 ¶ 4 & p. 13 ¶

4.] – he naturally would be the person dealing with the boat yard on a day to day basis.

19.    Dr. Lane does not recall making any phone call to Marblehead that resembled the one

described in the declaration Ralph Anderson recently gave the government. Dr. Lane has

spoken to Marblehead employees on occasion, although he is not certain he ever spoke to

Ralph Anderson, the owner of the company. When Dr. Lane called Marblehead he

generally spoke to a woman. When Dr. Lane saw the name "Ralph Anderson" in court

pleadings, he did not recognize that name, and thought it was some relative of Ole

Anderson's. Dr. Lane also knew a Marblehead employee named Marshall Chapman was

primarily responsible for doing the renovation work on the sailboat, and believes he may

have spoken to Chapman. [LaneAff3 ¶¶ 1-3.]  One of Dr. Lane's cancelled checks paid to

Ole Anderson for refurbishing Flash II was endorsed over to Marshall Chapman.

[LaneDocReqResp p. 24 (second check down).]

20.    Dr. Lane has no recollection of calling Marblehead close to the time of the seizure, and

certainly did not obtain Marblehead's attorney's name and number then.  He did call

Marblehead on approximately June 30, 2005, and they gave him the name and phone

number of Marblehead's lawyer, Kenneth Lindauer.  That same day Dr. Lane called

Lindauer, and on July 1, 2005, Lindauer faxed him copies of court documents. [LaneAff3

¶¶ 1-3; LaneDocReqResp pp. 33-35.]  These documents revealed the court and case

number (but not the proper case name), and AUSA Shelby Wright's contact information

– for the first time informing Dr. Lane of the essential information he needed to take

action in the pending forfeiture case.

21.    Harry E. Crosby – another member of the consortium, who filed a claim in this forfeiture

case and settled with the government for 30% of the proceeds of sale of the Flash II –

knew that Dr. Kerry Lane was the doctor/investor described by the CI in the complaint.

[Gov. Ex. 3 - CrosbyAff.[1] ¶ 4.]  Crosby even met Dr. Lane at the Guernsey's auction in

1998. [Gov. Ex. 3 - CrosbyAff. ¶ 5.]  However, the government did not ask him about

other owners of the sailboat, and apparently[2] he did not volunteer that information or give

---

[1]  The Crosby declaration was obtained by the government and submitted with its latest motion.  Dr. Lane takes issue with some of the representations Crosby made in his declaration, but perhaps those issues are not ripe for litigation yet, as this Court apparently ruled in quashing Dr. Lane's subpoena duces tecum to Crosby.

[2]  It is not clear from the government's answers to interrogatories whether they asked Crosby about the identity of the doctor-investor after October 18, 2005 because the government

the government documents with Dr. Lane's name on them.  [Usanswrogs ¶ 3.]

22.    Dr. Lane is licensed by the boards of medicine of both Florida and Massachusetts.  The

Boards of Medicine would always have his current address and phone, because

regulations require it.  The Florida Board of Medicine website has a search function that

allows one to search the entire database of all medical professionals licensed in the state,

by first and last name.  See http://ww2.doh.state.fl.us/IRM00profiling/searchform.asp.

Dr. Lane is the only "Kerry Lane" in the database.

23.    As a practicing physician, Dr. Lane was required to obtain a DEA certificate in order to

prescribe controlled substances.  Dr. Lane has always kept his DEA certificate current.

The DEA's own database of doctors holding such certificates would have contained Dr.

Lane's contact information. [LaneAff3 ¶ 5.]

24.    Dr. Lane has lived in Florida for 26 years, but, coincidentally, was living in Fall River,

Massachusetts, (where he had just gotten a job for St. Anne's Hospital), at the time the

Flash II was seized.  He has returned to Florida and is practicing medicine there now.

The people associated with Flash II knew he was a Florida doctor. [LaneAff3 ¶.]

**Dr. Lane's knowledge of the seizure, etc.**

25.    Dr. Lane has always acknowledged that he learned of the seizure of the sailboat in mid-

October 2004, in a phone call from Ole Anderson. [LaneAff1 ¶ 12, LaneAff2 ¶ 1.]

However, the First Circuit held that knowledge of the seizure does not substitute for

---

objected and narrowed its answers to the interrogatories to avoid divulging information learned
after that date.

notice of the forfeiture proceedings once filed.[3]

26. Dr. Lane did not know about the forfeiture laws, and did not appreciate the significance of Ole Anderson's statement that the sailboat had been seized. [LaneAff2 ¶ 1.]

27. Recently, in its interrogatories, the government asked Dr. Lane when he first became aware of the *possibility* of forfeiture. As he stated in his answers to interrogatories, when Dr. Lane visited in New Jersey with his friend, a law enforcement officer, on Saturday, June 25, 2005, his friend told him the seizure of the sailboat by law enforcement could lead to the loss of his property if forfeiture proceedings were filed.

> During the week of June 19-26, 2005, I spent the week in Philadelphia and New Jersey. While there, on Saturday June 25, 2005, I met with my oldest childhood friend, Inspector Richard Heathwood of the New York State Police who has been with the Joint DEA, New York State Police and NYPD drug task force since about 1985. I told him that Flash II had been seized. He urged me to act immediately, warning me that the boat might be sold if I did not act quickly. I was not familiar with the forfeiture process before that.

[LaneAnswRogs ¶ 6.] This spurred Dr. Lane into action.

28. During the week of June 27 - July 1, 2005, Dr. Lane learned for the first time of the pending forfeiture proceedings. First he read a newspaper article stating the government intended to forfeit the sailboat and sell it at auction. Then he immediately began making phone calls to track down the court case and take action. [LaneAff2 ¶ 3.]

29. Dr. Lane has recently pinpointed the newspaper article and the date he first read it.[4] His

---

[3] *U.S. v. One Sloop Sailboat... Flash II*, 458 F.3d 16, 22 (1st Cir. 2006), citing *Gonzalez-Gonzalez v. U.S.*, 257 F.3d 31, 36 (1st Cir. 2001).

[4] He previously tried to locate the article on his hard drive but was unsuccessful because he was looking in the wrong directory. In his recent searches of his hard drive he discovered he

computer hard drive shows that on June 27, 2005, he saved a copy of the October 13, 2004 Boston Globe article written by Shelley Murphy. That same evening he obviously conducted an internet search and saved other web pages to this directory. The "last modified" date of the files in this directory shows the earliest file saved was the Boston Globe article, saved 6-27-05 at 9:10 p.m. [LaneHardDrive p. 1.]

30. The Boston Globe article does not mention *pending* forfeiture proceedings – because there were no forfeiture proceedings pending then. This case was filed in February 2005. However the October 2004 article states that the government *intended* to file forfeiture proceedings. [USDocReqResp p. 101.] By then, Dr. Lane knew what "forfeiture" meant.

31. After reading the articles on Monday night, June 27, Dr. Lane began making phone calls to follow up. He called Marblehead and then Marblehead's attorney on June 30, and Marblehead's lawyer faxed him some court documents on July 1, 2005 – showing a pending notice of default. That was the first time he ever saw any court documents in the case. [LaneAff2 ¶ 3; LaneDocReqResp pp. 33-35.]

**Dr. Lane's phone call to the U.S. Attorney's Office**

32. In the week of June 27-July 1, Dr. Lane made a series of phone calls:

> On Monday June 27[5] I called Marblehead and they referred me to their lawyer, Kenneth Lindauer, who faxed me the notice of default in the forfeiture case on July 1, 2005. I also called Thomas Kerner, then several lawyers, then Lisa Talbott at the U.S. Attorney's Office on Friday July 1, 2005. I told Lisa Talbot that I was the

---

had several directories on his hard drive containing files pertaining to this case. [LaneAff3 ¶ 9.]

[5] Dr. Lane has now determined that his call to Marblehead was later in the week – probably Thursday June 30th, for he spoke to Marblehead's attorney Kenneth Lindauer on the 30th. [LaneAff3 ¶ 3; LaneDocReqResp p. 33.]

doctor mentioned in the complaint who was the primary investor in the sailboat, she told me that she was a paralegal and couldn't give me any legal advice and that I would have to hire a lawyer.

[LaneAnswRogs ¶ 6.]

33.    The government admits that paralegal Lisa Talbot took the phone call from Dr. Lane, and

that she told AUSA Kristina Barclay about the call.

> Paralegal Lisa Talbot had a telephone conversation with someone purporting to be Dr. Kerry Lane in or around June 2005. A memorandum regarding Ms. Talbot's memory of that conversation is produced herewith and incorporated herein by reference. Also produced herewith is a memorandum regarding AUSA Kristina Barclay's memory of a conversation that she had with Ms. Talbot regarding that phone call, which had to have occurred before AUSA Barclay went on maternity leave on July 1,2005.

[Usanswrogs ¶ 20.]  The memoranda Talbot and Barclay wrote about their recollection of

the July 1, 2005 conversation with Dr. Lane were written in late October 2006 (almost 14

months after the conversation). [USDocReqResp pp. 153-54.]  Dr. Lane disputes many of

the claims made by Lisa Talbot.  See Lane's Response to Statement of Facts ¶¶ 93-104.

34.    At this point the government knew or should have known that Dr. Lane was the

doctor/investor described by the CW in the complaint [Complaint p. 12 ¶ 16], and by Ole

Anderson in the Boston Globe article. [USDocReqResp p. 101.]  Willoughby noted Ole's

comment about the doctor in the Boston Globe article in his police report dated 10-14-04.

[USDocReqResp p. 5.]

35.    Ms. Talbot discussed Dr. Lane's call with AUSA Kristina Barclay , on or before July 1,

2005.  [USDocReqResp p. 153.]  Ms. Barclay advised Talbot to tell AUSA Shelbey

Wright.  Id.  There is no evidence that they informed Judge Zobel of that fact.

36.    At that time the government's motion for judgment was pending. [Docket # 14, 6-20-05.] Neither the motion for judgment [Docket #14, 6-20-05] nor the government's affidavit supporting entry of default [Docket # 12, 5-4-05] mentioned the fact that a party believed to own an interest in the property had not been served process.

**The government's theory of forfeiture is fatally defective**

37.    The government's theory of forfeiture is that drug proceeds were invested in the Flash II.

According to the information set forth below, I have probable cause to believe that the Sailboat, which is currently owned, in whole or in part, by Gregory Olaf Anderson, constitutes property derived from proceeds Anderson obtained, directly or indirectly, as the result of narcotics distribution, in violation of the provisions of Title 21 of the United States Code (the "Controlled Substances Act") and, therefore, that it is subject to seizure and forfeiture pursuant to 21 U.S.C. § 853(a) and (f) and/or 21 U.S.C. § 881(a) (6) and (d), as property obtained, directly or indirectly, as a result of such violations.

Search Warrant Affidavit ¶ 8 (hereinafter "SWAffidavit")   [USDocReqResp pp. 16-17.]

38.    There is no evidence in the record that Gregory Olaf Anderson ever invested any money of his own in the sailboat. Both Dr. Lane and Chuck Fitzgerald stated that to their knowledge Anderson never invested any of his own money in the sailboat. [FitzgeraldAff1 ¶ 4; LaneAff2 ¶ 8.]  The CW told the government the same thing. [USDocReqResp p. 40.] ("The CS stated that ANDERSON invested his time and effort in restoring the boat.")

39.    The government's theory is that the drug proceeds were supplied by the government's confidential informant.  "The CS stated that the money 'it' invested was proceeds from "its" marijuana sales..." [USDocReqResp p. 33.]  The DEA 6's Willoughby submitted quoted the CW as calling the money a loan rather than an investment of capital.

11

> During their meeting, the CS asked ANDERSON about the money
> "it" <u>loaned</u> ANDERSON so that he [ANDERSON] could initially
> purchase the sailboat. ANDERSON told the CS that he had paid the
> CS back for that loan, which ANDERSON stated was between
> $15,000 and $20,000.

Report of Investigation dated 9-28-04 [USDocReqResp p. 55] (emphasis added). This

conversation was recorded by the informant's wire, and the government retained a copy

of it as Exhibit N-168. [USDocReqResp pp. 56-57.]

40.    However, Anderson paid the informant back for his investment.

> On September 27, 2004, the CW met with Anderson in Beverly,
> Massachusetts. During their meeting, Anderson told the CW that
> he had paid the CW back for the CW's cash contribution to the
> Sailboat. Anderson said that he paid the CW back for everything
> the CW had loaned him to originally purchase the Sailboat.
> Anderson explained that that the CW originally loaned him
> between $15,000 and $20,000 to purchase the boat and that he
> [Anderson} paid the CW back over the course of making two
> "trips" [transporting marijuana] for the CW.")

Affidavit ¶ 21 [USDocReqResp p. 26]. In report of investigation prepared 9-28-04, the

CW "*remembered*" that he had paid Anderson back for the sailboat loan:

> During their meeting, the CS asked ANDERSON about the money
> "it" loaned ANDERSON so that he [ANDERSON] could initially
> purchase the sailboat. ANDERSON told the CS that he had paid
> the CS back for that loan, which ANDERSON stated was between
> $15,000 and $20,000. ANDERSON explained that he paid back
> the loan by working it off over two "trips" [transporting marijuana]
> for the CS. ANDERSON stated that he made a total of four (4)
> trips [transporting marijuana] for the CS but that he had spent most
> all of the money he had earned while working for the CS [in the
> marijuana business]. As previously reported, ANDERSON
> transported marijuana from Arizona to Massachusetts for the CS
> and was paid approximately $40,000 for each trip. The CS stated
> that the first trip ANDERSON made was approximately 800 -
> 1,000 pounds and increased to 1,200 pounds. The CS explained
> that the money "it" gave to ANDERSON for the sailboat was
> originally intended to be an investment; however, as time passed,

the CS did not expect to earn a profit on the investment and negotiated with ANDERSON to change it to a loan. <u>The CS stated that while speaking with ANDERSON, "it" recalled allowing ANDERSON to pay the CS back (for the sailboat loan) by allowing ANDERSON to work off the loan by transporting the marijuana to Massachusetts.</u>

Report of Investigation, 9-28-04 ¶ 4 [USDocReqResp p. 59] (emphasis added).

41.    The CW also admitted giving up any remaining interest he may have had in the sailboat in exchange for Anderson's silence after Anderson was arrested for transporting marijuana for the CW:

After Anderson was arrested in December 2001, he spoke with the CW and implied that he would inform the police about the CW unless the CW paid him. The CW agreed to pay Anderson [for his silence] and detailed that "it" paid Anderson the $40,000 United States currency for Anderson's transportation fee, an additional $50,000 cash for Anderson's silence and Anderson's defense attorney's fee, which was approximately $20,000. The CW also gave up the right to "its" twenty percent share of the profit from Anderson's sale of President Kennedy's Sailboat...

Affidavit in support of Seizure Warrant ¶ 18 [USDocReqResp p. 24.]

Respectfully submitted,
Kerry Scott Lane, MD,

By his attorneys,

_____/s/ Brenda Grantland_____
Brenda Grantland, Esq.
Law Office of Brenda Grantland
20 Sunnyside Suite A-204
Mill Valley, CA 94941
(415) 380-9108
Pro hac vice

_____/s/ Eric B. Goldberg_____
Jeffrey P. Allen (BBO# 015500)

13

Eric B. Goldberg (BBO# 564398)
Seegel Lipshutz & Wilchins, P.C.
Wellesley Office Park
20 William Street, Suite 130
Wellesley, MA 02481
(781) 237-4400

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | \| |
| | \| |
| Plaintiff, | \| |
| v. | \|     Civil Action # 05-10192 RWZ |
| | \| |
| ONE STAR CLASS SLOOP SAILBOAT | \| |
| BUILT IN 1930 WITH HULL NUMBER | \| |
| 721, NAMED "FLASH II", | \| |
| | \| |
| Defendant. | \| |
| ——————————————————— | \| |
| | \| |
| KERRY SCOTT LANE, M.D. | \| |
| | \| |
| Claimant. | \| |
| ——————————————————— | \| |

**CLAIMANT KERRY SCOTT LANE'S
MEMORANDUM OF LAW**

The government downplays the due process issues involved in the appeal and this remand. The question is not simply "whether Kerry Scott Lane is entitled to relief from the default judgment" – as the government claims. Gov. Memo. p. 1. The First Circuit identified two questions to be answered on remand: (1) whether the government violated due process by obtaining a default judgment without making reasonable attempts to locate the owners of the sailboat "Flash II" and serve them with notice of the forfeiture proceedings; and (2) whether Dr. Lane had actual notice of the pending forfeiture proceedings prior to entry of default. In his appeal, Dr. Lane also raised an issue which the Court of Appeals did not reach – whether the government denied Dr. Lane an opportunity to be heard by its conduct after he came forward and identified himself. The facts show these issues must be resolved in favor of Dr. Lane.

1

## COUNTERSTATEMENT OF FACTS

The government made several misrepresentations of fact in its Memorandum. The government's claim that Dr. Lane's "credentialing process... was not completed until May 21, 2005"[1] is false.  Dr. Lane's affidavits have always made it clear he was undergoing the credentialing process at his new job at St. Anne's Hospital in Fall River,  Massachusetts.  He never claimed it related to the renewal of his Massachusetts medical license – which happens automatically upon the payment of dues, with no credentialing process.  See Lane's Response to Statement of Facts ¶ 38 (hereinafter "Resp. to Gov. Facts").

The government's claim on pages 6 and 14 that Ralph Anderson, owner of Marblehead Trading Company, had a conversation with Dr. Lane shortly after the seizure of the sailboat in which various statements were allegedly made is unsupported.  Ralph Anderson's declaration shows the call was from an anonymous caller who did not give his name.  Dr. Lane denies having had such a conversation with Anderson.  See Resp. to Gov. Facts ¶¶ 71-74.

On pages 8-9 of its Memorandum the government claims the Marblehead lead would not have led to Dr. Lane because Ralph Anderson, Marblehead's owner, "had no knowledge of Kerry Lane" and "had only dealt with Anderson" and that none of the documents in Marblehead's file gave any indication that Dr. Lane had any relationship with Flash II.  The government apparently interviewed only the owner of the company – not the employees who would routinely deal with customers.  Marblehead's file shows the contact person on all the invoices for repairs was not Ole Anderson, but attorney Thomas Kerner.  Thomas Kerner knew that Dr. Lane was the primary

---

[1]  See Gov. Memo. at 6 & 12; Gov. Facts at ¶ 38.

investor, and could have given the government Lane's contact information.  See Lane's

Statement of Facts ¶¶ 10-14 (hereinafter cited as "Lane Facts").

**ARGUMENT**

I.    **Dr. Lane did not have actual notice of the pending forfeiture proceedings until the last week of June, 2005 – after entry of default**

The first question on remand is whether Dr. Lane had "notice in fact of the forfeiture

action" prior to entry of default.  *United States v. One Star Class Sloop Sailboat... Named "Flash*

*II"*, 458 F.3d 16, 25 (1ˢᵗ Cir. 2006).  The court of appeals held:

> a claimant's knowledge of a seizure, without more, is insufficient to defeat a
> challenge premised on an absence of actual notice. In such situations, due process
> entails "advance notice-in-fact of forfeiture proceedings, as opposed to notice-in-
> fact of seizure." *Gonzalez-Gonzalez, 257 F.3d at 38*. And although Lane was
> aware of the seizure as early as October of 2004, there is no evidence in the thin
> record presently before us that suggests he knew of the judicial forfeiture action
> until after the entry of default.

458 F.3d at 22-23.

Dr. Lane has demonstrated that he did not have actual notice-in-fact of the pending

forfeiture proceedings until June 30 or July 1, 2005 – after the entry of default (which occurred

on June 3, 2005).  Although he learned in mid-October 2004 that the sailboat had been seized, he

did not understand the possible forfeiture consequences of that seizure until Saturday, June 25,

2006, when his childhood friend, a New York police officer, explained the forfeiture process to

him. [Lane's Answer to Interrogatory 6.]  Upon returning home from work the following Monday

June 27, Dr. Lane found the October 13, 2004 Boston Globe article on line and saved it to his

hard drive. [LaneHardDrive p. 1].  The Boston Globe article was published before forfeiture

proceedings were even filed, so that article could not give him actual notice-in-fact of pending

3

forfeiture proceedings. But the article stated that the government intended to file forfeiture proceedings and if successful would auction the sailboat. [USDocReqResp pp. 101-02.] Between Tuesday June 28 and Friday July 1, Dr. Lane made phone calls trying to determine if forfeiture proceedings were pending. He called Marblehead and got the name and number of its lawyer. On June 30, Dr. Lane spoke to Marblehead's lawyer Kenneth Lindauer and on July 1, 2005, Lindauer faxed him two pages of documents from the case showing the court, case number (but an incorrect case name), and contact information for opposing counsel. [LaneAff2 p. 3; LaneDocReqResp pp. 33-35]. That fax for the first time gave Dr. Lane the essential information about the pending forfeiture case that he needed to take action. See Lane Facts ¶¶ 20, 25-31.

On July 1, Dr. Lane called the U.S. Attorney's Office and spoke to paralegal Lisa Talbott. Although Ms. Talbot claims this phone call occurred in late June, Dr. Lane did not have the case number, court or contact information for the U.S. Attorney's Office until July 1, so this had to have occurred on or after July 1. The government's response to claimant's documents requests showed Lisa Talbot spoke to her supervisor AUSA Kristina Barclay, about Dr. Lane's call on or before July 1. [USDocReqResp p. 153.] This pinpoints July 1, 2005 as the date of Dr. Lane's phone call to the U.S. Attorney's Office.

The government has not submitted any evidence disproving Dr. Lane's claim that he did not have actual notice-in-fact of the pending forfeiture proceedings until July 1, 2005. Instead they merely point to minor inconsistencies in Dr. Lane's affidavits and discovery responses regarding the order of events and their exact dates. It is human nature that, as memories fade, minor inaccuracies in minute details may be mistakenly made. Indeed, AUSA Barclay and paralegal Lisa Talbot did not know the exact date of Dr. Lane's phone call. [USDocReqResp pp.

4

153-54.]  In the few days Dr. Lane had to move to vacate the default judgment, he did not have the luxury of time to gather documents to reconstruct the exact dates of each event.  He has since been able to reconstruct the time line after finding Lindauer's fax and the directory on his computer where he saved the October 13, 2004 Boston Globe article.

The government presented no evidence that Dr. Lane had actual notice in fact of the forfeiture proceedings prior to the entry of default.  Rather, it argued that "Dr. Lane is responsible for his failure to answer in time,"  US Memo. pp. 13-14, citing a phone call it alleged Dr. Lane made to Marblehead's owner Ralph Anderson "within a month of the seizure of the sailboat."  US Memo. pp. 6-7, 13-14.  The government claims in its Memorandum, p. 6, that "shortly after the Sailboat was seized, Lane called the Marblehead Trading Company and spoke to its owner, Ralph Anderson."  However, the government's evidence only shows that Ralph Anderson claims in his affidavit that he received an anonymous phone call from someone representing himself to be a doctor, who claimed he owned an interest in the sailboat.  The caller did not give his name or leave any identifying information. [Govt. Ex. 4 - Ralph Anderson Affidavit ¶ 12.]  Dr. Lane denies having made such a call.  [LaneAff3 ¶¶ 1-3.]  This dispute of fact regarding the alleged phone call need not be resolved however, because it is immaterial.  Even if Ralph Anderson had told Dr. Lane in October 2004 that the government intended to file forfeiture proceedings, that could not constitute notice-in-fact of the forfeiture proceedings – for the complaint was not filed until several months later.

Therefore it is uncontroverted that Dr. Lane had no actual notice in fact of the forfeiture proceedings until July 1, 2005 – after the entry of default.

**II.    The government failed to make reasonable efforts to locate Dr. Lane and give him notice, therefore the default judgment is void under the Due Process clause**

The Court of Appeals remanded for a determination of "whether plainly indicated and easily accomplished efforts, undertaken with reasonable diligence during the relevant time frame, would have led the government directly to Lane." 458 F.3d at 25. "The rule of thumb is that the government, in endeavoring to identify and locate potential claimants, must exercise a degree of diligence commensurate with the particular circumstances." 458 F.3d at 23-24. The amount of diligence required depends on "the balance of interests of the government and the individual." 458 F.3d at 24. Here, the government's own appraisal shows the sailboat was worth between $800,000 and $1,000,000. [USDocReqResp pp. 124-25.] With such valuable property interests at stake, the government's efforts to locate owners should have been substantial.

**A.    All leads led to Dr. Lane in three easy steps or less**

If... the government has easy access to a lead that it knows (or reasonably should know) is potentially fruitful, it has some duty to elicit the available information and take reasonable action in response to it. See *Small v. United States*, 329 U.S. App. D.C. 98, 136 F.3d 1334, 1338 (D.C. Cir. 1998); cf. *Gonzalez-Gonzalez,* 257 F.3d at 38 (suggesting that the government's failure to act upon available information might result in a due process violation). The extent of the required follow-up will, of course, vary with the nature of the lead, the costs of pursuing the lead, and the idiosyncrasies of the case. If a person using the lead could easily identify and locate the potential claimant, eschewing further inquiry and relying on secondary measures (such as notice by publication) may be unreasonable, or out of step with due process, or both. See, e.g., *Small, 136 F.3d at 1338* (finding that if the government possesses a "piece of information that a reasonable person would use to locate the claimant," it is constitutionally obliged to try "unless it would be burdensome to do so")...

458 F.3d at 24.

[W]hen the claimant's identity may be easily ascertained through minimal effort, the government cannot eschew these efforts. See, e.g., *Foehl v. United States, 238 F.3d 474, 480 (3d Cir. 2001)* (finding the government's attempt to provide notice

6

insufficient when it failed to check with four "obvious sources" to ascertain the claimant's address). Here, for example, the government could at least have asked Crosby, with whom it was in contact, if he knew the names of his fellow investors, or it could have made similar inquires at Marblehead Trading (the locus from which the sloop was seized).

458 F.3d at 25.

Had the government asked Crosby, Crosby would have named the doctor/investor as Dr. Kerry Lane. Although Crosby did not know Dr. Lane's address or phone, he would have told them Dr. Lane was a Florida physician. Armed with those two leads, the DEA agent could have looked on the Florida Board of Medicine's website – where Dr. Lane is the only "Kerry Lane" listed – and would have found Dr. Lane's current contact information. Because doctors must have DEA certificates in order to prescribe controlled substances, the DEA could have found Dr. Lane's current contact information in its own database of DEA certified physicians in Florida. The Crosby lead would have led to Dr. Lane in two steps, accomplished with a phone call and a search from the DEA agent's computer.

Had the government looked in Marblehead's files for clues to trace ownership – rather than merely talk to the owner of the shipyard – it would have found that Marblehead addressed most of the invoices regarding the boat to attorney Robert Harper. [Marblehead pp. 6, 27, 29, 39, 41, 54, 60, 62, 80, 82, 96, 98, 116, 118, 123, 126, 137, 139.] Harper's phone number was on some of the documents in Marblehead's file. [Marblehead pp. 6, 8.] Had the government agents contacted Harper, he would have told them that Dr. Kerry Lane was the primary investor in the sailboat, and would have given Dr. Lane's contact information. [HarperAff ¶ 3.] Thus Marblehead's records would have led directly to Dr. Lane within 2 easy steps.

Even more alarming, however, is the fact that, during the relevant time period, the U.S. Attorney's Office was engaged in discussions with attorney Robert Harper regarding the Boston criminal investigation of Ole Anderson.  [HarperAff ¶ 2.]  The government states in its answers to interrogatories that

> [n]o employee of the United States Attorney's Office interviewed Gregory Olaf ("Ole") Anderson, or his attorney Robert Augustus Harper, at any time between February 2004 and October 18, 2005, in which any mention was made of the Kennedy sailboat and/or ownership thereof.

[UsAnswRog ¶ 1.]  This answer was skillfully phrased to disguise the fact that, during the relevant time period, *the Boston U.S. Attorneys Office was engaging in discussions with Harper in relation to the criminal investigation of Ole Anderson in the Boston area – but did not bother asking him about ownership of the sailboat*.  Had the government bothered to ask Harper, he would have given them Dr. Lane's name and contact information.  [HarperAff ¶ 3.]  They were one easy step away from Dr. Lane!

Other leads fell directly into the government's lap yet were not followed.

When Crosby filed his claim his attorney Thomas Kerner sent a letter to AUSA Shelbey Wright, enclosing a copy of an article showing Chuck Fitzgerald of Sailorman New and Used Marine Emporium in Ft. Lauderdale Florida purchased the sailboat at the 1996 auction. [USDocReqResp pp. 103-05.]  The government could have gotten Sailorman's phone number by calling 411.  Had they called Sailorman, Fitzgerald would have told them Dr. Lane's name, and that he was a Florida medical doctor.  Knowing that, the DEA could have looked up his address in its own database of DEA certified physicians, or on the Florida Board of Medicine's website.

Three simple steps which could be accomplished with two phone calls and an easy computer search.

The government had Guernsey's auction house appraise the Flash II in November 2004, and the appraisal mentions that Guernsey's handled the failed March, 1998 auction of Flash II. Since Attorney Robert Harper was the attorney representing the consortium in regard to the 1998 Guernsey's auction, Harper's contact information should have been in Guernsey's file, had the government asked. Had the government asked Harper, he would have provided Dr. Lane's name and contact information. Once again, had the government asked someone they were talking to already, they could have found Dr. Lane in two simple steps.

