UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Civil Action # 05-10192 RWZ |
| ONE STAR CLASS SLOOP SAILBOAT BUILT IN 1930 WITH HULL NUMBER 721, NAMED "FLASH II", | |
| Defendant. | |
| KERRY SCOTT LANE, M.D. | |
| Claimant. | |

### CLAIMANT KERRY SCOTT LANE'S  OPPOSITION TO THE GOVERNMENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

Claimant, Kerry Scott Lane, M.D., through his attorneys, hereby opposes the

government's motion for partial summary judgment on the issues of forfeitability and value.

Additionally, he moves for summary judgment in his own favor on those two issues.

Claimant's motion is based on the attached Memorandum of Points and Authorities,

Supporting Exhibits, and the record in this case.

1

Respectfully submitted,
Kerry Scott Lane, MD,

By his attorneys,


_____/s/ Brenda Grantland_____
Brenda Grantland, Esq.
Law Office of Brenda Grantland
20 Sunnyside Suite A-204
Mill Valley, CA 94941
(415) 380-9108
Pro hac vice


_____/s/ Eric B. Goldberg_____
Jeffrey P. Allen (BBO# 015500)
Eric B. Goldberg (BBO# 564398)
Seegel Lipshutz & Wilchins, P.C.
Wellesley Office Park
20 William Street, Suite 130
Wellesley, MA 02481
(781) 237-4400

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Civil Action # 05-10192 RWZ |
| ONE STAR CLASS SLOOP SAILBOAT BUILT IN 1930 WITH HULL NUMBER 721, NAMED "FLASH II", | |
| Defendant. | |
| KERRY SCOTT LANE, M.D. | |
| Claimant. | |

**CLAIMANT KERRY SCOTT LANE'S  MEMORANDUM OF LAW
IN OPPOSITION TO THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT
AND IN SUPPORT OF HIS CROSS-MOTION FOR SUMMARY JUDGMENT**

Although Claimant disagrees to some extent with the government's characterization of the

facts (see Claimant's Response to the Government's Statement of Undisputed Facts, filed today),

the facts themselves are undisputed.  Claimant has submitted today his own Statement of

Undisputed Facts, which includes items omitted from the government's filing.

**ARGUMENT**

**I.      The government's proceeds theory is fatally defective, and Claimant is entitled to a
judgment denying forfeiture**

The government's theory of forfeiture is that proceeds of marijuana trafficking were

allegedly invested in the sailboat.  However, taken in the light most favorable to the government,

the record shows any drug proceeds were the *government informant's* drug proceeds – which the

1

informant *loaned* to Ole Anderson to invest in the sailboat.  In the phone conversations they had in 2004, when the informant (hereinafter cited as "CW") was working as an informant, Anderson repeatedly claimed he had paid the CW back.  The CW told the agents he "remembered" that Anderson had paid him back.  Lane Statement of Facts ¶¶ 1 - 5.  As Claimant showed in his Response to the government's Statement of Undisputed Fact, ¶ 4 – based on the CW's allegations, it is clear the debt to the CW had to have been repaid before Anderson transported the load in which he was arrested (in December, 2001).

Thus, under the government's own factual allegations, the drug proceeds which the CW loaned to Ole Anderson were no longer invested in the sailboat when it was seized in 2004.

There are two problems with the government's theory of forfeiture.

First, if the CW's drug proceeds were "loaned" to Anderson, rather than a capital investment in the sailboat, did the CW ever actually acquire an interest in the sailboat?  Was the CW merely an unsecured creditor of Ole Anderson's?  Since the sailboat was not a type of property which is titled in the name of the owners in some government database, there is no place to register a lien on it.  If the CW had performed some restoration work on the sailboat, under state law he might have obtained a mechanic's lien, such as Marblehead Trading Company held at the time of the failed 1998 auction – but Anderson's debt does not fit the requirements of a mechanics lien.

Under federal forfeiture law, an unsecured creditor does not have the kind of ownership that gives him standing in the forfeiture case.  See *United States v. One-Sixth Share*, 326 F.3d 36, 44 (1st Cir. 2003) ("The federal courts have consistently held that unsecured creditors do not have standing to challenge the civil forfeiture of their debtors' property.")

2

Here, the United States stepped into the shoes of the unsecured creditor. If an unsecured creditor lacks standing to defend against the forfeiture of the sailboat, certainly the CW's unsecured debt did not give the government grounds to forfeit the property.

The second problem with the government's theory is that, in 2004 when the sailboat was seized there were no drug proceeds currently invested in it. In utilizing a proceeds theory "the government is required to trace the seized property directly to the offense giving rise to the forfeiture." *United States v. $ 8,221,877.16*, 330 F.3d 141, 158 (3rd Cir. 2003). Here, the government's own allegations trace proceeds into the property – *and back out of it* – before the forfeiture case was commenced.

Under the tracing rules, drug proceeds invested in property taints that property, and if that property is sold and the proceeds used to buy another property, the taint is removed from the first property and transferred to the new property. Taint does not spread like an expanding drop of ink in a glass of water to permanently infect each piece of property it ever touches. The expanding drop of ink theory was rejected by the courts twenty years ago. *United States v. Pole No. 3172, Hopkinton*, 852 F.2d 636, 639-40 (1st Cir. 1988) ("We do not believe, however, that forfeitability spreads like a disease from one infected mortgage payment to the entire interest in the property.... After all, only the actual proceeds of drug transactions are forfeitable.")

Thus, once Ole Anderson repaid the drug proceeds to the CW, the sailboat could not be forfeited on a proceeds theory. Therefore this Court should grant summary judgment against the government on the issue of forfeitability.

II.    **Claimant's failure to separately appeal the denial of his motion for a stay had no effect on his right to receive the full "fair market value" of his interest**

On November 8, 2005 – 21 days after judgment was entered denying Claimant's motion for reconsideration of the denial of his Rule 60(b) motion, he filed a notice of appeal and a motion for a stay pending appeal.  He submitted with his motion a proposed supersedeas bond of $100, and requested that the court waive the supersedeas bond all together since the government had possession of the res.

On November 17, 2005, the court denied Claimant's motion for a stay in an endorsed order, stating only that the motion is denied, and that "Kerry Lane, M.D. may attempt to work out an escrow arrangement with the Government as to the amount he claims."  Claimant had already filed a notice of appeal, and did not file a separate appeal from the denial of the stay.

Claimant's counsel contacted AUSA Shelbey Wright and attempted to negotiate an acceptable minimum reserve[1] at the forfeiture auction, but she refused to negotiate.  The government then put the sailboat up for auction without a minimum reserve.

Only one bid was received at the 2005 auction, and the sailboat sold for $100,000 – a tenth of its appraised value.

A.    **The government's waiver argument is based on a bankruptcy rule which does not apply here**

The government argues that, by failing to file a separate appeal from the denial of his motion for a stay of the judgment pending appeal, Dr. Lane waived the right to compensation

---

[1]    At the 1998 auction, the consortium set a minimum reserve.  Although the minimum reserve was not met, bidding came close, with a high bid of $800,000.

4

based on the fair market value of his interest in the property, and that his maximum recovery is limited to a portion of the proceeds the government obtained at the auction.

Whatever appeal the government's legal theory might have, it finds no support in federal forfeiture law.  Instead the government relies on three bankruptcy cases.  These bankruptcy cases rely on a Bankruptcy court rule, which provides that:

> Unless an order approving a sale of property or issuance of a certificate of indebtedness is stayed pending appeal, the sale to a good faith purchaser or the issuance of a certificate to a good faith holder shall not be affected by the reversal or modification of such order on appeal whether or not the purchaser or holder knows of the pendency of the appeal.

Bankruptcy Rule 12-61(2).  There is no such rule in forfeiture cases.

Additionally, these authorities the government cited do not hold that failure to appeal from the denial of a stay limits the claimant to the auction proceeds if he prevails on appeal – as the government claims.  Instead, the government's authorities hold failure to appeal the denial of a stay in bankruptcy cases moots the appeal.

> Under Rule 12-61(2), the failure of the Schupak group to obtain a stay of the sale of the debtor's assets either by order of the bankruptcy judge or district court or by filing a supersedeas bond has permitted the completion of the sale to Schottenstein to moot this appeal.

*In Re Dutch Inn of Orlando*, 614 F.2d 504, 506 (5th Cir., 1980).  Those bankruptcy authorities are not applicable here – and are not even helpful by analogy.

Fifteen years ago, the U.S. Supreme Court considered a similar argument in a civil forfeiture case.  In *Republic National Bank of Miami v. United States*, 506 U.S. 80 (1992) the Justice Department argued that because the claimant bank failed to seek a stay of the forfeiture judgment pending appeal, the appeal became moot when the government executed the judgment.

