UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.05-10192-WGY |
| | ) | |
| ONE STAR CLASS SLOOP SAILBOAT | ) | |
| BUILT IN 1930 WITH HULL NUMBER 721, | ) | |
| NAMED "*FLASH II,*" | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S RESPONSE TO CLAIMANT'S COUNTER-STATEMENT OF FACTS

1.     Agreed.

2-5.    Disputed.  Anderson claimed to have invested his own money over the years in the Flash II.  See Transcript of N-168, attached as Exhibit A and audio of same, attached as Exhibit B.  The government contends that all of Anderson's income was from drug transactions.  However, rather than prove the source of income of an absent non-party, the government relies instead on the nature of Anderson's payment of the CW, as set forth below:

A.    The Cooperating Witness ("CW") identified Gregory Olaf Anderson ("Anderson") as a person whom the CW had employed to transport marijuana.  Affidavit of Gregg Willoughby, Docket Entry 1, ¶ 11.

B.    Anderson was involved in transporting marijuana, in selling marijuana, and in smuggling marijuana.  Id. at ¶ 15.

C.    The CW invested marijuana proceeds in the Flash II sailboat.  Id. at ¶ 16.  Anderson knew that the CW's funds were derived from drug sales.

<u>Id</u>. at ¶ 15.

D.    In approximately 2001, the CW paid Anderson a flat fee of $40,000 or $50,000 to transport marijuana.  <u>Id</u>. at ¶ 17.   Anderson transported between four and eight loads of marijuana for the CW, until Anderson was arrested by law enforcement in approximately December 2001.  <u>Id</u>.

E.    After Anderson was arrested, Anderson indicated to the CW that Anderson would implicate the CW unless the CW paid Anderson.  <u>Id</u>. at ¶ 18.  As a result, the CW paid Anderson his transportation fee of $40,000; money for defense counsel of $20,000; additional money for silence of $50,000; and also surrendered the CW's right to a twenty percent share of the Flash II.  <u>Id</u>. at ¶ 18.

F.    On September 27, 2004, the CW met with Anderson.  <u>Id</u>. at ¶ 21.  That meeting was tape recorded.  <u>Id</u>.  In that meeting, Anderson told the CW that Anderson had paid the CW for the money that the CW had provided Anderson for the Flash II during the course of two trips for the CW.  <u>Id</u>.  <u>See also</u> Exhibit A and B, attached.  These "trips" were trips to transport marijuana.  <u>See</u> Docket Entry 1 at ¶ 17.

G.    During the course of the September 27, 2004 meeting, the CW asked Anderson "so now the Flash is yours again?" to which Anderson responded "Yeah."   Exhibit A & Exhibit B.

H.    The CW asked Anderson "You still owe anybody else for it?"  Anderson responded affirmatively.  The CW asked Anderson if it was the dentist that was owed, and Anderson responded: "Yeah, well, it's not a dentist –

2

an anesthesiologist – plus my buddy Eddie, plus my mom, they're all gettin' a piece." <u>Id</u>.

6.    Disputed.  Guernsey's contract shows that the owner of the Flash II was Ole Anderson.  <u>See</u> Declaration of Arlan Ettinger ("Ettinger Declaration"), and Exhibit 1 thereto.  There is no way to determine whether the $800,000 bid was a legitimate bid, as opposed to a bid at Anderson's behest to promote the Flash II.  Ettinger Declaration at ¶¶ 10-14.

7.    Disputed.  The reference to the exhibitions made for the Flash II are in fact exhibitions made for the preview to the Guernsey's March 1998 auction.  <u>See</u> prior sentence to Claimant's citation to Guernsey's Appraisal.

8.    Agreed.

9.    The government acknowledges that Claimant's Memorandum in Support of its Motion for Stay, Docket Entry 25-2, sought a waiver of the supersedeas bond citing case law.

10.    The government acknowledges that Claimant's Memorandum in Support of its Motion for Stay, Docket Entry 25-2, made the claimed statements, although the government disputes the accuracy of Claimant's assertions.

11 -15.  Agreed.

16.    Disputed.  There is no evidence that a consortium of owners ever made any efforts as described.  Guernsey's promoted the Flash II in both March 1998 and in December 2005.  In December 2005, the President of Guernsey's, Arlan Ettinger, was interviewed in a live broadcast from the Seventh Regiment Armory at the preview for the December 2005 auction, and the Flash II was prominently featured.  Ettinger was

standing at the stern of the Flash II during the broadcast, and Guernsey's had identified

the Flash II to media representatives as a "top item" during pre-auction publicity.

Ettinger Declaration, ¶¶ 17-22.

17.    Disputed.  While some articles may have mentioned the fact that the Flash II was

forfeited from a drug dealer, most articles did not.  Regardless of whether the articles

mentioned it or not, the fact was – and is – that a convicted drug dealer was in fact in

possession of the Flash II when it was seized.

18.    Agreed.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    /s/ Nancy Rue
Nancy Rue
Assistant U.S. Attorney


CERTIFICATE OF SERVICE

I hereby certify that these documents filed through the ECF system will be sent electronically to

the registered participants as identified on the Notice of Electronic Filing (NEF).


 /s/ Nancy Rue
Nancy Rue
Assistant U.S. Attorney

**Partial Transcript of N-168, Audio Recording of September 27, 2004 Meeting between CW and Ole Anderson**

**36:39 - 37:30**

| | |
|---|---|
| CW: | But, um, the other one, I remember I had, the, this one Flash, I lent you money . . . |
| Anderson: | I paid you back everything. |
| CW: | You did pay me back everything? |
| Anderson: | yeah, see that was, that was fifteen, plus |
| CW: | fifteen thousand? |
| Anderson: | Yeah, I gave you that...yeah.... |
| CW: | Was it during working? |
| Anderson: | Yeah, yeah, |
| CW: | when you worked for me |
| Anderson: | Right, you knocked it off – |
| CW: | I took it off, the uh....? |
| Anderson: | You kept it back, I paid you. |
| CW: | Off the first trip was it? |
| Anderson: | No, we did it for two trips. |
| CW: | OK |
| Anderson: | Because I think, it was either 15 or 27, but you got that paid off the first two trips. |
| CW: | Ok |
| CW: | So now the Flash is yours again? |
| Anderson: | Yeah. |
| CW: | You still owe anybody else for it? |
| Anderson: | Oh Yeah, yeah, yeah |
| CW: | who the dentist, or? |
| Anderson: | Yeah, well, it's not a dentist – an anesthesiologist – plus my buddy Eddie, plus my mom, they're all gettin' a piece – |

CW:             What about these guys at the marina, you owe
                them any?

Anderson:       No.

CW:             They're doing it for free?

Anderson:       No, they're not doing it for free, I paid them,
                shit, I paid them, she's gettin' me up the whole
                bill or somethin' but . . .

CW:             Even now with storage?

Anderson:       Oh yeah, I'm paying storage, I pay $500 for good
                storage, $500 other storage and $300 for summer
                storage –

CW:             Not per month?

Anderson:       No, $1,300 a year

CW:             Oh, ok

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,      )
           Plaintiff,       )
                      )
         v.           )Civil Action No.05-10192-WGY
                      )
ONE STAR CLASS SLOOP SAILBOAT   )
BUILT IN 1930 WITH HULL NUMBER 721,)
NAMED "FLASH II,"            )
           Defendant.      )

## DECLARATION OF ARLAN ETTINGER

I, Arlan Ettinger, state under oath as follows:

1. I am the President and owner of Guernsey's Auction House. I founded the company with Barbara Mintz in 1975. I am licensed as an auctioneer in New York, professional license number 09512250.

