UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Civil Action # 05-10192 |
| ONE STAR CLASS SLOOP SAILBOAT BUILT IN 1930 WITH HULL NUMBER 721, NAMED "FLASH II", | |
| Defendant. | |
| KERRY SCOTT LANE, | |
| Claimant. | |

**CLAIMANT'S MOTION FOR RECONSIDERATION
OF THE COURT'S ORAL RULING GRANTING SUMMARY JUDGMENT
IN FAVOR OF THE GOVERNMENT ON THE ISSUE OF
THE DISCRETIONARY FUNCTION EXCEPTION TO THE
FEDERAL TORT CLAIMS ACT**

Claimant, Kerry Scott Lane, M.D., through undersigned counsel, hereby moves this

Honorable Court to reconsider its oral ruling, made during a telephonic conference on or about

May 15-17, 2007[1] – that the government was immune from damages under the Federal Tort

Claims Act under the discretionary function exception, 28 U.S.C. § 2680(a).  As grounds for this

motion Claimant states the following:

1.  The government raised its discretionary function argument for the first time during the

hearing on the cross-motions for summary judgment, held before this Court on May 3, 2007.  At

---

[1]  The telephonic status conference does not appear in the docket.

the close of that hearing, the government asked permission to file additional memoranda.  The
Court stated the government was free to do so, but stated that it should be done quickly because
the Court would not await further filings before ruling on the cross-motions for summary
judgment.

2.  On May 10, the government filed its Supplemental Memorandum which devoted three
pages to the discretionary function exception, briefing the legal authorities on the exception only
in the broadest of terms.  Fearing the Court would be ruling on the pending motions before she
had a chance to respond, Claimant's counsel hurriedly filed a response on May 11, but frankly
could not make sense of the very complicated discretionary function exception.

3.  Subsequent research on this issue led Claimant to believe that the agency conduct fell
into one of the exceptions to the exception – the mandatory duty rule of *Berkovitz v. United
States*, 486 U.S. 531, 536 (1988) ("the discretionary function exception will not apply when a
federal statute, regulation, or policy specifically prescribes a course of action for an employee to
follow.  In this event, the employee has no rightful option but to adhere to the directive.")
Accordingly, Claimant asked the government to provide a copy of the Department of Justice
Manual *A Guide to Interlocutory Sales and Expedited Settlement* (2003).  The government
refused to provide discovery of this document, saying it was for internal use only, and this Court
would not force the government to turn it over, stating instead that the court could make an
adverse inference from the refusal.

4.  With the government continuing to refuse to provide the document, Claimant's
counsel put the word out among the defense bar, and in the weeks since the trial, one of her
colleagues managed to obtain the document by simply making a phone call to the Justice

Department.[2]  As expected, the *Guide to Interlocutory Sales* shows that the Marshal Service violated its mandatory duties – imposed by federal statute as well as internal policy – in selling the sailboat through Guernsey's auction house without a minimum reserve, for a tenth of its appraised value.

WHEREFORE, for the reasons set out in the attached Memorandum, Claimant requests that this Court reconsider and reverse its previous oral ruling that the government can hide behind sovereign immunity for its actions by virtue of the discretionary function exception.

Respectfully submitted,
Kerry Scott Lane, MD,

By his attorneys,

        /s/Brenda Grantland
Brenda Grantland, Esq.
Law Office of Brenda Grantland

20 Sunnyside Suite A-204
Mill Valley, CA 94941
(415) 380-9108
(Pro hac vice)

        s/Eric B. Goldberg
Jeffrey P. Allen (BBO# 015500)
Eric B. Goldberg (BBO# 564398)
Seegel Lipshutz & Wilchins, P.C.
Wellesley Office Park
20 William Street, Suite 130
Wellesley, MA 02481
(781) 237-4400

---

[2]  The Justice Department sent the document as a PDF file, but it is too large to efile, so Claimant is efiling relevant excerpts from the Guide, and will email the entire Guide in its original PDF format to the courtroom deputy.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Civil Action # 05-10192 |
| ONE STAR CLASS SLOOP SAILBOAT BUILT IN 1930 WITH HULL NUMBER 721, NAMED "FLASH II", | |
| Defendant. | |
| KERRY SCOTT LANE, | |
| Claimant. | |

**POINTS AND AUTHORITIES IN SUPPORT OF CLAIMANT'S MOTION
FOR RECONSIDERATION OF THE ORAL RULING ON SOVEREIGN IMMUNITY**

The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA") waived sovereign immunity to allow successful forfeiture claimants to sue for money damages under the Federal Tort Claims Act for "any claim based on injury or loss of goods, merchandise or other property" while held by law enforcement agencies for the purpose of forfeiture. 28 U.S.C. § 2680( c). CAFRA's waiver of sovereign immunity was held to allow a successful forfeiture claimant to obtain a money judgment for the fair market value of the property (which coincidentally had been sold for a tenth of its value while litigation was pending). *Intrigue Trading, Inc., v. United States*, C.D. Cal. # CV-04-02360 Order Denying Defendant's Motion to Dismiss. See Exhibit __ .

1

Here, the Flash II was also sold for a tenth of its value while the forfeiture litigation was

pending.  As a prevailing claimant in the forfeiture litigation, Dr. Lane – like Intrigue Trading

Inc. – is entitled to the full fair market value of his interest in Flash II.

The government nevertheless attempts to hide behind the discretionary function

exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a).  It argues that "the law *presumes*

that a decision is grounded in policy (social, economic or political)"[1] and claims that unless Dr.

Lane can show that the government conduct violated a mandatory regulation its conduct must be

deemed discretionary.  The government claimed Dr. Lane bears the burden of proof on this issue.

Gov. Supp. Mem., Doc. 63-1 p. 9.  This is a misstatement of the law.

## I.      The government has the burden of proving the discretionary function applies

The *government* has the burden of proving the discretionary function applies.  MOORE'S

FEDERAL PRACTICE, vol. _ § 105.26[7][e] (3rd Ed. 2006) (hereinafter cited as "MOORE'S") ("The

party asserting an exception to FTCA liability has the burden of proving that the exception

applies to the claims or case").  See also *Bear Medicine v. United States*, 241 F.3d 1208, 1213-

1217 (9th Cir. 2001).

"The general rule that a waiver of sovereign immunity is construed strictly in favor of the

sovereign does not apply in the context of the FTCA."  MOORE'S vol. __ § 105.26[7][d], citing

*Dolan v. United States Postal Serv.*, 546 U.S. 481, 491-492 (2006).  *Dolan* explained:

> [T]his case does not implicate the general rule that "a waiver of the Government's
> sovereign immunity will be strictly construed, in terms of its scope, in favor of
> the sovereign," *Lane v. Pena*, 518 U.S. 187, 192, (1996). As *Kosak* [*v. United
> States*, 465 U.S. 848 (1984)] explains, this principle is "unhelpful" in the FTCA
> context, where "unduly generous interpretations of the exceptions run the risk of

---

[1]  Doc. 63-1 p. 9 (emphasis in original).

2

defeating the central purpose of the statute," 465 U.S., at 853, n. 9, which "waives the Government's immunity from suit in sweeping language," *United States v. Yellow Cab Co.*, 340 U.S. 543, 547 (1951); see also *United States v. Nordic Village, Inc.*, 503 U.S. 30, 34 (1992) (observing "we have on occasion narrowly construed exceptions to waivers of sovereign immunity where that was consistent with Congress' clear intent, as in the context of the 'sweeping language' of the [FTCA]" (quoting *Yellow Cab Co.*, supra, at 547)). Hence, "the proper objective of a court attempting to construe one of the subsections of 28 U.S.C. § 2680 is to identify 'those circumstances which are within the words and reason of the exception' -- no less and no more." *Kosak*, supra, at 853, n. 9 (quoting *Dalehite v. United States*, 346 U.S. 15, 31 (1953)).

546 U.S. at 491-492 (2006).

## II.   The mandatory duty rule

In *Berkovitz v. United States*, 486 U.S. 531, 536-39 (1988), the Supreme Court held that

the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive.

486 U.S. at 536.   This is called the mandatory duty rule.

By falsely claiming that Dr. Lane had the burden of proof and refusing to turn over the applicable policy manual – claiming it was "internal" – the government attempted to hide behind a secret policy no one else could see.  The government had no right to hide behind this exception while refusing to disclose its internal regulations.  See *Ignatiev v. United States*, 238 F.3d 464, 466-67 (D.C. Cir. 2001) (internal policies and guidelines may constitute basis for mandatory duty; party opposing discretionary function exception is entitled to limited discovery to determine existence of internal policies that show the government actions were non-discretionary.)  Since the government has the burden of proof, it cannot rest behind its naked assertion that applicable statutes, regulations and policies gave it unfettered discretion to auction the Flash II through Guernsey's without a minimum reserve.

3

Now that the government's policy manual has been obtained through ordinary channels of the federal bureaucracy,[2] the purpose of the government's obfuscation is clear – the government is desperately trying to cover up the fact that it violated Department of Justice policy *and* federal statutes in auctioning Flash II as it did.

*A Guide to Interlocutory Sales and Expedited Settlement* (2003) (hereinafter cited as "*Guide*") [see Exhibit 1], states in its introduction to Part II:

> Forfeiture litigation may take years to complete, and situations may arise in which it is necessary or desirable to liquidate the property to preserve its value prior to a final order or judgment of forfeiture. Such sales, called "interlocutory" because they occur *during the pendency of litigation*, may be held pursuant to a court-approved stipulation of all parties. In the absence of an agreement, the court may order an interlocutory sale when certain criteria are met.

Id. at II-1 (emphasis added). "The primary consideration... is whether prompt sale is necessary to preserve the value of the property for forfeiture." *Guide* at II-2.

The *Guide* explains that – absent a stipulation between all the parties agreeing to the terms of the sale – the government has to obtain a court order finding one of three narrow grounds, after a hearing with notice to all interested parties. Federal statutes mandate that the property not be sold for less than 2/3 of its appraised value, after obtaining three appraisals.

## A.      Interlocutory sale by stipulation of all interested parties

"Interlocutory sales require court approval. This is most easily obtained when all interested parties agree to the sale." Id. at II-5.

---

[2] It is clear that this manual was never too "internal" to be released. It is clearly the same type of manual as the DOJ *Asset Forfeiture Policy Manual,* which was released under the Freedom of Information Act. Dr. Lane did not have time to pursue a FOIA request before responding to the government's sovereign immunity argument.

4

> If all interested parties consent to the sale, the parties may simply enter into a stipulation agreeing to sell the property, setting forth the terms of the proposed interlocutory sale, the process by which the sale will be conducted, and the agreed disposition of the proceeds pending conclusion of the case. ... The stipulation should be signed by all interested parties known to the Government, including all claimants in a civil case, all lienholders of record, *and all other persons known to have or to assert an ownership interest in the property.*[3]

Id. at II-5 (emphasis added).

Here, there was no attempt to obtain Dr. Lane's consent or a stipulation. The government simply announced it was selling the sailboat at Guernsey's December 2005 sale of Kennedy memorabilia. Dr. Lane stated that he would consent to the auction – but only if a minimum reserve was set which was acceptable to him. Lane Motion to Stay Judgment Pending Appeal, filed 11-8-2005, Doc. 25 p. 1 and Doc. 25-1, p. 2 and n. 1. Dr. Lane explained his concern that an auction without minimum reserve would risk a sale below market value.

> Because auctions of forfeited property are considered distress sales they typically result in prices significantly below fair market value – in fact they are often advertised as such. Given the fact that Dr. Lane and other co-owners of the sailboat were not served with notice and given the opportunity to contest the forfeiture before default judgment was entered, the potential clouds on the title could deter potential bidders from offering full value.[4]

Doc. 25-1 p. 2 n. 1.

### B.    Interlocutory sale over an owner's objections

"Where all interested parties do not agree to the interlocutory sale, federal statutes and case law provide means of obtaining the court's approval for a contested sale, pursuant to

---

[3] Thus, the fact that Dr. Lane had not been allowed to intervene in the case as a claimant prior to the sale, did not exempt the government from obtaining his consent to the terms of the sale.

[4] That, apparently is exactly what happened. Media publicity surrounding the auction included a prominent Boston Globe article about the forfeiture case and Dr. Lane's appeal of his unsuccessful attempt to intervene and vacate the default judgment.

complex and *strict guidelines*." *Guide*, Foreword at p. ii (emphasis added). "If the parties do not

agree to an interlocutory sale of the property or to the sale terms, a court order authorizing the

sale must be obtained by motion served on all interested parties..." *Guide* at II-6.  Grounds for

ordering an interlocutory sale over the objection of a party are limited to these situations:

> (A) "the... property is perishable, or liable to deterioration, decay, or injury by
>
> being detained in custody pending the action;"
>
> (B) "the expense of keeping the property is excessive or disproportionate; or"
>
> ( C) "there is an unreasonable delay in securing the release of the property."

Supp. R. Admir. Rule E(9)(b), quoted in *Guide* at II-3.  The same standards are imposed by 19

U.S.C. § 1612(a), allowing interlocutory sale if the property "is liable to perish or to waste or to

be greatly reduced in value by keeping, or ... the expense of keeping the same is disproportionate

to the value thereof...."

"The court may order that such a sale take place over a party's objection." *Guide* at II-6.

However, the order "must be obtained by motion served on all interested parties" and "the court

must articulate the reasons justifying the interlocutory sale."  Id.  Those conditions were not met.

### C.    Procedure for conducting a contested interlocutory sale

When a court orders an interlocutory sale over the objection of any interested party, such a sale must comply with the provisions of 28 U.S.C. §§ 2001, 2002, and/or 2004. These statutes provide procedural safeguards to ensure that court-ordered sales are made on terms that best preserve the parties' interests.

Section 2001(a) authorizes public sales of real property and sales by court-appointed receivers. Section 2001(b) permits private sales of real property after a hearing with notice to all interested parties and after the court finds that the best interests of the estate will be conserved thereby.

*Before confirming a private sale, the court must obtain three appraisals. No private sale can be confirmed for less than two-thirds of the appraised value*. The

proposed sale terms must be published before confirmation. The sale cannot be confirmed if a bona fide offer is made to buy the property for at least ten percent more than the proposed sale price. 28 U.S.C. § 2001(b).

... Contested interlocutory sales of personal property must be conducted in the same manner as real property sales, "unless the court orders otherwise." 28 U.S.C. § 2004.

*Guide* at II-6 (emphasis added).

The government's argument that the *Guide to Interlocutory Sales* is inapplicable because the sale occurred after entry of the default judgment[5] misses the point.  The standards enunciated in the manual come from federal statutes that do not limit their reach to sales prior to entry of a judgment.  The word "interlocutory" is not mentioned.

Pursuant to 28 U.S.C. § 2001(a), "any realty or interest therein *sold under any order or decree of any court of the United States* shall be sold... at public sale at the courthouse of the county, parish or city in which the greater part of the property is located."  Under 28 U.S.C. § 2004, the provisions of § 2001 apply to sales of personal property.  (Emphasis added.)

Since the auction was held at a private facility in New York City – and not at the federal courthouse in Boston, where the property was located – the Guernsey's auction did not qualify as a public sale.  The only other way to sell such property is through a private sale, pursuant to 28 U.S.C. § 2001(b).  Section 2001(b) requires the government to first obtain three appraisals, and the property cannot be sold for less than 2/3 of the appraised value.

---

[5]  The government in refusing discovery of the *Guide* has attempted to hyper-technically define the term "interlocutory sales" as sales occurring before final judgment, relying on the use of the term "interlocutory" in the sense of an interlocutory appeal.  Because appeals are limited by the final judgment rule, the term "interlocutory" in appellate procedure does not necessarily coincide with the meaning of the term in relation to the forced sale of subject property while litigation is ongoing.  Indeed, the *Guide* uses the term quite broadly.  "Such sales [are] called "interlocutory" because they occur *during the pendency of litigation*...."  *Guide* at II-1.

The government apparently only obtained one appraisal, not the three mandated by statute. Arlan Ettinger's November 18, 2004 appraisal, commissioned by the DEA, valued Flash II at between $800,000 and $1,000,000. See Exhibit 2. Since a private sale must be for at least 2/3 of the appraised value, Flash II could not legally have been auctioned at Guernsey's without at least a $600,000 minimum reserve (using the mid-range average of the one appraisal). This is a mandatory duty under the federal statutes.[6] Instead, the government stubbornly and lawlessly auctioned the Flash II through Guernsey's with no minimum reserve, resulting in a completed sale of $100,000 – approximately a tenth of the sailboat's appraised value.

Having failed to comply with its mandatory duty, the government cannot hide behind the discretionary function exception, and CAFRA's waiver of sovereign immunity permits Dr. Lane to obtain a money judgment for the fair market value of his interest in the Flash II.

### D.    Having decided to ignore its mandatory duties, the government's lawless conduct included further gyrations to accomplish its illegal private sale

It is not necessary for Claimant to go beyond the arguments presented above to establish that the mandatory duty rule precludes the government's reliance on the discretionary function exception. However, the government's subsequent deviations from its own internal policy showed the depths of its duplicity. Through their violation of DOJ policies the agents destroyed any meaningful recourse Dr. Lane had to retrieve the sailboat from the purchaser at auction – leaving the FTCA as his only remedy.

---

[6] In its *Guide*, the Department of Justice admits that the provisions of §§ 2001 and 2004 apply to forfeiture sales and that they are mandatory. "When a court orders an interlocutory sale over the objection of any interested party, such a sale must comply with the provisions of 28 U.S.C. §§ 2001, 2002 and/or 2004." *Guide* at II-6.

###### 1.    The Guernsey's contract

Guernsey's auction house owner Arlan Ettinger, who appraised Flash II for the DEA in November 2004, wanted to include Flash II in Guernsey's December 2005 auction of JFK memorabilia.  Documents produced in connection with Ettinger's deposition show that Guernsey's and the U.S. government engaged in discussions on amendments to Guernsey's standard auction consignment contract, and that a number of revisions were made – mostly having to do with the sliding scale percentage Guernsey's would take from the sale price.  See Exhibit 3, Ettinger deposition documents.

