UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | )Civil Action No.05-10192-WGY | |
| | ) | |
| ONE STAR CLASS SLOOP SAILBOAT | ) | |
| BUILT IN 1930 WITH HULL NUMBER 721, | ) | |
| NAMED "*FLASH II*," | ) | |
| Defendant. | ) | |

## GOVERNMENT'S POST-TRIAL MEMORANDUM

### FACTS

Gregory "Olaf" Anderson ("Anderson") purchased the Flash II, a sailboat previously owned by John F. Kennedy, from the estate of Don Ehler at auction on June 29, 1996. Deposition of Robert A. Harper, dated June 7, 2007, Docket Entry 74 ("Harper"), at 14-16; 22. Anderson was a long time marijuana dealer. Harper at 12-14. Anderson invited an attorney who had represented one of his confederates in a drug trafficking case, Robert Augustus Harper, to attend the auction with him. Harper at 12-14. Eddie Crosby and Charles Fitzgerald invested money in the Flash II. Harper at 18. Attorney Harper became an agent for the Flash II, serving as the repository for all documents associated with the Flash II. Harper at 24; Harper Ex. 8.[1]

Harper drew up an agreement in blank to allow other persons to invest funds in the restoration of the Flash II. Harper at 32-35 & Exs. 11, 12 & 13. The Claimant here, Kerry Scott Lane [Lane], was one of the persons who invested. Harper Ex. 13. Harper obtained a Bill of Sale for the Flash II from Ouida Ehler, the widow of Don Ehler. Harper at 26 & Ex. 7. This Bill of Sale conveyed "all right, title and interest" to Anderson. Id. Fitzgerald conveyed his interest

---

[1]The documents submitted as Exhibits in his deposition were compiled from files that he maintained as regular part of his business. Harper at 17. The government therefore respectfully maintains that they are admissible pursuant to Federal Rule of Evidence 803(6).

and title over to Anderson as well.   Harper at 37, Ex. 14.

Under the agreement that Harper drew up for Anderson, investors were to be paid 200% of their out of pocket investments when the Flash II was sold.  Harper 34-36; Ex. 11 at ¶ 4. Anderson and Harper had discussed setting up a corporation for the Flash II.  Harper at 45. However, the corporation was never formed.  Id.  In April 1998, Anderson sent Harper a letter asking him to draw up a revised document regarding the ownership of the Flash II.  Id.  In that document, Anderson noted that Lane was the owner of 30% of the total stock in the Flash II. Under the agreement, signed and dated by Anderson, Anderson stated that Lane had invested $13,500 to date in the Flash II, which, at a two to one payout, would entitle him to $27,000 at the time of sale.  Id.; Ex. 16.

Harper had initially become involved because he had contacts at Sotheby's auction house.  Sotheby's proposed a reserve value of $30,000 to $40,000 for the Flash II.  Harper at 30-31; Ex. 10.  However, Anderson decided to list the Flash II with Guernsey's auction house instead of Sotheby's.  Harper at 31.

Although Harper had been listed as the "exclusive agent" for the Flash II, Anderson made all the decisions.  Harper at 46.  Anderson decided to refurbish the Flash II, Harper at 38; Anderson decided to do it at Marblehead, id at 46; Anderson chose Guernsey's to auction the boat, id.; Anderson decided who would obtain an interest in the boat, id. at 51; Anderson incurred the expenses regarding the Flash II, id.; and Anderson decided when and if such bills would be paid.  Id. at 52.  Anderson controlled the Flash II.  Id. at 82.

Gary Milo was acquainted with Anderson through Anderson's brother.  Transcript of Bench Trial, May 24, 2007 (TR) 19.   Milo and Anderson's brother were marijuana traffickers. TR 2.  Anderson approached Milo about investing in the Flash II.  TR 21.  Under Anderson's proposal, Milo was to furnish money to refurbish the Flash II.  Then, when the Flash II was sold,

Milo would receive a percentage of the profit.  Id.  Milo invested approximately $16,000.  Id. at 22.  Milo invested the money in multiple cash installments sometime around the fall of 1996, although he was uncertain of the date.  TR at 54.  At the time that Milo invested money in the Flash II, a doctor [Lane] was already involved as an investor.  Id. at 51.  Anderson was the primary owner.  TR 50-51.  Milo expected to get a percentage of what the Flash II sold for at auction.  Id. at 51.

The Flash II was placed for auction with Guernsey's auction house in a sale of Kennedy memorabilia in March 1998.  Trial Ex. 5; Deposition of Arlan Ettinger, dated June 7, 2007, Docket Entry 75, (Ettinger) at 12.  Arlan Ettinger, the owner of the auction house, Ettinger at 5, dealt only with Anderson with regard to the Flash II.  Ettinger at 44-45.  Anderson put a reserve on the Flash II of $950,000.  Ettinger at 37.  Ettinger attempted to talk Anderson out of the reserve.  Ettinger at 38.  However, Anderson would not be persuaded.  Id. at 40.  Anderson would either place the Flash II with Guernsey's on Anderson's terms, or not at all.  Id.

The Flash II was bid up to $800,000 at the auction, but it did not sell because of the reserve.  Ettinger at 48-50.  Ettinger questioned afterward whether that bid was authentic.  Id. at 48-50.  A consignor has the ability to manipulate the bidding when a reserve is in place. Id.  Ettinger suspected afterward that that had occurred.  Id. at 51.  Kennedy memorabilia have fallen in value since the 1998 auction.  Ettinger at 54-57.  Ettinger now believes the Flash II is worth $100,000.  Ettinger at 66.

When Milo learned that Anderson had declined to sell the Flash II at the Guernsey's auction, Milo realized that Anderson was not motivated to sell the Flash II.  TR at 25.  Milo realized that if he waited to get his money out of the Flash II by waiting for Anderson to sell it, Milo might never get his money out.  Id.  Accordingly, Milo worked out a deal with Anderson where Anderson bought back Milo's original investment by transporting marijuana for Milo.  Id.

