UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                    )
IN RE ONE STAR CLASS SLOOP          )
SAILBOAT BUILT IN 1930 WITH HULL    )   CIVIL ACTION
NUMBER 721, NAMED "FLASH II,"       )   NO. 05-10192-WGY
                                    )
                                    )
```

<u>MEMORANDUM OF DECISION</u>

YOUNG, D.J.                                    October 1, 2007

This in rem action arises in the context of a civil forfeiture proceeding.  Kerry Lane ("Lane") is a Florida physician who was a partial owner of a sloop formerly owned by President John F. Kennedy.  It seized the sloop on the ground that the purchase of the boat or its tackle was traceable to drug proceeds.  The government publicized the seizure in hopes of finding other persons with an interest in the boat.  One person came forward, but Lane did not.  Lane knew of the seizure but did nothing because he was undergoing a credentialing process at the hospital where he worked and did not want to become associated with the tainted vessel.  With the exception of the person who came forward, the government sought and received entry of default against all interested owners.  The government, however, failed to provide adequate notice of the forfeiture proceeding and Lane did not learn of it until after default had been entered.  By the time Lane was able to set aside the default following an appeal, the government had sold the sloop.

This case requires this Court to face vexing questions of first impression at virtually every turn. It is not often that a claimant overcomes an initial default and has the chance to contest the forfeiture proceeding after the res has long since been sold. This is a hazardous course for claimants to chart but, having overcome these obstacles, Lane was entitled to his day in court, and this Court on May 24, 2007 afforded him a full evidentiary hearing and welcomed substantial briefing. As a result, the Court has considerable work to do in unwinding this case's tortured factual and procedural posture -- a collateral consequence of the government's failure to provide Lane with adequate notice and his late appearance in the case.

I.   **PRIOR PROCEEDINGS**

The government instituted this civil forfeiture proceeding on February 1, 2005. The case was assigned to Judge Zobel. Compl. [Doc. No. 1]. Harry Crosby ("Crosby") was the only person to file a verified claim. Verified Claim [Doc. No. 3]. The government moved for entry of default as to all other interested parties. Mot. for Entry of Default [Doc. No. 11]. Default entered on June 3, 2005. Soon after, Lane learned of the entry of default and obtained counsel. Lane Aff. [Doc. No. 17-2] ¶ 16.

By then, however, Crosby and the government had reached a settlement whereby the government would sell the sloop with the government getting two-thirds of the proceeds and Crosby one-

third.  Joint Mot. for Judgment and Order of Forfeiture [Doc. No. 14].  This settlement required the United States Marshals Service to arrange for the sale of the boat in accordance with Department of Justice policies regarding disposition of forfeited property.  Stipulation of Settlement [Doc. No. 14] ¶ 3.  The parties further agreed that the government could "retain a broker and other professionals in its reasonable best efforts to market and sell" the boat "at the highest possible price."  Id.  Finally, the parties had to agree on offers made by potential buyers before accepting.  Id. ¶ 4.  On July 15, 2005, Judge Zobel endorsed the parties' proposed judgment and order of forfeiture.  Judgment and Order of Forfeiture [Doc. No. 15].  This order entered default judgment against all other potential claimants.  Id. ¶ 3.

Notwithstanding the entry of default judgment, Lane continued to press his case.  On July 27, 2005, Lane filed a Rule 60(b) motion seeking relief from the judgment [Doc. No. 16] asserting that he was an innocent part-owner of the sloop and that the government had failed to take reasonable steps to notify him of the institution of the forfeiture proceedings.  On August 16, 2005, Judge Zobel entered an electronic order denying the motion without a hearing on the ground that Lane had known about the seizure of the sloop and deliberately declined to disclose his interest.

