UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Civil Action # 05-10192 |
| ONE STAR CLASS SLOOP SAILBOAT BUILT IN 1930 WITH HULL NUMBER 721, NAMED "FLASH II", | |
| Defendant. | |
| KERRY SCOTT LANE, | |
| Claimant. | |

## CLAIMANT'S MEMORANDUM ON CROSBY'S INTEREST

In compliance with this Court's Memorandum Decision entered October 1, 2007,

Claimant Kerry Scott Lane M.D. submits the deposition testimony of Harry E. Crosby, exhibits

and this Legal Memorandum on the computation of Crosby's interest in the Flash II.

## I.    STATEMENT OF FACTS

In its October 1, 2007 Memorandum of Decision, this Court stated:

> Lane is entitled to recover from the government the $100,000 received at auction
> after subtracting the lesser of (1) the sum paid to Crosby, or (2) the amount of
> Crosby's ownership share in the Flash II.

Doc. 81 p. 23.

### A.    Crosby's payment from the government auction

According to a letter submitted by J. Thomas Kerner, Exhibit 2 hereto, the government

paid Harry E. Crosby $26,101 from the proceeds of the Guernsey's auction.

**B.      The amount Crosby was entitled to under the contracts**

The amount Crosby would be entitled to under the contracts evidencing the various ownership shares in Flash II is significantly less.

At his deposition, Crosby claimed he had an oral agreement with Ole Anderson, and that originally when he paid $5,500 toward the purchase of the sailboat at the 1996 auction, he was orally promised a 25% share.  Exhibit 1, Depo. pp. 14, 28.  After the auction they discovered the sailboat was in very poor shape, and they decided to restore it before selling it.  Depo. pp. 29-30. At that point – which was after Chuck Fitzgerald's interest had been bought out by Dr. Lane[1] [Depo. pp. 38] – Crosby invested another $5,000 toward the restoration costs, bringing his total investment to $10,500.  Depo p. 30.  According to Crosby, this $5,000 increased Crosby's share to one-third, under a hand-shake deal he had with Ole Anderson only.  Depo p.  14.  After that investment of $5,000 toward the cost of refitting, in Crosby's words, it was "cap city" – Crosby was unwilling to contribute anything more to the restoration, storage, shipping and other expenses of Flash II.  Depo pp. 18, 30, 42.  He claimed he never agreed that ownership percentages would change, although he admitted that Ole Anderson had talked to him about his percentage of ownership interest declining if he did not continue investing in the restoration. Depo p. 18.

Cross-examination showed Crosby's claim that he had an oral contract giving him a 1/3 interest is not credible, especially in light of a document he admitted signing.  On direct examination Crosby admitted signing an agreement that had "all kinds of scribblings and

---

[1]  Crosby did not invest any money in helping buy out Chuck Fitzgerald.  Depo p. 38.

scratchings out on it." Depo p. 17. On cross-examination he admitted that the signature on

Harper38[2] [Exhibit 3] was his, and that he signed the document on December 24, 1996. Depo p.

39. He insisted he could not remember whether he signed it before or after the scribblings and

scratch-outs (which he had described on direct examination) Depo p. 17, 39, 47. He

remembered signing an agreement initially but did not believe he signed anything later. Depo p.

15.

      In contrast to Crosby's deposition testimony that his ownership share stayed the same or

actually increased without his having to invest any more money, the contract which Crosby

signed on December 24, 1996 showed Crosby agreed that he would be responsible for paying a

quarter of the expenses of refitting. Exhibit 3 ¶ 3 ("Crosby will contribute twenty-five percent of

the cost of refitting" remains in the language that is not scratched out.) The language that had

been scratched out shows Chuck Fitzgerald was formerly liable for 75% of the expenses of

refitting. In buying out Chuck Fitzgerald, the consortium had to find someone not only to buy

out Chuck's present ownership interest, but also his liability for the expenses of refitting. The

contract Dr. Lane signed on the same day – December 24, 1996 – shows the formula the

consortium came up with for raising the money to buy out Fitzgerald and refurbish the sailboat.

Exhibit 4 paragraph 2 shows an open-ended agreement to allow current members and other

investors to obtain shares by investing $5,000 per participation unit. Under paragraph 3, each

member would get double his investment back or 5% of the net sales proceeds, whichever is

---

[2] This document was obtained from the files of Attorney Robert Harper, pursuant to his
deposition subpoena. Harper's office had Bates stamped the documents before turning them
over. For convenience, whenever we refer to a document from the Harper production, we
assigned it the number Harper's office Bates stamped on the first page of that document.

greater.

On redirect, the government asked Crosby why he signed this document showing he would get 16.6% of the overages, when he maintained he owned 33.3%. Depo p. 47. He said he signed the document so Ole Anderson would have something to show to investors, but that he had an oral agreement with Anderson that he would get one third. Depo p. 48. Once confronted with these documents showing Crosby's share of the overages was 16.6%, Crosby worked that figure into a new explanation: that he had an agreement to split his share with Anderson, so that Anderson got the balance between the 25% or 33.3% share he was allegedly promised, and Crosby's 16.6% share. Depo pp. 34-35. On redirect he acknowledged that 16.6% is half of 33.3% [Depo p. 47].

Crosby admitted on direct that the money to refit the sailboat would have to come from somebody. Depo p. 19. He claimed not to know who contributed the money for the rest of the expenses relating to the sailboat, or the lawyer's fees and expenses [Depo pp. 41-42]. He knew Robert Harper was the lawyer for the consortium. Depo p. 44. He traveled to the Guernsey's auction in New York City in 1998, but did not know who paid for his hotel expenses. He ventured that it was probably Dr. Lane. Depo p. 44. He claimed he did not remember Ole Anderson telling him, before the auction, about the various expenses owed for rebuilding the sailboat, and he did not get anything in writing from Anderson showing what he [Crosby] would be paid out of the 1998 auction. Depo pp. 45-46.

Even if Crosby refused to sign any further written agreement to accommodate the changes made to buy out Crosby's liability for restoration and other expenses, very clearly he knowingly acquiesced in the dilution of his share by accepting the benefits of Dr. Lane's

continued contributions to the costs of refitting and other expenses.

Crosby tenaciously clung to his claim that his agreement with Ole Anderson that he would get a third was an oral agreement.  Since the written contract Crosby signed on December 24, 1996 superseded all prior oral contracts, if the oral agreement that he would get a third was made before December 24, 1996, it was superseded.  To the extent he claimed it was a subsequent oral modification of the written contract, there would be no consideration for it. Under the written agreement, Crosby was liable for one fourth of the expenses.  To absolve Crosby from that clause, there would have to be some consideration flowing from Crosby to the other consortium members equal to that liability.  To absolve Crosby from that liability *and* increase his ownership share, the consideration would have to be considerable.  All Crosby could point to was his claim that he did Ole Anderson a lot of favors – towing the boat around and helping set it up.  Depo p. 49.  It is simply not credible that he could have done enough work towing the boat around and helping set it up to support such an oral contract modification. Furthermore, doing favors for Ole Anderson would not be enough since the written agreements were with the consortium, not Ole individually.

## II.     Crosby's interest is limited to his pro-rata share of the double reimbursement clause

The two contracts signed on December 24, 1996 were not a model of clarity –  they included strikeouts and handwritten revisions, and their language differs – but in substance they agree on the basic terms.  The investors, including Crosby and Dr. Lane, would first be reimbursed for 200% of each of their investments, and after that, Anderson and other residual shareholders such as Chuck Fitzgerald (who retained a 1% interest) would be paid certain set percentages of the "overages."  Crosby was to get 16.6% of the overages.  See Exhibit 4 and 5.

5

Because the government sold the sailboat for $100,000, there was not enough sale proceeds to even satisfy the double-the-investors-money-back clause. Since there were no overages, the various ownership percentages do not kick in. The investors would just be entitled to their pro rata share of 200% of their investments.

If Crosby gets double his money back ($21,000) and Dr. Lane gets double his money back ($140,000) that comes to $161,000 – which exceeds the $100,000 the boat sold for. Therefore each investor would have to settle for a pro rata share of what they were each due under the "double the investment" formula.

Dividing $100,000 by $161,000, the boat sold for 62.1118% of what it would take to double each of the investments. Multiplying .62118 by $21,000 shows Crosby's pro rata share is $13,042.48. Dr. Lane's share would be $86,956.52.

### III.   Dr. Lane is entitled to interest on the auction proceeds and attorney's fees

Pursuant to 28 U.S.C. § 2465(b)(1):

Except as provided in paragraph (2), in any civil proceeding to forfeit property under any provision of Federal law in which the claimant substantially prevails, the United States shall be liable for--
  (A) reasonable attorney fees and other litigation costs reasonably incurred by the claimant;
  (B) post-judgment interest, as set forth in section 1961 of this *title* [28 USCS § 1961]; and
  (C) *in cases involving* currency, other negotiable instruments, or the proceeds of *an interlocutory sale*--
    (i) interest actually paid to the United States from the date of seizure or arrest of the property that resulted from the investment of the property in an interest-bearing account or instrument; and
    (ii) an imputed amount of interest that such currency, instruments, or proceeds would have earned at the rate applicable to the 30-day Treasury Bill, for any period during which no interest was paid (not including any period when the property reasonably was in use as evidence in an official proceeding or in conducting scientific tests for the purpose of collecting evidence), commencing

15 days after the property was seized by a Federal law enforcement agency, or was turned over to a Federal law enforcement agency by a State or local law enforcement agency.