There is no doubt that "plainly indicated and easily accomplished efforts, undertaken with reasonable diligence during the relevant time frame, would have led the government directly to Lane." 458 F.3d at 25. The government clearly made no attempt to locate other owners of the sailboat, since they neglected to ask any of the people they interviewed in connection with the case. It is no excuse that the agent or AUSA assumed when Crosby came forward and filed a claim, that Crosby was the missing doctor/investor – for a simple question to Crosby "are you the doctor who invested in this sailboat" would have elicited the response "no, that doctor is Kerry Lane."

### B.    Dr. Lane was denied the opportunity to be heard

The record shows that Dr. Lane, through his own efforts, obtained notice-in-fact of the forfeiture proceedings on June 30- July 1, 2005, and on July 1, he called the U.S. Attorney's Office and spoke to paralegal Lisa Talbot. At that point, the clerk's entry of default had been filed, and the government's and Crosby's joint motion for a default judgment was pending.

Neither the government's motion seeking entry of default nor the motion for default judgment – nor any other government pleading – informed the court that a person believed to own an interest in the sailboat had not been served process. The missing doctor/investor identified in the complaint was simply never mentioned again in the proceedings.

The government admits that Dr. Lane called the U.S. Attorney's Office and spoke to paralegal Lisa Talbot on or about July 1, 2005, and that he identified himself as the doctor/investor named in the complaint, and gave her his contact information. The record also shows that Lisa Talbot told AUSA Kristina Barclay, head of the forfeiture division, about Dr. Lane's phone call, on or about July 1, 2005. AUSA Barclay advised Ms. Talbot to tell AUSA Shelbey Wright, the Assistant handling the forfeiture case, but it is not known whether she did so. Both Talbot and Barclay wrote down their recollections of these conversations on October 23, 2006. [USDocReqResp pp. 153-54]. Ms. Talbot also prepared a declaration dated December 22, 2006 (18 months after the fact) describing the phone call. Although Dr. Lane disputes some of the claims in Talbot's October 23 memo and her declaration – which were drafted 16 months and 18 months after the fact – Ms. Talbot's own admissions show she tried to discourage Dr. Lane from contesting the litigation, suggesting his documentation would not be credible. [Gov. Ex. 6 - Talbot Aff. ¶¶ 4, 6, 9, 11. ]

There is no evidence that the U.S. Attorney's Office notified the district judge that the doctor/investor described in the complaint had come forward and identified himself.

The government had an ethical duty to notify the court – particularly since the government's uncontested motion for default judgment, which had been pending since June 20 and could be decided any day, failed to make note of the claimant who had not been served.

10

When Dr. Lane hired a lawyer and moved to vacate the default, the government fought him aggressively – in the district court, on appeal, and now on remand.   The government should have apologized  for its failure to notify him and accommodated his late entry into the case.

The government's conduct violated Dr. Lane's opportunity to be heard, also guaranteed by the Due Process clause.

> A fundamental requirement of due process is "the opportunity to be heard."
> *Grannis v. Ordean*, 234 U.S. 385, 394 (1914).  It is an opportunity which must be
> granted at a meaningful time and in a meaningful manner.  The trial court could
> have fully accorded this right to the petitioner only by granting his motion to set
> aside the decree and consider the case anew.  Only that would have wiped the
> slate clean.  Only that would have restored the petitioner to the position he would
> have occupied had due process of law been accorded to him in the first place.  His
> motion should have been granted.

*Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

## III.    Dr. Lane met all the requirements of Rule 60(b)

The Court of Appeals held that, if the district court finds "finds that Lane had no notice in fact of the forfeiture action, [and] that the government's efforts to identify him were nonexistent or otherwise insufficient under the circumstances" the Court of Appeals directed this Court to determine whether "Lane has satisfied the other prerequisites for Rule 60(b) relief."

As Dr. Lane has shown in Part II-A above, the government did not make a good faith effort to determine who the other owners of the sailboat were and provide them notice.  Instead of asking neutral third parties – such as the Marblehead shipyard, Guernsey's auction house, and attorney Thomas Harper – for information in their files that might lead to the identities of any other owners of the sailboat, the government relied solely on its cooperating witness, whose self-interest was served by the forfeiture of the sailboat.  Even then the government failed to follow

11

up on the informant's lead that a doctor or dentist owned an interest in the sailboat. This lead

was separately corroborated by a spontaneous statement of Ole Anderson to the Boston Globe

only days after seizure of the sailboat. Agent Willoughby made note of Anderson's statement in

his investigative report then did nothing to follow up. [USDocReqResp p. 62.]

Dr. Lane has shown he was denied Due Process notice and the opportunity to be heard. A

judgment obtained without due process is void. *United States v. Giraldo*, 45 F.3d 509, 512 (1st

Cir. 1995). It is not necessary in such situations for the claimant to show excusable neglect or

any other grounds under Rule 60(b). Void judgments are a "nullity" *United States v. One*

*Toshiba Television*, 213 F.3d 147, 157 (3rd Cir. 2000) – and must be vacated. The court has no

discretion to deny a motion to vacate on this ground. Id. at 157-58.

## IV.    The government knew it lacked a factual basis for this forfeiture case

The deprivation of due process notice and the opportunity to be heard is not the only

egregious misconduct in this case. The record also establishes that the government lacked a

legitimate basis for forfeiture of the sailboat, and that it knew or should have know that before

filing the forfeiture complaint.

The government's only forfeiture theory is that proceeds were allegedly invested in the

sailboat. But its evidence shows the drug proceeds were the government informant's drug

proceeds – which the CW *loaned* to Ole Anderson to invest in the sailboat (or invested and

converted to a loan rather than a capital investment) – and which Anderson paid back before the

boat was seized. See Lane Statement of Facts ¶¶ 37-41. The complaint admits that Ole

Anderson claims he paid the CW back for his loan. [Complaint p. 18 ¶ 21.] However, it fails to

state that the CW *admitted* to the DEA that the loan had been repaid – before the sailboat was

12

seized.  [USDocReqResp pp. 24, 59]  This fact – which is fatal to the government's forfeiture case – did not come out until remand, when claimant obtained discovery of the police reports.

This fatal hole in the government's case probably explains the government's lack of effort to find and notify potential owners, and its aggressiveness in thwarting Dr. Lane once he came forward.  The government's case simply could not withstand the scrutiny of an adversary proceeding.

## Conclusion

This case presents a shocking example of abuse of the forfeiture laws.  In addition to making Dr. Lane whole for the deprivation of his rights, something should be done to ensure that such abuses do not happen again.

In every forfeiture case there should be a requirement that the government's motion for default identify any persons believed to own an interest in the property who had not been served process.  The court should scrutinize the government's attempts to locate these claimants and give them notice – before entering default judgment.

There should also be a website database where property owners could look up their seized property, determine whether there is a pending forfeiture proceeding, and obtain the essential information needed to launch a defense – the court, case number and contact information for government counsel.

Had either of these remedies been in place, Dr. Lane would not have had to spend all of this time and money litigating the motion to vacate default judgment, the appeal, and this remand – just to file a claim as an innocent owner.  The fact that the government proceeded in this case

without any factual basis only makes the lack of these safeguards more appalling – and more

capable of repetition.

Respectfully submitted,
Kerry Scott Lane, MD,

By his attorneys,


_____/s/ Brenda Grantland_____
Brenda Grantland, Esq.
Law Office of Brenda Grantland
20 Sunnyside Suite A-204
Mill Valley, CA 94941
(415) 380-9108
Pro hac vice


_____/s/ Eric B. Goldberg_____
Jeffrey P. Allen (BBO# 015500)
Eric B. Goldberg (BBO# 564398)
Seegel Lipshutz & Wilchins, P.C.
Wellesley Office Park
20 William Street, Suite 130
Wellesley, MA 02481
(781) 237-4400

14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,              |
                                       |
              Plaintiff,               |
       v.                              |        Civil Action # 05-10192 RWZ
                                       |
ONE STAR CLASS SLOOP SAILBOAT          |
BUILT IN 1930 WITH HULL NUMBER         |
721, NAMED "FLASH II",                 |
                                       |
              Defendant.               |
_____|
                                       |
KERRY SCOTT LANE, M.D.,                |
                                       |
              Claimant.                |
_____|

**Index of Exhibits**

To assist the Court in locating documents referred to in Claimant's memoranda, we are providing this index of the abbreviations Claimant used to cite the documents – with the "Part" numbers at which they are found in the e-filing system, and description of each document.

**<u>Part</u>**

| | | |
|---|---|---|
| 3 | Index | - this Index of Exhibits |
| 4 | Complaint | - excerpts from the complaint |
| 5 | FitzgeraldAff1 | - Affidavit of Chuck Fitzgerald dated September 14, 2005 |
| 6 | FitzgeraldAff2 | - Affidavit of Chuck Fitzgerald dated January 8, 2007 |
| 7 | HarperAff | - Affidavit of attorney Robert Harper dated January 19, 2007 |
| 8 | LaneAff1 | - Lane Affidavit dated July 27, 2005 |
| 9 | LaneAff2 | - Lane Affidavit dated August 28, 2005 |
| 10 | LaneAff3 | - Lane Affidavit dated January 22, 2007 |

11      LaneAnswRogs         - excerpts from Dr. Lane's answers to interrogatories

12      LaneHardDrive        - a printout of the directory of Dr. Lane's computer hard drive
                             where he had saved the October 13, 2004 Boston Globe article

13      LaneDocReqResp       - excerpts from the documents Dr. Lane turned over to the
                             government in response to its Request for Production of
                             Documents

14      Marblehead           - excerpts from Marblehead's file on the Flash II, turned over in
                             response to the government's subpoena duces tecum in December
                             2006.  All the documents produced were Bates stamped in the
                             lower right corner before creating these excerpts.

15      USAnswRogs           - excerpts from the government's answers to interrogatories

16      USDocReqResp         - excerpts from the documents the government  turned over to Dr.
                             Lane in response to his Request for Production of Documents

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,
            Plaintiff,

      v.

ONE STAR CLASS SLOOP SAILBOAT
BUILT IN 1930 WITH HULL NUMBER
NAMED "*FLASH II*,"
            Defendant.

Civil Action No.

05 10192

**VERIFIED COMPLAINT FOR FORFEITURE IN REM**

The United States of America, by its attorney, Michael J.
Sullivan, United States Attorney for the District of
Massachusetts, in a civil action of forfeiture pursuant to Title
21, United States Code, Section 881(a)(6), alleges that:

1.    This Court has jurisdiction in this matter pursuant to
28 U.S.C. §§ 1345, 1355, and 1356.  Venue is appropriate pursuant
to 28 U.S.C. § 1395.

2.    The in rem Defendant Property is now, and, during the
pendency of this action, will be within the jurisdiction of this
Court.

3.    The Defendant Property consists of one Star Class Sloop
Sailboat built in 1930 with hull number 721, named "*Flash II*" and
once owned by President John F. Kennedy and Joseph P. Kennedy
(the "Sailboat").

4.    As detailed in the Affidavit of United States Drug
Enforcement Administration Special Agent Gregg A. Willoughby,
attached hereto as Exhibit A, and incorporated herein by
reference, the United States has probable cause to believe that

marijuana to was Jim Anderson in Florida.  According to the CW,
Jim Anderson used to purchase between 20 and 100 pounds of
marijuana from the CW at a time for approximately $900 to $1,000
per pound.  On one or more occasions, Anderson actually picked up
the marijuana from the CW on behalf of his brother, Jim Anderson.
The CW also learned from Anderson that he [Anderson] maintained
marijuana customers in New Hampshire and possibly the Virginia
area.  The CW reported to me that Anderson had long been involved
in smuggling marijuana and that Anderson knew that the CW's
primary form of income was from the sale of marijuana.

        16.  Around the time the CW supplied Jim Anderson with
marijuana, Anderson purchased a sailboat previously owned by
President John F. Kennedy.  According to the CW (which the CW
learned from Anderson), President Kennedy sailed that boat in
races off of Hyannis, Massachusetts.  Although the CW did not
know how much Anderson paid for the boat, the CW stated that "it"
invested approximately $12,000 to $15,000 in cash at Anderson's
request.  Another person, possibly a doctor or dentist, also
invested roughly the same amount.  The CW stated that the money
"it" and the other investor invested covered the purchase price
and materials Anderson used to repair and refurbish the Sailboat.

9

Anderson told the CW that he was going to refurbish the boat and sell it for a significant profit based on the Sailboat's association with President Kennedy and its historical value. The CW understood that "it" and the other investor were each to receive 20 percent of the profit. The CW stated that the money "it" invested was proceeds from "its" marijuana sales to Jim Anderson and other customers. The CW stated that Anderson brought the boat to an auction in New York a few years ago and received a bid of approximately $800,000 for the Sailboat. Anderson turned down the offer, believing that he could sell the boat for $1,000,000 or more. The CW stated that Anderson purchased the boat somewhere on the west coast of Florida and that he has documents authenticating that the Sailboat was once owned by President Kennedy.

17.   In or around 2001, the CW lost one of "its" drivers (marijuana transporters) and hired Anderson as a replacement. At the time, the CW was purchasing as much as 3,000 pounds of marijuana from individuals known by the CW as "The Reverend", and "Cowboy" [identified as Michael Twarog] and/or from suppliers known by Mark Wojciechowski [one of whom was identified as Luis Dominguez].   Wojciechowski was a close associate of the CW's and

10

Sailboat on the deck of the Aircraft Carrier "*John F. Kennedy*" during the tall ships tour in Boston approximately four years ago. Also during the call, Anderson stated that he was traveling "down there" (which the CW understood from past conversations to mean Cuba) on June 1st and that he didn't think that he would be able to make it to Massachusetts until August. Anderson stated that he wanted to go to Marblehead to complete some work on the Sailboat in order to prepare it for sale. The CW and Anderson agreed to contact each other after Anderson returned [from Cuba]. The call between the CW and Anderson on May 3rd was consensually recorded.

21. On September 27, 2004, the CW met with Anderson in Beverly, Massachusetts. During their meeting, Anderson told the CW that he had paid the CW back for the CW's cash contribution to the Sailboat. Anderson said that he paid the CW back for everything the CW had loaned him to originally purchase the Sailboat. Anderson explained that the CW originally loaned him between $15,000 and $20,000 to purchase the boat and that he [Anderson] paid the CW back over the course of making two "trips" [transporting marijuana] for the CW. Anderson told the CW that he had made a total of four "trips" [transporting marijuana] for

15

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

ONE STAR CLASS SLOOP SAILBOAT
BUILT IN 1930 WITH HULL NUMBER
721, NAMED "FLASH II",

        Defendant.

KERRY SCOTT LANE, M.D.,

        Claimant.

Civil Action # 05-10192 RWZ

## AFFIDAVIT OF CHUCK FITZGERALD

I, Chuck Fitzgerald, do under oath depose and say as follows:

1. I am the owner of Sailorman New and Used Marine Emporium, Ft. Lauderdale,
Florida.

2. I currently own a 1% interest in the sailboat "Flash II." My interest in the sailboat
dates back to the purchase of the sailboat at the auction in June 1996.

3. I first heard about the pending auction of the sailboat when Ole Anderson came to me
with an ad in from the Miami Herald saying the JFK Star boat was going up for auction in the
Florida Panhandle. Anderson asked me if I would invest $10,000 to buy the boat. That $10,000
he requested later turned out to be a request for $11,000 to bid on the boat. The original
agreement was that Anderson would go to the auction and buy it for $11,000 or less, and we

1

would fix it up and resell it. In return I would get three times my investment back and then half of anything beyond that. Anderson would get the other half.

4. Anderson did not invest any of his own money in the sailboat at that time. He didn't have any money. I did not go to the auction with Anderson. On his way to the auction, Anderson spent the night in an attorney's house on the West Coast of Florida - around Sarasota. Anderson was concerned that $11,000 might not be a high enough bid to win the auction, so he contacted me and said this attorney wanted to put $5,000 in it, so we could bid up to $16,000. I was not too happy that my percentage would be diluted, but I went along with it to make sure we would win the bid. I do not know the name of the attorney who invested the $5,000.

5. At the Auction the bidding went to $18,500, plus there was another 10% buyer's premium on top of $18,500. Anderson called me and asked me to wire the rest of the money and I did.

6. Eventually the boat came back to my business, Sailorman's New and Used Marine Emporium in Ft. Lauderdale, Florida, on an expensive trailer which I had to pay for as well. I went into the boat looking for hull numbers and there were none. I knew this would make it hard for us to prove the boat was authentic. The second way to prove it was JFK's boat was to establish an unbroken trail of registrations. There was a break in the trail, so we could not show it irrefutably belonged to JFK. Ole suggested they put the hull numbers in it, and I refused. Because we didn't have irrefutable proof it belonged to JFK, I told Anderson I was going to sell it and get my money back out of it before the coals turned cold. Anderson offered to buy it from me. I asked him why he didn't buy it in the first place, and Anderson said he didn't have the money. Anderson said would put together a group of investors and buy out my interest for

2

$22,500 or $23,000. I gave him 2 weeks to do that. During that two weeks, Anderson brought Dr. Kerry Lane to Sailorman to see the boat and talk about buying my interest. I kept the documentation showing Dr. Lane was one of the investors who bought out my interest (or the majority of it). After Dr. Lane bought out my interest, I was to retain 1% interest in the sailboat, and didn't have to contribute any more to the cost and upkeep of the boat.

7. The sale of the boat at auction generated lots of publicity. UPI and AP announced that Sailorman was buying the Kennedy boat. I kept the newspaper clippings framed on my wall. One clipping, an AP Wire article entitled "Boat Buyer Gets Piece of Kennedy Past" published Sunday June 30, 1996, in *Florida News* specifically mentions "Chuck Fitzgerald, Sailorman New and Used Marine Emporium, Ft. Lauderdale" as the purchaser and uses the terms "Flash II" and "sailboat." I believe all of the articles mention Sailorman as buyer, but cannot tell because of the way the articles were framed overlapping each other. I believe if the government had run a newspaper article search for the time frame of the 1996 auction, and put in the words "Flash II" or Kennedy sailboat, they would have found these articles I have on my wall, and it would have alerted them to the fact that I was one of the original purchasers.

8. The government has never contacted me about the boat, or interviewed me. Had they contacted me I would have told them I sold most of my interest to Dr. Kerry Lane, and would have provided them with the documentation.

9. I did not get notice of the forfeiture proceedings either. Had they notified me, I would have gone to court to fight for my interest. I want to be reimbursed for my 1% interest in the boat.

SIGNED UNDER THE PENALTIES OF PERJURY THIS _14th_ DAY OF

SEPTEMBER, 2005.

CHUCK FITZGERALD

4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

           Plaintiff,

v.

ONE STAR CLASS SLOOP SAILBOAT
BUILT IN 1930 WITH HULL NUMBER
721, NAMED "FLASH II",

           Defendant.

Civil Action # 05-10192 RWZ

KERRY SCOTT LANE, M.D.,

           Claimant.

## AFFIDAVIT OF CHUCK FITZGERALD

I, Chuck Fitzgerald, do under oath depose and say as follows:

1. The government has never contacted me to try to locate the owners of the Flash II.

2. Had the government contacted me, I could have given them a copy of the cashier's check Dr. Lane gave me, which would have shown his full name to be Kerry Scott Lane. I also could have told them that Dr. Lane was a medical doctor in Florida, and they could have called the Board of Medicine to get his contact information.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 8ᵗʰ DAY OF JANUARY, 2007.

CHUCK FITZGERALD

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

        Plaintiff,

v.

        Civil Action # 05-10192 RWZ

ONE STAR CLASS SLOOP SAILBOAT
BUILT IN 1930 WITH HULL NUMBER
721, NAMED "FLASH II",

        Defendant.

KERRY SCOTT LANE, M.D.,

        Claimant.

## DECLARATION OF ROBERT AUGUSTUS HARPER, ESQ.

STATE OF FLORIDA    :

COUNTY OF LEON    :

I, Robert A. Harper, Esq., do under oath depose and say as follows:

1.    Affiant was the attorney representing Gregory Olaf Anderson who had an ownership interest in the sailboat "Flash II" in legal matters relating to the restoration, promotion and auction of the sailboat.

2.    After the (failed) auction, Affiant was in contact with the Office of the United States Attorney regarding a criminal investigation involving Mr. Anderson in the Boston Area.


RAH

Page 1 of 2

3.    No one from the government contacted Affiant after the seizure of the sailboat to ask me who the other owners of the Flash II were or how to contact them. Had they asked me, I would have told them that Dr. Kerry Lane was the primary investor in the sailboat, and that he was a medical doctor licensed in Florida. I could have given them contact information for him – or they could have obtained his current contact information from the Florida Board of Medicine.

4.    I personally met Dr. Lane in New York at the (failed) 1998 auction of the sailboat.

Before me, the undersigned authority, this day personally appeared ROBERT AUGUSTUS HARPER, who first being duly sworn, says that he has read the foregoing Declaration and has personal knowledge of the facts and matters therein set forth and alleged and that each and all of these facts and matters are true and correct.

_____
Robert Augustus Harper

SWORN AND SUBSCRIBED TO before me by Robert Augustus Harper, who is personally known to me or who has produced Florida Driver's License H-616-761-46-295-0 as identification this __19th__ day of January, 2007.



NOTARY PUBLIC, or other person authorized to administer an oath (print, type, or stamp commissioned name of notary public)

> EVELYN D. EDWARDS
> MY COMMISSION # DD 612636
> EXPIRES: November 7, 2010
> Bonded Thru Notary Public Underwriters

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05 CV 10192 RWZ

UNITED STATES OF AMERICA,

        Plaintiff,

v.

ONE STAR CLASS SLOOP SAILBOAT
BUILT IN 1930 WITH HULL NUMBER 721,
NAMED "*FLASH II,*"

        Defendant.

## AFFIDAVIT OF KERRY SCOTT LANE, M.D.

I, Kerry Scott Lane, M.D., do under oath depose and say as follows:

1.     I reside at 750 Davol Street, Apt. 924, Fall River, Massachusetts. I make this affidavit based upon personal knowledge in support of my claim of ownership of the subject sailboat, *Flash II* (the "Sailboat").

2.     In the Summer of 1996, I was introduced to Gregory "Ole Anderson" via a mutual acquaintance. At the time, Ole Anderson was seeking an investor to purchase and fund the restoration of the Sailboat. It was agreed at the outset that in exchange for my financial support, I would share in the profits of any future sale.

3.     Later in the Summer of 1996, I traveled with my then girlfriend and Ole Anderson to Fort Lauderdale, Florida, to inspect the Sailboat at a marine emporium known as "Sailorman." Attached as Exhibit 1 is a true and accurate copy of a photograph of me (right) standing with Ole

1

Anderson (left) in front of the Sailboat in a storage garage at Sailorman. A Sailorman sign can be seen in the lower right corner of the photograph.

4.    On or about July 12, 1996, I provided a cashier's check in the amount of $5,000.00 as a deposit for the purchase of the Sailboat. Attached as Exhibit 2 is a true copy of a Sailorman invoice dated July 12, 1996, confirming Sailorman's receipt of my $5000.00 payment. I subsequently provided a cashier's check in the amount of $20,000.00 toward the purchase of the Sailboat. I am informed by the East Atlantic Office of Sun Bank, Delray Beach, Florida, that the Bank does not retain copies of checks for longer than seven years. However, attached hereto as Exhibit 3 is a true copy of a handwritten agreement dated July 12, 1996, signed by Chuck Fitzgerald, owner of Sailorman, memorializing Mr. Fitzgerald's agreement to sell his interest in the Sailboat to Ole Anderson and other investors, including myself, for the sum of $22,000.00. It is my recollection at this time that my $20,000.00 check was used at least in part to satisfy the agreement with Mr. Fitzgerald.

5.    Several days later, Ole Anderson arranged for the delivery of the Sailboat to my home at 621 Andrews Avenue, Delray Beach, Florida, where it was stored for the next several months before it was delivered for winter storage to the Marblehead Trading Company, in Marblehead, Massachusetts. Attached as Exhibit 4 is a true and accurate copy of a photograph of myself standing next to the Sailboat in my garage after delivery from Sailorman.

6.    Throughout 1997, substantial work was done to restore the Sailboat while it was kept in Marblehead.

2

7.      I invested approximately $50,000.00 toward restoration, shipping, promotions and lodging in connection with my and Ole Anderson's efforts to refurbish the Sailboat and prepare it for sale. I am diligently searching for canceled checks relating to these payments.

8.      In the Summer of 1997, the Sailboat was displayed at the Museum of Yachting in Newport, Rhode Island. Attached as Exhibit 5 is an August 1997 Associated Press article appearing in *SouthCoast Today* reporting that the Sailboat would be on display at the Museum.

9.      In the Fall of 1999, the Sailboat was taken to the 45th Street Armory in Manhattan where it was to be auctioned. I paid for transportation fees and housing expenses for Ole Anderson and others. The Sailboat failed to meet the minimum reserve, however.

10.     After the failed auction in 1999, the Sailboat was returned to my garage in Delray Beach, Florida. In 2000, the Sailboat was shipped to Boston to be exhibited on the aircraft carrier, U.S.S. John F. Kennedy. It was then shipped to Marblehead for storage.

11.     In December 2001, Ole Anderson telephoned me, and requested that we meet for lunch. During their meeting, Ole Anderson informed me that he was to be incarcerated for drug trafficking. I had absolutely no knowledge of Ole Anderson's criminal activities. Ole Anderson assured me at that time that the Sailboat would remain safely stored in Marblehead.

12.     In October 2004, Ole Anderson telephoned me, and informed me that the Sailboat had been seized from the Marblehead storage facility by the Drug Enforcement Agency.

13.     Although Ole Anderson offered to identify me as the owner of the Sailboat, I requested that he not do so at the time because I was about to start a new position at a Massachusetts hospital, and I was still in the credentialing process. I was afraid that my

3

professional reputation would be damaged by publicity of my unwitting association with a convicted drug trafficker, and I could not risk losing the employment opportunity.

14.    I recently discovered that in February and March of 2005, unbeknownst to me at the time, the Boston Herald published a Notice of Libel commanding all with interest in the Sailboat to state their claim. Ole Anderson never informed me that the United States had commenced this action, or that I faced losing my interest in the Sailboat.

15.    The drug activities giving rise to the boat's seizure and this forfeiture action occurred – by Agent Willoughby's own admission – some time between 2001 and 2004, five to eight years *after* I provided Ole Anderson with the funds needed to buy and restore the Sailboat.

16.    In late June 2005, I learned for the first time through a newspaper article that the Sailboat was to be auctioned. I retained an attorney in early July, and I instructed counsel to move as quickly as possible to restore my lawful interest in the Sailboat.

17.    I would have come forward and timely complied with the filing requirements to assert my lawful interest in the Sailboat had I known of the filing of this action.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 27th DAY OF JULY, 2005

*Kerry Scott Lane MD*

Kerry Scott Lane, M.D.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

          Plaintiff,

    v.

ONE STAR CLASS SLOOP SAILBOAT
BUILT IN 1930 WITH HULL NUMBER
721, NAMED "FLASH II",

          Defendant.

KERRY SCOTT LANE, M.D.,

          Claimant.

Civil Action # 05-10192 RWZ

## SUPPLEMENTAL AFFIDAVIT OF CLAIMANT KERRY SCOTT LANE, M.D.

I, Kerry Scott Lane, M.D., do under oath depose and say as follows:

1. The court has apparently misunderstood my previous affidavit, so I will explain in greater detail. When Ole Anderson called me some time between October 13th and 15th, 2004 and told me that the sailboat had been seized by the DEA, I did not understand the significance of that statement. I did not know about the asset forfeiture laws, and it did not occur to me that this seizure could affect my ownership interest in the boat. The phone call came in at 7:00 a.m., rousting me from sleep. I was too groggy and startled by his call to ask Ole the significance of the seizure. During that call Ole did not say anything about forfeiture. He was very upset. He kept saying he had been "set up." He said he was going talk to the newspaper, or had gone to the newspaper about it, and I told him I don't want my name in the press.  Basically my attitude was

1

"I don't want to get involved in your problems." I did not want his problems to become my problems. It did not occur to me that his legal problems could affect my ownership interest in the sailboat. I told him not to tell the police about me because I did not want the police coming to my new job asking questions while I was trying to get through the credentialing process. I also did not want the newspaper publicity connecting my name to a drug dealer. I had no intention of relinquishing my interest in the sailboat. Had I known that my statement to Ole that I did not want him giving my name to the police would be interpreted as my unwillingness to defend my own property I certainly would have told him to give the police my name. I told Ole to keep me posted on any new developments. In the nine years we have been business partners in the ownership of this sailboat, I had relied on Ole to consult me about any matters that needed our attention. I expected him to continue to do so.

2. Later that day I started wondering what he was talking about, regarding the boat being seized. I was never able to reach Ole again, and he has never called me back. I called the Kennedy Library – where the sailboat was supposed to be shipped to be put on display – and asked them if the boat was still scheduled to arrive there. I was told that it was. Over the following months I made several other phone calls to the Kennedy Library to see if it had arrived, but was unable to get any other information.

3. In the meantime, I immediately began searching on the internet for any information about what was going on. I set up a Google alert that automatically sent me updates of any website posting containing the words "John F. Kennedy Flash II." I read through hundreds of these search results and found no references to the whereabouts of the boat. I also watched the news and read newspapers looking for any news about the boat. Months passed with no word.