The Supreme Court soundly rejected that argument, and had a few choice words for the audacity

of the government's argument:

> If the conjured rule were genuine, we would have to decide whether it had outlived
> its usefulness, and whether, in any event, it could ever be used by a plaintiff -- the
> instigator of the *in rem* action -- to contest the appellate court's jurisdiction.

*Republic National Bank*, 506 U.S. at 88.   Justice Stevens, in his concurrence, stated:

> I am surprised that the Government would make "such a transparently fallacious"
> argument in support of its unconscionable position in this case.

*Republic National Bank*, 506 U.S. at 99.

The government's argument here is similarly fallacious.

### B.     It was unnecessary to separately appeal from the denial of the stay

Claimant's research has uncovered no forfeiture cases supporting the government's theory

that failing to separately appeal from the denial of a stay limits the claimant's recovery to the

amount the property sold for at auction.

Indeed, the case law suggests that pursuant to Rule 62(d), a forfeiture claimant is

automatically entitled to a stay of execution just by filing an appeal.

> Unlike the typical case where the defendant ship stealthily absconds from port and
> leaves the plaintiff with no *res* from which to collect, here the defendant *res* is in
> the possession of the United States and thus in no danger of disappearing. Because
> the *res* is unlikely to disappear, *we see no reason to require the claimant to file a*
> *stay of execution or a supersedeas bond in a civil forfeiture action*, because such
> bonds are typically filed to protect the interests of the party that prevailed in the
> district court. Having prevailed below, the government, if it wins on appeal, is
> assured of execution regardless of whether Baxter files a bond or stays execution of
> the judgment.

*United States v. $95,945.18*, 913 F.2d 1106, 1009 (4th Cir. 1990) (emphasis added).  This

language from *$95,945.18* was quoted in *United States v. Woburn City Athletic Club*, 928 F.2d 1,

4 (1st Cir. 1991) (affirmed on other grounds), and in *United States v. $25,721*, 938 F.2d 1417,

1419 (1st Cir. 1991).

The court in *$ 25,721* held that execution of a forfeiture judgment does not extinguish

appellate jurisdiction  –  "the filing of a timely appeal makes the filing of a request for a stay of

the district court judgment and the posting of a supersedeas bond unnecessary for jurisdictional

purposes."  938 F.2d at 1420.  In so holding, the First Circuit was persuaded by the dissenters in

*United States v. One Lear Jet*, 836 F.2d 1571 (11th Cir.), cert. denied 487 U.S. 1204 (1988), and

quoted with approval the dissenting opinion of Judge Clark in *One Lear Jet*:

> In other types of proceedings, when a judgment for property is rendered, the losing
> party has a choice. He need not post a bond. He can still appeal the judgment.  *If he
> wins on appeal, he can bring an action to recover his property or its value.*

836 F.2d at 1584, quoted at 938 F.2d at 1420 (emphasis added).

The federal statute governing forfeiture appeals now provides:

> In any case in which a final order disposing of property in a civil forfeiture action
> or proceeding is appealed, removal of the property by the prevailing party shall not
> deprive the court of jurisdiction. Upon motion of the appealing party, the district
> court or the court of appeals *shall issue any order necessary to preserve the right
> of the appealing party to the full value of the property at issue*, including a stay of
> the judgment of the district court pending appeal or requiring the prevailing party
> to post an appeal bond.

28 U.S.C. § 1355(c).

Under the above authority, Dr. Lane's appeal of the merits should have been enough to

automatically stay the forfeiture sale.  The fact that the government proceeded to liquidate the

sailboat for a tenth of its value does not destroy his right to the full value of his property – "he can

bring an action to recover his property or its value," as Judge Clark said in *One Lear Jet*.

Since this Court has jurisdiction over this matter, judicial economy dictates that his relief – return of the property or its fair market value – be afforded in this proceeding.

> The remedy proposed by the *Mayo* court and by the government, a separate civil action, is inadequate in light of the time and expense involved, particularly where the court considering the motion already has jurisdiction over the matter.

*United States v. Martinson*, 809 F.2d 1364, 1368 (9th Cir. 1987) (holding that where property was administratively forfeited without notice, and the property was subsequently destroyed, the claimant was entitled to the value of the property.)  The claimant "should be allowed to amend his [pleading] to request damages if he so desires."  Id. at 1370.

**III.    Since Dr. Lane's property interest was taken for public use in violation of his Due Process rights, he is entitled to return of his property or its "fair market value"**

**A.    The forfeiture judgment was void and the sale at auction did not convey good title**

Since the government failed to make reasonable efforts to locate Dr. Lane and give him notice as required by the Due Process clause, the default judgment of forfeiture was void.  The judgment being void, the government did not have good title to the sailboat when it was sold at the Guernsey's auction in December 2005.  If the government did not have good title, it could not convey good title to the successful bidder at the auction.

Under the circumstances, Dr. Lane should be entitled to his choice of the return of the Flash II (subject to the claims of the other co-owners) or the fair market value of his interest – not some portion of what the government sold it for at its distress sale.

**B.    Fair market value is not limited by what the property sold for at auction**

"The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both

having reasonable knowledge of relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551

(1973).

> [P]rices obtained at forced sales or public auction sales, or sales on restricted
> markets, are not always the best criterion of value, and are certainly not conclusive,
> particularly where there is evidence that the property would sell for more under
> different circumstances.

*McGuire v. Commissioner, IRS*, 44 T.C. 801, 808-09 (1965).  In *McGuire*

> the auction sales were made in a limited market and in a manner and under
> conditions over which petitioners had no control....  The hospital was not interested
> in the property, which it could not use, but wanted cash, which it could use.
> Holding the property for sale item by item to individual customers would have
> incurred trouble and expense.  Consequently the hospital directed Sheridan to
> liquidate all the property as soon as reasonably possible.  We do not think that a
> sale of property of the type here involved at auction, particularly at an
> "unrestricted" auction where the property is sold to the highest bidder with no
> minimum bid or number of bids being required, is necessarily indicative of the fair
> market value of the property, particularly where there is evidence that the property
> had an intrinsic value far in excess of the auction sales price and could have been
> sold under other circumstances at a considerably higher price.  We are convinced
> by the evidence that the prices obtained at the auction sales did not reflect the fair
> market value of the property... and that under the particular circumstances in this
> case, in determining fair market value we should give consideration to the price
> this property would sell for if sold in the market and under circumstances in which
> property of this type and quality would normally be sold, and that this should not
> limit us to consideration of the prices obtained at the auction sales.

Id. at 809.

In an admiralty case, the First Circuit held that a successful bid at a judicial auction can be

set aside for gross disparity.  *Munro Drydock Inc. v. M/V Heron*, 585 F.2d 13, 14 (1st Cir. 1978):

> The policy of inspiring confidence in sales under the supervision of the court
> favors confirmation of a sale made to the highest bidder at a fairly conducted
> public auction. But this policy must be weighed against the purpose to be achieved
> by these judicial sales, which is to benefit the creditors and debtor.

9

A similar bid at public auction was held properly overturned in the bankruptcy case *In Re Muscongus Bay Company*, 597 F.2d 11, 12 (1ˢᵗ Cir. 1979) ("That Mr. Abbotoni's bid was the only timely bid and therefore had prevailed as much by default as through a truly competitive bidding process is a further factor favoring the bankruptcy court's decision.")  These cases are not directly on point, because in the admiralty collections action and the bankruptcy liquidation case, the creditors were competing for money from the liquidation, and the only property they could receive payment from was the liquidated property itself.

The argument for rejecting the auction bid here is far more compelling.  The government was not a competing creditor, seeking liquidation of Dr. Lane's property to secure its own property rights.  Far from it.  The government was, in effect, a thief fencing stolen property.  It took the property – without grounds for forfeiture – and obtained a default judgment without making reasonable efforts to give Dr. Lane notice of the forfeiture proceedings.  When he came forward on his own before default judgment was entered, the government fought hard and successfully to deny him the opportunity to be heard in the forfeiture case.  It then managed to sell the Flash II  for pennies on the dollar – over Dr. Lane's objection – after the district court improperly denied his requested stay. .  The only proper remedy is to require the auction sale to be voided or that the government pay Dr. Lane the full fair market value of his interest.

**C.**    **The fair market value here is established by the government's own appraisal and the previously rejected high bid at the 1998 auction**

Two reliable sources place the fair market value of this historic relic in the range of $800,000 to $1,000,000.

At the 1998 auction, the bids for the Flash II did not meet the minimum reserve, but fetched a high bid $ 800,000.  That bid was rejected.  Secondly, the government obtained an appraisal from Guernsey's in 2004, appraising the sailboat at $800,000 to $1,000,000.

There are several reasons why at this forced sale – made over Claimant's objection that a minimum reserve must be set – was not a reliable indicator of fair market value.  Unlike the 1998 auction, the government made no attempt to promote or market the sailboat as a valuable historic relic.  In 1998, the consortium spent considerable trouble and expense (funded entirely by Dr. Lane) to display the sailboat at various museums in New York in the months preceding the 1998 auction – and publicized these events.  No such effort was made before the government liquidated the asset in 2005.