2. I was the principal auctioneer of the March 1998 auction of Kennedy memorabilia from the Robert White Collection (the "March 1998 auction").

3. One of the items placed for bid at the March 1998 auction was a Star Class Sailboat known as the Flash II.

4. It was my understanding that the owner of the Flash II was Gregory Olaf "Ole" Anderson ("Anderson"). Anderson placed the item for bid with Guernsey's, and we dealt exclusively with him as the consignor for the Flash II in connection with the March 1998 auction. A copy of the contract between Anderson and Guernsey's is attached hereto as Exhibit 1.

5. Anderson placed a reserve of $~~$900,000~~ #950,000 —AE on the Flash II. Normally, the amount of the reserve is not disclosed in advance of or during the course of an auction; nor do I

recall disclosing this reserve in advance of or during the course of the March 1998 auction.

6. The fact of a reserve was designated by the "●" symbol to the left of the lot number (Lot Number 80) in the auction catalogue. A true and accurate copy of the catalogue entry for this item is attached to this Declaration as Exhibit 2.

7. While some items submitted for bid at the auction included an estimated value, Lot 80 stated "estimate upon request." See, for comparison, catalogue entries for lots 81 through 86, attached as Exhibit 3.

8. During the course of the March 1998 auction, no record was maintained of who bid on Lot 80.

9. When an item is placed for bid subject to a reserve, the house has the right to place bids on the item up to the amount of the reserve in order to generate interest or to determine whether other bidders have an interest level greater than the reserve amount.

10. Guernsey's contract with consignors provides that neither the consignor nor his agents may bid on items placed for auction with Guernsey's. However, Guernsey's has no way to identify all friends, family and agents of a consignor, and therefore Guernsey's has no ability to enforce this provision as to unknown agents of a consignor.

11. On occasion, when an item is not sold at the close of bidding for failure to meet a reserve, a high bidder will

Declaration of Arlan Ettinger, page 2

subsequently contact the auction house in order to determine whether the seller wishes to arrange a sale despite the reserve.

12. Although the high bid on the Flash II at the March 1998 auction was, to my recollection, at or near the $800,000 level, no one contacted Guernsey's after the Flash II was withdrawn from bidding to determine whether a purchase was possible.

13. Upon later reflection, one possible explanation for the failure of an unsuccessful bidder from the Flash II auction to approach Guernsey's was that the bidding on the Flash II may have been generated by agents of the consignor in the hope of stimulating interest in or publicity for the Flash II.

14. We cannot recall an occasion in which an item that was withdrawn from bidding for failure to meet a high reserve was later placed successfully for auction and exceeded the earlier reserve.

15. We were not involved in the setting of the reserve level for the Flash II at the March 1998 auction. That amount was solely determined by the consignor, Anderson.

16. It was, and is, my understanding that the value of the Flash II as a sailboat – separate and apart from its value as an item once owned by John F. Kennedy – is significantly less than $100,000.


Declaration of Arlan Ettinger, page 3

17.  I was involved in the December 2005 auction of Kennedy
     memorabilia which again included the Flash II, this time as
     Lot 741.

18.  The December 2005 auction received an enormous amount of
     media coverage.

19.  Items available for bid at the December 2005 auction,
     including the Flash II, were exhibited during the auction
     preview at the Seventh Regiment Armory in Manhattan.

20.  During pre-auction publicity, media representatives
     frequently ask for Guernsey's to identify "top lots" for the
     auction.  The Flash II was one of the items featured by
     Guernsey's as a top lot during the pre-auction publicity for
     the December 2005 auction.

21.  I specifically recall that I was interviewed by Good Morning
     America in a live broadcast from the Seventh Regiment Armory
     during the December 2005 auction preview.  During this live
     interview, I was standing at the stern of the Flash II.

22.  The December 2005 auction received both national and
     international media coverage.

23.  As shown by the list of Prices Realized, attached as
     Exhibit 4, only two items, Lot Number 259 and Lot Number
     1221, sold for a greater price than the Flash II at that
     auction.

24.  Many items at the December 2005 auction did not achieve the
     prices that might have been anticipated based on prices for

Declaration of Arlan Ettinger, page 4

similar items achieved shortly after the death of Jacqueline Kennedy Onassis.

25. Some items at the December 2005 auction of Kennedy memorabilia failed to sell as a result of not reaching their reserve.

Arlan Ettinger

Declaration of Arlan Ettinger, page 5

# GUERNSEY•S

## LOT STATEMENT

Consignor: Ole Anderson

Date: March 15, 1998
Reference: JFK Auction
Telephone:
Evening:
Fax:

This schedule of property, including the following item or items consigned to Guernsey's, ncorporated into the consignment contract and made a part thereof.

| CODE | LOT | DESCRIPTION OF PROPERTY | |
|------|-----|------------------------|---|
| OA 1 | 80 | Flash II  Star Class: Sailboat | ~~Total~~ reserve |
| | | (#1,000 given for delivery of boat on 12/23/97) to deduct from settlement. | $950.00 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

The above is an accurate description of the property consigned.

Consignor Signature _____    Date _____

GUERNSEY•S, 108 EAST 73RD STREET, NEW YORK, NY 10021•212.794.2280 /FAX 212.744.363

Final Contract

# GUERNSEY'S

REFERENCE: JFK

: December 9, 1997

## CONSIGNMENT AGREEMENT BETWEEN:

| ER: | Ole Anderson | | GUERNSEY'S |
| | | | A Division of Barlan Enterprises, Ltd. |
| RESS: | 718 South Lake Avenue | AND | 108 East 73rd Street |
| | Delray Beach, Florida 33483 | | New York, New York 10021 |
| PHONE: | 561-278-3979; fax 561-278-8084 | | 212-794-2280   FAX: 212-744-3638 |

k you for consigning your property to Guernsey's. This contract confirms our agreement under which all property gn to us, as listed on the annexed inventory (the "Property"), will be offered by us as your agent for sale at public at ct to provisions as set forth below and Guernsey's standard TERMS AND CONDITIONS OF SALE and INFORMATIO NDING BUYERS in effect at the time of the auction.

1. Guernsey's Responsibility.  We shall be responsible for any and all costs incurred in connection with the pre-auctio on activities including the promotion of same, production of the auction catalogue, advertising, security, employme on site personnel, and obtaining the required permits for auction, display, as well as other expenses reasonably requi uct the auction.

2. The Auction.  Guernsey's shall have absolute discretion as to a) the place and date of the sale, b)the manner in whi is conducted, including the TERMS AND CONDITIONS OF SALE then in effect, c) consulting any expert, d) the combir vision of the Property into lots as may be deemed appropriate for the sale, e) the description of the Property in its cata other descriptions as we believe appropriate.

3. Commission.  For its services, Guernsey's will receive and retain from the proceeds of the sale as a commission fror mount equal to 8.5% of the final bid on each lot sold. You are aware that the buyer will be paying an additional premi of the final bid up to and including $50,000 and 10% of the amount above $50,000 and that premium in no way affer unt due to us from you or the net amount payable to you from us after deducting our commission.

4. Settlement.  Thirty-five days after the sale, we will mail you the net proceeds (gross proceeds less our comm itional premium and agreed upon reimbursable expenses) from the sale of the property, provided that we have receive :cted payment in full from the buyer, unless the buyer has notified us of intention to rescind the sale or we have re :e of any other claim which would bear upon the validity of the sale, or have for any reason refunded such proceeds er prior to the expiration of such thirty-five days. Reimbursable expenses are those expenses incurred by Guernsey's o alf, and include but are not limited to expenses we incur for transporting of property, cost for insurance at all times, sto perty, repair of property at your request, additional services requested by you, etc.