Despite the negotiated contract revisions, several mind-boggling provisions remained in the contract signed by Marshal Service employee Mary Magna, allowing Guernsey's to auction the Flash II without a minimum reserve.  See Exhibit 4

First, the government falsely warranted that it owned title free and clear of all liens and claims:

> 10. Representations, Warranties and Indemnification. You represent and warrant that you have title to the Property and the right to consign the Property for sale by us and that the Property is and will until the completion of the sale by us be free and clear of all liens, claims, encumbrances of others of whatever nature and that good title and right of possession of the Property will pass to the buyer free of all such liens, claims, encumbrances of whatever nature, and that there are not and, until the completion of the sale by us, there will not be any restriction or claims against us prohibiting or restricting our right to offer the Property at auction...

Guernsey's contract, paragraph 10. Exhibit 4 p. 2..

The contract's warranties of clear title were backed up by a hold harmless agreement, in which the U.S. government agreed to indemnify Guernsey's and/or the buyer, including attorneys fees, if they had to undergo litigation over title to the property.

> You hereby agree to indemnify us and hold us harmless from and against any and all claims, damage, loss or expense, inclusive of attorneys' fees, which we may incur by reason of your breach or alleged breach of any of your obligations, warranties or representations herein.

Id.  Amazingly, the government also warranted that the property was not forfeited!

> ...Consignor represents and warrants to Guernsey's that... (b) the Property is not "confiscated Property" within the meaning of any United States federal or state laws, (c) Consignor's consignment to and authorization of Guernsey's to sell the property is in full compliance with all United States federal and state laws...

### 2.    The policies of the DOJ *Asset Forfeiture Policy Manual*

The DOJ manual that the government did begrudgingly turn over[7] – the 2005 *Asset Forfeiture Policy Manual*, discusses the procedures regarding transfer of title to forfeited property in Chapter 5 (attached as Exhibit 5.)  The "Legal analysis" section begins with a caveat that the procedures specified govern disposition of property that has already been forfeited – that is, that the forfeiture process has progressed to the point that title has transferred to the government.

> Forfeiture divests an owner of property of all his or her right, title, and interest therein, and vests such right, title, and interest in the Government. In other words, because of the property's or its owner's involvement in criminal activity, forfeiture extinguishes all of the former owner's interests in that criminally derived or criminally involved asset and vests title in the United States." While the relation back doctrine found in section 853(c) provides that all right, title, and interest in forfeitable property vests in the United States upon the commission of the criminal act giving rise to the forfeiture, the Government's ownership interest therein is not confirmed to the world unless and until a final order of forfeiture is entered by a court.

---

[7]  The government turned it over only after the Court ordered it to, and delayed providing Claimant's counsel with a copy (citing difficulty finding another copy) until after the Court's May 15 oral ruling granting summary judgment for the government on sovereign immunity.  See emails from Nancy Rue, Ex. 7.

> Since the forfeiture process vests title to the property in the United States, a
> forfeiture sale is a sale by the Government of property it owns.

*Asset Forfeiture Policy Manual*, Exhibit 5, p. 86.

At the time the Flash II was sold, the government could not reasonably believe it had

title, free and clear of all claims. Dr. Lane had challenged the default judgment as void for lack

of due process. His motion to vacate the default judgment had been denied for a reason not

permitted under binding First Circuit precedent.[8] Though the government successfully hid the

facts until discovery after remand, the government knew it had made no attempt to locate Dr.

Lane or any other of the co-owners. Dr. Lane had already filed an appeal, though it had not yet

been docketed in the court of appeals, when the government auctioned the sailboat. On remand

from the appeal the default judgment was shown to be void for lack of due process notice.

Part IV of the *Policy Manual*, "Attorney General's Authority to Warrant Title" governs

the procedures regarding the transfer of title of forfeited property. Subsection B states

> Following the completion of procedures for the forfeiture of property pursuant to
> any law enforced or administered by the Department, the Attorney General is
> authorized, in her discretion, to warrant clear title to any subsequent purchaser or
> transferee of such property.
>
> The preferred deed to transfer forfeited property is a U.S. Marshal's quitclaim
> deed (USM-159A) executed by the U.S. Marshal. The quitclaim deed makes no
> warranty representations. It serves only to convey whatever right, title, and
> interest the Government had as of the execution date. A special warranty deed
> may be used instead when the U.S. Marshal, in consultation with the U.S.
> Attorney, concludes that such a deed is necessary and appropriate under the facts
> of a particular case, as described in section IV.B below. Finally, property may be
> transferred by a general warranty deed, but it is DOJ policy to use general
> warranty deeds only in exceptional circumstances as outlined in section IV.C at
> page 90.

---

[8] See *Gonzales-Gonzales v. United States*, 257 F.3d 31, 38 (1st Cir. 2001), cited in *United States
v. One Star Class Sloop Sailboat... Named "Flash II"*, 458 F.3d 16, 22-23 (1st Cir. 2006).

In footnotes the *Policy Manual* explains:

> The special warranty deed assures the grantee/buyer that the United States, as the current seller, has done nothing to encumber the property, nor has it conveyed any right, title, or interest in the property while the Government was the owner of the property. In effect, the special warranty deed warrants the forfeiture process.

P. 87 n. 93.  A special warranty may be used when the government concludes it is necessary and appropriate under the facts of a particular case, under the "limited circumstances" provided in Section IV-B at p. 99.

Of the seven "limited circumstances" or "special circumstances" enumerated, three include situations where the government is unsure it provided constitutionally adequate notice - in scenarios suggesting the party possibly deprived of notice was not actively contesting the case.  (Items 1, 4, 5).  Clearly, Dr. Lane  falls into a different category[9] than any of those three examples of potential clouds on title due to inadequate service of process.  Item 6 makes it a special circumstance if the forfeiture judgment is appealed at all – even when the claimants were given their full due process rights.  The prevalence of so many special circumstances, and the seriousness of the due process issues presented here should have alerted the government that an interlocutory sale over Dr. Lane's objection was not appropriate under DOJ policy.

Because of the obvious cloud on its default judgment, the government went out of its way to warrant title to Guernsey's.

---

[9]  Dr. Lane came forward and identified himself to the U.S. Attorney's Office before the default judgment was entered.  He filed a motion to vacate the default judgment alleging the judgment was void for lack of due process notice, and was actively litigating it when the property was sold without his consent.

The highest form of warranty discussed in the *Policy Manual* is the general warranty – which is to be used "only in exceptional circumstances outlined in Section IV.C. at page 90."  A general warranty "assures the grantee/buyer that title to the property is free and clear of any and all liens and encumbrances and insures the grantee/buyer from any future claims against the property."  Id. p. 88 n. 94.  The government provided Guernsey's with a general warranty:

> You represent and warrant that you have title to the Property and the right to consign the Property for sale by us and that the Property is and will until the completion of the sale by us be free and clear of all liens, claims, encumbrances of others of whatever nature and that good title and right of possession of the Property will pass to the buyer free of all such liens, claims, encumbrances of whatever nature, and that there are not and, until the completion of the sale by us, there will not be any restriction or claims against us prohibiting or restricting our right to offer the Property at auction...

Guernsey's contract, Exhibit 4, paragraph 10.  According to the *Policy Manual*:

> It is the policy of the DOJ that the Attorney General's discretion to warrant clear title, through the use of a general warranty deed, will be exercised only in compelling circumstances where the financial advantage of offering a general warranty deed in the particular case, compared to the available alternatives, far outweighs both the potential cost of honoring the warranty in that case and the potential effect of increased purchaser demand for general warranty deeds in future sales of other forfeited properties....

> ... If one or more of the circumstances listed in section IV.B at page 88, is present, and the U.S. Marshal and the U.S. Attorney responsible for the forfeiture action deem it appropriate to warrant clear title, the U.S. Marshal and the U.S. Attorney shall request approval from the Seized Assets Division to convey title through a general warranty deed or its equivalent.

Id. p. 90.[10]

---

[10]  On June 6, 2007, Claimant requested discovery of any documents submitted to the Seized Assets Division to obtain permission to provide Guernsey's with a general warranty, pursuant to *Policy Manual* pages 89-90.  AUSA Rue refused, stating the provision was irrelevant because it only applied to real property.  Exhibit 7 pp. 5-6.

In addition to giving Guernsey's a general warranty, the government gave Guernsey's and the buyer at auction an indemnity and hold harmless agreement, including reimbursement of attorneys fees if litigation resulted over breach of the warranties of good title. Again the Justice Department violated its own policies.

The *Policy Manual* requires indemnification agreements to state:

> (2) In the event that a court in a final judgment rules that the United States did not acquire valid legal title to the real property through the forfeiture process and therefore was not able to convey clear title to the buyer, the United States will refund to the buyer the amount of the purchase price of the property, plus the value of any improvements made to the property by the buyer. The amount will be paid out of the Assets Forfeiture Fund, plus interest on the total amount at the current rate as provided in 28 U.S.c. § 1961 from the date of the purchase of the property by the buyer to the date of the final judgment.

*Policy Manual* Exhibit 5 p. 89. The Guernsey's contract failed to include such a provision. Instead, it broadly agreed to indemnify Guernsey's and the buyer and hold them harmless for any claims, including attorney's fees.

If the indemnification agreement had included the required clause, the auction sale could have been voided and the sailboat returned to Dr. Lane to be resold at fair market value. Instead, the Guernsey's contract armed Guernsey's and the buyer with the full financial backing of the U.S. government – including attorneys fees – to defend its bogus title against Dr. Lane.

Given the rampant disregard of its mandatory duties, the government cannot rely on the discretionary function exception, and sovereign immunity does not protect it. Therefore, Dr. Lane is entitled to the full fair market value of his property interest in Flash II.

Respectfully submitted,
Kerry Scott Lane, MD,

By his attorneys,

14

/s/Brenda Grantland

Brenda Grantland, Esq.
Law Office of Brenda Grantland
20 Sunnyside Suite A-204
Mill Valley, CA 94941
(415) 380-9108
(Pro hac vice)


s/Eric B. Goldberg

Jeffrey P. Allen (BBO# 015500)
Eric B. Goldberg (BBO# 564398)
Seegel Lipshutz & Wilchins, P.C.
Wellesley Office Park
20 William Street, Suite 130
Wellesley, MA 02481
(781) 237-4400

# Foreword

This new publication revises and supersedes all previous editions of the *Expedited Forfeiture Settlement Policy for Mortgagees and Lienholders* and the *Guide to Sales of Property Prior to Forfeiture: The Stipulated and Interlocutory Sale*. It contains revised policies for expedited settlements and interlocutory sales and updated model forms. Additional forms are available on Asset Forfeiture and Money Laundering Online (AFML Online).

These policies are being covered by a single publication because they address similar concerns, and because they frequently overlap in practice. For example, entities that enter into expedited settlements with the Government early in a forfeiture case may later request an interlocutory sale after loans have gone into default or the forfeiture process has been unduly delayed.

The new policies contained in this publication address the legitimate concerns of the lending community while protecting the Government's interests as well. The expedited settlement policy seeks to avoid, insofar as possible, costly and unnecessary litigation between the Government and third-party lenders that have secured uncontested interests in forfeitable property. The interlocutory sale policy provides a means of protecting the interests of lenders and the Government, while preserving as much equity as possible for forfeiture, in cases where property owners default on their mortgages or other exigent circumstances arise.

I.   *Expedited Forfeiture Settlement Policy for Mortgagees and Lienholders*

The new policy set forth in this section is intended to avoid unnecessary litigation between the United States and innocent third parties holding perfected liens or mortgages against property that is subject to federal forfeiture. The policy is intended to provide consistency, predictability, and fairness in handling the claims of such parties. It applies to property that is restrained, arrested, seized, or alleged to be civilly or criminally forfeitable by the United States.

The primary driving force behind this revision of the expedited settlement policy is the Civil Asset Forfeiture Reform Act (CAFRA) of 2000. CAFRA substantially changed civil forfeiture practice. Among other things, it limited the time between seizure and the provision of notice to interested parties, and the time between the filing of a claim and initiation of civil forfeiture. It provided for hardship releases of personal property. It made even clearer, consistent with *United States v. James Daniel Good Real Property*, 510 U.S. 43, 114 S. Ct. 492 (1993), that pretrial seizure of real estate is the exception, not the rule, in forfeiture cases. It also increased the Government's burden of proof at civil forfeiture trials, and provided for the payment of attorneys' fees to successful claimants in contested civil forfeitures.

On the one hand, by speeding up the forfeiture process and leaving real estate in the hands of the original owner until trial in most cases, CAFRA should reduce the likelihood of pretrial mortgage defaults and should also reduce the waiting period that mortgagees and lienholders will typically face before they receive final

payments with respect to forfeited real properties. On the other hand, CAFRA increases the risks to the Government of paying off mortgages or liens, other than by agreement of all parties, before properties are finally forfeited and sold.

The former expedited settlement policy often committed the Government to pay liens and mortgages before properties were sold. The new policy does not require such advance payments as a condition of any expedited settlement, and presumes that generally such payments will not be made, because the Department of Justice has determined that such advance payments are generally no longer warranted in light of the changes effected by CAFRA.

The objective of the new expedited settlement policy is to encourage early settlements with legitimate mortgagees and lienholders. In those settlements, the Government will agree not to contest payment of the principal and accrued interest that are due from the net proceeds of sale of the property to the full extent possible. Thus, by entering into an expedited settlement, mortgagees and lienholders will protect their interests in forfeitable property early in a forfeiture case, avoiding unnecessary litigation costs. They will receive payment after sale of the property, pursuant either to an approved interlocutory sale or a final order of forfeiture.

II.  *A Guide to Interlocutory Sales in Forfeiture Cases*

Where a property owner has allowed a mortgage to go into default, and in certain other exigent circumstances, it is often advantageous and prudent to sell property seized or restrained for forfeiture before the conclusion of the forfeiture case. The proceeds of such an interlocutory sale are treated as a substitute for the original property (called the "substitute *res*" in a civil case) for purposes of jurisdiction and satisfaction of the final judgment.

*The Attorney General's Guidelines on Seized and Forfeited Property* encourages the use of pre-forfeiture sales as a means of preserving forfeitable equity and reducing asset management expenses. Such interlocutory sales may be accomplished either by agreement of all parties with the court's approval, or by court order on a contested motion.

The best, and least cumbersome, way to carry out an interlocutory sale is by agreement of all interested parties. In such a stipulated interlocutory sale, a proposed order setting forth the terms of the agreement is prepared and submitted to the court. If the court approves the order, the property is sold and the proceeds become the substitute *res*. Where all interested parties do not agree to the interlocutory sale, federal statutes and case law provide means of obtaining the court's approval for a contested sale, pursuant to complex and strict guidelines.

A *Guide to Interlocutory Sales in Forfeiture Cases* addresses both stipulated and contested interlocutory sales. It also provides guidance for determining whether or not an interlocutory sale of the property is warranted, and addresses the pros and cons of the two types of interlocutory sale. Sample pleadings can be found in the appendices and on AFML Online.

# Appendix B

# Model Forms

## 1. Motion for Interlocutory Sale

> Comment: This motion is intended for use in civil forfeitures where the interlocutory sale is contested. If this motion is used in cases where the parties have agreed to the sale and its terms, section C should be deleted to avoid confusion with the procedural requirements applicable to contested sales. For an alternative form of stipulation and order for use in uncontested sales, see Form 2.
>
> Likewise, this form can be adapted for use in criminal forfeitures by substituting the discussion on legal authority.

UNITED STATES DISTRICT COURT

_____DISTRICT OF _____

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA,       ) | |
|                                           ) | |
|         Plaintiff,                    ) | |
|                                           ) | Civil Action No. _____ |
|         - against -                   ) | |
|                                           ) | MOTION FOR INTERLOCUTORY SALE OF |
| REAL PROPERTY AND PREMISES     ) | [REAL PROPERTY AND PREMISES] |
| LOCATED AT _____     ) | |
| AND ALL IMPROVEMENTS AND       ) | |
| APPURTENANCES AFFIXED           ) | |
| THERETO,                             ) | |
|                                           ) | |
|         Defendants.                   ) | |
| _____) | |

**PLAINTIFF'S MOTION FOR INTERLOCUTORY SALE**

COMES NOW the plaintiff, United States of America, by and through the United States Attorney for the District of _____, and moves the court to order the interlocutory sale of the defendant real property described as follows:

[INCLUDE LEGAL DESCRIPTION]

<div align="center">

**PROCEDURAL HISTORY**

</div>

Plaintiff commenced this civil action on [DATE] to forfeit the defendant real property for violation of federal law, namely _____. Plaintiff served notice upon all persons and entities believed to have an interest in the defendant property by [PROVIDE DETAILS OF NOTICE] and notice of the action was published on [DATE] in [newspaper of general circulation]. On [DATES], _____ filed a claim to the defendant property and an answer to the complaint.

<div align="center">

**ARGUMENT**

</div>

**THE DEFENDANT PROPERTY SHOULD BE SOLD IN AN INTERLOCUTORY SALE TO PRESERVE ITS VALUE PENDING A DECISION ON THE FORFEITURE CLAIM**

When certain conditions are present, the court has authority under three statutory provisions to order an interlocutory sale of property that is subject to civil forfeiture prior to a final adjudication on the Government's forfeiture claim.

**A. Statutory Authority**

**1. The Supplemental Rules for Certain Admiralty and Maritime Claims**

The Supplemental Rules for Certain Admiralty and Maritime Claims generally apply to civil *in rem* forfeitures. *See* 28 U.S.C. § 2461(b); *United States v. $506,231 in United States Currency*, 125 F.3d 442, 449 n.5 (7th Cir. 1997) ("The Supplemental Rules are applicable to civil forfeiture proceedings pursuant to 28 U.S.C. § 2461(b)").