3

Lane invested $5,000 in the Flash II in July 1996. Lane's Document Production, Docket Entry 45-13, Filed 1/23/07 page 5 of 27; Bates page 5. He paid that money to Chuck Fitzgerald at Sailorman's. TR 63. Lane's girlfriend paid another $5,000; however, her money was provided to Anderson, and Anderson put it in his own name. Id. See also Lane's Document Production, Docket Entry 45-13, Filed 1/23/07 page 5 of 27; Bates page 5. Lane asserts that he paid another $20,000 to Sailorman a week later. TR 68. However, Lane was vague about how this happened. TR at 68-69. Lane stated that the money went to Sailorman, and that it came from Lane's bank account. Id. However, Lane has no bank statement showing the withdrawal, no cancelled check, no receipt, and no photocopy of a cashier's check. See Lane's Document Production, Docket Entry 45-13, Filed 1/23/07.[2]

By Lane's own account, Anderson was the moving force behind the Flash II. TR 74. Anderson located the boat, TR 63, Anderson retained an attorney to set up a consortium of investors, and Anderson was going to refurbish the Flash II. TR 73. At the time that Lane first invested money, Eddie Crosby was already an investor. Lane's Answers to Interrogatories, Docket Entry 41-7, filed 1/4/07 (INT) at Response 9.

Lane signed an agreement with Anderson "within a week or two or three" of his initial investment in the Flash II. TR 72. That agreement provided that Anderson had the power to decide whether to reject an offer of sale on the Flash II; Anderson had the power to determine how the Flash II would be restored; and Anderson would decide whether an offer to buy the Flash II would be accepted. TR 97-99. Lane agreed to those terms. Id. There was no agreement giving Lane the power to decide whether the restoration was acceptable. TR 99.

---

[2]Likewise, Lane offered no explanation for why his girlfriend supplied half the initial money when Lane had $20,000 in ready cash available to invest in an undocumented venture a week later.

In December 1997, Anderson compiled a handwritten list of all of the people who would be compensated from the proceeds of the sale if the Flash II sold at auction and how much each would be paid.  INT Response 9.  Lane did not know the other people on the list.   INT Response 9.  Lane did not challenge the list.  TR 78.   Because Anderson was the manager of the Flash II, "everything went through him."   INT 18.  All of Lane's communications were through Anderson "rather than the other investors."  Id.  Anderson was always good about communicating with Lane about any matters affecting the boat.  INT 3.  Anderson was always reliable in keeping Lane informed about matters relevant to the Flash II. INT 7.

Lane provided Anderson with thousands of dollars in 1998, but Lane did not know where the money went.  TR 79.  Lane had no idea how Anderson was disbursing the funds.  TR 86.  Lane purchased a check for Marshall Chapman for $3,000.  He purchased the check in Anderson's name because Anderson wanted him to.  TR 100-01.  Lane did not know whether the check was sent to Marblehead.  TR 101.  If the check was indeed cashed, TR 101, Lane had "no idea" whether Chapman kept the funds or gave it to Marblehead.  Id.  Lane never saw the Marblehead Trading Company invoices prior to the litigation.  TR 79; 86; 91-93; 94.  Lane did not know if his funds were being used to pay Marblehead.  Tr 94.   Lane never received an accounting of how much Anderson spent on the Flash II or where it was disbursed.  TR 90.  Lane never registered the Flash II, never insured it, and never paid personal property taxes on it.  TR 95-96.

## ARGUMENT

### I.    Anderson's Consensually Recorded Statements Are Admissible As Statements of An Agent.

On September 27, 2004, Anderson made statements to Milo regarding the ownership of the Flash II.  The statements were consensually recorded by Milo, and the audio recording and

transcript were tendered for admission at trial.  <u>See</u> TR at 28-34; <u>see also</u> Docket Entry 58, attachment 1 (audio transcript).  Specifically, Anderson told Milo that Anderson had paid Milo back "everything" over the course of "two trips" while "working" for Milo.   Audio transcript at p.1.  Anderson stated that the amount that he had paid Milo was either "15" [$15,000] or "27" [$27,000] but that Milo had been paid back everything.  <u>Id</u>.  Anderson then agreed that the Flash II was his again as a result, but that he still "owed" the anesthesiologist, plus "Eddie," plus his "mom."  <u>Id</u>.

        The government respectfully submits that the statements of Anderson regarding the Flash II are admissible as statements of an agent of Lane pursuant to Federal Rule of Evidence 801(d)(2)(D).  In <u>Larch v. Mansfield Mun. Elec. Dept.</u>, 272 F.3d 63, 72 (1st Cir. 2001), the United States Court of Appeals for the First Circuit addressed the issue of when statements of an agent are admissible under this Rule.  In <u>Larch,</u> a former manager of a municipal electric department sued under the state whistleblower statute, alleging that he had been fired for refusing to obey a commissioner's order to hire one of the commissioner's friends.  At trial, the district court admitted evidence that another commissioner, deceased at the time of trial, had said that he would "kick [Larch's] ass out of town and . . . make life miserable for the department." <u>Id</u>.  On appeal, the defendant argued that the statements should have been excluded because they were outside the scope of the commissioner's agency, because the statements threatening Larch were not within the scope of the commissioner's employment, not authorized by the department and not made to further the department's interest.  <u>Id</u>.

        The First Circuit rejected the department's analysis and affirmed the admission of the statements.   <u>Id</u>.  According to the First Circuit, although the commissioner's job did not include making life miserable for the department, as threatened in the statement, it did include oversight of the department.  Therefore, statements regarding the department were within the scope of his

agency.   The First Circuit noted that:

> To qualify as nonhearsay under Rule 801(d)(2)(D), a statement must concern "a matter within the scope" of the declarant's agency or employment.  The statement itself is not required to be "within the scope of the declarant's agency. Rather, it need only be shown that the statement be related to a matter within the scope of the agency."

Id. (quoting 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 801.33[2][c], at 801-69 (2d ed.2001) (footnotes omitted)).