Subsequently, Lane moved to alter the judgment to set aside the default. [Doc. No. 20].  On October 18, 2005, Judge Zobel entered an order denying this motion.  On November 8, 2005, Lane filed a notice of appeal [Doc. No. 24] and asked Judge Zobel to stay the auction pending the appeal [Doc. No. 25].  Lane stated that he would stipulate to an interlocutory sale of the boat provided that a minimum reserve was set and his share of the proceeds was held in escrow.  Mot. for Stay of J. Pending Appeal [Doc. No. 25-2], at 2-3.  On November 17, 2005, Judge Zobel denied the motion for a stay but entered an order stating that Lane could attempt to work out an escrow arrangement with the government as to the amount he claimed.  Lane and the government could not reach agreement.  Lane did not seek a stay from the First Circuit.  In December 2005, the boat was displayed as part of an auction of Kennedy memorabilia.  The boat received one bid for $100,000.  This bid was accepted.  After the government deducted costs, Crosby received his one-third share and the remainder was placed into the Asset Forfeiture Fund.

Some eight months later, on August 16, 2006, the First Circuit issued its opinion.  United States v. One Star Class Sloop Sailboat Built in 1930 with Hull Number 721, Named "Flash II", 458 F.3d 16 (1st Cir. 2006).  The court distinguished between "notice-in-fact of seizure" and "advance notice-in-fact of forfeiture proceedings," with due process requiring only the

4

latter.  Id. at 22-23.  The court explained that the
constitutionally required advance notice-in-fact of forfeiture
proceedings required that, in this case, the government at least
have asked Crosby if he knew the names of his fellow investors.
Id. at 25.  The court could not determine on the record before it
whether Lane had been afforded adequate due process and remanded
to the district court to make this determination.  Id.

On remand, the case was reassigned to this session of the
Court.  D. Mass. R. 40.1(K)(2).  Lane submitted an affidavit from
Crosby that Crosby knew Lane's name but could not have provided
an address.  Lane's Statement of Facts [Doc. No. 41], Ex. 2, at ¶
5.  The government did not deny that it could have tracked down
Lane with this information.  Rather, the government submitted
that asking Crosby would not have been a reasonable step.
Government's Mem. in Opp. to Relief from Default [Doc. No. 42] at
9.  The First Circuit foreclosed this argument, however, by its
mandate, which explicitly stated that the government should at
least have asked Crosby if he knew of any other co-owners.  458
F.3d at 25.  Consequently, this Court set aside the default
judgment as void.  See United States v. Giraldo, 45 F.3d 509, 512
(1st Cir. 1995) (per curiam) ("If the notice turns out to have
been inadequate, the forfeiture is void.").

On March 22, 2007, the government moved for partial summary
judgment.  In its brief, the government stated that there were

three disputed issues: (1) the forfeitability of the sloop; (2) the value of the sloop; and (3) the validity and scope of Lane's ownership claim. Government's Mot. for Partial Summ. J. [Doc. No. 54] ("Government's Mot.") at 1. The government explained that it was moving for summary judgment only as to the first two issues, anticipating that early adjudication of those issues would allow extra-judicial resolution of the validity and scope of Lane's ownership claim. Lane accepted this framing of the issues and filed a cross-motion for partial summary judgment with respect to the forfeitability and value of the sloop. Lane's Cross-Mot. for Partial Summ. J. [Doc. No. 56] ("Lane's Mot."). The government and Lane each filed reply briefs. [Doc. Nos. 59 & 60]. Lane also filed a motion to amend the complaint to include a counterclaim under the Federal Torts Claims Act. [Doc. No. 61]. Lane stated that he could not amend his complaint earlier because he first had to exhaust his administrative remedies pursuant to the Federal Torts Claims Act. [Doc. No. 61] at 2.

During briefing, Lane contended that he was entitled to a choice of remedy: (1) the return of the sloop; or (2) the market value of his share in the sloop. Lane Mot. at 8. Lane requested the option of the sloop's return even though its current owner had not been joined as a party. As Lane would have had it, he would not have had to choose his remedy until after this Court ruled whether sovereign immunity limits Lane to a share of the

auction proceeds.  For Lane, the benefits of waiting were clear.