(Emphasis added).  It is not known whether the government invested the money in an interest-bearing account.  If not, interest must be imputed under the 30-day Treasury Bill rate for the applicable period.  (Claimant has not been able to determine how to compute those rates.)

The language of § 2465 is not entirely clear about the starting date for computation of interest when the property is sold at interlocutory sale.  Subsection (i) suggests it is from the date of seizure of the property, rather than the date of interlocutory sale.  Once again this appears to be an issue of first impression.  The only case that cites 28 U.S.C. § 2465(b)(1)(C)(i) holds that it does not apply because that case pre-dated CAFRA.  *Larson v. United States*, 274 F.3d 643, 647 (1st Cir. 2001).  This case was brought after CAFRA took effect.

Dr. Lane is also entitled to attorneys fees under § 2465(b)(1)(A).  He will be filing his petition for attorneys fees within 14 days of entry of a final judgment – as is required by Fed. R. Civ. Proc. 54(d)(2)(B).

<div style="margin-left:40%">

Respectfully submitted,
Kerry Scott Lane, MD,

By his attorneys,

_____/s/Brenda Grantland_____
Brenda Grantland, Esq.
Law Office of Brenda Grantland
20 Sunnyside Suite A-204
Mill Valley, CA 94941
(415) 380-9108
(Pro hac vice)

</div>

s/Eric B. Goldberg
Jeffrey P. Allen (BBO# 015500)
Eric B. Goldberg (BBO# 564398)
Seegel Lipshutz & Wilchins, P.C.
Wellesley Office Park
20 William Street, Suite 130
Wellesley, MA 02481
(781) 237-4400

1

1 - 53

IN THE UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,       )
                                )
        Plaintiff,              )
-v-                             ) DOCKET NO.
                                ) 05-10192-WGY
ONE STAR CLASS SLOOP SAILBOAT   )
BUILT IN 1990 WITH HULL NUMBER  )
NAMED FLASH II,                 )
                                )
        Defendant,             )
                                )

        THE ORAL/TELEPHONIC DEPOSITION OF HARRY E. CROSBY,

JR., scheduled to be held pursuant to Notice, and the

applicable provisions of the Federal Rules of Civil

Procedure, before MaryAnn Rossi, a Court Reporter and Notary

Public, within and for the Commonwealth of Massachusetts, at

the offices of the United States Attorney, 1 Courthouse Way,

Suite 9200, Boston, Massachusetts, on Wednesday, September

19, 2007, commencing at 1:23 p.m.

2

PRESENT:

On Behalf of the Plaintiff:

    NANCY B. RUE, ESQ.
    Assistant U.S. Attorney
    Office of the United States Attorney
    1 Courthouse Way
    Boston, MA  02210
    (617) 748-3100

For Kerry Scott Lane, MD:  (Via telephone)

    BRENDA GRANTLAND, ESQ.
    Law Office of Brenda Grantland
    20 Sunnyside Avenue
    Suite A-204
    Mill Valley, CA  94941
    415-380-9108

On Behalf of the Witness:

    J. THOMAS KERNER, ESQ.
    343 Commercial Street
    Unit 104
    Boston, MA  -02109
    617-720-5509

3

I N D E X

WITNESS:                                                    PAGE

Harry E. Crosby, Jr. (Via telephone)                          5

EXHIBITS: DESCRIPTION                                       PAGE

  KSL1    Newspaper article                                   50

  1       Letter to Ms. Wright from Mr. Kerner
          3-10-05                                             50

  12      Handwritten Document marked Harper 12               50

  93      Handwritten Letter to Mr. Harper from
          Mr. Anderson, 7-9-96                                50

  38      Agreement, 12-24-96                                 50

  177     Handwritten Document, 12-3-97, marked
          Harper 177                                          50

4

<u>S T I P U L A T I O N S</u>

IT IS HEREBY STIPULATED AND AGREED TO,
by and between the parties and their
respective attorneys, that all
objections, except as to the form of the
questions, shall be reserved until the
time of trial; that the filing of the
deposition be waived; and, that the
witness may read and sign the deposition
without any Notary Public being present.

5

1                        P R O C E E D I N G S

2                                            (1:23 p.m.)

3        H A R R Y   E .   C R O S B Y, J R ., having been sworn

4        by a Notary Public to tell the truth, the whole truth

5        and nothing but the truth, testified upon his oath as

6        follows:

7              EXAMINATION BY MS. RUE:

8        Q    We are on the record and your name please?

9        A    Harry E. Crosby, Jr.

10       Q    Mr. Crosby, this deposition is taking place by

11  stipulation.  And I believe that counsel, Brenda Grantland

12  is on the telephone with us.

13             MS. RUE:  Do we have you Ms. Grantland?

14             MS. GRANTLAND:  Yes.

15             MS. RUE:  At one preliminary matter before we

16  began, ordinarily, you would have a court reporter in the

17  physical room with you, but I believe that we have

18  stipulated that your oath could be taken by telephone.

19             Ms. Grantland, that is acceptable to you?

20             MS. GRANTLAND:  Yes.

21             MS. RUE:  Okay.  So, that has been done.

22             REPORTER:  There is one thing I need to do for the

23  record as a court reporter.  I need Attorney Kerner to say

24  aloud on the record that this gentleman is who he says he is

25  and I have sworn in --

6

```
 1              MS. GRANTLAND:  I can't hear you guys anymore.
 2              MR. KERNER:  The court reporter has asked me to
 3   swear on the record that it is my belief that the person we
 4   are hearing on the telephone representing himself to be
 5   Eddie Crosby is indeed, Eddie Crosby.
 6              MS. GRANTLAND:  Okay.
 7              MR. KERNER:  And all I can say is, it is the same
 8   voice I have always heard.  I've never met Mr. Crosby.
 9              THE WITNESS:  Correct.
10              MS. RUE:  And you -- we dialed the same telephone
11   number that you've used to get hold of him in the past?
12              MR. KERNER:  Yes.
13              MS. RUE:  So, this is your client?
14              MR. KERNER:  As far as I know, he is.
15              MS. RUE:  This is the person that you have been
16   representing and he has represented to you and that he is
17   Eddie Crosby?
18              MR. KERNER:  Yes.
19              BY MS. RUE:
20         Q    Okay.  Mr. Crosby, are you familiar with the
21   gentleman named Ole Anderson?
22         A    I am.
23         Q    How are you familiar with him?
24         A    I have known the whole Anderson family pretty much
25   since I was 16 years old.
```

7

| 1 | Q | Wow. How so? |
| 2 | A | They live in the same small town that I do. |
| 3 | Q | Okay. And is that small town in Clewiston, |

Florida?

| 5 | A | It is. |
| 6 | Q | Do you know where Mr. Ole Anderson is right now? |
| 7 | A | I do not. |
| 8 | Q | Okay. Have you seen him since 2004? |
| 9 | A | I think I have since 2004, yes. |
| 10 | Q | Okay. So, since the time the boat was seized, |

you've actually run into him?

| 12 | A | He is the one who told me the boat was seized. |
| 13 | Q | Did he tell you that in person or by telephone? |
| 14 | A | By telephone. |
| 15 | Q | Have you seen him since he told you that? |
| 16 | A | I believe I have, yes. |
| 17 | Q | Where did you see him? |
| 18 | A | He comes through Clewiston. We are on a busy |

highway and he comes through here from time to time. Just

passing through.

| 21 | Q | Have you talked to him about -- |
| 22 | A | I take that back. I saw him at his mother's |

funeral also.

| 24 | Q | Was his mother Jean Anderson? |
| 25 | A | Correct. |

8

1      Q      And when did she die approximately?

2      A      Are we there?

3      Q      Yes.

4      A      It would be an approximate guess, I don't know,

5  maybe a year ago.

6      Q      Have you talked to him about the sailboat since --

7  since the day that he told you that it was seized?

8      A      Oh, yes, ma'am.

9      Q      Can you relate to those conversations to us?

10     A      Well, he was worried that possibly he had gotten

11  too deep involved with the wrong people in some kind of --

12            MS. GRANTLAND:  First of all, I would object to

13  the hearsay.  But, you can continue answering.

14            Go ahead.

15     A      He told me that he had run into some problems with

16  the law.  The boat had been seized by the DEA.  He was

17  worried he was going to be arrested and told me he was

18  leaving the country.

19            BY MS. RUE:

20     Q      Approximately went did that conversation that you

21  just referred to take place?

22     A      As far as the date, I don't -- you know, this

23  would be probably within a week or maybe days after the boat

24  had been seized.

25     Q      Did he also tell you at that time that he had

9

1    spoken with Kerry Lane?

2         A    He did.  He indicated that he had called Dr. Lane

3    and the doctor had some kind of deal going up in

4    Massachusetts, a job offer or something.  He did not want to

5    be associated with the Anderson deal.

6              MS. GRANTLAND:  Once again, I am making a

7    continuing objection to the hearsay having to do with any

8    statements made by Ole Anderson.

9              But, you can go ahead and answer.

10             MR. KERNER:  Let me interject for a second,

11   Brenda, to advise Eddie Crosby what this means.

12             MS. GRANTLAND:  Okay.

13             MR. KERNER:  Eddie, you continue to answer these

14   questions as you feel appropriate.

15             Ms. Grantland is just making an objection for the

16   record.  And at some time in the future, a judge may not

17   allow what you said to be used.

18             But, you keep on saying it and it is going to be

19   recorded.  Okay, Eddie?

20             THE WITNESS:  I have -- I have no problem either

21   way.  If she doesn't want me to say this, I'll be quiet.