2

The first I ever heard of a forfeiture case against the boat was an article from my Google alert in late June 2005. It said that forfeiture procedures had taken place and the boat would be auctioned in December 2005. I immediately started looking for a lawyer and raising money for legal fees. On June 30 I contacted Marblehead, and their lawyer faxed me the Notice of Default on July 1, 2005. That was the first time I ever saw any documents relating to the forfeiture case. I couldn't find a lawyer experienced in forfeiture law, but I was running out of time and hired Mr. Goldberg. We were in a rush to get something on file, and did the best we could.

4. If I had been served with process in the forfeiture case I would have hired an attorney and litigated the case immediately.

5. The government knew I was a co-owner of the boat, but apparently made no attempt to find me and serve me with the complaint. The employees at Marblehead Trading Company, where the boat was stored when it was seized, knew I was the co-owner. The sailboat was shipped back and forth between my home in Florida and Marblehead several times. I'm certain that Marblehead had my name and address on past receipts and other correspondence. Since the boat was at Marblehead when it was seized, the government should have asked them about me.

6. I do not oppose the sale of the sailboat at the auction in December, so long as sufficient proceeds are reserved in escrow to cover my share of the proceeds.

7. I did not know or have any reason to believe that Ole Anderson was involved in selling drugs. He never appeared to have any significant amount of money. He was always relying on me to finance the restoration, storage, and transportation of the boat to various places where it was exhibited.

8. Anderson's contribution to the ownership and maintenance of the boat appeared to be

3

mostly sweat equity in managing the boat – setting up places where it was to be exhibited, arranging restoration and repairs, transportation, paying the bills (after collecting money from me to pay them) – plus his finders fee interest, obtained by his having found this historic artifact in the first place. I am not sure he ever put any of his own money into the boat that was not reimbursed by other investors. For example, the $5,000 Anderson paid Sailorman on July 26, 1996 when he and I were buying out Sailorman's interest, was, to the best of my recollection, money he obtained from my girlfriend Anne Kleinrichert. She is also currently the owner of an interest in the sailboat, who apparently was not given notice. Her name appears in some newspaper articles about the boat.

SIGNED UNDER THE PENALTIES OF PERJURY THIS _28th_ DAY OF AUGUST, 2005.

_Kerry Scott Lane MD_
KERRY SCOTT LANE, M.D.

4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, |

        Plaintiff, |

v. |    Civil Action # 05-10192 RWZ

ONE STAR CLASS SLOOP SAILBOAT |
BUILT IN 1930 WITH HULL NUMBER |
721, NAMED "FLASH II", |

        Defendant. |

_____ |

KERRY SCOTT LANE, M.D., |

        Claimant. |

_____ |

### THIRD AFFIDAVIT OF CLAIMANT KERRY SCOTT LANE, M.D.

I, Kerry Scott Lane, M.D., do under oath depose and say as follows:

1.    I did not make a phone call to Ralph Anderson at or near the time of the seizure of the
   sailboat that resembled the one described in Ralph Anderson declaration. I have spoken to
   Marblehead employees on occasion, although I am not certain I ever spoke to Ralph
   Anderson, or anyone I knew to be the owner of the company. When I saw the name
   "Ralph Anderson" in court pleadings, I did not recognize the name, and thought it was
   some relative of Ole Anderson's.

2.    When I called Marblehead I generally spoke to a woman. I also knew a Marblehead
   employee named Marshall Chapman was primarily responsible for doing the renovation
   work on the sailboat, and believe I may have spoken to Chapman on one or more

1

occasions. One of my cancelled checks paid to Ole Anderson for refurbishing Flash II was endorsed over to Marshall Chapman. [LaneDocReqResp 24 (second check down).]

3. I have no recollection of calling Marblehead close to the time of the seizure, and certainly did not obtain Marblehead's attorney's name and number then. I obtained the name of Marblehead's attorney, Kenneth Lindauer, when I called Marblehead on approximately June 30, 2005. I called Lindauer that same day, and on July 1, 2005, Lindauer faxed me copies of court documents. These documents revealed the court and case number (but not the proper case name), and AUSA Shelby Wright's contact information – for the first time informing me of the essential information I needed to locate the pending forfeiture case. I immediately called the U.S. Attorney's Office and spoke to the paralegal, Lisa Talbot.

4. I met three or four people who accompanied Ole Anderson to the 1998 auction, but I wasn't sure whether one of them was Crosby until Crosby confirmed it in his declaration. I did remember meeting attorney Robert Harper there. I already knew Harper because I had talked to him on the phone.

5. As a licensed physician, I am required to have a valid DEA certificate in order to prescribe controlled substances. I have always kept my DEA certificate current. In order to keep my DEA certificate current, I had to provide my contact information to the DEA. The DEA could have looked up my contact information at any time in its own database.

6. On July 1, 2005, I called the U.S. Attorney's Office and spoke to Lisa Talbot. She tried to discourage me from contesting the case, stating it would be hard for me to prevail. She told me I would have to hire an attorney to get relief. I was outraged that the government

2

wouldn't simply accept my representations and negotiate with me in good faith regarding my innocent ownership claim – without requiring me to hire an attorney first. If anyone said I would likely get nothing in return it was Ms. Talbot. I had no reason to believe my chances of prevailing were slim, because I was innocent and had documentation of my interest.

7.    Although I may have asked Ms. Talbot if they were planning on selling the sailboat to the Smithsonian, I did not agree to give up my interest if it were to go to the Smithsonian. The members of the consortium had always been hoping a major museum would acquire the sailboat and put it on public display – but I still expected to get paid for my interest. There was no reason I would have bothered calling the U.S. Attorney's Office if my intent was to give the sailboat away.

8.    For most of my medical career I have lived in Florida (26 years), but I lived for about a year in Fall River, Massachusetts, where I practiced medicine at St. Anne's Hospital. I had just gotten the job at St. Anne's when the Flash II was seized. I have since returned to Florida. The people associated with Flash II all knew me as a Florida doctor.

9.    At the time of the seizure, I was going through the credentialing process at St. Anne's Hospital – which lasted from October through early December 2004. Once that process was over there would not have been any reason for me to avoid having my name in the press regarding the seizure of this sailboat. The renewal of my Massachusetts medical license – which occurs every two year by the payment of dues, without any credentialing process – had nothing to do with the credentialing process at my new job. I never said my reluctance to be publicly associated with Ole Anderson was based on my renewal of my

3

Massachusetts medical license. Even during the credentialing process, I had told Ole to keep me apprised of further developments, and expected to hear from him if anything else occurred in relation to the sailboat.

10. I set up a Google alert thinking it would keep me apprised of new developments. I'm not sure exactly when I set that up. If I set it up after the Boston Globe article came out, that article would not turn up on the *Google alert*, since Google alerts send out news articles as they are published (although a couple of times I have seen an old article get republished for some unknown reason). A *Google search* on the other hand brings up articles published in the past. I now think that I must have found the Boston Globe article – which I saved to my hard drive on June 27, 2005 – during a Google search I conducted on June 27 – two days after I met with my friend the New York police officer, who explained the forfeiture process to me. LaneHardDrive is a printout of the files in the directory of my hard drive where I found the Boston Globe article. I did not find this saved file earlier – apparently because I was not looking in the right directory. (I see now that I have several directories on my computer that contain files relating to this case.)

SIGNED UNDER THE PENALTIES OF PERJURY THIS 22nd DAY OF JANUARY, 2007.

Kerry Scott Lane (MD)
KERRY SCOTT LANE, M.D.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| |
|---|
| UNITED STATES OF AMERICA,           | |
| | |
| Plaintiff,         | |
| v.                          | |     Civil Action # 05-10192 RWZ |
| | |
| ONE STAR CLASS SLOOP SAILBOAT    | |
| BUILT IN 1930 WITH HULL NUMBER  | |
| 721, NAMED "FLASH II",              | |
| | |
| Defendant.           | |
| | |
| KERRY SCOTT LANE, M.D.              | |
| | |
| Claimant.          | |

**CLAIMANT KERRY SCOTT LANE'S ANSWERS TO
THE UNITED STATES'
FIRST SET OF INTERROGATORIES**

*INTERROGATORY NO. 1:*
*Provide the following information about yourself:*
*(a) full name;*
*(b) marital status;*
*(c) if married, the identity of your spouse;*
*(d) if divorced, the date of the judgment of divorce and case number.*

ANSWER:  Kerry Scott Lane MD, a single man, never married.

*INTERROGATORY NO. 2:*
*Identify any person with knowledge of the ownership, at any time from 1996 to July 27, 2005, of
the Flash II.*

ANSWER:  Persons with knowledge of ownership of Flash II:  Ann Kleinrichert, my then

girlfriend, who also invested in the Flash II;  Donna Bickmeyer Hoffner, (the woman who

1

introduced me to Mr. Anderson);  my brother Jeffrey Lane R.Ph.; my mother Peggy Welch RN;

my brother Robert Haarde; my sister Lisa Scarpa; all my Colleagues at Delray Medical Center

numbering in the hundreds (Drs. Colletta, Klein, Wideroff, Motta, Keusch, Buchalter, Ross,

Cohen, Owitz, et al); Sailorman of Ft. Lauderdale-Chuck Fitzgerald; Attorney Robert A. Harper,

who represented "the consortium" of owners in Flash II with regards to the 1998 auction;

employees at Marblehead Trading Company; co-investor Eddie Crosby; my accountant Vincent

Morrelli; Ann Wattlington; my lawyer Donald Dowling Esq.; my yardman Will Sasser; Jeff Teitz

(legislative aide to Senator Kennedy) - to name a few.  I also wrote a letter to John Kennedy Jr. in

an effort to interest him in our venture.


_INTERROGATORY NO. 3:_
_Describe every communication between you (or any agent or employee) and Gregory "Ole"_
_Anderson (or any agent or employee of Gregory "Ole" Anderson) from October 2004 to July 27,_
_2005, and for each communication:_
_(a)  state the date of the communication;_
_(b)  state whether the communication was oral or written;_
_(c)  describe in detail the substance of the communication;_
_(d)  identify any parties to the communication;_
_(e)  identify any persons present during any part of the communication;_
_(f)  identify the place(s) of the communication; and_
_(g)  identify any documents concerning any part of the communication._

ANSWER:  Ole Anderson called me at 7 a.m. on either October 13th, 14th or 15th, 2004 and told

me that the sailboat had been seized, but I did not understand the significance of that statement.  I

did not know about the asset forfeiture laws, and it did not occur to me that this seizure could

affect my ownership interest in the boat.  The phone call woke me up and I was too groggy and

startled by his call to ask Ole the significance of the seizure.  During that call Ole did not say

anything about forfeiture.  He was very upset.  He kept saying he had been "set up" and that the

2

police were going to prosecute him again, which would be double jeopardy. Basically my attitude was "I don't want to get involved in your problems." I did not want his problems to become my problems. It did not occur to me that his legal problems could affect my ownership interest in the sailboat. He said he was going talk to the newspaper, or had gone to the newspaper about it, and I told him I don't want my name in the press. I told him not to tell the police about me – at that time – because I did not want the police coming to my new job asking questions while I was trying to get through the credentialing process. I also did not want the newspaper publicity connecting my name to a drug dealer while my credentialing process was going on. A few weeks later, the credentialing process ended and after that it would not have bothered me if Anderson told the police about my interest in the sailboat. I told Anderson to keep me posted on any further developments, and expected him to do that. He had always been good about communicating with me about any matters affecting the boat. He may have called me back again that day or the next day, but I'm not sure. After that I never heard from him again, and could not reach him after that. There were no documents associated with this conversation. There were no other parties to the conversation.

---

*INTERROGATORY NO. 4:*

*Describe in full every communication between you (or any agent or employee) and Harry Crosby (or any agent or employee of Harry Crosby from October 2004 to July 27, 2005, on any subject and for each communication:*

*(a)  state the date of the communication;*

*(b)  state whether the communication was oral or written;*

*(c)  describe in detail the substance of the communication;*

*(d)  identify any parties to the communication;*

*(e)  identify any persons present during any part of the communication;*

*(f)  identify the place(s) of the communication; and*

*(g)  identify any documents concerning any part of the communication.*

3

In the week of June 27 to July 1, 2005, after my friend told me that the seizure of the boat might lead to a forfeiture of my interest in the sailboat, I contacted Marblehead, Marblehead's lawyer Kenneth Lindauer, Thomas Kerner, and Lisa Talbot at the U.S. Attorney's Office. Kenneth Lindauer faxed me some court documents [Doc. Req. pp. 31-33], and consulted several attorneys in the attempt to find a Boston lawyer experienced in forfeiture defense. After failing to find an experienced forfeiture attorney, I hired Eric Goldberg, and we filed a motion to vacate the default.

*INTERROGATORY NO. 6:*
*Describe any actions undertaken by you from October 2004 to July 27, 2005, to determine what would happen to the Flash II as a result of its seizure by DEA, and for each action:*
*(a)  state the date(s) on which you took such action;*
*(b)  describe in detail the action taken;*
*(c)  identify any persons with knowledge of each action; and*
*(d)  identify any documents concerning such action.*

ANSWER:  See 5 above. I set up a Google alert, but it did not turn up any articles about the seizure of the boat until late June 2005 (at the earliest).

During the week of June 19-26, 2005, I spent the week in Philadelphia and New Jersey. While there, on Saturday June 25, 2005, I met with my oldest childhood friend, Inspector Richard Heathwood of the New York State Police who has been with the Joint DEA, New York State Police and NYPD drug task force since about 1985. I told him that Flash II had been seized. He urged me to act immediately, warning me that the boat might be sold if I did not act quickly. I was not familiar with the forfeiture process before that. On Monday June 27 I called Marblehead and they referred me to their lawyer, Kenneth Lindauer, who faxed me the notice of default in the forfeiture case on July 1, 2005. I also called Thomas Kerner, then several lawyers, then Lisa Talbott at the U.S. Attorney's Office on Friday July 1, 2005. I told Lisa Talbot that I was the doctor mentioned in the

5

complaint who was the primary investor in the sailboat, she told me that she was a paralegal and

couldn't give me any legal advice and that I would have to hire a lawyer.

_INTERROGATORY NO. 7:_
_Explain what you thought, believed or understood would happen to the Flash II, based on the seizure_
_referred to in paragraph 12 of your July 27, 2005 Affidavit, prior to the time that you learned in_
_June 2005 that the Flash II would be auctioned. If that belief or understanding changed over the_
_period described above, explain how and why it changed._

ANSWER:   I thought the government might have seized the sailboat as evidence in the criminal

case Ole Anderson believed they were about to file against him.  At the time I did not know that

innocent owners' property could be taken in a forfeiture case.  I had never heard of "forfeiture"  in

the context of the taking of property by the government.

I expected Ole Anderson to contact me if any new developments occurred regarding the

sailboat.  He had always been reliable in keeping me informed about matters relevant to the Flash

II.  I also expected the Google alert I had set up would turn up any new developments.


_INTERROGATORY NO. 8:_
_If you have ever been involved in any legal action, whether civil or criminal, as a plaintiff,_
_defendant, or witness, provide for each such action:_
_(a)  a description of the nature of the action;_
_(b)  the identity of the court where the action was, or is pending;_
_(c)  the caption or title of such action; and_
_(d)  the docket number of such action._

ANSWER: I was the defendant in a Medical Malpractice Case in Palm Beach County, Florida,

_Gisela Taitel v. Delray Medical Center et al._  It settled in January 2004, and the case was sealed. I

was also involved in a case settled in the mid 1990s, _Brennan v. Delray Medical Center._  It also

settled and the case was sealed. I don't know the docket numbers.