The publicity for the December 16, 2005 auction of Kennedy memorabilia put most of its emphasis on the Robert White collection of Kennedy memorabilia from his presidency and/or Kennedy's Omega wristwatch.  An ABC News story aired on December 14, 2005 (and published on the ABC News website) claimed Flash II was forfeited from a convicted drug dealer.  This claim – more false than true – put a negative stigma on the sailboat, depressing its value to potential buyers.  The Boston Globe's story published November 9, 2005, also publicized the claim that it was forfeited from a "convicted marijuana trafficker" and discussed Dr. Lane's unsuccessful attempts to vacate the default judgment, and his intended appeal.  Any potential buyer who found this story on the internet would be wary of bidding because of the obvious cloud on the government's title arising from Dr. Lane's pending litigation.

In short, the government made no attempt to market the sailboat to achieve its full value.  To the government, this was just another piece of forfeited property being liquidated as quickly as

11

possible and with the least amount of effort.  There was plenty more to be had – for free – where that came from.

The government's auction sale price is not a fair measure of fair market value of the Flash II.  The high bid from the 1998 auction and the Guernsey's appraisal set the minimum threshold for fair market value at $800,000.  That is the fair market value from which Dr. Lane's portion should be determined.

<u>Conclusion</u>

For the foregoing reasons, this Court should grant summary judgment in Dr. Lane's favor on both the non-forfeitability of the property and the measure of damages.

Respectfully submitted,
Kerry Scott Lane, MD,

By his attorneys,


_____/s/ Brenda Grantland_____
Brenda Grantland, Esq.
Law Office of Brenda Grantland
20 Sunnyside Suite A-204
Mill Valley, CA 94941
(415) 380-9108
Pro hac vice


_____/s/ Eric B. Goldberg____
Jeffrey P. Allen (BBO# 015500)
Eric B. Goldberg (BBO# 564398)
Seegel Lipshutz & Wilchins, P.C.
Wellesley Office Park
20 William Street, Suite 130
Wellesley, MA 02481
(781) 237-4400

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          |
                                   |
                Plaintiff,          |
            v.                      |          Civil Action # 05-10192 RWZ
                                   |
ONE STAR CLASS SLOOP SAILBOAT       |
BUILT IN 1930 WITH HULL NUMBER      |
721, NAMED "FLASH II",              |
                                   |
                Defendant.          |
_____    |
                                   |
KERRY SCOTT LANE, M.D.              |
                                   |
                Claimant.           |
_____    |

## CLAIMANT KERRY SCOTT LANE'S
## STATEMENT OF UNDISPUTED FACTS
## PURSUANT TO LOCAL RULE 56.1

1.    The government's theory of forfeiture is that drug proceeds were invested in the Flash II.

      According to the information set forth below, I have probable cause to believe that
      the Sailboat, which is currently owned, in whole or in part, by Gregory Olaf
      Anderson, constitutes property derived from proceeds Anderson obtained, directly
      or indirectly, as the result of narcotics distribution, in violation of the provisions
      of Title 21 of the United States Code (the "Controlled Substances Act") and,
      therefore, that it is subject to seizure and forfeiture pursuant to 21 U.S.C. § 853(a)
      and (f) and/or 21 U.S.C. § 881(a) (6) and (d), as property obtained, directly or
      indirectly, as a result of such violations.

      [Affidavit of Agent Willoughby in Support of Seizure Warrant ¶ 8 (hereinafter
      "WilloughbyAffidavit")]

2.    There is no evidence that Ole Anderson ever invested any money of his own in the

      sailboat. Both Dr. Lane and Chuck Fitzgerald stated that Anderson's contributed sweat

      equity, but to their knowledge Anderson never invested any of his own money in the

1

sailboat. The CW told the government the same thing. ("The CS stated that ANDERSON

invested his time and effort in restoring the boat.") [See Doc. # 45 ¶ 38 and supporting

exhibits.]

3.     The government's theory is that the drug proceeds were supplied by the government's

confidential informant.  "The CS stated that the money 'it' invested was proceeds from

"its" marijuana sales..."   In the DEA 6 reports, the CW called the money a "loan" rather

than an investment of capital.

> During their meeting, the CS asked ANDERSON about the money
> "it" <u>loaned</u> ANDERSON so that he  [ANDERSON] could initially
> purchase the sailboat. ANDERSON told the CS that he had paid the
> CS back for that loan, which ANDERSON stated was between
> $15,000 and $20,000.

Report of Investigation dated 9-28-04  This conversation was recorded by the informant's

wire, and the government retained a copy of it as Exhibit N-168. [See Doc. # 45 ¶ 39 and

supporting exhibits.]

4.     Anderson also called the CW's contribution a loan, and consistently claimed he paid the

informant back for the loan.

> On September 27, 2004, the CW met with Anderson in Beverly,
> Massachusetts. During their meeting, Anderson told the CW that
> he had paid the CW back for the CW's cash contribution to the
> Sailboat. Anderson said that he paid the CW back for everything
> the CW had loaned him to originally purchase the Sailboat.
> Anderson explained that that the CW originally loaned him
> between $15,000 and $20,000 to purchase the boat and that he
> [Anderson] paid the CW back over the course of making two
> "trips" [transporting marijuana] for the CW.")

[See Doc. # 45 ¶ 40 and supporting exhibits.]

5.     In the DEA 6 report of investigation prepared 9-28-04, the CW "*remembered*" that he had

2

paid Anderson back for the sailboat loan:

> During their meeting, the CS asked ANDERSON about the money "it" loaned ANDERSON so that he [ANDERSON] could initially purchase the sailboat. ANDERSON told the CS that he had paid the CS back for that loan, which ANDERSON stated was between $15,000 and $20,000. ANDERSON explained that he paid back the loan by working it off over two "trips" [transporting marijuana] for the CS. ANDERSON stated that he made a total of four (4) trips [transporting marijuana] for the CS but that he had spent most all of the money he had earned while working for the CS [in the marijuana business]. As previously reported, ANDERSON transported marijuana from Arizona to Massachusetts for the CS and was paid approximately $40,000 for each trip. The CS stated that the first trip ANDERSON made was approximately 800 - 1,000 pounds and increased to 1,200 pounds. The CS explained that the money "it" gave to ANDERSON for the sailboat was originally intended to be an investment; however, as time passed, the CS did not expect to earn a profit on the investment and negotiated with ANDERSON to change it to a loan. <u>The CS stated that while speaking with ANDERSON, "it" recalled allowing ANDERSON to pay the CS back (for the sailboat loan) by allowing ANDERSON to work off the loan by transporting the marijuana to Massachusetts.</u>

[See Doc. # 45 ¶ 40 and supporting exhibits.]

## <u>Valuation</u>

6.    The consortium of owners of the Flash II (which included Claimant Kerry Scott Lane, M.D.) put the sailboat up for auction at Guernsey's auction house in New York City in March 1998.  The high bid at that auction was $800,000, but the bid was rejected because it did not meet the minimum reserve. [Complaint Doc. 1 ¶ 16.  Guernsey's 2004 appraisal.]

7.    Before the 1998 Guernsey's auction, the consortium of owners made extensive efforts to advertise and promote the Flash II as a historical relic.

3

In conjunction with that event the boat was exhibited at the New York Historical Society, Seventh Regiment Armory and the atrium of Trump Tower.  This boat has also been exhibited at numerous boat shows and museums including the Museum of Yachting in Newport Rhode Island in 1997.

[Guernsey's 2004  appraisal.]

8.   Arlan Ettinger, president of Guernsey's auction house, performed an appraisal of the

Flash II for the U.S. Marshal Service on November 18, 2004.  The appraisal states:

In our opinion, were the Flash II to be made available to us today, we would place an estimate on it of from $800,000 to $1,000,000 (eight hundred thousand to one million dollars.)  At auction, we believe it would be capable of fetching $1,000,000.

[Guernsey's 2004  appraisal.]

9.   When Claimant's Rule 60(b) motion to vacate default judgment was denied, along with

his motion for reconsideration of that order, claimant moved for a stay of the judgment

pending appeal.  In connection with his motion Claimant submitted a proposed nominal

supersedeas bond of $100, pending further order of the court, but requested waiver of the

supersedeas bond under case law holding a bond is not required for a stay pending appeal

of forfeiture judgments because the government has control of the property. [Doc. # 25-1

p. 2.]

10.   Claimant's motion for a stay stated that "Dr. Lane would stipulate to the interlocutory

sale of the sailboat, provided that a minimum reserve is set in an amount agreed to by Dr.