In the event of non-payment by the buyer, Guernsey's, in its sole discretion, reserves the right to cancel the sale and Property to you, or enforce payment by the buyer. You authorize us, at our sole discretion to impose on the buyer and our account, a late charge if payment is not made in keeping with the TERMS AND CONDITIONS OF SALE.

5. Private Sales.  If a lot fails to sell at auction, you authorize us. as your ~~exclusive~~ agent, for a period of 60 days fol auction date to sell the lot privately for a sum that will result in a payment to you of not less than the net amount (af umission and expenses) to which you would have been entitled had the lot been sold at auction at a sum equal to the rve or such sum mutually agreed upon by Guernsey's and you prior to the sale thereof. In such event, your obligation ı respect to such lot are the same as if it had been sold at auction. If the lot is sold by anyone othe Guernsey's over the 60 day period, Guernsey's will recei

6. Expenses.  You agree to bear the expenses of a) shipping to our premises* and b) insurance.  (*Should the consigne sell for failing to reach its reserve, Guernsey's agrees to reimburse the consignor $1,000 towards the cost of shipp signed item.)                                                                                                            on a reserve i

                                                                                                                            O.A

7. Insurance.  The Property will be1) insured from time of receipt until it ceases to be in our custody for an amount e he final bid price (excluding buyer's premium) if the property has been sold, or b) 65% of our latest presale low esti old and unreserved, or c) the reserve (but not more than our latest presale low estimate), if unsold.  Insurance for p zived by us will be charged to you at a rate of 2% of a) the final bid if the Property has been sold, or b) 65% of our latest r estimate on unsold and unreserved Property.

: 2) insured by you, naming Guernsey's as co-insured.  In this case, you must provide Guernsey's with a copy · urance certificate.

the event that there is damage to or loss of any portion of the Property, Guernsey's shall receive a commission of any in iceeds for the items consigned, equal to that which would have been earned had the Property been sold.

8. Limits of Liability.  Guernsey's liability to you resulting from loss of or damage to any Property shall not exc

1. Guernsey's Responsibility. We shall be responsible for any and all costs incurred in connection with the pre-auction
n activities including the promotion of same, production of the auction catalogue, advertising, security, employmen
n site personnel, and obtaining the required permits for auction, display, as well as other expenses reasonably require
ict the auction.

. The Auction. Guernsey's shall have absolute discretion as to a) the place and date of the sale, b)the manner in which
conducted, including the TERMS AND CONDITIONS OF SALE then in effect, c) consulting any expert, d) the combina
ision of the Property into lots as may be deemed appropriate for the sale, e) the description of the Property in its catalc
ther descriptions as we believe appropriate.

3. Commission. For its services, Guernsey's will receive and retain from the proceeds of the sale as a commission from
ount equal to 8.5% of the final bid on each lot sold. You are aware that the buyer will be paying an additional premiu
of the final bid up to and including $50,000 and 10% of the amount above $50,000 and that premium in no way affect
nt due to us from you or the net amount payable to you from us after deducting our commission.

4. Settlement. Thirty-five days after the sale, we will mail you the net proceeds (gross proceeds less our commis
ional premium and agreed upon reimbursable expenses) from the sale of the property, provided that we have received
ted payment in full from the buyer, unless the buyer has notified us of intention to rescind the sale or we have rece
: of any other claim which would bear upon the validity of the sale, or have for any reason refunded such proceeds t
· prior to the expiration of such thirty-five days. Reimbursable expenses are those expenses incurred by Guernsey's on
f, and include but are not limited to expenses we incur for transporting of property, cost for insurance at all times, stora
rty, repair of property at your request, additional services requested by you, etc.

In the event of non-payment by the buyer, Guernsey's, in its sole discretion, reserves the right to cancel the sale and n
roperty to you, or enforce payment by the buyer. You authorize us, at our sole discretion to impose on the buyer and r
r account, a late charge if payment is not made in keeping with the TERMS AND CONDITIONS OF SALE.

5. Private Sales. If a lot fails to sell at auction, you authorize us. as your ~~exclusive~~ agent, for a period of 60 days follo
ction date to sell the lot privately for a sum that will result in a payment to you of not less than the net amount (afte
iission and expenses) to which you would have been entitled had the lot been sold at auction at a sum equal to the a
ve or such sum mutually agreed upon by Guernsey's and you prior to the sale thereof. In such event, your obligations
respect to such lot are the same as if it had been sold at auction. *If the last is sid by anyone other*
*Guernsey's over the 60 day period, Guernsey's will receive*
6. Expenses. You agree to bear the expenses of a) shipping to our premises* and b) insurance. (*Should the consigned ~~8.5%~~
ell for failing to reach its reserve, Guernsey's agrees to reimburse the consignor $1,000 towards the cost of shippin
gned item.) *orig reserve pr*
*O.A 12*

7. Insurance. The Property will be1) insured from time of receipt until it ceases to be in our custody for an amount equ
 final bid price (excluding buyer's premium) if the property has been sold, or b) 65% of our latest presale low estim
ld and unreserved, or c) the reserve (but not more than our latest presale low estimate), if unsold. Insurance for pro
ved by us will be charged to you at a rate of 2% of a) the final bid if the Property has been sold, or b) 65% of our latest pi
stimate on unsold and unreserved Property.

2) insured by you, naming Guernsey's as co-insured. In this case, you must provide Guernsey's with a copy of
ance certificate.

e event that there is damage to or loss of any portion of the Property, Guernsey's shall receive a commission of any insu
eds for the items consigned, equal to that which would have been earned had the Property been sold.

8. Limits of Liability. Guernsey's liability to you resulting from loss of or damage to any Property shall not excee
ance coverage of such Property as provided in Paragraph 8 of this agreement, and shall be limited to the time perio
Property is in our custody. In this respect, custody shall not cover storage. While we undertake to exercise reasonabl
indling the Property, we shall not be responsible for any damage to any Property caused by changes in humid
erature; inherent conditions or defects; nor shall we be responsible for any damage to frames, display cases or glass;
age caused by restorers, framers or other independent contractors employed with your consent.

9. Reserves. The consigned item can be reserved, with the reserve price mutually agreed to by you and Guernsey's.
d reserve cannot be raised but may be lowered up to the time of sale with your approval. All stated reserves are
missionable).

Guernsey's may sell any property below the reserve price, provided that we pay you, on the settlement date, the net an
h you would have been entitled to receive had the property been sold at the reserve (that is, the reserve minus our s
nission; reimbursable expenses and any other amount you owe us).

Neither you, your principals, agents, nor any representative of you or your principal may bid for your Property.
t that you breach any terms of this paragraph and you and/or your agent or representative becomes the successful bid
Property, then you shall pay to us a commission of 20% of the successful bid price plus the buyer's premium of 15%.

10. Representations, Warranties and Indemnification. You represent and warrant that you have title to the property an
 to consign the Property for sale by us and that the Property is and will until the completion of the sale by us be fre

of all liens, claims, encumbrances of others of whatever nature and that good title and right or possession of the Pro
pass to the buyer free of all such liens, claims, encumbrances of whatever nature, and that there are not and, unt
letion of the sale by us, there will not be any restriction or claims against us prohibiting or restricting our right to offe
rty at auction or to reproduce photographs or exhibit the Property for sale. We retain the exclusive copyright t
ogue and other illustrations and descriptions of the Property created by us.

You further represent the authenticity, history, and condition of the Property, as set forth on the annexed inventory here
y documentation supplied by you to us.