Supplemental Rule A states that:

> These rules also apply to the procedure in statutory condemnation proceedings analogous to maritime actions *in rem*, whether within the admiralty and maritime jurisdiction or not. Except as otherwise provided, references in these Supplemental Rules to actions *in rem* include such analogous statutory condemnation proceedings.

Civil forfeiture actions are such "analogous statutory condemnation proceedings" covered by the Supplemental Rules. *See United States v. All Right, Title and Interest et al.* 1996 WL 695671 *5 (S.D.N.Y. Dec. 5, 1996) ("A civil forfeiture proceeding is a type of in rem action within the meaning of 'statutory condemnation proceedings analogous to maritime actions in rem' as set forth in Supplemental Rule A."); *see also United States v. U.S. Currency in the Amount of $2,857*, 754 F.2d 208, 210 n.2 (7th Cir. 1984).

Supplemental Rule E(9)(b) provides:

> (i) On application of a party, the marshal, or other person having custody of the property, the court may order all or part of the property sold—with the sales proceeds, or as much of them as will satisfy the judgment, paid into court to await further orders of the court—if:

(A) the attached or arrested property is perishable, or liable to deterioration, decay or injury by being detained in custody pending the action;

(B) the expense of keeping the property is excessive or disproportionate; or

(C) there is an unreasonable delay in securing release of the property.

*See Berryhill Farm Estates*, 128 F.3d at 1389-90 (motion for interlocutory sale filed under Supp. R. E(9)(b)); *United States v. 8 Princess Court*, 970 F.2d 1156, 1160 (2d Cir. 1992) (Supp. R. E(9)(b) authorized interlocutory sale).

### 2. Customs Laws

Other statutory authority for interlocutory sales is found in the customs statute, 19 U.S.C. § 1612(a). Section 1612(a) is incorporated with other pertinent customs statutes by 21 U.S.C. § 881(d), 18 U.S.C. § 981(d), and 18 U.S.C. § 2254(d) to the extent it is "applicable and not inconsistent" with those civil forfeiture provisions. *See United States v. One Parcel of Property Located at 414 Kings Highway*, 128 F.3d 125, 127 n.2 (2d Cir. 1997) (19 U.S.C. § 1612 applies to forfeitures under 21 U.S.C. § 881). Section 1612(a), which is similar to Rule E(9)(b), also authorizes interlocutory sales when property becomes subject to diminishing value:

> Whenever it appears to the Customs Service that any vessel, vehicle, aircraft, merchandise, or baggage seized under the customs laws is liable to perish or to waste or to be greatly reduced in value by keeping, or that the expense of keeping the same is disproportionate to the value thereof, and such [PROPERTY]… has not been delivered under bond…[AND IS NOT SUBJECT TO ADMINISTRATIVE FORFEITURE], the Customs Service shall forthwith transmit its report of the seizure to the United States attorney, who shall petition the court to order an immediate sale of such vessel, vehicle, aircraft, merchandise, or baggage, and if the ends of justice require it the court shall order such immediate sale, the proceeds thereof to be deposited with the court to await the final determination of the condemnation proceedings….

19 U.S.C. § 1612(a); *cf. United States v. 8.4 Acres of Land Located in Little River Township*, 823 F.2d 546, 1987 WL 38057 *2 (4th Cir. May 20, 1987) (Table) (interlocutory sale stayed upon posting of bond).

### 3. Civil Asset Forfeiture Reform Act of 2000

In addition to the explicit provisions above, 18 U.S.C. § 983(j), enacted as part of the Civil Asset Forfeiture Reform Act of 2000, also provides general authority for interlocutory sales. Section 983(j) enables courts to take any "action to…preserve the availability of property subject to civil forfeiture." 18 U.S.C. § 983(j)(1). Interlocutory sales are intended for that very purpose—to preserve the value of property that is subject to forfeiture.

**B. The Conditions for an Interlocutory Sale Are Present**

As described in the Declaration of _____, the condition of the defendant property is [GIVE DETAILS REGARDING BASIS FOR INTERLOCUTORY SALE, E.G., PROPERTY SUBJECT TO DETERIORATION, DEPRECIATION, VANDALISM, NON-PAYMENT OF MORTGAGE, WHETHER THERE HAS BEEN A STAY OF THE PROCEEDINGS, ETC.]. These factors demonstrate the need for an interlocutory sale to preserve the value of the property pending a determination of the Government's forfeiture claims.

**C. Judicial Sale Procedures**

Contested judicial sales of real property must comply with the provisions of 28 U.S.C. §§ 2001 and 2002. These statutes provide procedural safeguards to ensure that court-ordered sales are made on terms that best preserve the parties' interests. Section 2001(a) authorizes public sales of real property and sales by court-appointed receivers. Section 2001(b) permits private sales of real property after a hearing with notice to all interested parties and after the court finds that the best interests of the estate will be conserved thereby. Before confirming a private sale, the court must obtain three appraisals. No private sale may be confirmed for less than two-thirds of the appraised value; the proposed sale terms must be published before confirmation; and the sale may not be confirmed if a bona fide offer is made to buy the property for at least ten percent more than the proposed sale price. 28 U.S.C. § 2001(b). These provisions apply to civil forfeitures such as this one. *See 1984 Kawasaki Ninja Motorcycle*, 790 F. Supp. at 701 (noting that property subject to 21 U.S.C. § 881 forfeiture may be sold pursuant to 28 U.S.C. §§ 2001-2004 "to the extent… not inconsistent with the relevant portions of the Drug Control Act").

<u>CONCLUSION</u>

For the reasons stated above, the United States respectfully requests that the court order the sale of the defendant property on the terms and conditions set forth in the proposed order submitted herewith.

Respectfully submitted,

DATED:                          _____
                                United States Attorney


                                _____
                                Assistant U.S. Attorney

## 2. Stipulation and Order for Uncontested Interlocutory Sale

UNITED STATES DISTRICT COURT

_____ DISTRICT OF _____

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. _____ |
| ) | |
| - against - ) | STIPULATION AND ORDER |
| ) | FOR INTERLOCUTORY SALE |
| REAL PROPERTY AND PREMISES ) | OF [REAL PROPERTY AND |
| LOCATED AT _____ ) | PREMISES] |
| AND ALL IMPROVEMENTS AND ) | |
| APPURTENANCES AFFIXED ) | |
| THERETO, ) | |
| ) | |
| Defendants. ) | |

_____ )

WHEREAS, the United States of America ("plaintiff"), by and through its counsel, _____, United States Attorney, and _____, Assistant United States Attorney, filed this action in the _____ District of _____ on _____, seeking the forfeiture of property known as _____, AND ALL IMPROVEMENTS AND APPURTENANCES AFFIXED THERETO  ("defendant property"); and

WHEREAS, on [DATE] plaintiff served notice upon all persons and entities believed to have an interest in the defendant property by [PROVIDE DETAILS OF NOTICE] and notice of the action was published on [DATE] in [NEWSPAPER OF GENERAL CIRCULATION]; and

WHEREAS, on [DATES], _____ filed a claim to the defendant property, and an answer to the complaint; and

WHEREAS, no other person or entity has filed a claim to the defendant property and the time to do so has expired; and

WHEREAS, the parties agree that the defendant property should be sold to preserve its value pending a final adjudication on the merits;

NOW THEREFORE, IT IS HEREBY STIPULATED AND AGREED that plaintiff, by and through its undersigned counsel, Claimant _____, _____, attorney of record for Claimant _____, and lienholder _____, by its undersigned authorized representative consent to the following:

1. The legal description of the defendant property is: _____, and the owners of record are _____.

2. In furtherance of the interlocutory sale, Claimant _____ agrees to execute promptly any documents which may be required to complete the interlocutory sale of the defendant property.

3. In furtherance of the interlocutory sale, the [UNITED STATES MARSHALS SERVICE OR OTHER APPLICABLE AGENCY] will retain a licensed, certified real estate appraiser to perform an appraisal of the defendant property. Claimant _____ agrees that he/she and his/her agents will fully cooperate with the [UNITED STATES MARSHALS SERVICE OR OTHER APPLICABLE AGENCY] for purposes of the appraisal, in that they will do the following:

    a.  Allow the appraiser full access to the defendant property;

    b.  [IF PROPERTY HAS RENTAL INCOME] Immediately provide the rent roll (the list of renters and the amount of rent paid by each) for the defendant property;

    c.  [IF PROPERTY HAS RENTAL INCOME] Immediately provide the last three years of operating expense records for the defendant property.

4. After the above-referenced appraisal has been completed, the Government will promptly forward a copy to claimant through his/her attorney of record. If any claimant disagrees with the value of the defendant property determined by the appraiser retained by the [UNITED STATES MARSHALS SERVICE OR OTHER APPLICABLE AGENCY], said claimant shall have the right, at his/her own expense, to have the property appraised by a licensed certified real estate appraiser of his/her choosing. If the parties thereafter are unable to agree on a sales price for the defendant property, the parties agree that the Honorable _____, United States [MAGISTRATE/DISTRICT] Judge, shall determine the offering price of the defendant property.

5. The parties agree that the [UNITED STATES MARSHALS SERVICE OR OTHER APPLICABLE AGENCY] will market and sell the defendant property and that the defendant property will be listed with a licensed real estate broker selected by the [UNITED STATES MARSHALS SERVICE OR OTHER APPLICABLE AGENCY].

6.   The parties agree that claimant will be notified of all reasonable offers to purchase the defendant property.

7.   If the highest offer to purchase is less than 95 percent of the offering price, the sale shall go forward only if plaintiff and claimant agree to the sale. However, the [UNITED STATES MARSHALS SERVICE OR OTHER APPLICABLE AGENCY] may, in its sole discretion, accept any offer to purchase the defendant property that is 95 percent or more of the offering price. The [UNITED STATES MARSHALS SERVICE OR OTHER APPLICABLE AGENCY] may, in its sole discretion, reject any offer to purchase the defendant property where it determines that the offer is being made by, or on behalf of, a person involved in the criminal activity alleged as the basis for forfeiture.

8.   The purchase price of the defendant property will be a cash price.

9.   The net proceeds from the sale of the defendant property will include all money realized from the sale of the defendant property, except for the following:
     a.   Real estate commissions, if any;
     b.   The amounts due to lienholder _____ pursuant to a _____ evidenced by documents recorded at the _____;
     c.   Amounts due the holder of any other valid lien which was recorded at the _____ prior to the time plaintiff's Notice of *Lis Pendens* was recorded;
     d.   Real estate property taxes which are due and owing;
     e.   Insurance costs, if any;
     f.   All costs incurred by the [UNITED STATES MARSHALS SERVICE OR OTHER APPLICABLE AGENCY] in connection with the maintenance, repair, marketing, and sale of the defendant property;
     g.   Escrow fees;
     h.   Document recording fees not paid by the buyer;
     i.   Title fees;
     j.   County transfer taxes.

10.  Plaintiff and claimant hereby agree to substitute the net proceeds realized from the sale of the defendant property as a "substitute *res*" for the defendant property in this lawsuit. The net proceeds shall be remitted to the custody and control of the [UNITED STATES MARSHALS SERVICE OR OTHER APPLICABLE AGENCY, OR CLERK OF THE COURT] as the substitute *res* in this case, and held pending further order of the Court.

11.  [IF MORTGAGE PAYMENTS ARE IN ARREARS]: Claimant _____ agrees that he/she will bring current the [MORTGAGE/DEED OF TRUST] held by _____, which is currently in arrears, and will further keep all payments current until the interlocutory sale is completed and the [MORTGAGE/DEED OF TRUST] held by_____ has been paid in full from the net proceeds of the sale of the defendant property.

12. Claimant _____ agrees that he/she will retain custody, control, and responsibility for the defendant property until the interlocutory sale has been completed. Claimant _____ further agrees that he/she will retain existing insurance on the defendant property until the interlocutory sale has been completed.

13. The signature pages of this stipulation may be executed in one or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument.

DATED:

                _____
                United States Attorney

                _____
                Assistant U.S. Attorney

DATED:

                _____
                Claimant

DATED:

                _____
                Attorney for Claimant

DATED:

                _____
                By: Authorized Representative
                for [LIENHOLDER]

### ORDER

Having reviewed the foregoing Stipulation and good cause appearing,
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

1. The Stipulation is hereby APPROVED.

2. Plaintiff and claimants have agreed to the interlocutory sale of the defendant property.

3. In furtherance of the interlocutory sale, Claimant _____ will execute promptly any documents which may be required to complete the interlocutory sale of the defendant property.

4.  In furtherance of the interlocutory sale, the United States Marshals Service will retain a [STATE]-licensed certified real estate appraiser to perform an appraisal of the defendant property. Claimant _____ and his/her agents will fully cooperate with the United States Marshals Service for purposes of the appraisal, in that they will do the following:

    a.  Allow the appraiser full access to the defendant property;
    b.  [IF PROPERTY HAS RENTAL INCOME] Immediately provide the rent roll (the list of renters and the amount of rent paid by each) for the defendant property;
    c.  [IF PROPERTY HAS RENTAL INCOME] Immediately provide the last three years of operating expense records for the defendant property.

5.  After the above-referenced appraisal has been completed, the Government will promptly forward a copy to claimant through his/her attorney of record. If any claimant disagrees with the value of the defendant property determined by the appraiser retained by the United States Marshals Service, said claimant shall have the right, at his/her own expense, to have the property appraised by a licensed certified real estate appraiser of his/her choosing. If the parties thereafter are unable to agree on a sales price for the defendant property, the parties agree that the Honorable_____, United States [DISTRICT/MAGISTRATE] Judge, shall determine the offering price of the defendant property.

6.  The [UNITED STATES MARSHALS SERVICE OR OTHER APPLICABLE AGENCY] will market and sell the defendant property and the defendant property will be listed with a licensed real estate broker selected by the [UNITED STATES MARSHALS SERVICE OR OTHER APPLICABLE AGENCY].

7.  The claimant will be notified of all reasonable offers to purchase the defendant property.

8.  If the highest offer to purchase is less than 95 percent of the offering price, the sale shall go forward only if plaintiff and claimant agree to the sale. However, the [UNITED STATES MARSHALS SERVICE OR OTHER APPLICABLE AGENCY] may, in its sole discretion, accept any offer to purchase the defendant property that is 95 percent or more of the offering price. The [UNITED STATES MARSHALS SERVICE OR OTHER APPLICABLE AGENCY] may, in its sole discretion, reject any offer to purchase the defendant property where it determines that the offer is being made by, or on behalf of, a person involved in the criminal activity alleged as the basis for forfeiture.

9.  The purchase price of the defendant property will be a cash price.

10. The net proceeds from the sale of the defendant property will include all money realized from the sale of the defendant property, except for the following:

    a.  Real estate commissions, if any;
    b.  The amounts due to lienholder _____ pursuant to a _____ evidenced by documents recorded at the _____;
    c.  Amounts due the holder of any other valid lien which was recorded at the _____ prior to the time plaintiff's Notice of *Lis Pendens* was recorded;

    d.   Real estate property taxes which are due and owing;

    e.   Insurance costs, if any;

    f.   Any and all costs incurred by the [UNITED STATES MARSHALS SERVICE OR OTHER APPLICABLE AGENCY] in connection with the maintenance, repair, marketing, and sale of the defendant property;

    g.   Escrow fees;

    h.   Document recording fees not paid by the buyer;

    i.   Title fees;

    j.   County transfer taxes.

11. Plaintiff and claimants will substitute the net proceeds realized from the sale of the defendant property as a "substitute *res*" for the defendant property in this lawsuit. The net proceeds shall be remitted to the custody and control of the [UNITED STATES MARSHALS SERVICE OR OTHER APPLICABLE AGENCY] as the substitute *res* in this case, and held pending further order of the Court.

12. [IF MORTGAGE/DEED OF TRUST PAYMENTS ARE IN ARREARS] Claimant _____ will bring current the [mortgage/deed of trust] held by _____, which is currently in arrears, and will further keep all payments current until the interlocutory sale is completed and the deed of trust held by _____ has been paid in full from the net proceeds of the sale of the defendant property.

13. Claimant _____ will retain custody, control, and responsibility for the defendant property until the interlocutory sale has been completed. Claimant _____ will retain existing insurance on the defendant property until the interlocutory sale has been completed.

DATED:

                _____

                Honorable

                United States District Court Judge

*A Guide to Interlocutory Sales in Forfeiture Cases*

# 3. Order for Public Judicial Interlocutory Sale

<div align="center">

UNITED STATES DISTRICT COURT

_____ DISTRICT OF _____

</div>

```
_____
                                )
UNITED STATES OF AMERICA,       )
                                )
           Plaintiff,           )        Civil Action No. _____
                                )
         - against -            )        ORDER FOR PUBLIC JUDICIAL
                                )         INTERLOCUTORY SALE
REAL PROPERTY AND PREMISES      )        OF [REAL PROPERTY AND
LOCATED AT _____   )        PREMISES]
AND ALL IMPROVEMENTS AND        )
APPURTENANCES AFFIXED           )
 THERETO,                       )
                                )
           Defendants.          )
_____ )
```

     Plaintiff United States of America has moved this court, pursuant to the Court's powers under 18 U.S.C. § 983(j); Rule E(9)(b) of the Supplemental Rules to the Federal Rules of Civil Procedure for Certain Admiralty and Maritime Claims; and the customs laws, 19 U.S.C. § l612(a) (made applicable to this action by [**21 U.S.C. § 881(D) OR OTHER STATUTE AS APPROPRIATE**]), for an order directing the interlocutory sale of the defendant real property with all its buildings, appurtenances, and improvements. Plaintiff has shown that:

     [**INCLUDE ANY APPROPRIATE FINDINGS, SUCH AS—**]

1. The defendant real property is liable to deterioration, decay, or injury pending this action and the expenses of keeping and maintaining the property during the pendency of the proceedings are excessive.