Applying this rule to the instant case, the statements by Anderson related to a matter within the scope of Anderson's agency –  the Flash II – and were thus admissible.  Anderson was Lane's agent with regard to the Flash II generally, and with regard to ownership specifically. See INT 9; 18.  Indeed, because Anderson was the "manager" of the Flash II venture, "everything went through him."   INT 18.  Lane expected that Anderson would have communications with other investors on Lane's behalf, INT 18, and communicate information to Lane when it was relevant.  INT 3&7. By written agreement, Anderson was expressly authorized to act on behalf of Lane as the "general director and general manager of this entire project from purchase through the refurbishment and eventual sale of the vessel."  Lane's Document Production, Docket Entry 45-13, Filed 1/23/07 page 10 of 27; Bates page 11, at ¶ 4. Accordingly, the statements by Anderson regarding the Flash II are clearly within the scope of Anderson's agency.  Lane may have disagreed with the statements, and they may not have been in Lane's interest, see Larch, 272 F.3d at 72.  Regardless, the statements are about a matter within the scope of Anderson's agency relationship with Lane, and they should therefore be admitted under Rule 801(d)(2)(D).


## II.    The Evidence Establishes that the Flash II Was Forfeitable.

The Controlled Substances Act provides for forfeiture of property associated with drug

trafficking.  Under 21 U.S.C. § 881(a), eleven categories of property are subject to forfeiture as

drug-involved.  Among them, section 881(a)(6) provides that:

> All moneys, negotiable instruments, securities, or other things of
> value furnished or intended to be furnished by any person in
> exchange for a controlled substance or listed chemical in violation
> of this subchapter, all proceeds traceable to such an exchange, and
> all moneys, negotiable instruments, and securities used or intended
> to be used to facilitate any violation of this subchapter.

21 U.S.C. § 881(a)(6)( 2007).  This paragraph was added in 1978 by the Senate Amendment to

Pub.L. 95-633, § 301(1).  The legislative history describing the need for the addition explains

that the provision is intended to be broadly applied.  Prior to the addition of this section, only

property used in the manufacturing of illegal drugs or to facilitate transportation of drugs could

be forfeited.  This section was added by Senate Amendment in order to render moneys, proceeds,

and things of value forfeitable when it is  "exchanged or intended to be exchanged in an illegal

drug transaction."  Joint Explanatory Statement of Titles II and III, P.L. No. 95-633, 95 Cong. 2d

Sess. (Oct. 7, 1978),  reprinted in 1978 U.S.C.C.A.N. 9518, 9522.   It also reaches proceeds of an

illegal transaction "to the extent that . . . a traceable connection to an illegal transaction in

controlled substances existed."  Id.

    A.    Milo Invested Drug Proceeds in the Flash II in 1996, Rendering the Flash II
             Forfeitable.

Here, the government has shown by a fair preponderance of the evidence that an interest

in the Flash II was exchanged or intended to be exchanged in an illegal drug transaction, and that

there is a traceable connection to drug proceeds.   Ole Anderson was a long time drug dealer.

Harper at 13-14.  See also  Affidavit of Les Owen, Federal Bureau of Prisons, filed herewith.

Milo provided drug proceeds to Anderson to invest in the Flash II.  Milo made this transfer based

upon "Anderson's representation that the funds secured for Milo an interest, an ownership

interest or an interest at least in a consortium as something akin to a limited partner, in the

venture to restore Flash II and auction her off at a significant profit." TR 5/24/07 at 127 (Court's Findings of Fact).

From the Court's finding that Milo intended the drug proceeds to be invested in Flash II, together with the Court's finding that Anderson represented to Milo that the proceeds had in fact purchased for Milo an interest in the Flash II, the government respectfully submits that the Court should find the Flash II is forfeitable.   The evidence in this case demonstrates that at all relevant times, Anderson was the titled owner of the Flash II, and he was the decision-maker regarding the Flash II, both as a matter of contract and a matter of fact.  Anderson was the agent for the Flash II, he was the agent for the consortium of investors in the Flash II, and he was the agent for Lane regarding the Flash II.  Therefore, when Anderson represented to Milo that Milo's drug proceeds had purchased an investment interest in the Flash II, Anderson had the power to make that commitment.   Milo and Anderson had always dealt in verbal agreements, both in their prior venture regarding a pirate boat and in their drug ventures.  Therefore, Milo did not expect to receive a document proving his ownership.  TR 35-36.  However, Anderson documented Milo's interest in a signed memorandum that was received by both Robert Harper (as the "exclusive agent" and keeper of records for the Flash II consortium, see Harper Ex. 8 & Ex. 15)  and by Lane (Trial Exhibit 6; Lane's Document Production, Docket Entry 45-13, page 23 of 27; Bates page 29).   This memorandum, published to interested parties contemporaneous with Milo's investment, is strong evidence to find that Milo's drug proceeds were in fact invested in the Flash II.

Indeed, the reasonable inference from the evidence is that Milo's actual currency was in fact used for the refurbishment.  Milo testified that he provided the drug proceeds to Anderson in the form of cash sometime during the fall of 1996, although he was not certain of the date.   TR 5/24/07 at 54.  During the time that the Flash II was being restored, Anderson was constantly

traveling between Florida, where Milo gave him the money, and Marblehead, Massachusetts, where the Flash II was being restored.  Harper at 24.  Therefore, given that Milo testified he gave the money to Anderson in cash installments sometime near the fall of 1996 for refurbishing the Flash II, and Anderson was traveling back and forth to Marblehead, Massachusetts, where the Flash II was being restored during this time, see Harper Ex. 19 (Marblehead itemization of charges and payments), it is reasonable to infer that Milo's proceeds were in fact expended, at least in part, toward the refurbishment.  Indeed, there is no documentary evidence of any other funds from any other source paying Anderson for the refurbishment during that time frame.  Lane has submitted various checks, some to Anderson and some to other persons, which he asserts were paid to Anderson for the Flash II.  However, all but two of those 16 checks were paid by Lane in 1998, after the refurbishment of the Flash II had already taken place.  Lane's Document Production, Docket Entry 45-13, Filed 1/23/07 pages 13 of 27 thru 21 of 27; Bates page 17 -26.  See also Summary Chart, filed herewith.  Cf. Harper Ex. 19.[3]

Additionally, regardless of whether or not Anderson used the actual currency that Milo provided for paint, varnish, or other restoration costs, Anderson gave Milo an investment position in the Flash II in exchange for his drug proceeds.   As set forth above, Anderson clearly had the power to give that interest: he was the titled owner [Harper Ex. 7 & Ex. 14; Trial Ex. 10], he was the authorized agent, he was the authorized manager and director, and he was the de facto

---

[3]Indeed, in a statement sent to Harper as the record keeper for the Flash II, Anderson signified that as of April 7, 1998, Lane had expended at total of $13,500 for the Flash II.  Harper Ex. 16.  This matches the total of the $5,000 that Lane expended in the initial investment, Docket 45-13 at page 5 of 27; Bates 5, plus the checks that Lane paid to Anderson through that date.  See Attachment A.