Were this Court to rule that sovereign immunity applied, Lane
could then forego the auction proceeds and seek the return of the
vessel, which he contended was worth far more than what it
brought at auction.  If the boat owner successfully defended
title, then Lane might be able to return for a share of the
auction proceeds as a consolation prize.  Alternately, if the
Court ruled that sovereign immunity were no bar, then Lane could
settle for the market value of his share.  This would save him
the trouble of going after the boat owner.  May 3 Tr. at 3:10-22.

At oral argument, the Court stated that Lane's desired
course of action would require it to render an advisory opinion.
If Lane did not like the Court's ruling with respect to sovereign
immunity and the value of the sloop, Lane could sidestep this
Court's ruling by going after the sloop and winning title.  <u>Id.</u>
at 3:23-4:5.  Further, any ruling the Court made with respect to
forfeitability would not bind the boat owner, a non-party to the
case.  Consequently, the Court required Lane to set his course at
this juncture.  If Lane desired to join the boat owner, the Court
would continue the trial date.  Alternately, if Lane agreed to
satisfy himself with a money judgment -- whatever the amount
might be -- the Court was prepared presently to adjudicate the
matter.  <u>Id.</u> at 5:4-16.

7

When presented with this choice, Lane's counsel stated that she had not discussed this issue with her client. <u>Id.</u> at 4:20-21. The Court gave Lane's counsel time and she went out of the courtroom to contact her client. <u>Id.</u> at 5:15-25. When Lane's counsel returned to the courtroom, she stated that because joining the boat owner would delay things another year, her client would settle for a money judgment. <u>Id.</u> at 6:2-6. At this point, there existed a "case or controversy" for the Court to adjudicate, U.S. CONST. art. III, § 2, and the Court heard oral argument on the merits. The Court took the case under advisement to consider the cross-motions for partial summary judgment and Lane's motion to amend his complaint to state a counterclaim under the Federal Torts Claims Act.[1]

The Court tentatively opined that Lane could overcome sovereign immunity only by establishing that the sloop was not forfeitable. On May 24, 2007, the Court held an evidentiary

---

[1] The Court also took the case under advisement to consider a number of issues that the government raised for the first time at oral argument. Although the government moved first for partial summary judgment, it did not assert sovereign immunity until its reply brief. Even then, the government did not brief the discretionary function exception or quasi-judicial immunity, issues that it raised for the first time at oral argument.

This practice of holding back the strongest arguments during briefing does not commend itself to the Court. It results in unfair surprise to the other party and undermines an adversary system designed to flesh out the strongest legal arguments.

In the interest of fairness, the Court invited supplemental briefing, giving Lane an opportunity to respond to the government's arguments.

hearing to determine whether the sloop was forfeitable.  After oral testimony, submission of exhibits, and (by agreement) deposition testimony, the parties have rested on the issues of the sloop's forfeitability and value.  This memorandum of decision fully sets forth the Court's factual findings and conclusions of law as to forfeitability and valuation.

## II.  FINDINGS OF FACT

### A.    The Purchase and Restoration of the Sloop

In July 1996, Ole Anderson learned that a sloop once owned by President Kennedy was for sale.  Ole Anderson thought the sloop could be refurbished and sold for a high price.  He floated this idea to Lane, who agreed to participate in the venture. Lane provided Anderson with funds to purchase the boat for $22,000.  May 24 Tr. at 68:2-8.  Lane, Crosby, and another investor put up the money initially thought necessary to restore the sloop. The initial deal was that the three investors would own the sloop with Ole Anderson as their agent and facilitator of the project.  Upon return of the three owners' investment, all four would share in the profits of the sale.  Ole Anderson was never an owner of the sloop.  Lane continued to provide Ole Anderson with additional funds to refurbish and store the vessel. Id. at 79:18-21.