22             I'm answering the lady's questions as honestly as

23   possible.

24             MR. KERNER:  And you continue to do that today.

25             THE WITNESS:  Thank you.

10

1          BY MS. RUE:

2      Q    Now, Mr. Crosby, you indicated that you have seen

3   Ole Anderson subsequent to that initial conversation; is

4   that right?

5      A    I've seen him at the funeral and I think I have

6   seen him a time or two since then, yes.

7      Q    During those subsequent encounters, did you

8   discuss with him the sailboat or this forfeiture case?

9      A    No, ma'am.  He pretty much didn't want -- for his

10  own, I think, well-being and protection, he didn't want to

11  get around me and talk about that.  After the boat was

12  seized, I wasn't real happy with him.

13     Q    Subsequent to that initial conversation that you

14  described, have you talked with him about Dr. Lane?

15     A    No, ma'am.  I have not.

16     Q    So, you have seen him.  You know that he has been

17  in the country.

18          But you haven't had any substantive conversations

19  that are relevant to the sailboat?

20     A    The only conversation about Dr. Lane was that

21  originally, he tried to talk to the doctor and the doctor

22  had a job offer in Massachusetts or somewhere where the --

23  it was close to where the seizure took place.  And my

24  understanding was, he didn't want to be associated with a

25  boat that was seized in a drug forfeiture.

11

1    Q    Okay.  Did you, at one point, believe that you had

2  an ownership interest in the Kennedy sailboat?

3    A    I definitely had an ownership interest.

4    Q    How did that occur?  From the beginning?

5    A    He came through Clewiston, told me -- once again,

6  he was just driving through town and told me he was going to

7  an auction.  This was just after the Kennedy auction where

8  they sold all the expensive golf clubs and rocking chairs.

9         And he had this idea of buying this boat.  And I

10 kind of liked the idea.

11        So, I told him, if I could get in on the ground

12 floor, I didn't -- I didn't want to pay any more than Chuck

13 Fitzgerald or anybody else.  I wanted to be in on the ground

14 floor, that I would give him 5000.  You know, get him on up.

15 He only had $12,000.

16        And then, I ended up having to send him a little

17 extra money besides the 5, not much.  But that's how it all

18 started.

19        He went to the auction.  He won the boat.  I sent

20 him the money.

21    Q    When you referred to, he went to the auction, this

22 was the Rowell Realty auction?

23    A    I believe that's who put it on, yes, ma'am, in

24 either North Florida, extreme north Florida or it was -- it

25 was a long way.  It was south Georgia, somewhere, or

*APEX Reporting*
(617) 269-2900

12

1  Tallahassee, somewhere up in there.

2       Q    And you say that you gave him $5,000.

3            How did that occur?

4       A    I didn't give him any money at the time.  I

5  informed him that, you know, if he was short to bid it up, I

6  would -- that I would give him as much as 5000.

7            And he called me on Monday or Tuesday, the day of

8  the auction informing me we had won the auction.  We needed

9  my money.  I was in.

10           I went to my bank and had to banker wire 52 or 50

11  something hundred dollars.

12      Q    Who is your bank?

13      A    First Bank of Clewiston.

14      Q    Did you subsequently provide a copy of that

15  document to your lawyer?

16      A    I'm pretty sure I did.

17           MS. RUE:  And Brenda, will you stipulate that the

18  document we are talking about is page 107 of my document

19  production?

20           (Pause.)

21           MS. GRANTLAND:  I can't hear anybody anymore.

22           MS. RUE:  Oh, that's because I asked you a

23  question and we were waiting for your answer.

24           I said, Brenda, would you stipulate that the

25  document that we are discussing is document number 107 of my

13

1    document production.

2              MS. GRANTLAND:  Well, I don't know.  The witness

3    needs to do that.  I -- we can -- it looks like it might be,

4    but if he doesn't have it, how is he going to identify that.

5              So, I don't know.  I don't know what he is --

6              THE WITNESS:  I -- I do not have a copy of it.

7              But, it would have been a bank wire from First

8    Bank of Clewiston to Rowell Auction Realty for just a tad

9    over $5,000.

10             BY MS. RUE:

11        Q    And you sent that to your lawyer and during the

12   initial --

13        A    And I certainly sent a copy of that to my

14   attorney.

15        Q    Okay.  Did you also send him other documents?

16        A    I don't remember what all I sent him.  I'm sure I

17   did, yes.

18        Q    Did you pay additional money in for the sailboat

19   at some point in time?

20        A    I did.  It turns out the boat wasn't in quite the

21   shape we thought it was.  And Anderson wanted to rebuild the

22   boat.  Fitzgerald wanted to bail out of the boat.

23             And he hit me for five more thousand claiming to

24   refit the boat.

25        Q    And what did you understand that your 5 -- your

14

1    additional $5,000 was going to do?

2         A    It was going to buy me some more of the boat.

3         Q    By buying out Chuck Fitzgerald?

4         A    Correct.  Well, at that time, I'm not sure if

5    Fitzgerald was still in or not now to be honest with you.

6             Fitzgerald sold out.  Anderson claimed he had

7    another buyer.  As far as which -- you know, somewhere in

8    there, I got hit up for 5000 more for the refit.

9         Q    What was your understanding of how much of the

10   boat you originally purchased?

11        A    Originally, with the 5000, I bought one quarter of

12   the boat.

13        Q    And subsequently, with the initial 5000?

14        A    Well, we had kind of an oral hand shake deal that

15   I was going to get a third of the boat.  I wanted more than

16   that with another 5000, but we worked it out as a third.

17        Q    Who did you work this out with?

18        A    Anderson.

19        Q    Anyone else?

20        A    No, ma'am.

21        Q    Was it your understanding at that point that Chuck

22   Fitzgerald was out of it?

23        A    I believe, right around that same time, yes.

24             Like I say, it might be a week or two or a month,

25   one way or the other.

15

1           But he told me Chuck Fitzgerald was out and some

2    doctor that he knew was in.

3        Q    With regard to this boat, did you ever sign

4    anything?

5        A    I thought we did, yes.  I think I did for the

6    initial -- at the beginning of the boat.

7           I am sure I signed something, yes.

8        Q    Subsequently?

9        A    No.  What do you mean subsequently?

10       Q    You said you think you did sign something

11   initially.

12          Do you think you signed anything later?

13       A    I don't believe I did, no, ma'am.

14       Q    Did you have investors meetings regarding the

15   boat?

16       A    No, ma'am.

17       Q    Were you involved --

18       A    I did -- I did meet the doctor one time when the

19   boat was on display at a little church deal over in Fort

20   Myers, Florida.

21          We never discussed money.  We never discussed who

22   owned what.  It was just a little social deal.

23          I met him and that was about it.

24       Q    Did you know Robert Harper?

25       A    I met Robert Harper one time in New York City at

16

1   the boat auction.

2       Q    Prior to that, did you know him?

3       A    No, ma'am.

4       Q    Prior to that, did you know of him?

5       A    No, ma'am.

6       Q    You had --

7            MS. GRANTLAND:  Oh, what was the last one you

8   said?

9            MS. RUE:  I asked, prior to that, did you know of

10  him.

11           MS. GRANTLAND:  Know of him.

12      A    What do you mean?  Prior to what date, ma'am?

13           BY MS. RUE:

14      Q    Prior to meeting him at the New York auction?

15      A    No, ma'am.  That's the first time I have ever met

16  him.

17           I believe, Anderson may have had him do some law

18  work, you know, for the boat, but I had never met him.  No.

19  I never talked to him.

20      Q    Did you know, either from Ole Anderson or from any

21  other source, that Anderson was seeking additional investors

22  in the boat?

23      A    Only maybe his mother.  I think he told me his

24  mother loaned him some money and he was going to pay her

25  back with some -- some something.

*APEX Reporting*
(617) 269-2900

17

1          And the thing I signed, if I remember, it had all

2    kinds of scribblings and scratchings out on it.  And he had

3    people in for this and for that.

4          But, I don't remember what all they were to be

5    honest with you.

6          But, his mother gave him some money.  The doctor

7    gave him some money.  I gave him some money.  Chuck

8    Fitzgerald gave him some money.

9          Fitzgerald got his money back.  I don't know who

10   else.

11         Maybe some people that helped him on the

12   refurbishment he might have had in there.

13         But nobody other really than the doctor and I.

14   Q    And did you keep copies of any documents that you

15   had signed?

16   A    Only thing I kept a copy of is I -- I gave to

17   Mr. Kerner.

18   Q    Okay.  And that is the one wire receipt?

19   A    Whatever he has is what I have there.

20   Q    Mr. Crosby, did you ever receive repayment of your

21   money from Ole Anderson?

22   A    From Ole Anderson?

23   Q    Yes.

24   A    I received -- no would be the answer to that

25   question.  No.  I received my payments from the Government.

18

1    Q    Prior to receiving your payment from the
2    Government, did you ever receive any repayment from anyone
3    --
4    A    No.
5    Q    -- for the sailboat?
6    A    No.
7    Q    At the time that you found out that the sailboat
8    had been seized, what did you believe you owned?
9    A    A third of the sailboat.
10   Q    Had that changed since the time that you invested
11   the second $5,000?
12   A    No, ma'am.
13   Q    Did you ever agree that it would change?
14   A    No.  I never really agreed with change.  If he had
15   hit me up for more money, I would have changed it, or we
16   would have agreed to change it.
17   Q    Because you weren't going to invest any more
18   money?
19   A    I sure wasn't.  It was cap city.
20   Q    But, he never talked to you about, if you don't
21   invest more money, your interest is going to go down?
22   A    The only time he talked about that, was when I put
23   in the second 5000, he stressed that I needed 5,000 from
24   you.  If you don't, you were going to risk things happening
25   is sort of how he explained it.