6

Listing

Volume in drive C has no label.
Volume Serial Number is A0C8-D75F

Directory of C:\Documents and Settings\Kerry Lane\My Documents\Kennedy Boat
forfeiture

```
12/13/2006  08:58 AM    <DIR>          .
12/13/2006  08:58 AM    <DIR>          ..
09/14/2005  03:16 PM         8,132 AffidavitFitzgerald.rtf
12/07/2006  07:12 PM        30,161 Agents seize JFK's old sailboat - The Boston
Globe.htm
09/15/2005  02:55 AM        59,097 AT&T webmail 9 14 2005.htm
09/08/2005  09:28 PM        65,953 Boston Globe Shelly Murphy 8 14 2005.htm
06/27/2005  09:10 PM         6,043 Boston_com - Boston Globe Archives -
Easy-Print Version.htm
06/27/2005  09:13 PM        23,926 Boston_com - News - Boston Globe Archives.htm
06/28/2005  04:27 PM        25,418 Boston_com - News - Local - Mass_ - Drug
agents seize John F_ Kennedy former sailboat.htm
11/16/2005  11:19 PM        17,478 CrosbyOpStay.pdf
09/08/2005  09:37 PM        64,106 Denial to re=open 8 18 2005.htm
01/21/2006  04:12 PM        42,587 Eagle-Tribune Online.htm
09/15/2005  03:31 AM     2,382,650 exhibits 2.pdf
09/14/2005  08:47 PM     2,382,650 exhibits.pdf
08/22/2005  10:36 PM        60,286 fear.htm
07/29/2005  04:16 PM       117,960 Flash II archives A.htm
07/29/2005  04:18 PM       112,851 Flash II archives B.htm
07/29/2005  04:19 PM       102,533 Flash II website.htm
09/08/2005  09:29 PM        13,414 flashII_best[1].JPG
07/13/2005  06:51 AM        63,239 globe.htm
09/08/2005  09:36 PM        65,480 Goldberg 8 11 2005.htm
07/12/2006  04:32 PM        33,280 Grantland correspondence 6 2006.doc
02/19/2006  10:50 AM        63,263 Grantland mediation document.htm
09/14/2005  06:09 PM        25,565 grantland reply 9 14 2005.rtf
07/12/2005  11:44 AM         8,873 Internet Archive Wayback Machine.htm
07/12/2005  11:46 AM        33,118 Internet Archive.htm
09/08/2005  09:30 PM        65,961 ISCYRA Flash II.htm
07/13/2005  07:02 AM       117,267 jfk flash 2 b.htm
07/18/2005  05:20 PM        25,600 JFK FlashII WebPage.doc
06/27/2005  09:37 PM         9,175 JFK's FLASH II HISTORY.htm
06/27/2005  09:32 PM         5,214 JFK's FLASH II HOME PAGE.htm
06/27/2005  09:47 PM         3,727 JFK's FLASH II SPECIFICATIONS.htm
09/08/2005  09:33 PM        61,990 JFKs Sailboat restored.htm
06/27/2005  09:35 PM        17,939 John F_ Kennedy's FLASH II, HULL #721 A.htm
07/12/2005  11:41 AM        17,944 John F_ Kennedy's FLASH II, HULL #721.htm
06/27/2005  10:16 PM        19,624 John F_ Kennedy's FLASH II, HULL #721a.htm
09/14/2005  05:03 PM     8,771,082 Katri House Flash.JPG
07/29/2005  04:31 PM        60,895 Kennedy Drug Seizure.htm
09/14/2005  05:01 PM     9,194,550 Lane driveway.JPG
09/14/2005  05:02 PM     8,860,489 Lane Ole Sailorman.JPG
07/25/2005  05:54 PM        44,544 Lane_Affidavit.doc
09/15/2005  02:57 AM        28,027 lettertoShelbeyKerner pdf.pdf
09/15/2005  02:56 AM        28,027 lettertoShelbeyKerner.pdf
07/15/2005  06:47 AM        56,573 Library Gets Control of Items From Kennedy's
Presidency - New York Times.htm
09/10/2005  01:23 PM        33,349 Licensing Portal - License Details Crosby
Lake Butler.htm
09/10/2005  01:20 PM        33,394 Licensing Portal - License Details Crosby
NO.htm
02/24/2006  10:58 AM        63,272 mediation.htm
07/25/2005  05:59 PM        64,512
Memo_in_Support_of_Motion_for_Relief_from_Judgment_and_for_Leave.doc
12/10/2005  07:53 AM        56,369 Mirror_co_uk - News - JFK FOR SALE.htm
09/14/2005  08:27 PM        73,292 motion 9 12 2005.pdf
```

```
                                  Listing
07/25/2005  05:50 PM              44,544
motion_for_Relief_from_Judgment_and_for_Leave.doc
09/14/2005  08:58 PM              30,662 motionforleavetoreply    n.pdf
09/15/2005  02:59 AM               9,268 motionforleavetoreply rtf.rtf
09/14/2005  08:54 PM              30,568 motionforleavetoreply.pdf
11/09/2005  10:02 AM              29,287 motionforstay.pdf
06/28/2005  04:26 AM              34,226 News & Features  QUOTES + NUMBERS.htm
09/14/2005  05:01 PM           8,644,111 Ole Lane driveway.JPG
09/14/2005  05:03 PM           7,830,379 Ole Lane Guernsys Auction.JPG
09/14/2005  04:54 PM          20,831,717 Ole Monticello $18,500.JPG
09/14/2005  04:53 PM           4,653,299 Painting Joe john kennedy.JPG
09/14/2005  05:00 PM           8,537,741 Photo 4 ole donna elwoods.JPG
09/14/2005  04:52 PM          29,732,438 photo driveway kids.JPG
09/15/2005  03:13 AM              73,263 reply fional.pdf
09/15/2005  03:01 AM              73,263 reply fonal.pdf
09/14/2005  09:01 PM              73,347 reply.pdf
11/10/2005  10:15 AM              46,110 Reuters 11 10 05.htm
07/12/2005  11:18 AM              61,481 S Starr retainer letter 7 12 2005.htm
06/27/2005  09:39 PM              17,406 SECTION 1 Title 1 Title 2 Title 3.htm
11/09/2005  10:05 AM              66,391 Stay e mail.htm
11/09/2005  09:58 AM              46,641 staypa.pdf
07/29/2005  04:23 PM              48,829 The New York Times Search Abstract.htm
              69 File(s)   114,435,850 bytes
               2 Dir(s)  27,749,912,576 bytes free
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

ONE STAR CLASS SLOOP SAILBOAT
BUILT IN 1930 WITH HULL NUMBER
721, NAMED "FLASH II",

        Defendant.

Civil Action # 05-10192 RWZ

KERRY SCOTT LANE, M.D.

        Claimant.

## CLAIMANT KERRY SCOTT LANE'S RESPONSE TO
## THE UNITED STATES'
## REQUEST FOR PRODUCTION OF DOCUMENTS

REQUEST NO. 1:

Any documents that you identified and/or relied upon in response to the United States' First Set
of Interrogatories, as well as any documents concerning your responses to the Interrogatories.

    ANSWER: Dr. Kerry S. Lane has produced all documents responsive to this request
currently in his possession, custody or control. If additional documents responsive to this request
turn up, he will supplement this response.

REQUEST NO. 2:

Any documents concerning the assertions in your Affidavit dated July 27, 2005.

    ANSWER: Dr. Kerry S. Lane has produced all documents responsive to this request
currently in his possession, custody or control. If additional documents responsive to this request
turn up, he will supplement this response.

REQUEST NO. 3:

1

Any documents concerning the Flash II, including without limitation:

      a. the ownership of the Flash II as of October 2004;

      b. any changes in the ownership of the Flash II between 1996 and October 2004.

      ANSWER: Dr. Kerry S. Lane has produced all documents responsive to this request currently in his possession, custody or control. If additional documents responsive to this request turn up, he will supplement this response.

REQUEST NO. 4:

Any documents concerning any business or financial dealings between you and Gregory "Ole" Anderson.

      ANSWER: Dr. Kerry S. Lane has produced all documents responsive to this request currently in his possession, custody or control. If additional documents responsive to this request turn up, he will supplement this response.

                      Respectfully submitted,

                         /s/ Brenda Grantland
                      Brenda Grantland, Esq.
                      Law Office of Brenda Grantland
                      20 Sunnyside Suite A-204
                      Mill Valley, CA 94941
                      (415) 380-9108
                      Pro hac vice

## CERTIFICATE OF SERVICE

      This is to certify that a true copy of the above document was served upon counsel for the government, by email, and fax, ~~and first class mail,~~ on this date.

Dated: December 8, 2006                    /s/ Brenda Grantland
                                     BRENDA GRANTLAND

LaneDocReqResp000002

# ROBERT AUGUSTUS HARPER
## LAW FIRM, P.A.

| | | |
|---|---|---|
| State of Florida | 904/224-5900 | Board Certified |
| State of Georgia | fax   904/224-9800 | Appellate Criminal Law |
| St. James on Park | 1-800-64-L-A-W-Y-E-R | Criminal Law |
| 300 West Park Avenue  32301-1414 | | Appellate Practice |
| P. O. Box 10132 | | Major & Complex Civil Litigation |
| Tallahassee, Florida  32302-2132 | | |

• *Steven Brian Whittington*

03 July 1996

**Via Certified Mail/Return Receipt Requested**
Ms. Chapin Carson
c/o Sotheby's
1334 York Avenue
New York, NY 10021

Re: *Flash II*/Star Class #721

Dear Ms. Carson:

Pursuant to our telephone conversation of 01 July 1996, you will please find some preliminary
information on the sailing vessel *Flash II*, a Star Class racing yacht, formerly owned and sailed
by President John F. Kennedy.  My client is interested in selling the vessel through your company
and has authorized these inquires.  Thank you for your attention and interest.

Sincerely,

Robert Augustus Harper

RAH/mms

Enc. (7)

3

LaneDocReqResp000005



**4**

LaneDocReqResp000006

**SAILORMAN**
350 East State Road 84
FORT LAUDERDALE, FLORIDA 33316
(954) 522-6716
FAX (954) 760-7686
1-800-523-0772

| CUSTOMER'S ORDER NO. | | PHONE | | | DATE 7/12/96 | |
|---|---|---|---|---|---|---|
| NAME | | | | | | |
| ADDRESS | | | | | | |
| CITY | | | STATE | | ZIP | |
| SOLD BY | CASH | C.O.D. | CHARGE | ON ACCT. | MDSE. RET'D | PAID OUT | RETURN |

| QTY | PART NO. | DESCRIPTION | | PRICE | AMOUNT |
|---|---|---|---|---|---|
| | | received from Kerry Lee | | | |
| | | cashiers check # 1767 | | | |
| | | for $5000.00 | | | |
| | | received from Brenda & Anderson | | | |
| | | cashiers check # 1767 | | | |
| | | $5000.00 | | | |

No return on new items after 14 days and used items after 3 days

RECEIVED BY

All claims and returned goods
MUST be accompanied by this bill.

TAX
TOTAL

*Thank You!*

LaneDocReqResp000007

I, Chuck Fitzgerald, have agreed to
sell my interest in the Star Class Boat, # 721,
to the Consortium headed by Ole Anderson
for the sum of $22,000.

I will hold all monies paid to me by
Mr. Anderson, or the Consortium members,
until July 26, 1996. If AT THAT TIME
MR. Anderson and the Consortium have not
paid me the entire $22,000, I will refund
all money paid & held by me to Mr. Anderson
and the members of the Consortium.

7/12/96

**6**

LaneDocReqResp000008

# AGREEMENT

This agreement is to codify all previous understandings between Gregory Olaf Anderson (Anderson) and _Charles B. Fitzgerald_ . This agreement supersedes any previous understandings relative to the purchase, refurbishment, and eventual sale of the sailing vessel *Flash II*, Star Class Boat #721, previously owned by former President of the U. S., John F. Kennedy.

1.    **Purpose of Consortium.** Anderson and _Fitzgerald_ understand and agree that the purpose of the Consortium is to obtain legal title to and possession of said vessel, *Flash II*. It is intended that the vessel is to be refurbished to as new condition and then resold at a profit, either to a private party or at auction to the highest bidder. A minimum reserve figure may be agreed upon by consensus of the members. The vessel will be resold promptly upon completion of refitting and restoration to the satisfaction of Mr. Anderson. The appropriate value of the vessel is not now known, but may be determined after appraisal by a qualified appraiser. If a reasonable offer for the purchase of the vessel is received before refurbishment, or if after written disclosure of said offer and consultation with the contributors Anderson concludes such offer satisfies the terms of the investment prospectives of this agreement, Anderson is authorized on behalf of the parties to accept or reject such offer as will satisfy the investment distribution as further set forth below. Anderson has the sole discretion to reject any offer

2.    **Contribution of Funds for the Purchase and Refit.** The Consortium shall consist of the two present members, Anderson and Mr. Eddie Crosby, and new members whose participation shall be the sum of $5,000.00 each. Any member may take more than one $5,000.00 position. The funds obtained from these members shall be used solely for the purchase, refurbishment, and related expenses to the vessel.

3.    **Distribution of Proceeds Upon Sale.** Each member shall be a primary recipient of $7,500.00 or 5 percent of the net sale proceeds after auction house and attorney fees are deducted, whichever sum is greater. Robert Augustus Harper Law Firm of Tallahassee, Florida, has been retained as exclusive agent for the consortium. Anderson's participation in the sharing of profits shall

1 of 2

7

LaneDocReqResp000009

not begin before each member of the Consortium has received $7,500.00 for each initial $5,000.00 investment. This $7,500.00 payment will be the first and primary obligation of the Consortium after Mr. Crosby's receipt of $10,500.

4.  **Responsibility.** Mr. Anderson will be general director and general manager of this entire project from purchase through the refurbishment and eventual sale of the vessel. He shall be responsible for keeping an accurate accounting of all costs associated with the project, including receipts and records of all disbursements. These records shall be available for inspection by any member upon demand. Viewing of and access to the vessel shall be permitted to any member upon reasonable notification to Anderson.

It is agreed that Anderson will solely coordinate and be responsible for any and all media access to *Flash II*. This access will be administered in such a manner as to derive maximum sustained publicity and interest in *Flash II* culminating in a successful sale of the vessel.

Anderson will also be responsible for researching and obtaining any documents, film, correspondence, articles of historical significance pertaining to the vessel, and any other such memorabilia deemed useful to receiving maximum profit from the eventual sale of *Flash II*.

5.  WE HEREBY AGREE to the above terms and conditions and hereby contribute

$ #1.00 for 1% ~~participation units,~~ receipt of which being hereby acknowledged.

GREGORY OLAF ANDERSON

Signature

Charles B. Fitzgerald
Printed Name

350 E. State Rd 84
Address

522-6716
Telephone Number

Sworn to and subscribed before me this
26th day of July 19, 96.
by: Gregory Olaf Anderson
Marsha L Holm
Signature of Notary Public
Marsha L Holm

Notary's Name, Printed, Stamped or Typed
Personally Known: ___ or Produced ID ___
Type of ID produced FL DL A536-294-50-245-0

Sworn to and subscribed before me this
___ day of ___ 19, ___ .
by: ___

Signature of Notary Public

Notary's Name, Printed, Stamped or Typed
Personally ___ or Produced ID ___
Type of ID produced ___

2 of 2.

OFFICIAL NOTARY SEAL
MARSHA L HOLM
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC444816
MY COMMISSION EXP. APR. 29,1999

8

LaneDocReqResp000010

# AGREEMENT

This agreement is to codify all previous understandings between Gregory Olaf Anderson (Anderson) and ___K. LANE___ . This agreement supersedes any previous understandings relative to the purchase, refurbishment, and eventual sale of the sailing vessel *Flash II*, Star Class Boat #721, previously owned by former President of the U. S., John F. Kennedy.

1.    **Purpose of Consortium.** Anderson and ___K. LANE___ understand and agree that the purpose of the Consortium is to obtain legal title to and possession of said vessel, *Flash II*. It is intended that the vessel is to be refurbished to as new condition and then resold at a profit, either to a private party or at auction to the highest bidder. A minimum reserve figure may be agreed upon by consensus of the members. The vessel will be resold promptly upon completion of refitting and restoration to the satisfaction of Mr. Anderson. The appropriate value of the vessel is not now known, but may be determined after appraisal by a qualified appraiser. If a reasonable offer for the purchase of the vessel is received before refurbishment, or if after written disclosure of said offer and consultation with the contributors Anderson concludes such offer satisfies the terms of the investment prospectives of this agreement, Anderson is authorized on behalf of the parties to accept or reject such offer as will satisfy the investment distribution as further set forth below. Anderson has the sole discretion to reject any offer

2.    **Contribution of Funds for the Purchase and Refit.** The Consortium shall consist of the two present members, Anderson and Mr. Eddie Crosby, and new members whose participation shall be the sum of $5,000.00 each. Any member may take more than one $5,000.00 position. The funds obtained from these members shall be used solely for the purchase, refurbishment, and related expenses to the vessel.

3.    **Distribution of Proceeds Upon Sale.** Each member shall be a primary recipient of $7,500.00 or 5 percent of the net sale proceeds after auction house and attorney fees are deducted, whichever sum is greater. Robert Augustus Harper Law Firm of Tallahassee, Florida, has been retained as exclusive agent for the consortium. Anderson's participation in the sharing of profits shall

1 of 2

**10**

LaneDocReqResp000012

not begin before each member of the Consortium has received $7,500.00 for each initial $5,000.00 investment. This $7,500.00 payment will be the first and primary obligation of the Consortium after Mr. Crosby's receipt of $10,500.

4.    **Responsibility.** Mr. Anderson will be general director and general manager of this entire project from purchase through the refurbishment and eventual sale of the vessel. He shall be responsible for keeping an accurate accounting of all costs associated with the project, including receipts and records of all disbursements. These records shall be available for inspection by any member upon demand. Viewing of and access to the vessel shall be permitted to any member upon reasonable notification to Anderson.

It is agreed that Anderson will solely coordinate and be responsible for any and all media access to *Flash II*. This access will be administered in such a manner as to derive maximum sustained publicity and interest in *Flash II* culminating in a successful sale of the vessel.

Anderson will also be responsible for researching and obtaining any documents, film, correspondence, articles of historical significance pertaining to the vessel, and any other such memorabilia deemed useful to receiving maximum profit from the eventual sale of *Flash II*.

5.    WE HEREBY AGREE to the above terms and conditions and hereby contribute $ 20,000.00 for _____ 20% & net ~~participation units~~, receipt of which being hereby acknowledged.

*Gregory Olaf Anders*
GREGORY OLAF ANDERSON

*L Slane*
Signature

*Kerry Lane*
Printed Name

Investors Copy - #1 & 2 TOTAL

621 Andrews Ave
Address Delray

462 278 3060
Telephone Number

LaneDocReqResp000013

7 Positions available @ $5K per — $35K

Each position to receive $7.5K return off the Top.

Sale Price of $91K will achieve this end.

After this figure is reached each position has

A 5% interest in the boat, plus return of $5K investm

TOTAL Return - ea. position ($5K)

Selling Price

up to $150K — $7500

$150K — $8,231.25

$250K    $12,318.75

$500     $22,411.25

$1M      $42,500.00

**13**

LaneDocReqResp000015

I get.

$50,000 or 25% after costs

whichever is greater

---

Costs are: 1). Sothebys 15%

∴ Repayment        2). Harpers 5%

Priorities are: 3). Refit - approx 20,000 in

(40,000 after retired.)

Refit:
Lane  5k → 10k
Crush  5k → 10k
G. Arden 10k → 20k

4) Crosby        $10,500

5) Lane — 50k or 25% of overage

Jan Arden — 10k or 5% of overage

Gregg O. Arden  12/24/96

(Back of page 2 of 2)
KSL

14

LaneDocReqResp000016

4656

KERRY S. LANE 03-05-66
621 Andrews Ave.
Delray Beach, FL 33483-7207

63-607/670

12/25/97 19

PAY TO THE
ORDER OF Greg Anderson

$ 1,500.—

One thousand five hundred DOLLARS

SUNTRUST
SunTrust Bank, South Florida, N.A.
Palm Beach Lakes Office
West Palm Beach, Florida (904) 487-4786

K S Lane

FOR JFK 21 7 I will

⑈067006076⑈049600⑈018394⑈ 4656 ⑈0000150000⑈

---

4679

KERRY S. LANE 03-05-66
621 Andrews Ave.
Delray Beach, FL 33483-7207

63-607/670

1/ 98 19

PAY TO THE
ORDER OF Greg Anderson

$ 2,000.

Two thousand + one DOLLARS

SUNTRUST
SunTrust Bank, South Florida, N.A.
Palm Beach Lakes Office
West Palm Beach, Florida (904) 487-4786

K S Lane

FOR JFK 21

⑈067006076⑈049600⑈2⑈18394⑈ 4679 ⑈0000200000⑈

---

4751

KERRY S. LANE 03-05-66
621 Andrews Ave.
Delray Beach, FL 33483-7207

63-607/670

DATE 2/6/98

PAY TO THE
ORDER OF Greg Anderson

$ 1,500.

One Thousand five hundred DOLLARS

SUNTRUST
SunTrust Bank, South Florida, N.A.
Palm Beach Lakes Office
West Palm Beach, Florida (904) 487-4786

K S Lane

FOR JFK 21

⑈067006076⑈049600⑈018394⑈ 4751 ⑈0000150000⑈

---

4783

KERRY S. LANE 03-05-66
621 Andrews Ave.
Delray Beach, FL 33483-7207

63-607/670

DATE 3/3/98

PAY TO THE
ORDER OF Greg Anderson

$ 2500.00

Twenty five hundred dollars DOLLARS

SUNTRUST
SunTrust Bank, South Florida, N.A.
Palm Beach Lakes Office
West Palm Beach, Florida (904) 487-4786

K S Lane 17

FOR JFK 21 #15K 12+2500

LaneDocReqResp000019



**18**

# SunTrust

SunTrust Bank, South Florida, N.A.
Ft. Lauderdale, FL 33310

Remitter   Ole Anderson

Pay
to
the
order
of

⌐ Marshall Chapman ¬

If this Cashier's Check is lost, stolen or destroyed, it will be necessary
for the Purchaser/Remitter to supply the Bank with an Indemnity
Agreement in addition to a Surety bond, for before the value of the
check with a waiting period of 90 days, before a duplicate check is by
issuer of or any refund is made.

Date   January 8, 1997

$ 3,000.00

Cashier's Check

CUSTOMER FILE COPY

Authorized Signature

1815445

63-607
670

LaneDocReqResp000021

KERRY S. LANE 03-05-98
621 Andrews Ave.
Delray Beach, FL 33483-7207

4656

63-607/670

12/25 97

PAY TO THE ORDER OF ___Greg Anderson___ $ 1,500.—

One Thousand five hundred _____ DOLLARS

SUNTRUST
SunTrust Bank, South Florida, N.A.
Palm Beach Lakes Office
West Palm Beach, Florida (561) 467-4798

FOR JFK 71 > 1 mill

K S Lane

⑈06 700607⑈: 049600 20 18394⑈ 4656 ⑈0000 150000⑈

---

SUNTRUST

SunTrust Bank, South Florida, N.A.
Ft. Lauderdale, FL 33310

If this Cashier's Check is lost, stolen or destroyed, it will be necessary for the Purchaser/Remitter to supply the Bank with an Indemnity Agreement in addition to a Surety bond, for twice the value of the check with a waiting period of 30 days, before a duplicate check is issued or any refund is made.

1815445

63-607 607
670

sg – 490

Remitter    Ola Anderson

Date    January 8, 1997

$ 3,000.00

Pay to the order of    **Marshall Chapman**

from KSL for
JFK
boat

Cashier's Check

CUSTOMER FILE COPY
NON-NEGOTIABLE

Authorized Signature

---

KERRY S. LANE 03-05-98
621 Andrews Ave.
Delray Beach, FL 33483-7207

4679

63-607/670

11    98    19

PAY TO THE ORDER OF ___Greg Anderson___ $ 2,000.—

Two Thousand + one _____ DOLLARS

SUNTRUST
SunTrust Bank, South Florida, N.A.
Palm Beach Lakes Office
West Palm Beach, Florida (561) 467-4798

FOR JFK 274

K S Lane

⑈06 700607⑈: 049600 20 18394⑈ 4679 ⑈0000 200000⑈

---

KERRY S. LANE 03-05-98
621 Andrews Ave.
Delray Beach, FL 33483-7207

4151

63-607/670

DATE 2/6/98

PAY TO THE ORDER OF ___Greg Anderson___ $ 1,500.—

One Thousand five hundred _____ DOLLARS

SUNTRUST
SunTrust Bank, South Florida, N.A.
Palm Beach Lakes Office
West Palm Beach, Florida (561) 467-4798

JFK 71

20

LaneDocReqResp000022

KERRY S. LANE   03-05-86
621 Andrews Ave.
Delray Beach, FL 33483

3920

63-607/670
BRANCH 498

3/19  19  98

PAY TO THE ORDER OF  Matt _____

$500.

Five hundred + none —————   DOLLARS

SunBank/South Florida, N.A.
Palm Beach Lakes Office
540 Village Boulevard
West Palm Beach, Florida 33409

K.S. Lane

FOR 2-1 over IM, 1.5 under

⑈067006076⑈049600201 8394⑈ 3920 ⑈00000050000⑈

---

KERRY S. LANE   03-05-86
621 Andrews Ave.
Delray Beach, FL 33483

3917

63-607/670
BRANCH 498

3/19  19  98

PAY TO THE ORDER OF  Gregory O. Anderson

$500.

Five hundred + none —————   DOLLARS

SunBank/South Florida, N.A.
Palm Beach Lakes Office
540 Village Boulevard
West Palm Beach, Florida 33409

K S Lane

FOR

⑈067006076⑈049600201 8394⑈ 3917 ⑈00000050000⑈

---

KERRY S. LANE   03-05-86
621 Andrews Ave.
Delray Beach, FL 33483-7207

4717

63-607/670

DATE  6/7/98

PAY TO THE ORDER OF  Kerry Lane

$ 4000.

Four thousand and none   DOLLARS

SunTrust
SunTrust Bank, South Florida, N.A.
Palm Beach Lakes Office
West Palm Beach, Florida (561) 467-6788

K S Lane

FOR

⑈067006076⑈049600 018394⑈ 4717 ⑈0000400000⑈

---

KERRY S. LANE   03-05-86
621 Andrews Ave.
Delray Beach, FL 33483-7207

4894

63-607/670

DATE  6/1/98

PAY TO THE ORDER OF  Ole Anderson

$ 150.—

One hundred fifty + none   DOLLARS

SunTrust
SunTrust Bank, South Florida, N.A.
Palm Beach Lakes Office
West Palm Beach, Florida (561) 467-6788

K S Lane

FOR

LaneDocReqResp000023



LaneDocReqResp000024

**Check 4899**

KERRY S. LANE 03-05-88
621 Andrews Ave.
Delray Beach, FL 33483-7207
63-607/670

DATE 5/4/98

PAY TO THE ORDER OF _Che Anderson_ $ 500.—

_Five hundred + none_ DOLLARS

SunTrust
SunTrust Bank, South Florida, N.A.
Palm Beach Lakes Office
West Palm Beach, Florida (954) 497-4788

FOR _JFK 2.1_ _K S Lane_

⑆067006076⑆049600 018394⑈ 4899 ⑆0000050000⑆

**Check 4949**

KERRY S. LANE 03-01-88
621 Andrews Ave.
Delray Beach, FL 33483-7207
63-607/670

DATE 5/12/98

PAY TO THE ORDER OF _Chef Greg Anderson_ $ 1,500.—

_One thousand, five hundred_ DOLLARS

SunTrust
SunTrust Bank, South Florida, N.A.
Palm Beach Lakes Office
West Palm Beach, Florida (954) 497-4788

FOR _JFK 2.1_ _K S Lane_

⑆067006076⑆049600 018394⑈ 4949 ⑆0000150000⑆

**Check 5033**

KERRY S. LANE 03-88
621 Andrews Ave.
Delray Beach, FL 33483-7207
63-607/670

DATE 7/2/98

PAY TO THE ORDER OF _Rich Dehanty_ $ 300

_Three hundred + none_ DOLLARS

SunTrust _727_
SunTrust Bank, South Florida, N.A.
Palm Beach Lakes Office
West Palm Beach, Florida (954) 497-4788

FOR _JFK 5 Student_ _K S Lane_

⑆067006076⑆049600 018394⑈ 5033 ⑆0000030000⑆

**Check 5171**

FDLA 536-294-50-245-0

KERRY S. LANE 03-88
621 Andrews Ave.
Delray Beach, FL 33483-7207
63-607/670

DATE 9/2/98

PAY TO THE ORDER OF _Greg Anderson_ $ 1,000.—

_One thousand and none_ DOLLARS

SunTrust
SunTrust Bank, South Florida, N.A.
Palm Beach Lakes Office
West Palm Beach, Florida (954) 497-4788

FOR _JFK 1.1_ _K S Lane_ 23



24

KERRY S. LANE
621 Andrews Ave.
Delray Beach, FL 33483-7207

5202
63-607/670

DATE 9/29/98

PAY TO THE ORDER OF Greg Anderson          $ 2,000.—

Two Thousand faore —                    DOLLARS

SunTrust
SunTrust Bank, South Florida, N.A.
Palm Beach Lakes Office
West Palm Beach, Florida (561) 837-4700

FOR Ben Pool                            K Slane

⑈067006076⑈049600 ⑈018394⑈ 5202 ⑈0000200000⑈

---

KERRY S. LANE
621 Andrews Ave.
Delray Beach, FL 33483-7207

5215
63-607/670

DATE 10/7/98

PAY TO THE ORDER OF Greg Anderson          $ 3,000.—

Three Thousand faore —                  DOLLARS

SunTrust
SunTrust Bank, South Florida, N.A.
Palm Beach Lakes Office
West Palm Beach, Florida (561) 837-4700

FOR Marblehead Med Co.                  K Slane

⑈067006076⑈049600 ⑈018394⑈ 5215 ⑈0000300000⑈

---

KERRY S. LANE
621 Andrews Ave.
Delray Beach, FL 33483-7207

5286
63-607/670

DATE 11/13/98

PAY TO THE ORDER OF Greg Anderson          $ 1,000.—

One Thousand faore —                    DOLLARS

SunTrust
SunTrust Bank, South Florida, N.A.
Palm Beach Lakes Office
West Palm Beach, Florida (561) 837-4700

FOR                                     K Slane

⑈067006076⑈049600 ⑈018394⑈ 5286 ⑈0000100000⑈

25

LaneDocReqResp000027



LaneDocReqResp000028

This Statement is a summary of total investment dollars and terms of repayment to all investors in FLASH II, Star Boat #721. This statement supercedes any and all previous statements.

A. — When FLASH II is sold and all Fees, Costs, and any other expenses incurred by the sale have been paid, Mr. Robert A. Harper, Atty., will receive 5% of the net proceeds. The remainder will be [Figure #1]

B — [Figure #1] will be paid out in this manner:

Eddie Crosby — $11,000
Kerry Lane — $60,000
Jean Anderson — $10,000
$81,000 Total

[Figure #2 will be Figure #1 minus $81,000]

C — [Figure #2] will be paid out in this manner:

EDDIE CROSBY — $10,000
KERRY LANG — $10,000
JEAN Anderson — $10,000
OLG Anderson — $32,000
MARBLEHEAD TRADING CO — $14,500
GARY MILO — $16,000 ($16,000)
(954) 764-7154 Pete + Carole Walker — $12,000
Homer Earnest 2,000
Jim Anderson 2,000
$108,000 Total

12/4/97
Gregory Olf Anderson

[Figure #3 will be Figure #2 minus $108,000]

29

LaneDocReqResp000031

08/30/2005 14:11 FAX 5228                    DSC                              ☐002

D — [Figure #3] will be paid at in this manner:

    EDDIE CROSBY — 16.6 %

    KERRY LANE — 30.0 %

    JOAN ANDERSON — 10.0 %

    Mr/Mrs Horace Earnest — 1.0 %

    Chuck Fitzgerald — 1.0 %

    Olaf Anderson — 41.4 %

             100.0 %

E — EDDIE CROSBY WILL BE PAID 16.6 % in ADDITION TO his $11,000 payment in Section B

F — KERRY LANE WILL BE PAID $60,000 or 30% of FIGURE 3, whichever sum is greater. His initial payment of $60,000 in Section B will be deducted from his 30% should the 30% figure be greater than $60C.

G — JOAN ANDERSON will BE PAID $10,000 or 10% of Figure 3, whichever sum is greater. Her initial Payment of $10,000 in section B will be deducted from her 10% should the 10% figure be greater than $10K.

12/4/97

Gregory Olaf Anderson

30

LaneDocReqResp000032

LAW OFFICES
# KENNETH E. LINDAUER
THE RUFUS CHOATE HOUSE
14 LYNDE STREET
SALEM, MASSACHUSETTS 01970-34C4

NEW YORK
MASSACHUSETTS
AND
VERMONT

TELEPHONE (978) 744-5861
FACSIMILE (978) 744-1319
E-MAIL ken@lindauer.com

16 CENTRAL STREET
PO Box 729
WOODSTOCK, VT 05091
Phone (802) 457-4446
Fax (802) 457-4496

## TELECOPY TRANSMITTAL SHEET

**Date:**                          July 1, 2005

**To:**                            Dr. Lane

**Fax No:**                        (508) 235-5269

**From:**                          Kenneth E. Lindauer, Esq.

**Fax No:**                        (978) 744-1319

**Number of pages
including transmittal sheet:**    20

**Re:**

### Original to be sent via:

_____ Hand Delivery          _____ Mail              _____ Express Mail
_____ Federal Express        _____ Not Sending       _____ Other

### Message

Here are the documents we talked about last night. Good Luck!

### Confidentiality Note

The document(s) accompanying this transmission contain confidential or privileged information from the Law Offices of Kenneth E. Lindauer. The information is intended to be for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this telecopied information is prohibited. If you received this telecopy in error, please notify us by telephone immediately so that we can arrange for the retrieval of the original documents at no cost to your office.
**IF YOU DO NOT RECEIVE ALL OF THE PAGES OR FIND THAT THEY ARE ILLEGIBLE, PLEASE CALL AS SOON AS POSSIBLE: (978) 744-5861.**

**31**

LaneDocReqResp000033

M'HEAD TRADING    PAGE 02/20
PAGE 81

JUN - 4 2005

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA
Plaintiff

V.

CIVIL ACTION: 05CV10192-RWZ

GREGORY ANDERSON & RALPH ANDERSON
Defendant

## NOTICE OF DEFAULT

Upon application of the plaintiff UNITED STATES OF AMERICA, for an order of default for failure of the defendant GREGORY AND

RALPH ANDERSON, to plead or otherwise defend as provided by Rule 55(a) of the Federal Rules of Civil Procedure, notice is hereby

given that the defendant has been defaulted this 3RD day of JUNE, 2005.

By the Court,

_s/ Lisa A. Urso _
Deputy Clerk

Notice mailed to:
Counsel & defendants

default.ntc

**32**

LaneDocReqResp000034

07/21/2005  01:23  978/441515

U.S. Department of Justice
United States Marshals Service

**PROCESS RECEIPT AND RETURN**

| PLAINTIFF | COURT CASE NUMBER |
|---|---|
| UNITED STATES OF AMERICA | CA No. 05-10192-RWZ |

| DEFENDANT | TYPE OF PROCESS |
|---|---|
| ONE STAR CLASS SLOOP SAILBOAT BUILT IN 1930 WITH HULL NUMBER 721, NAMED "FLASH II" | Complaint and Warrant & Monition |

| SERVE | NAME OF INDIVIDUAL, COMPANY, CORPORATION, ETC. TO SERVE OR DESCRIPTION OF PROPERTY TO SEIZE OR CONDEMN |
|---|---|
| | Gregory Olaf Anderson |
| AT | ADDRESS (Street or RFD, Apartment No., City, State, and ZIP Code) |
| | 321 West Arcade Avenue, Clewiston, FL 33440 |

SEND NOTICE OF SERVICE TO REQUESTER AT NAME AND ADDRESS BELOW:

Shelbey D. Wright, Assistant U.S. Attorney
United States Attorney's Office
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210

| Number of process to be served with this Form - 285 | |
| Number of parties to be served in this case | |
| Check for service on U.S.A. | |

SPECIAL INSTRUCTIONS OR OTHER INFORMATION THAT WILL ASSIST IN EXPEDITING SERVICE (Include Business and Alternate Address, All Telephone Numbers, and Estimated Times Available For Service)

Please serve the attached Verified Complaint and Warrant & Monition, upon the above-referenced individual by certified mail, return receipt requested.

05-DEA-442507

LTT x3283

Signature of Attorney or other Originator requesting service on behalf of: *Shelbey D. Wright/LTT*  ☒ PLAINTIFF ☐ DEFENDANT   TELEPHONE NUMBER (617) 748-3100   DATE February 9, 2005

**SPACE BELOW FOR USE OF U.S. MARSHAL ONLY - DO NOT WRITE BELOW THIS LINE**

| I acknowledge receipt for the total number of process indicated. | Total Process | District of Origin | District to Serve | Signature of Authorized USMS Deputy or Clerk | Date |
|---|---|---|---|---|---|
| | No. | No. 35 | No. 35 | | 2/10/05 |

I hereby certify and return that I ☐ have personally served, ☐ have legal evidence of service, ☐ have executed as shown in "Remarks", the process described on the individual, company, corporation, etc. at the address shown above or on the individual, company, corporation, etc., shown at the address inserted below.

☐ I hereby certify and return that I am unable to locate the individual, company, corporation, etc., named above (See remarks below).

| Name and title of individual served (if not shown above). | ☐ A person of suitable age and discretion then residing in the defendant's usual place of abode. |
|---|---|
| Address (complete only if different than shown above) | Date of Service 2/25/05   Time |
| | Signature of U.S. Marshal or Deputy |

| Service Fee | Total Mileage Charges (including endeavors) | Forwarding Fee | Total Charges | Advance Deposits | Amount Owed to US Marshal or | Amount or Refund |
|---|---|---|---|---|---|---|

REMARKS: 2/11 Certify # 7002 0510 0004 1358 2075
2/18/05 Delivery Date

| PRIOR EDITIONS MAY BE USED | 1. CLERK OF THE COURT | FORM U... |

... ☐ NOTICE OF SERVICE  ☐ BILLING STATEMENT  ☐ ACKNOWLEDGMENT OF RECEIPT

GOVERNMENT EXHIBIT

CLIFF STREET

*Kim for your file*

Invoice #    500715
Invoice Date  04/24/98