Lane and the other parties...."  [Doc. # 25-1 p. 2.]   He warned that failure to set a

minimum reserve could result in a sale below fair market value:

Because auctions of forfeited property are considered distress sales they typically result in prices significantly below fair market value

4

– in fact they are often advertised as such.  Given the fact that Dr.
Lane and other co-owners of the sailboat were not served with
notice and given the opportunity to contest the forfeiture before
default judgment was entered, the potential clouds on the title
could deter potential bidders from offering full value.

[Doc. # 25-1 p. 2 n. 1.]

11.    On November 18, 2005 the Honorable Judge Rya W. Zobel denied the stay.  The

endorsed order denying the motion merely states: "Kerry Lane, M.D. may attempt to

work out an escrow arrangement with the Government as to the amount he claims."

[Docket entry for 11/17/2005.]

12.    Dr. Lane's counsel contacted the government in the attempt to negotiate a minimum bid.

The government refused to negotiate.

13.    The sailboat was set for auction by Guernsey's at an auction of John F. Kennedy

memorabilia on December 16, 2005. [E-Bay ad.]

14.    "No agent of the United States informed Guernseys that the forfeiture litigation was still

pending." [US Supplemental Answers to Interrogatories # 16.]

15.    "Guernseys set the starting bid in keeping with their usual procedures.  The United States

did not seek a minimum reserve." [US Supp. Ans. To Interrog. # 17.]

16.    The government apparently made no effort to advertise or promote the Flash II prior to

the auction, such as the consortium of owners had done prior to the 1998 Guernsey's

auction.

17.    Newspaper publicity about the auction of Kennedy memorabilia stressed the White

collection. Articles that mentioned Flash II included the claim that it had been forfeited

from a convicted drug dealer. [ABC News article dated 12/14/2005. Boston Globe article

dated 11/9/2005.]

18.    The Boston Globe article discussed Dr. Lane's attempt to overturn the default judgment

in the forfeiture case and his intent to appeal. [Boston Globe article dated 11/9/2005.]

Respectfully submitted,
Kerry Scott Lane, MD,

By his attorneys,


_____/s/ Brenda Grantland_____
Brenda Grantland, Esq.
Law Office of Brenda Grantland
20 Sunnyside Suite A-204
Mill Valley, CA 94941
(415) 380-9108
Pro hac vice


_____/s/ Eric B. Goldberg_____
Jeffrey P. Allen (BBO# 015500)
Eric B. Goldberg (BBO# 564398)
Seegel Lipshutz & Wilchins, P.C.
Wellesley Office Park
20 William Street, Suite 130
Wellesley, MA 02481
(781) 237-4400

## AFFIDAVIT OF SPECIAL AGENT GREGG A. WILLOUGHBY

I, Gregg A. Willoughby, being duly sworn, depose and state as follows:

### I.    INTRODUCTION

1.    I am a Special Agent with the United States Drug Enforcement Administration ("DEA"), and have been so employed for twelve years.  As a Special Agent of the DEA, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2.    I am currently assigned to the DEA's Boston Field Division.  During my employment at the DEA, I have participated in hundreds of investigations relating to the distribution of controlled substances, including cocaine, cocaine base, heroin, marijuana, methamphetamine, and other illegal drugs.  I have received extensive training in the aspects of narcotics investigations.  I have sworn out numerous affidavits in support of search warrants, arrest warrants and other applications. Since approximately August of 1997, I have been assigned to the DEA's Cross Border Initiative ("CBI") Task Force in Lowell, MA. This task force includes representatives from a variety of federal, state and local law enforcement agencies, including the DEA, the Massachusetts State Police, the Lowell, Massachusetts

1

10

USDocReqResp000010

Police Department, the Wilmington, Massachusetts Police
Department, the Haverhill, Massachusetts Police Department, the
Salem, New Hampshire Police Department, and the Essex County,
Massachusetts Sheriff's Department.

     3.    During the course of my employment with the DEA, I have
received specialized training regarding the activities of
narcotics traffickers, including the methods used to package,
transport, store, and distribute narcotics, and the methods used
by narcotics traffickers to conceal and launder the proceeds of
their narcotics trafficking activities.

     4.    In addition to my training, I have had extensive
experience in the investigation of the activities of narcotics
traffickers. Since joining the DEA, I have participated in
hundreds of narcotics investigations as a case agent and in
subsidiary roles. I have debriefed numerous defendants,
informants, and witnesses who had personal knowledge about
narcotics trafficking activities and the operation of narcotics
trafficking organizations. I personally have participated in
almost all aspects of narcotics trafficking investigations,
including but not limited to conducting surveillance, acting in
undercover capacities, using confidential informants, executing
arrest and search warrants, and conducting court-authorized wire
and electronic surveillance.

     5.    Based upon my training and experience, I am familiar

11

USDocReqResp000011

with narcotics traffickers' methods of operation, including the
distribution, storage, and transportation of narcotics and the
collection of money that constitutes the proceeds of narcotics
trafficking activities.

6.    Specifically, I am familiar with the manner in which
narcotics traffickers use vehicles, common carriers, mail and
private delivery services, and a variety of other means to
transport and distribute narcotics and the proceeds of narcotics
trafficking.  I also am familiar with the manner in which
narcotics traffickers use telephones, coded or slang-filled
telephone conversations, pagers, coded pager messages, and other
means to facilitate their illegal activities.

7.    I also am familiar with the vernacular of users and
distributors of controlled substances and the methods by which
such persons attempt to disguise the subjects of their
conversations and operations.

8.    I submit this Affidavit in support of a Seizure Warrant
for the Star Class Sloop Sailboat built in 1930 with hull number
721, named *Flash II* and once owned by President John F. Kennedy
and Joseph P. Kennedy (hereafter, the "Sailboat").  According to
the information set forth below, I have probable cause to believe
that the Sailboat, which is currently owned, in whole or in part,
by Gregory Olaf Anderson, constitutes property derived from
proceeds Anderson obtained, directly or indirectly, as the result

3

12

of narcotics distribution, in violation of the provisions of Title 21 of the United States Code (the "Controlled Substances Act") and, therefore, that it is subject to seizure and forfeiture pursuant to 21 U.S.C. § 853(a) and (f) and/or 21 U.S.C. § 881(a)(6) and (d), as property obtained, directly or indirectly, as a result of such violations.

9.    Since in or about February 2004, I have participated in an investigation of Gregory Olaf Anderson, a/k/a "Ole Anderson", a/k/a "Lance" (hereafter, "Ole" or "Anderson") and others, by the DEA, for distribution of marijuana.  This Affidavit does not contain every detail I and other law enforcement personnel have learned during the course of this investigation, but rather is intended to demonstrate probable cause for this seizure warrant.

10.   The information contained in this Affidavit is based upon my own personal observations, as well as observations of other officers and agents, made during the investigation, and information provided by a cooperating witness (hereafter referred to as the "CW").  The CW is deemed to be reliable and accurate because it was in a position to have personal knowledge of the information it has provided and much of the information it has provided has been corroborated by independent investigation.  The CW has also provided information in other related investigations that has proved to be accurate and reliable.  Specifically, the CW's information has led to indictments of other marijuana

4

13

traffickers, the conviction of at least one other trafficker and to the seizure of large amounts of marijuana and U.S. currency. To the best of my knowledge and belief, the CW has not provided any false information.

**Overview of the Investigation**

11.  During numerous interviews from December 2003 to the present, the CW provided detailed information relative to "its" marijuana trafficking organization to me, other agents and police officers participating in the investigation of a large-scale marijuana trafficking organization in Massachusetts.  The CW stated that "it" used to distribute large amounts of marijuana to several customers in Massachusetts.  The CW identified several of "its" criminal associates that sold, purchased and otherwise assisted the CW in "its" marijuana trafficking.  Specifically, the CW stated that "it" purchased up to 3,000 pounds of marijuana on a monthly basis from suppliers in Arizona and elsewhere over a period of several years.  The CW then had individuals transport the marijuana from Arizona to Massachusetts where the CW would then distribute the marijuana to several customers.  The CW identified "Ole Anderson", a/k/a "Lance", as one of the CW's marijuana transporters.  On February 20, 2004, the CW stated that "Ole" Anderson was currently residing in Florida.  The CW also stated that Anderson served approximately one year in an Arizona prison for a conviction related to transporting the CW's

5

USDocReqResp000014

marijuana.  I later confirmed from Arizona state criminal history records and with the Arizona Department of Corrections that Anderson was arrested on or about December 3, 2001 for transporting and/or selling marijuana (approximately 1,322 pounds).  Anderson was convicted of that charge and sentenced to serve one and a half years in an Arizona state prison.

12.  In October and/or November 2003, Anderson contacted the CW.  Anderson told the CW that he had met someone in prison who was able and willing to supply him and the CW with large amounts of marijuana and that the supplier was willing to deliver the marijuana to any location that he and the CW wanted it to be delivered.  Anderson also asked about selling marijuana to some of the CW's customers based in Massachusetts.