You acknowledge that we are relying on the foregoing representations and warranties in accepting this consignmen
that such representations and warranties are of a continuing nature and shall survive the completion of the transac
mplated by this agreement. You agree to notify us promptly in writing of any event or circumstances that may cau
oing representation and warranties to be in doubt, false, inaccurate or violated in any way. If you are acting as an age
ndisclosed principal, you and principal, jointly and severally, assume all obligations hereunder to the same extent as i
acting as principal.

You hereby agree to indemnify us and hold us harmless from and against any and all claims, damage, loss or exp
sive of attorneys' fees, which we may incur by reason of your breach or alleged breach of any of your obligations, warr
presentations herein. In the event of any such claims by third parties arising out of your breach of or alleged breach o
ations, warranties or representations herein, you shall be obligated to still pay Guernsey's the full commission which v
been earned from the sale of such Property, whether or not the Property has yet been offered, sold or returned to Guern

11. Withdrawal. You may not withdraw any property after the date of this agreement without written approval
nsey's. In the event we consent to such a withdrawal, the Property may be withdrawn upon payment of 20% of the re
: or of the insurance evaluation where the reserve has not been fixed, which approximately represents the commissio
rs premium which would have been earned by Guernsey's, plus all out-of-pocket expenses, if any, incurred by Guern
e event that you fail to comply with the provisions of this paragraph, we will be entitled to recover, in addition to the
d above, all necessary and reasonable expenses incurred by us to recover same, including reasonable attorneys' fee:
ve the right to withdraw any Property from the Auction at any time if we reasonably believe (a) there is a doubt as
ution or to its authenticity, or (b) there is a doubt as to the accuracy of your representation herein in any respect, or (
or are about to breach any provision of this agreement including authenticity or attribution of the Property or its con
) for any other just cause. We will then return the Property to you at your sole cost and expense. Guernsey's may in i
etion determine that the Property is not suitable for auction. In such event, the Property will be released to you o
sentative at Guernsey's offices. Guernsey's shall have no liability for any determination to return any Property hereun

12. Estimates, Property Descriptions. We are not responsible for any errors or omissions in the catalogue or
riptions of the Property, and we make no guarantees, representations or warranties whatsoever to you with respect
erty, its authenticity, condition, value or otherwise. Our presale estimates, subject to revision by us at our sole discretic
ded as a guide for prospective bidders only and we make no representation or warranty, written or oral, of the antic
ng price of any Property and no estimate may be relied upon as a prediction of the actual selling price.

13. Rescission. Guernsey's is authorized, as your agent, to rescind the sale of any Property at any time if, in ou
ement, we determine that the offering for sale of any Property has subjected or may subject Guernsey's and/or you
lity, including any liability under warranty of authenticity or title. In such event, we are further authorized to refi
it to the buyer the purchase price of such returned Property rather than remit the net proceeds to you. If Guernsey
idy remitted to you any proceeds of the rescinded sale, you shall pay us on request an amount equal to the remitted pr
our expenses incurred in the connection with the rescinded sale and any other amount you owe us, inclusive of atto

14. Unsold Property. Any Property remaining unsold for any reason after the auction, and not being kept for sale, m
ed up by you within ten days after notice requiring you to collect it. We reserve the right to arrange for storage of any
erty at a warehouse or other storage facility at your risk and expense. You shall not be entitled to reclaim any t
erty until all commissions, expenses and other amounts owed Guernsey's have been paid in full. Thirty-five days afte
ze to collect, if Property has not been sold privately pursuant to paragraph 5, and is not reconsigned to us for sale on mu
ed upon terms, we may return it to you by shipment at your risk and expense or sell it at public auction without reser
e and date determined by us. The proceeds of any such sale will first be applied to any amount you owe us and/
ehouse or other storage facility, including but not limited to our commissions and expenses incurred hereunder, an
ss, if any, will be remitted to you. You hereby waive any requirements of notice, advertisement and the disposition
ceeds with regard to said sale of uncollected Property.

15. Default. In the event of your default of any of the terms herein, we reserve any and all rights we have at law or eq
ition to the rights herein. We shall be entitled to reasonable attorneys' fees, and all costs incurred in the enforcement
ement.

16. Entire Agreement. All prior negotiation, representations, contracts or agreements, if any, between the parties
ing to the Property consigned, are hereby merged into this agreement and this agreement is the complete, entire ar
ement between the parties. No modification, alteration, construction, amendment or rescission of or to this agreemer
ffective or binding unless in writing and executed by duly authorized officer of Guernsey's and you. This agreem
ing upon your heirs, executors, beneficiaries, successors, and assigns. However, you may not assign this agreement w
r written consent

17. Controlling law. This agreement is entered into pursuant to New York law, and shall be governed by and constr
rdance with the laws of New York State.

ey's. In the event we consent to such a withdrawal, the Property may be withdrawn upon payment of 20% of the rese
r of the insurance evaluation before the reserve has not been fixed, which approximately represents the commission a
premium which would have been earned by Guernsey's, plus all out-of-pocket expenses, if any, incurred by Guernse
event that you fail to comply with the provisions of this paragraph, we will be entitled to recover, in addition to the su
above, all necessary and reasonable expenses incurred by us to recover same, including reasonable attorneys' fees.
   the right to withdraw any Property from the Auction at any time if we reasonably believe (a) there is a doubt as to
tion or to its authenticity, or (b) there is a doubt as to the accuracy of your representation herein in any respect, or (c) y
r are about to breach any provision of this agreement including authenticity or attribution of the Property or its conditi
or any other just cause. We will then return the Property to you at your sole cost and expense. Guernsey's may in its s
ion determine that the Property is not suitable for auction. In such event, the Property will be released to you or y
ntative at Guernsey's offices. Guernsey's shall have no liability for any determination to return any Property hereunder

2. Estimates, Property Descriptions. We are not responsible for any errors or omissions in the catalogue or ol
otions of the Property, and we make no guarantees, representations or warranties whatsoever to you with respect to
ty, its authenticity, condition, value or otherwise. Our presale estimates, subject to revision by us at our sole discretion,
ed as a guide for prospective bidders only and we make no representation or warranty, written or oral, of the anticip:
price of any Property and no estimate may be relied upon as a prediction of the actual selling price.

3. Rescission. Guernsey's is authorized, as your agent, to rescind the sale of any Property at any time if, in our
nent, we determine that the offering for sale of any Property has subjected or may subject Guernsey's and/or you to
y, including any liability under warranty of authenticity or title. In such event, we are further authorized to refun
to the buyer the purchase price of such returned Property rather than remit the net proceeds to you. If Guernsey's
y remitted to you any proceeds of the rescinded sale, you shall pay us on request an amount equal to the remitted proc
ur expenses incurred in the connection with the rescinded sale and any other amount you owe us, inclusive of attorr

4. Unsold Property. Any Property remaining unsold for any reason after the auction, and not being kept for sale, mu:
l up by you within ten days after notice requiring you to collect it. We reserve the right to arrange for storage of any un
rty at a warehouse or other storage facility at your risk and expense. You shall not be entitled to reclaim any un
rty until all commissions, expenses and other amounts owed Guernsey's have been paid in full. Thirty-five days after
to collect, if Property has not been sold privately pursuant to paragraph 5, and is not reconsigned to us for sale on muti
l upon terms, we may return it to you by shipment at your risk and expense or sell it at public auction without reserve
and date determined by us. The proceeds of any such sale will first be applied to any amount you owe us and/o
ouse or other storage facility, including but not limited to our commissions and expenses incurred hereunder, anc
, if any, will be remitted to you. You hereby waive any requirements of notice, advertisement and the disposition o
ids with regard to said sale of uncollected Property.