2. The equity in the property is being reduced by the accruing interest on the note payable to _____ because the owner and claimant _____ is not making mortgage payments. The Government's forfeitable interest in the property could be significantly reduced or eliminated if the mortgagee were permitted to conduct a foreclosure sale of the property.

3. An immediate interlocutory sale is in the best interests of all parties concerned.

4. Plaintiff does not contest the claim of [MORTGAGE HOLDER] and an agreement between plaintiff and [MORTGAGE HOLDER] has been filed with this Court and approved.

Accordingly, it is hereby ORDERED, ADJUDGED, and DECREED:

1. The defendant property shall be sold in an interlocutory sale pursuant to terms agreed to by all interested parties, in a written stipulation submitted to this court on or before _____.

2. If the parties cannot agree on the terms of the sale by the above referenced date, the defendant property shall be sold at public sale pursuant to 28 U.S.C. § 2001(a) or, if the best interests of the estate will be conserved thereby, at a private sale pursuant to 28 U.S.C. § 2001(b), after notice and a hearing has been held, pursuant to 28 U.S.C. § 2001(b).

[THE FOLLOWING APPLIES IF THE COURT ORDERS A PUBLIC SALE—SEE SEPARATE FORM FOR PRIVATE SALE]

3. Pursuant to 28 U.S.C. § 2002, notice of the sale shall be published once a week for four weeks in _____, a newspaper regularly issued and of general circulation in the county, state, or district where the defendant property is located. Notice shall also be sent by mail or other reasonable means to all persons known to the government to assert an interest in the property. The notice shall include the legal description of the property, the time and location of the sale, and either a copy of this order or a statement to the effect that: the property will be sold free and clear of all liens and encumbrances; any person having an interest in the property who fails to appear and participate in the sale will lose any right to assert that interest against the property; and only persons filing timely claims in this forfeiture proceeding may assert claims against the proceeds of sale. [ADD ANYTHING ELSE APPROPRIATE]

4. The sale shall take place at _____ on _____.

5. The net proceeds of the sale (sales price less real estate commission, closing costs, and other selling expenses) shall be used to pay off the outstanding taxes on the real property, the costs incurred by the _____ to maintain the property since the seizure on _____, and the note payable to [LIENHOLDER]. If the net proceeds are insufficient to pay the note, this order shall not affect any rights [LIENHOLDER] may have to seek a deficiency judgment against its obligor. No deficiency resulting from a sale pursuant to this order shall be a basis for action or recovery against the United States.

*A Guide to Interlocutory Sales in Forfeiture Cases*

6.  The remaining proceeds shall be deposited in [THE REGISTRY OF THE COURT, U.S. MARSHALS SEIZED ASSET DEPOSIT FUND, OR OTHER INTEREST BEARING ESCROW ACCOUNT] and shall be substituted as the defendant *res* in this action.

SO ORDERED, this _____ of _____, 20___.


_____

Honorable
United States District Judge

# 4. Order for Private Judicial Interlocutory Sale

UNITED STATES DISTRICT COURT

_____ DISTRICT OF _____

_____
|                                                      |
| UNITED STATES OF AMERICA,                            )
|                                                      )
|         Plaintiff,                                   )         Civil Action No. _____
|                                                      )
|       - against -                                    )         ORDER FOR PRIVATE JUDICIAL
|                                                      )          INTERLOCUTORY SALE
| REAL PROPERTY AND PREMISES                           )         OF [REAL PROPERTY AND
| LOCATED AT _____                        )         PREMISES]
| AND ALL IMPROVEMENTS AND                             )
| APPURTENANCES AFFIXED                                )
|  THERETO,                                            )
|                                                      )
|         Defendants.                                  )
_____)

This court, having issued an order on _____ directing the interlocutory sale of the defendant real property pursuant to Rule E(9)(b) of the Supplemental Rules to the Federal Rules of Civil Procedure for Certain Admiralty and Maritime Claims, [AND ANY OTHER STATUTE AS APPROPRIATE], and having found after a hearing held on _____ pursuant to 28 U.S.C. § 2001(b), that the best interests of the estate will be conserved by a private sale of the defendant property rather than a public sale,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

1. The defendant real property and premises, as described in Exhibit __ attached hereto and incorporated herein by reference, shall be sold as provided by 28 U.S.C. § 2001(b).

2. [THE UNITED STATES MARSHALS SERVICE OR OTHER APPLICABLE AGENCY] is authorized to retain a licensed, certified real estate broker, who shall be paid the usual and customary commission and/or fees from the proceeds of the sale, but not exceeding ___ percent.

3.  The following three disinterested appraisers are hereby appointed by the court to appraise the fair market value of the defendant property: _____. The appraisers shall submit their appraisal reports to [THE UNITED STATES MARSHALS SERVICE OR OTHER APPLICABLE AGENCY] no later than [DATE].

4.  No private sale shall be confirmed at a price less than two-thirds of the appraised value of the property, as determined by the court.

5.  The terms and conditions of the sale shall be as follows:

    (a) The sale shall be for cash;
    (b) The defendant property shall be sold in its entirety, free and clear of all right, title, claim, liens and interest of any and all persons or parties whatsoever existing in said property.

    **If the property is to be sold subject to a prior mortgage or lien, use the following language instead of 5(b):**
    (b) The defendant property shall be sold subject to the following mortgages or liens: [LIST].

6.  [THE UNITED STATES MARSHALS SERVICE OR OTHER APPLICABLE AGENCY] shall publish the terms of the highest and best contract of sale offered for the defendant real property in _____, a newspaper of general circulation at least ten days before confirmation.

7.  Such private sale shall not be confirmed if a bona fide offer is made which guarantees at least ten percent over the price offered in the private sale.

8.  Any bona fide offer (over bid) that guarantees at least a ten percent increase over the price offered in the private sale, as published in the newspaper, shall be made in the same terms and conditions as ordered by the court herein. Such over bid shall be reported by the [UNITED STATES MARSHALS SERVICE OR OTHER APPLICABLE AGENCY] as the sale price without the need of further publication for confirmation by the court.

9.  Thereafter, the [UNITED STATES MARSHALS SERVICE OR OTHER APPLICABLE AGENCY] shall file its report of sale, along with the reports of the appraisers. The report of sale shall include a statement of the highest and best offer of contract of sale, and the highest and best over bid, if any, for consideration by the court.

10. Upon the confirmation by the court of the private sale, the [UNITED STATES MARSHALS SERVICE OR OTHER APPLICABLE AGENCY] shall execute the contract of sale on the terms ordered by the court; proceed to consummate the sale and shall issue a deed without covenants or warranties, expressed or implied [OR QUITCLAIM DEED], to the buyer at such private sale.

11. From the proceeds of the sale, the [UNITED STATES MARSHALS SERVICE OR OTHER APPLICABLE AGENCY] shall pay any real estate commission, closing costs, and other selling expenses; all outstanding state and local taxes prorated to the date of the sale; all costs incurred by the

_____________ to maintain the property since the seizure on ______________; and the following mortgages and liens: _______________.

12. The remaining net proceeds shall be deposited in [**THE REGISTRY OF THE COURT, U.S. MARSHALS SEIZED ASSET DEPOSIT FUND, OR OTHER INTEREST BEARING ESCROW ACCOUNT**] and shall be substituted as the defendant *res* in this action.

**[THE FOLLOWING PROVISION MAY BE INCLUDED IF THE PARTIES WOULD PREFER TO TERMINATE A SALE RATHER THAN COMPLETING IT AT A PRICE TOO LOW TO COVER OUTSTANDING TAXES, LIENS, AND EXPENSES OF SALE. NOTE THAT IN SUCH CIRCUMSTANCES, IT MAY BE APPROPRIATE TO STIPULATE TO DISMISSAL OF THE FORFEITURE, PERMITTING THE LIENHOLDER TO FORECLOSE ON THE PROPERTY.]**

13. The sale of the defendant property shall not be confirmed if the net proceeds of the sale fail to equal or exceed any expenses of the sale and any mortgages, liens,or taxes encumbering the defendant property.

SO ORDERED, this _____ of _______________, 20___.

___________________________________
Honorable
United States District Judge

# 5. Joint Motion for Interlocutory Sale of Real Property

Comment:  When a court orders an interlocutory sale over the objection of any interested party, such a sale must comply with the provisions of 28 U.S.C. §§ 2001, 2002, and/or 2004. These statutes provide procedural safeguards to ensure that court-ordered sales are made on terms that best preserve the parties' interests. The case law does not explicitly address whether a court is bound by these provisions when all interested parties agree to an interlocutory sale and to the specific terms of sale. The apparent purpose of these provisions is to protect the rights of the parties in situations where the court orders an interlocutory sale over a party's objection. Once proper notice of the intended interlocutory sale has been given to all interested parties (including, for example, lienholders and unindicted co-owners in criminal forfeitures) and all interested parties have agreed on the terms of sale, the concerns that might otherwise have justified costly protective measures such as publishing the terms and obtaining three appraisals prior to a private sale are no longer present. Accordingly, courts routinely approve stipulated interlocutory sales without reference to 28 U.S.C. §§ 2001 et seq. *See BCCI Holdings*, 69 F. Supp. 2d at 44-45 (describing uncontested interlocutory liquidation of assets in criminal case); *see also 22 Santa Barbara Drive*, 264 F.3d at 866-67 (describing stipulated sale without citation of section 2001 et seq.); *United States v. 4118 West 178th Street*, 1995 WL 758436 (N.D. Ill. Dec. 21, 1995) (same).

UNITED STATES DISTRICT COURT
_____ DISTRICT OF _____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| - against - | ) | Criminal No. |
| | ) | _____ |
| JOHN DOE | ) | |

### Joint Motion For Interlocutory Sale Of Real Property

The United States of America, by its attorney, _____, United States Attorney for the District of _____, and Defendant _____ by his/her attorney, _____, hereby move that the Court enter an Order, in the form attached hereto as Exhibit A, permitting the sale of certain real property located at _____ [**Property Address**]. As reasons therefor, the parties state as follows:

[**Briefly Describe Circumstances and Reasons For Sale, Such As:**]

1.  On _____, a grand jury in this district indicted Defendant _____ (hereafter, "Defendant"), charging him with, among other offenses, money laundering, in violation of 18 U.S.C. § 1956. The indictment alleged further, that upon Defendant's conviction, certain property would be forfeitable to the United States, including the real property (hereafter the "Property") described in the indictment as follows: _____ [**Full Property Description**]. On the United States' motion, this

# Part II

# A Guide to Interlocutory Sales in Forfeiture Cases

## I. Introduction

Forfeiture litigation may take years to complete, and situations may arise in which it is necessary or desirable to liquidate the property to preserve its value prior to a final order or judgment of forfeiture. Such sales, called "interlocutory" because they occur during the pendency of litigation, may be held pursuant to a court-approved stipulation of all parties. In the absence of an agreement, the court may order an interlocutory sale when certain criteria are met. The sale proceeds (called the "substitute *res*" in a civil case) are substituted for the original property and used to satisfy the judgment whether for the United States or the opposing party. Interlocutory sales may be held in both civil and criminal forfeiture cases.

## II. Situations Where Interlocutory Sales May Be Appropriate

Interlocutory sales are appropriate where: (1) property is perishable or subject to depreciation, decay, or injury; (2) the expense of maintaining the property is excessive or disproportionate to the property's value; (3) a stay, lengthy pretrial proceedings, or some other factor delays the litigation; or (4) other exigent circumstances arise. The following are some examples:

- vacant real property that is subject to vandalism or that poses a particular danger to the community
- real property with delinquent mortgage payments, especially where a mortgagee is threatening or attempting to foreclose on the property
- real property that is deteriorating or in need of extensive repair work
- real property with growing crops that need constant attention
- livestock that must be fed and cared for
- perishable items that will lose their value if not sold immediately
- cars, planes, or boats that are expensive to store and maintain in relation to their value
- inherently dangerous materials such as explosives
- chemicals and pharmaceuticals with limited shelf life
- businesses operating under state or local licenses which may be revoked
- cases that have been stayed or otherwise delayed
- personal property subject to rapid, significant depreciation or loss in equity (*e.g.*, business interests; securities; and equipment, vessels, aircraft, and automobiles subject to lease or financing arrangements)

Courts have ordered interlocutory sales in these circumstances. *See, e.g., United States v. Real Property Located at 22 Santa Barbara Drive*, 264 F.3d 860, 866-67 (9th Cir. 2001) (stipulated sale paid off mortgage); *United States v. Pelullo*, 178 F.3d 196, 198-99 (3d Cir. 1999) (interlocutory sale approved over criminal defendant's objections where equity was being depleted by accruing taxes and interest on mortgagee's foreclosure judgment); *United States v. One Parcel of Real Property Described as Lot 41, Berryhill Farm Estates*, 128 F.3d 1386, 1389-90 (10th Cir. 1997) (because property was subject to deterioration and decay, district court granted Government's unopposed motion for interlocutory sale and confirmed sale despite claimant's subsequent motion to block it); *United States v. $82,685.53, More or Less in Proceeds from the Interlocutory Sale of 218 Cattle*, 2000 WL 828080 (S.D. Ala. May 31, 2000) (livestock sold); *Aguilar v. United States*, 1999 WL 1067841 *5 (D. Conn. Nov. 8, 1999) (despite claimant's opposition, interlocutory sale was warranted because properties were abandoned and subject to "vandalism, deterioration and depreciation" and mortgage payments were several months in arrears); *United States v. One 1979 Peterbilt*, 1994 WL 99540 *2 (E.D. La. Mar. 18, 1994) (granting unopposed motion for interlocutory sale because of depreciating value of vehicle); *cf. United States v. Real Property Known As 2916 Forest Glen Court*, 162 F. Supp. 2d 909, 917 (S.D. Ohio 2001) (court denied claimant's motion for interlocutory sale of seized, and nearly expired, pharmaceuticals because, *inter alia*, claimant failed to show likelihood of success on the merits and it was not in public interest to require Government to incur significant expense for tests to determine whether expiration date could be extended).

The proceeds of an interlocutory sale are substituted for the forfeitable property (as the substitute *res* in a civil case) and are held by the U.S. Marshals Service (USMS) or other custodial agency in a Seized Assets Deposit Fund or, if the court so orders, in the registry of the court or an interest-bearing escrow account, until the forfeiture is concluded. *See Berryhill Farm Estates*, 128 F.3d at 1390 (court ordered USMS to hold real property sale proceeds in Marshals' escrow account as substitute *res*). *See also Isbrandtsen Marine Services, Inc. v. M/V Inagua Tania*, 93 F.3d 728, 734 (11th Cir. 1996) (proceeds deposited in court registry); *Bowman v. United States*, 35 Fed. Cl. 397, 399 (Cl. Ct. 1996) (proceeds substituted as *res* and held in escrow); *United States v. Real Property Located at 40 Clark Road et al.*, 52 F. Supp. 2d 254, 257 n.1 (D. Mass. 1999) (same); *United States v. Premises Known as 1625 S. Delaware Avenue*, 1989 WL 156346 *1 (E.D. Pa. 1989) (same).

The primary consideration in deciding to seek an interlocutory sale is whether prompt sale is necessary to preserve the value of the property for forfeiture. Other factors may also weigh on the decision, such as whether the property has special evidentiary value, whether the property in its present condition poses a danger to the community or is fit to be sold to the public, and, in some cases, whether the most appropriate final disposition of the property is for official or public use rather than sale.

## III. Statutory Authority

A. Civil Forfeitures

Three statutory provisions authorize courts to order (or permit) interlocutory sale in civil forfeiture cases.

1. Supplemental Rules for Certain Admiralty and Maritime Claims

The Supplemental Rules for Certain Admiralty and Maritime Claims generally apply to civil *in rem* forfeitures. *See* 28 U.S.C. § 2461(b); *United States v. $506,231 in United States Currency*, 125 F.3d 442, 449 n.5 (7th Cir. 1997) ("the Supplemental Rules are applicable to civil forfeiture proceedings pursuant to 28 U.S.C. § 2461(b)").

In addition, Supplemental Rule A states that:

> These rules also apply to the procedure in statutory condemnation proceedings analogous to maritime actions *in rem*, whether within the admiralty and maritime jurisdiction or not. Except as otherwise provided, references in these Supplemental Rules to actions *in rem* include such analogous statutory condemnation proceedings.

Civil forfeiture actions are such "analogous statutory condemnation proceedings" covered by the Supplemental Rules. *See United States v. All Right, Title and Interest et al.*, 1996 WL 695671 *5 (S.D.N.Y. Dec. 5, 1996) ("civil forfeiture proceeding is a type of *in rem* action within the meaning of 'statutory condemnation proceedings analogous to maritime actions *in rem*' as set forth in Supplemental Rule A"); *see also United States v. U.S. Currency in the Amount of $2,857*, 754 F.2d 208, 210 n.2 (7th Cir. 1984).

Supplemental Rule E(9)(b) provides:

> (i) On application of a party, the marshal, or other person having custody of the property, the court may order all or part of the property sold—with the sales proceeds, or as much of them as will satisfy the judgment, paid into court to await further orders of the court—if:
>
> > (A)  the attached or arrested property is perishable, or liable to deterioration, decay, or injury by being detained in custody pending the action;
> >
> > (B) the expense of keeping the property is excessive or disproportionate; or
> >
> > (C) there is an unreasonable delay in securing release of the property.

*See Berryhill Farm Estates*, 128 F.3d at 1389-90 (motion for interlocutory sale filed under Supp. R. E(9)(b)); *United States v. 8 Princess Court*, 970 F.2d 1156, 1160 (2d Cir. 1992) (Supp. R. E(9)(b) authorized interlocutory sale).