The government notes that the total of checks provided by Lane through 3/3/98, total to $7,500 (without factoring in the $5,000 that Lane initial invested in the purchase).  This is consistent with Lane's notation on the 3/3/98 that this "last $2,500" paid out at "2:1" results in "$15K" [$15,000].  See margin note, check 4783.

agent.  See Section I, supra.  When Ole Anderson made a decision regarding investments, Lane

was "resigned" to accept it.  TR at 78.  However Anderson "decided to divvy up the funds under

a scheme that he concocted" –  Lane did not challenge it.  TR at 79.  When Anderson wanted

something done regarding the Flash II, "that's the way it was."  TR at 94.  Therefore, when

Anderson represented to Milo that Milo's money bought him an interest in the Flash II,

Anderson had the power, both apparent and real, to effect that representation.  From this

evidence, there is a traceable connection between Milo's drug proceeds and the Flash II,

sufficient to satisfy section 881(a)(6).

　　　The government respectfully submits that any other finding would subvert the will of

Congress with regard to forfeiting the traceable proceeds of drug transactions.  If Milo could

supply drug proceeds to another convicted drug felon (Anderson), obtain a written record of the

investment interest in personal property as a result of the transfer, and yet avoid forfeiture of the

property as not "traceable," merely because Anderson carefully used the actual currency

received from Milo for consumable daily living expenses (or lawyer's fees) while using other

currency for the actual expenditures on the Flash II, it would undermine the purpose of Congress

in enacting the proceeds statute.  Milo obtained an interest in the Flash II regardless of whether

his funds were used to pay for paint or whether they were simply the beginning of Anderson's

profit stream on the venture.  By Anderson ceding Milo an interest, which is evidenced by

Lane's own documents, the government has successfully traced the proceeds to the Flash II and

it is therefore forfeitable under the statute.

　　　B.　　Milo Ceded His Interest in the Flash II Back to Anderson in 2001 During the
　　　　　　Course of a Drug Transaction, Rendering the Flash II Forfeitable.

　　　Milo testified that after the Flash II failed to sell at the March 1998 Guernsey's auction,

Milo concluded that Anderson was never actually going to sell the Flash II.  TR at 25.  Milo

therefore decided that he wanted to get his investment back from Anderson. Milo and Anderson worked out a deal where Anderson transported drugs for Milo at a cut rate, and in exchange, Milo ceded back to Anderson the investment interest that Milo had in the Flash II. TR at 25. Milo testified to this transaction at trial, and it was discussed by Milo and Anderson in the consensually recorded conversation of September 27, 2004.[4]

Under the terms of 21 U.S.C. § 881(a)(6), this 2001 transaction independently rendered the Flash II forfeitable. Milo had bought an investment interest in the Flash II from Anderson. Anderson's re-acquisition of that interest from Milo in the course of a drug transaction rendered the Flash II forfeitable. The Flash II is a "thing of value" which was exchanged for the transportation of marijuana in violation of the Controlled Substances Act. See 21 U.S.C. § 881(a)(6). See also Joint Explanatory Statement, supra, at 9522.[5]

## III.    Lane is Not An Owner of the Flash II.

Once the government meets its burden of forfeitability, the burden shifts to Lane to prove by a preponderance of the evidence that he is an owner of the Flash II. 18 U.S.C. § 983(d)(1). An "owner" is defined by statute as a person who has an ownership interest, including a leasehold, lien, mortgage, recorded security interest, or valid assignment of ownership interest. 18 U.S.C. § 983(d)(6)(A) (emphasis supplied). State law determines the ownership interest in

---

[4]This portion of the conversation was not admitted by the Court at trial, but the government has argued in Section I above, that the conversation is admissible under Federal Evidence Rule 802(d)(2)(D).

[5]The 2001 transaction would also render the Flash II forfeitable under 21 U.S.C. § 881(a)(4) as a vessel which was used to facilitate the transportation of marijuana. Anderson agreed to transport the marijuana for Milo in return for cash and the re-purchase of Milo's interest in the Flash II. While this is not the traditional means in which a vessel facilitates the transportation of drugs, Section 881(a)(4) is broadly written to include the use "in any manner" to facilitate transportation. Accordingly, the 2001 transaction falls within the literal scope of this provision as well.

the property; federal law determines the effect of that interest on the right to bring a claim in a federal forfeiture proceeding.  United States v. United States Currency, $81,000, 189 F.3d 28, 33 (1st Cir. 1999).  The law of the state in which the ownership interest, if any, arose, supplies the rule of decision.  United States v. One Lincoln Navigator, 328 F.3d 1011, 1013 (8th Cir. 2003).

Here, the Flash II was purchased in Florida, and the bills of sale and the consortium agreements were all executed in Florida.  Therefore, Lane must demonstrate that he is an owner of the Flash II within the meaning of Florida law.  Lane cannot meet this burden.

Under Florida law, water vessels, including sailboats, are regulated under a comprehensive statutory scheme.  See Fla. Stat. Title 24 (Vessels).  A certificate of title issued under Florida law is prima facie evidence of the ownership of the vessel.  Fl Stat. 328.03(4).