After the sloop was purchased, Ole Anderson began to say that he needed ever more funds to restore the vessel.  He

obtained additional funds from new investors by promising them shares in the profits from the sale of the sloop.  Id. at 72:22-73:7.  Lane was unhappy with the profit-sharing scheme as it diluted his own interest in the profits but he became resigned to it in order to bring the venture to a profitable conclusion.  Id. at 84:14-19.

One of the later investors was a confidential witness, the CW,[2] who ran a marijuana trafficking business.  Id. at 14:1-2. After the sloop was purchased, Ole Anderson began transporting marijuana for the CW.  Id. at 47:1-18; 49:2-4.  Ole Anderson approached the CW with a proposal whereby the CW would invest in the refurbishment of the sloop and receive a percentage of the profits from her sale.  Id. at 21:3-6; 51:10-15.  The CW verbally accepted this proposal and invested $16,000 in cash from its marijuana business.  Id. at 22:1-5; 36:7-12; 52:19-20.  The CW believed that it had obtained an ownership interest in the sloop. Id. at 21:7-9.

Lane, the CW, and the other investors provided Ole Anderson with a steady stream of funds.  Ole Anderson drew indiscriminately on these funds in refurbishing and storing the vessel.  In March 1998, Ole Anderson put the sloop up for

---

[2] This person later cooperated with the Drug Enforcement Agency.  The Court follows the parties' lead in referring to this person as "the CW" and using gender-neutral pronouns when referring to the CW.

auction. <u>Id.</u> at 77:8-10. The vessel received a bid of $800,000 but Ole Anderson did not accept the bid. Lane's Stat. of Undisp. Facts [Doc. No. 56-3] ¶ 16. The CW came to understand that it did not have an ownership interest and wanted to get out before it lost its entire investment in the boat. May 24 Tr. at 24:25-25:11. Ole Anderson worked off the $16,000 by transporting marijuana before he was arrested in December 2001. <u>Id.</u> at 25:11-20; 26:23-27:4; 48:19-20.

Subsequently, the CW was arrested in December 2003. <u>Id.</u> at 36:4-7. The CW began cooperating with the government, providing information about the transactions it had with Ole Anderson. <u>Id.</u> at 40:9-13. In October 2004, pursuant to a warrant, the government seized the sloop on the ground that it constituted proceeds of drug crimes. The government publicized the seizure in hopes of finding other persons involved in the boat's restoration. One investor, Crosby, came forward, but Lane did not. Lane knew of the seizure but did nothing because he was undergoing a credentialing process at the hospital where he worked and did not want to become associated with Ole Anderson.

**B.  The Value of the Sloop**

The government contends that the sloop was worth no more than the $100,000 that it sold for at auction. Lane observes that in the month before the auction, there was considerable

publicity about the vessel.  The Boston Globe reported that the
vessel had been seized from a "convicted marijuana trafficker"
and discussed Lane's plan to appeal Judge Zobel's entry of
default judgment against him.  Lane's Mot. for Summ. J. [Doc. No.
56], Ex. 8.  Lane contends that for the government, "this was
just another piece of forfeited property being liquidated as
quickly as possible and with the least amount of effort."  Id. at
11-12.

Although sales pursuant to court order do not always reflect
market value, see, e.g., Munro Drydock Inc. v. M/V Heron, 585
F.2d 13, 15 (1st Cir. 1978), the sloop was sold under favorable
conditions that maximized its value notwithstanding publicity
about the boat's recent history.  The government was obligated by
its settlement agreement with Crosby, another investor, to sell
the sloop "at the highest possible price."  Stipulation of
Settlement ¶ 3.  With this goal in mind, the government hired
Guernsey's to market the sloop with a warranty of clear title.
Mot. for Reconsideration [Doc. No. 73], Ex. 6, ¶¶ 3, 10.  The
contract provided that Guernsey's would receive a commission,
giving Guernsey's every incentive aggressively to market the boat
in search of the highest bidder.  Guernsey's sold the boat at an
auction of President Kennedy memorabilia that received
significant publicity including mentions on Good Morning America

and the Today Show with Katie Couric.  It is difficult to imagine more favorable conditions for the sale of the sloop.