19

1           He didn't -- he didn't say why.  He didn't say any
2    numbers.

3           He said, you need to give me 5000 for the refit.
4    My understanding, he was going to have to get it from
5    somebody else or come up with it somewhere.

6       Q    And you paid him?

7       A    I paid him.

8       Q    Did he ever hit you up for any more money?

9       A    No, ma'am.

10      Q    Did he ever ask you for more?

11      A    No, ma'am.

12      Q    You mentioned that you were in attendance at the
13   auction in New York.

14          Was this the Guernsey's auction?

15      A    Yes.

16      Q    What happened at that auction?

17      A    The boat was put up for auction.  Anderson was
18   running the deal 100 percent.  He -- he decided there would
19   be a pretty big reserve of like $1.2 million.

20          The boat went on the auction block.  The bidding
21   started at, I think, at 300,000.  There were four or five
22   bids for 6, 7, 800,000.  The place went quiet.  There were
23   no more bids.

24          And no sale.  Next item.

25      Q    Do you know, one way or the other, whether any of

20

1   those bids were authentic?

2        A    Well --

3             MS. GRANTLAND:  What was that?  If they were what?

4             MS. RUE:  Authentic.

5             MS. GRANTLAND:  Oh, okay.

6        A    Honestly, I do not know.

7             BY MS. RUE:

8        Q    Did you ever talk about it with anyone afterward?

9        A    I talked about it with Mr. Anderson many times.

10       Q    And what did you talk about?

11       A    It was his belief that they could have been a fake

12   bid.

13            I mean, he didn't want to look like a fool that

14   he'd just turned down $800,000.

15            That was my feeling right then.

16            You know, he had a 1.2 million reserve, and you

17   know, I don't know the laws of the auction houses in New

18   York City.

19            I don't know if they put somebody in there to bid

20   it up.  It was never discussed prior.

21            You know, you'd have to ask Guernsey's about that.

22   They might tell you the truth.  I don't know.

23            I mean, they ran the auction.  I don't know if the

24   bids were real or fake.  I've would -- I would like to know.

25            MS. RUE:  Okay.  Mr. Crosby, I have nothing

21

1   further for you.

2           THE WITNESS:  Thank you.

3           MR. KERNER:  Don't hang up.  Don't hang up.

4           MS. GRANTLAND:  Okay.  Are you ready for my cross?

5           MS. RUE:  Yes.

6           THE WITNESS:  Yes, ma'am.

7           EXAMINATION BY MS. GRANTLAND:

8       Q   So, you originally bought the boat at auction on

9   approximately June 29, 1996; is that the correct date?

10      A   Yes.

11      Q   And you didn't go to the auction with Ole?

12      A   No.

13      Q   When Ole went to the auction, didn't he have

14  $11,000 of Chuck Fitzgerald's money to invest?

15      A   I think it was 11 or 12,000, yes, ma'am.

16      Q   And you've invested 5000 at that time or agreed

17  to?

18      A   I told him I had up to 5000, yes.  That was about

19  all I really -- really wanted to put in at the time.

20      Q   Okay.  Now, do you have the documents that I

21  FedEx'd to you?

22      A   No, ma'am.  They didn't come in yet.

23      Q   They were supposed to --

24          MS. GRANTLAND:  Okay.  We are going to recess

25  this.  And you go get your FedEx package.  It was supposed

22

1  to be delivered by 10:00 this morning.

2          THE WITNESS:  Well, I was there until 12:00 and it

3  was not in by 12:00.

4          MS. GRANTLAND:  Well, I'll trace it right now,

5  because we are going to do this deposition right, and I

6  bothered to get those to you.

7          So, we're going to have this right now.

8          Let me go check on FedEx to see what happened.

9          MR. KERNER:  Hold on, Eddie.

10          THE WITNESS:  I'm here.

11          MR. KERNER:  Or do you want us to call you back?

12          THE WITNESS:  How long is she going to be?

13          MS. GRANTLAND:  Hold on a second.  I can go on

14  line and check FedEx.

15          MR. KERNER:  Okay.

16          (Pause.)

17          MS. GRANTLAND:  This shows that was delivered at

18  1:00 p.m.

19          THE WITNESS:  Okay.  That's quite possible.  I

20  haven't been back down to my -- I left the office down there

21  to get away from it so I could do this.

22          MS. GRANTLAND:  Okay.  Why don't you go pick that

23  up and come right back.

24          And as soon as you get back, call Nancy Rue and we

25  will just take a recess until you get back.

23

 1            THE WITNESS:  How about, you all call me back in

 2   maybe 10 minutes.

 3            MS. GRANTLAND:  Okay.  It says it was signed for

 4   by M. Gupton.

 5            THE WITNESS:  That's the boy down at my business,

 6   yes.

 7            MS. GRANTLAND:  Okay.  All right.

 8            THE WITNESS:  I'll go down there.  It takes me 10

 9   minutes to get there.  Call me and I will be there.

10            MS. GRANTLAND:  Okay.

11            THE WITNESS:  Thank you.

12            MS. GRANTLAND:  Do you want to just leave it --

13   this phone on the line or do you want to call me back in 10

14   minutes?

15            MS. RUE:  No.  We'll call back.

16            MS. GRANTLAND:  Pardon?

17            MS. RUE:  We'll call back.

18            MR. KERNER:  Okay.  When you call back, you can

19   call my fax number, 415-381-6105.  And that will be, you

20   said about 10 minutes?

21            MS. RUE:  Yeah.  Let's call it 15.

22            MS. GRANTLAND:  Okay.  So, the top of the hour

23   then.

24            MS. RUE:  Okay.

25            MR. KERNER:  All right.

24

1            MS. RUE:  Thanks.

2            MR. KERNER:  Okay.  Bye.

3            (Off the record from 1:45 p.m. to 2:00 p.m.)

4            MS. RUE:  Back on the record.

5            Mr. Crosby, are you present?

6            THE WITNESS:  Yes, I am.

7            MS. RUE:  Ms. Grantland, are you present?

8            MS. GRANTLAND:  Yes.

9            MS. RUE:  And Nancy Rue and Tom Kerner are here.

10           Mr. Crosby, you understand that you are still

11   under oath?

12           THE WITNESS:  I do.

13           MS. RUE:  Okay.  And Ms. Grantland was

14   questioning.

15           BY MS. GRANTLAND:

16       Q   Okay.  Do you have the documents in front of you?

17       A   Yes, ma'am.

18       Q   All right.  Could you start by looking at -- okay.

19   First of all, let me just tell you, in the lower left-hand

20   corner of these documents, you will see, in very small type,

21   I don't know if the top one says Harper 12 or if it says KSL

22   1, but it should have some notation like that; do you see

23   it?

24       A   Yes, ma'am.

25       Q   What does that say?

25

1      A     Harper, and then there are some numbers.

2      Q     Okay. That is the numbers that I'm going to refer

3 to these documents by so that you can find the one I am

4 talking about.

5           MS. GRANTLAND: Nancy, when it says Harper,

6 whatever the number, that means it is from Harper's

7 deposition documents.

8           MS. RUE: Yes. And the court reporter has a set.

9 And what I have done is to put a big bright yellow sticker

10 on those documents. And where you referred to 12, it is

11 marked 12.

12           MS. GRANTLAND: Okay.

13           MS. RUE: And the only ones that are different in

14 there are KSL 1 and 2.

15           MS. GRANTLAND: Okay. And the -- just for

16 reference, the numbers I am referring to are the Bates

17 stamped numbers that Harper's office put on these documents.

18           They're hard to read, you know, but if a document

19 is multi paged, I am just using the page number of the first

20 one.

21           BY MS. GRANTLAND:

22      Q     Okay. Looking at Harper 12, have you ever seen

23 this document before?

24      A     Well, let me find that one.

25      Q     It should be the top one.

26

1      A     No.   I've never seen that document.

2      Q     All right.   Just to sum it up quickly, it says,

3  Chuck Fitzgerald, 75 percent, Eddie Crosby 25 percent.  They

4  will be responsible for the cost of the refit at these

5  percentages.

6             And then, under that, it says, sell, Chuck

7  Fitzgerald and Eddie Crosby will receive 200 percent of

8  their total investment off the top.  After all fees are paid

9  and the investment money paid, the split of the remainder

10 will be Chuck Fitzgerald 50 percent, Eddie Crosby .166,

11 which would be 16.6 percent, Ole Anderson .333.

12     A     I see that, yes.

13     Q     Do you have any idea when -- the time period that

14 this document is referring to?

15            MS. RUE:   Objection.

16            MR. KERNER:   You can answer, Eddie.

17     A     No, I don't.

18            It must have -- would you like me to venture a

19 guess or did you just want a yes or no?

20            BY MS. GRANTLAND:

21     Q     Wouldn't you say it had to have been before Chuck

22 Fitzgerald bailed out --

23            MS. RUE:   Objection.

24     A     I would think -- I would think that is pretty

25 obvious, yes, ma'am.

27

1           BY MS. GRANTLAND:

2       Q    And was that your understanding of the percentages

3   that would be used to purchase the boat and refit the boat?

4       A    Probably, at this stage, I'm just guessing.  I

5   don't know when this was made, but you are probably right.

6   I was probably in for a fourth at that time.

7           That would probably be my understanding.

8       Q    And did you agree to pay for a fourth of the cost

9   of refitting the boat?