```
┌─────────────────────────────────┐
│ MARBLEHEAD TRADING CO.           │
│     89 FRONT STREET              │
│ MARBLEHEAD, MA     01945         │
│                                  │
│     (781) 631-4650               │
└─────────────────────────────────┘
```

Boat Name: FLASH II

To:  Harper, Robert A.
     Law Firm, P.A.
     P.O. Box 10132
     Tallahassee      FL  32302

Work Order # 500715
Mooring #
C/J:           0

Home Phone:  (0  ) 0  -0
Work Phone:  (561) 278-3979

Launch/Haul Date:
Launch/Haul:      0

*TERMS: PAYABLE UPON RECEIPT. Finance Chg. 1.5% per Month on Overdue Accounts

| CODE | DESCRIPTION | QTY | RATE | AMOUNT |
|------|-------------|-----|------|--------|
| – – | Transport boat from New York to Marblehead, MA | 1.00 | 500.00 | 500.00 |

*Mailed to O.ee Anderson 4/24/98*

** YARD IS NOT RESPONSIBLE FOR MAST HEAD GEAR **
** ALL WORK MUST BE PAID IN FULL BEFORE BOAT LEAVES YARD **

COMMENTS:

TOTAL MATERIAL $
TOTAL LABOR    $
TOTAL TAX      $
               ------------
TOTAL DUE      $    500.00

Marblehead 000006

INVOICE NO

**MARBLEHEAD TRADING CO.**
89 Front Street
MARBLEHEAD, MA 01945-3201

(617) 639-0029
FAX (617) 631-0542

TO:
Robert A. Larpar lav with
205 Parl Av
P. O. Box 10112
Tallahassee, FL 32302-0112

| TERMS | DESCRIPTION OF WORK | AMOUNT |
|---|---|---|
| 4/30/97 - 7/30/97 | C/o Anderson. 71' C. Lake Av. Delray Neach. FL | |
| | Moving | |
| | Step and unstep | |
| | Hanging boat | |
| | Paint/Varnish | |
| | Prep for shipping | |
| | Load on trailer | |

| QTY | MATERIAL | PRICE | AMOUNT |
|---|---|---|---|
| STOCK | Inv. #22204 | | 26 |
| | 24220 | | 02 |
| | 28271 | | 37 |
| | N321 | 7 | 05 |
| | B3417 | | 43 |
| | T8434 | 98 | |
| | 18454 | 55 | 05 |
| | T8495 | 01 | 10 |
| | T8520 | 69 | 09 |
| | | 475 | 00 |
| | Less 20% | 04 | 40 |
| | | 277 | 60 |

** YARD IS NOT RESPONSIBLE FOR MAST HEAD GEAR **

In the event that credit is extended by Marblehead Trading Co., the undersigned agrees as follows:
1. Payment for parts and service invoices is due 30 days from date of invoice.
2. Any account past due over 60 days will automatically be placed on C.O.D. and credit privileges withdrawn.
3. Pay reasonable attorney fee and court costs incurred in enforcing collection of the account.
4. Finance charges at a rate of 1% per month will be charged on amounts past due over 30 days.

I have read, understand and agree to the above terms.

SIGNATURE

WORK ORDER NO.
DATE COMPLETED 8/11/97

| | AMOUNT |
|---|---|
| TRUCKING | 400 00 |
| TOTAL LABOR | 967 50 |
| TOTAL MATERIALS | 377 60 |
| TAX | 18 23 |

7744V5 MarbleHead 0000279

PAY THIS AMOUNT → 98

## MARBLEHEAD TRADING CO.
89 Front Street
MARBLEHEAD, MA 01945-3201

(617) 639-0029
FAX (617) 631-0542

**INVOICE NO.** 2F-63

DATE OF ORDER

| JOB PHONE | |
| --- | --- |
| JOB NAME/LOCATION | |

FLAGH IT
Starboat #701

TO:
Robert A. Harper Law Firm
325 Park Av
P. O. Box 10132
Tallahassee, FL 32302-2132

Ole Anderson, 718 S. Lake Av., Delray Beach, FL

| QTY | MATERIAL | PRICE | AMOUNT |
| --- | --- | --- | --- |
| | | | |

| TERMS | DESCRIPTION OF WORK | AMOUNT |
| --- | --- | --- |
| | 4-30-97 — 7-30-97 | |

TOTAL MATERIALS
TOTAL LABOR
TAX
PAY THIS AMOUNT →

**· · YARD IS NOT RESPONSIBLE FOR MAST HEAD GEAR · ·**

In the event that credit is extended by Marblehead Trading Co., the undersigned agrees
as follows:
1. Payment for parts and service invoices is due 30 days from date of invoice.
2. Any account past due over 60 days will automatically be placed on C.O.D. and credit privileges withdrawn.
3. Pay reasonable attorney fee and court costs incurred in enforcing collection of the account.
4. Finance charges at a rate of 1% per month will be charged on amounts past due over 30 days.

I have read, understand and agree to the above terms

SIGNATURE

Marblehead 000029

**MARBLEHEAD TRADING CO.**
89 Front Street
MARBLEHEAD, MA 01945-3201

(617) 639-0029
FAX (617) 631-0542

INVOICE NO. _____

| JOB PHONE | | DATE OF ORDER |
| --- | --- | --- |
| JOB NAME, LOCATION | | 3/18/97 |
| | PLACE | |
| | Starbont #791 | |

TO:

Robert A. Harper Law Firm
355 Park Ave
P. O. Box 10189
Tallahassee FL   32302-0189

| | PHONE |
| --- | --- |
| ORDER TAKEN BY | |

Ole Anderson
719 S. Lake Ave, Dairy Beach
FL

**DESCRIPTION OF WORK**

LABOR 3-18-97 thru 3-19-97

Mount deck hardware

Install keel

Install trailers

Install rudder

Reinstall bronze knees

| QTY | MATERIAL | PRICE | AMOUNT |
| --- | --- | --- | --- |
| 2 | Thk x 12750 | 42 50 | 42 50 |
| | 82970 | 70 55 | 70 55 |
| | 37983 | 39 00 | 39 00 |
| | 3720 E | 78 51 | 78 51 |
| | T-451 | 87 57 | 87 57 |
| | Less 20% | 257 11 | 257 11 |
| | | 71 40 | 71 40 |
| | Met 1192 Aluminex | 985 00 | 985 00 |
| 3 | Ots 2 Spar 101 Semi White | 40 80 | 40 80 |
| | Bronze Fasteners | 24 40 | 24 40 |
| | Mahogany | 10 00 | 10 00 |
| | | 285 77 | 285 77 |

** YARD IS NOT RESPONSIBLE FOR MAST HEAD GEAR **

| | | | TOTAL LABOR | 1003 00 |
| --- | --- | --- | --- | --- |
| | | | TOTAL MATERIALS | 1892 57 |
| | | | TAX | |
| | | | PAY THIS AMOUNT → | 3005 77 |

THANK YOU!

Marblehead 000039

In the event that credit is extended by Marblehead Trading Co., the undersigned agrees as follows:
1. Payment for parts and service invoices is due 30 days from date of invoice.
2. Any account past due over 60 days will automatically be placed on C.O.D. and credit privileges withdrawn.
3. Pay reasonable attorney fee and court costs incurred in enforcing collection of the account
4. Finance charges at a rate of 1½% per month will be charged on amounts past due over 30 days.

I have read, understand and agree to the above terms.

SIGNATURE _____

DATE, COMPLETED _____

**MARBLEHEAD TRADING CO.**

89 Front Street
MARBLEHEAD, MA 01945-3201

(617) 639-0029
FAX (617) 631-0542

INVOICE NO.

| JOB PHONE | | DATE OF ORDER |
| --- | --- | --- |
| JOB NAME/LOCATION | | |
| | FLASH 11 | |
| | Starboat #721 | |

TO:

Robert A. Hammer Jr. Trim
225 Park Ave
P O Box 1010
Tallahassee, FL 30302-0100

Joe Anderson
718 S. Lake Ave, Delray Beach, FL

| QTY | MATERIAL | PRICE | AMOUNT |
| --- | --- | --- | --- |
| | B-1030 | 41.17 | |
| | B-7973 | 27.25 | |
| | B-7903 | 63.97 | |
| | B-764 | | |
| | 7645 | 28.51 | |
| | | 87.37 | |
| | HULT 2.5 Aluminum | loss 20% | 71.42 |
| | 7 lbs Semi to bds | | 17.27 |
| | brerze Fasteners | | 4.40 |
| | | | 24.49 |
| | Ma Hqd Any | | 16.80 |

**TERMS**

| DESCRIPTION OF WORK | AMOUNT |
| --- | --- |
| LABOR 2-18-97 — 3-13-97 | |
| Mount Deck Hardware | |
| Install Keel | 452.00 |
| Swap Trailers | |
| Install Rudder | |
| Re Install Bronze Wheel | |
| | |
| 652 of this Shop | 60.00 |
| | 1673.00 |
| TOTAL MATERIALS | 1573.32 |
| TOTAL LABOR | |
| TAX | 302.77 |
| THANK YOU! | |
| PAY THIS AMOUNT ➔ | |

** YARD IS NOT RESPONSIBLE FOR MAST HEAD GEAR **

In the event that credit is extended by Marblehead Trading Co., the undersigned agrees as follows:

1. Payment for parts and service invoices is due 30 days from date of invoice.
2. Any account past due over 60 days will automatically be placed on C.O.D. and credit privileges withdrawn.
3. Pay reasonable attorney fee and court costs incurred in enforcing collection of the account.
4. Finance charges at a rate of 1% per month will be charged on amounts past due over 30 days.

I have read, understand and agree to the above terms.

SIGNATURE

Marblehead 000041

**MARBLEHEAD TRADING CO.**
89 Front Street
MARBLEHEAD, MA 01945-3201

(617) 639-0029
FAX (617) 631-0542

INVOICE NO.

| JOB PHONE | DATE OR ORDER |
| --- | --- |
| JOB NAME / LOCATION | 3/3/07 |

ORDER TAKEN BY

PHONE

TO: S. Robert A. Werner Law Firm, P.A.
     538 High Ave
     P. O. Box 10193
     Tallahassee, FL 32302-0193

TERMS

Ole Anderson

| QTY | MATERIAL | PRICE | AMOUNT |
| --- | --- | --- | --- |
| | | | |
| | | | |
| | | | |
| Bronze Screws | | | |
| | | | |

| DESCRIPTION OF WORK | AMOUNT |
| --- | --- |
| Floor boards | |
| Glue up rub rail | |
| Dry fit rub rails and remove for finishing | |
| Fabricate deck hardware | |
| | |

| | |
| --- | --- |
| TOTAL LABOR | 1057 50 |
| TOTAL MATERIALS | |
| TAX | |
| **THANK YOU!** PAY THIS AMOUNT | 1 |

Marblehead 000054

** YARD IS NOT RESPONSIBLE FOR MAST HEAD GEAR **

In the event that credit is extended by Marblehead Trading Co., the undersigned agrees as follows:
1. Payment for parts and service invoices is due 30 days from date of invoice.
2. Any account past due over 60 days will automatically be placed on C.O.D. and credit privileges withdrawn.
3. Pay reasonable attorney fee and court costs incurred in enforcing collection of the account.
4. Finance charges at a rate of 1% per month will be charged on amounts past due over 30 days.

I have read, understand and agree to the above terms.

SIGNATURE

# MARBLEHEAD TRADING CO.
89 Front Street
MARBLEHEAD, MA 01945-3201

(617) 639-0029
FAX (617) 631-0542

INVOICE NO. ____ 28

| | | |
|---|---|---|
| JOB PHONE | | JOB NAME/LOCATION |
| | DATE OF ORDER 1/29/07 | |

TO:
J.R. Bob 10133
Tallahassee, FA 32000-0133

West Park Ave
Tallahassee, FA

| QTY | MATERIAL | PRICE | AMOUNT |
|---|---|---|---|
| | Tax | | 51 67 |
| | 75424 | | 10 74 |
| | 17973 | | 60 91 |
| | 17391 | | 73 93 |
| | 17904 | | 38 43 |
| | less 20% | | 255 27 |
| | | | -46 47 |
| | | | 185 00 |
| | ½" Monel Staples 1 hx | | 19 46 |
| | Putty knife, etc. | | 28 04 |
| | lumber, Pipe | | 63 34 |
| | Mahogany | | 140 00 |
| | Bondures Mahogany | | 186 00 |
| | 18 P.Mach.Screws w/nuts & wash | | 29 52 |
| | | | 653 19 |

· · YARD IS NOT RESPONSIBLE FOR MAST HEAD GEAR · ·

In the event that credit is extended by Marblehead Trading Co., the undersigned agrees as follows:

1. Payment for parts and service invoices is due 30 days from date of invoice.
2. Any account past due over 60 days will automatically be placed on C.O.D. and credit privileges withdrawn.
3. Pay reasonable attorney fee and court costs incurred in enforcing collection of the account.
4. Finance charges at a rate of 1% per month will be charged on amounts past due over 30 days.

I have read, understand and agree to the above terms.

SIGNATURE ____

| DESCRIPTION OF WORK | AMOUNT |
|---|---|
| LABOR thru the 29th of January 1997 | |
| Fabricate and install rudder tube | |
| Block and install rudder tube | |
| Install Forestay fitting | |
| Fare/deck beams | |
| Install decking | |
| Fame decking | |
| Fabricate floor boards | |
| Install canvas | |
| Fabricate stem plate | |
| Modify sleave assembly for forestay | |

| | AMOUNT |
|---|---|
| ORDER TAKEN BY | |
| TOTAL LABOR | |
| TOTAL MATERIALS | 653 19 |
| TAX | |
| THANK YOU! | |
| Freight | |
| PAY THIS AMOUNT ➔ | 3913 57 |

Marblehead 000060

**MARBLEHEAD TRADING CO.**
89 Front Street
MARBLEHEAD, MA 01945-3201

**(617) 639-0029**
**FAX (617) 631-0542**

INVOICE NO.    25228

| JOB PHONE | | DATE OF ORDER 1/22/97 |
|---|---|---|
| JOB NAME/LOCATION | FLASH II | |

TO:    Robert A. Harper Law Firm, P.A.
325 West Park Ave
P. O. Box 10132
Tallahassee, FA    32302-2132

Starboat #721

| PHONE | |
|---|---|
| ORDER TAKEN BY | |

| QTY | MATERIAL | PRICE | AMOUNT | TERMS | DESCRIPTION OF WORK | AMOUNT |
|---|---|---|---|---|---|---|
| | | | | | | |

**· · YARD IS NOT RESPONSIBLE FOR MAST HEAD GEAR · ·**

In the event that credit is extended by Marblehead Trading Co., the undersigned agrees
as follows:

1. Payment for parts and service invoices is due 30 days from date of invoice.
2. Any account past due over 60 days will automatically be placed on C.O.D. and
   credit privileges withdrawn.
3. Pay reasonable attorney fee and court costs incurred in enforcing collection of
   the account.
4. Finance charges at a rate of 1% per month will be charged on amounts past due
   over 30 days.

I have read, understand and agree to the above terms.

| | TOTAL LABOR | |
|---|---|---|
| | TOTAL MATERIALS | |
| | TAX | |
| | PAY THIS AMOUNT → | |

SIGNATURE

Marblehead 000062

**MARBLEHEAD TRADING CO.**
89 Front Street
MARBLEHEAD, MA 01945-3201

(617) 639-0029
FAX (617) 631-0542

INVOICE NO. 5203

| JOB PHONE | FOR VALUE LOCATION | DATE OF ORDER |
|---|---|---|
| | | 1/10/07 |

TO:
S. Colvert A. Harper Law Firm, P.A.
225 West Park Avenue
P. O. Box 10193
Tallahassee, FL 32302-2193

Flash II
Starboat #751

TERMS:

| | PHONE |
|---|---|
| ORDER TAKEN BY | |

| QTY. | MATERIAL | PRICE | AMOUNT |
|---|---|---|---|
| 1 ov. | #75386 | 339 | 55 |
| | B7812 | 50 | 59 |
| | 53836 | 196 | 48 |
| | B7849 | 495 | 06 |
| | B7856 | 48 | 27 |
| | | 1138 | 04 |
| | Less 20% | -227 | 79 |
| | | 911 | 15 |
| | Bronze Plat Stock | 91 | 50 |
| | Lumber | 28 | 74 |
| | Canvas | 34 | 14 |
| | Mahogany | 17 | 96 |
| | Stringer (net) | 91 | 83 |
| | | 1045 | 52 |

**· · YARD IS NOT RESPONSIBLE FOR MAST HEAD GEAR · ·**

In the event that credit is extended by Marblehead Trading Co., the undersigned agrees as follows:

1. Payment for parts and service invoices is due 30 days from date of invoice.
2. Any account past due over 60 days will automatically be placed on C.O.D. and credit privileges withdrawn.
3. Pay reasonable attorney fee, and court costs incurred in: enforcing collection of the account.
4. Finance charges at a rate of 1½% per month will be charged on amounts past due over 30 days.

I have read, understand and agree to the above terms.

_____
SIGNATURE

| | DESCRIPTION OF WORK | AMOUNT |
|---|---|---|
| Cole Anderson | | |
| LABOR for chain plates and hull faring | | 1075 | 50 |
| Misc heating costs | | 100 | 00 |
| (Through 1/20/07) | | |

| | |
|---|---|
| TOTAL MATERIALS | 1045 | 52 |
| TOTAL LABOR | | |
| TAX | 20 | 26 |
| PAY THIS AMOUNT ▸ THANK YOU! | 2295 | 28 |

Marblehead 000080

# MARBLEHEAD TRADING CO.

89 Front Street
MARBLEHEAD, MA 01945-3201

(617) 639-0029
FAX (617) 631-0542

INVOICE NO. 5203

| | |
|---|---|
| JOB PHONE | DATE OF ORDER 1/10/97 |
| JOB NAME/LOCATION | PLASH II |
| | Starboat #781 |

TO:
% Robert A. Tarmon Law Firm, P.A.
225 West Park Drive
P. O. Box 10193
Tallahassee, FL 32302-2193

TERMS: Ole Anderson

ORDER TAKEN BY

| QTY | MATERIAL | PRICE | AMOUNT |
|---|---|---|---|
| 1 | 5356 | | 339.65 |
| 2 | 7812 | | 56.58 |
| 2 | 7836 | | 196.48 |
| 2 | 7848 | | 498.06 |
| 2 | 7656 | | 48.2 |
| | | | 1139.99 |
| | less 20% | | (227.79) |
| | | 911.15 | |

| | DESCRIPTION OF WORK | | AMOUNT |
|---|---|---|---|
| Bronze Keel Stock | Labor For Clevis Plates | | 31.50 |
| Lumber | 04p Hull Towing. | | 28.24 |
| Canvas | | | 9.14 |
| Mastic | Stock Changes | | 17.86 |
| Shipping (mast) | Misc Mooring Costs | | 21.83 |
| | Mooring 1/20/97 Freight | | |
| | | TOTAL MATERIALS | 1075.50 |
| | | TOTAL LABOR | 100.00 |
| | | TAX | |
| | | THANK YOU! PAY THIS AMOUNT → | 2030 |

**YARD IS NOT RESPONSIBLE FOR MAST HEAD GEAR**

In the event that credit is extended by Marblehead Trading Co., the undersigned agrees as follows:

1. Payment for parts and service invoices is due 30 days from date of invoice
2. Any account past due over 60 days will automatically be placed on C.O.D. and credit privileges withdrawn.
3. Pay reasonable attorney fee and court costs incurred in enforcing collection of the account.
4. Finance charges at a rate of 1% per month will be charged on amounts past due over 30 days.

I have read, understand and agree to the above terms.

SIGNATURE _____

SIGNATURE I hereby acknowledge the satisfactory completion of the above described work.

WORK ORDERED BY _____ DATE COMPLETED

Marblehead 000062

## MARBLEHEAD TRADING CO.

89 Front Street
MARBLEHEAD, MA 01945-3201

(617) 639-0029
FAX (617) 631-0542

INVOICE NO. 35035

| QTY | MATERIAL | PRICE | AMOUNT |
|-----|----------|-------|--------|
| 1 | Inv. # 5340 | | 177 13 |
| | B7235 | | 88 52 |
| | B7756 | | 46 40 |
| | B7767 | | 44 40 |
| | B7777 | | 52 42 |
| | less one | | 406 78 |
| | | | 81 76 |
| | | | 327 00 |
| | Lumber (Cedar Mahog Pine) | | 835 00 |
| | | | 163 00 |
| | Silicone Bnze fasteners | | 1896 95 |

TO: Robert A. Warner Law Firm P.A.

325 West Park Ave.
P. O. Box 10132
Tallahassee FL 32302-2132

DATE OF ORDER 3/20/96

JOB NAME/LOCATION PHASE II
#701 Starbe...

ORDER TAKEN BY

PHONE 904 224-5900
FAX 224 9800

### DESCRIPTION OF WORK

Work to date rebuilding PHASE II

11-28-95 thru 12-30-95

Mr. Ole' Anderson

TOTAL MATERIALS    1,226 95
TOTAL LABOR        2,295 50
TAX
FAX THIS AMOUNT →  111 0 45

THANK YOU!

CONFIDENTIAL

· · YARD IS NOT RESPONSIBLE FOR MAST HEAD GEAR · ·

In the event that credit is extended by Marblehead Trading Co., the undersigned agrees as follows:

1. Payment for parts and service invoices is due 30 days from date of invoice.
2. Any account past due over 60 days will automatically be placed on C.O.D. and credit privileges withdrawn.
3. Pay reasonable attorney fee and court costs incurred in enforcing collection of the account.
4. Finance charges at a rate of 1% per month will be charged on amounts past due over 30 days.

I have read, understand and agree to the above terms.

SIGNATURE

Marblehead 000096

# MARBLEHEAD TRADING CO.

89 Front Street
MARBLEHEAD, MA 01945-3201

(617) 639-0029
FAX (617) 631-0542

INVOICE NO. 25095

| JOB PHONE | | DATE OF ORDER 11/26/96 |
| JOB NAME/LOCATION | | |

Robert A. Harvie Law Firm
325 West Park Ave.
P. O. Box 10132
Tallahassee, Fa  32302-0132

Mr. Ole' Anderson

PHONE 904 224-5000
ORDER TAKEN BY

FLASH II
#721  Starboard

FAX · 224 0800

| QTY | MATERIAL | PRICE | AMOUNT | | DESCRIPTION OF WORK | AMOUNT |
|---|---|---|---|---|---|---|
| 1 | 5344 | | 177.12 | | Work to Date Rebuilding | |
| 8 | 7758 | | 46.19 | | Flash II | |
| 6 | 7736 | | 88.52 | | 11-26-96 — 12-20-96 | |
| 8 | 7761 | | 44.49 | | | |
| 8 | 7777 | | 51.46 | | | |
| | | | | | LABOR | 985.50 |
| Cutless | | | 409.78 | | | |
| Cutlas, Holley | | Less 20% | 81.76 | | | |
| Prop | | | 327.02 | | | |
| | | | 92.40 | | | |
| | | | 82.07 | | | |
| | | | 76.66 | | | |
| | | | 560.00 | | | |
| Silicon Bronze Fasteners | 163. | 26.30 | | | | |
| | | | 327.02 | | | |

** YARD IS NOT RESPONSIBLE FOR MAST HEAD GEAR **

In the event that credit is extended by Marblehead Trading Co., the undersigned agrees as follows:
1. Payment for parts and service invoices is due 30 days from date of invoice.
2. Any account past due over 60 days will automatically be placed on C.O.D. and credit privileges withdrawn.
3. Pay reasonable attorney fee and court costs incurred in enforcing collection of the account
4. Finance charges at a rate of 1% per month will be charged on amounts past due over 30 days.
I have read, understand and agree to the above terms.

SIGNATURE

No Tax Boy Is Bring Shipped Out of State

WORK ORDERED BY

SIGNATURE _____ hereby acknowledges the satisfactory completion of all work above described ____

DATE COMPLETED

| | |
|---|---|
| TOTAL LABOR | 985.50 |
| TOTAL MATERIALS | 1326.95 |
| TAX | |
| PAY THIS AMOUNT → | |

THANK YOU!

Less Deposit 3000.00

1132.45
8132.45

Marblehead 000098

# MARBLEHEAD TRADING CO.

89 Front Street
MARBLEHEAD, MA 01945-3201

(781) 639-0029
FAX (781) 631-0542

**INVOICE NO.** 27658

| JOB PHONE | | DATE OF ORDER |
|---|---|---|
| JOB NAME-LOCATION | | |
| | KLASH II | |

TO: Mr. Ole Anderson

718 South Lake Ave.

Del Ray Beach, FL 33483

PHONE

ORDER TAKEN BY

TERMS

| QTY | MATERIAL | PRICE | AMOUNT |
|---|---|---|---|

\*\* YARD IS NOT RESPONSIBLE FOR MAST HEAD GEAR \*\*

In the event that credit is extended by Marblehead Trading Co. the undersigned agrees as follows:
1. Payment for parts and service invoices is due 30 days from date of invoice.
2. Any account past due over 60 days will automatically be placed on C.O.D. and credit privileges withdrawn.
3. Pay reasonable attorney fee and court costs incurred in entering collection of the account.
4. Finance charges at a rate of 1½% per month will be charged on amounts past due over 30 days.

I have read, understand and agree to the above terms.

SIGNATURE

| DESCRIPTION OF WORK | AMOUNT |
|---|---|
| SUMMER STORAGE @ $100.00/mo | 300 00 |
| WINTER STORAGE, 1998-99 | 300 00 |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL LABOR | |
| TOTAL MATERIALS | |
| TAX | |
| **THANK YOU!** TOTAL AMOUNT ➤ | |

Marblehead 000112

| QTY | MATERIAL | PRICE | AMOUNT |
|---|---|---|---|

** YARD IS NOT RESPONSIBLE FOR MAST HEAD GEAR **

In the event that credit is extended by Marblehead Trading Co., the undersigned agrees as follows:

1. Payment for parts and service invoices is due 30 days from date of invoice
2. Any account past due over 60 days will automatically be placed on C.O.D. and credit privileges withdrawn.
3. Pay reasonable attorney fee and court costs incurred in enforcing collection of the account.
4. Finance charges at a rate of 1½ per month will be charged on amounts past due over 30 days

I have read, understand and agree to the above terms

---

## MARBLEHEAD TRADING CO.

89 Front Street
MARBLEHEAD, MA 01945-3201

**(617) 639-0029**
**FAX (617) 631-0542**

TO: Robert A. Harper Law Firm
305 Park Ave
P. O. Box 10132
Tallahassee,

INVOICE NO.

| | | | | | JOB PHONE | | | DATE OF ORDER |
|---|---|---|---|---|---|---|---|---|
| | | JOB NAME & LOCATION | | | | | | |

FLASH II

Stardust #701

ORDER TAKEN BY

| STOCK | DESCRIPTION OF WORK | | | | AMOUNT |
|---|---|---|---|---|---|
| | 621-278-7075 | Mr. Ole Anderson | | | |
| | | 718 S. Lake Ave | | | |
| | | Delray Beach, FL 33483 | | | |
| | Inv. #7065 | | | | 58.47 |
| | 7034 | | | | 46.35 |
| | 7040 | | | | 50.21 |
| 1 CT Dolomite 2005 Natural Redding | | | | | 10.51 |
| | | | | | 161.24 |
| | less 20% | | | | 32.25 |
| | | | | | 128.99 |
| Mahogany | | | | | 96.27 |
| | | | | | 225.26 |

TOTAL LABOR

TOTAL MATERIALS

TAX

PAY THIS AMOUNT ▸

THANK YOU!

Marblehead 000116

# MARBLEHEAD TRADING CO.

89 Front Street
MARBLEHEAD, MA 01945-3201

(617) 639-0029
FAX (617) 631-0542

INVOICE NO. _____

| JOB PHONE | | DATE OF ORDER |
|---|---|---|
| JOB NAME/LOCATION | | |
| | PHONE | ORDER TAKEN BY |

TO:
Robert A. Warner Law Firm
325 Park Ave.
P. O. Box 10132
Tallahassee, FL 32302-2132

Mr. Ole Anderson
718 S. Lake Ave.
Delray Beach, FL 33483

Starboat #791
MARK II

| QTY | MATERIAL | PRICE | AMOUNT |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

TERMS          361-278-3975

DESCRIPTION OF WORK

| | AMOUNT |
|---|---|
| TOTAL LABOR | |
| TOTAL MATERIALS | |
| TAX | |
| PAY THIS AMOUNT → | |

** YARD IS NOT RESPONSIBLE FOR MAST HEAD GEAR **

In the event that credit is extended by Marblehead Trading Co., the undersigned agrees as follows:

1. Payment for parts and service invoices is due 30 days from date of invoice.
2. Any account past due over 60 days will automatically be placed on C.O.D. and credit privileges withdrawn.
3. Pay reasonable attorney fee and court costs incurred in enforcing collection of the account.
4. Finance charges at a rate of 1½% per month will be charged on amounts past due over 30 days.

I have read, understand and agree to the above terms

SIGNATURE

THANK YOU!

WORK ORDERED BY

SIGNATURE (I hereby acknowledge the satisfactory completion of the above described work)

DATE COMPLETED:

Marblehead 000118

# MARBLEHEAD TRADING CO.

89 Front Street
MARBLEHEAD, MA 01945-3201

(617) 639-0029
FAX (617) 631-0542

**INVOICE NO.** 25166

| QTY | MATERIAL | PRICE | AMOUNT |
|---|---|---|---|
| | | | |
| | Silicone Bar Fasteners | 2rd .14 | 709 45 |
| | | | |

** YARD IS NOT RESPONSIBLE FOR MAST HEAD GEAR **

In the event that credit is extended by Marblehead Trading Co., the undersigned agrees as follows:
1. Payment for parts and service invoices is due 30 days from date of invoice.
2. Any account past due over 60 days will automatically be placed on C.O.D. and credit privileges withdrawn.
3. Pay reasonable attorney fee and court costs incurred in enforcing collection of the account.
4. Finance charges at a rate of 1% per month will be charged on amounts past due over 30 days.

I have read, understand and agree to the above terms.

SIGNATURE _____

**DESCRIPTION OF WORK**

TERMS

LABOR 10/3 0/06 01/08/07

| | AMOUNT |
|---|---|
| | 418 50 |

TOTAL LABOR 418 50
TOTAL MATERIALS 709 45
TAX 1000 05

WORK ORDER# 1112 97

DATE COMPLETED 1/12/07

PAY THIS AMOUNT 910 45

**MARBLEHEAD TRADING CO.**
89 Front Street
MARBLEHEAD, MA 01945-3201

**(617) 639-0029**
**FAX (617) 631-0542**

INVOICE NO.

| | JOB PHONE | | DATE OF ORDER |
| --- | --- | --- | --- |
| | JOB NAME/LOCATION | | |

TO: % Robert A. Harper Law Firm, P.A.
325 West Park Ave
Tallahassee, FL 32302-9152

FLASH II

Star Boat #321

TERMS:

| | PHONE |
| --- | --- |
| ORDER TAKEN BY | |

| QTY | MATERIAL | PRICE | AMOUNT |
| --- | --- | --- | --- |
| | Inv. # 22760 | | 87.91 |
| | 57787 | | 69.96 |
| | 57900 | | 54.02 |
| | T5362 | | 434.20 |
| | Less 20% | | -126.96 |
| | | | 507.81 |
| | Threaded Rod & fasteners | | 25.34 |
| | Silicone Brz fasteners | | 254.28 |
| | | | 788.43 |

** YARD IS NOT RESPONSIBLE FOR MAST HEAD GEAR **

In the event that credit is extended by Marblehead Trading Co., the undersigned agrees as follows:
1. Payment for parts and service invoices is due 30 days from date of invoice.
2. Any account past due over 60 days will automatically be placed on C.O.D. and credit privileges withdrawn.
3. Pay reasonable attorney fee and court costs incurred in enforcing collection of the account.
4. Finance charges at a rate of 1% per month will be charged on amounts past due over 30 days.
I have read, understand and agree to the above terms.

SIGNATURE

| | DESCRIPTION OF WORK | | AMOUNT |
| --- | --- | --- | --- |
| LABOR 12/3 9/06 - 01/08/07 | | | 413.50 |

WORK ORDERED BY

SIGNATURE

DATE COMPLETED

THANK YOU!

| | | |
| --- | --- | --- |
| TOTAL LABOR | | 413.50 |
| TOTAL MATERIALS | | 788.43 |
| TAX | | |
| PAY THIS AMOUNT ▶ | | |

Marblehead 000126

# MARBLEHEAD TRADING CO.

89 Front Street
MARBLEHEAD, MA 01945-3201

(617) 639-0029
FAX (617) 631-0542

**INVOICE NO.**   5402

| DATE OF ORDER | 1/18/97 |
| --- | --- |

OWN PHONE

JOB NAME / LOCATION

| QTY | MATERIAL | PRICE | AMOUNT |
| --- | --- | --- | --- |
| 1 | Tav. # 18140 | | 18.50 |
| | BB017 | | .99 |
| | | | 59.97 |
| | Less 20% | | 11.63 |
| | | | 46.02 |
| | 75486 | | 6.45 |
| | | | 40.17 |
| 2 | Qts 101 Semi White | | 44.80 |
| | | | 84.97 |

TO:
C Robert A. Harper Law Firm
325 Park Ave
P. O. Box 10132
Tallahassee, FL 32302-2132

ELASH II
Startout #721

| PHONE | |
| --- | --- |

ORDER TAKEN BY

**TERMS**

**DESCRIPTION OF WORK**

OLE ANDERSON, 718 N. Lake Ave.
Delray Beach, FL

Move boat for filming

Fabricate mast wedges

Glue up mast and boom cradle

• • YARD IS NOT RESPONSIBLE FOR MAST HEAD GEAR • •

In the event that credit is extended by Marblehead Trading Co., the undersigned agrees as follows:
1. Payment for parts and service invoices is due 30 days from date of invoice.
2. Any account past due over 60 days will automatically be placed on C.O.D. and credit privileges withdrawn.
3. Pay reasonable attorney fee and court costs incurred in enforcing collection of the account.
4. Finance charges at a rate of 1% per month will be charged on amounts past due over 30 days.

I have read, understand and agree to the above terms.

SIGNATURE

| | AMOUNT |
| --- | --- |
| TOTAL LABOR | |
| TOTAL MATERIALS | |
| TAX | |

THANK YOU!
PAY THIS AMOUNT →

Marblehead 000137

 

# INVOICE

7601-1

## Marblehead Trading Company

89 Front St. Marblehead, MA 01945
Phone: 781-639-0029  Fax: 781-631-0542

**Date:** 11/2/2004
**Page 1**

Bill To:  Anderson, Ole
321 W Arcade

Clewiston,FL 33440-

**Boat Name:** **FLASH**

**Home Phone:** (561) 573-2602

**Work Phone:**

| Work Order No. | Customer ID | WO Date | Terms | | Boat ID | Launch/Haul Date |
|---|---|---|---|---|---|---|
| 7601 | AND012 | 11/2/2004 | | | FLASH1 | |

| Code | Description | | | Quantity: | Unit Price: | Extended Price: |
|---|---|---|---|---|---|---|
| CREDIT | CREDIT | CREDIT | CREDIT | | | |
| S7 | INSIDE STORAGE 2004-2005 SEASON | | | -1 | 600.00 | -600.00 |

|  |  |  |  |
|---|---|---|---|
| **Total Material** | $0.00 | **Tax:** | 0.00 |

** Yard is not responsible for mast head gear **

** All work must be paid in full before boat leaves yard **

** Finance Charge 1.5% per Month on Overdue Accounts **

**Total:**   ($600.00)



Marblehead 000160





# INVOICE

## 7415-1

**Marblehead Trading Company**
89 Front St. Marblehead, MA 01945
Phone: 781-639-0029  Fax: 781-631-0542

**Date:**  9/18/2004
**Page 1**

Bill To:  Anderson, Ole
321 W Arcade

Clewiston, FL  33440-

**Boat Name:**  **FLASH**

**Home Phone:**  (561) 573-2602

**Work Phone:**

| Work Order No. | Customer ID | WO Date | Terms | Boat ID | Launch/Haul Date |
|---|---|---|---|---|---|
| 7415 | AND012 | 9/18/2004 | | FLASH1 | |

| Code | Description | Quantity | Unit Price | Extended Price |
|---|---|---|---|---|
| S7 | INSIDE STORAGE 2004-2005 SEASON | 1 | 600.00 | 600.00 |

**Total Material**          $0.00

**Tax:**          0.00

** Yard is not responsible for mast head gear **

** All work must be paid in full before boat leaves yard  **

** Finance Charge 1.5% per Month on Overdue Accounts **

**Total:**          $600.00

SEP 2 0 2004

Marblehead 000162



# INVOICE

**7559-1**

**Marblehead Trading Company**
89 Front St. Marblehead, MA 01945
Phone: 781-639-0029  Fax: 781-631-0542

Date:    10/13/2004
Page 1

Bill To:  Anderson, Ole
321 W Arcade

Clewiston,FL  33440-

Boat Name:  **FLASH**

Home Phone:  (561) 573-2602

Work Phone:

| Work Order No. | Customer ID | WO Date | Terms | Boat ID | Launch/Haul Date |
|---|---|---|---|---|---|
| 7559 | AND012 | 10/13/2004 | | FLASH1 | |

| Code | Description | Quantity: | Unit Price: | | Extended Price: |
|---|---|---|---|---|---|
| - | Remove and launder cover (7/13/04) | 1 | 50.00 | | 50.00 |
| * | STOCK: Inv. #B16459 | 1 | 57.68 | T | 57.68 |

**Total Material**   $57.68

Tax:    2.88

Total:   $110.56

** Yard is not responsible for mast head gear **
** All work must be paid in full before boat leaves yard **
** Finance Charge 1.5% per Month on Overdue Accounts **





# INVOICE

**6937-1**

**Marblehead Trading Company**
89 Front St. Marblehead, MA 01945
Phone: 781-639-0029  Fax: 781-631-0542

Date:     7/16/2004
Page 1

Bill To:  Anderson, Ole
          321 W Arcade

          Clewiston,FL  33440-

Boat Name:  **FLASH**

Home Phone:  (561) 573-2602

Work Phone:

| Work Order No. | Customer ID | WO Date | Terms | Boat ID | Launch/Haul Date |
|---|---|---|---|---|---|
| 6937 | AND012 | 7/16/2004 | | FLASH1 | |

| Code | Description | Quantity: | Unit Price: | Extended Price: |
|---|---|---|---|---|
| - | Summer Storage | 3 | 100.00 | 300.00 |
| - | | | | |
| - | | | | |
| - | | | | |
| - | | | | |
| - | | | | |

Total Material          $0.00

** Yard is not responsible for mast head gear **
** All work must be paid in full before boat leaves yard  **
** Finance Charge 1.5% per Month on Overdue Accounts **

Tax:          0.00

Total:      $300.00

JUL 1 9 2004



# INVOICE

6328-1

**Marblehead Trading Company**

89 Front St.  Marblehead, MA  01945
Phone: 781-639-0029   Fax: 781-631-0542

Date:    1/6/2004
Page 1

Bill To:  Anderson, Ole
321 W Arcade

Clewiston, FL  33440-

Boat Name:   **FLASH**

Home Phone:  (561) 573-0021

Work Phone:

| Work Order No. | Customer ID | WO Date | Terms | Boat ID | Launch/Haul Date |
|---|---|---|---|---|---|
| 6328 | | 1/6/2004 | | FLASH1 | |

| Code | Description | Quantity: | Unit Price: | Extended Price: |
|---|---|---|---|---|
| - | Temporary Storage | 1 | 500.00 | 500.00 |
| - | Remove covers.  Wash/dry.  Recover | 1 | 100.00 | 100.00 |
| - | | | | |
| - | | | | |
| - | | | | |
| - | | | | |

|  | Total Material | $0.00 | Tax: | 0.00 |
|---|---|---|---|---|

** Yard is not responsible for mast head gear **

** All work must be paid in full before boat leaves yard **

** Finance Charge 1.5% per Month on Overdue Accounts **

Total:    $600.00

- 7 2004

Marblehead 000167



# INVOICE

**5871-1**

## Marblehead Trading Company

89 Front St.  Marblehead, MA  01945
Phone: 781-639-0029   Fax: 781-631-0542

**Date:**   09/05/2003
**Page 1**

Bill To:   Anderson, Ole
          145 NE 6th Ave

          Delray Beach,FL  33483-5422

**Boat Name:**   **FLASH**

**Home Phone:**   (561) 573-0021

**Work Phone:**

| Work Order No. | Customer ID | WO Date | Terms | Boat ID | Launch/Haul Date |
|---|---|---|---|---|---|
| 5871 | | 09/05/2003 | | FLASH1 | |

| Code | Description | Quantity: | Unit Price: | Extended Price: |
|---|---|---|---|---|
| - | Temporary Storage | 1 | 500.00 | 500.00 |
| - | | | | |
| - | | | | |
| - | | | | |
| - | | | | |
| - | | | | |

|  |  |  |  |
|---|---|---|---|
| **Total Material** | $0.00 | **Tax:** | 0.00 |
| ** Yard is not responsible for mast head gear ** | | **Total:** | $500.00 |
| ** All work must be paid in full before boat leaves yard  ** | | | |
| ** Finance Charge 1.5% per Month on Overdue Accounts ** | | | |

SEP - 8 2003

Marblehead 000172



# INVOICE

### 4201-1

**Marblehead Trading Company**
89 Front St.  Marblehead, MA  01945
Phone: 781-639-0029   Fax: 781-631-0542

**Date:**   05/02/2002
**Page 1**

Bill To:  Anderson, Ole
145 NE 6th Ave

Delray Beach, FL  33483-5422

**Boat Name:**   **FLASH**

**Home Phone:**  (561) 573-0021

**Work Phone:**

| Work Order No. | Customer ID | WO Date | Terms | Boat ID | Launch/Haul Date |
|---|---|---|---|---|---|
| 4201 | | 05/02/2002 | | FLASH1 | |

| Code | Description | Quantity | Unit Price | Extended Price |
|---|---|---|---|---|
| - | Temporary Storage | 1 | 500.00 | 500.00 |

| | | |
|---|---|---|
| **Total Material** | $0.00 | **Tax:**   0.00 |
| | | **Total:**   $500.00 |

** Yard is not responsible for mast head gear **
** All work must be paid in full before boat leaves yard  **
** Finance Charge 1.5% per Month on Overdue Accounts **

*[handwritten: For storage per note on check. Item Invoice to cover 500.00 Temp storage]*

*[stamp: MAY - 2 2002]*

Marblehead 000173



Marblehead 000174

Invoice #        1741
Invoice Date  08/30/2000

MARBLEHEAD TRADING CO.
A9 FRONT STREET
MARBLEHEAD, MA   01945

(781) 639-0029

Boat Name: Flash

To: Anderson, Ole
145 NE 5th Ave

Work Order #   1741
Mooring #
C/J:        C

Launch/Haul Date:  07/08/2000
Launch/Haul:        0

Finance Charge 1.5% per Month on Overdue Accounts.

| DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|
| | 22.00 | 3.50 | 84.00 |
| | 1.00 | 5?.50 | ??1.50 |

TOTAL MATERIAL $
TOTAL LABOR    $
TOTAL TAX      $

TOTAL DUE

**Marblehead 000176**

ENTERED



Marblehead 000177