13.  On or about April 5, 2004, the CW placed a call to Anderson's cell phone and received an answer from Anderson. During the call, the CW refers to Anderson by his nickname, "Lance".  Also during their call (which was not recorded), Anderson asked the CW to call him back within a week.  On April 12, 2004, the CW called Anderson again and recorded the call. During the call, Anderson, in cryptic terms, indicated that he had not spoken with his potential marijuana supplier and that he needed a little more time.  Anderson also told the CW that he wanted to try and sell "Kennedy's" boat and that he was planning on traveling to Marblehead, Massachusetts (where the boat was

6

15

stored) in or around May 2004 to take the boat out of storage to
ready it for sale and to look for possible parties interested in
purchasing it.

14.  On April 12, 2004, the CW stated that it first met
Anderson several years ago through Anderson's older brother, Jim
Anderson (hereafter, "Jim Anderson").  The CW used to buy small
amounts of marijuana (user amounts) for a friend at that time
from Jim Anderson.  The CW only knows Anderson by the nicknames
"Ole Anderson" and "Lance".  The CW described Anderson as a white
male from Florida, approximately 55 years old, approximately
5'10" tall and 180 lbs., with blondish hair and blue eyes.  On
May 3, 2004, the CW identified a photograph obtained from the
Arizona Department of Corrections of Gregory Olaf Anderson
displayed in an array, as the person the CW knew as "Ole
Anderson" and "Lance".

15.  The CW stated that "it" used to transport marijuana
from Texas to Massachusetts for Joseph Milo and Paul Nicolo.
After a while, the CW began investing "its" own money into the
marijuana business.  The CW started purchasing marijuana from
Mark Wojciechowski (the Texas-based marijuana supplier at the
time) in addition to what the CW transported to Massachusetts for
Milo and Nicolo.  One of the individuals the CW sold "its"
marijuana to was Jim Anderson in Florida.  According to the CW,
Jim Anderson used to purchase between 20 and 100 pounds of

7

16

USDocReqResp000016

marijuana from the CW at a time for approximately $900 to $1,000
per pound.  On one or more occasions, Anderson actually picked up
the marijuana from the CW on behalf of his brother, Jim.  The CW
also learned from Anderson that he [Anderson] maintained
marijuana customers in New Hampshire and possibly the Virginia
area.  The CW reported to me that Anderson had long been involved
in smuggling marijuana and that Anderson knew that the CW's
primary form of income was from the sale of marijuana.

    16.  Around the time the CW supplied Jim Anderson with
marijuana, Anderson purchased a sailboat previously owned by
President John F. Kennedy.  According to the CW (which the CW
learned from Anderson), President Kennedy sailed that boat in
races off of Hyannis, Massachusetts.  Although the CW did not
know how much Anderson paid for the boat, the CW stated that "it"
invested approximately $12,000 to $15,000 in cash at Anderson's
request.  Another person, possibly a doctor or dentist, also
invested roughly the same amount.  The CW stated that the money
"it" and the other investor invested covered the purchase price
and materials Anderson used to repair and refurbish the Sailboat.
Anderson told the CW that he was going to refurbish the boat and
sell it for a significant profit based on the Sailboat's
association with President Kennedy and its historical value.  The
CW understood that "it" and the other investor were each to
receive 20 percent of the profit.  The CW stated that the money

8

17

it invested was proceeds from its marijuana sales to Jim Anderson
and other customers.  The CW stated that Anderson brought the
boat to an auction in New York a few years ago and received a bid
of approximately $800,000 for the Sailboat.  Anderson turned down
the offer, believing that he could sell the boat for $1,000,000
or more.  The CW stated that Anderson purchased the boat
somewhere on the west coast of Florida and that he has documents
authenticating that the Sailboat was once owned by President
Kennedy.

    17.  In or around 2001, the CW lost one of its drivers
(marijuana transporters) and hired Anderson as a replacement.  At
the time, the CW was purchasing as much as 3,000 pounds of
marijuana from individuals known by the CW as "The Reverend",
"Cowboy" [identified as Michael Twarog] and/or from suppliers
known by Mark Wojciechowski [one of whom was identified as Luis
Dominguez].  Wojciechowski was a close associate of the CW's and
assisted the CW in almost every aspect of the CW's marijuana
business, as well as broker marijuana sales between the CW and
Wojciechowski's suppliers.  The CW could not recall the exact
timing of hiring Anderson but believed it was in the time period
of the CW's transition from buying marijuana from "Cowboy" and
"The Reverend".  The CW stated that "it" negotiated to pay
Anderson a set fee of $40,000 (possibly up to $50,000) per
marijuana load Anderson transported.  The CW also had Edward

9

18

Parker driving a second truck (transporting marijuana and money) for the CW at the time Anderson was hired. The marijuana the CW obtained in Arizona was divided into two loads and transported by Anderson and Parker in two pick-up trucks from Arizona to Massachusetts. The CW estimated that Anderson transported between four and eight loads of marijuana, ranging from approximately 800 pounds to 1,200 pounds each load, from Arizona to Massachusetts for the CW. Anderson's role as one of The CW's transporters ended when he [Anderson] was arrested by local law enforcement authorities in Arizona on or about December 3, 2001. The CW stated that Anderson was stopped shortly after leaving Tucson with 1,200 pounds of the CW's and Wojciechowski's marijuana. The other pick-up truck, driven by Parker, successfully delivered 1,200 pounds of marijuana to the CW in Massachusetts. According to the CW, part of the 1,200 pounds in Anderson's truck was owned by Wojciechowski. It should be noted that Edward Parker was arrested in November 2003 in Iowa transporting approximately 1,325 pounds of marijuana in the back of a pick-up truck. The CW admitted that the marijuana Parker was transporting at that time was owned by the CW and that Parker was driving it (what the CW believed to be 1,200 pounds) from Arizona to the CW in Massachusetts. Additionally, based on the CW's information and cooperation, Mark Wojciechowski was arrested in Tucson, Arizona in January 2001 transporting approximately 601

10

19

pounds of marijuana.  Furthermore, Michael Twarog and four others
were arrested in Tucson in March 2004 in relation to the seizure
of approximately 2,000 pounds of marijuana.

18.  After Anderson was arrested in December 2001, he spoke
with the CW and implied that he would inform the police about the
CW unless the CW paid him.  The CW agreed to pay Anderson [for
his silence] and detailed that "it" paid Anderson the $40,000
United States currency for Anderson's transportation fee, an
additional $50,000 cash for Anderson's silence and Anderson's
defense attorney's fee, which was approximately $20,000.  The CW
also gave up the right to "its" twenty percent share of the
profit from Anderson's sale of President Kennedy's Sailboat, as
well as other concessions.  The CW had also loaned Jim Anderson
approximately $20,000 and forgave that loan on behalf of
Anderson.

19.  In or around October or November 2003, the CW was
contacted by Anderson.  Anderson had recently been released from
prison in Arizona after serving about one year.  During their
conversation, Anderson told the CW that he had met and befriended
a Mexican National (Anderson did not provide a name) while in
prison.  Anderson explained that the Mexican National was part of
a large marijuana trafficking organization capable of supplying
the CW with marijuana.  Anderson further detailed that the
Mexican National would deliver the marijuana to any location in

11

USDocReqResp000020

the United States without having to receive the payment until time of delivery, which, at that time, the entire payment would be due.  Anderson told the CW that the Mexican supplier was due to be released from prison in or around the end of March or beginning of April 2004.  The CW told Anderson that "it" was retiring from the marijuana business at which time Anderson asked that the CW turn "its" marijuana customers over to him.

20.  On May 3, 2004, I and other law enforcement agents met with the CW.  During the meeting, the CW stated that it had placed a call to "Ole" Anderson (now identified as Gregory Olaf Anderson) on Anderson's cell phone on April 30, 2004.  Anderson did not answer and the CW left a message on Anderson's voice-mail.  The CW placed another call to Anderson on the morning of May 3, 2004, and had a lengthy conversation with him.  In summary, the CW spoke with Anderson about Anderson's Sailboat.  Anderson told the CW that the boat's name was "*Flash II*" and that it was built in 1930.  The Sailboat is a "Star", which Anderson described as an Olympic class racing Sailboat.  Anderson further detailed that President Kennedy and his brother Joe Kennedy purchased the boat in 1934.  President Kennedy sold the boat in 1942 just before he shipped out to the Pacific theater during World War II.  Anderson also informed the CW that he was storing the boat at the Marblehead Trading Company in Marblehead, Massachusetts.  Anderson told the CW that he is still trying to

12

21

sell the Sailboat and that he is asking $1.2 million for it, although willing to negotiate. Anderson told the CW that he believed he could get $1 million or more based on the sales of other JFK-related items. Anderson stated that he displayed the Sailboat on the deck of the Aircraft Carrier "*John F. Kennedy*" during the tall ships tour in Boston approximately four years ago. Also during the call, Anderson stated that he was traveling "down there" (which the CW understood from past conversations to mean Cuba) on June 1st and that he didn't think that he would be able to make it to Massachusetts until August. Anderson stated that he wanted to go to Marblehead to complete some work on the Sailboat in order to prepare it for sale. The CW and Anderson agreed to contact each other after Anderson returned [from Cuba]. The call between the CW and Anderson on May 3rd was consensually recorded.