5. Default. In the event of your default of any of the terms herein, we reserve any and all rights we have at law or equi
on to the rights herein. We shall be entitled to reasonable attorneys' fees, and all costs incurred in the enforcement of
nent.

6. Entire Agreement. All prior negotiation, representations, contracts or agreements, if any, between the parties h
ig to the Property consigned, are hereby merged into this agreement and this agreement is the complete, entire and
nent between the parties. No modification, alteration, construction, amendment or rescission of or to this agreement
ective or binding unless in writing and executed by duly authorized officer of Guernsey's and you. This agreeme
ig upon your heirs, executors, beneficiaries, successors, and assigns. However, you may not assign this agreement wil
written consent.

'7. Controlling law. This agreement is entered into pursuant to New York law, and shall be governed by and constru
iance with the laws of New York State.

.8. Disputes. Any dispute arising out of a breach or an alleged breach of this agreement shall be brought in the courts o
of New York. Venue shall be within the County of New York. Any defense of lack of personal or subject matter jurisdi
ved by the parties hereto.

.9. Miscellaneous. The paragraph headings contained herein are for convenience of reference only and shall n
rued to affect in meaning the provisions of this agreement.

Please confirm your agreement with the foregoing by dating, signing and returning to us a duplicate copy of this agreer

EED TO AND ACCEPTED BY:

ED _Ole Arderson — Agent_          BY _____

                                  GUERNSEY'S
                                  A Division of Barlan Enterprises, Ltd.

ED: __12/23/97__



\-60
Flash II
John F. Kennedy's Star Class Sailboat

Registered as #721 by the International Star Class Yacht Racing Association. The boat measures 22 feet by 8 feet with a 35 foot mast and weighs 760 pounds.

The Star Class sloop, "Flash II", shot through the water, manned with the skill and expertise of a world class navigator. It was the summer of 1936 and 19 year old John F. Kennedy was in his prime at the helm of his favorite sailboat, Flash II. Kennedy loved to pilot the boat and direct the crew exhibiting, as a young man, the leadership



ally built in 1930 by Ole Hope, this sleek
was purchased in 1934 by John F. Kennedy
s older brother Joe. The Kennedys were
s for their die-hard attitudes toward water
and their passion and enthusiasm for swim-
 and sailing turned each outing into a con-
competition, particularly during their sum-
t Hyannisport. The purchase of this 22
which was renamed *Flash II*, allowed
Kennedy to promulgate his talent as a
r of the Nantucket Sound Star Fleet.

n towering mast and narrow hull, the
I was a difficult boat to navigate, but
dy's skill enabled him to gracefully maneu-
acceleration through harsh waters. During
Yer Atlantic Coast Championships, John F.
dy won high acclaim when he triumphed in
e in an unprecedented four minute victory,
ed in publications from the time, "...the
e win by John Kennedy in his Nantucket
*Flash II* in the last race by nearly four and a
nutes, an almost unprecedented margin for
Star event."

About the summer months, John F.
dy spent hours each day sailing with close
. the very people who would later serve him
political advisors, including Len Billings. It
c that Kennedy continued to sail through-
life, even after his brush with death aboard
in World War II. However, Kennedy's poor
as a lad was nourished with his fervor for
and it was his water activities that helped
lly strengthen him. Having been a weak-
ily child, John F. Kennedy fell ill again dur-
college years and, through his therapeutic
ctivities, regained most of his health. *Flash
II* ultimately played a large part in his rehabili-





John F. Kennedy removed his brother Joe's name from the boat registry in 1940, and shortly thereafter, in 1942, he sold Flash II. It was kept in storage for many years, and recently, the current owner rendered a thorough and loving restoration. Over 90% of the sloop is original and the owner's fondness for the historical significance of the boat prompted him to use materials from the era, as difficult as they were to obtain. Craftsmen were carefully selected with the highest level of expertise to help restore the boat, thus ensuring that Flash II would be preserved in flawless condition. The boat boasts its beauty: its slim white body is finished with linseed oil-based enamel paint, polished fittings in bronze and the wood trimpieces include a Spanish cedar-varnished splash rail.

John F. Kennedy's Flash II has been on display at various boat shows and museums including its most recent public display at the very fine Museum of Yachting, Newport, Rhode Island, where its beauty and history have been viewed in full grandeur.





**86**
**Cigarette Box**

Silver folded cigarette box, ball I
*O.A.J.*
*August 1940*
*1st Prize*
*Eunice and Bob*
Bottom stamped L.B.S. Co. 25

5 1/2 x 4 x 1 3/4 inches.

Robert and Eunice Kennedy wo
at first prize in a 1940 summer
summer was significant to the I
while Europe was at war, JFK,
Hayväld and published his the
Slept" and Joseph Kennedy, Jr.
to the Democratic National C

$400 - 1,700



who loved the thrill of the competition and the
opportunity to demonstrate their sailing skills.
The Flash II was a favorite sailboat of the Kennedy
brothers, and Joseph Kennedy, Jr., shared it with
brother John.

Ownership initially was in both brothers' names,
but reverted to John's exclusively in later years.
Universally acknowledged as John F. Kennedy's
first sailboat, Flash II itself is offered for sale in this
auction and is elsewhere described in this cata-
logue.



Hot **Teddy Warmer**

Inscribed as follows:
*Labor Day Race*
*Flash II*
*Joe Kennedy*

inches high

This handsome sterling silver piece that resembles
a mini-cocktail shaker was won by Joe Kennedy,
Jr., for one of his many competitive sailing races
during summers spent at the shore. Sailing races





**84**
**PT Boats, Two Photographs**

10 1/2 x 13 1/2 inches image
15 1/2 x 19 inches framed

Two framed vintage
black/white photographs of
PT boats marked 117 and 10.
Both signed M. Rosenfeld,
New York. Boat number 10 is
shown in New York Harbor at
the foot of Manhattan. Four
people are shown aboard.
There is reason to believe that
JFK may be one of them. It is
believed that this pair of PT
Boat photographs hung in
Senator Kennedy's office.

**agraph of Flash II**

Illustration on the first page showed to the
iption of the actual Flash II, six pages earlier
s catalogue. )

4 x 10 1/2 inches image
2 x 16 1/2 inches framed

ed vintage black and white photograph signed
otographer D. Moyer 1941. The name John
nedy is stamped on the reverse. It is believed
his photograph hung in John F. Kennedy's
c Office. Flash II, is pictured elsewhere in
atalogue, was John F. Kennedy's first sailboat.

$400 - 2,000

**agraph of John F. Kennedy Sailing**

Illustration on the third page devoted to the
iption of the actual Flash II, four pages earlier
s catalogue. It is the shown to the right)

9 3/4 inches image
2 x 16 1/2 inches framed

ed vintage photograph of John F. Kennedy
ling his boat in heavy wind. Penciled
ely 4 on reverse. It is believed that this pho-
ph hung in Senator Kennedy's office.

$400 - 2,000

**agraph of Sloop Under Sail**

2 x 13 1/2 inches image
4 x 18 3/4 inches framed

ed vintage black and white image from the
ely Collection of sailing photographs. This
graph likely hung in the Senator's office.

ume *John F. Kennedy* is stamped twice on
e. It is believed that this photograph hung in
or Kennedy's office.