### 2. Customs Laws

Other statutory authority for interlocutory sales is found in the customs statute, 19 U.S.C. § 1612(a). Section 1612(a) is incorporated with other pertinent customs statutes by 21 U.S.C. § 881(d), 18 U.S.C. § 981(d), and 18 U.S.C. § 2254(d) to the extent it is "applicable and not inconsistent" with those civil forfeiture provisions. *See United States v. One Parcel of Property Located at 414 Kings Highway*, 128 F.3d 125, 127 n.2 (2d Cir. 1997) (19 U.S.C. § 1612 applies to forfeitures under 21 U.S.C. § 881). Section 1612(a), which is similar to Rule E(9)(b), also authorizes interlocutory sale when property's value is diminishing:

> Whenever it appears to the Customs Service that any vessel, vehicle, aircraft, merchandise, or baggage seized under the customs laws is liable to perish or to waste or to be greatly reduced in value by keeping, or that the expense of keeping the same is disproportionate to the value thereof, and such [property]…has not been delivered under bond…[and is not subject to administrative forfeiture], the Customs Service shall forthwith transmit its report of the seizure to the United States attorney, who shall petition the court to order an immediate sale of such vessel, vehicle, aircraft, merchandise, or baggage, and if the ends of justice require it the court shall order such immediate sale, the proceeds thereof to be deposited with the court to await the final determination of the condemnation proceedings… .

19 U.S.C. § 1612(a); *cf. United States v. 8.4 Acres of Land Located in Little River Township*, 823 F.2d 546, 1987 WL 38057 *2 (4th Cir. May 20, 1987) (Table) (interlocutory sale stayed upon posting of bond).

### 3. Civil Asset Forfeiture Reform Act of 2000

In addition to the explicit provisions above, 18 U.S.C. § 983(j), enacted as part of the Civil Asset Forfeiture Reform Act of 2000, also provides general authority for interlocutory sales. Section 983(j) enables courts to take any "action to…preserve the availability of property subject to civil forfeiture." 18 U.S.C. § 983(j)(1). Interlocutory sales are intended for that very purpose—to preserve the forfeitable value of property.

## B. Criminal Forfeitures

### 1. Protective Orders

Statutory authority for interlocutory sales in criminal forfeiture cases can be found in the general provision for forfeiture protective orders, 21 U.S.C. § 853(e), which states:

> Upon application of the United States, the court may enter a restraining order or injunction, require the execution of a satisfactory performance bond, or take any other action to preserve the availability of the property…for forfeiture….

21 U.S.C. § 853(e)(1). Section 853(e) applies directly to title 21 criminal forfeitures and is incorporated by reference as to most other types of criminal forfeitures by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c).

Analogous provisions apply to other criminal forfeitures—18 U.S.C. § 2253(c) (forfeitures arising from sexual exploitation of children) and 18 U.S.C. § 1963(d) (RICO forfeitures).

2. Incorporation of Customs Laws

Most criminal forfeiture statutes also incorporate civil forfeiture procedures, including the customs laws, through a provision similar to 21 U.S.C. § 853(j), which states:

> (j) Applicability of civil forfeiture provisions
>
> Except to the extent that they are inconsistent with the provisions of this section, the provisions of section 881(d) of this title shall apply to a criminal forfeiture under this section.

As noted above, the civil forfeiture provision 21 U.S.C. § 881(d) incorporates the customs law authorizing interlocutory sales, and 21 U.S.C. § 853 is applicable to other criminal forfeitures under 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). A similar provision incorporating the customs law is found in 18 U.S.C. § 2253(i) (criminal forfeiture statute for child sexual exploitation offenses). Section 2253(i) cites an analogous provision in the corresponding civil forfeiture statute, 18 U.S.C. § 2254(d), which in turn incorporates the customs law. Accordingly, the customs law permitting or requiring interlocutory sales can be used with equal force in most criminal forfeitures.

## IV. Obtaining Court Approval for an Interlocutory Sale

A. Stipulated Motion and Order

Interlocutory sales require court approval. This is most easily obtained when all interested parties agree to the sale. It is thus advisable to seek the consent of all parties *first* before filing a motion. Where there is a significant risk that property will lose value before the case is concluded, it will generally be in the best interests of all parties to agree to an interlocutory sale as the best way to preserve the property's value. *See United States v. One 1984 Kawasaki Ninja Motorcycle*, 790 F. Supp. 697, 701 (W.D. Tex. 1992) (observing that "many circumstances could arise in which a claimant would want to be able to pursue [an interlocutory sale]").

If all interested parties consent to the sale, the parties may simply enter into a stipulation agreeing to sell the property, setting forth the terms of the proposed interlocutory sale, the process by which the sale will be conducted, and the agreed disposition of the proceeds pending conclusion of the case. *See United States v. BCCI Holdings (Luxembourg), S.A.*, 69 F. Supp. 2d 36, 44-45 (D.D.C. 1999) (describing uncontested interlocutory liquidation of assets in criminal case to mitigate storage and maintenance costs); *United States v. Real Property and Residence at 3097 S.W. 111th Avenue*, 699 F. Supp. 287, 288 (S.D. Fla. 1988) (noting that parties had agreed to interlocutory sale). The stipulation should be signed by all interested parties known to the Government, including all claimants in a civil case, all lienholders of record, and all other persons known to have or to assert an ownership interest in the property. The signed stipulation is then

submitted to the court to be "so ordered," or if required by local rule and practice, is submitted with a motion and proposed order for interlocutory sale.

## B. Contested Motion and Order

If the parties do not agree to an interlocutory sale of the property or to the sale terms, a court order authorizing the sale must be obtained by motion served on all interested parties. *See United States v. Steel Tank Barge H 1651*, 272 F. Supp. 658, 662-63 (E.D. La. 1967) (vacating interlocutory sale order because barge's owner had not received actual notice of the proposed sale). The court may order that such a sale take place over a party's objection. *See Pelullo*, 178 F.3d at 198-99 (interlocutory sale approved over criminal defendant's objections where equity was being depleted by accruing taxes and interest on mortgagee's foreclosure judgment); *Aguilar*, 1999 WL 1067841 *4-6 (explaining that interlocutory sale opposed by claimant was warranted because properties were abandoned and subject to "vandalism, deterioration and depreciation" and mortgage payments were several months in arrears). In the order, the court must articulate the reasons justifying the interlocutory sale. *See 8 Princess Court*, 970 F.2d at 1160 (noting absence of findings by district court to justify sale and remanding case for further proceedings).

When a court orders an interlocutory sale over the objection of any interested party, such a sale must comply with the provisions of 28 U.S.C. §§ 2001, 2002, and/or 2004. These statutes provide procedural safeguards to ensure that court-ordered sales are made on terms that best preserve the parties' interests. Section 2001(a) authorizes public sales of real property and sales by court-appointed receivers. Section 2001(b) permits private sales of real property after a hearing with notice to all interested parties and after the court finds that the best interests of the estate will be conserved thereby.

Before confirming a private sale, the court must obtain three appraisals. No private sale can be confirmed for less than two-thirds of the appraised value. The proposed sale terms must be published before confirmation. The sale cannot be confirmed if a bona fide offer is made to buy the property for at least ten percent more than the proposed sale price. 28 U.S.C. § 2001(b).

These provisions apply to civil as well as criminal forfeitures. *See United States v. Macia*, 157 F. Supp. 2d 1369, 1371 (S.D. Fla. 2001) (applying section 2001 to interlocutory sale in criminal forfeiture); *1984 Kawasaki Ninja Motorcycle*, 790 F. Supp. at 701 (noting that property subject to 21 U.S.C. § 881 forfeiture may be sold pursuant to 28 U.S.C. §§ 2001-2004 "to the extent…not inconsistent with the relevant portions of the Drug Control Act"). Contested interlocutory sales of personal property must be conducted in the same manner as real property sales, "unless the court orders otherwise." 28 U.S.C. § 2004.

*NB:* The case law does not explicitly address whether a court is bound by these provisions when all interested parties agree to an interlocutory sale and to the specific terms of sale.[1] Section 2004 does expressly

---

[1]  *Macia*'s scope is questionable. Although the decision purports to address the broad question "Does 28 U.S.C. § 2001 apply to the sale of forfeited property?" (157 F. Supp. 2d at 1371), other statements in the opinion indicate that the court was faced with the narrower issues presented by an interlocutory sale to which the claimant had objected. *See id.* at 1370.

allow courts to alter the procedures for sales of personal property, but sections 2001 and 2002 do not contain such language. However, the apparent purpose of these provisions is to protect the rights of the parties in situations where the court orders an interlocutory sale over a party's objection. Once proper notice of the intended interlocutory sale has been given to all interested parties (including, for example, lienholders and unindicted co-owners in criminal forfeitures) and all interested parties have agreed on the terms of sale, the concerns that might otherwise have justified costly protective measures such as publishing the terms and obtaining three appraisals prior to a private sale are no longer present. The parties' consent indicates that the terms of the sale are acceptable to them. Accordingly, courts routinely approve stipulated interlocutory sales without reference to 28 U.S.C. §§ 2001 *et seq. See BCCI Holdings*, 69 F. Supp. 2d at 44-45 (describing uncontested interlocutory liquidation of assets in criminal case); *see also 22 Santa Barbara Drive*, 264 F.3d at 866-67 (describing stipulated sale without citation of section 2001 *et seq.*); *United States v. 4118 West 178th Street*, 1995 WL 758436 (N.D. Ill. Dec. 21, 1995) (same).

## V. Practical Considerations

Interlocutory sales should be undertaken only after consultation with the USMS or, in cases where USMS is not the property custodian, with the applicable agency or contractor. USMS is authorized to carry out such sales under 28 U.S.C. § 566. The Secretary of the Treasury is authorized to retain contract services to do so. *See* 31 U.S.C. § 9703(a); Directive No. 27, October 1, 1995, "Processing Interlocutory Sales," issued by the Treasury Executive Office for Asset Forfeiture.

The proposed order should set out the terms and conditions of the interlocutory sale explicitly, with references to any applicable statutes and rules. It should include clear instructions to the USMS or the other agency or contractor conducting the sale. The order should also make specific provision for payment of taxes, any uncontested liens or mortgages, and all costs associated with the sale, and for the disposition of the net proceeds of the sale pending the conclusion of the case.

Assistant U.S. Attorneys (AUSAs) negotiating an interlocutory sale agreement or proposed order that will involve paying off a third-party claimant's mortgage or lien should include language to the effect that the parties will bear their own costs and attorneys' fees in the matter, unless the parties have agreed otherwise, such as where contract law requires the payment of costs and fees pursuant to the terms of the mortgage or lien and the Government has agreed to pay reasonable or negotiated costs and fees as part of the settlement agreement. Payment of costs and attorneys' fees should be rare in cases where the Government has promptly agreed not to contest a third party's claim. In all settlements it is appropriate for AUSAs to seek a waiver of any non-contractual claim for attorneys' fees under 28 U.S.C. § 2465(b).

# G U E R N S E Y ' S

# F A X

TO:          GREGG WILLOUGHBY

FAX:         978-453-7286

FROM:        SUSAN JAFFE

DATE:        NOVEMBER 18, 2004

PAGES:       COVER + INVOICE (1 PAGE)

             + APPRAISAL (2 PAGES)

Deposition Exhibit 17

108 EAST 73RD STREET, NEW YORK, NY 10021
212-794-2280 • FAX: 212-744-3638

S.S. UNITED STATES
PRESIDENT JOHN F. KENNEDY
THE McGWIRE BALL · MICKEY MANTLE
ARTWORK OF THE SOVIET UNION
ELVIS PRESLEY · JERRY GARCIA
SPORTING AUTOMOBILES

PH:  212.794.2280
FAX:  212.744.3638

AUCTIONS@GUERNSEYS.COM
WWW.GUERNSEYS.COM

# GUERNSEY'S

A LEADER IN THE SALE OF UNIQUE PROPERTIES AT AUCTION
108 EAST 73RD STREET · NEW YORK · NY 10021

November 18, 2004

D.E.A.
15 New Sudbury Street
Room E-400
Boston, Massachusetts   02203

## INVOICE

Appraisal fee.................................................................................$ 250.00
Ref: Star Class Sloop, *Flash II*, Hull #721

*Thank you.*

A DIVISION OF BARLAN ENTERPRISES, LTD.

S.S. UNITED STATES
PRESIDENT JOHN F. KENNEDY
THE McGWIRE BALL • MICKEY MANTLE
ARTWORK OF THE SOVIET UNION
ELVIS PRESLEY • JERRY GARCIA
SPORTING AUTOMOBILES

PH:  212.794.2280
FAX:  212.744.3638

AUCTIONS@GUERNSEYS.COM
WWW.GUERNSEYS.COM

# GUERNSEY'S

A LEADER IN THE SALE OF UNIQUE PROPERTIES AT AUCTION
108 EAST 73RD STREET • NEW YORK • NY 10021

## FLASH II
John F. Kennedy's Star Class Sailboat

## DESCRIPTION & HISTORY

DIMENSIONS:    22 feet long
               8 feet wide
               35 feet mast
WEIGHT:        760 pounds

Registered as #721 by the International Star Class Yacht Racing Association.

Believed to have been originally built in 1930 by Ole Hope for Hercules B. Atkin, this sleek sloop was purchased in 1934 by John F. Kennedy and his older brother Joseph Kennedy, Jr.  The Kennedy's keen interest in sports, and particularly the water sports they enjoyed during their summers in Hyannisport, was well known.  Their enthusiasm and passion for sailing and swimming usually evolved into heated competitions among the brothers, their family, and friends.  With the purchase of this 22-footer, John F. Kennedy was able to further hone his sailing skills as a member of the Nantucket Sound Star Fleet.

Star boats were exceedingly tricky to sail because of their towering masts and narrow hulls, but Flash II was an especially fast boat and in it John F. Kennedy became an exceptional sailor, winning many races at the Wianno and Hyannisport Yacht Clubs.  Kennedy won high acclaim when he triumphed in one race in an unprecedented four-minute victory.  As stated in a publication from the time, "...the amazing win by John Kennedy in his Nantucket Sound Flash II in the last race by nearly four and a half minutes, an almost unprecedented margin for a Blue Star event."

Throughout the summer months, John F. Kennedy spent hours each day sailing with close friends, often the very people who would later serve him as key political advisors, including Lem Billings.  Kennedy's poor health as a child was nourished with his fervor for sailing, and undoubtedly it was his water activities that helped physically strengthen him.  Having been a weak and sickly youngster, Kennedy fell ill again during his college years and, through his therapeutic water activities, regained much of his health and strength.  His time aboard his sloop, Flash II, clearly played a large part of this rehabilitation.

In 1940, John F. Kennedy removed his brother Joe's name from the boat registry, and shortly thereafter, in 1942, he sold Flash II.  The boat was kept in storage for many years, after which its' most recent owner undertook a meticulous and thorough restoration.  Over 90% of the sloop is original and during its restoration, great care was taken to use materials from the era, although they were often difficult to obtain.  Craftsmen with the high-

est possible level of expertise were carefully selected to help restore the boat, ensuring that Flash II would be returned to its' original condition. Details of this restoration include a white body finished with linseed oil-based enamel paint, polished fittings in bronze and wood trim pieces that include a Spanish cedar-varnished splash rail.

Flash II was included as Lot #80 in Guernsey's John F. Kennedy Auction, conducted in March, 1998 in New York City. In conjunction with that event the boat was exhibited at the New-York Historical Society, Seventh Regiment Armory and the atrium of Trump Tower. This boat has also been exhibited at numerous boat shows and museums including the Museum of Yachting in Newport Rhode Island in 1997.

## APPRAISAL

In our opinion, were the Flash II to be made available to us today, we would place an estimate on it of from $800,000 to $1,000,000 (eight hundred thousand to one million dollars.) At auction, we believe it would be capable of fetching $1,000,000.

We offer the above opinion based on our thirty years of experience selling high end items relating to legendary figures primarily from the twentieth century. For example, Guernsey's sold the rock-era guitars of Jerry Garcia (Grateful Dead) for approximately $1 million each and the home run record setting baseball hit by Mark McGwire for $3 million. The firm has sold many vintage automobiles for substantial amounts and conducted what many view as the most highly regarded auction of boats and boating artifacts when we held our Yachting Auction on the grounds of the Museum of Yachting in Newport, Rhode Island. Other nautical events conducted by Guernsey's would include the sale of the contents of the ocean liner *SS United States* (the world's largest auction) and our recent Titanic Auction held at New York's South Street Seaport Museum. In addition to working closely with many of our nation's finest museums, we have proudly represented our government in such matters as the appraisal and sale of the Calumet Farm Thoroughbred Racing Trophy Collection. Of course, auctions including material relating to John F. Kennedy, Franklin Roosevelt and many other presidents have long been a mainstay of this company.

Arlan Ettinger
President

November 18, 2004

# GUERNSEY'S

# FAX

| | |
|---|---|
| TO: | MARY MAGNO |
| | UNITED STATES MARSHALL'S OFFICE |
| FAX: | 617-748-2539 |
| | |
| FROM: | ARLAN ETTINGER |
| DATE: | SEPTEMBER 13, 2005 |
| | |
| RE: | JOHN F. KENNEDY SAILBOAT, FLASH II |
| PAGES: | COVER + 1 |

Deposition Exhibit 22

108 EAST 73RD STREET, NEW YORK, NY 10021
212-794-2280 • FAX: 212-744-3638

S. S. UNITED STATES
PRESIDENT JOHN F. KENNEDY
THE McGWIRE BALL · MICKEY MANTLE
ARTWORK OF THE SOVIET UNION
ELVIS PRESLEY · JERRY GARCIA
SPORTING AUTOMOBILES

PH:  212.794.2280
FAX:  212.744.3638

AUCTIONS@GUERNSEYS.COM
WWW.GUERNSEYS.COM

# GUERNSEY'S

A LEADER IN THE SALE OF UNIQUE PROPERTIES AT AUCTION
108 EAST 73RD STREET · NEW YORK · NY 10021

September 13, 2005

Ms. Mary Magno
United States Marshall's Service
1 Court House Way
Boston, Massachusetts 02101

re:   Kennedy sailboat, Flash II

Dear Ms. Magno:

Susan Jaffe of my office explained to me that, due to the high potential worth of the John F. Kennedy sailboat known as Flash II, you are obligated by law to speak with three potential sellers. Having been involved in competitions of this sort on other types of items, we are well aware of how that process works.   However, we would again look to point out that, in this unique situation, special circumstances exist.