The Flash II was never registered with the state of Florida, and no certificate of title was obtained.  TR at 96; Harper at 27-28.  Under Title 24, ownership of the vessel is established, and a certificate of title will issue, upon the submission of "an executed bill of sale."  Fl. Stat. § 328.48(1)(b).  Here, two executed bills of sale exist based on the 1996 auction of the Flash II from the estate of Don Ehler.  Ehler's widow executed a "Bill of Sale and General Release," notarized by attorney Robert Harper (the "exclusive agent of the consortium according to Lane's consortium agreement Harper Ex. 13), warranting title and conveying "all right, title and interest" in the Flash II to Anderson.  Harper Ex. 7.  Likewise, Fitzgerald, who originally purchased the Flash II with Anderson, executed an identical bill of sale in favor of Anderson on July 22, 1996.  Lane Doc. Production, Docket 45-13,page 6 of 27; Bates No. 6.  Therefore, under Florida law, Anderson was the sole person entitled to obtain a "certificate of title" for the Flash II.  Anderson was, under Florida law, the owner of the Flash II.

In forfeiture cases, Florida courts have interpreted its law regarding ownership in property subject to registration very rigidly.  In Lamar v. Wheels Unlimited, Inc., 513 So. 2d 135

(Fla. 1987), a Sheriff sought to forfeit a vehicle that had been used in a drug crime.  Claimant Wheels Unlimited, Inc. intervened, asserting that it was an innocent owner.  The vehicle had been registered to Vehicles Unlimited, Inc., but the shareholders of Wheels Unlimited, Inc. filed affidavits  asserting that the car had been purchased from Vehicles Unlimited, Inc., and ultimately transferred to Wheels Unlimited, Inc., as a capital contribution.  Id. at 136.  The trial court granted summary judgment for the sheriff, because the claimants were not the titled owner of the vehicle.  The Florida District Court of Appeal reversed.  Id.  The court of appeal reasoned that the motor vehicle registration statute was not designed to prohibit courts from recognizing equitable interests when those interests were not asserted in opposition to a purchaser who had relied on a certificate of title.  Therefore, the district court of appeal concluded that Wheels Unlimited, Inc. could assert an equitable interest in the vehicle.  Id.

The Florida Supreme Court reversed, reinstating the judgment of forfeiture.  The Supreme Court reasoned that the Florida statutes for registration and titling of vehicles, "when read as a whole and in conjunction with the rest of the chapter," reflects a legislative intention that the protections of the innocent owner provision be afforded only to those who had registered the vehicle in compliance with the statute.  Id. at 137.  The supreme court noted that its decision was consistent with the prior decisions of appellate courts rejecting claims of innocent lienholders when those claims were not recorded as required by statute.  Id. at 137-38 (citing In re Forfeiture of One 1979 Chevrolet C10 Van, VIN No. CGU1590137222, Florida Tag No. BXF, 922  490 So. 2d 240 (Fla. App. 2 Dist.1986), and Smith v. City of Miami Beach, 440 So.2d 611 (Fla. App. 3 Dist. 1983)).  The supreme court also concluded that its opinion was consistent with In re Forfeiture of One 1946 Lockheed L-18 Loadstar, 493 So. 2d 10 (Fla. 2d Dist. 1986).  In Lockheed, a claimant attempted to challenge the forfeiture of an aircraft that had been used in drug trafficking.  The claimant asserted that he had purchased the aircraft for value and that it

14

had been transferred to him by a bill of sale months before the incident giving rise to the

forfeiture claim.  The court rejected the claim, and the court of appeal affirmed, because the

claimant had failed to record the change in ownership with the Federal Aviation Administrator as

provided by Florida statutes.  Having failed to do so, the court concluded that the claimant was

not the owner of the aircraft.  Id.

The clear rule from Wheels Unlimited, Inc., and the cases relied on in its analysis, is that

Florida does not recognize "equitable" interests in property that is subject to a clear statutory

registration framework.  Since no equitable claim of ownership would be recognized by Florida

state courts, Lane cannot meet his statutory burden of demonstrating that he is an innocent owner

for federal forfeiture purposes.  In United States v. One-Sixth Share of James J. Bulger in All

Present & Future Proceeds of Mass Millions Lottery Ticket No. M246233, 326 F.3d 36, 44 (1st

Cir. 2003), the United States Court of Appeals for the First Circuit noted, in a pre-CAFRA case,

that "[a] mere equitable interest in the property was historically not deemed sufficient to confer

standing."  Id. (quoting D.B. Smith, Prosecution & Defense of Forfeiture Cases ¶ 9.04 at 70.6-

70.7 (2002).

Here, Lane has, at best, a "mere equitable interest" in the Flash II.  He voluntarily

transferred funds to Anderson without obtaining title to or possession of the Flash II.  This

makes him a general unsecured creditor of Anderson.   He may have a cause of action in contract

or tort against Anderson, but he has no ownership interest in the defendant property.  See United

States v. BCCI Holdings, Luxembourg, S.A.,46 F.3d 1185, 1191-92 (D.C. Cir. 1995)(bank

depositors, having voluntarily turned over their funds to bank,  have no interest in the specific

accounts to which their funds may be traced);  United States v. BCCI Holdings, Luxembourg,

S.A., 69 F. Supp. 2d 36, 59 (D.D.C. 1999) (same); United States v. All Funds on Deposit on or

Before November 8, 1994 in Citibank Account No. 42773634 in the Name Imtiaz Ahmed Kahn,

955 F.Supp. 23, 26-27 (E.D.N.Y.1997) (same).   Just as a shareholder in a corporation cannot

recover on an equitable interest in seized assets of the corporation, <u>United States v. New Silver</u>

<u>Palace Restaurant, Inc.</u>, 810 F. Supp. 440, 443 (E.D.N.Y. 1992), Lane cannot recover on his

claim to an equitable share in the Flash II for control and title that he deliberately and voluntarily

placed in Anderson.

Indeed, even if Lane had obtained title, he would not meet the statutory requirement for

an innocent owner.   Under 18 U.S.C. § 983(d), an owner does not include a person who has

nominal title but does not exercise dominion or control over the property.  18 U.S.C. § 983(d)(6)

( . . ."the term "owner" . . . (B) does not include . . . (iii) a nominee who exercises no dominion or

control over the property").  In <u>United States v. $ 81,000</u>, the First Circuit cited with approval a

district court's decision rejecting a forfeiture claim by a father who had possession and title to a

Datsun 280Z X sports car because the son was the only person who exercised dominion and

control over the car.  <u>United States v. $81,000</u>, 189 F.3d at 35.