Lane observes that the sloop received a bid of $800,000 in a 1998 auction.  This bid does not establish the value of the vessel some seven years later in 2005.  During that time period, the value of other Kennedy memorabilia declined substantially. For instance, there was a set of Kennedy rocking chairs that was sold piecemeal between 1996 and 2005.  In 1996, the first rocking chair sold for $440,000.  In 2005, however, another rocking chair sold for only $50,000.  The evidence points to the declining value of Kennedy memorabilia in recent years.  Ettinger Dep. at 55:4-57:11 (Jun. 7, 2007).

For these reasons, the Court finds that the price that the sloop sold for at auction reflected the its fair market value at the time of its seizure.

## III. RULINGS OF LAW

### A.    Forfeitability of the Sloop

Pursuant to the civil forfeiture statute, all "moneys, negotiable instruments, securities, or other things of value" exchanged for illegal drugs and "all proceeds traceable to such an exchange" are forfeitable. 18 U.S.C. § 981(a)(1). The government contends that the sloop was forfeitable as proceeds of a drug trafficking conspiracy in violation of 21 U.S.C. §§ 841(a)(1) and 846.

The Court has found that the CW gave Ole Anderson $16,000 in drug proceeds in exchange for a percentage of profits on the sale the sloop. When the CW wished to divest its expectancy interest, Ole Anderson re-acquired the interest through income earned from marijuana trafficking. This expectancy interest in the sloop is forfeitable, having been twice exchanged for drug proceeds.

This does not, however, render the entire vessel forfeitable. The expectancy interest is analogous to a financial instrument such as a stock derivative that allows the holder to speculate on the future value of the underlying security. Consider the following hypothetical situation. Coca-Cola decides to issue warrants entitling holders to buy its stock in the future at a specified price. A drug dealer obtains some warrants using drug proceeds. The fact that the drug dealer used drug proceeds to obtain the warrants does not render all of Coca-Cola's assets forfeitable. Rather, only the warrants that the drug dealer purchased using drug proceeds are forfeitable. So it is here. The CW and Ole Anderson traded in an expectancy interest using drug proceeds. It is not the vessel but this informal security that is forfeitable.

The Court has found that Lane, the CW, and other investors gave Ole Anderson money and that Ole Anderson drew indiscriminately from these funds in refurbishing the sloop. The government contends in the alternative that the boat is

forfeitable based on allegations that Ole Anderson used some of the $16,000 in drug proceeds to refurbish the sloop. The vessel is forfeitable if the CW's funds were actually put into refurbishing or maintaining the boat. This case, therefore, is analogous to cases concerning withdrawals from bank accounts that commingle drug proceeds and clean money.

The Second Circuit addressed this problem at considerable length in United States v. Banco Cafetero Panama, 797 F.2d 1154 (2d Cir. 1986):

> Where the credit in a depositor's account represents the net results of transactions that include a deposit of drug money, there is a plausible argument to be made either that the account contains the "traceable proceeds" of the tainted deposit (so long as the balance has not fallen below the amount of the tainted deposit) or that any withdrawal (in excess of the tainted deposit) contains the "traceable proceeds" of such a deposit. Which approach reflects reality in any particular case will depend on the precise circumstances. For example, if a depositor placed a $175 check from his automobile insurer in payment of a damage claim into an account that contained $100 from a drug sale and the next day paid a $175 bill for car repairs, a fact-finder would be entitled to conclude that the $175 withdrawal did not contain "traceable proceeds" of the drug transaction but solely the "traceable proceeds" of the insurance payment, with the tainted deposit remaining in the account. Obviously few cases will present facts that neatly match untainted deposits with withdrawals, and the real question therefore becomes which side bears the risk of the inevitable uncertainty that will arise in most cases.