10      A    We didn't know anything about refitting the boat

11  at that time.

12      Q    Okay.  So it was only later that you discovered

13  the condition the boat was in?

14      A    Correct.

15      Q    Okay.  Now, if you can -- so, at the auction, was

16  the bidding -- did the bidding go up to 18,000 even or

17  18,500?

18      A    I was not there.  I do not know.

19      Q    Okay.  So, somewhere in the -- it was either

20  18,000 or 18,500; right?

21      A    If you say -- you are the one saying that, not me,

22  ma'am.

23      Q    Well --

24      A    I've got -- I've got a document here that says --

25  KSL one that since 18,500, yes, ma'am.

28

1  Q Okay. And --

2  A I'm sure you have that document.

3  Q And there was a buyer's premium of 10 percent; do

4 you remember that?

5  A There was a buyer's premium. I'm guessing that's

6 right around there, yes.

7  Q So that brought -- brought the price of the boat

8 up to -- or the amount you had to shell out, just to buy the

9 boat, to about $20,000?

10  A Yes, ma'am.

11  Q And 25 percent of that would be 5000, which is

12 what you invested; right?

13  A Correct.

14  Q Okay. So, after the auction, what happened to the

15 boat? Where was it taken?

16  A After the initial auction where we bought the

17 boat?

18  Q Um-hmm.

19  A The boat was brought from the auction site, which

20 I believe now, looking at this document, Monticello,

21 Florida. It was taken to Sailor Man Chuck's, Fitzgerald's

22 place of business, I believe.

23  Q And did Sailor Man pay the trailer and pay the

24 expenses of hauling it?

25  A I think, we might have all -- honestly, I think, I

29

1  paid part of that.  I don't know if he paid all of it.  I

2  don't -- I don't believe he paid it all without me probably

3  dipping into my pocket.

4         It was brought back on a wrecker.

5     Q   On a what?

6     A   On any flatbed wrecker.

7     Q   A flat bed wrecker?

8     A   A roll back type wrecker, yes, ma'am.

9     Q   Oh, you mean like you put a car on?

10    A   Correct.  Correct.

11    Q   Okay.  A tow truck, a flatbed tow truck kind of

12  thing?

13    A   Correct.  I think, we paid $500 for that somewhere

14  along the line.

15    Q   Now the -- once you discovered -- when did you

16  discover that the boat was not in good condition?

17    A   Personally, when did I discover it?

18    Q   Um-hmm.

19    A   When they came through town.  They came right

20  through town with it on the way down there and I got a look

21  at.  And it looked like a boat that had just sat under an

22  old oak tree for about 20 years and had been neglected.  And

23  the boat was in pretty poor shape.

24    Q   And did you talk at that time about restoring it?

25    A   At that time, we didn't know what we were going to

30

1  | do to be quite honest with you.  No.  I don't -- I don't
2  | think we really -- no, ma'am.  We did not.
3  |     Q    Did you ever meet Chuck Fitzgerald?
4  |     A    No, ma'am.
5  |     Q    I'm sorry?  What?
6  |     A    No.
7  |     Q    And did you ever talk to him on the phone?
8  |     A    No.
9  |     Q    All right.  When it was decided that you had to
10 | restore it in order to make any money off of it, what --
11 | what arrangements did you make to come up with the money for
12 | restoring it?
13 |     A    I worked and I got the money.  I made the money
14 | and sent it to Anderson.
15 |     Q    How much was that?  $5,000?
16 |     A    An additional 5000.
17 |     Q    Okay.  So, your total investment in this boat is
18 | 10,500 or 10,000 even?  Something like that?
19 |     A    I think 10,500.
20 |     Q    10,500.  So, the 500 was what you contributed
21 | towards the hauling?
22 |     A    I think, I sent 5200 and something with the
23 | initial wire.
24 |     Q    Okay.
25 |     A    Do you have that wire?

31

1        Q      Yes.  Let me just take a look at that.

2               5250 you wired.  So, you contributed another --

3        A      And then got -- I put in another 5000.

4        Q      Right.

5        A      And I'm sure, maybe that other 250 could be for

6   part of the tow or for some other expense.

7        Q      Okay.  Now, when -- when it was discussed that it

8   would have to be restored, did you agree to pay 25 percent

9   of the cost of restoring it?

10       A      No.

11       Q      So, you just --

12       A      I didn't agree to a percentage.  I mean, he told

13  me what I owed and he said it was going to be another 20, 25

14  percent.

15              He told me he needed another 5000.

16              We discussed it in terms of money, not percentage

17  at that point.  He didn't say mine was going to be 25.

18              I assumed it was, but he told me 5000 is what he

19  told me.

20       Q      Now, according to Harper 12, the document called

21  Harper 12, when you sold the boat, everybody was paid back

22  double for their investment, you were supposed to get 16.6

23  percent according to this document.

24              MS. RUE:  Objection.

25              MS. GRANTLAND:  It's a leading question.  I'm

32

1  about to ask you -- I said, according to this document.

2           BY MS. GRANTLAND:

3       Q    But, is that your understanding?

4           MS. RUE:  Objection.

5       A    What is your question again?

6           BY MS. GRANTLAND:

7       Q    I said, according to this document, Harper 12,

8  this exhibit, and Nancy has already objected, so I am asking

9  you this question, you still have to answer this question

10  even though she has objected.

11           According to this document, after the boat sold,

12  you and Fitzgerald were to be paid twice the amount of your

13  total investment off the top.

14           And after all fees were paid and the investment

15  money was paid back, the remainder will be split with

16  Fitzgerald getting 50 percent.  You would get 16.6 according

17  to this document.

18           Is that your understanding of what the original

19  agreement was?

20           MS. RUE:  Objection.

21       A    No.  The --

22           BY MS. GRANTLAND:

23       Q    No.  All right.

24       A    I -- I've never seen this document before.

25           This -- I never -- I never knew -- the document we

*APEX Reporting*
(617) 269-2900

33

1    are talking about, I never saw it until right now.

2        Q    All right.  Let me --

3        A    According to that document, what you are saying is

4    correct, but no, I was -- I don't know what the date --

5        Q    So, you are saying that you were supposed to get

6    --

7        A    This --

8             MS. RUE:  Ms. Grantland, please let the witness

9    answer the question.

10            MS. GRANTLAND:  I'm asking him another question.

11            MS. RUE:  Well, not until he is finished with his

12   answer.

13            MS. GRANTLAND:  All right.  I am objecting to his

14   answering beyond the scope of my question.

15            I asked him if this is his understanding and he

16   said no.

17            MS. RUE:  Mr. Crosby, please continue with your

18   answer.

19            BY MS. GRANTLAND:

20       Q    What was your understanding of what you would get

21   --

22            MS. RUE:  I want him to continue his answer.

23            You have objected to it.

24            Mr. Crosby, please continue.

25       A    Like I said, according to this document, yes.  But

34

1   no, I'd have to see a date before I could give you an answer

2   on that.

3              There is no date on this document.

4              BY MS. GRANTLAND:

5        Q    This was before Chuck Fitzgerald was out of the

6   picture, so we --

7        A    Had I --

8        Q    So, we --

9        A    Had I given the extra 5000 at this point?

10       Q    I would assume not.

11       A    Well, then this document --

12       Q    We don't have anything to place when you paid that

13  extra five.

14       A    Okay.  Well that's why I don't know the answer to

15  your question.

16       Q    So, at the beginning, when all you have put into

17  it was the 5000 -- 5250, was it your understanding that you

18  would receive -- how much -- how much was it originally --

19  was your understanding that you would originally receive

20  when it was sold, at that point, before you put in any more

21  money?

22       A    I was going to get double my investment and 25

23  percent, which I had to pay some to Anderson, which made it

24  16 percent at that point with Fitzgerald.

25       Q    I don't understand.  Made what 16 percent?

35

1      A      That's what's on your document.  It says 16
2  percent.
3      Q      But you said you had to pay some to Anderson.
4             What would Anderson have gotten out of this deal
5  if it had sold?
6      A      It depends what it sold for, I guess.
7      Q      I'm sorry?  What?
8      A      That would depend on what the boat sold for.
9      Q      What would be his --
10     A      I paid 25 -- ma'am, I paid 25 percent.  On this
11  document, it says I get 16 percent.
12     Q      And what did it -- and was it your understanding
13  that Ole Anderson was doing this out of the goodness of his
14  heart and was not expecting any percentage of the sales
15  price?
16     A      No, ma'am.  That's not my understanding.
17     Q      Well, what was Anderson to get in your
18  understanding?
19     A      Out of my 25 percent?  Whatever between 16.6 and
20  25 percent would be for Anderson.
21     Q      Okay.  So, of your 25 percent, Anderson was to get
22  about 9 percent?
23     A      8.4 is what the math is.
24     Q      8.4.  Okay.
25     A      If you want to be --

36

1    Q    Okay.  Now, let's -- let's move on.

2         Now, so, we said earlier that the auction that you

3  bought the boat at was approximately June 29th.

4         By July 9, 1997, Chuck Fitzgerald told Ole that he

5  wanted his investment to be bought out; is that right?

6         MS. RUE:  Objection.

7    A    I don't know the exact date, but Fitzgerald did

8  not feel comfortable with the boat we had bought.  He wanted

9  to get out of the deal.

10        BY MS. GRANTLAND:

11   Q    Could you --

12   A    I don't know the exact date.

13   Q    Could you take a look at Harper 93?

14   A    All right.  Okay.

15   Q    Take a look at that and see if you have ever seen

16  that document, see if he had given you a copy of it?