```
                                          WORK ORDER  #   1741
                                          ORDER DATE   07/08/96

   MARBLEHEAD TRADING CO.
      63 FRONT STREET              Boat Name: Flash
   MARBLEHEAD, MA   01945
                                          Class:  Star #721
       (781) 639-0029                     Length:  20.00
                                          Type:   S (Sail/Power)
                                          Color:
   To:  Anderson, Ole             Key/Combo:
        1540 4th Ave

        Ft. Lauderdale    FL  33305       Mooring #
                                          C/J:               C

        (                    )            Launch/Haul Date:  07/08/96
        Work Phone: (    )                Launch/Hours:             0
                                          Haul Site:
        Boat Storage:                     Launch Site:
        Rack Number:

   _____

        Description                       QTY    RATE     AMOUNT
   _____

        Off Load @ Cliff St
        Haul to Beacon Street
        Storage

   _____

   (                 MUST BE PAID IN FULL BEFORE BOAT LEAVES YARD **

   WORK NOTES:                        TOTAL MATERIAL  $
                                      TOTAL LABOR     $
                                      TOTAL TAX       %
                                      _____
                                      TOTAL DUE       $
```

Marblehead 000179

Invoice #        1741
Invoice Date  09/15/2000

MARBLEHEAD TRADING CO.
83 FRONT STREET
MARBLEHEAD, MA    01945

(781) 639-0029

Boat Name: Flash

To:  Anderson, Ole
     145 NE 6th Ave

     Del Ray Beach    FL   33483

     Home Phone:  (561) 573-21
     Work Phone:

Work Order #    1741
Mooring #
C/I:            0

Launch/Haul Date:  07/08/00A
Launch/Haul:       0

*TERMS: Net 30 DAYS.  Finance Charge 1.5% per Month on Overdue Accounts.

| CODE | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| | Off Load @ Cliff St | 22.00 | 3.80 | 83.60 |
| | Rig for Boston | | | |
| | Truck to Boston & Back | 1.00 | 571.50 | 571.50 |

NOTE:  Ole, the rig & truck to Boston & back
       11 hours, plus fuel, plus the use
       of the truck was a deal!

       Received on MASS         -400.00    1.00    -400.00

COMMENTS:

TOTAL MATERIAL  $
TOTAL LABOR     $
TOTAL TAX       $

TOTAL DUE    **Marblehead 000181**

[The body of this page is too faded/illegible to transcribe reliably.]

Marblehead 000182

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,                        )
            Plaintiff,                          )
      v.                                             )    Civil Action # 05-10192 RWZ
                              )
ONE STAR CLASS SLOOP SAILBOAT       )
BUILT IN 1930 WITH HULL NUMBER      )
721, NAMED "FLASH II",                          )
            Defendant.                         )

## UNITED STATES' ANSWERS TO INTERROGATORIES

      The United States of America, by its attorney, Michael J. Sullivan, United States

Attorney for the District of Massachusetts, provides the following responses to the

interrogatories propounded by Kerry Scott Lane, M.D. (the "Interrogatories"), pursuant to

Federal Rules of Civil Procedure 26 and 33.

## GENERAL RESPONSES AND OBJECTIONS TO INTERROGATORIES

      The following General Objections are incorporated into each of the responses as if set

forth in full, even if not repeated therein.

      1.    The United States objects to the Interrogatories to the extent that they call for the

disclosure of information subject to the attorney-client privilege, work product protection,

investigatory privilege or any other privilege or protection recognized by applicable federal or

state law. To the extent that any such privileged or protected information is disclosed, such

disclosure is not intended as, nor should it be deemed to be, a waiver of any privilege or

protection.

      2.    The United States objects to the Interrogatories to the extent that they seek to

define terms and/or characterize the evidence in this matter. To the extent that the United States

1

Wright ("AUSA Wright") and all other employees of the United States Attorney's Office who

worked on this forfeiture case, and on behalf of the investigating officers from the United States

Drug Enforcement Administration (the "DEA") who worked on the investigation leading up to

this forfeiture case. The terms "DEA", "employee of the DEA," and/or "agent of the DEA" as

used herein do not include confidential informants.

        8.     The United States objects to the time frame of the Interrogatories as overly broad.

Specifically, the United States objects to all requests that extend beyond October 18, 2005, the

date of the district court's judgment in this matter.

### SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES

**INTERROGATORY NO. 1**
     State whether you[1] interviewed Gregory Olaf ("Ole") Anderson, or his attorney Robert
Augustus Harper, at any time between February 2004 and present, in which any mention was
made of the Kennedy sailboat and/or ownership thereof. If the answer is yes, as to each and
every such interview, please separately state the following:

> a. The date, place, time if known, and identities of all persons present or
> listening telephonically or through other means (e.g. wire or other listening
> device.)

> b. State with particularity every statement made by Anderson or Harper –
> whether spontaneously or in response to questioning – regarding the owners of
> interests in the sailboat, the identity of the doctor or dentist referred to on page 9
> of the Complaint, or the location of any documents relating to the identities of the
> owners of interests in the sailboat.

> c. If the statements referred to in subpart b above were recorded or reduced to
> writing in a police report or contemporaneous notes, identify those documents.

**ANSWER TO INTERROGATORY NO. 1**
     Subject to and without waiving the General Objections, the United States responds as
follows:

---

    [1] The pronoun "you" is used collectively throughout these interrogatories. See
instruction (a) above.

No employee of the United States Attorney's Office interviewed Gregory Olaf ("Ole") Anderson, or his attorney Robert Augustus Harper, at any time between February 2004 and October 18, 2005, in which any mention was made of the Kennedy sailboat and/or ownership thereof.

There were no communications directly between Gregory Olaf Anderson and the DEA.

**INTERROGATORY NO. 2**
State whether you interviewed Ralph Anderson, or any employee or agent of Marblehead Trading Company (including its attorney Kenneth Lindauer) at any time between February 2004 and present, in which any information was requested or provided concerning the identities of the owners of the Kennedy sailboat. If the answer is yes, as to each and every such interview, please separately state the following:

> a.  Identify the person interviewed and the interviewer(s);
>
> b.  State the date, place, time, and whether the interview was in person or by phone;
>
> c.  Identify each other person present or listening telephonically or through other means (e.g. wire or other listening device);
>
> d.  State what information or statements were given by the interviewee;
>
> e.  State whether the interviewer requested that the interviewee check Marblehead's records and books for information that might lead to the identities of the owners, and if so, the interviewee's response;
>
> f.  If the statements referred to in subpart d above were recorded or reduced to writing in a police report or contemporaneous notes, identify those documents.
>
> g.  If Ralph Anderson or any employees or agents of Marblehead turned over documents to you, identify those documents.

4

**ANSWER TO INTERROGATORY NO. 2**

Subject to and without waiving the General Objections, the United States responds as follows:

No employee of the United States Attorney's Office interviewed Ralph Anderson, or any employee or agent of Marblehead Trading Company (including its attorney Kenneth Lindauer) at any time between February 2004 and October 18, 2005 in which any information was requested or provided concerning the identities of the owners of the Kennedy Sailboat. I and/or other agents of the DEA interviewed Ralph Anderson, as set forth in the DEA Form 6 regarding that interview, produced herewith and incorporated herein by reference.

**INTERROGATORY NO. 3**

State whether you interviewed Harry E. Crosby or his attorney, J. Thomas Kerner, at any time between February 2004 and present, in which any information was requested or provided concerning the identities of other owners of the Kennedy sailboat. If the answer is yes, as to each and every such interview, please separately state the following:

> a.  Identify the person interviewed and the interviewer(s);
> b.  State the date, place, time, and whether the interview was in person or by phone;
> c.  Identify each other person present or listening telephonically or through other means (e.g. wire or other listening device);
> d.  State what information or statements were given by the interviewee;
> e.  State whether the interviewer requested that Crosby check his records for information that might lead to the identities of the owners, and if so, the interviewee's response;
> f.  If the statements referred to in subpart d above were recorded or reduced to writing in a police report or contemporaneous notes, identify those documents.
> g.  If Harry E. Crosby or his attorney, J. Thomas Kerner, turned over any documents to you pertaining to the Kennedy sailboat, identify those documents. This request is not limited to documents pertaining to the identities of other co-owners.

**ANSWER TO INTERROGATORY NO. 3**

Subject to and without waiving the General Objections, the United States responds as follows:

At some point in late October 2004 or early November 2004, AUSA Wright received a telephone message from J. Thomas Kerner, an attorney representing Harry E. Crosby. AUSA Wright believes that she called Kerner back, and that there was no one else on the call from AUSA Wright's end. Kerner told AUSA Wright that his client, Crosby, was a part owner of the Kennedy Sailboat and had purchased his interest for $19,800. Kerner said that Chuck Fitzgerald had previously had an interest in the Kennedy Sailboat, but had sold or transferred that interest. Kerner wanted to know how Crosby could protect his claim to the Kennedy Sailboat. AUSA

Wright informed Kerner that he would receive a copy of the Complaint for Forfeiture *in rem* once it was filed and a Warrant and Monition was issued by the Court. At that time, Crosby could file a claim with any documentation showing his ownership interest in the Kennedy Sailboat. Kerner agreed to accept service of the Complaint and gave AUSA Wright his office address. AUSA Wright told Kerner that she would pass Crosby's name along to the seizing agency for purposes of notice. AUSA Wright has a brief notation in her running telephone log of that conversation.

On or about March 10, 2005, Kerner sent AUSA Wright a letter describing Crosby's interest in the Kennedy Sailboat, and attached documents showing transfer of $5,250 to Ole Anderson on or about July 1, 1996.

No employee or agent of the DEA interviewed Harry E. Crosby or his attorney, J. Thomas Kerner, at any time between February 2004 and October 18, 2005 in which any information was requested or provided concerning the identities of the owners of the Kennedy Sailboat.

**INTERROGATORY NO. 4**
State whether you interviewed Jean Anderson, at any time between February 2004 and present, in which any information was requested or provided concerning the identities of other owners of the Kennedy sailboat. If the answer is yes, as to each and every such interview, please separately state the following:

> a. Identify the person interviewed and the interviewer(s);
> b. State the date, place, time, and whether the interview was in person or by phone;
> c. Identify each other person present or listening telephonically or through other means (e.g. wire or other listening device);
> d. State what information or statements were given by the interviewee;
> e. State whether the interviewer requested that Jean Anderson check her records for information that might lead to the identities of the owners;
> f. If the statements referred to in subpart d above were recorded or reduced to writing in a police report or contemporaneous notes, identify those documents.
> g. If Jean Anderson or her agents or attorney turned over any documents to you pertaining to the Kennedy sailboat, identify those documents. This request is not limited to documents pertaining to the identities of other co-owners.

6

**INTERROGATORY NO. 9**

State whether, at any time since February 2004, you or your agents obtained information that Sailorman New And Used Marine Emporium, Fort Lauderdale Florida and/or Chuck Fitzgerald purchased the sailboat at auction in 1996, or that they previously or currently owned an interest in the sailboat. You should answer in the affirmative if you had information but the name or location was incomplete or incorrect. If the answer is yes, state the following:

> a.  Identify each person who provided the information and the date it was provided.
> b.  As to each person identified in subpart a state with particularity what that person told you about Sailorman and/or Fitzgerald.
> c.  If your information about Sailorman and/or Fitzgerald was obtained from other sources, such as a database or newspaper articles, please identify each of those sources and produce such documents.

**ANSWER TO INTERROGATORY NO. 9**

Subject to and without waiving the General Objections, the United States responds as follows:

On or about March 10, 2005, AUSA Wright received a letter from Attorney J. Thomas Kerner which enclosed a copy of a June 30, 1996, story from *The Tallahassee Democrat*, page 4B, by Bill Bergstrom titled, "Forgotten JFK Sailboat Fetches $18,500." Copies of the letter and article are being produced in response to the Request for the Production of Documents.

**INTERROGATORY NO.10**

State whether you interviewed the Confidential Informant (referred to in the Complaint) or his attorney, at any time between February 2004 and present, in which any information was requested or provided concerning the identities of other owners of the Kennedy sailboat. If the answer is yes, as to each and every such interview, please separately state the following:

> a.  Identify the person interviewed and the interviewer(s);
> b.  State the date, place, time, and whether the interview was in person or by phone;
> c.  Identify each other person present or listening telephonically or through other means (e.g. wire or other listening device);
> d.  State in detail what information or statements were given by the Confidential Informant with regard to the identities and locations of the other owners, including vague and incomplete information.
> e.  State whether the interviewer requested that the Confidential Informant check his records for information that might lead to the identities of the owners, and if so, the interviewee's response;
> f.  If the statements referred to in subpart d above were recorded or reduced to writing in a police report or contemporaneous notes, identify those documents.
> g.  If the Confidential Informant or his attorney turned over any documents to you

10

**INTERROGATORY NO. 17**
     State how the United States and Guernseys arrived at the following figures regarding the value and sale of the sailboat:

          a. the estimated value;
          b. the starting bid; and
          c. the minimum reserve; and
          d. identify any documents provided to Guernseys to document the estimated value, or relating in any way to the matters in subsection a through c.

**ANSWER TO INTERROGATORY NO. 17**
     The United States objects to Interrogatory No. 17 on the grounds that it calls for information that is neither relevant to, nor reasonably calculated to lead to the discovery of admissible evidence concerning, the government's attempts to identify any owner(s) of the Kennedy Sailboat.

**INTERROGATORY NO. 18**
     With regard to the Guernseys auction state the following:

          a. the name and address of the person or entity who purchased the sailboat;
          b. the price paid;
          c. how many bids there were, and the amount of those losing bids; and
          d. state whether the successful bidder is related – either by blood, by marriage, or through a business partnership, agency or other business relationship – to any party in this case, including government agents on the case, the Confidential Informant, and Harry E. Crosby.

**ANSWER TO INTERROGATORY NO. 18**
     The United States objects to Interrogatory No. 18 on the grounds that it calls for information that is neither relevant to, nor reasonably calculated to lead to the discovery of admissible evidence concerning, the government's attempts to identify any owner(s) of the Kennedy Sailboat.

**INTERROGATORY NO. 19**
     Identify any and all documents in your possession documenting the matters in interrogatory 16.

**ANSWER TO INTERROGATORY NO. 19**
     The United States objects to Interrogatory No. 19 on the grounds that it calls for information more properly the subject of a document request.  The United States further objects to Interrogatory No. 19 on the grounds that it calls for information that is neither relevant to, nor reasonably calculated to lead to the discovery of admissible evidence concerning, the government's attempts to identify any owner(s) of the Kennedy Sailboat.
**INTERROGATORY NO. 20**

14

State whether you spoke to Dr. Kerry Lane on the telephone prior to the filing of his Rule 60(b) motion.  If so,

> a.  State the date(s) of these conversations and who participated in the conversation other than Dr. Lane;
> b.  State with particularity the contents of the conversation, including statements made by you and by Dr. Lane;
> c.  Identify any notes made by you concerning the conversation, with the date and time the notes were made, if known; and
> d.  State what actions you took to notify the district judge that Dr. Lane was asserting an ownership interest in the sailboat.

## ANSWER TO INTERROGATORY NO. 20

Subject to and without waiving the General Objections, the United States responds as follows:

AUSA Wright does not believe that she spoke to Dr. Kerry Lane prior to the filing of his Rule 60(b) motion.  She did have at least one conversation with his attorney, Eric Goldberg, in July 2005.  During that conversation, Attorney Goldberg told AUSA Wright that he had been retained by the unnamed doctor.  Paralegal Lisa Talbot had a telephone conversation with someone purporting to be Dr. Kerry Lane in or around June 2005.  A memorandum regarding Ms. Talbot's memory of that conversation is produced herewith and incorporated herein by reference.  Also produced herewith is a memorandum regarding AUSA Kristina Barclay's memory of a conversation that she had with Ms. Talbot regarding that phone call, which had to have occurred before AUSA Barclay went on maternity leave on July 1, 2005.

## INTERROGATORY NO. 21

If you made any efforts to locate owners of interests in the sailboat other than those detailed in answer to the interrogatories above, please describe those efforts.

## ANSWER TO INTERROGATORY NO. 21

Subject to and without waiving the General Objections, the United States responds as follows:

All of the efforts made by employees of the United States Attorney's Office and the DEA to locate those with potential interests in the Kennedy Sailboat have been described in my answers to Interrogatories 1 through 20.

15

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | | | | Page 1 of 2 | |
|---|---|---|---|---|---|
| 1. Program Code<br>N/A | 2. Cross<br>File | Related Files | 3. File No. | | 4. G-DEP Identifier |
| 5. By: S/A Gregg Willoughby<br>At: Boston Fld. Div.<br>CBI - Lowell, MA | | | 6. File Title<br>BURNHAM, Daniel at al. | | |
| 7. ☐ Closed ☐ Requested Action Completed<br>☐ Action Requested By: | | | 8. Date Prepared<br>10/14/04 | | |
| 9. Other Officers: S/A Michael O'Shaughnessy, Mass. S.P. Lt. Kenneth Gill, Tpr. John Foster | | | | | |
| 10. Report Re: Seizure of exhibit N-172 on 10/13/04 | | | | | |

## DETAILS & CUSTODY OF EVIDENCE

1.  Reference is made to all prior reports prepared under the subject investigative file relative Gregory Olaf ANDERSON.

2.  On October 5, 2004, United States Magistrate Judge Robert B. Collings, District of Massachusetts, issued a seizure warrant for one Star Class Sloop Sailboat, with Hull number 721, named "FLASH II" and owned, in whole or in part, by Gregory Olaf ANDERSON (hereafter, exhibit N-172).

3.  On October 13, 2004, at approximately 10:30 a.m., the above named officers arrived at the Marblehead Trading Company in Marblehead, Massachusetts (hereafter, the "boatyard") to execute the aforementioned seizure warrant. ANDERSON was storing exhibit N-172 at that location. Shortly after arriving, S/A's Willoughby and O'Shaughnessy, Lt. Gill and Tpr. Foster met with Mr. Ralph Anderson, the owner of the boatyard (not related to Gregory Olaf ANDERSON), and identified themselves as Special Agents from the Drug Enforcement Administration and as Massachusetts State Police officers. S/A Willoughby explained that they were there to seize the aforementioned Sailboat and provided Mr. Anderson with a copy of the seizure warrant. At that time, Mr. Anderson stated "poor Ole" and that "Ole" was always involved in some kind of "scam" and that he has something going in Cuba. Mr. Anderson also stated that he expected ANDERSON to

| 11. Distribution:<br>Division | 12. Signature (Agent)<br>S/A Gregg A. Willoughby | 13. Date<br>10/14/04 |
|---|---|---|
| District | 14. Approved (Name and Title) | 15. Date<br>10/18/04 |
| Other | G/S James Connolly | |

| DEA Form     - 6<br>(Jul. 1996)<br>gw<br>4 4 Extra | DEA SENSITIVE<br>Drug Enforcement Administration | |
|---|---|---|

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

USDocReqResp000004

FILE COPY

**U.S. Department of Justice**
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION**<br>*(Continuation)* | | |
| | 3. File Title | |
| 4.<br>Page  2  of  2 | BURNHAM, Daniel at al. | |
| 5. Program Code<br>N/A | 6. Date Prepared<br>10/14/04 | |

return to Marblehead soon because he [ANDERSON] had said that he had
a buyer for the Sailboat lined up.  Thereafter, exhibit N-172 was
seized without incident and with Mr. Anderson's full compliance and
cooperation.  Mr. Anderson also stated that the Sailboat's mast was
also stored at the boatyard but that because it was fragile, he
recommended that it not be moved without the proper equipment.  Mr.
Anderson offered to maintain the Sailboat's mast at the boatyard for
as long as needed and that he has the capability to transport the
mast to whatever location desired.  The Sailboat (without the mast)
was subsequently towed by a private boat-towing company to the U.S.
Marshal's storage facility in Massachusetts where it will be secured
pending forfeiture proceedings.  Mr. Anderson did not have ANDERSON's
address or contact information but stated that someone who works at
the boatyard would likely have it.

4.    In an article written in the Boston Globe by Shelley Murphy (dated
October 14, 2004), ANDERSON denied being the owner of the Sailboat
and that an unidentified doctor was the boat's primary owner.
According to the article, ANDERSON also made statements that he hoped
to receive up to one third of the profit from the sale of the
Sailboat for his role in assisting in the purchase of the boat and
restoring the boat.  The article also detailed that ANDERSON said
that the boat was purchased "long before" his involvement in drugs.

**INDEXING**

1.    ANDERSON, Gregory Olaf    -    Naddi

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

4 - Extra
USDocReqResp000005

stored) in or around May 2004 to take the boat out of storage to ready it for sale and to look for possible parties interested in purchasing it.

14. On April 12, 2004, the CW stated that it first met Anderson several years ago through Anderson's older brother, Jim Anderson (hereafter, "Jim Anderson"). The CW used to buy small amounts of marijuana (user amounts) for a friend at that time from Jim Anderson. The CW only knows Anderson by the nicknames "Ole Anderson" and "Lance". The CW described Anderson as a white male from Florida, approximately 55 years old, approximately 5'10" tall and 180 lbs., with blondish hair and blue eyes. On May 3, 2004, the CW identified a photograph obtained from the Arizona Department of Corrections of Gregory Olaf Anderson displayed in an array, as the person the CW knew as "Ole Anderson" and "Lance".

15. The CW stated that "it" used to transport marijuana from Texas to Massachusetts for Joseph Milo and Paul Nicolo. After a while, the CW began investing "its" own money into the marijuana business. The CW started purchasing marijuana from Mark Wojciechowski (the Texas-based marijuana supplier at the time) in addition to what the CW transported to Massachusetts for Milo and Nicolo. One of the individuals the CW sold "its" marijuana to was Jim Anderson in Florida. According to the CW, Jim Anderson used to purchase between 20 and 100 pounds of

7

16

marijuana from the CW at a time for approximately $900 to $1,000 per pound.  On one or more occasions, Anderson actually picked up the marijuana from the CW on behalf of his brother, Jim.  The CW also learned from Anderson that he [Anderson] maintained marijuana customers in New Hampshire and possibly the Virginia area.  The CW reported to me that Anderson had long been involved in smuggling marijuana and that Anderson knew that the CW's primary form of income was from the sale of marijuana.

16.  Around the time the CW supplied Jim Anderson with marijuana, Anderson purchased a sailboat previously owned by President John F. Kennedy.  According to the CW (which the CW learned from Anderson), President Kennedy sailed that boat in races off of Hyannis, Massachusetts.  Although the CW did not know how much Anderson paid for the boat, the CW stated that "it" invested approximately $12,000 to $15,000 in cash at Anderson's request.  Another person, possibly a doctor or dentist, also invested roughly the same amount.  The CW stated that the money "it" and the other investor invested covered the purchase price and materials Anderson used to repair and refurbish the Sailboat.  Anderson told the CW that he was going to refurbish the boat and sell it for a significant profit based on the Sailboat's association with President Kennedy and its historical value.  The CW understood that "it" and the other investor were each to receive 20 percent of the profit.  The CW stated that the money

8

17

pounds of marijuana.  Furthermore, Michael Twarog and four others were arrested in Tucson in March 2004 in relation to the seizure of approximately 2,000 pounds of marijuana.

18.  After Anderson was arrested in December 2001, he spoke with the CW and implied that he would inform the police about the CW unless the CW paid him.  The CW agreed to pay Anderson [for his silence] and detailed that "it" paid Anderson the $40,000 United States currency for Anderson's transportation fee, an additional $50,000 cash for Anderson's silence and Anderson's defense attorney's fee, which was approximately $20,000.  The CW also gave up the right to "its" twenty percent share of the profit from Anderson's sale of President Kennedy's Sailboat, as well as other concessions.  The CW had also loaned Jim Anderson approximately $20,000 and forgave that loan on behalf of Anderson.

19.  In or around October or November 2003, the CW was contacted by Anderson.  Anderson had recently been released from prison in Arizona after serving about one year.  During their conversation, Anderson told the CW that he had met and befriended a Mexican National (Anderson did not provide a name) while in prison.  Anderson explained that the Mexican National was part of a large marijuana trafficking organization capable of supplying the CW with marijuana.  Anderson further detailed that the Mexican National would deliver the marijuana to any location in

11

USDocReqResp000020

sell the Sailboat and that he is asking $1.2 million for it, although willing to negotiate. Anderson told the CW that he believed he could get $1 million or more based on the sales of other JFK-related items. Anderson stated that he displayed the Sailboat on the deck of the Aircraft Carrier "*John F. Kennedy*" during the tall ships tour in Boston approximately four years ago. Also during the call, Anderson stated that he was traveling "down there" (which the CW understood from past conversations to mean Cuba) on June 1st and that he didn't think that he would be able to make it to Massachusetts until August. Anderson stated that he wanted to go to Marblehead to complete some work on the Sailboat in order to prepare it for sale. The CW and Anderson agreed to contact each other after Anderson returned [from Cuba]. The call between the CW and Anderson on May 3rd was consensually recorded.

21. On September 27, 2004, the CW met with Anderson in Beverly, Massachusetts. During their meeting, Anderson told the CW that he had paid the CW back for the CW's cash contribution to the Sailboat. Anderson said that he paid the CW back for everything the CW had loaned him to originally purchase the Sailboat. Anderson explained that that the CW originally loaned him between $15,000 and $20,000 to purchase the boat and that he [Anderson] paid the CW back over the course of making two "trips" [transporting marijuana] for the CW. Anderson told the CW that

13

22

telephone.  During their conversation, Anderson told the CW that he originally paid $20,000 for the Sailboat and that the bill of sale only reflects $10.00 because of "tax" reasons.  Anderson also said that he intends to keep the boat stored at the Marblehead Trading Company.  The call between the CW and Anderson on September 28th was consensually recorded.

23.  Based on the facts outlined in this Affidavit, I have probable cause to believe that the Star Class Sloop Sailboat built in 1930 with hull number 721, named Flash II and once owned by President John F. Kennedy and Joseph P. Kennedy is subject to seizure and forfeiture to the United States pursuant to 21 U.S.C. § 853(a) and (f), and/or 881(a)(6) and (d) because it constitutes property constituting or derived from proceeds obtained, directly or indirectly, as the result of  violations of Title 21.  I believe that a seizure warrant is necessary because the Sailboat is capable of being moved, sold, or transferred by the owner.  I therefore request that the Court issue a warrant for the seizure of this Sailboat.


_____

GREGG A. WILLOUGHBY
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me, this ___ day of October, 2004


_____

United States Magistrate Judge

15

24

U.S. Department of Justice
Drug Enforcement Administration

| | 1. File No. CC-02-0118 | 2. G-DEP Identifier ▮▮▮ |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | 3. File Title ▮▮▮▮ | |
| 4. Page 2 of 6 | | |
| 5. Program Code N/A | 6. Date Prepared 03/03/04 | |

smaller shipments of marijuana from Tucson, Arizona to the CS' house located outside of Las Vegas, Nevada. The Las Vegas house was rented under Shawn LNU's name and was used as a temporary storage and transshipment location. Shawn LNU would transfer the marijuana load to Edward PARKER who, in turn, would transport it to Massachusetts for the CS. The CS also stated that "it" paid Shawn LNU approximately $15,000 per shipment of marijuana he drove to Las Vegas.

5. As previously reported, Gary SILVERSTEIN also worked for the CS as a marijuana transporter. SILVERSTEIN retired from that job a few years and, according to the CS, moved back to Oregon. The CS stated that "it" paid SILVERSTEIN $50 per pound of marijuana transported up to 1,000 lbs. ($50,000). The CS capped SILVERSTEIN's fee at $50,000 per shipment. SILVERSTEIN, and the other transporters for that matter, paid for all travel related expenses from the fee.

6. The CS also obtained "COWBOY's" cell phone number and provided it to S/A Willoughby as (602) 999-6565.

7. During the period February 17, 2004 through March 2, 2003, the CS recorded numerous calls between the CS and "THE REVEREND" onto one audio-cassette tape that is hereafter referred to as exhibit N-131. On February 21, 2004, the CS contacted S/A Willoughby by telephone and reported that it had a telephone conversation with "THE REVEREND" during the previous evening. According to the CS, "THE REVEREND" stated that he was making progress regarding the shipment of marijuana and that he was planning on meeting with his supplier(s) over the coming weekend. "THE REVEREND" also told the CS that he wanted the CS to travel to Arizona to meet with him for the purpose of discussing the details of the anticipated marijuana shipment. Specifically, "THE REVEREND" wanted to discuss possible locations to be used to transfer the load. The CS reported that "it" attempted to record the February 20th call with "THE REVEREND" but due to a technical malfunction, a recording was not obtained. However, on the morning of February 21, 2004, the CS called "THE REVEREND" again and discussed many of the same issues the CS and "THE REVEREND" had discussed during the call on February 20th. "THE REVEREND" and the CS

| DEA Form - 6a | **DEA SENSITIVE** | |
|---|---|---|
| (Jul. 1996) | Drug Enforcement Administration | |

26

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.    USDocReqResp000026

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 8

| 1. Program Code<br>N/A | 2. Cross<br>File | Related Files | 3. File No.<br>CC-02-0118 | 4. G-DEP Identifier |
|---|---|---|---|---|
| 5. By: S/A Gregg Willoughby<br>At: Boston Fld. Div.<br>    CBI - Lowell, MA | ☒<br>☒<br>☐<br>☐<br>☐ | COPY | 6. File Title | |
| 7. ☐ Closed ☐ Requested Action Completed<br>☐ Action Requested By: | | | 8. Date Prepared<br>04/12/04 | |
| 9. Other Officers: G/S James Sullivan | | | | |

10. Report Re: Debriefing of CS-⬛⬛⬛⬛⬛ on 4/12/04 and the acquisition of exhibits
N-155 & N-156.

## SYNOPSIS

On April 12, 2004, CS-⬛⬛⬛⬛⬛ provided additional information concerning marijuana traffickers involved with the CS and others.

## DRUG RELATED INFORMATION

1.  Reference is made to all prior reports prepared by S/A Gregg Willoughby under the subject investigative file relative to debriefings of CS-⬛⬛⬛⬛.

2.  On February 20, 2004, CS⬛⬛⬛⬛⬛ hereafter, the "CS") reported that in or about October or November 2003, "Ole" ANDERSON contacted the CS and reported that he had met someone in prison who was able to supply large amounts of marijuana. That person, whom ANDERSON did not identify, was able to ship the marijuana to anywhere in the United States without a down payment but that a payment had to be made upon delivery (see DEA-6 dated February 20, 2004, report re: Debriefing of CS-⬛⬛⬛⬛⬛. Based on the forgoing information, the CS placed a recorded call to (561) 573-2602 on March 17, 2004 at the direction of S/A Willoughby. The CS identified that number as belonging to "Ole" ANDERSON's (a/k/a "Lance") cell phone. The CS received no answer and left a voice message saying that "it" called. On or about April 5, 2004, the CS placed a call to ANDERSON's cell phone and received an answer from ANDERSON. The CS refers to ANDERSON by his nickname, "Lance". During their call (which was not recorded), ANDERSON asked the CS to call him back within a week. On

| 11. Distribution:<br>    Division ⬛⬛⬛⬛<br>    District ⬛⬛⬛⬛⬛<br>    Other ⬛⬛ | 12. Signature (Agent)<br>    S/A Gregg A. Willoughby | 13. Date |
|---|---|---|
| | 14. Approved (Name and Title)<br>    G/S James P. Sullivan, Jr. | 15. Date |

DEA Form    - 6
(Jul. 1996)
31    gw

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.    USDocReqResp000031

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | 1. File No. CC-02-0118 | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | 3. File Title | |
| 4. Page 2 of 8 | | |
| 5. Program Code N/A | 6. Date Prepared 04/12/04 | |