21.   On September 27, 2004, the CW met with Anderson in Beverly, Massachusetts. During their meeting, Anderson told the CW that he had paid the CW back for the CW's cash contribution to the Sailboat. Anderson said that he paid the CW back for everything the CW had loaned him to originally purchase the Sailboat. Anderson explained that that the CW originally loaned him between $15,000 and $20,000 to purchase the boat and that he [Anderson] paid the CW back over the course of making two "trips" [transporting marijuana] for the CW. Anderson told the CW that

13

22

he had made a total of four "trips" [transporting marijuana] for

the CW.  According to the CW and as detailed earlier, Anderson

transported between 800 pounds to 1,200 pounds of marijuana

(approximately) during each trip for the CW.  Anderson told the

CW that he is asking $1.2 million for the Sailboat but is willing

to accept $900,000.  During the meeting, Anderson also gave the

CW photo-copies of documents that he [Anderson] said authenticate

the Sailboat having once owned by President Kennedy.  The

documents include news articles, documents from International

Star Class Yacht Racing Association, photographs, a letter dated

August 6, 1997 addressed to Mr. Ole Anderson from United States

Senator Edward M. Kennedy, and a bill of sale documenting that G.

Olaf Anderson purchased the boat from Ouida M. Ehler on August 2,

1996 in consideration of $10.00 and "other good and valuable

consideration."  After the meeting, the CW turned these documents

over to me.  The CW and Anderson also discussed the possibility

of completing future marijuana business.  Anderson told the CW

that he was not successful at contacting the marijuana supplier

he met while serving his prison term in Arizona.  Anderson also

said that he still has marijuana customers in New Hampshire and

Florida and asked whether the CW was able to deliver marijuana to

Florida.  The meeting between the CW and Anderson on September

27, 2004 was consensually recorded.

    22.  On September 28, 2004, the CW spoke with Anderson by

14

**23**

USDocReqResp000023

telephone.  During their conversation, Anderson told the CW that
he originally paid $20,000 for the Sailboat and that the bill of
sale only reflects $10.00 because of "tax" reasons.  Anderson
also said that he intends to keep the boat stored at the
Marblehead Trading Company.  The call between the CW and Anderson
on September 28th was consensually recorded.

23.  Based on the facts outlined in this Affidavit, I have
probable cause to believe that the Star Class Sloop Sailboat
built in 1930 with hull number 721, named Flash II and once owned
by President John F. Kennedy and Joseph P. Kennedy is subject to
seizure and forfeiture to the United States pursuant to 21 U.S.C.
§ 853(a) and (f), and/or 881(a)(6) and (d) because it constitutes
property constituting or derived from proceeds obtained, directly
or indirectly, as the result of  violations of Title 21.  I
believe that a seizure warrant is necessary because the Sailboat
is capable of being moved, sold, or transferred by the owner.  I
therefore request that the Court issue a warrant for the seizure
of this Sailboat.


_____

GREGG A. WILLOUGHBY
Special Agent
Drug Enforcement Administration


Subscribed and sworn to before me, this ___ day of October, 2004


_____

United States Magistrate Judge

15

24

USDocReqResp000024

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action # 05-10192 WGY |
| | ) | |
| ONE STAR CLASS SLOOP SAILBOAT | ) | |
| BUILT IN 1930 WITH HULL NUMBER | ) | |
| 721, NAMED "FLASH II", | ) | |
| Defendant. | ) | |

### UNITED STATES' SUPPLEMENTAL RESPONSES TO INTERROGATORIES

The United States of America, by its attorney, Michael J. Sullivan, United States

Attorney for the District of Massachusetts, provides the following responses to the

interrogatories propounded by Kerry Scott Lane, M.D. (the "Interrogatories"), pursuant to

Federal Rules of Civil Procedure 26 and 33.

### GENERAL RESPONSES AND OBJECTIONS TO INTERROGATORIES

The General Objections are re-incorporated herein by reference.

### SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES

### INTERROGATORY NO. 15
Identify the provenance or other documentation of ownership the government provided to
the Guernseys auction house to establish that the U.S. owned the sailboat when placing the item
up for auction.

### ANSWER TO INTERROGATORY NO. 15

No supplementation is required.

### INTERROGATORY NO. 16

State whether the United States informed Guernseys that the forfeiture litigation was still
pending.  If so,

a. state with particularity what you told Guernseys regarding the status of Dr.
Lane's attempt to vacate the default judgment to defend his interest in the
property;

b.  identify the government agents and Guernseys employees who participated in
each of the conversations mentioned in subsection 14a;
c.  identify any documents given Guernseys regarding Dr. Lane's attempt to
vacate the default judgment to defend his interest in the property;
d.  state with particularity what you told Guernseys about Dr. Lane's request to
set  a minimum reserve.

## ANSWER TO INTERROGATORY NO. 16

No agent of the United States informed Guernseys that the forfeiture litigation was still
pending.

## INTERROGATORY NO. 17

State how the United States and Guernseys arrived at the following figures regarding the
value and sale of the sailboat:

a.  the estimated value;
b.  the starting bid; and
c.  the minimum reserve; and
d.  identify any documents provided to Guernseys to document the estimated
value, or relating in any way to the matters in subsection a through c.

## ANSWER TO INTERROGATORY NO. 17

Guernseys provided the information regarding the estimated value to DEA at the time of
the initial seizure.  Guernseys set the starting bid in keeping with their usual procedures.  The
United States did not seek a minimum reserve.  No documents were provided to Guernseys in
relation to items a through c.

## INTERROGATORY NO. 18

With regard to the Guernseys auction state the following:

a.  the name and address of the person or entity who purchased the sailboat;
b.  the price paid;
c.  how many bids there were, and the amount of those losing bids; and
d.  state whether the successful bidder is related  – either by blood, by marriage,
or through a business partnership, agency or other business relationship – to any
party in this case, including government agents on the case, the Confidential
Informant, and Harry E. Crosby.

## ANSWER TO INTERROGATORY NO. 18

a.      Frank L. Harvey, 8733 Banzer, Houston, Texas.
b.      $100,000.00.
c.      Unknown.
d.      The government has no information to indicate that the buyer was related to any

of these persons.

**INTERROGATORY NO. 19**

Identify any and all documents in your possession documenting the matters in interrogatory 16.

**ANSWER TO INTERROGATORY NO. 19**

No supplementation is required.

Signed under the pains and penalties of perjury this19th day of March 2007.

/s/ Mary Magno by NBR
per telephone authority
Mary Magno
Property Mgmt. Specialist

Objections made by:

MICHAEL J. SULLIVAN
United States Attorney

By:     /s/ Nancy Rue
Nancy Rue
Assistant U.S. Attorney
U. S. Attorney's Office
John Joseph Moakley
United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA  02210
617 748-3100

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing interrogatory responses were served upon Brenda Grantland, Esq., by email, this 19th day of March 2007.

/s/ Nancy Rue
NANCY RUE

S.S. UNITED STATES
PRESIDENT JOHN F. KENNEDY
THE McGWIRE BALL · MICKEY MANTLE
ARTWORK OF THE SOVIET UNION
ELVIS PRESLEY · JERRY GARCIA
SPORTING AUTOMOBILES

PH: 212.794.2280
FAX: 212.744.3638

AUCTIONS@GUERNSEYS.COM
WWW.GUERNSEYS.COM

# GUERNSEY'S

A LEADER IN THE SALE OF UNIQUE PROPERTIES AT AUCTION
108 EAST 73RD STREET · NEW YORK · NY 10021

## FLASH II
### John F. Kennedy's Star Class Sailboat

## DESCRIPTION & HISTORY

DIMENSIONS:    22 feet long
              8 feet wide
              35 feet mast
WEIGHT:        760 pounds

Registered as #721 by the International Star Class Yacht Racing Association.

Believed to have been originally built in 1930 by Ole Hope for Hercules B. Atkin, this sleek sloop was pur-
chased in 1934 by John F. Kennedy and his older brother Joseph Kennedy, Jr. The Kennedy's keen interest in
sports, and particularly the water sports they enjoyed during their summers in Hyannisport was well known. Their
enthusiasm and passion for sailing and swimming usually evolved into heated competitions among the brothers,
their family, and friends. With the purchase of this 22-footer, John F. Kennedy was able to further hone his
sailing skills as a member of the Nantucket Sound Star Fleet.