# John F. Kennedy: The Robert L. White Collection
## December 15-17, 2006; January 21, 2006
## Prices Realized

## Guernsey's

108 East 73rd Street, New York, NY 10021, 212-794-2280, www.guernseys.com

| Lot | Price | Lot | Price | Lot | Price | Lot | Price | Lot | Price | Lot | Price | Lot | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $220 | 42 | | 84 | | 136 | | 178 | | 234 | | 288 | |
| 2 | $510 | 43 | | 88 | | 137 | | 179 | | 235 | | 289 | |
| 3 | $2,160 | 44 | | 90 | | 138 | | 181 | | 236 | | 290 | |
| 4 | | 45 | | 91 | | 140 | | 182 | | 237 | | 291 | |
| 5 | $1,820 | 46 | | 93 | | 141 | | 183 | | 238 | | 294 | |
| 7 | $650 | 47 | | 94 | | 142 | | 184 | | 240 | | 295 | |
| 8 | $775 | 48 | | 95 | | 143 | | 185 | | 242 | | 296 | |
| 9 | | 49 | | 96 | | 144 | | 187 | | 243 | | 297 | |
| 10 | $2,400 | 50 | | 97 | | 145 | | 188 | | 244 | | 300 | |
| 11 | $840 | 51 | | 98 | | 146 | | 189 | | 247 | | 301 | |
| 12 | $840 | 52 | | 99 | | 147 | | 190 | | 248 | | 302 | |
| 13 | $660 | 54 | | 100 | | 148 | | 191 | | 252 | | 303 | |
| 14 | $450 | 55 | | 101 | | 149 | | 193 | | 253 | | 304 | |
| 15 | $3,600 | 56 | | 103 | | 150 | | 194 | | 258 | | 305 | |
| 16 | $360 | 57 | | 104 | | 151 | | 196 | | 259 | | 306 | |
| 17 | $1,020 | 58 | | 106 | | 152 | | 198 | | 260 | | 307 | |
| 18 | $1,560 | 59 | | 109 | | 153 | | 199 | | 261 | | 308 | |
| 19 | $310 | 60 | | 110 | | 155 | | 200 | | 262 | | 309 | |
| 20 | $216 | 62 | | 111 | | 156 | | 201 | | 263 | | 311 | |
| 21 | $125 | 63 | | 112 | | 157 | | 202 | | 264 | | 313 | |
| 22 | $360 | 64 | | 113 | | 158 | | 203 | | 265 | | 315 | |
| 24 | $360 | 66 | | 116 | | 159 | | 204 | | 266 | | 317 | |
| 25 | $660 | 67 | | 117 | | 160 | | 206 | | 267 | | 318 | |
| 26 | $800 | 68 | | 118 | | 161 | | 207 | | 268 | | 319 | |
| 27 | $155 | 69 | | 119 | | 162 | | 208 | | 271 | | 320 | |
| 28 | $360 | 70 | | 121 | | 163 | | 210 | | 272 | | 321 | |
| 29 | $2,400 | 72 | | 122 | | 164 | | 211 | | 273 | | 322 | |
| 30 | $210 | 73 | | 123 | | 165 | | 215 | | 274 | | 323 | |
| 31 | $155 | 74 | | 124 | | 166 | | 216 | | 275 | | 324 | |
| 32 | $480 | 75 | | 126 | | 168 | | 218 | | 276 | | 325 | |
| 33 | $550 | 76 | | 127 | | 169 | | 222 | | 277 | | 326 | |
| 34 | $120 | 77 | | 128 | | 170 | | 223 | | 278 | | 327 | |
| 36 | $2,160 | 78 | | 129 | | 171 | | 224 | | 278A | | 328 | |
| 37 | $660 | 79 | | 130 | | 172 | | 225 | | 281 | | 329 | |
| 38 | $1,680 | 80 | | 131 | | 173 | | 229 | | 282 | | 330 | |
| 39 | $600 | 81 | | 132 | | 174 | | 230A | | 283 | | 331 | |
| 40 | $6,600 | 82 | | 133 | | 176 | | 232 | | 284 | | 332 | |
| 41 | $6,000 | 83 | | 134 | | 177 | | 233 | | 285 | | 333 | |

| Lot | Price | Lot | Price | Lot | Price | Lot | Price | Lot | Price | Lot | Price | Lot | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 334 | $820 | 406 | | 464 | | 528 | | 578 | | 627 | | 710 | |
| 335 | $6,000 | 407 | | 465 | | 529 | | 579 | | 629 | | 711 | |
| 336 | $360 | 408 | | 466 | | 531 | | 580 | | 630 | | 712 | |
| 337 | $820 | 410 | | 468 | | 533 | | 581 | | 633 | | 713 | |
| 338 | $510 | 411 | | 469 | | 534 | | 582 | | 635 | | 715 | |
| 339 | $350 | 412 | | 470 | | 535 | | 584 | | 636 | | 716 | |
| 341 | $270 | 413 | | 471 | | 536 | | 585 | | 637 | | 717 | |
| 342 | $240 | 414 | | 472 | | 537 | | 586 | | 638 | | 718 | |
| 343 | $120 | 415 | | 474 | | 538 | | 587 | | 639 | | 722 | |
| 344 | $120 | 417 | | 475 | | 539 | | 588 | | 640 | | 723 | |
| 345 | $150 | 418 | | 476 | | 540 | | 589 | | 641 | | 731 | |
| 352 | $120 | 419 | | 477 | | 541 | | 590 | | 642 | | 732 | |
| 359 | $240 | 420 | | 478 | | 542 | | 591 | | 643 | | 733 | |
| 361 | $540 | 423 | | 479 | | 543 | | 592 | | 644 | | 734 | |
| 362 | $270 | 424 | | 480 | | 544 | | 593 | | 645 | | 735 | |
| 365 | $300 | 425 | | 481 | | 545 | | 594 | | 646 | | 736 | |
| 365 | $1,200 | 427 | | 483 | | 546 | | 595 | | 647 | | 739 | |
| 366 | $4,800 | 428 | | 486 | | 547 | | 596 | | 648 | | 740 | |
| 367 | $240 | 430 | | 487 | | 548 | | 597 | | 649 | | 741 | |
| 368 | $270 | 431 | | 488 | | 550 | | 598 | | 650 | | 742 | |
| 369 | $720 | 432 | | 500 | | 551 | | 599 | | 652 | | 743 | |
| 371 | $840 | 434 | | 501 | | 552 | | 600 | | 653 | | 744 | |
| 372 | $870 | 435 | | 502 | | 553 | | 601 | | 659 | | 745 | |
| 373 | $240 | 436 | | 503 | | 554 | | 602 | | 660A | | 750 | |
| 374 | $210 | 437 | | 504 | | 555 | | 603 | | 661 | | 751 | |
| 376 | $120 | 438 | | 505 | | 556 | | 604 | | 662 | | 752 | |
| 377 | $240 | 439 | | 506 | | 557 | | 605 | | 667 | | 753 | |
| 379 | $960 | 440 | | 507 | | 558 | | 606 | | 672 | | 754 | |
| 380 | $510 | 441 | | 508 | | 559 | | 607 | | 674 | | 755 | |
| 381 | $8,400 | 442 | | 509 | | 560 | | 608 | | 675 | | 756 | |
| 382 | $26,400 | 445 | | 510 | | 561 | | 609 | | 676 | | 758 | |
| 388 | $540 | 446 | | 511 | | 562 | | 610 | | 677 | | 759 | |
| 390 | $480 | 447 | | 512 | | 563 | | 611 | | 678 | | 762 | |
| 391 | $1,440 | 448 | | 514 | | 564 | | 612 | | 679 | | 766 | |
| 392 | $480 | 449 | | 516 | | 565 | | 613 | | 680 | | 771 | |
| 393 | $270 | 450 | | 517 | | 566 | | 616 | | 681 | | 772 | |
| 394 | $390 | 451 | | 518 | | 567 | | 617 | | 686 | | 774 | |
| 395 | $600 | 452 | | 519 | | 568 | | 618 | | 700 | | 776 | |
| 396 | $210 | 453 | | 520 | | 569 | | 619 | | 701 | | 779 | |
| 397 | $240 | 454 | | 521 | | 570 | | 620 | | 702 | | 782 | |
| 398 | $4,500 | 456 | | 522 | | 571 | | 621 | | 703 | | 784 | |
| 399 | $42,000 | 457 | | 523 | | 572 | | 622 | | 704 | | 785 | |
| 402 | $900 | 458 | | 524 | | 573 | | 623 | | 706 | | 786 | |
| 403 | $4,200 | 459 | | 525 | | 574 | | 624 | | 707 | | 788 | |
| 404 | $510 | 460 | | 526 | | 575 | | 625 | | 708 | | 792 | |
| 405 | $180 | 461 | | 527 | | 577 | | 626 | | 709 | | 793 | |