The Flash II is not simply a used car, an antique piece of furniture or a painting by a known artist.   It is a treasured artifact with strong links to one of the most important Americans of the 20th century.   As such, all precedents would point to a high profile specialized auction, focusing on the career of such an individual and held on a global scale, as the way to go to maximize the potential of an item as extraordinary as this one.   To choose an auction house simply on the basis of a lower commission would be, in our opinion, shortchanging both the government and the private party that maintains a partial interest in the boat.   In this business, "you get what you pay for."

The John F. Kennedy auction we are preparing for is, by far, the most important and major auction relating to the late President ever held.   The catalogue we are currently in the midst of preparing will be the most comprehensive (and hopefully handsome) book of its type ever produced.   The Flash II, to be sure, would be a substantial addition to this project.

Please feel free to contact me personally, at your soonest convenience, particularly if it relates to modifying the commission we've proposed.

Sincerely,

Arlan Ettinger
President

A DIVISION OF BARLAN ENTERPRISES, LTD.

# G U E R N S E Y • S

# F A X

TO:       MARY MAGNO                          FAX:        617-748-2539
          U. S. MARSHALL'S OFFICE

FROM:     SUSAN JAFFE
DATE:     SEPTEMBER 30, 2005

WE ARE DELIGHTED WITH THE DECISION TO INCLUDE THE FLASH II IN OUR UPCOMING JOHN F. KENNEDY AUCTION. IT'S HARD TO IMAGINE A MORE APPROPRIATE OPPORTUNITY TO OFFER THIS HISTORIC VESSEL.

IN CONSIDERATION OF YOUR REQUEST AND SUGGESTION THAT GUERNSEY'S COMMISSION BE STRUCTURED ON A SLIDING SCALE, WE WOULD LIKE TO PROPOSE THE FOLLOWING:

   A.   A REDUCTION OF THE INITIAL COMMISSION FROM 20% TO 18%
   B.   A INCREMENTAL REDUCTION TO THE RATE OF COMMISSION AT INCREMENTALLY
        INCREASED LEVELS OF BIDDING, STRUCTURED AS FOLLOWS

| HIGH BID (HAMMER PRICE) | COMMISSION |
|---|---|
| UP TO $500,000. | 18% |
| $501,000 - $600,000 | 17% |
| $601,000 - $700,000 | 16% |
| $701,000 - $800,000 | 15% |
| $801,000 - $900,000 | 14% |
| $901,000 - $1,000,000 | 13% |
| $1,000,001 AND UP | 12% |

WE'LL LOOK FORWARD TO HEARING FROM YOU AFTER YOU'VE HAD AN OPPORTUNITY TO REVIEW THIS.

THANKS AGAIN... WE VERY MUCH LOOK FORWARD TO WORKING WITH YOU ON THIS EXCITING PROJECT.

Deposition Exhibit 24

108 EAST 73RD STREET    NEW YORK   NY 10021
212 794 2280 / FAX 212 744 3638 • AUCTIONS@GUERNSEYS.COM / WWW.GUERNSEYS.COM
A DIVISION OF BARLAN ENTERPRISES LTD

# GUERNSEY'S
# FAX

TO:      MARY MAGNO
         U. S. MARSHAL'S SERVICE
FAX:     617-748-2539

FROM:    SUSAN JAFFE
DATE:    OCTOBER 7, 2005

RE:      FLASH II - CONSIGNMENT AGREEMENT
PAGES:   COVER + 4

HI MARY,

FOLLOWING OUR CONVERSATION YESTERDAY, WE HAVE PREPARED THE FOLLOWING CONSIGNMENT AGREEMENT FOR THE INCLUSION OF THE FLASH II IN OUR UPCOMING JOHN F. KENNEDY AUCTION.

IN THIS AGREEMENT, I HAVE MODIFIED PARAGRAPH 3 WHICH DEALS WITH OUR COMMISSION, TO REFLECT THE SLIDING SCALE THAT THE U.S. MARSHAL'S SERVICE HAS REQUESTED.  I HAVE ALSO DELETED MOST OF THE CUSTOMARY FEES (I.E. PHOTOGRAPHY, CATALOGUING, ETC) WHICH ARE USUALLY THE RESPONSIBILITY OF THE CONSIGNOR.

WITH REGARD TO PARAGRAPH 8 WHICH DEALS WITH INSURANCE, I HAVE MADE NO CHANGES TO OUR STANDARD LANGUAGE.  PLEASE REVIEW THIS PASSAGE, AS WELL AS THE BALANCE OF THE AGREEMENT WITH YOUR LEGAL DEPARTMENT, ETC. AND LET US KNOW HOW THIS CAN BEST BE DEALT WITH.

THANK AGAIN FOR ALL OF YOUR HELP ON THIS EXCITING PROJECT

Deposition Exhibit 25

108 EAST 73RD STREET, NEW YORK, NY 10021
212-794-2280 • FAX: 212-744-3638

## Susan Jaffe

**From:** "Margaret Bussiere" <MBussiere@dewittstern.com>
**To:** "Susan Jaffe" <sjaffe@guernseys.com>
**Sent:** Friday, October 28, 2005 9:45 AM
**Subject:** Guernsey's

Susan,

Underwriters at AXA Art Insurance Company have agreed to quote coverage for the addition of the JFK boat for a premium of $1,000 for the period through January 31, 2006 while in transit from Massachusetts and while located in storage.

The boat's value is based on $800,000.

This quote is subject to the following:

- Transit:
  - To be handled by professional boat mover only. Insured to provide schedule of expected transit and to notify us not less than 2 business days of any unscheduled transit.
- Storage location: Lafayette Fine Arts storage. Any other storage facilty must be pre-approved by the underwriter.
- Valuation:
  - Partial Loss: cost of repair or restoration only. Diminution in value due to a partial loss or damage will not be adjusted for claims purposes. The company reserves the right to approve the boatyard or shipwright that will perform any restoration, retouching or repair.
  - Total Loss: A total loss is determined if 80% of the existing hull is lost, destroyed or otherwise unrecoverable. Fittings, sheets, halyards, sails and removable equipment are not covered under this policy or considered part of the hull.
  - Value in the Event of a total loss: $800,000 or hammer price if the item is sold but not delivered.
- Inspection: If the underwriter requests an inspection of the premises, we must allow him to perform this service.

If you have any questions, please let me know. If you would like to bind coverage, please confirm by return email.

Thanks and regards,

Margaret

**Margaret Bussiere**
Assistant Vice President - Fine Arts

**DeWitt Stern Group, Inc.**
420 Lexington Avenue Suite 2700
New York, New York 10170
Tel. 212-297-1494
Fax. 212-573-4022
MBussiere@dewittstern.com
www.dewittstern.com

DeWitt Stern is compensated through fees and/or commissions for services provided to clients to identify, value, mitigate, transfer, and administer their risks. In addition to this compensation, DeWitt Stern has agreements with many of its insurance markets through which it is compensated for insurance placed in these insurance markets. These payments are based upon such factors as the overall volume, growth, and profitability of the total premium placed with each insurer. DeWitt Stern provides additional information about its compensation practices at the request of a client.

# GUERNSEY • S
# F A X

TO:      **MARY MAGNO**            FAX:      **617-748-2539**
           **U. S. MARSHALL'S OFFICE**

FROM:    **SUSAN JAFFE**
DATE:     **OCTOBER 26, 2005**

PAGES:    **COVER + 4**

FOLLOWING PLEASE FIND THE REVISED CONSIGNMENT AGREEMENT THAT WE HAVE PREPARED FOR THE INCLUSION OF THE JFK SAILBOAT "FLASH II" IN OUR UPCOMING KENNEDY AUCTION IN DECEMBER. I BELIEVE THAT WE HAVE MADE ALL OF THE CHANGES THAT YOU REQUESTED.

WITH REGARD TO YOUR REQUEST FOR A COPY FO THE LAW (REF: PARAGRAPH 18) , I CALLED OUR ATTORNEY TO GET THIS FOR YOU. HE ADVISED ME THAT WHAT IS REFERRED TO HERE IS THE GENERAL OVER-ALL LAW AS IT APPLIES TO CONTRACTUAL RELATIONS, BREACH OF CONTRACT, ETC. - AND THAT A "COPY OF THE LAW" WOULD CONSIST A COMPLETE SET OF BOOKS (APPROX 50 VOLUMES) THAT HE CALLED "MCKINNEY'S STATUTES". IT'S NOT LIKELY THAT THIS IS WHAT YOUR "LEGAL" FOLKS MEANT. PERHAPS YOU COULD RELAY THIS TO THEM.

TO SAVE TIME, IF EVERYTHING HAS BEEN CHANGED TO YOUR SATISFACTION ON THIS AGREEMENT, PLEASE SIGN AND RETURN A COPY TO US BY FAX (SEND TO: 212-744-3638). WE CAN THEN FAX BACK A COUNTER-SIGNED COPY TO YOU. HOWEVER, WE, AS WELL AS YOU (I'M SURE) WOULD LIKE ORIGINALS WITH ORIGINAL SIGNATURES AS WELL. SO FOR THAT REASON, I'LL BE FED-EXING 4 ORIGINAL HARD COPIES TO YOU THIS AFTERNOON. PLEASE HAVE 3 OF THEM SIGNED AND SENT BACK TO US, WE WILL THAN RETURN A FULLY EXECUTED COUNTER-SIGNED COPY TO YOU AS WELL.

WE'LL WAIT TO HEAR BACK FROM YOU - LATER TODAY, I GUESS - WITH WHAT YOU'VE BEEN ABLE TO ARRANGE FOR THE TRANSPORT OF THE BOAT, ETC.

WON'T YOU BE GLAD TO HAVE THIS "OUT OF YOUR HAIR"?!?!? WE DO REALLY APPRECIATE ALL OF YOUR HELP, AND THANK YOU AGAIN FOR OUR EFFORTS.

# GUERNSEY'S

DATE:  October 26, 2005                                    REFERENCE:  John F. Kennedy

### CONSIGNMENT AGREEMENT BETWEEN:

SELLER:   United States Marshal's Service                **GUERNSEY'S**
                                                         A Division of Barlan Enterprises, Ltd.
ADDRESS:  1 Courthouse Way, Suite I-500     **AND**     108 East 73rd Street
                 Boston, Massachusetts  02210              New York, New York 10021
TELEPHONE:  617-748-2525 (Mary Magno)                   212-794-2280  FAX: 212-744-3638

Thank you for consigning your property to Guernsey's.  This contract confirms our agreement under which the sailboat known as "Flash II", formerly owned by John F. Kennedy, will be offered by us as your agent for sale at unreserved public auction subject to provisions as set forth below and Guernsey's standard Terms and Conditions of Sale in effect at the time of the auction.  In the event of a conflict between the Terms and Conditions of Sale, on the one hand, and this Agreement, on the other hand, the terms of this Agreement shall control.  From time to time, we will refer to you as "Consignor."

1. Guernsey's Responsibility.  We shall be responsible for any and all costs incurred in connection with the pre-auction and auction activities including the promotion of same, production of the auction catalogue, advertising, security, employment of auction site personnel, and obtaining the required permits for auction, display, as well as other expenses reasonably required to conduct the auction.

2. The Auction.  Guernsey's shall have absolute discretion as to a) the place and date of the sale, b) the manner in which the sale is conducted, including the Terms and Conditions of Sale then in effect, and any determination to waive all or any portion thereof, c) consulting any expert, d) the description of the Property in its catalogue and other descriptions as we believe appropriate.

3. Commission.  For its services, Guernsey's will receive and retain a commission from the proceeds of the sale for each lot sold.  The commission due to Guernsey's will be calculated on the following sliding scale: 16% commission of a successful high bid up to and including $500,000; 15% commission of a successful high bid between $500,001 and $600,000; 14% commission of a successful high bid between $600,001 and $700,000; 13% of a successful high bid between $700,001 and $800,000; 12% of a successful high bid between $801,000 and $900,000; 11% of a successful high bid between $900,001 and $1,000,000; and 10% of a successful high bid of $1,000,001 or more.  You are aware that the buyer will be paying an additional premium and that premium in no way affects the amount due to us from you or the net amount payable to you from us after deducting our commission.

4. Settlement/Non-payment.  Thirty-five days after the sale, we will mail you the net proceeds (gross proceeds less our commission and buyer's premium) from the sale of the property, provided that we have received and collected payment in full from the buyer, unless the buyer has notified us of intention to rescind the sale or we have received notice of any other claim which would bear upon the validity of the sale, or have for any reason refunded such proceeds to the buyer prior to the expiration of such thirty-five days.

In the event of non-payment by the buyer, Guernsey's, in its sole discretion, as Consignor's agent or on our own behalf, reserves the right to cancel the sale and return the Property to you, or enforce payment by the buyer or take any other action permitted by law.  However, Guernsey's shall have no obligation to enforce payment by the buyer.  Guernsey's shall not, under any circumstances, be liable for any consequential damages to you as a result of non-payment by the buyer.

Depo Ek 31   1

5. **Expenses.** You agree to bear the expenses of a) packing and shipping to and from our premises, and b) other services and such additional costs and expenses not set forth above as may be agreed upon.

6. **Packing and Transport.** While we may recommend a carrier upon request, we accept no responsibility for that carrier's failure to comply with its agreement with you, and packing and transport of the Property to and from the auction will be at your expense and risk. Guernsey's shall have no liability whatsoever to Consignor in connection therewith, even when Guernsey's has recommended a carrier.

7. **Insurance.** (a) The Property will be insured by us from time of receipt until it ceases to be in our custody for an amount of $800,000.00, at no additional expense to the Consignor.

In the event that there is damage to or loss of any portion of the Property, Guernsey's shall receive a commission of any insurance proceeds for the items consigned, equal to that which would have been earned had the Property been sold.

8. **Limits of Liability.** If insured by us, Guernsey's liability to you resulting from loss of or damage to any Property shall not exceed the insurance coverage of such Property as provided in paragraph 7 of this agreement, less our commission, and shall be limited to the time period that said Property is in our custody. While we undertake to exercise reasonable care in handling the Property, we shall not be responsible for any damage to any Property caused by changes in humidity or temperature; inherent conditions or defects; nor shall we be responsible for any damage to frames, display cases or glass; or for damage caused by restorers, framers or other independent contractors employed with your consent. If insured by you Guernsey's shall have no liability to Consignor whatsoever resulting from loss of or damage to any Property.

9. Under no circumstances may you, your principals, agents, nor any representative of you or your principal bid for your Property. In the event that you breach any terms of this paragraph and you and/or your agent or representative becomes the successful bidder on your Property, then you shall pay to us a commission of 16% of the successful bid price plus the appropriate buyer's premium.

10. **Representations, Warranties and Indemnification.** You represent and warrant that you have title to the Property and the right to consign the Property for sale by us and that the Property is and will until the completion of the sale by us be free and clear of all liens, claims, encumbrances of others of whatever nature and that good title and right of possession of the Property will pass to the buyer free of all such liens, claims, encumbrances of whatever nature, and that there are not and, until the completion of the sale by us, there will not be any restriction or claims against us prohibiting or restricting our right to offer the Property at auction or to photograph, reproduce photographs or exhibit the Property for sale. Consignor grants to Guernsey's the right to illustrate and photograph the Property and to use such photographs, illustrations or images at any time before or after the sale and for such purposes as Guernsey's deems appropriate. Consignor agrees that all catalogues and other photographs, illustrations and descriptions of the Property created by or for Guernsey's are not "works made for hire" on behalf of Consignor under copyright law, and that Guernsey's shall own the exclusive copyright and all other rights relating to all such photographs, illustrations and descriptions.

You further represent the authenticity, history, and condition of the Property, as set forth on the annexed inventory hereof or in any documentation supplied by you to us. Consignor represents and warrants to Guernsey's that (a) Consignor has no reason to believe that any lot of Property is not authentic or is counterfeit, (b) the Property is not "confiscated Property" within the meaning of any United States federal or state laws, (c) Consignor's consignment to and authorization of Guernsey's to sell the Property is in full compliance with all United States federal and state laws, and (d) the exportation, if any, of the Property from any foreign country has been in full conformity with the laws of such country and the importation of the Property into the United States has been or will be in full conformity with the laws of the United States.

2

You acknowledge that the representations and warranties herein are for the benefit of Guernsey's and buyers of the Property and that we are relying on the foregoing representations and warranties in accepting this consignment. You agree that such representations and warranties are of a continuing nature and shall survive the completion of the transactions contemplated by this agreement. You agree to notify us promptly in writing of any event or circumstances that may cause the foregoing representation and warranties to be in doubt, false, inaccurate or violated in any way.

If you are acting as an agent for an undisclosed principal, you and principal, jointly and severally, assume all obligations in this Agreement to the same extent as if you were acting as principal.

You hereby agree to indemnify us and hold us harmless from and against any and all claims, damage, loss or expense, inclusive of attorneys' fees, which we may incur by reason of your breach or alleged breach of any of your obligations, warranties or representations herein. In the event of any such claims by third parties arising out of your breach of or alleged breach of your obligations, warranties or representations herein, you shall be obligated to still pay Guernsey's the full commission which would have been earned from the sale of such Property, whether or not the Property has yet been offered, sold or returned to Guernsey's, based upon the sale price, if sold, and the high estimate, if unsold.

The Property is bein sold "as is", where is, with no guarantee or warantees intended or implied.

11. Estimates, Property Descriptions. We are not responsible for any errors or omissions in the catalogue or other descriptions of the Property, and we make no guarantees, representations or warranties whatsoever to you with respect to the Property, its authenticity, condition, value, selling price or otherwise. Our presale estimates, subject to revision by us at our sole discretion, are intended as a guide for prospective bidders only. We make no representation or warranty, written or oral, of the anticipated selling price or value of any Property and no estimate may be relied upon as a prediction of the actual selling price.