In this case, Anderson exercised dominion and control over the Flash II, to the exclusion

of Lane.  In Lane's own words, "Anderson was the manager of the Flash II, and everything went

through him."  INT Response 18.  Lane did not know who was owed a mechanic's lien or who

was an investor.  INT Response 9.   Anderson had the authority to reject or accept an offer of

sale on the Flash II.  Anderson had the sole authority to decide whether the refurbishment of the

Flash II was adequate.  Lane did not.  TR 97-99.  Lane exercised no dominion or control over the

Flash II.  He is therefore not an "owner."  18 U.S.C. § 983(d)(6)(B).

IV.    <u>Lane Has No Viable Counterclaim Against the United States.</u>

A.    There Is No Takings Claim For Property Seized For Forfeiture.

There is no fifth amendment takings claim available for property seized for forfeiture.

Forfeiture is an exercise of the police power.  <u>Bennis v. Michigan</u>, 516 U.S. 442, 452-53 (1996).

A lawful forfeiture is not a taking.  Id.  See also Crocker v. United States, 37 Fed. Cl. 191, 195-96 (1997).  A seizure in order to assert in rem jurisdiction over property for which a court has found probable cause for forfeiture is likewise not a taking.  See United States v. One 1979 Cadillac Coupe De Ville VIN 6d4799266999, 833 F.2d 994, 1000 (Fed. Cir. 1987) (citing Calero Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 679 (1974)).  Even if a court ultimately finds lawfully seized property not to be forfeitable, that does not convert the seizure into a taking.  Id. at 1000.  See also Gahagan v. United States, 72 Fed. Cl. 157 (2006).

Likewise, an unlawful forfeiture has not historically been deemed a taking.  In order to state a takings claim, a plaintiff must concede the lawfulness of the actions of the government that resulted in the alleged taking.  See Gahagan, 72 Fed. Cl. at 161;  Florida Rock Indust., Inc. v. United States, 791 F.2d 893, 898 (Fed. Cir.1986) ("Tucker Act suit in the Claims Court is not . . . available to recover damages for unauthorized acts of government officials."); Crocker v. United States, 37 Fed.Cl. 191, 195 (1997)(" Crocker I ")("[t]o state a takings claim in this court . . . the plaintiff must concede the lawfulness of the actions of the Government that resulted in the alleged 'taking.' "); Alde, S.A. v. United States, 28 Fed.Cl. 26, 33 (1993)("[b]ecause a taking can only occur when the Government acts lawfully, alleging that property was taken unlawfully eliminates the foundation of a takings claim.").  But see Innovair Aviation, Ltd. v. United States, 72 Fed. Cl. 415, 422-23 (Aug. 31,2006) (finding that a reversed forfeiture was a taking when the property was no longer available for return).

Finally, if a takings suit were possible, see Innovair, supra, this Court would not have jurisdiction.  The Court of Federal Claims has exclusive jurisdiction of takings suits for more than $10,000.  28 U.S.C. § 1346(a)(2); 28 U.S.C. § 1491(a)(1).  See Innovair Aviation, Ltd. v. United States, 58 Fed. Cl. 560, 563 (2003); Crocker v. United States, 37 Fed. Cl. 191, 195 (1997).

Accordingly, the government respectfully submits that there is no justiciable takings claim before this Court.

B.      There Is No Claim Under the Federal Tort Claims Act

As previously demonstrated in the "Government's Supplemental Memorandum Regarding Sovereign Immunity Under CAFRA, the Discretionary Function Exemption and Administrative Exhaustion," Docket Entry 63 (filed May 10, 2007), sovereign immunity bars any claim by Lane for damages arising from the government's sale of the Flash II pursuant to this Court's Order of July 15, 2005.  Lane had the ability to seek to prevent the sale of the Flash II by appealing the Court's denial of his motion to stay the Court's July 15, 2005 Order or by moving for a stay in the First Circuit Court of Appeals pursuant to Federal Rule of Appellate Procedure 8(a).  After Lane failed to do so, the government properly sold the Flash II, and the Court has no subject matter jurisdiction to entertain any claim by Lane for any amount beyond the remaining proceeds of the sale currently in escrow.  The government respectfully submits that its earlier memorandum fully addressed this issue, and therefore respectfully refers the Court to that brief.

C.      Lane Has No Equitable Claim.

If the Court were to find that the government did not meet its burden on forfeitability, the government's claim as plaintiff would fail, and the government would then return the res, or in this case, the substituted res of the proceeds remaining in the forfeiture fund, to the person from whom it was seized.  That person was not Lane.  In order for Lane to recover, he would still be required to demonstrate a right to the funds.  Given his lack of ownership, the government asserts that he cannot make that showing.

Additionally, the government asserts that this Court has no jurisdiction over any claim for any amount in excess of the substituted res because, as demonstrated above, no theory has been

advanced under which sovereign immunity has been waived for a claim in this Court. Moreover, no evidence has been adduced that the value exceeded the amount of the substituted <u>res</u>.

Finally, even if some form of equitable claim were to exist, which the government strongly disputes, the government respectfully submits that equity does not lie with Lane in this matter. As the Court found at its initial hearing in this case, Lane knew of the seizure of the Flash II but he deliberately hid from the DEA. Affidavit of Kerry Scott Lane dated 7/27/05, Docket Entry 17-2, at ¶¶ 12-13. This would be disturbing enough from an unsophisticated layman. Lane is not a layman. He is an anesthesiologist authorized by the DEA to distribute controlled substances pursuant to 21 U.S.C. § 822(b). His deliberate choice to hide his claims from the DEA at the time of the seizure, and his direction to Anderson not to tell the DEA about him, mitigate against equitable relief. <u>See</u> <u>United States v. One Star Class Sloop Sailboat</u>, 458 F.3d 16, 25 & n.10 (1st Cir. 2006).