Id. at 1159-60 (emphasis added). The court ruled that "Congress had answered that question in the Government's favor by assigning it a lenient burden of proof in obtaining forfeiture of 'traceable proceeds' of drug transactions." Id. at 1160. The

15

court observed that, under the then-existing burden-shifting
framework, the government needed only to show probable cause for
a forfeiture.  Once the government demonstrated probable cause,
the burden shifted to the claimant to show that the property was
not forfeitable.  The court ruled that this burden-shifting
required the claimant to show that "no portions of the account or
no portions of the withdrawal" constituted traceable proceeds.
Id. at 1160-61.

Subsequently, however, Congress enacted the Civil Asset
Forfeiture Reform Act of 2000, Pub. L. No. 106-185, 114 Stat.
202, which raised the government's burden of proof in civil
forfeiture proceedings.  Now the government must show by a fair
preponderance of the evidence that the property is forfeitable.
18 U.S.C. § 983(c)(1).  Accordingly, the reasoning in Banco
Cafetero now requires that the government bear the risk of
uncertainty that arises in cases involving withdrawals from
accounts commingling drug money and clean money.

This conclusion is bolstered by United States v. Voigt, 89
F.3d 1050 (3d Cir. 1996), a case where the government bore the
burden of proving by a fair preponderance of the evidence that
jewelry was "traceable to" the proceeds of money laundering
activity.

> While we can envision a situation where $500,000 is added
> to an account containing only $500, such that one might
> argue that the probability of seizing "tainted" funds is
> far greater than the government's preponderance burden

> (50.1%), such an approach is ultimately unworkable. . .
> . . . [T]he presence of one illegal dollar in an account
> does not taint the rest--as if the dollar obtained from
> money laundering activity were like a drop of ink falling
> into a glass of water.

Id. at 1087 (brackets and citation omitted).  The court ruled

that in light of numerous intervening bank deposits and

withdrawals, it could not "say that, more probably than not, the

jewelry [was] 'traceable to' money laundering activity."  Id. at

1088.

This principle that drug money is no longer traceable once

commingled is without limits.  The First Circuit has ruled

property forfeitable when there was insufficient clean money to

support the purchase of property.  In United States v. Parcels of

Land, 903 F.2d 36, 39-42 (1st Cir. 1990), the court held that

forfeiture was appropriate because there was "scant evidence in

the record of any 'substantial' sources of legitimate income" to

support the purchase of property worth more than $1,000,000.

Although the First Circuit employed the probable cause standard

under the then-existing legal framework, such reasoning continues

to make sense under a preponderance of the evidence standard.

In the instant case, Ole Anderson drew indiscriminately from

funds obtained from Lane, the CW, and other investors as the

funds came in.  This coming and going of money resembles the

intervening deposits and withdrawals that obscured the trace of

drug proceeds in Voigt.  Although it is theoretically possible

17

that Ole Anderson put some of the $16,000 in drug money towards refurbishing the vessel, the government failed to carry its burden of showing that Ole Anderson necessarily so used some of that money.

Accordingly, the Court rules that the sloop was not forfeitable. Because the sloop was not forfeitable, the government had no interest in the sloop and therefore no right to dispose of the sloop.[3]

## B. The Forfeiture Statute

What now? Simply ruling that the vessel is not forfeitable puts no money in Lane's pockets. He is litigating with the sovereign, and the sovereign is generally immune from suit by its citizens. At the same time, Lane's constitutional rights are

---

[3] This does not mean, however, that the government knew that the sloop was not forfeitable when it seized her and put her up for auction. Nonetheless, Lane's counsel has asserted that the "government has proven itself to be a thief, fencing stolen property, and laundering the proceeds to prevent Dr. Lane from undoing the sale." Reply to Government's Opp. [Doc. No. 80] at 8. Lane's counsel has further declared that "[t]he farther we go, and the deeper we dig, the more corruption we uncover in this case." Id. at 9. This vitriol is completely unsupported by the record and constitutes unacceptable conduct by an officer of the court. It falls well below the standards and character exemplified by the Massachusetts bar.