17   A    No.  I've never seen that document.

18   Q    Look at the whole thing.

19   A    I did.

20   Q    The second thing, it's got your --

21   A    I did.

22   Q    And you have not --

23   A    It's got my name and address and I've never seen

24  this document.

25   Q    Okay.  Does July 9th -- on page, the first page,

37

1    it says that "Mr. Fitzgerald has given me until Monday, the

2    15th of July to relieve him of his position in the

3    consortium."

4            Does that sound like the correct date?

5            MS. RUE:  Objection.

6       A    It could be the correct date, yes.

7            BY MS. GRANTLAND:

8       Q    And he wanted $22,000 to buy out his interest; is

9    that correct?

10      A    I have no idea.

11      Q    Did he -- did Ole not tell you how much he wanted

12   to get his interest bought out?

13           MS. RUE:  Objection.

14      A    Correct.  He never told me.

15           BY MS. GRANTLAND:

16      Q    You didn't ask him?

17      A    No, I did not.

18           I was told that I was in on the ground floor and

19   the doctor was not.  The eventual buyer --

20           BY MS. GRANTLAND:

21      Q    That doesn't matter.  Let's talk about -- can you

22   try to stick to the questions?

23      A    Okay.  The answer was --

24      Q    Just answer the questions I am asking you.

25      A    The answer was --

38

1    Q    Did -- did you -- okay.

2         Well, if the boat -- if it costs approximately

3    $20,000 to buy the boat, and -- and Chuck Fitzgerald paid 75

4    percent, he had invested 15,000 in the boat; isn't that

5    correct?

6    A    Yes.

7    Q    And you -- you put in $5,000 to help buy back

8    Chuck Fitzgerald's interest; right?

9    A    No.

10   Q    No.  So, you didn't put any money in to buy back

11   Chuck Fitzgerald's interest?

12   A    No.

13   Q    When did you invest more money in the consortium?

14   A    I don't know the exact date.  I don't know if any

15   of the things I sent to Tom have that date on it or not.

16   Q    Did -- I don't believe it does if that's all you

17   set the Tom.

18        So, was it before or after Chuck Fitzgerald was

19   bought out?

20   A    After.

21   Q    And approximately how long after?

22   A    I really don't know.

23   Q    I mean, would it be a few weeks or a year?

24   A    I do not know.

25   Q    Do you have a canceled check showing that

39

1   investment?

2        A    I do not think so.  I think I sent him maybe some

3   kind of financial proof that I sent it.  But, it was not a

4   personal check, I don't think.

5        Q    Who did you send it to?

6        A    I believe, that 5000 I actually sent to the

7   Marblehead Trading Company in Marblehead, Massachusetts to

8   put towards the boat rebuilding bill.

9        Q    Now, do you know how much the cost of Marblehead's

10  rebuilding was?

11       A    I know my part was 5000.  I have no idea what the

12  total bill was, no.

13       Q    And you didn't ask Ole for those bills?

14       A    No.

15       Q    Take a look at Harper 38.

16       A    Okay.

17       Q    And take a minute to look at, to read it.

18            (Pause.)

19       A    Okay.

20       Q    Is that your signature on the second page?

21       A    Yes, it is.

22       Q    Did you sign it before or after the strike outs?

23       A    Good question.  I don't know.  I signed it on

24  12-24-96.  I believe, I signed -- I believe, I might have

25  signed it before.  I'm not sure.  Really, I'm not sure.

40

1    Q    Is it possible that you signed a copy of this

2  before the changes were made?

3    A    Is it possible?

4    Q    Do you think you signed it with these strike outs

5  in it?  These things struck out?  Or do you think you might

6  have --

7    A    I said -- I said, I don't know.

8    Q    Okay.  Now, the strike outs in this document

9  eliminates Fitzgerald's interest?

10    A    Yes.

11    Q    And the stuff that is added at the bottom shows

12  who the other investors are, the bottom of the second page.

13        Do you -- do you recall this being on there when

14  you signed it?

15    A    That must have been nine years ago, and I honestly

16  do not recall.  I really do not recall.

17    Q    Well, on the page that --

18    A    I don't think so though.  I don't know.  I don't

19  know.

20    Q    On the second page, the page that you signed, it

21  shows Crosby 16.6 percent?

22    A    Um-hmm.

23        REPORTER:  Yes or no.

24        BY MS. GRANTLAND:

25    Q    5500 purchase, 5000 refit, 10,500 total.

41

1            Is that -- is that correct?  Was that --

2       A    Yes.

3       Q    And so, this shows that, before December 24th of

4    '96, you had invested that amount of money?

5       A    Yes.

6            I say yes to that question.  I am presuming I gave

7    him the 5000.  Maybe he put down that I owned him the 5000.

8            I'm not -- you know, you are quizzing me on dates

9    that I'm not 100 percent sure of.  But, I believe I had

10   given him the 5000 the way it would look, yes.

11      Q    Now, who paid for the rest of the expenses

12   relating to the boat?

13      A    Anderson paid for all of the expenses.

14      Q    I mean, who actually came up with the money to pay

15   it?  Not who sent the checks in?

16      A    It depends who you ask.  I gave him my money.

17           I don't know -- he says he got some money from

18   Dr. Kerry Lane.  He says he got the money from his mama.

19           The Government says he got some money from some

20   marijuana dealers.  It depends on who you want to ask that

21   question.

22           But, the only answer I can give you is me.

23           That's the only place that I know that he got

24   money from.

25      Q    And after you -- after you --

*APEX Reporting*
(617) 269-2900

42

1              (Phone ringing.)

2              MS. GRANTLAND:  Hang on.  Let me get them off the

3    line.

4              MR. KERNER:  Hey, Eddie, do you have a problem if

5    I leave?

6              THE WITNESS:  No.

7              MR. KERNER:  Okay.

8              BY MS. GRANTLAND:

9        Q    So, who paid for the lawyer's expenses?

10       A    What lawyer expenses?

11       Q    Well, you said that you know that Mr. Robert

12   Harper did some legal work for -- regarding the boat.

13       A    Yes, ma'am.  But, I explained to you just a second

14   ago, that Mr. Anderson handled all the paying and expenses.

15   I gave him money for this deal.  I -- that was all I did.

16            I gave him money for it.  He handled pretty much

17   100 percent of the money.

18       Q    At some time, did you tell him that he did not

19   want to invest any more money in restoring the boat or

20   paying for the shipping and storage and all of that?

21       A    Well, I probably might have mentioned to him that

22   I was cap city after the 10 grand, yeah.

23            REPORTER:  Hold on.  Hold on, please.

24            MS. RUE:  Sorry.  We have been trying to break in,

25   but it's difficult with our speaker phone system.

43

1           MS. GRANTLAND:  Okay.

2           MS. RUE:  Mr. Kerner has to leave.  I am going to

3    walk him out of our secured space and be right back.

4           We are just going to leave the phone on.  The

5    court reporter will still be here.  I will be back.

6           MS. GRANTLAND:  Well, I'm going to be done in

7    about a minute.  It may even be --

8           MR. KERNER:  Oh, that's fine.

9           MS. GRANTLAND:  I might be done.  I just need to

10   --

11          MS. RUE:  Terrific.

12          MS. GRANTLAND:  -- just need to look at --

13   actually, I could be done in five minutes, I'm certain.

14          MS. RUE:  Okay.

15          MR. KERNER:  Good.

16          MS. GRANTLAND:  Because I am at the end of my page

17   of questions.

18          BY MS. GRANTLAND:

19   Q     While you were in New York City, at the auction,

20   you met Dr. Lane; right?

21   A     Correct.

22   Q     And Attorney Robert Harper?

23   A     Correct.

24   Q     And you knew that Mr. Harper was the attorney

25   representing the consortium?

44

1      A      That's what Anderson told me yes.

2      Q      Who paid for your hotel room?

3      A      I have no idea.  I really don't.  I take that

4  back.  According -- according to some document I read here

5  in this FedEx you just sent me, possibly Dr. Lane.

6             But I don't know that to be a fact.

7             Which -- which document?  Did I read that in one

8  of these documents?

9      Q      Could you take a look at -- I'm sorry.  What?

10            Yes, you did.

11     A      Harper 313, I believe it said.

12     Q      Right.

13     A      It says also, Dr. Lane will be reimbursed -- and

14  I've never seen this document, I'd like to say too.  I've

15  never seen -- I've never seen this document.  I've never

16  seen this.

17            So, the answer is -- the answer is, I guess,

18  Dr. Lane.  And no, I did not know that.

19     Q      Could you look at Harper number 177?

20     A      Okay.

21     Q      Have you ever seen that document?

22     A      No, I have not.

23            MS. RUE:  And Brenda, I do need to interrupt.

24            Mr. Kerner says he has to go.  And I'm going to

25  have a couple of questions too.

45

1              So, I'm just going to walk him out and I will be

2    right back.

3              MS. GRANTLAND:  Okay.

4              MR. KERNER:  And Eddie, I will call you later on

5    today.

6              THE WITNESS:  Thank you.

7              REPORTER:  I am going off the record.

8              (Off the record from 2:26 p.m. to 2:29 p.m.)

9              MS. RUE:  I am back and we are back on the record.

10             THE WITNESS:  Okay.  I have Harper 177 in front of

11   me.

12             BY MS. GRANTLAND:

13        Q    Okay.  Have you looked it over?

14        A    I have.

15        Q    Are you familiar with this document?

16        A    Never seen it before in my life.

17        Q    Now, when you -- it's dated at the top December 3,

18   1997.