April 12, 2004, the CS called ANDERSON again and recorded the call. During the call, ANDERSON, in cryptic terms, indicated that he had not spoken with his potential marijuana supplier and that he needed a little more time. ANDERSON also told the CS that he wanted to try and sell "Kennedy's" boat and that he was planning on traveling to Marblehead, Massachusetts (where the boat was stored) in or around May 2004 to take the boat out of storage and ready it for sale and to look for possible parties interested in purchasing it. The CS recorded the calls on March 17th and April 12th onto one (1) audio-cassette tape that is hereafter referred to as exhibit N-155. The CS maintained custody of exhibit N-155 until it was turned over to S/A Willoughby on April 12, 2004.

3.  On April 12, 2004, G/S Sullivan and S/A Willoughby met with the CS in Lowell, Massachusetts for the purpose of conducting a debriefing of the CS. During the debriefing, the CS provided the following details:

4.  The CS first met "Ole" ANDERSON" (hereafter, "ANDERSON") several years ago through Jim ANDERSON (hereafter, "Jim ANDERSON"), ANDERSON's older brother. The CS used to buy small amounts of marijuana (user amounts) for a girlfriend at that time from Jim ANDERSON. The CS only knows "Ole" by this nickname and "Lance", another nickname. The CS described ANDERSON as a white male, approximately 55 years old, approximately 5'10" tall and 180 lbs., with blondish hair and blue eyes. ANDERSON was born and raised in Florida and likes to surf and sail, smokes cigarettes and is possibly an alcoholic. "Ole" and Jim ANDERSON have a lengthy history of being involved in smuggling, transporting and distributing marijuana in the Florida area and other parts of the east coast. The CS believed that one or both might also have smuggled drugs into Florida in the 1980's using speed boats. The CS also heard that Jim ANDERSON might currently be involved in smuggling high quality "Hydro" marijuana from Canada into the United States.

5.  As previously reported, the CS used to transport marijuana from Texas to Massachusetts for Joseph MILO and Paul NICOLO. After investing "its" own money, the CS started purchasing marijuana from Mark

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.    USDocReqResp000032

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** | CC-02-0118 | ▮▮▮▮▮ |
| *(Continuation)* | 3. File Title | |
| 4. Page 3 of 8 | ▮▮▮▮▮▮▮▮▮▮ | |
| 5. Program Code N/A | 6. Date Prepared 04/12/04 | |

WOJCIECHOWSKI (the Texas-based marijuana supplier at the time) in addition to what the CS transported to Massachusetts for MILO and NICOLO. One of the individuals the CS sold "its" marijuana to was Jim ANDERSON in Florida. According to the CS, Jim ANDERSON used to purchase between 20 and 100 pounds of marijuana from the CS at a time for approximately $900 to $1,000 per pound. One (1) or more occasions, ANDERSON actually picked-up the marijuana from the CS on behalf of his brother Jim. The CS also learned that ANDERSON maintained marijuana customers in New Hampshire and possibly the Virginia area. In an around the time the CS supplied Jim ANDERSON with marijuana, ANDERSON purchased a "J Class" sailboat previously owned by President John F. Kennedy. According to the CS, President Kennedy sailed that boat in races off of Hyannis, Massachusetts. Although the CS does not know how much ANDERSON paid for the boat, the CS stated that "it" invested approximately $12,000 to $15,000 in cash and another person, possibly a doctor or dentist, invested roughly the same amount. ANDERSON told the CS that he was going to refurbish the boat and sell it. The CS and the other investor were to each receive 20 percent of the profit. The CS stated that the money "it" invested was proceeds from "its" marijuana sales to Jim ANDERSON and other customers. The CS stated that ANDERSON brought the boat to an auction in New York a few years ago and received a bid of $800,000 for the boat. ANDERSON turned down the offer believing that he could sell the boat for $1,000,000 or more. The CS stated that ANDERSON purchased the boat somewhere on the west coast of Florida and that he has documents verifying that the boat was owned and raced by President Kennedy.

6.  ANDERSON also had a friend who had designed and built his own submarine capable of descending to a depth of 700 feet. ANDERSON, who frequently traveled to the Bahamas and Cuba, got involved with Canadian treasure hunters and requested the CS' financial assistance. According to the CS, ANDERSON told the CS that the Canadians had an agreement with the Cuban Government giving them [the Canadians] the right to search for lost treasures in Havana Harbor. The Canadians, however, were to share 50 percent of the treasure found with the Cuban Government. ANDERSON negotiated a deal with the Canadians in which he would provide the Canadians with a boat and submarine that

---

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.   USDocReqResp000033

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | 1. File No.<br>CC-02-0118 | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | 3. File Title | |
| 4.<br>Page  4  of  8 | ▓▓▓▓▓▓▓▓▓▓▓ | |
| 5. Program Code<br>N/A | 6. Date Prepared<br>04/12/04 | |

could be used to search the harbor for treasure.  ANDERSON advised
the CS that he would get 20 percent of the Canadians' share of the
treasure.  ANDERSON asked the CS to purchase a boat capable of
transporting the submarine.  In return, the CS would receive an eight
(8) percent share of the profit.  The CS agreed to purchase the boat.
The CS invested $60,000 and bought a boat that was then configured to
haul the submarine.  ANDERSON sailed the boat carrying the submarine
to Cuba where the CS believed it was used to search for sunken
treasure.  The CS stated that thus far, no treasure had been found
and believes that the boat is still in Cuba as of this date.

7.    In or around 2000, the CS lost one of "its" drivers (marijuana
transporters) and hired ANDERSON as a replacement.  The CS could not
recall the exact timing of hiring ANDERSON but believed it was in the
time period of the CS' transition from buying marijuana from "Cowboy"
[identified as Michael TWAROG] and "THE REVEREND".  The CS stated
that "it" negotiated to pay ANDERSON a set fee of $40,000 (possibly
up to $50,000) per load transported.  The CS also had Edward PARKER
driving a second truck for him at the time ANDERSON was hired.  At
the time, the CS was purchasing as much as 3,000 pounds of marijuana
from "THE REVEREND" and/or "COWBOY" and/or Mark WOJCIECHOWSKI's
suppliers [who was identified as Luis DOMINGUEZ].  The marijuana was
divided into two (2) loads and transported by two (2) pick-up trucks
[by ANDERSON and PARKER] from Tucson, Arizona to Massachusetts.  The
CS estimated that ANDERSON transported between four (4) and eight (8)
loads of marijuana from Tucson to Massachusetts for the CS.
ANDERSON's role as one of the CS' transporters ended when he was
arrested by local law enforcement authorities in Arizona.  The CS
stated that ANDERSON was stopped shortly after leaving Tucson with
1,200 pounds of the CS' and WOJCIECHOWSKI's marijuana.  The other
pick-up truck, driven by PARKER, successfully delivered the 1,200
pounds to the CS in Massachusetts.  According to the CS, part of the
1,200 pounds in ANDERSON's truck was owned by WOJCIECHOWSKI.

8.    After ANDERSON was arrested, ANDERSON spoke with the CS and implied
that he would inform the police about the CS unless the CS paid him.
The CS agreed to pay ANDERSON for his silence and detailed that "it"
paid ANDERSON the $40,000 USC for ANDERSON's transportation fee, an

---

DEA Form    - 6a
(Jul. 1996)
34

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.    USDocReqResp000034

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** *(Continuation)* | 1. File No. CC-02-0118 | 2. G-DEP Identifier |
|---|---|---|
| | 3. File Title | |
| 4. Page  5  of  8 | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | |
| 5. Program Code N/A | 6. Date Prepared 04/12/04 | |

additional $50,000 USC for ANDERSON's silence and paid ANDERSON's defense attorney's fee, which was approximately $20,000.  The CS also gave up the right to "its" 20 percent share of what ANDERSON would make from the sale of President Kennedy's sailboat and gave up "its" interest in the boat used in Cuba (at least $60,000).  The CS had also loaned Jim ANDERSON $20,000 USC and forgave that loan because of ANDERSON.

9.    As detailed above and in previous reports, the CS was contacted by ANDERSON in November 2003.  ANDERSON had recently been released from prison in Arizona after serving about one year.  During their conversation, ANDERSON told the CS that he had met and befriended a Mexican National (ANDERSON did not provide a name) while in prison. ANDERSON explained that the Mexican National was part of a large marijuana trafficking organization capable of supplying the CS with marijuana.  ANDERSON further detailed that the Mexican National would deliver the marijuana to any location in the United States without having to receive the payment until time of delivery.  The CS stated that the entire payment was due upon delivery.  ANDERSON told the CS that the Mexican supplier was due to be released from prison in or around the end of March or beginning of April 2004.  The CS told ANDERSON that "it" was retiring from the marijuana business at which time ANDERSON asked that the CS turn "its" marijuana customers over to him.

10.    During the debriefing, S/A Willoughby displayed a photograph of a white male to the CS and asked if the CS recognized the person depicted.  [Agent's note: That photograph was from Michael DIPLATZI's Massachusetts driver's license obtained by S/A Willoughby from the Massachusetts Registry of Motor Vehicles earlier that day].  The CS immediately recognized the person as the individual "it" had met at Anthony BELMONTE's wedding and who had tried to give the CS his telephone number in an effort to purchase marijuana directly from the CS, circumventing BELMONTE.  The CS subsequently recalled the person's name as "Michael".  The CS also detailed that DIPLATZI was one of BELMONTE's larger marijuana customers.  The CS stated that during the period that BELMONTE was purchasing 1,000 or more pounds of marijuana from the CS, BELMONTE sold a large amount of that

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

USDocReqResp000035

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | 1. File No. CC-02-0118 | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | 3. File Title | |
| 4. Page  2  of  4 | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | |
| 5. Program Code N/A | 6. Date Prepared 05/04/04 | |

message on ANDERSON's voice-mail.  The CS placed another call to ANDERSON on the morning of May 3, 2004 and had a lengthy conversation with him.  In summary, the CS spoke with ANDERSON about ANDERSON's sailboat that was owned by President John F. Kennedy.  ANDERSON told the CS that the boat's name was "Flash II" and that it was built in 1930.  The sailboat is a Star, which ANDERSON described as an Olympic class racing sailboat.  ANDERSON further detailed that President Kennedy and his brother Joe Kennedy purchased the boat in 1934.  President Kennedy sold the boat in 1942 just before he shipped out to the Pacific Theater during World War II.  ANDERSON is currently storing the boat at the Marblehead Trading Company in Marblehead, Massachusetts.  ANDERSON told the CS that he is currently trying to sell the boat and that he is asking $1.2 million for it but is willing to negotiate.  ANDERSON told the CS that he believed he could get $1 million or more based on the sales of other JFK related items.  ANDERSON stated that he displayed the sailboat on the deck of the John F. Kennedy Aircraft Carrier during the Tall Ships tour in Boston approximately four (4) years ago.  Also during the call, ANDERSON stated that he was traveling "down there" [Cuba] on June 1st and that he didn't think that he would be able to make it to Massachusetts until August.  ANDERSON stated that he wanted to go to Marblehead to paint the bottom of the sailboat.  The CS recorded "its" call with ANDERSON on May 3, 2004 onto one (1) audio-cassette tape that is hereafter referred to as exhibit N-159.  The CS transferred exhibit N-159 to S/A Willoughby during the debriefing later that same day.

4.   As previously reported, the CS stated that "it" invested approximately $15,000 in "its" drug proceeds so that ANDERSON could purchase the sailboat.  ANDERSON also told the CS that another individual, whom the CS recalled being a dentist or doctor, also invested approximately $15,000 in the initial purchase of the boat.  The CS stated that ANDERSON invested his time and effort in restoring the boat.  In response to questions, the CS stated that although ANDERSON was not transporting marijuana for the CS at the time, the CS was selling 20 to 100 pounds of marijuana at a time to ANDERSON's brother, Jim ANDERSON, and that ["Ole"] ANDERSON had picked up the marijuana from the CS, on behalf of his brother Jim, on at least one occasion.  The CS also reported that ANDERSON had long been involved

---

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.    USDocReqResp000040

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| **REPORT OF INVESTIGATION**<br>*(Continuation)* | 1. File No.<br>████-0118 | 2. G-DEP Identifier<br>████ |
|---|---|---|
| | 3. File Title<br>████████████████████ | |
| 4.<br>Page   3   of   6 | | |
| 5. Program Code<br>N/A | 6. Date Prepared<br>09/28/04 | |

purchased the boat from Ouida M. Ehler on August 2, 1996 in
consideration of $10.00 and "other good and valuable consideration."
The documents ANDERSON handed to the CS are hereafter referred to as
exhibit N-169.  ANDERSON went over the documents with the CS and
explained that the documents authenticate that the boat was once
owned by President John F. Kennedy and Joseph P. Kennedy.  ANDERSON
also reiterated that he is selling the sailboat for the asking price
of $1.2 million, but that he is willing to accept $900,000.  ANDERSON
believes that because of the sailboat's historical value, he is able
to sell it for his asking price.  ANDERSON also told the CS that he
has been working on the boat to get it into a presentable condition
that will allow him to get the highest price.  ANDERSON also said
that he had to sell stock in order to pay for his trip from Florida
to Massachusetts.

5.   During their meeting, the CS asked ANDERSON about the money "it"
loaned ANDERSON so that he [ANDERSON] could initially purchase the
sailboat.  ANDERSON told the CS that he had paid the CS back for that
loan, which ANDERSON stated was between $15,000 and $20,000.
ANDERSON explained that he paid back the loan by working it off over
two "trips" [transporting marijuana] for the CS.  ANDERSON stated
that he made a total of four (4) trips [transporting marijuana] for
the CS but that he had spent most all of the money he had earned
while working for the CS [in the marijuana business].  As previously
reported, ANDERSON transported marijuana from Arizona to
Massachusetts for the CS and was paid approximately $40,000 for each
trip.   The CS stated that the first trip ANDERSON made was
approximately 800 – 1,000 pounds and increased to 1,200 pounds.   The
CS explained that the money "it" gave to ANDERSON for the sailboat
was originally intended to be an investment; however, as time passed,
the CS did not expect to earn a profit on the investment and
negotiated with ANDERSON to change it to a loan.   The CS stated that
while speaking with ANDERSON, "it" recalled allowing ANDERSON to pay
the CS back (for the sailboat loan) by allowing ANDERSON to work off
the loan by transporting the marijuana to Massachusetts.

6.   The CS and ANDERSON also discussed another boat that ANDERSON
currently maintains in Cuba.  ANDERSON said that he has been working

---

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

USDocReqResp000055

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. CC-02-0118 | 2. G-DEP Identifier ███████ |
|---|---|---|
| *(Continuation)* | 3. File Title ███████████ . | |
| 4. Page  4  of  6 | | |
| 5. Program Code N/A | 6. Date Prepared 09/28/04 | |

on that boat and asked the CS to loan him $20,000 to complete repairs and upgrades to it.  ANDERSON also explained that he has large fuel tanks on board the boat and that he can use the tanks to conceal artifacts and treasure that he finds in Cuba to smuggle them out of Cuba to the Bahamas.  ANDERSON also stated that when he just recently returned to the U.S. from Cuba, he traveled via Honduras.  ANDERSON also explained that he has hired an attorney to assist him in bringing his wife, an unidentified 19 year-old Cuban female National, to the United States.

7.   The CS also asked ANDERSON about the marijuana supplier he [ANDERSON] met while in prison in Arizona.  ANDERSON stated that he has not been successful at his attempts to contact the unidentified supplier and that earlier in the year (in or around February 2004), he [ANDERSON] went to Cuba and returned to the United States by walking across the U.S./Mexican border into Arizona.  ANDERSON said that he tried to locate and/or contact the supplier while in Arizona but was not successful.  ANDERSON said that he does not believe that he will be able to contact the supplier.  ANDERSON said that he did receive a letter from the supplier before he [the supplier] was released from prison and he [ANDERSON] had expected to hear from the supplier.

8.   The CS informed ANDERSON that "it" was making arrangements to bring a shipment of marijuana [to Massachusetts] and asked whether ANDERSON still had marijuana customers in New Hampshire.  ANDERSON replied that he did; however, asked if the CS was able to deliver the marijuana to Florida instead.  ANDERSON said that he would be able to sell a large quantity of it to customers there if the marijuana was as good a quality as it was before.

9.   At the conclusion of their meeting, the CS and ANDERSON agreed to talk within the next couple of days as to the status of the potential sale of the "*Flash II*".

10.  While debriefing the CS relative to "its" meeting with ANDERSON, S/A Willoughby retained the digital recording device from the CS.  On September 28, 2004, S/A Michael O'Shaughnessy downloaded the recording onto a compact disc (CD) that is hereafter referred to as

---

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.          USDocReqResp000056

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. CC-02-0118 | 2. G-DEP Identifier ▇▇▇▇ |
|---|---|---|
| *(Continuation)* | 3. File Title ▇▇▇▇▇▇▇▇▇▇. | |
| 4. Page 5 of 6 | | |
| 5. Program Code N/A | 6. Date Prepared 09/28/04 | |

exhibit N-168. S/A Willoughby also searched the CS and the CS' vehicle for money and contraband with negative results.

11. On September 28, 2004, the CS contacted S/A Willoughby and reported that ANDERSON had called the CS on two (2) occasions and left messages requesting that the CS call him back. As instructed by S/A Willoughby, the CS called ANDERSON back and recorded the call. The CS reported that during the call, ANDERSON stated that he had purchased the *"Flash II"* for $20,000 but that the bill of sale (one of the documents given to the CS by ANDERSON) listed the sale price as only $10.00 for "tax" purposes. ANDERSON also stated that he received the permission of the Captain of the U.S. Navy Aircraft Carrier *"John F. Kennedy"* when he [ANDERSON] displayed the *"Flash II"* on its deck during the *Tall Ships* tour in Boston in July 2000. ANDERSON also advised the CS that he intended to keep the Sailboat stored at the Marblehead Trading Company in Marblehead. The audio-cassette tape containing the recorded telephone call with ANDERSON on September 28th is hereafter referred to as exhibit N-171. The CS transferred custody of exhibit N-171 to S/A Willoughby on September 29, 2004.

## NON-DRUG RELATED INFORMATION

1. See above.

## FINANCIAL INFORMATION

1. See above.

## TERRORIST/EXTREMIST RELATED INFORMATION

1. None to report.

## CUSTODY OF EVIDENCE

1. Exhibit N-167 is described as one (1) original audio-cassette tape containing recorded undercover telephone calls by CS▇▇▇▇▇ to Gregory Olaf ANDERSON during the period September 15, 2004 thru

---

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

USDocReqResp000057

*Previous edition dated 8/94 may be used.*

**U.S. Department of Justice**
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 2

| 1. Program Code<br>N/A | 2. Cross File | Related Files | 3. File No.<br>CC-02-0118 | 4. G-DEP Identifier |
|---|---|---|---|---|
| 5. By: S/A Gregg Willoughby<br>At: Boston Fld. Div.<br>CBI - Lowell, MA | ☒ ▓▓▓<br>☐<br>☐ COPY<br>☐ | | 6. File Title | |
| 7. ☐ Closed ☐ Requested Action Completed<br>☐ Action Requested By: | | | 8. Date Prepared<br>10/11/04 | |
| 9. Other Officers: None | | | | |
| 10. Report Re: Debriefing of CS-▓▓▓ on 10/11/04. | | | | |

### DRUG RELATED INFORMATION

1.  Reference is made to DEA-6 dated September 28, 2004, report re:
    Debriefing of CS-▓▓▓ on September 27, 2004 and September 28,
    2004.

2.  On October 9, 2004, CS-▓▓▓ (hereafter, the "CS"), contacted S/A
    Willoughby by telephone and left a message reporting that the CS had
    just spoken with Gregory Olaf ANDERSON by telephone.  The CS reported
    that "it" called ANDERSON in return to ANDERSON's recent calls.  The
    CS stated that ANDERSON was interested in the status of the potential
    "buyer" for ANDERSON's sailboat and that he [ANDERSON] wanted to know
    whether the CS had any news as to whether the "buyer" was going to
    view and/or purchase the sailboat ["*FLASH II*"].  The CS stated that
    "it" did not record the call because "it" did not have a recording
    device at the time of the call.

3.  On October 11, 2004, S/A Willoughby spoke with the CS by telephone
    regarding the October 9th call.  During the call, the CS again stated
    that ANDERSON was primarily interested in the status of negotiations
    for the sale of ANDERSON's sailboat "*FLASH II*" since the CS' and
    ANDERSON's meeting on September 27, 2004.  The CS also stated that
    ANDERSON told the CS that he had attempted to contact the
    unidentified marijuana supplier in Arizona but without success.
    ANDERSON said that the telephone number he had for the supplier was

| 11. Distribution:<br>Division ▓▓▓ | 12. Signature (Agent)<br><br>S/A Gregg A. Willoughby | 13. Date |
|---|---|---|
| District | 14. Approved (Name and Title)<br><br>G/S James Connolly | 15. Date |
| Other | | |

**DEA Form - 6**
(Jul. 1996)
59     gw

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

USDocReqResp000059

**U.S. Department of Justice**
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 2

| 1. Program Code N/A | 2. Cross File | Related Files | 3. File No. CC-02-0118 | 4. G-DEP Identifier |
|---|---|---|---|---|
| 5. By: S/A Gregg Willoughby At: Boston Fld. Div. CBI - Lowell, MA | ☐ ☐ ☐ | | 6. File Title | |
| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | ☐ ☐ | | 8. Date Prepared 10/14/04 | |
| 9. Other Officers: S/A Michael O'Shaughnessy, Mass. S.P. Lt. Kenneth Gill, Tpr. John Foster | | | | |
| 10. Report Re: Seizure of exhibit N-172 on 10/13/04 | | | | |

### DETAILS & CUSTODY OF EVIDENCE

1.  Reference is made to all prior reports prepared under the subject investigative file relative Gregory Olaf ANDERSON.

2.  On October 5, 2004, United States Magistrate Judge Robert B. Collings, District of Massachusetts, issued a seizure warrant for one Star Class Sloop Sailboat, with Hull number 721, named *"FLASH II"* and owned, in whole or in part, by Gregory Olaf ANDERSON (hereafter, exhibit N-172).

3.  On October 13, 2004, at approximately 10:30 a.m., the above named officers arrived at the Marblehead Trading Company in Marblehead, Massachusetts (hereafter, the "boatyard") to execute the aforementioned seizure warrant. ANDERSON was storing exhibit N-172 at that location. Shortly after arriving, S/A's Willoughby and O'Shaughnessy, Lt. Gill and Tpr. Foster met with Mr. Ralph Anderson, the owner of the boatyard (not related to Gregory Olaf ANDERSON), and identified themselves as Special Agents from the Drug Enforcement Administration and as Massachusetts State Police officers. S/A Willoughby explained that they were there to seize the aforementioned Sailboat and provided Mr. Anderson with a copy of the seizure warrant. At that time, Mr. Anderson stated "poor Ole" and that "Ole" was always involved in some kind of "scam" and that he has something going in Cuba. Mr. Anderson also stated that he expected ANDERSON to return to Marblehead soon because he [ANDERSON] had said that he had

| 11. Distribution: Division | 12. Signature (Agent) S/A Gregg A. Willoughby | 13. Date |
|---|---|---|
| District | 14. Approved (Name and Title) G/S James Connolly | 15. Date |
| Other | | |

| DEA Form  - 6 (Jul. 1996) | **DEA SENSITIVE** Drug Enforcement Administration |
|---|---|

gw

This report is the property of the Drug Enforcement Administration. Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

61

USDocReqResp000061

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No.<br>CC-02-0118 | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | 3. File Title | |
| 4.<br>Page   2   of   2 | | |
| 5. Program Code<br>N/A | 6. Date Prepared<br>10/14/04 | |

a buyer for the Sailboat lined up.  Thereafter, exhibit N-172 was seized without incident and with Mr. Anderson's full compliance and cooperation.  Mr. Anderson also stated that the Sailboat's mast was also stored at the boatyard but that because it was fragile, he recommended that it not be moved without the proper equipment.  Mr. Anderson offered to maintain the Sailboat's mast at the boatyard for as long as needed and that he has the capability to transport the mast to whatever location desired.  The Sailboat (without the mast) was subsequently towed by a private boat-towing company to the U.S. Marshal's storage facility in Massachusetts where it will be secured pending forfeiture proceedings.  Mr. Anderson did not have ANDERSON's address or contact information but stated that someone who works at the boatyard would likely have it.

4.    In an article written in the Boston Globe by Shelley Murphy (dated October 14, 2004), ANDERSON denied being the owner of the Sailboat and that an unidentified doctor was the boat's primary owner.  According to the article, ANDERSON also made statements that he hoped to receive up to one third of the profit from the sale of the Sailboat for his role in assisting in the purchase of the boat and restoring the boat.  The article also detailed that ANDERSON said that the boat was purchased "long before" his involvement in drugs.

**INDEXING**

1.    ██████████████████ — ████████████

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

USDocReqResp000062

## BILL OF SALE AND GENERAL RELEASE

IN CONSIDERATION of ten and no/100th dollars ($10.00) and other good and valuable

consideration, receipt of which being hereby acknowledged, the undersigned does sell, bargain

and convey all right, title and interest in *Flash II, #721*, Star Craft sailing vessel, unto G. Olaf

Anderson, and further warrants title to same, dated this _2_ day of August 1996.

_Ouida M. Ehler_
Signature

_OuidA M. EhleR_
Printed Name

_Rt #4, Box 40990_
Address

_Monticello, Fl. 32344_
City/State/Zip

## ACKNOWLEDGMENT

STATE OF FLORIDA        :

COUNTY OF _Jefferson_    :

Sworn to and subscribed before me by _Ouida McClellan Ehler_ who is personally

known to me or who has produced Florida driver's license _E460-713-29-713_ as identification

this _02d_ day of August, 1996.

_[signature]_
Notary Public
State of Florida at Large
My commission expires:


ROBERT A. HARPER, JR.
MY COMMISSION # CC428965 EXPIRES
February 3, 1999
BONDED THRU TROY FAIN INSURANCE

79

the company.

"The inattentiveness can't be tolerated, but, secondly, the employee that filmed the senior reactor operator did not immediately report the potential

**PILGRIM NUCLEAR, Page B8**



AP FILE PHOTO

**The Flash II, bought by John F. Kennedy when he was 17 for between $400 and $600.**

# Agents seize JFK's old sailboat

### By Shelley Murphy
GLOBE STAFF

A 22-foot sailboat that a teenage John F. Kennedy raced in regattas off Cape Cod was seized yesterday by federal agents who allege that its current owner bought and refurbished it with marijuana profits.

The Flash II — a Star Class sloop that the late president owned for six years and sold in 1942, before shipping out to the Pacific during World War II — was hauled away from its storage spot at the Marblehead Trading

**SAILBOAT, Page B7**

ıııııııııııııııııııııııııııııııııııııııııııııııııııı

**Writings condemned**

The Islamic Society of Boston distances itself from a trustee and treasurer accused of publishing anti-Semitic articles. **B3**

USDocReqResp000101

THE BOSTON GLOBE

# Drug agents seize JFK's old sailboat

▶ **SAILBOAT**
*Continued from Page B1*

Co. in Marblehead by agents from the US Drug Enforcement Administration.

"Crime doesn't pay," said US Attorney Michael J. Sullivan. "The seizure and forfeiture of assets allegedly gained from drug proceeds is critically important and sends a deterrent message to those who want to get involved in the illegal drug business."

If the government wins its forfeiture case, then it will probably sell the boat to the highest bidder, Sullivan said.

In 1998, the sloop drew an $800,000 offer during an auction of Kennedy memorabilia, but the owner turned it down, saying at the time that he hoped it would fetch up to $1.2 million.

In an affidavit released yesterday, the DEA asserted that Gregory "Ole" Anderson of Florida was the sole or primary owner of the Flash II and had bought and refurbished it with drug profits.

Anderson, who spent a year in an Arizona state prison for transporting marijuana, was contacted in February by a former drug-dealing associate who was secretly cooperating with the DEA and helped agents build a forfeiture case, according to the affidavit.

The drug dealer said that he gave Anderson between $12,000 and $15,000 toward refurbishing the boat and that Anderson used other money he obtained from transporting drugs.

But in a telephone interview last night, Anderson insisted that the boat's primary owner is a doctor, whom he would not identify,

and that drug profits were never used to buy the boat or restore it.

Anderson said that after helping someone else buy the boat in 1996 for $18,500, he has invested years of "sweat equity" restoring the boat, with the understanding that he would get a percentage of the sale, possibly as much as a third. He said he was storing the boat in Marblehead so that he could sell it close to the boat's history.

"This boat has nothing to do with a mistake I made which I paid for," Anderson said, adding

that the boat was bought long before his involvement in drugs.

"They do this and bring this up to put some sort of pallor over the name of the boat, which should not be, because it's a magnificent, historic artifact," he said.

Kennedy, then 17, and his older brother, Joe, bought the Olympic-style Star Class vessel in 1934. Two years later, Kennedy, a member of the Nantucket Sound

Star Fleet, raced the boat to an Atlantic Coast Championship.

The boat — built in 1930 on Long Island, N.Y. — originally sold for about $900. Kennedy paid between $400 and $600 for it and sold it six years later for $300 to a man who owned it for 27 years before the 1996 sale.

*Shelley Murphy can be reached at smurphy@globe.com.*





All Dunham Footwear
All New Balance
Walking & Outdoor
Shoes
Now 20% OFF

Huge savings on selected apparel    Also on sale!    All basketball shoes just $29.99

Shoes are factory seconds/discontinued styles.
Discounts off factory store prices. Cannot apply to prior sales, sale prices or other offers.

Come to the store nearest you
October 8 - 24, 2004

LAWRENCE, MA
5 S. Union St.
call toll free
1.877.NBF-STOR

BRIGHTON, MA
40 Life St.
call toll free
1.877.NBF-STOR

SKOWHEGAN, ME
12 Walnut St.
207.474.6231

NORWAY, ME
356 Main St.
207.744.4242

new balance factory store
achieve new balance™

For first quality merchandise, call 1.800.253.SHOE or visit City Sports. Sorry. Factory Store offers not valid at dealer locations.



230 Commercial Street, First Floor · Boston, Massachusetts 02109

# J. Thomas Kerner

March 10, 2005

Ms. Shelbey D. Wright
Assistant United States Attorney
United States Courthouse
1 Courthouse Way
Suite 9200
Boston, MA 02210

> Re:   *U.S. v. One Star Class Sloop Sailboat Built in 1930 with
> Hull Number 721, Named "Flash II,"* 05 CV 10192

Dear Ms. Wright:

Enclosed, please find the following documents:

1.   a reprint of, *Forgotten JFK Sail Boat Fetches $18,500,* an A.P. story dated June 30, 1996, from The Tallahassee Democrat, page 4B, by Bill Bergstrom and

2.   three pages of documents which demonstrated that on July 1, 1996, Mr. Crosby had the First Bank of Clewiston wire $5,250 to Rowell Realty & Auction Co., Inc.

It is my understanding that Mr. Harry Crosby was asked by Ole Anderson whether Crosby wanted to invest in the Kennedy sail boat. Crosby was told by Anderson that there was another investor, named Chuck Fitzgerald. Crosby agreed and, once Anderson won the auction for the boat, Crosby wired $5,250. Crosby was told that his funds were combined with $14,000 from Fitzgerald to purchase the boat. In addition to the $18,500 purchase price, a commission had to be paid to Rowell Realty & Auction Co.

Initially, Crosby's $5,250 bought him a one-quarter share in the boat. Subsequently Fitzgerald asked to be bought out and Crosby invested another $5,000. Crosby now owns one-third of the boat.

Crosby is willing to stipulate to an order forfeiting the boat to the government, provided the government agrees to sell the boat at auction and pay Crosby one-third of the net proceeds. He also would like an additional $15,000 for legal fees, but that's not a deal breaker. You may find it not surprising that Crosby is upset that Anderson turned down a reported $800,000 bid for the boat at an auction in, I believe, 1998.

103

Thank you.

Very truly yours,

J. Thomas Kerner

JTK:ms

104

USDocReqResp000104

Tallahassee Democrat (FL)Tallahassee Democrat (FL)
June 30, 1996
Section: LOCAL
Page: 4B

## FORGOTTEN JFK SAILBOAT FETCHES $18,500
*Bill Bergstrom THE ASSOCIATED PRESS*

When John F. **Kennedy** raced **sailboats** as a teen-ager, one of his prized boats was a Star Class sloop named Flash II.

The future president skippered the sleek 22-footer to an Atlantic Coast Championship in 1936 as a 19-year-old member of the Nantucket Sound Star Fleet.
Six decades later, far from Cape Cod, its mast broken and white paint weathered, the boat brought $18,500 at auction Saturday.

The buyer, Chuck Fitzgerald, owner of Sailorman Used Marine Gear Emporium in Fort Lauderdale, will restore the 66-year-old wooden craft, said Ole Anderson, who bid on Fitzgerald's behalf.

The price didn't approach the $453,500 paid for **Kennedy**'s oak rocking chair or $722,500 paid for his golf clubs at the auction of Jacqueline **Kennedy** Onassis' estate in April.

But it was a big jump from the $300 the late Don Ehler paid for the boat in 1963 in Clearwater - with no idea who the former owner was.

Ehler, who died in April, kept the boat in a shed since 1972 when he retired.

Despite the price, Ouida Enler, Don's wife, said, "It's kind of sad selling something that meant a lot to him."

**Illustration:**B&W photo

HUGH SCOGGINS/The Associated Press

Ole Anderson, who placed the winning bid for the boat's new owner, packs up the Flash II, which once belonged to John F. **Kennedy**.

Copyright (c) 1996 Tallahassee Democrat

105

USDocReqResp000105

11-17- 04 08:16  FROM-LYONS PRINTING    863-983-2607



Current Date:        November 15, 2004

Account Number:      111205490
Capture Date:        July 01, 1996
Item Number:         99990000006836
Posted Date:         July 01, 1996
Posted Item Number:  7690080
Amount:              $5,250.00
Record Type:         Credit

CLEWISTON

MEMBER F.D.I.C.

| CREDIT | Date 7-1-96 | ACCOUNT NUMBER |
|---|---|---|

Account _____

| DESCRIPTION | AMOUNT |
|---|---|
| WIRE — | |
| ROWELL REITY & AUCTION | |
| H.E. CROSBY | |
| Approved By | TOTAL 5,250 00 |

Guempw E. Harrer Printers 800-845-0099

⑆0⑆ 70037786⑆    0⑆ 112054⑈90    903 ⑆0000 5 25000⑆

617· 720 - 0707

107

11-17-'04 08:16  FROM-LYONS PRINTING    863-983-2607    T-652  P03    U-616

Page 5