Star boats were exceedingly tricky to sail because of their towering masts and narrow hulls, but Flash II was an
especially fast boat and in it John F. Kennedy became an exceptional sailor, winning many races at the Wianno
and Hyannisport Yacht Clubs. Kennedy won high acclaim when he triumphed in one race in an unprecedented
four-minute victory. As stated in a publication from the time, "...the amazing win by John Kennedy in his
Nantucket Sound Flash II in the last race by nearly four and a half minutes, an almost unprecedented margin
for a Blue Star event."

Throughout the summer months, John F. Kennedy spent hours each day sailing with close friends, often the very
people who would later serve him as key political advisors, including Lem Billings. Kennedy's poor health as a
child was nourished with his fervor for sailing, and undoubtedly it was his water activities that helped physical-
ly strengthen him. Having been a weak and sickly youngster, Kennedy fell ill again during his college years and,
through his therapeutic water activities, regained much of his health and strength. His time aboard his sloop,
Flash II, clearly played a large part of this rehabilitation.

In 1940, John F. Kennedy removed his brother Joe's name from the boat registry, and shortly thereafter, in 1942,
he sold Flash II. The boat was kept in storage for many years, after which its most recent owner undertook
a meticulous and thorough restoration. Over 90% of the sloop is original and during its restoration, great care
was taken to use materials from the era, although they were often difficult to obtain. Craftsmen with the high-

124

A DIVISION OF MARIAN ENTERPRISES, LTD

USDocReqResp000124

est possible level of expertise were carefully selected to help restore the boat, ensuring that Flash II would be returned to its' original condition. Details of this restoration include a white body finished with linseed oil-based enamel paint, polished fittings in bronze and wood trim pieces that include a Spanish cedar-varnished splash rail.

Flash II was included as Lot #80 in Guernsey's John F. Kennedy Auction, conducted in March, 1998 in New York City. In conjunction with that event the boat was exhibited at the New-York Historical Society, Seventh Regiment Armory and the atrium of Trump Tower. This boat has also been exhibited at numerous boat shows and museums including the Museum of Yachting in Newport Rhode Island in 1997.

APPRAISAL

In our opinion, were the Flash II to be made available to us today, we would place an estimate on it of from $800,000 to $1,000,000 (eight hundred thousand to one million dollars.) At auction, we believe it would be capable of fetching $1,000,000.

We offer the above opinion based on our thirty years of experience selling high end items relating to legendary figures primarily from the twentieth century. For example, Guernsey's sold the rock-era guitars of Jerry Garcia (Grateful Dead) for approximately $1million each and the home run record setting baseball hit by Mark McGwire for $3million. The firm has sold many vintage automobiles for substantial amounts and conducted what many view as the most highly regarded auction of boats and boating artifacts when we held our Yachting Auction on the grounds of the Museum of Yachting in Newport, Rhode Island. Other nautical events conducted by Guernsey's would include the sale of the contents of the ocean liner SS *United States* (the world's largest auction) and our recent Titanic Auction held at New York's South Street Seaport Museum. In addition to working closely with many of our nation's finest museums, we have proudly represented our government in such matters as the appraisal and sale of the Calumet Farm Thoroughbred Racing Trophy Collection. Of course, auctions including material relating to John F. Kennedy, Franklin Roosevelt and many other presidents have long been a mainstay of this company.

Arlan Ettinger
President

November 18, 2004

125



# Kennedy Collection Up for Auction

## Items Range from Personal to Presidential

**Dec. 14, 2005**  - Many people know that John F. Kennedy was the youngest American president ever elected. They also know his family -- an American political dynasty -- is often thought of as American royalty. Many people do not know, however, that Kennedy was a chronic doodler.

Many of Kennedy's personal memorabilia -- including the doodles he drew on White House stationery during the Cuban Missile Crisis -- will be auctioned in New York City from Dec. 15 to 17.

All but 5 percent of the auction, which features 1,800 lots, comes from the Robert White Collection, which includes the former president's drawings of sailboats and his children. Bids can also be placed on eBay in January. The auction is expected to take in between $5 million and $10 million.

"This collection is the most famous Kennedy collection in the world -- apart from the one in the Kennedy Museum," said Arlan Ettinger, president and founder of Guernsey's Auction House. Many of the items were given to Robert White by Kennedy's longtime secretary, Evelyn Lincoln, Ettinger said.

In addition to the wealth of historical items, the auction features personal things -- like the president and first lady's passports. One can even see where Jackie Kennedy crossed out her maiden name, Bouvier, and wrote in her married name. Also up for bidding is the watch the president wore during his 1961 inauguration speech. It was a gift from friend Ambassador Grant Stockdale.

Other items include a sailboat that the 19-year-old Kennedy bought with his brother Joe Kennedy Jr., who died in World War II. Jackie Kennedy later gave a similar boat to their son John F. Kennedy Jr., which is also being auctioned.

From the darker side of the Kennedy legacy, there are items related to the president's 1963 assassination including the itinerary for that November day and the flags on the limo he was riding in when he was shot to death. There is also a note from the first lady that reads: "There will never be another Camelot."

Some of the items have potential to be quite affordable as there is no reserve, which means there is no minimum price, Ettinger said.

**Here is a sample of the items available and some estimated prices:**

## OMEGA WRISTWATCH

• Kennedy's Omega wristwatch is believed to be in working condition. He wore it during his inauguration. It was given to him by his friend Grant Stockdale, who became his ambassador to Ireland.
• The engraving reads: "President of the United States John F. Kennedy from his friend Grant."
• It was given to Kennedy before the 1960 election. He wore it throughout 1961 and whenever he saw Stockdale.

## FLASH II SAILBOAT

• The Flash II, a Star Class sloop, purchased by Kennedy and his brother Joe when Kennedy was 19.
• Joe Kennedy Jr. was killed Aug. 12, 1944, while at war as a Navy flier.
• The boat was seized from a convicted drug dealer in 2004, forfeited to the government, and is being sold on consignment for the U.S. Marshals Service.

## BEETLE CAT SAILBOAT

• The 12-feet by 4-inch sailboat was ordered in 1969 by Jackie Kennedy from the Beetle Cat Boat Division of Concordia Yachts.
• She purchased it so that son John could use it to learn to sail.
• The boat is considered a "classic-style" sailboat.
• It was shipped to the Kennedys in Greece, where they lived at the time.
• It was later sent to Hyannis Port, where it was kept in storage until this auction.
• The boat is not from the Robert White Collection.
• Expected sale price: $40,000 to $60,000.

## TEXAS ITINERARY

• One typed page with listings of Kennedy's appointments on Nov. 21 and 22 in 1963 -- including arrival at Love Field and motorcade through Dallas.

## FLAGS

• The American flag and the Presidential Flag were used throughout Kennedy's administration on all motorcades, as well as on the convertible limo the president was in when he was fatally shot on Nov. 22, 1963.
• The flags remained on the limo until Nov. 25, 1963, the day Kennedy was buried, when they were removed and replaced by new ones.
• Etiquette requires that two flags be flown on any vehicle the president is riding in and the flags be of "approximately equal size" with the American flag on the right front fender. The American flag is

slightly larger than the Presidential Flag.

## JACKIE'S 'CAMELOT' NOTE

• The handwritten note to Evelyn Lincoln is in black ink on a White House stationery card.

## DOODLES

• Kennedy's doodles were drawn on a sheet of White House stationery at a meeting in the Oval Office on the Cuban Missile Crisis. The notations include "Blockade Cuba," "NATO" and "Fidel Castro," as well as a drawing of a sailboat.
• The Second Cuban Missile Crisis doodle has "good" written several times across the top and "bad" five times across the bottom. "Haiti" is also written and crossed out.
• The Kennedy drawings were done for daughter Caroline in Palm Beach, Fla., in 1960. She requested that her father draw her cats, dogs and houses -- this picture in blue ink is the result.

## JACKIE'S POSSESSIONS

• Essex Fox Hounds Trophy was awarded to Jackie Onassis for "Ideal Time" in the 1992 Hunter Pace. She rode "Be Frank." Expected sale price: $2,000 to 3,000.
• Wool Cooler Horse Blanket with "JKO" monogram. Expected sale price: $1,500 to $2,500.
• One-piece sarong-style bathing suit is styled in a cotton print of light-blue butterflies on a white background. The label reads "Reel Poise 4 Bestlyne Co. New York."
• Bodice-fitting bathing suit has shoulder straps and back zipper. The label reads "Catalina Created in California."

Copyright © 2007 ABC News Internet Ventures

Boston Globe

Date 11/9/05 Page B1 & B7

# Place your bid for JFK sailboat

## Other presidential items set for auction

### By Shelley Murphy
GLOBE STAFF

A sleek, 22-foot sailboat that John F. Kennedy raced off Cape Cod as a teenager will go to the highest bidder next month in New York City when Guernsey's auctions offers one of the largest collections of JFK memorabilia ever to go on sale.