| Lot | Price | Lot | Price | Lot | Price | Lot | Price | Lot | Price | Lot | Price | Lot | Price |
|-----|-------|-----|-------|-----|-------|-----|-------|-----|-------|-----|-------|-----|-------|
| 794 | $960 | 848 | | 918 | $510 | 974 | | 1244 | | 1297 | | 1344 | |
| 797 | $120 | 849 | | 919 | | 975 | | 1245 | | 1298 | | 1361 | |
| 798 | $144 | 850 | $240 | 920 | | 979 | | 1246 | | 1299 | | 1364 | |
| 801 | $150 | 853C | | 921 | | 980 | | 1247 | | 1300 | | 1368 | |
| 802 | $240 | 853E | | 922 | $120 | 983 | | 1249 | | 1301 | | 1369 | |
| 803 | $240 | 853F | | 923 | | 986 | | 1251 | | 1302 | | 1370 | |
| 805 | $600 | 854 | | 924 | | 987 | | 1252 | | 1303 | | 1371 | |
| 809 | $1,800 | 855 | | 925 | | 988 | | 1253 | | 1304 | | 1372 | |
| 810 | $300 | 858 | | 927 | | 989 | | 1254 | | 1305 | | 1373 | |
| 815 | $240 | 859 | | 928 | | 994A | | 1255 | | 1306 | | 1374 | |
| 817 | $180 | 861 | | 930 | | 995 | | 1256 | | 1307 | | 1375 | |
| 819 | $360 | 862 | | 931 | | 997 | | 1257 | | 1308 | | 1376 | |
| 820 | $4,800 | 863 | | 932 | $120 | 1200 | | 1259 | | 1309 | | 1377 | |
| 822 | $270 | 865 | | 933 | $120 | 1201 | | 1261 | | 1311 | | 1378 | |
| 823 | $180 | 866 | | 935 | | 1202 | | 1262 | | 1312 | | 1379 | |
| 824A | $960 | 867 | | 936 | | 1203 | | 1263 | | 1313 | | 1380 | |
| 824B | $600 | 868 | | 939 | | 1204 | | 1264 | | 1314 | | 1382 | |
| 824C | $1,200 | 869 | | 944 | | 1205 | | 1265 | | 1315 | | 1383 | |
| 824D | $1,200 | 870 | | 945 | $150 | 1206 | | 1266 | | 1316 | | 1384 | |
| 824E | $1,200 | 871 | | 946 | $240 | 1207 | | 1267 | | 1317 | | 1385 | |
| 824F | $960 | 872 | | 947 | | 1209 | | 1268 | | 1318 | | 1387 | |
| 824G | $1,200 | 873 | | 948 | | 1210 | | 1269 | | 1319 | | 1388 | |
| 824H | $1,200 | 874 | | 950 | | 1211 | | 1270 | | 1320 | | 1389 | |
| 824I | $720 | 874A | | 951 | | 1212 | | 1271 | | 1321 | | 1392 | |
| 830 | $420 | 874C | | 952 | $400 | 1213 | | 1273 | | 1322 | | 1406 | |
| 831 | $360 | 874D | | 953 | | 1214 | | 1274 | | 1323 | | 1410 | |
| 832 | $360 | 874E | | 954 | | 1215 | | 1275 | | 1324 | | 1413 | |
| 833 | $480 | 874F | | 956 | | 1216 | | 1276 | | 1325 | | 1414 | |
| 833D | $240 | 875 | | 957 | $10,260 | 1218 | | 1277 | | 1326 | | 1415 | |
| 833E | $360 | 876 | | 958 | | 1219 | | 1278 | | 1327 | | 1416 | |
| 833F | $600 | 877 | | 958A | | 1220 | | 1279 | | 1328 | | 1417 | |
| 833G | $120 | 879 | | 958B | | 1221 | | 1280 | | 1329 | | 1418 | |
| 833H | $180 | 880 | | 958C | | 1223 | | 1281 | | 1330 | | 1423 | |
| 833I | $360 | 881 | | 959 | | 1224 | | 1282 | | 1331 | | 1425 | |
| 834 | $6,600 | 882 | | 960 | $900 | 1225 | | 1283 | | 1332 | | 1426 | |
| 835 | $2,700 | 884 | | 961 | | 1226 | | 1284 | | 1333 | | 1429 | |
| 836 | $2,280 | 886 | | 962 | | 1227 | | 1285 | | 1334 | | 1430 | |
| 836A | $360 | 894 | | 963 | | 1228 | | 1286 | | 1335 | | 1431 | |
| 836B | $1,080 | 910 | | 965 | $1,080 | 1229 | | 1287 | | 1336 | | 1432 | |
| 837 | $120 | 911 | | 967 | $600 | 1230 | | 1288 | | 1337 | | 1433 | |
| 838 | $480 | 912 | | 968 | | 1232 | | 1289 | | 1338 | | 1434 | |
| 839 | $480 | 913 | | 969 | | 1234 | | 1290 | | 1339 | | 1435 | |
| 840 | $180 | 914 | | 970 | | 1236 | | 1291 | | 1340 | | 1436 | |
| 841 | $270 | 915 | | 971 | | 1241 | | 1292 | | 1341 | | 1437 | |
| 845 | $120 | 916 | | 972 | | 1242 | | 1294 | | 1342 | | 1438 | |
| 846 | $540 | 917 | | 973 | | 1243 | | 1296 | | 1343 | | 1440 | |