12. Rescission. Guernsey's is authorized, as your agent, to rescind the sale of any Property at any time if, in our sole judgement, we determine that the offering for sale of any Property has subjected or may subject Guernsey's and/or you to any liability, including any liability under warranty of authenticity or title. In such event, we are further authorized to refund or credit to the buyer the purchase price of such returned Property rather than remit the net proceeds to you. If Guernsey's has already remitted to you any proceeds of the rescinded sale, you shall pay us on request an amount equal to the remitted proceeds plus our expenses incurred in the connection with the rescinded sale and any other amount you owe us, inclusive of attorneys' fees. In the event of rescission for reasons set forth in paragraphs 12 (a), (b) or (c), you will be liable to us for all buyer premiums and seller commissions which we would otherwise have earned.

13. Unsold Property. Any Property remaining unsold for any reason after the auction, and not being kept for sale, must be picked up by you within ten days after notice requiring you to collect it.

14. Default. In the event of the default of any of the terms herein, by either party hereto, the other party reserves any and all rights that party has at law or equity in addition to the rights herein specified. The prevailing party shall be entitled to reasonable attorneys' fees, and all costs incurred in the enforcement of this agreement.

15. Entire Agreement. All prior negotiation, representations, contracts or agreements, if any, between the parties hereto relating to the Property consigned, are hereby merged into this agreement and this agreement is the complete, entire and sole agreement between the parties. No modification, alteration, construction, amendment or rescission of or to this agreement shall be effective or binding unless in writing and executed by duly authorized officer of Guernsey's and you. This agreement is binding upon your heirs, executors, beneficiaries, successors, and assigns. However, you may not assign this agreement without prior written consent.

3

16. Controlling law. This agreement is entered into pursuant to New York law, and shall be governed by and construed in accordance with the laws of New York State.

17. Disputes. Any dispute arising out of a breach or an alleged breach of this agreement shall be brought exclusively in the courts of the State of New York. Venue shall be within the County of New York. Any defense of lack of personal or subject matter jurisdiction is waived by the parties hereto and neither party shall be liable to the other for any special, consequential or incidental damages.

18. Miscellaneous. The paragraph headings contained herein are for convenience of reference only and shall not be construed to affect in meaning the provisions of this agreement.

Please confirm your agreement with the foregoing by dating, signing and returning to us a duplicate copy of this agreement.

AGREED TO AND ACCEPTED BY:

BY _____

SIGNED _____     GUERNSEY'S
                                      A Division of Barlan Enterprises, Ltd.

DATED _____

**4**

# Chapter 5

# Use and Disposition of Seized and Forfeited Property

## I. Management and Disposal of Seized Assets

### A. Role of the U.S. Marshals Service

The U.S. Marshals Service shall have primary authority over the management and disposal of seized assets in its custody that are subject to forfeiture or are forfeited. Arrangements for property services or commitments pertaining to the management and disposition of such property are the responsibility of the U.S. Marshals Service. 28 C.F.R. § 0.111(i).

Prior to taking any action (e.g., in a settlement or plea agreement) concerning the management or disposition of property, the U.S. Attorney or agent in charge of the field office responsible for an administrative forfeiture case should consult with the U.S. Marshals Service or other custodial agency. Such discussions shall address the impact that such proposed action may have on the U.S. Marshals Service or other custodial agency in undertaking, continuing, or terminating custody of the property. If the interests of claimants are to be satisfied in whole or in part by payments from the proceeds of a sale of the property by the Marshals Service or other custodial agency, the proposed forfeiture order should provide specific guidance for the U.S. Marshals Service or other custodial agency concerning such payments.

## II. Use of Seized Property

### A. Background

Absent a final order of forfeiture affirmatively vesting title to seized property to the Government, the United States does not have title to the property. Any use of property under seizure and pending forfeiture raises issues of liability and creates the appearance of impropriety. The following general policies govern the use of seized property.

### B. Use of seized property by Department of Justice personnel

Property under seizure and pending forfeiture shall not be utilized for any reason by DOJ personnel, including for official use, unless and until a final order of forfeiture is issued.

Likewise, DOJ personnel shall not make such property available for use by others, including person(s) acting in the capacity of a substitute custodian, for any purpose prior to completion of the forfeiture. However, exceptions may be granted by the U.S. Marshals Service in situations such as the seizure of a ranch or business where use of equipment under seizure is necessary to maintain the ranch or business.

### C. Use of seized property where custody is retained by the state or local seizing agency

To minimize storage and management costs incurred by the DOJ, state and local agencies that present motor vehicles for federal adoptions should generally be asked to serve as substitute custodians of the property pending forfeiture.

Any use of such vehicles, including official use, by state and local law enforcement officials or others is prohibited by DOJ policy until such time as the forfeiture is completed and an equitable transfer is made.

### D. Use of seized real property by occupants

As a general rule, occupants of real property seized for forfeiture should be permitted to remain in the property pursuant to an occupancy agreement pending the forfeiture.

An occupancy agreement form has been developed by the DOJ that addresses departmental concerns and includes various restrictions (e.g., maintenance and access to the property, potential for continued illegal activity, threat to health and safety, etc.).

## III. Disposition of Forfeited Property

### A. Forfeiture orders

The disposition of property forfeited to the United States is an executive branch decision and not a matter for the court. Consequently, preliminary and final orders of forfeiture should be drafted broadly to direct forfeiture of the property to the United States "for disposition in accordance with law." It is also unnecessary to have the court confirm the manner and

*Asset Forfeiture Policy Manual*

conditions of the sale of forfeited property except in certain civil settlements. In the usual case, the U.S. Marshals Service is to determine the best method and conditions of the sale of forfeited property in its custody.

## B. Disposition of forfeited property in civil and criminal cases

### 1. Background

The Attorney General has been given the authority under 21 U.S.C. §§ 881(e) and 853(h) and other statutes[90] to dispose of forfeited property "by sale or any other commercially feasible means" without subsequent court approval. This is generally called a "forfeiture sale" of the property. While the DOJ takes the position that forfeiture sales do not require judicial confirmation pursuant to 28 U.S.C. § 2001,[91] at least one United States magistrate judge has concluded in a published opinion that section 2001 applies to the sale of forfeited property. *See United States v. Macia*, 157 F. Supp. 2d 1369, 1370 (S.D. Fla. 2001).

Note: Unlike the statutes cited in the preceding paragraph, the civil forfeiture statute, 18 U.S.C. § 981, contains no provision authorizing the Attorney General to dispose of forfeited property "by sale or any other commercially feasible means." Section 981(d) incorporates those provisions of the Customs laws dealing with the disposition of forfeited property. The forfeiture provisions of the federal gambling statute, 18 U.S.C. § 1955(d), also incorporate the Customs laws.

Under 19 U.S.C. § 1609(a), Customs officers are authorized to sell forfeited property "at public auction in the same manner as merchandise abandoned to the United States is sold or otherwise dispose of the same according to law…" *See also* 19 U.S.C. § 1612(a) (providing for interlocutory sale of administratively forfeitable property "at auction under regulations to be prescribed by the Secretary of the Treasury," and of other property pursuant to court order, without specifying the means of sale); 19 U.S.C. §§ 1491(a) and (e)(3) (providing, respectively, for sale of unclaimed merchandise and seized spirits "at public auction under such regulations as the Secretary of the Treasury shall prescribe"); *but see* section 1491(c) (providing that unclaimed merchandise, title to which has vested in the United States pursuant to section 1491(b), may be disposed of "in accordance with such regulations as the Secretary shall prescribe").

---

[90] *See* 18 U.S.C.§§ 1467(g), 1963(f), and 2253(g).

[91] In contrast, if an interlocutory sale is necessary before forfeiture because the property is declining in value, or for some other reason, the procedures set forth in *A Guide to Interlocutory Sales and Expedited Settlement* (2003) should be followed.

The Customs regulations provide as follows: 19 C.F.R. § 162.46(a) provides that administratively forfeited property "shall be disposed of in accordance with" sections 1609 and 1491(b). Part 162.46(c)(1) provides for sale of forfeited property "in accordance with the applicable provisions of part 127 of this chapter." Part 162.50(a) simply refers back to part 162.46 for disposition of judicially forfeited property.

Parts 127.14 and 127.21–.29 (to which one is cross-referred by part 162.46(c)(1)) provides for the sale of unclaimed and abandoned merchandise. Part 127.14(a) provides that abandoned merchandise is to be sold as provided in parts 127.21–.29, retained for official use, destroyed, "or otherwise disposed of as authorized by the Commissioner of Customs under the law...." Parts 127.21–.29 seem to presume that the method of sale will be by auction (e.g., by reference to "catalogs," "regular sales" to be held in each port, etc.) but they only actually say so as to certain types of "special merchandise." Parts 127.28(d) and (h), for example, provide for quick sale by public auction of "articles liable to depreciation" and "unclaimed merchandise remaining on dock." Part 127.27, the provision on "conduct of sale," simply provides, "sales may be conducted by the port director, any employee designated by him or by a public auctioneer," which could be read to presume auction sales, or could be read to mean that auctions are one option.

## 2. Legal analysis

Forfeiture divests an owner of property of all his or her right, title, and interest therein, and vests such right, title, and interest in the Government. In other words, because of the property's or its owner's involvement in criminal activity, forfeiture extinguishes all of the former owner's interests in that criminally derived or criminally involved asset and vests title in the United States.[92] While the relation back doctrine found in section 853(c) provides that all right, title, and interest in forfeitable property vests in the United States upon the commission of the criminal act giving rise to the forfeiture, the Government's ownership interest therein is not confirmed to the world unless and until a final order of forfeiture is entered by a court.

Since the forfeiture process vests title to the property in the United States, a forfeiture sale is a sale by the Government of property it owns. The forfeiture statutes give the power to the Attorney General, on behalf of the United States as owner, to dispose of the property

---

[92] *See United States v. A Parcel of Land, Buildings, Appurtenances and Improvements, Known as 92 Buena Vista Avenue, Rumson, New Jersey, et al.*, 507 U.S. 111, 128-130 (1993); *United States v. Grundy*, 7 U.S. (3 Cranch) 337, 350-351 (1806); *cf. Republic National Bank of Miami v. United States*, 506 U.S. 80, 89-92 (1992); *United States v. Real Property Located at 185 Hargraves Drive (In Re Newport Saving and Loan Association)*, 928 F.2d 472, 478 (1st Cir. 1991); sections 881(h), 853(c), and 18 U.S.C. § 1963(c).

however he or she deems suitable. After the final order of forfeiture, the court is not involved in the sale or disposal process.

The Attorney General's authority to dispose of forfeited property is determined by the relevant forfeiture statutes. The forfeiture statutes at issue, such as sections 881(e) and 853(h), give the Attorney General the authority to dispose of forfeited property "by sale or other commercially feasible means." It is clear from the language of the forfeiture statutes, from their legislative history, and from the cases and other authorities which have addressed this issue, that the Attorney General has complete authority to dispose of forfeited property.

## IV. Attorney General's Authority to Warrant Title

### A. Background

Section 2002 of the Crime Control Act of 1990, which amends 28 U.S.C. § 524(c), gives the Attorney General the authority to warrant clear title upon transfer of forfeited property. Section 524(c)(9)(A) reads as follows:

"Following the completion of procedures for the forfeiture of property pursuant to any law enforced or administered by the Department, the Attorney General is authorized, in her discretion, to warrant clear title to any subsequent purchaser or transferee of such property."

The authority of the Attorney General to dispose of forfeited real property and to execute deeds and warrant title has been delegated to the director of the U.S. Marshals Service, by 28C.F.R. § 0.111(i), and redelegated to chief deputies or deputy U.S. Marshals by 28 C.F.R. § 0.156.

The preferred deed to transfer forfeited property is a U.S. Marshal's quitclaim deed (USM-159A) executed by the U.S. Marshal. The quitclaim deed makes no warranty representations. It serves only to convey whatever right, title, and interest the Government had as of the execution date. A special warranty deed[93] may be used instead when the U.S. Marshal, in consultation with the U.S. Attorney, concludes that such a deed is necessary and appropriate under the facts of a particular case, as described in section IV.B below. Finally,

---

[93] The special warranty deed assures the grantee/buyer that the United States, as the current seller, has done nothing to encumber the property, nor has it conveyed any right, title, or interest in the property while the Government was the owner of the property. In effect, the special warranty deed warrants the forfeiture process.

property may be transferred by a general warranty deed,[94] but it is DOJ policy to use general warranty deeds only in exceptional circumstances as outlined in section IV.C at page 90.[95]

## B. Circumstances for the use of a special warranty deed and indemnification agreement

The DOJ recognizes that in some situations the use of the U.S. Marshal's quitclaim deed will not be sufficient for title company requirements to insure title for a purchaser of forfeited property. Such limited circumstances include the following situations:

(1) The owner of the defendant property is a fugitive and the Government cannot prove the fugitive was served in the forfeiture action.

(2) The owner of the defendant property is a fugitive and title to the property is held by a constructive trustee.

(3) One of the owners of the defendant property is a fugitive who holds title to the property in a cotenancy with innocent owners.

(4) The owner of the defendant property dies before or during the forfeiture process and there is some question of proper service or substitution of the successors or representatives of the deceased party.

(5) The owner of defendant property is a United States or foreign corporation and the United States cannot prove that the corporation was properly served in the forfeiture action.

(6) The forfeiture is subject to a pending appeal.

(7) Such other situations in which a special warranty deed with certain indemnification provisions or a separate indemnification agreement is appropriate (e.g., jurisdictions in which title insurance is unattainable without such a deed).

---

[94] A general warranty deed assures the grantee/buyer that title to the property is free and clear of any and all liens and encumbrances and insures the grantee/buyer from any future claims against the property.

[95] As used in this policy, the terms "general warranty deed" and "special warranty deed" are not intended to be limiting in their application. In some states, warranty deeds are not used (e.g., in California a "grant deed" provides limited statutory warranties). The use of such state variations equivalent to a general warranty deed is satisfactory for purposes of this policy.

If such special circumstances exist, the U.S. Marshal in consultation with the U.S. Attorney may execute a special warranty deed to the buyer specifically warranting against claims arising from the applicable circumstances as listed *supra*. Such special warranty deeds are permitted by the authority delegated to the U.S. Marshal in part 0.156.

It is suggested that the language of the special warranty deed be as follows, with the insertion of the specifically applicable circumstances as listed *supra*.

> The grantor covenants to specially warrant the title to the property hereby conveyed against any claim arising from... [Insert the specifically applicable circumstances here.]

Further, when such special circumstances exist, the buyer may also request that the United States provide certain indemnifications in order to obtain title insurance. These indemnification agreements establish affirmative measures to be taken by the United States, beyond the basic terms and obligations of its warranty deed, in the event that claims are later made against the property. The indemnification agreement may be included either in the terms of the special warranty deed or in a separate document which incorporates the deed by reference. In either form, indemnification agreements will be limited to the following terms:

(1) The United States will specially warrant its title against defects or clouds arising out of the forfeiture process and hold the buyer harmless as a result of such defects in title or clouds involving the propriety of the forfeiture of the property.

(2) In the event that a court in a final judgment rules that the United States did not acquire valid legal title to the real property through the forfeiture process and therefore was not able to convey clear title to the buyer, the United States will refund to the buyer the amount of the purchase price of the property, plus the value of any improvements made to the property by the buyer. The amount will be paid out of the Assets Forfeiture Fund, plus interest on the total amount at the current rate as provided in 28 U.S.C. § 1961 from the date of the purchase of the property by the buyer to the date of the final judgment.

(3) The United States, by its special warranty deed, does not warrant the title of the prior owner of the property who acquired title before the forfeiture.

Requests to the Seized Assets Division of the U.S. Marshals Service for approval to convey title through a special warranty deed with indemnification must be accompanied by the following:

(1) an explanation of the special circumstances which justify the indemnification;

(2) a proposed indemnification agreement, whether in a separate agreement or as additional paragraphs in a special warranty deed; and

(3) a statement of the amount of the purchase price which potentially may have to be refunded.

## C. Circumstances for the use of a general warranty deed

If the buyer of the forfeited property is still unable to procure a title insurance policy, the U.S. Marshal may be authorized by a significant property decision to execute a general warranty deed.

It is the policy of the DOJ that the Attorney General's discretion to warrant clear title, through the use of a general warranty deed, will be exercised only in compelling circumstances where the financial advantage of offering a general warranty deed in the particular case, compared to the available alternatives, far outweighs both the potential cost of honoring the warranty in that case and the potential effect of increased purchaser demand for general warranty deeds in future sales of other forfeited properties. The Seized Asset Division of the U.S. Marshals Service, in the exercise of sound business judgment, shall also consider the cumulative potential liability which will accrue over time as a result of each successive use of a general warranty deed.

If one or more of the circumstances listed in section IV.B at page 88, is present, and the U.S. Marshal and the U.S. Attorney responsible for the forfeiture action deem it appropriate to warrant clear title, the U.S. Marshal and the U.S. Attorney shall request approval from the Seized Assets Division to convey title through a general warranty deed or its equivalent.

Requests to the Seized Assets Division of the U.S. Marshals Service for approval to convey title through a general warranty deed or its equivalent shall include the following:

(1) a title report, identifying specific deficiencies and/or exceptions that are the basis of the inability to secure title insurance, and a written explanation from the responsible AUSA addressing why the deficiencies and/or exceptions have not been or cannot be corrected in order to avoid the necessity of a general warranty deed;

    (2) an explanation establishing that a special warranty deed (e.g., warranting only the forfeiture process) would not be sufficient;

    (3) a statement of, and an explanation of the basis for, the estimated financial advantage of offering a general warranty deed as compared to other options;

    (4) an explanation of the circumstances that do not permit disposition of the property by allowing the lienholder to foreclose, sell the property, recover the amount of the lien plus interest and expenses from the proceeds of the sale, and pay to the U.S. Marshal for forfeiture any remaining proceeds in return for the release of the *lis pendens* on the property.