Moreover, from his first involvement with the Flash II, Lane failed to undertake easily available steps to protect his financial investment and, to the contrary, deliberately exposed himself to the risk of malfeasance by Anderson. Lane issued checks to Anderson without an accounting, he bought cashier's checks in Anderson's name rather than his own, he failed to register the Flash II, failed to pay registration or property taxes on the Flash II, and he failed to insure the Flash II. Once the Flash II was seized, in addition to failing to call the DEA to find out the status of the boat, he asserts that he failed to call Marblehead Trading Company, the place the Flash II was seized from. He asserts that he set up a passive alert for internet stories, but an active search would have alerted him to the fact that the boat had been seized for forfeiture.

Even once he had concrete knowledge of the forfeiture, he failed to file an appearance with this Court for nearly a month. After this Court ordered the Flash II to be forfeited and sold,

he failed to post a supersedeas bond for the appeal in order to obtain a stay as of right. When this Court declined to stay the sale order pending appeal without the bond, he failed to appeal the denial of the stay, and he failed to apply for a stay of the order in the First Circuit, pursuant to Federal Rule of Appellate Procedure 8(a).

Lane repeatedly threw hundreds and thousands of dollars at Anderson without ever taking the steps that a prudent person would to protect his interest. After the Flash II was seized, he hid. Once it was ordered sold, he failed to take reasonable steps to avoid the sale while his appeal was pending. Having repeatedly failed to undertake the simple means available to protect his own financial interest over the past decade, Lane is not in a position to seek equity from this Court.

## V.      The Value of the Flash II Was $100,000.

Lane has contended throughout these proceedings that he was entitled to void the sale of the Flash II. At this Court's hearing on May 3, 2007, the Court asserted that a necessary party to the action, the new owner of the Flash II, was not present. Lane waived his claim to void the sale, but asserted that he had a claim for the "value" of the Flash II, which he claimed was greater than the proceeds of the government's auction of the Flash II in December 2005.

The Court has ruled that if the government prevails on forfeitability, then the value of the Flash II is the amount the government obtained at auction: $100,000. However, the Court suggested that if the government did not prevail, Lane may have a claim for the actual fair market value.

The government respectfully submits that even if the government failed to meet its burden as to forfeitability, Lane has no counterclaim under which to seek the value of the Flash II because the government has not waived sovereign immunity under any theory available to him. See section IV, supra.

20

Regardless, even if there were a claim for relief, the value of the Flash II at the time of its seizure and sale was $100,000. The value of the Flash II was its connection to John F. Kennedy. TR at 73. The Flash II was sold at an auction of other memorabilia of John F. Kennedy. It received a tremendous amount of publicity. Ettinger at 64-66. It was advertised on Good Morning America and on the Today Show, with Katie Couric. People could participate in the auction by submitting bids through a fax machine, a telephone, or over the internet. Ettinger at 22-23. This presented the Flash II with its best opportunity to obtain an interested buyer. Ettinger at 64-66.

In a forfeiture sale, the government has every incentive to seek the highest possible sales price for an item. United States v. Carmichael, 436 F. Supp. 2d 1244, 1250 (M.D. Ala. 2006). Moreover, when a selling agent is receiving a commission on a sale, as Guernsey's was, the agent has the incentive to market the property aggressively and to seek the highest bidder. Id. In the face of such incentives, when the government sells a property in an arms length transaction to the highest bidder, the Court should accept the sales price as the fair market value of the property on the day in question. Id.

Moreover, the government respectfully submits that the Court should accept the sales price that the government obtained at auction as the value because there is no admissible evidence of any other value for the Flash II at the time that it was seized. Lane has asserted that the value should be based on a bid that Anderson rejected at an auction in 1998. However, there is no evidence that such a bid was authentic. See Ettinger at 49-54. Additionally, even if such a bid had been authentic, a supposition which Lane, who bears the burden on this point, cannot prove, the value of Kennedy memorabilia declined substantially between 1995 and 2005, as objectively demonstrated by the history of sales of Kennedy rocking chairs over this time period. Ettinger at 55-57. There were about a dozen Kennedy rocking chairs, all the same model,

21

which have become available for sale to the public after Jacqueline Kennedy Onassis' death.

The first one sold for about $440,000 in 1996.  Two years later, a rocking chair included in the

first Guernsey's Kennedy auction sold for $340,000, a twenty percent decrease.  Ettinger at 55.

At a 2000 auction, the sales price dropped still further, to $100,000.  Id.  In 2005, at the second

Guernsey's Kennedy auction, the rocking chair offered for sale commanded only $50,000.[6]  Id.

56.   Therefore, there is no basis for concluding that the value of the Flash II at the time of the

seizure and judicial sale was greater than the $100,000 for which it sold at auction.

## CONCLUSION

The evidence at trial demonstrates by a fair preponderance that drug proceeds were

invested into the Flash II in 1996 or 1997, and that investment was re-paid during the course of a

drug transaction in 2001.  Therefore, the government has proven that the Flash II was forfeitable

pursuant to 21 U.S.C. § 881(a).   This causes the burden to shift to Lane to prove that he is an

innocent owner under the terms of 18 U.S.C. § 983(d)(6).  Lane cannot meet that burden because

Anderson, not Lane, was the owner of the Flash II.  Accordingly, the government respectfully

requests that the Court enter judgment in favor of the United States in this matter.

Additionally, even if the government had failed to meet its burden, no legal avenue exists

for Lane to claim damages in this Court, because the government has not waived sovereign

immunity.  Furthermore, Lane has no basis to state a claim in equity, and he has no injury,

because the sales price obtained by the government for the Flash II at auction was fair market

value of the Flash II.  Therefore, Lane should not be permitted to amend his answer to file

additional claims.