Should there be any further unwarranted vilification, the allowance of the motion to appear pro hac vice will be vacated and the Court's action reported to the appropriate bar authorities.

implicated; the government may not simply take property from its citizens.  It is deeply troubling indeed, and perhaps unconstitutional, for the government to seize real and personal property with multiple owners upon probable cause, sell the property, and finally, when the sale is adjudicated improper, to say to an innocent claimant, "Prove the extent of your interest and we'll give that proportion back," and for the government to pocket the difference.  This is topping it very high indeed.

The simple fact is this: the government had no right to sell the sloop.  Nor does it have any right to the proceeds.  Lane is at least a part owner of the proceeds.  As between the two, Lane has the superior claim.  In a forfeiture proceeding, the claimant may obtain the return of the res by demonstrating that it was wrongfully seized.  28 U.S.C. § 2465(a)(1).  When the government has sold the res in the interim, the proceeds constitute the substitute res that is returned to the claimant.

In the circumstances of the present case, Lane is entitled to the return of the substitute res ($100,000) less the sum paid to Crosby should the government successfully prove that Crosby's proportional share of the $100,000 was at least equal to the amount paid him. Claimants may recover up to the amount of the substitute res without running into the bar of sovereign immunity.  Claimants cannot recover beyond this amount unless there has been waiver of sovereign immunity.  See United States

19

v. 1461 West 42nd Street, Hialeah, Fla., 251 F.3d 1329, 1339
(11th Cir. 2001).

**IV. Ruminations on Summary Judgment**

Nine years ago Judge Patricia Wald wisely observed, the
jurisprudence of the federal courts is the jurisprudence of
summary judgment.  Patricia M. Wald, *Summary Judgement at Sixty*,
76 TEX. L. REV. 1897 (1998). Today, commentators are in near
unanimous agreement that federal courts overuse summary judgment
as a case management tool, Arthur R. Miller, *The Pre-trial Rush
to Judgment: Are the "Litigation Explosion," "Liability Crisis,"
and Efficiency Cliches Eroding Our Day in Court and Jury Trial
Commitments?* 78 N.Y.U. L. REV. 982, 1047 (2003); Stephen B.
Burbank, *Vanishing Trials and Summary Judgment in Federal Civil
Cases: Drifting Toward Bethlehem or Gomorrah?*, 1 J. EMPIRICAL LEGAL
STUD. 591, 592, 600 (2004); Sujo A. Thomas, *Why Summary Judgment
is Unconstitutional*, 93 VA. L. REV. 139 (2007); D. Theodore Rave,
Note, *Questioning the Efficiency of Summary Judgment*, 8 N.Y.U. L.
REV. 875, 900 (2006); John Bronsteen, *Against Summary Judgment*, 75
GEO. WASH. L. REV. 522, 551 (2007); and the courts themselves
acknowledge the force of the charge. See Doe v. Abington Friends
School, 480 F.3d 252, 258 (3d Cir. 2007) (Ambro, J.) ("Since the
Supreme Court removed the [summary] judgment procedure from
disfavored status in the 1980s, some have opined that the

pendulum has swung too far in the opposite direction."). The

brilliant judge, Richard S. Arnold, cuts directly to the bone:

> I think in the 20 years since I was a district court
> judge, we've seen a tremendous increase in volume,
> tremendous pressure to decide cases without thinking very
> much about them, tremendous pressure to avoid deciding
> cases. I mean, some judges will do almost anything to
> avoid deciding a case on the merits and find some
> procedural reason to get rid of it, coerce the parties
> into settling or whatever it might be.