19             Did you talk to Ole about all the different

20   expenses that were owed on the rebuilding of the boat and

21   all of that?  Before the boat was put up for auction at

22   Guernsey's?

23        A    We talked about the boat.  We talked about a lot

24   of things.

25             I don't really remember having a specific

46

1  conversation about costs or expenses, no.

2     Q   So, did you not have anything in writing showing

3  specifically what you would pay out of the sale of the boat?

4     A   We had an oral agreement, after I gave him more

5  money and I did demand several small little favors here and

6  there.

7         And shortly after I gave him more money and he

8  told me, "Eddie", he says:  "You are going to get a third of

9  the boat."  And we had an oral agreement.

10    Q   Now, where was the boat stored other than

11 Marblehead?

12    A   It was all around the state.  It was on display in

13 different places.

14        I believe, at one time, it may have been in the

15 doctor's garage.  I believe, it was stored in Marblehead

16 Trading Company for quite a while.

17        It was at the University of South Florida in Tampa

18 for a period of time.

19        The boat was probably at one of those four places

20 the whole time.

21        MS. GRANTLAND:  Okay.  I have no other questions

22 right now.

23        MS. RUE:  I do.  But I'm choking.  So, I'm just

24 going to take a second and step out and then I will be right

25 back.

47

1       Sorry.  I didn't want to cough in the court

2   reporter's microphone.

3           EXAMINATION BY MS. RUE:

4       Q   Mr. Crosby, I'd like to ask you to go back to the

5   document 38 for a second.

6       A   Number 38?

7       Q   Yes, sir.

8       A   Okay.

9       Q   Do you know if this document, the way it is right

10  now, is an accurate representation of what you signed?  Did

11  it look this way when you put your signature on it?

12      A   Once again, I really don't recall if the

13  scratching had been on there or if the bottom part that is

14  on there was on there.  And I don't -- I just do not recall.

15      Q   At the time that you signed it, did it say Crosby

16  16.6 percent?

17      A   Yes.

18      Q   Okay.  Now, you've maintained throughout your

19  testimony that what you had was a deal for one third?

20      A   Correct.

21      Q   And one third would be 33.3 percent; is that

22  right?

23      A   Correct.  Yes, ma'am.

24      Q   And 16.6 percent would be half of that?

25      A   Yes, ma'am.

48

1    Q    So, why would you have signed a document that
2    represented that you were going to get half of what you said
3    your agreement had been?
4    A    At that point, I had only put in the 10,000, or, I
5    initially put in the 5,500 and then they came for another
6    5000.
7         We had a -- I told him I wasn't going to put in
8    any more money than 5000 unless I can got a bigger
9    percentage.
10        And he came up with this doubling the money, 21
11   percent.
12        And I had to sign this.  He said, he needed a
13   document to show the other investors.
14        And that's -- to show the other investors is the
15   reason I really signed it.  To answer your question, just to
16   show the other investors.
17        He and I had an oral agreement for a third of the
18   boat.  And I'm not saying that the oral agreement came the
19   day after I signed this or I don't -- you know, as far as
20   dates, once again, this is nine years ago.
21        But many, many times after I signed this
22   agreement, many times, he told me that I'm in for a third.
23   Q    And out of your --
24   A    And also, you know, my understanding is, when I
25   got my third, when he changed it over to a third, that I

49

1  would not get that $21,000, that is also on -- you know, it

2  is also on that document.

3       Q    Now, out of that one third --

4       A    I was supposed to -- when I signed this document,

5  I was supposed to get 16 percent and $21,000.

6       Q    And but you say, subsequently, you had --

7       A    Subsequently we had an oral agreement.

8            I did Mr. Anderson many favors and towed that boat

9  around.  I helped him set it up.

10           And our agreement was for a third, which

11  eliminated the 21,000 deal too.

12      Q    Now, once you received your one-third, did you

13  think that you were going to have to pay some of that back

14  to Anderson?

15      A    No, I did not.

16      Q    When the Government paid you a third, did you pay

17  some of it back to Anderson?

18      A    I did not.

19      Q    You said on cross examination, "I was told that I

20  was in on the ground floor and the doctor was not."

21      A    Correct.

22      Q    What did you mean by that?

23      A    That means that it cost him more -- in my

24  understanding, to get a percentage, you know, than it did

25  me.

```
                                                              50
 1              I got in at the initial investment and you put up
 2   a fourth of the investment, you got a fourth of the deal.
 3              The doctor did not get in on that same lower tier
 4   was my kind of -- the way he explained it to me.
 5              Not the doctor, Anderson explained that to me.
 6              MS. RUE:  Okay.  Nothing further.
 7              MS. GRANTLAND:  I have nothing further.
 8              MS. RUE:  I think this concludes the deposition
 9   then.  And we will be off the record.
10              THE WITNESS:  Thank you, very much.
11              MS. RUE:  Thank you, Mr. Crosby.
12              (Whereupon, at 2:34 p.m., the deposition was
13   concluded.)
14                              (Exhibit Number KSL1 marked for
15                               identification.)
16                              (Exhibit Number 1 marked for
17                               identification.)
18                              (Exhibit Number 12 marked for
19                               identification.)
20                              (Exhibit Number 93 marked for
21                               identification.)
22                              (Exhibit Number 38 marked for
23                               identification.)
24                              (Exhibit Number 177 marked for
25                               identification.)
```

51

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS )
                              ) SS.
COUNTY OF SUFFOLK             )

I, MaryAnn Rossi, a Court Reporter and Notary Public, within and for the Commonwealth of Massachusetts, do hereby certify that there came before me (via telephone) on this 17th day of September, 2007, the person hereinbefore named, who was by me duly sworn to tell the truth, the whole truth, and nothing but the truth, concerning and touching the matter in controversy in this cause; that he was thereupon examined upon his oath, and his examination reduced to typewriting, under my direction, and that this deposition transcript is a true and accurate record of the testimony given by the witness.

I further certify that I am not related to any of the parties hereto or their counsel, and that I am in no way interested in the outcome of said cause.

Dated at Boston, Massachusetts, this 2nd day of October, 2007.

_____
MaryAnn Rossi
NOTARY PUBLIC
My Commission Expires:
September 12, 2008

52

CORRECTION SHEET

DEPOSITION OF HARRY E. CROSBY, JR.

PAGE NO.  LINE NO.  SUGGESTED CORRECTION

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

53

SIGNATURE OF WITNESS:

I have read the foregoing transcript and the same contains a true and accurate recording of my answers to the questions therein set forth, subject to the change and/or correction sheet(s) attached.

_____

Deponent

_____

Date



# J. Thomas Kerner, Attorney at Law

343 Commercial Street, Unit 104 ● Boston, MA 02109 ● (617) 720-5509 ● Fax: (617) 720-0707

# FAX

**TO:**        Brenda Grantland
**FAX NO:**   (415) 381-6105
**FROM:**     J. Thomas Kerner

**DATE:**     September 17, 2007

**RE:**        JFK Sailboat -- Flash II

### 2 Page(s) including Cover Sheet

**Message:**

Attorney Grantland:

Mr. Crosby has agreed to a deposition by telephone on September 19, 2007 at 1:00 p.m. (East coast time). I will be in the U.S. Attorney's office. He will be deposed by phone from his place of business in Florida.

It is Crosby's contention that his payments of $10,500 to Anderson plus his work relating to the boat in the months immediately after it was purchased at auction resulted in an agreement with Anderson that Crosby owned one-third of the boat. Crosby obtained a one-third interest in the boat for significantly less than Dr. Lane because Crosby bought in at the very beginning. In fact, the first $5,500 Crosby invested was wired not to Anderson but to the auctioneer. The second $5,000 was given to Anderson to help buy out Fitzgerald. Fitzgerald never intended to be a major investor and was pressuring Anderson to buy him out A.S.A.P.

The reason neither Crosby nor I understand why you are so insistent that Crosby testify in this case is that his contention, which admittedly is not supported in writing, differs from what you want him to stipulate to by an insignificant amount.

In return for Crosby's one-third interest in the net proceeds of the sale of the Kennedy boat, Crosby was paid $26,101. The proceeds from the sale were $78,382. The auction house sent the Marshals a check for $83,894 and the Marshals had expenses totaling $5,512. You want Crosby to stipulate to 16.5% plus $10,500. If you add $10,500 to 16.5% of $78,382.09 ($12,933) you would get $23,433. The difference is $2,668.

I fail to understand why it is important to you to attempt to prove that Crosby received $2,668 more than Lane believes Crosby should have received from the sale of

J. Thomas Kerner, Attorney at Law
Page: 2
September 17, 2007

the boat. Crosby does not doubt anything that Dr. Lane claims he was told by Anderson
or that certain representations by Anderson were reduced to writing for the benefit of Dr.
Lane. Crosby confirmed to the government that Anderson told him that Lane bought into
the Kennedy boat but at a much higher cost than Crosby's cost. Crosby further believes
that Anderson probably distributed more than 100% of the Kennedy boat over the years,
one-third to Crosby, possibly one-third to Dr. Lane, and percentages to family, friends,
lawyers and drug dealers, whomever was willing to give Anderson money.

Thank you.