```
+----------------------------------------------------------------+
: Domestic Wire Transfer:              Date: 07/01/1996 Time: 10:08 AM :
:                                                                :
:    Name:                  ABA    Institution                   :
:   ----------------------------- --------- --------------------  :
: Orig: TUESDAY ORTEGA             067003778 First Bank of Clewiston :
: From:                     000000000 GOLDNET                     :
:                                                                :
: Re:                                Trace: 19960701100806700377800  :
:                                                                :
: Verified by: TUESDAY ORTEGA                                    :
+----------------------------------------------------------------+
:                                                                :
:  Sender ABA: 063111594  Name: IB&F                             :
: Receiver ABA: 063100277 Name: NATIONS BANK                     :
:       City: TALLAHASSEE      State: FL                          :
:                                                                :
:   Type Code: 1000 - Transfer of Funds                          :
:                                                                :
:       Amount: $      5,250.00    Reference Number:             :
:  Sending Info: ORG=W.E. CROSBY, JR. OGB=067003778 1ST BK CLEWISTON :
: Receiving Info: BNF=ROWELL REALTY & AUCTION CO INC /AC-90612663 BB :
:              I=ATTN: OLE ANDERSON, MARK MANLY                  :
:                                                                :
:                                                                :
:                                                                :
:   .s:                                            15.00         :
+----------------------------------------------------------------+
```

xxx  Report Process Complete  xxx

108

USDocReqResp000108

Boston Globe

Date 11/9/05 Page B1 & B7

# Place your bid for JFK sailboat

## Other presidential items set for auction

### By Shelley Murphy
GLOBE STAFF

A sleek, 22-foot sailboat that John F. Kennedy raced off Cape Cod as a teenager will go to the highest bidder next month in New York City when Guernsey's auctions offers one of the largest collections of JFK memorabilia ever to go on sale.

The Omega watch Kennedy wore at his presidential inauguration, the "hot line" telephone he carried while away from the White House, and passports belonging to the late president and his wife, Jacqueline, will also be on the block.

But one item is in a category of its own: the Flash II, a Star class sloop — with a past.

The boat was seized from a convicted drug dealer last year, forfeited to the government, and is being sold on consignment for the US Marshals Service.

And now, with the boat expected to draw a handsome price, a Florida


LAURIE SWOPE, ASSOCIATED PRESS/FILE 1997

The Flash II was seized from drug trafficker Gregory "Ole" Anderson (above) last year by the Drug Enforcement Administration.

anesthesiologist urged a federal appeals court in Boston yesterday to order a judge to reconsider the doctor's claim that he has a stake in the boat.

In papers filed with the US District Court in Boston, a lawyer for Dr. Kerry Scott Lane said the doctor is not trying to stop the auction, but he wants Guernsey's to set an appropriate minimum bid, and wants the money from the sale placed in escrow until his challenge is resolved.

But US Attorney Michael J. Sullivan said Lane's appeal lacks merit, noting a judge has already ruled twice that the doctor knew in October 2004 that the boat had been seized, but failed to stake a claim until after the vessel was forfeited in July.

The Flash II, which the late president owned for six years and sold in 1942, was seized by the Drug Enforcement Administration after a cooperating witness asserted it was bought with drug profits in 1996 by Gregory "Ole" Anderson, of Florida, a convicted marijuana trafficker.

Ownership of the boat has been a matter of contention.

The government alleged that Anderson was the primary or sole owner of the boat.

But Anderson told the Globe last year that the primary owner was a doctor, whom he wouldn't identify, and that drug profits were never used to buy the boat or restore it.

He said that others invested money in the boat, while he invested years of "sweat equity" restoring the vessel, with the understanding that he'd get a percentage of the sale.

Lane acknowledged that Anderson told him DEA had seized the boat last year from its storage spot at the Marblehead Trading Company in Marblehead.

Lane said he didn't come forward at the time to tell the government he had invested $60,000 in legitimate money in the boat because he had just joined the staff at St. Anne's Hospital in Fall River.

"I was concerned about my hospital privileges at a new job," said Lane, adding, "I didn't want to be associated with a drug dealer."

Lane said he learned only in

July that the government had filed a forfeiture claim in US District Court in Boston last February.

Another Florida man, Harry Crosby, did come forward to contest the forfeiture, claiming he had invested $10,000 in the sailboat, and US District Judge Rya Zobel ordered the government to give him a third of any profits it makes from the sale.

The US Marshals Service has been authorized by the court to sell the boat and after shopping around, decided it would attract the highest price at Guernsey's auction, said Bill Ryan, administrative officer for the marshals in Boston.

Ryan said the DEA had the boat appraised at about $800,000, based on a bid of that amount for the Flash II in 1998, when Guernsey's offered it at another JFK memorabilia auction.

Anderson rejected that bid, holding out for $1 million.

109

USDocReqResp000109

S.G. UNITED STATES
PRESIDENT JOHN F. KENNEDY
THE McGWIRE BALL · MICKEY MANTLE
ARTWORK OF THE SOVIET UNION
ELVIS PRESLEY · JERRY GARCIA
SPORTING AUTOMOBILES

PH: 212.794.2280
FAX: 212.744.3638

AUCTIONS@GUERNSEYS.COM
WWW.GUERNSEYS.COM

# GUERNSEY'S

A LEADER IN THE SALE OF UNIQUE PROPERTIES AT AUCTION
108 EAST 73RD STREET · NEW YORK · NY 10021

## FLASH II
John F. Kennedy's Star Class Sailboat

### DESCRIPTION & HISTORY

| | |
|---|---|
| DIMENSIONS: | 22 feet long |
| | 8 feet wide |
| | 35 feet mast |
| WEIGHT: | 760 pounds |

Registered as #721 by the International Star Class Yacht Racing Association.

Believed to have been originally built in 1930 by Ole Hope for Hercules B. Atkin, this sleek sloop was purchased in 1934 by John F. Kennedy and his older brother Joseph Kennedy, Jr. The Kennedy's keen interest in sports, and particularly the water sports they enjoyed during their summers in Hyannisport was well known. Their enthusiasm and passion for sailing and swimming usually evolved into heated competitions among the brothers, their family, and friends. With the purchase of this 22-footer, John F. Kennedy was able to further hone his sailing skills as a member of the Nantucket Sound Star Fleet.

Star boats were exceedingly tricky to sail because of their towering masts and narrow hulls, but Flash II was an especially fast boat and in it John F. Kennedy became an exceptional sailor, winning many races at the Wianno and Hyannisport Yacht Clubs. Kennedy won high acclaim when he triumphed in one race in an unprecedented four-minute victory. As stated in a publication from the time, "...the amazing win by John Kennedy in his Nantucket Sound Flash II in the last race by nearly four and a half minutes, an almost unprecedented margin for a Blue Star event."

Throughout the summer months, John F. Kennedy spent hours each day sailing with close friends, often the very people who would later serve him as key political advisors, including Lem Billings. Kennedy's poor health as a child was nourished with his fervor for sailing, and undoubtedly it was his water activities that helped physically strengthen him. Having been a weak and sickly youngster, Kennedy fell ill again during his college years and, through his therapeutic water activities, regained much of his health and strength. His time aboard his sloop, Flash II, clearly played a large part of this rehabilitation.

In 1940, John F. Kennedy removed his brother Joe's name from the boat registry, and shortly thereafter, in 1942, he sold Flash II. The boat was kept in storage for many years, after which its most recent owner undertook a meticulous and thorough restoration. Over 90% of the sloop is original and during its restoration, great care was taken to use materials from the era, although they were often difficult to obtain. Craftsmen with the high-

124

USDocReqResp000124

est possible level of expertise were carefully selected to help restore the boat, ensuring that Flash II would be returned to its' original condition. Details of this restoration include a white body finished with linseed oil-based enamel paint, polished fittings in bronze and wood trim pieces that include a Spanish cedar-varnished splash rail.

Flash II was included as Lot #80 in Guernsey's John F. Kennedy Auction, conducted in March, 1998 in New York City. In conjunction with that event the boat was exhibited at the New-York Historical Society, Seventh Regiment Armory and the atrium of Trump Tower. This boat has also been exhibited at numerous boat shows and museums including the Museum of Yachting in Newport Rhode Island in 1997.

## APPRAISAL

In our opinion, were the Flash II to be made available to us today, we would place an estimate on it of from $800,000 to $1,000,000 (eight hundred thousand to one million dollars.) At auction, we believe it would be capable of fetching $1,000,000.

We offer the above opinion based on our thirty years of experience selling high end items relating to legendary figures primarily from the twentieth century. For example, Guernsey's sold the rock-era guitars of Jerry Garcia (Grateful Dead) for approximately $1million each and the home run record setting baseball hit by Mark McGwire for $3million. The firm has sold many vintage automobiles for substantial amounts and conducted what many view as the most highly regarded auction of boats and boating artifacts when we held our Yachting Auction on the grounds of the Museum of Yachting in Newport, Rhode Island. Other nautical events conducted by Guernsey's would include the sale of the contents of the ocean liner *SS United States* (the world's largest auction) and our recent Titanic Auction held at New York's South Street Seaport Museum. In addition to working closely with many of our nation's finest museums, we have proudly represented our government in such matters as the appraisal and sale of the Calumet Farm Thoroughbred Racing Trophy Collection. Of course, auctions including material relating to John F. Kennedy, Franklin Roosevelt and many other presidents have long been a mainstay of this company.

Arlan Ettinger
President

November 18, 2004

125

USDocReqResp000125

## Talbot, Lisa (USAMA)

| | |
|---|---|
| **From:** | Barclay, Kristina (USAMA) |
| **Sent:** | Monday, October 23, 2006 12:33 PM |
| **To:** | Rue, Nancy (USAMA) |
| **Cc:** | Talbot, Lisa (USAMA) |
| **Subject:** | File: U.S. v. One Star Class Sloop |

Before I went on maternity leave in July 2005, Lisa Talbot told me that she had just gotten off the phone with someone who claimed to have an interest in J.F.K.'s sailboat, which was at the time the defendant in a civil forfeiture action being handled by AUSA Shelbey Wright. Lisa told me that the man stated that he was a Dr. I recommended that Lisa tell Shelbey about the conversation. My last day of work before maternity leave was Friday, July 1, 2006, so this conversation must have occurred on or before that day.

153

USDocReqResp000153

**Talbot, Lisa (USAMA)**

| | |
|---|---|
| **From:** | Talbot, Lisa (USAMA) |
| **Sent:** | Monday, October 23, 2006 11:44 AM |
| **To:** | Talbot, Lisa (USAMA) |
| **Subject:** | Memo to the File (JFK Sailboat) |

**NOTE TO FILE (Telephone conversation between Lisa Talbot and Dr. Kerry Lane)**

Dr. Kerry Lane phoned the United States Attorney's office and I spoke with him concerning the forfeiture of the sailboat (approx. June 2005). Dr. Lane told me that he was part owner of the sailboat, and wanted to know what he could do to get his fair share, because he had heard that the sailboat was being forfeited and sold by the United States. I told him that the Court had entered a Notice of Default, and that the boat was being turned over to the U.S. for forfeiture, but if he thought that he had standing, he would need to get an attorney. He said that he didn't want to spend $5,000 for an attorney and not get anything in return. I explained that the Court had issued a Default, and asked why he hadn't come forward sooner to file a claim. He told me that he didn't come forward sooner because of two reasons: 1) He was going through the accreditation process at (I believe Fall River Hospital) his new place of employment, and didn't want them to know of his possible affiliation with a criminal (Ole Anderson); and 2) He stated that he hadn't come forward sooner because he was under the impression that the boat would be donated to the Smithsonian when it was forfeited, and if the sailboat was going to be donated to the Smithsonian, he would just let it go to the museum. However, since he had found out that the sailboat was going to be sold by the government after the forfeiture was finalized, he decided that he would come forward claiming an ownership interest, to see if he could get a piece of the sale. I asked him if he had any concrete documentation indicating an ownership interest in the sailboat, i.e. title documents, etc…and he said no. I again told him that if he truly felt that he had an ownership interest in the sailboat, he would need to get an attorney, as the Court had already issued a Notice of Default in this case, and would need documentation before it would consider his claim of ownership. Dr. Lane balked at the suggestion of getting an attorney, again indicating that he didn't want to spend $5,000 for an attorney when he may not get anything in return. He also said to me, "I have a hand written agreement on my stationary that I could send the Court for verification that the boat belongs to me." To which I responded, "I'm not sure how credible the Court will find hand-written notes on your stationary - you really need to get an attorney." Dr. Lane then agreed to look into getting an attorney and the conversation ended.

154

USDocReqResp000154