The Omega watch Kennedy wore at his presidential inauguration, the "hot line" telephone he carried while away from the White House, and passports belonging to the late president and his wife, Jacqueline, will also be on the block.

But one item is in a category of its own: the Flash II, a Star class sloop — with a past.

The boat was seized from a convicted drug dealer last year, forfeited to the government, and is being sold on consignment for the US Marshals Service.

And now, with the boat expected to draw a handsome price, a Florida


LAURIE SWOPE, ASSOCIATED PRESS/FILE 1997
The Flash II was seized from drug trafficker Gregory "Ole" Anderson (above) last year by the Drug Enforcement Administration.

anesthesiologist urged a federal appeals court in Boston yesterday to order a judge to reconsider the doctor's claim that he has a stake in the boat.

In papers filed with the US District Court in Boston, a lawyer for Dr. Kerry Scott Lane said the doctor is not trying to stop the auction, but he wants Guernsey's to set an appropriate minimum bid, and wants the money from the sale placed in escrow until his challenge is resolved.

But US Attorney Michael J. Sullivan said Lane's appeal lacks merit, noting a judge has already ruled twice that the doctor knew in October 2004 that the boat had been seized, but failed to stake a claim until after the vessel was forfeited in July.

The Flash II, which the late president owned for six years and sold in 1942, was seized by the Drug Enforcement Administration after a cooperating witness asserted it was bought with drug profits in 1996 by Gregory "Ole" Anderson, of Florida, a convicted marijuana trafficker.

Ownership of the boat has been a matter of contention.

The government alleged that Anderson was the primary or sole owner of the boat.

But Anderson told the Globe last year that the primary owner was a doctor, whom he wouldn't identify, and that drug profits were never used to buy the boat or restore it.

He said that others invested money in the boat, while he invested years of "sweat equity" restoring the vessel, with the understanding that he'd get a percentage of the sale.

Lane acknowledged that Anderson told him DEA had seized the boat last year from its storage spot at the Marblehead Trading Company in Marblehead.

Lane said he didn't come forward at the time to tell the government he had invested $60,000 in legitimate money in the boat because he had just joined the staff at St. Anne's Hospital in Fall River.

"I was concerned about my hospital privileges at a new job," said Lane, adding, "I didn't want to be associated with a drug dealer."

Lane said he learned only in July that the government had filed a forfeiture claim in US District Court in Boston last February.

Another Florida man, Harry Crosby, did come forward to contest the forfeiture, claiming he had invested $10,000 in the sailboat, and US District Judge Rya Zobel ordered the government to give him a third of any profits it makes from the sale.

The US Marshals Service has been authorized by the court to sell the boat and after shopping around, decided it would attract the highest price at Guernsey's auction, said Bill Ryan, administrative officer for the marshals in Boston.

Ryan said the DEA had the boat appraised at about $800,000, based on a bid of that amount for the Flash II in 1998, when Guernsey's offered it at another JFK memorabilia auction.

Anderson rejected that bid, holding out for $1 million.

USDocReqResp000109



Boston Globe

Date 11|9|05    Page B14 67

The boat was built in 1930. Kennedy, then 17, and his older brother, Joe, bought the vessel four years later and Kennedy, a member of the Nantucket Sound Star Fleet, raced the boat to an Atlantic Coast championship.

Arlan Ettinger, president and founder of Guernsey's, said yesterday he was reluctant to estimate the value of the sailboat and didn't plan to set a minimum bid. But he said he was confident it would get the maximum price at the auction, running Dec. 13-17, with bids also being placed simultaneously on eBay.

"This clearly is the most comprehensive auction relating to JFK that has ever been held or ever will be held," said Ettinger, calling the boat one of his personal favorites.

"You'll never see another collection of the numbers or quality like this coming across the block again, so this is its day," said Ettinger.

USDocReqResp000110



eBay | eBay Motors | sign in

eBay | eBay Motors | sign out

HOME | BROWSE | SEARCH | REGISTRATION | SERVICES | HELP

Back to home page

Catalog:              John F. Kennedy - The Robert White Collection
eBay Live Auctions: Collectibles & Memorabilia > Historical > Live Auction Seller

# Flash II, John F. Kennedy's Star Class Sailboat

Item number: 6578391031

**Bidder or seller of this item?** Sign in for your status

**Bidding has ended for this item**



View larger picture

| | |
|---|---|
| Closed at: | **US $100,000.00** |
| Estimate: | US $200,000.00 - US $1,000,000.00 |
| History: | 1 bid |
| Lot number: | 741 (View all lots) |
| Auction Date: | Dec-16-05 07:00:00 PST |
| Auction Currency: | US $ (U.S. dollar) |
| | Currency Calculator |
| High Bid: | Live Auction Floor Bidder |
| Item location: | New York City |
| You can also: | Email to a friend |

Meet the seller

Seller: guernseys_auction
( 151 ⭐ ) me

Feedback: **88.4% Positive**
Member: since Apr-18-02 in United States

- Read feedback comments
- Ask seller a question
- Add to Favorite Sellers
- **View seller's other items**

Buy safely
1. **Check the seller's reputation**
   Score: 151 | 88.4% Positive
   Read feedback comments
2. **Check how you're protected**

Description







The Star Class sloop, Flash II, shot through the water, manned with the skill and expertise of a world class navigator. It was the summer of 1936 and 19 year old John F. Kennedy was in his prime at the helm of his favorite sailboat, Flash II. Kennedy loved to pilot the boat and direct the crew, exhibiting, as a young man, the leadership that would one day lead him to the White House.

Originally built in 1930 by Ole Hope, this sleek sloop was purchased in 1934 by John F. Kennedy and his older brother Joe. The Kennedy's were famous for their die-hard attitudes toward water sports, and their passion and enthusiasm for swimming and sailing turned each outing into a cutthroat competition, particularly during their summers in Hyannis Port. The purchase of this 22 footer, which was renamed Flash II, allowed John F. Kennedy to promulgate his talent as a member of the Nantucket Sound Star Fleet.

With its towering mast and narrow hull, the Flash II was a difficult boat to navigate, but Kennedy's skill enabled him to gracefully maneuver its acceleration through harsh waters. During the 1936 Atlantic Coast Championships, John F. Kennedy won high acclaim when he triumphed in one race in an unprecedented four minute victory. As stated in publications from the time, "...the amazing win by John Kennedy in his Nantucket Sound Flash II in the last race by nearly four and a half minutes, an almost unprecedented margin for a Blue Star event."

Throughout the summer months, John F. Kennedy spent hours each day sailing with close friends, the very people who would later serve him as key political advisors, including Lem Billings. It is ironic that Kennedy continued to sail throughout his life, even after his brush with death aboard a boat in World War II. However, Kennedy's poor health as a lad was nourished with his fervor for sailing, and it was his water activities that helped physically strengthen him. Having been a weak and sickly child, John F. Kennedy fell ill again during his college years and, through his therapeutic water activities, regained most of his health. Flash II undoubtedly played a large part in his rehabilitation.

John F. Kennedy removed his brother Joe's name from the boat's registry in 1940, and shortly thereafter, in 1942, he sold Flash II. It was kept in storage for many years, and tendered a thorough and loving restoration by its new owner. Over 90% of the sloop is original and the owner's fondness for the historical significance of the boat prompted him to use materials from the era, as difficult as they were to obtain. Craftsmen were carefully selected with the highest level of expertise to help

restore the boat, thus ensuring that Flash II would be presented in flawless condition. The boat boasts it beauty: its slim white body is finished with linseed oil-based enamel paint, polished fittings in bronze and the wood trim pieces include a Spanish cedar-varnished splash rail.

John F. Kennedy's Flash II has been on display in various boat shows and museum. Good condition. Registered as #721 by the International Star Class Yacht Racing Association. The boat measures 22 feet by 8 feet with a 35 mast and weighs 760 pounds.

## Shipping and handling

**Services available**
Check item description and payment instructions or contact seller for details.

**Ships to**
Worldwide

## Payment details

| Payment method | Preferred/ Accepted | Buyer protection on eBay |
|---|---|---|
| Money order/Cashiers check | Accepted | |
| Personal check | Accepted | |
| | | |

Learn about payment methods

Where to go next

[Leave feedback]() if you are the buyer or seller.

Other options

 [Back to home page]()  |  [Report this item]()  |  [Printer Version]()  |  [Sell one like this]()

Seller assumes all responsibility for listing this item.

Still have a question? Ask our Live Auctions support staff at [lasupport@ebay.com]() .

[Home]()  |  [Browse]()  |  [Search]()  |  [Registration]()  |  [Services]()  |  [Help]()
[eBay]()  |  [eBay Motors]()

Copyright © 1995-2007 [eBay Inc.]() All Rights Reserved. Designated trademarks and brands are the property of their respective owners. Use of this Web site constitutes acceptance of the eBay [User Agreement](), [Privacy Policy](), and [Live Auction User Agreement.]()