| Lot | Price | Lot | Price | Lot | Price | Lot | Price | Lot | Price | Lot | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1441 | $250 | 1495 | | 1561 | | 1633 | | 2067 | | 2197 | |
| 1443 | $240 | 1496 | | 1562 | | 1634 | | 2068 | | 2198 | |
| 1444 | $120 | 1497 | | 1568 | | 1635 | | 2069 | | 2202 | |
| 1445 | $780 | 1499 | | 1569 | | 1639 | | 2070 | | 2203 | |
| 1446 | $130 | 1500 | | 1570 | | 1639A | | 2073 | | 2204 | |
| 1448 | | 1501 | | 1571 | | 1640 | | 2075 | | 2205 | |
| 1449 | $300 | 1502 | | 1572 | $150 | 1642 | | 2076 | | 2206 | |
| 1450 | $240 | 1503 | | 1575 | | 1643 | | 2077 | | 2215 | |
| 1451 | $180 | 1504 | | 1578 | | 1645 | | 2078 | | 2216 | |
| 1452 | | 1505 | | 1579 | | 1647 | | 2092 | | 2226 | |
| 1453 | $180 | 1506 | | 1580 | | 1648 | | 2094 | | 2227 | |
| 1455 | $840 | 1507 | | 1581 | | 1649 | | 2096 | | 2229 | |
| 1458 | $240 | 1508 | | 1583 | | 1651 | | 2099 | | 2230 | |
| 1459 | $600 | 1509 | | 1584 | | 1652 | | 2100 | | 2231 | |
| 1461 | $360 | 1510 | | 1585 | | 1653 | | 2101 | | 2234 | |
| 1462 | $240 | 1511 | | 1586 | | 1656 | | 2102 | | 2235 | |
| 1463 | | 1515 | | 1588 | | 1657 | | 2107 | | 2236 | |
| 1464 | $360 | 1516 | | 1593 | | 1658 | | 2108 | | 2238 | |
| 1465 | $300 | 1517 | | 1594 | | 1659 | | 2110 | | 2240 | |
| 1466 | $180 | 1520 | | 1596 | | 1660 | | 2116 | | 2241 | |
| 1467 | $360 | 1522 | | 1597 | | 2002 | | 2118 | | 2242 | |
| 1468 | | 1524 | | 1598 | | 2003 | | 2120 | | 2243 | |
| 1469 | | 1529 | | 1599 | | 2007 | | 2129 | | 2245 | |
| 1470 | $120 | 1530 | | 1600 | | 2011 | | 2131 | | 2248 | |
| 1471 | $300 | 1531 | | 1601 | | 2016 | | 2133 | | 2253 | |
| 1472 | $360 | 1532 | | 1602 | | 2017 | | 2137 | | 2255 | |
| 1474 | | 1533 | | 1603 | | 2021 | | 2138 | | 2256 | |
| 1475 | $660 | 1535 | | 1607 | | 2024 | | 2139 | | 2257 | |
| 1476 | $180 | 1538 | | 1611 | | 2025 | | 2140 | | 2258 | |
| 1478 | $270 | 1541 | | 1613 | | 2026 | | 2141 | | 2260 | |
| 1479 | | 1542 | | 1614 | | 2027 | | 2142 | | 2261 | |
| 1480 | $240 | 1543 | | 1618 | | 2028 | | 2143 | | 2262 | |
| 1481 | $210 | 1545 | | 1619 | | 2029 | | 2173 | | 2263 | |
| 1482 | $240 | 1546 | | 1620 | | 2031 | | 2175 | | 2267 | |
| 1483 | $120 | 1547 | | 1621 | | 2033 | | 2177 | | 2268 | |
| 1484 | | 1548 | | 1622 | | 2036 | | 2178 | | 2270 | |
| 1485 | $180 | 1549 | | 1623 | | 2038 | | 2179 | | 2271 | |
| 1486 | $600 | 1550 | | 1624 | | 2039 | | 2180 | | 2272 | |
| 1487 | $9,000 | 1551 | | 1625 | | 2042 | | 2181 | | 2273 | |
| 1488 | $450 | 1552 | | 1626 | | 2046 | | 2182 | | 2274 | |
| 1489 | $300 | 1553 | | 1627 | | 2047 | | 2184 | | 2276 | |
| 1490 | | 1555 | | 1628 | | 2048 | | 2187 | | 2278 | |
| 1491 | $450 | 1556 | | 1629 | | 2052 | | 2190 | | 2279 | |
| 1492 | $180 | 1557 | | 1630 | | 2053 | | 2193 | | 2281 | |
| 1493 | $780 | 1558 | | 1631 | | 2054 | | 2195 | | 2283 | |
| 1494 | $120 | 1560 | | 1632 | | 2064 | | 2196 | | | |

Guernsey's JFK Auction
Publication date: 1/26/06. Not responsible for typographic errors or omissions.

page 4 c

# Lot 741* Flash II, John F. Kennedy's Star Class Sailboat

The Star Class sloop, Flash II, shot through the water, manned with the skill and expertise of a world class navigator. It was the summer of 1936 and 19 year old John F. Kennedy was in his prime at the helm of his favorite sailboat, Flash II. Kennedy loved to pilot the boat and direct the crew, exhibiting, as a young man, the leadership that would one day lead him to the White House.

Originally built in 1930 by Ole Hope, this sleek sloop was purchased in 1934 by John F. Kennedy and his older brother Joe. The Kennedy's were famous for their die-hard attitudes toward water sports, and their passion and enthusiasm for swimming and sailing turned each outing into a cutthroat competition, particularly during their summers in Hyannis Port. The purchase of this 22 footer, which was renamed Flash II, allowed John F. Kennedy to promulgate his talent as a member of the Nantucket Sound Star Fleet.

With its towering mast and narrow hull, the Flash II was a difficult boat to navigate, but Kennedy's skill enabled him to gracefully maneuver its acceleration through harsh waters. During the 1936 Atlantic Coast Championships, John F. Kennedy won high acclaim when he triumphed in one race in an unprecedented four minute victory. As stated in publications from the time, "...the amazing win by John Kennedy in his Nantucket Sound Flash II in the last race by nearly four and a half minutes, an almost unprecedented margin for a Blue Star event."

Throughout the summer months, John F. Kennedy spent hours each day sailing with close friends, the very people who would later serve him as key political advisors, including Lem Billings. It is ironic that Kennedy continued to sail throughout his life, even after his brush with death aboard a boat in World War II. However, Kennedy's poor health as a lad was nourished with his fervor for sailing, and it was his water activities that helped physically strengthen him. Having been a weak and sickly child, John F. Kennedy fell ill again during his college years and, through his therapeutic water activities, regained most of his health. Flash II undoubtedly played a large part in his rehabilitation.

John F. Kennedy removed his brother Joe's name from the boat's registry in 1940, and shortly thereafter, in 1942, he sold Flash II. It was kept in storage for many years, and tendered a thorough and loving restoration by its new owner. Over 90% of the sloop is original and the owner's fondness for the historical significance of the boat prompted him to use materials from the era, as difficult as they were to obtain. Craftsmen were carefully selected with the highest level of expertise to help restore the boat, thus ensuring that Flash II would be presented in flawless condition. The boat boasts it beauty: its slim white body is finished with linseed oil-based enamel paint, polished fittings in bronze and the wood trim pieces include a Spanish cedar-varnished splash rail.

John F. Kennedy's Flash II has been on display in various boat shows and museum. Good condition. Registered as #721 by the International Star Class Yacht Racing Association. The boat measures 22 feet by 8 feet with a 35 mast and weighs 760 pounds.

* This lot is not part of the Robert L. White Collection

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA,            )
              Plaintiff,             )
                                     )
         v.                          )Civil Action No.05-10192-WGY
                                     )
ONE STAR CLASS SLOOP SAILBOAT        )
BUILT IN 1930 WITH HULL NUMBER 721,  )
NAMED "FLASH II,"                    )
              Defendant.             )
```

## NOTICE OF FILING OF EXHIBIT B
## TO GOVERNMENT'S RESPONSE TO CLAIMANT'S
## COUNTER STATEMENT OF FACTS

The government herewith files a segment from the audio

recording of the conversation between Anderson and the CW on

September 27, 2004.  This audio recording is a segment of DEA

Exhibit N-168, referred to by Claimant at ¶ 3 of Claimant's 56.1

Statement.  See Docket Entry 56-3, at ¶ 3.  The transcript of

this audio segment was filed as Exhibit A to the Government's

Response to Claimant's Counter Statement of Facts.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /s/ Nancy Rue
     Nancy Rue
     Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I certify that this exhibit has been served by mail on
Brenda Grantland, cousel for Claimant.

By:  /s/ Nancy Rue
     Nancy Rue
     Assistant U.S. Attorney