It is suggested that the language of the general warranty deed, or its equivalent, provide as follows:

> The grantor does hereby fully warrant the title to said real property, and will hold the grantee harmless against the lawful claims of all persons whomsoever.

It should be noted that the requirements of a general warranty deed may differ between jurisdictions.

### D. Dispute resolution

The Asset Forfeiture and Money Laundering Section (AFMLS) will resolve any disputes that may arise in the event the U.S. Attorney and the U.S. Marshal cannot agree on the appropriate form of deed to be used.

## V. Purchase or Personal Use of Forfeited Property by Department of Justice Employees

DOJ employees are generally prohibited from purchasing property that has been forfeited to the Government and is being sold by the DOJ or its agents. This policy is intended to ensure that there is no actual or apparent use of inside information by employees wishing to purchase such property. The purpose of this policy is to protect the integrity of the asset forfeiture program.

Although we are unaware that any such purchases have occurred, this policy will avoid problems before they develop. We believe it is important to the integrity of the DOJ's

forfeiture program that we preclude even the appearance of a conflict of interest which would otherwise arise should a DOJ employee purchase forfeited property.

Under 28 C.F.R. §§ 45.735-18(a) and (b), DOJ employees are prohibited from purchasing, either directly or indirectly, or using any property if the property has been forfeited to the Government and offered for sale by the DOJ or its agents. A waiver to the aforementioned restrictions may be granted by the head of the employee's division upon a determination that two requirements are satisfied:

(1) the purchase was not based on nonpublic information that came to the employee's attention by reason of status as a DOJ employee, i.e., that the purchase was based upon nonpublic source information; and

(2) the employee's reason for purchasing or using the property is so compelling as to outweigh any appearance of impropriety. *See* parts 45.735-18(c)(1)-(2).

## VI. Review of Official Use of Forfeited Property

Part IV.D of *The Attorney General's Guidelines on Seized and Forfeited Property* (July 1990) requires notification to the "Executive Office for Asset Forfeiture…at the time property valued at $50,000 or greater is placed into official use." Although this requirement may be satisfied by post-transfer notification, the FBI and U.S. Marshals Service provided the then-active Executive Office for Asset Forfeiture with advance notice of and an opportunity to review such decisions. Such notification should *now* be made to AFMLS.

Law enforcement personnel should ensure that AFMLS is given advance notice of and an opportunity to review official use actions involving federal forfeited property valued at $50,000 or more. AFMLS will endeavor to act on all such notifications within 2 weeks of receipt.



FILED
CLERK, U.S DISTRICT COURT

NOV - 8 2004

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

SCANNED

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTRIGUE TRADING, INC., | CV 04-02360 FMC (Mcx) |
| Plaintiff, | |
| vs. | **ORDER DENYING DEFENDANT'S MOTION TO DISMISS** |
| UNITED STATES OF AMERICA, | |
| Defendant. | |



ENTERED
CLERK, U.S. DISTRICT COURT

NOV - 9 2004

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

This matter is before the Court pursuant to Defendant's Motion to Dismiss, filed September 24, 2004. The Court, having read and considered the moving and opposition papers, hereby **DENIES** Defendant's Motion to Dismiss.

## I. Background

On April 6, 2001, 4,432 mastercases of cigarettes belonging to Plaintiff Intrigue Trading Inc., were seized by United States Customs and Border Protection ("Customs"). Forfeiture proceedings were thereafter commenced by Defendant ("the Government"). While the case was still pending, the cigarettes were sold for $450,000; allegedly less than 10% of their value when seized by Customs. Judgment was eventually entered in favor of Plaintiff for the forfeiture case and the $450,000 earned from the sale of the cigarettes was

1    returned to Plaintiff.

2    Plaintiff filed the present action seeking damages arising from the

3    seizure by Customs of the cigarettes owned by Plaintiff. Plaintiff asserts the

4    following causes of action against Defendant: (1) negligence; (2) negligent

5    and tortious injury to Plaintiff's business, including loss of funds;

6    (3) wrongful taking and continued illegal possession of Plaintiff's property;

7    (4) abuse of process; (5) malicious prosecution; (6) conversion; and

8    (7) breach of fiduciary duty.

9    The Government filed the instant Motion to Dismiss on September 24,

10    2004, pursuant to Federal Rule of Civil Procedure 12(b)(1) and the Federal

11    Tort Claims Act, 28 U.S.C. §§ 1346(b), 2670-2680 ("FTCA"), on the grounds

12    that the Court lacks subject matter jurisdiction because the United States is

13    immune from suit for the claims set forth in Plaintiff's Complaint.

14

15    **II. Standard for Dismissal Pursuant to Fed. R. Civ. P. 12(b)(1)**

16    A motion to dismiss an action for lack of subject mater jurisdiction is

17    properly brought under Federal Rule of Civil Procedure 12(b)(1). The

18    objection presented by this motion is that the Court has no authority to hear

19    and decide the case. When considering a Rule 12(b)(1) motion challenging

20    the substance of jurisdictional allegations, the Court is not restricted to the

21    face of the pleadings, but may review any evidence, such as declarations and

22    testimony, to resolve any factual disputes concerning the existence of

23    jurisdiction. *See McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988).

24    The burden of proof on a Rule 12(b)(1) motion is on the party asserting

25    jurisdiction. *See Sopcak v. Northern Mountain Helicopter Serv.*, 52 F.3d 817,

26    818 (9th Cir. 1995).

27

28

## III. Discussion

The Government filed the present Motion to Dismiss on the basis that the Court lacks subject matter jurisdiction over the case because the United States has not waived sovereign immunity. Specifically, the Government argues that although the FTCA provides a limited waiver of sovereign immunity, the waiver of immunity is subject to 28 U.S.C. §2680(c), which provides an exception for claims arising from the detention of goods by federal officers. Plaintiff contends that the United States has waived its sovereign immunity under the FTCA and that §2680(c) does not bar its claims. Both parties agree that all of the claims asserted by Plaintiff arise from the detention of the cigarettes by Customs.

Plaintiff may bring suit against the Government only if the United States has waived sovereign immunity. *Tucson Airport Authority v. General Dynamics Corp.*, 136 F.3d 641, 644 (9th Cir. 1998). The FTCA provides for a limited waiver of the United States' sovereign immunity. *See Lehman v. Nakshian*, 453 U.S. 156, 161 (1981). Under the FTCA, the United States waives its sovereign immunity as to claims for money damages, injury or loss of property "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. §1346(b). The FTCA has several enumerated exceptions to liability, including 28 U.S.C. §2680(c), which provides an exception to the waiver of immunity in cases involving the detention of goods.

3

1    Section 2680(c) was amended in 2000, when Congress enacted the

2 Civil Asset Forfeiture Reform Act ("CAFRA"). Section 2680(c), as amended,

3 states in pertinent part:

4    The provisions of [the FTCA] shall not apply to - . . .

5    (c) Any claim arising in respect of . . . the detention of any goods,

6    merchandise, or other property by any officer of customs or excise or

7    any other law enforcement officer, except that the provisions of [the

8    FTCA] apply to any claim based on injury or loss of goods,

9    merchandise, or other property while in the possession of any officer

10    of customs or excise or any other law enforcement officer, if -

11        (1) the property was seized for the purpose of forfeiture under

12        any provision of Federal law providing for the forfeiture of

13        property . . . ;

14        (2) the interest of the claimant was not forfeited;

15        (3) the interest of the claimant was not remitted or

16        mitigated . . . ; and

17        (4) the claimant was not convicted of a crime for which the

18        interest of the claimant in the property was subject to forfeiture

19        under a Federal criminal forfeiture law.

20 28 U.S.C. §2680(c). Thus, pursuant to §2680(c) as amended, where a plaintiff

21 can demonstrate that the property at issue was seized for the purpose of

22 forfeiture, and the plaintiff's interest was not forfeited, the United States has

23 waived its immunity from suit and the Court has jurisdiction over the

24 claims.

25    Plaintiff contends that its cigarettes were seized for the purpose of

26 forfeiture and Plaintiff's interest was not forfeited, thus the exception to

27

28                                    4

1  liability under §2680(c) does not apply and the United States has waived

2  sovereign immunity. This Court previously determined in the forfeiture

3  proceeding by the United States against Plaintiff, that Customs seized

4  Plaintiff's cigarettes because Customs had determined that the merchandise

5  constituted prohibited goods under the Customs laws. The Government's

6  claims against Plaintiff were eventually dismissed and summary judgment

7  awarded in favor of Plaintiff. These facts clearly indicate that the goods were

8  seized for the purpose of forfeiture and that Plaintiff's interest was not

9  forfeited. Accordingly, the exception to liability under §2680(c) does not

10  apply and the United States has waived its sovereign immunity.

11      The Government, however, points to the legislative history of §2680(c)

12  as evidence that the United States did not intend to waive sovereign

13  immunity for Plaintiff's claims. In describing the proposed legislation, the

14  Judiciary Committee stated that the purpose of the amendment was "to make

15  federal civil forfeiture proceedings fair to property owners and to give owners

16  innocent of any wrongdoing the means to recover their property . . . after

17  wrongful government seizures." The Committee further stated that the

18  legislation "amends the rules governing all civil forfeitures under federal law

19  except those contained in the Tariff Act of 1930 or the Internal Revenue

20  Code of 1996." H.R. REP. 106-192, at 11 (1999), 1999 WL 406892. The

21  Government argues that because the forfeitures in the present case were

22  based on the Tariff Act and the Internal Revenue Code, the United States

23  did not waive immunity and Plaintiff's claims are barred.

24      However, the Court is precluded from considering the legislative

25  history of §2680(c) because the language of the statute is plain and

26  unambiguous. *EEOC v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742,

27

28                                    5

1    752-53 (9th Cir. 2003) (stating that the court was "precluded from
2    considering legislative history" where the text of the statute was
3    unambiguous); *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)
4    ("Our inquiry must cease if the statutory language is unambiguous and the
5    'statutory scheme is coherent and consistent.'").  Although the legislative
6    history may indicate that Congress did not intend to permit claims where the
7    forfeiture was based on the Tariff Act or Internal Revenue Code, such an
8    exception is not found in the statute.  If Congress intended to exclude
9    forfeitures brought under the Tariff Act or the Internal Revenue Code from
10   the reach of §2680(c), such an intention should have been reflected in the
11   text of the statute.  Accordingly, forfeitures based on the Tariff Act or
12   Internal Revenue Code are not exempt from liability under §2680(c).

13       The Government next contends that the language of 18 U.S.C. §983
14   supports their position. Section 983, Title 18, which provides the general
15   rules governing civil forfeiture proceedings, was also amended by CAFRA to
16   include a definition of "civil forfeiture statute."  Section 983(i), as amended,
17   states that "in this section, the term 'civil forfeiture statute'" does not include
18   the Tariff Act of 1930 or the Internal Revenue Code.  The Government
19   argues that because §983(i) does not include the Tariff Act or Internal
20   Revenue Code, this must be read into §2680(c) to preclude claims based on
21   forfeitures under those statutes.  However, interpretation of §2680(c) is not
22   dependent on §983.  Nowhere in §2680(c) do the words "civil forfeiture
23   statute" appear.  Moreover, and perhaps more importantly, §983(i) states that
24   the definition of "civil forfeiture statute" as provided in the section is limited
25   to §983. 18 U.S.C. §983(i).  Accordingly, the Court may not look to §983 to
26   interpret §2680(c).

27

28                                        6

## IV. Conclusion

For the reasons set forth above, Defendant's Motion to Dismiss is hereby **DENIED**.


Dated: November 8, 2004


FLORENCE-MARIE COOPER, Judge
UNITED STATES DISTRICT COURT

**Subject:** 2005 Asset Forfeiture Policy Manual
**From:** "Rue, Nancy \(USAMA\)"
**Date:** Thu, 17 May 2007 13:36:14 -0400
**To:**
**CC:**

Elizabeth Smith, Docket Clerk

Honorable William G. Young

Boston, MA 02210

    Re: United States v. One Star Class Sloop Sailboat, CV. 05-10192-WGY

Dear Ms. Smith:

When I submitted the 2005 Asset Forfeiture Policy Manual yesterday, I noted that it was the only copy that we had but that I was searching for additional copies for myself and for attorney Grantland.  I have now received two additional copies, and we will Federal Express one to attorney Grantland for delivery tomorrow.

Thank you.

Very truly yours,

Nancy Rue

Assistant U.S. Attorney

cc:  Brenda Grantland,  Esq.

**Subject:** RE: supplemental discovery
**From:** "Rue, Nancy \(USAMA\)"
**Date:** Tue, 15 May 2007 15:35:11 -0400
**To:**

Are you cancelling the depo of Ettinger in light of the court's decision?

I'll fax you the CW's affidavit.

-----Original Message-----
From: Brenda Grantland [mailto:bgrantland1@comcast.net]
Sent: Tuesday, May 15, 2007 4:29 PM
To: Rue, Nancy (USAMA); Brenda Grantland
Subject: supplemental discovery

Nancy -

Be sure to supplement your discovery responses with any documents the CW

gives you to corroborate his claimed interest in the sailboat.  I didn't

see any documents in your previous response to our Documents Request
which appear to come from the CW except exhibit N-169, which Ole
Anderson allegedly gave the CW on September 27, 2004.

I need the supplemental responses to discovery as soon as you get them
-- but by Monday at the latest, because I'll be traveling on Wednesday,
and I'll need to make copies of any exhibits I want to use on Tuesday.

Brenda

# Brenda Grantland

Attorney at Law
20 Sunnyside Suite A-204
Mill Valley, CA 94941
(415) 380-9108
fax (415) 381-6105

June 5, 2007

AUSA Nancy Rue
1 Courthouse Way
Suite 9200
Boston, MA 02210

Re: U.S. v. Star Class Sloop "Flash II"
Demand for supplemental discovery

Dear Ms. Rue:

I am preparing a motion for reconsideration of the judge's oral decision on the discretionary function exception, as he stated I could do at the end of the trial.

In the last couple of days I did a lot of research on the discretionary function and found case law saying we're entitled to certain discovery because you are relying on that exception. See Ignatiev v. U.S., 238 F.3d 464, 467 (D.C. Cir. 2001).

Since you're objecting to my taking Mary Magda's deposition, I will forego the deposition if you will agree to provide me the following documents. We are entitled to discovery of these documents, even if they are internal guidelines, because they are relevant to your legal basis for asserting that the decision to auction the boat without a minimum reserve falls within the discretionary function exception.

I hereby my demand production of these documents:

1. The DoJ guide to interlocutory sales, which you so far have refused to turn over (I want that whole guide, because I believe it is all relevant)

Relevant portions of any and all statutes, regulations, policy statements, manuals, or internal guidelines applicable to the Dept. Of Justice, US Attorney's Office and/or Marshal Service which govern the following:

2. Any other regulation/policy defining "interlocutory sale"

3. Any requirements that the government obtain a stipulation of the parties or a court

1

order before conducting an interlocutory sale

4.  Any procedures for sales when there are owners the government knows were not served process in the forfeiture case

5.  Any procedures for sales when the claimant has appealed the judgment

6.  Any procedures for sales after default judgments that are contested

7.  Any procedures, internal guidelines or policy statements the Marshal Service relied upon in deviating from the limitation on indemnification agreements in the Asset Forfeiture Policy Manual, p. 89 - specifically subsection (2) – when it signed the Guernsey's contract, section 10.

8.  Any procedures, internal guidelines or policy statements the Marshal Service relied upon in representing in the Guernsey's contract, section 10, that "the Property is not 'confiscated Property' within the meaning of any United States federal or state laws."

9.  If the Marshal Service complied with the requirement of the Asset Forfeiture Policy Manual, pp. 89-90, that any request to convey title through a special warranty deed with indemnification requires a written request to the Seized Assets Division, provide all paperwork submitted in relation to the 2005 Guernsey's auction of Flash II.

It may sound like a lot of stuff, but Mary Magna should know what regulations and policies she is required to apply.  If there are no documents responsive to any of these categories of requests, you can just state so, with the paragraph number of the request.

If you object to any of these requests, let me know so I can file my motion to compel.

Sincerely,


Brenda Grantland

2



**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

June 6, 2007

**By Electronic Mail**

Brenda Grantland, Esquire
20 Sunnyside Avenue STE A-204
Mill Valley, CA 94941

> Re:  <u>United States v. One Star Class Sloop Sailboat</u>, 05-10192-WGY

Dear Ms. Grantland:

In response to your letter of June 5, 2007, the government responds as follows:

Items 1-3: Objection.  These items are irrelevant.  The sale in this case was pursuant to a final order.  <u>See</u> <u>Judgment and Order of Forfeiture</u>, Docket Entry 15, ("[T]his shall be and is the full, final and complete disposition of this civil forfeiture action.")  Interlocutory is defined by law as not final. <u>See</u> <u>Zayas-Green v. Casaine</u>, 906 F.2d 18, 21 (1st Cir. 1990). Therefore, rules related to interlocutory procedures are irrelevant.

Items 4-6: No specialized documents exist related to the circumstances described in these items.  In the case of a judicial order directing the Marshals Service to sell a forfeited asset, the Marshals Service follows the directive of the Order. To the extent that there are subsequent orders of the Court regarding the sale, the Marshals Service follows the directive of such orders.  No subsequent orders were received in this case.

Item 7-8: Objection.  Paragraph 10 states: "The property is being sold "as is", where is, with no guarantee or warantees [sic] intended or implied."

Brenda Grantland, Esquire
June 6, 2007
page 2


    Item 9: Objection.  A deed is a conveyance of realty.  No
realty was conveyed here.  Provisions related to deeds are not
relevant.

                              Very truly yours,

                              MICHAEL J. SULLIVAN
                              United States Attorney

By:    /s/ Nancy Rue
                              Nancy Rue
                              Assistant U.S. Attorney