---

[6]Whether ironically or as a reflection of the actual market for Kennedy goods, the price of
the 2005 rocking chair was about one eighth the price of the first sale.   This is the same level of
change reflected between the "rejected" 1998 bid (if it existed) and the actual 2005 sales price.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:     /s/ Nancy Rue
        Nancy Rue
        Assistant U.S. Attorney


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that these documents filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

        /s/ Nancy Rue
        Nancy Rue
        Assistant U.S. Attorney

**Copies of checks submitted as part of Claimant Kerry Scott Lane's Response to the United States' Request for Production of Documents, Filed with the District Court on January 23, 2007, as Document No. 45, Exhibit No. 12.  See Bench Trial on 5/24/07, Transcript Pages 64 and 65.**

| Check No. | Date | Check Amount | Payable to | Bates No. | Docket Page No. |
|---|---|---|---|---|---|
| 4656** | 12/25/97 | $1,500 | Greg Anderson | LaneDocReqResp000019 | Doc.#45, Ex. 12, Page 13 |
| 4679** | 01/98 | $2,000 | Greg Anderson | LaneDocReqResp000019 | Doc.#45, Ex. 12, Page 13 |
| 4751** | 02/06/98 | $1,500 | Greg Anderson | LaneDocReqResp000019 | Doc.#45, Ex. 12, Page 13 |
| 4783 | 03/03/98 | $2,500 | Greg Anderson | LaneDocReqResp000019 | Doc.#45, Ex. 12, Page 13 |
| 3920 | 03/19/98 | $  500 | Matt Gineo | LaneDocReqResp000023 | Doc.#45, Ex. 12, Page 17 |
| 3917 | 03/19/98 | $  500 | Gregory O. Anderson | LaneDocReqResp000023 | Doc.#45, Ex. 12, Page 17 |
| | **Subtotal** | $8,500 | | | |

| Check No. | Date | Check Amount | Payable to | Bates No. | Docket Page No. |
|---|---|---|---|---|---|
| 4894 | 05/01/98 | $   150 | Ole Anderson | LaneDocReqResp000023 | Doc.#45, Ex. 12, Page 17 |
| 4899 | 05/04/98 | $   500 | Ole Anderson | LaneDocReqResp000025 | Doc.#45, Ex. 12, Page 19 |
| 4949 | 05/12/98 | $1,500 | Ole (Greg) Anderson | LaneDocReqResp000025 | Doc.#45, Ex. 12, Page 19 |
| 5033 | 07/02/98 | $   300 | Rich Delhauty (??) | LaneDocReqResp000025 | Doc.#45, Ex. 12, Page 19 |
| 5171 | 09/02/98 | $1,000 | Greg Anderson | LaneDocReqResp000025 | Doc.#45, Ex. 12, Page 19 |
| 5202 | 09/29/98 | $2,000 | Greg Anderson | LaneDocReqResp000027 | Doc.#45, Ex. 12, Page 21 |
| 5215 | 10/07/98 | $3,000 | Greg Anderson | LaneDocReqResp000027 | Doc.#45, Ex. 12, Page 21 |
| 5286 | 11/13/98 | $1,000 | Greg Anderson | LaneDocReqResp000027 | Doc.#45, Ex. 12, Page 21 |
| **TOTAL** | | $17,950 | | | |
| 1815445** | 01/08/97 | $3,000 | **Marshall Chapman (from Ole Anderson)** | LaneDocReqResp000021 | Doc.#45, Ex. 12, Page 15 |
| 4717 | 04/07/98 | $4,000 | **Kerry Lane** | LaneDocReqResp000023 | Doc.#45, Ex. 12, Page 17 |

**\*\*These checks were also included on LaneDocReqResp000022, but were duplicates.**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-10192-WGY |
| | ) | |
| ONE STAR CLASS SLOOP SAILBOAT | ) | |
| BUILT IN 1930 WITH HULL NO. 721, | ) | |
| NAMED "*FLASH II,*" | ) | |
| Defendant. | ) | |

DECLARATION OF M. LES OWEN

I, M. LES OWEN, hereby make the following declaration:

1.    I am currently employed by the Federal Bureau of Prisons ("BOP") as the Supervisory Attorney of the Consolidated Legal Center ("CLC"), located at Federal Medical Center, Devens, Massachusetts ("FMC Devens"). I have held this position since October 29, 2006. I have worked for the BOP since September 14, 1997.

2.    In order to perform my official duties as Supervisory Attorney, I have access to numerous records regarding prisoners maintained in the ordinary course of business in the BOP. This information includes, but is not limited to, documentary records, Judgment and Commitment files, and computerized records maintained on SENTRY, the BOP's computerized database.

3.    I have reviewed SENTRY records as they pertain to Gregory Olaf Anderson, Federal Register No. 00817-068, which reflect that he served a 179-day term of imprisonment, with two years probation following, for conspiracy to possess marijuana. This sentence expired on November 11, 1980.

Attached hereto, please find a true and correct copy of the following document:

a.    SENTRY "Inmate Profile" sheet, dated June 22, 2007.

I declare the foregoing is true and correct to the best of my knowledge and belief, and given under penalty of perjury pursuant to 28 U.S.C. § 1746.

Executed this ___ day of June, 2007.

M. Les Owen
Supervisory Attorney
CLC Devens, MA

```
  DEVBS  535.03 *              INMATE PROFILE              *    06-25-2007
PAGE 001 OF 001                                                16:08:40
          00817-068                 REG
REGNO: 00817-068                 FUNCTION: PRT DOB/AGE.: 07-05-1950 / 56
NAME.: ANDERSON, GREGORY OLAF                   R/S/ETH.: W/M/O
RSP..: EGL-EGLIN FPC                            MILEAGE.: 426 MILES
PHONE: 850-882-8522      FAX: 850-729-8190
ARS ASSIGNMENT..: EXPIRATION OF SENTENCE        FBI NO..:
ARS DATE/TIME...: 11-21-1980/0550               INS NO..:
 PROJ REL METHOD: UNKNOWN                        SSN.....: 584073712
 PROJ REL DATE..: UNKNOWN          PSYCH: NO     DETAINER: NO          CMC..: NO
      - - - - - - - - RELEASE DESTINATION - - - - - - -
          AGENCY...............:
          DST ASSIGNMENT.......:
          ADDRESS..............:

OFFN/CHG RMKS: CONSP POSS MARI  179 DAYS;2YRS PROB N/C FINE
    FACL CATEGORY    - - - - CURRENT ASSIGNMENT - - - - - EFF DATE  TIME
    EGL ADM-REL    EXPIRATION EXPIRATION OF SENTENCE      11-21-1980 0550




G0000        TRANSACTION SUCCESSFULLY COMPLETED
```