Judge Richard S. Arnold, *Mr. Justice Brennan and the Little Case*,

32 LOY. L.A. L. REV. 663, 670 (1999).[4]

---

[4]Employment discrimination cases are especially vulnerable
to such pseudo-analysis, Judge Nancy Gertner, Address to the
Employment Law Conference, Massachusetts Bar Association (May 7,
2007):

> Simplistic, heuristic devices and formulaic approaches
> have led to an extraordinary rate of defendant decisions
> on summary judgment. In part, I suggest, this is the
> pressure of the docket. Discrimination claims have
> tripled over the last twenty years. And since they are so
> fact-bound, they take up multiple trial days. Clearly,
> some judges simply want to be rid of them. When I was a
> "baby judge" I attended a training session.  The trainer
> was to address employment discrimination cases. He began
> his presentation with: "Here's how you can get rid of
> these cases . . ." and he was not talking about
> plaintiff's verdicts. Gender Bias Task Forces from the
> Ninth and Eight Circuits reported that judges were
> impatient with sex-based employment discrimination
> claims. . . . Summary judgment has transformed employment
> discrimination law, not just because it is necessarily
> eliminates jury trials but because it has transformed the
> substantive law of discrimination. Let me underscore that
> -- under the guise of summary judgment, judges, not
> juries, are completely reshaping discrimination law --
> what kinds of sexual comments are harassing, what kinds
> of racist epithets count as discriminatory, what
> environments disadvantage even the most reasonable of
> women, what kinds of words connote discrimination.

Here, the initial hearing explored the amenability of resolving the forfeiture issue via partial summary judgment. Inevitably, however, the parties and the Court fell to wrangling over what would happen if the value of the sloop far exceeded the auction proceeds. Fearing this result, the government then (see fn 1 above) began to cast out anchors to windward (sovereign immunity and quasi-judicial immunity) to foreclose such recovery. Fearing sovereign immunity, Lane then moved to amend to add negligence and conversion claims under the Federal Tort Claims Act. 28 U.S.C. § 2674. Fearing the Federal Tort Claims Act, the government fell to briefing the discretionary function exception. There followed a great deal of toing and froing -- occasioning the spillage of a great deal of ink -- until the Court did what is should have done when the case was first transferred to this session, pressed for trial.[5]

---

[5]The wisdom of Judge John H. Meagher's famous aphorism ("This is a trial court. Trial judges ought go on the bench every day and try cases.") is here starkly illustrated. District judges have a myriad of duties. It is necessary to have one organizing principle for the discharge of the judicial office. Judge Meagher's approach is the best I've ever received. Equally good is the advice given me by Judge Owen Panner of the United States District Court for the District of Oregon: "There's not too much to this judging business, Bill. You find out what cases you have. You get them to trial as soon as you reasonably can. You try cases the best you know how. You decide what you need to decide as fairly as you can -- and you keep moving on."

As is always the case, issues yield readily to fact finding. Most important, the Court independently found after careful reflection that the fair market value of the sloop at the time of seizure is $100,000.  This largely obviates the most difficult issues of sovereign immunity.  The government wisely appears ready to pay over the substitute res to the legitimate claimants without skimming off its administrative costs in conducting the auction.  At least it has not raised the issue in briefs or argument.

## V. CONCLUSION

Accordingly, Lane is entitled to recover from the government the $100,000 received at auction after subtracting the lesser of (1) the sum paid to Crosby, or (2) the amount of Crosby's ownership share in the Flash II.  A prompt evidentiary hearing will be scheduled at which the government shall bear the burden of justifying this deduction. This Court also DENIES as moot Lane's motion to amend his complaint [Doc. No. 61] to add a counterclaim under the Federal Torts Claim Act and also DENIES as moot Lane's motion for reconsideration [Doc. No. 73] of the Court's holding that the discretionary function exception bars Lane's claim that the government negligently sold the sloop for below market value.

/s/ William G. Young

WILLIAM G. YOUNG
DISTRICT JUDGE