Very truly yours,

J. Thomas Kerner

## AGREEMENT

THIS AGREEMENT between ~~Charles Fitzgerald~~ of Ft. ~~Lauderdale, Florida~~, on ~~behalf of himself personally and Sailorman Used Marine and Outfitters, Inc., (hereinafter Fitzgerald)~~, Edward Crosby (hereinafter Crosby) of Clewiston, Florida, and Gregory Olaf Anderson (Anderson) of Delray Beach, Florida, this undersigned date is to codify the previous oral understandings among the parties. These presents shall supersede any oral understandings to the contrary relative to the purchase of and distribution of the proceeds of the eventual sale of the sailing vessel, *Flash II,* Starboat #721, previously owned by former President of the United States, John F. Kennedy.

1. *Purpose of consortium.* ~~Fitzgerald,~~ Crosby, and Anderson agree that the purpose of this agreement is to memorialize previous understandings and agreements, and that this agreement will supersede contrary verbal assertions or agreements. ~~Fitzgerald,~~ Crosby and Anderson have pooled assets, funds, resources, and labor in an effort to purchase the sailing vessel *Flash II.* The reason the parties have come together is to obtain legal title to and possession of said vessel. The parties thereafter intend to sell the vessel at a profit. The vessel will be resold promptly upon completion of refitting and restoration to the satisfaction of Anderson ~~and Fitzgerald.~~ The appropriate value of the vessel is not now known but may be agreed upon by the above parties after appraisal by a qualified appraiser. The vessel shall be sold at auction to the highest bidder. ~~· ~~

2. *Contribution of funds for purchase.* ~~Fitzgerald will contribute seventy-five percent (75%) toward the purchase price.~~ Crosby will contribute twenty-five percent (25%) of the purchase price. The purchase price is $18,000.00, plus auction premium of $1,800.00 for a total of $19,800.00.

3. *Cost of refitting.* ~~Fitzgerald will contribute seventy-five percent (75%) of the cost of refitting;~~ Crosby will contribute twenty-five percent (25%) of the cost of refitting. Verification of

such costs and expenses will be provided by receipts and invoices.

4. *Distribution of proceeds upon sale.*  The vessel will be sold as set forth in Paragraph 1.

Upon closing, it is agreed that ~~Fitzgerald and~~ Crosby will ~~each~~ receive 200% of ~~their~~ his total investment

which will include their pro rata purchase investment as well as their pro rata cost of refitting

investment.  Restated, ~~Fitzgerald and~~ Crosby will recoup twice ~~their~~ his out-of-pocket purchase

investment and costs when the *Flash II* is sold.  The parties agree that Anderson shall receive a

percentage of the overage based on services rendered to date which services led to the successful

procurement of the vessel, *Flash II*, No. 721, as set forth below.  The overage shall constitute that

sum in excess of the purchase investment and costs distributed ~~to Fitzgerald and~~ to Crosby and ~~such~~ other investor

~~Orange the distribution:~~

a. ~~Fitzgerald - 51%~~
a.
b. Crosby - 16.6%  — $5500 PURCHASE , $5000 REFIT — $10,500 TOTAL
    ( yields $21,000.00 )
c. ~~Anderson - 32.4%~~
d.
ACCEPTED AND AGREED:

_____                    _____
~~Charles Fitzgerald~~                                        ~~Date~~

*Edward Crosby* [signature]        12-24-96  — TO RECOVER $21,000 before overage
Edward Crosby                      Date

*Gregory Olaf Anderson* [signature]    12/24/96
Gregory Olaf Anderson              Date          — TO RECOVER $20,000 before overage

OTHER INVESTORS ARE :

DR. KERRY LANE  — 25%  — TO RECOVER $50,000 before overage

JEAN ANDERSON  — 5%  — TO RECOVER $10,000 before overage

~~Crosby~~
CHUCK FITZGERALD — 1%  — TO SHARE in overage only

TOTAL Recovery Before overage - $111,000
( includes repayment of refurbishment costs )

## AGREEMENT

This agreement is to codify all previous understandings between Gregory Olaf Anderson (Anderson) and ___DR. KERRY LANE_____. This agreement supersedes any previous understandings relative to the purchase, refurbishment, and eventual sale of the sailing vessel *Flash II*, Star Class Boat #721, previously owned by former President of the U. S., John F. Kennedy.

1.    **Purpose of Consortium.**  Anderson and ___LANE_____ understand and agree that the purpose of the Consortium is to obtain legal title to and possession of said vessel, *Flash II*.  It is intended that the vessel is to be refurbished to as new condition and then resold at a profit, either to a private party or at auction to the highest bidder.  A minimum reserve figure may be agreed upon by consensus of the members.  The vessel will be resold promptly upon completion of refitting and restoration to the satisfaction of Mr. Anderson.  The appropriate value of the vessel is not now known, but may be determined after appraisal by a qualified appraiser.  If a reasonable offer for the purchase of the vessel is received before refurbishment, or if after written disclosure of said offer and consultation with the contributors Anderson concludes such offer satisfies the terms of the investment prospectives of this agreement, Anderson is authorized on behalf of the parties to accept or reject such offer as will satisfy the investment distribution as further set forth below.  Anderson has the sole discretion to reject any offer.

2.    **Contribution of Funds for the Purchase and Refit.**  The Consortium shall consist of the two present members, Anderson and Mr. Eddie Crosby, and new members whose participation shall be the sum of $5,000.00 each.  Any member may take more than one $5,000.00 position.  The funds obtained from these members shall be used solely for the purchase, refurbishment, and related expenses to the vessel.

3.    **Distribution of Proceeds Upon Sale.**  Each member shall be a primary recipient of
$ 10,000.00                     *for each Participation unit  – Gwo  12/24*
$~~5,000.00~~ or 5 percent of the net sale proceeds after auction house and attorney fees are deducted, whichever sum is greater.  Anderson's participation in the sharing of profits shall not begin before

1 of 2

0 0 0 . . .

Harper40

each member of the Consortium has received ~~$7,500.00~~ $10,000.00 for each initial $5,000.00 investment. This ~~$7,500.00~~ $10,000 payment will be the first and primary obligation of the Consortium after Mr. Crosby's receipt of $10,500, AND REPAYMENT OF COSTS OF REFURBISHMENT. GOA 12/24 (approx. $20K → $40K) GOA 12/24

4.    **Responsibility.** Mr. Anderson will be general director and general manager of this entire project from purchase through the refurbishment and eventual sale of the vessel. He shall be responsible for keeping an accurate accounting of all costs associated with the project, including receipts and records of all disbursements. These records shall be available for inspection by any member upon demand. Viewing of and access to the vessel shall be permitted to any member upon reasonable notification to Anderson.

It is agreed that Anderson will solely coordinate and be responsible for any and all media access to *Flash II*. This access will be administered in such a manner as to derive maximum sustained publicity and interest in *Flash II* culminating in a successful sale of the vessel.

Anderson will also be responsible for researching and obtaining any documents, film, correspondence, articles of historical significance pertaining to the vessel, and any other such memorabilia deemed useful to receiving maximum profit from the eventual sale of *Flash II*.

5.    WE HEREBY AGREE to the above terms and conditions and hereby contribute $25,000.00 for ___5___ participation units, receipt of which being hereby acknowledged. (25% TOTAL) GOA 12/24

Gregory Olaf Anderson
GREGORY OLAF ANDERSON

K S Lane
Signature

Kerry Lane
Printed Name

621 Andrews, Delray
Address

561 278 3060
Telephone Number

+ $10,000. repayment as part of refurbishment costs for Dr. Lanes additional payment of $5,000. ~~towards~~ refurbishment.

Harper40

2 of 2

This statement is a summary of total investment dollars and terms of repayment to all investors in FLASH II, Star Boat #721. This statement supercedes any and all previous statements.

A. — When FLASH II is sold and all Fees, Costs, and any other expenses incurred by the sale have been paid, Mr. Robert A. Harper, Atty., will receive 5% of the net proceeds. The remainder will be [Figure #1]

B — [Figure #1] will be paid out in this manner:

Eddie Crosby — $11,000

Kerry Lane — $60,000

Jean Anderson — $10,000

$81,000 Total

[Figure #2 will be Figure #1 minus $81,000]

C — [Figure #2] will be paid out in this manner:

EDDIE CROSBY — $10,000

KERRY LANG — $10,000

JEAN Anderson — $10,000

OLG ANDERSON — $32,000

MARBLEHEAD TRADING CO — $14,500

GARY MILO — $16,000  ($16,000)

(954) 764-7154  Pete & Carole Walker — $12,000

Homer Earnest  2,000

Jim Anderson  2,000

13/4/97    $108,000 Total

Gregory Olf Anderson

[Figure #3 will be Figure #2 minus $108,000]

LaneDocReqResp000031

08/30/2005 14:11 FAX 5226          DSC                                    ☐002

D — [Figure #3] will be paid at in this manner :

| | |
|---|---|
| EDDIE CROSBY — | 16.6 % |
| KERRY LANE — | 30.0 % |
| JEAN ANDERSON — | 10.0 % |
| mr/mrs Horace Earnest — | 1.0 % |
| Chuck Fitzgerald — | 1.0 % |
| Ole Anderson | 41.4 % |
| | 100.0 % |

E — EDDIE CROSBY WILL BE PAID 16.6% in ADDITION TO his $11,000 payment in Section B

F — KERRY LANE WILL BE PAID $60,000 or 30% of Figure 3, whichever sum is greater. His initial payment of $60,000 in Section B will be deducted from his 30% should the 30% figure be greater than $60C.

G — JEAN ANDERSON will be PAID $10,000 or 10% of Figure 3, whichever sum is greater. Her initial payment of $10,000 in section B will be deducted from her 10% should the 10% figure be greater than $10K.

12/4/97

Gregory Olaf Anderson

**30**

LaneDocReqResp000032