UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) |
| v. | )Civil Action No.05-10192-WGY |
| | ) |
| ONE STAR CLASS SLOOP SAILBOAT | ) |
| BUILT IN 1930 WITH HULL NUMBER 721, | ) |
| NAMED "*FLASH II*," | ) |
| Defendant. | ) |

**GOVERNMENT'S BRIEF REGARDING
CROSBY'S INTEREST IN THE DEFENDANT RES**

In the Court's Memorandum of Decision dated October 1, 2007, Docket Entry 81, the Court held that the defendant Flash II was not forfeitable, and that Claimant Kerry Scott Lane ("Lane") is entitled to recover the $100,000 received for the Flash II at auction less "the sum paid to Crosby should the government successfully prove that Crosby's proportional share of the $100,000 was at least equal to the amount paid him." Opinion at 19. The government reserves its right to appeal those holdings, but pursuant to this Court's order respectfully submits this brief regarding Crosby's interest in the Flash II.

The government executed a Settlement Agreement (the "Settlement Agreement") with Crosby on June 20, 2005, Docket Entry 14, and Crobsy was paid $26,101.24 under the terms of the Settlement Agreement. Under any calculation, the amount paid by the government to Crosby was less than Crosby's proportional share of the value of the sailboat. Moreover, the government respectfully asserts that the Lane should be estopped from contesting the amount paid to Crosby by the government. Accordingly, the government submits that the amount payable to Lane under the Court's Memorandum and Decision would be $73,898.76.

I.    **Lane's Own Evidence Establishes That Crosby Was Entitled to At Least $26,101.24**

After this Court issued a default judgment in this case, Lane filed a Motion to Set Aside the Forfeiture (Docket 16), a Motion to Alter the Judgment (Docket 19), and a Motion to File a Reply Brief (Docket 23).  In support of the last motion, Lane presented a document dated 12/4/97 (the "12/4/97 Statement") asserting his interest in the Flash II.  [Docket Entry 23-3, pp.11-12, Exhibit D].[1]  At the May 24, 2007 Bench Trial in this matter, the Court credited the 12/4/97 Statement, asserting:  "I'm placing a fair amount of  – this is Exhibit 6 – a fair amount of weight on this."  Transcript, May 24, 2007 Bench Trial, at p. 59.

Under the 12/4/97 Statement, the sales proceeds of the Flash II were to be paid out according to a hierarchy, with payments to the lawyer to be made first (item A), then repayments of funds advanced (items B and C), and finally, if funds remained, distribution of profits, by percentages.  The distributions to Crosby[2] and Lane were to be as follows:[3]

|   |   |   |
|---|---|---|
| B. | Eddie Crosby | $11,000 |
|    | Kerry Lane   | $60,000 |
|    |              |         |
| C. | Eddie Crosby | $10,000 |
|    | Kerry Lane   | $10,000 |

Attachment I, 12/4/97 Statement, at page 1 of 2.

Items D through F then specify how the percentage of any remaining profits will be

---

[1]This document has been submitted at other times in this litigation, including as Exhibit 6 in the May 24, 2007 Bench Trial in this case.  Lane adopted the 12/4/97 Statement during his testimony.  Bench Trial at p.79.  For the Court's convenience, the 12/4/97 Statement is attached hereto as Attachment I.

[2]Claimant Harry E. Crosby is listed on the 12/4/97 Statement by his nickname Eddie Crosby.

[3]Other persons are listed on the 12/4/97 Statement.  However, those persons have not filed a claim in this proceeding.

distributed. <u>Id.</u> at page 2 of 2.  According to Item D, Crosby was to receive 16.6 % of the profits.

<u>Id.</u>  Item E specifies that this 16.6 % will be paid "in addition to his $11,000 payment in Section

B." <u>Id.</u>  Lane is also addressed in Item D.  <u>Id.</u>  However, according to Item F, "Kerry Lane will

be paid $60,000 <u>OR</u> 30% of Figure 3,[4] whichever is greater.  <u>Id.</u>  His initial payment of $60,000

in Section B will be <u>deducted</u> from his 30% should the 30% figure be greater than $60K."  <u>Id.</u>

Accordingly, the initial sales proceeds of the Flash II were to be paid as follows:  Crosby

would receive $11,000 from the first payment and $10,000 from the second, for a total of

$21,000;  Lane would receive $10,000 plus either $60,000 or a percentage of the remainder,

whichever was greater.  Therefore, Lane was to receive either $60,000 or his comparative share

of the proceeds after the mandatory payments, whichever was greater.  On proceeds of $100,000,

the fixed payments ($21,000 to Crosby and $10,000 to Lane) left a balance of $69,000.  From

this amount, clearly $60,000 is higher than the proportional share.[5]  By contrast, under Item E,

Crosby was to receive his percentage in addition to, rather than lieu of, the initial fixed sum

payments.  Therefore, when Lane received the $60,000, Crosby would receive the remaining

balance.  The final allocation under the 12/4/97 Statement would therefore be $70,000 to Lane

and $30,000 to Crosby.

## II.    Under Crosby's 12/24/96 Contract With Anderson, Crosby Was Entitled to a Greater Share

Crosby testified that he never saw the 12/4/97 Statement.  [Deposition of Harry E.

---

[4]Figure 3 is the remainder of the Sales Proceeds after Items A, B, and C are deducted.

[5]The proportional share in this case, with no other persons having filed a claim, is calculated by taking Lane's portion as a fraction of the two shares:  [30/(16.6 + 30)], or 64.38%. Lane's proportional share of $69,000 would therefore be $44,421.

Crosby on 9/19/07, ("Crosby Depo"), at page 44, attached as Attachment II].[6]  However, he

testified that he executed an agreement with Ole Anderson on December 24, 1996 ("12/24/96

Crosby Agreement", Attachment III)[7] that contained, as to Crosby, the same terms.  Under the

12/24/96 Crosby Agreement, Crosby was to receive $21,000 from the proceeds of sale of the

Flash II, plus 16.6 % of any profit after other mandatory payments.  The 12/24/96 Crosby

Agreement and the 12/4/97 Statement (which Crosby never saw) differ in the amount of

investments and costs payable to persons other than Crosby, prior to the payment of the profit

percentage.  According to the 12/24/96 Crosby Agreement, Lane was to receive only $50,000

before the percentage payments were made.  Therefore, under the 12/24/96 Crosby Agreement,

Crosby would be allocated $21,000 plus $11,572[8], or $32,572 of the proceeds.

## III.    Lane Should Be Estopped From Challenging the Government's Settlement With Crosby

While the government contends that the amount it paid Crosby was actually less than his

allocable share of the proceeds under this Court's October 1, 2007 Order, even it were not, Lane

should be estopped from challenging the share paid to Crosby.

As this Court and the United States Court of Appeals for the First Circuit have both

---

[6]The 12/4/97 Statement was marked as Exhibit 177 in that deposition, based on the Bates Numbering from attorney Robert E. Harper's files.  The exhibit in deposition form is attached to the deposition for the Court's convenience.

[7]The 12/24/96 Crosby Agreement was referred to as Exhibit 38 in the Crosby Deposition, based on the Bates Numbering from attorney Robert E. Harper's files.  Crosby acknowledged his signature on the document during his deposition.  Crosby Depo, at p.39, Attachment II.

[8]The two claimants were to receive 16.6% and 25%, respectively.  Therefore, Crosby's pro rata share was 16.6/[16.6+25] or 39.9%.  Applying this percentage to the $29,000 remaining after Crosby and Lane were provided their $21,000 and $50,000 respective fixed payments yields $11,572.

observed, Lane knew of the seizure of the Flash II by the Drug Enforcement Administration

("DEA"). While Crosby came forward timely and filed a claim, Lane hid. The First Circuit

asserted that Lane's conduct could be taken into consideration for equitable considerations if the

government was prejudiced by it.[9]

       The government respectfully submits that equity should foreclose Lane from challenging

the amount paid to Crosby under the Settlement Agreement. The government executed the

settlement with Crosby on June 20, 2005, more than eight months after Lane admits he learned

of the seizure of the Flash II by the DEA. While Crosby testified that knew the name of the

doctor who had invested money in the Flash II,[10] the government notes that prior to execution of

the Settlement Agreement, Crosby was an adverse party to the government, with no incentive to

assist the government in locating additional claimants. Indeed, Crosby also testified that he

knew that the doctor had been told of the seizure of the boat in the same manner that Crosby had,

Docket 41-3 at ¶ 13, and that he knew "the doctor did not want to be involved ." Id. More

emphatically, Crosby testified that "the doctor did not want anything to do with it." Id.

Therefore, there is no basis in the record to assert that the government could have located Lane

---

    [9]"Although notice of seizure is not tantamount to notice of forfeiture. . . , the fact that Lane had notice of the seizure and the further fact that Lane asked Anderson not to disclose his name are not necessarily irrelevant to the final outcome of the Rule 60(b) motion. The government remains free to argue, for example, that equitable considerations – especially any prejudice that it may have suffered through delay or concealment by Lane – should be taken into consideration." United States v. One Star Class Sloop Sailboat Built in 1930 with Hull Number 721, Named "Flash II", 458 F.3d 16, 25 n.10 (1st Cir. 2006).

    [10]Docket 41-3. The October 1, 2007 Opinion erroneously attributes this filing to Lane. Memorandum of Decision at 5. While the testimony was helpful to Lane, it was actually submitted by the government in its case, consistent with the government's duty of candor to the Court.

through Crosby **prior** to executing a binding Settlement Agreement with Crosby.[11]

Instead, the record shows that Crosby has been hostile to Lane's claim of interest. Crosby (not the government) opposed Lane's motion to stay the sale of Flash II pending appeal, Docket 27, and Crosby successfully quashed Lane's attempt to seek documents from him. Docket 43-1.

If Lane had come forward, as Crosby did, at the time that Anderson informed both claimants of the DEA's seizure of the Flash II, the government could have evaluated both of their claims of ownership simultaneously, and could have addressed any dispute between them as to their proportional share pursuant to 28 U.S.C. § 2465(C). Instead, because Lane hid, the government had only Crosby's assertions regarding his ownership interest, which was fully supported by contemporaneous records submitted to the government by Crosby's counsel that were consistent with the information about ownership already in the government's possession. See Docket 41-3 at pages 4-6 (proof of payment by Harry E. Crosby); Crosby Depo at 11-13; Affidavit of Thomas Kerner, attached as Attachment IV.

Under these circumstances, the government respectfully submits that equity bars Lane from challenging the government's settlement with Crosby, and the Court should confine Lane's award to the excess of the amount received for the Flash II over the amount paid to Crosby under the Settlement Agreement.

## CONCLUSION

For the reasons set forth above, the government asserts that the amount paid to Crosby

---

[11]The First Circuit had speculated that Crosby "presumably had a copy of the December 1997 profit-sharing agreement that listed the owners of the Flash." 458 F.3d 16, 25 n.9 To the contrary, Crosby testified that he had never seen this item. Crosby Depo at 44.

under the Settlement Agreement did not exceed Crosby's appropriate share.  Moreover, Crosby

should be estopped from challenging the Settlement Agreement.  Accordingly, while the

government respectfully reserves its right to appeal the Court's Memorandum and Decision (and

to move to stay any award pending appeal, if appropriate), the evidence in this case proves that

Court should fully credit the amount that the government paid to Crosby when calculating its

award to Lane, yielding a final award of  $73,898.76.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:      /s/ Nancy Rue
Nancy Rue
Assistant U.S. Attorney


## CERTIFICATE OF SERVICE

I hereby certify that these documents filed through the ECF system will be sent electronically to

the registered participants as identified on the Notice of Electronic Filing (NEF).

 /s/ Nancy Rue
Nancy Rue
Assistant U.S. Attorney

# Attachment I

This statement is a summary
of total investment dollars and terms of repayment
to all investors in FLASH II, Star Boat #721.
This statement supercedes any and all previous Statements.

A. —   When FLASH II is sold and all Fees, Costs, and
any other expenses incurred by the sale have been
paid, MR. Robert A. Harper, Atty. will receive
5% of the net proceeds. The remainder will be [Figure #1]

B —   [Figure #1] will be paid out in this manner :
Eddie Crosby    — $11,000
Kerry Lane      — $6,000
Jean Anderson   — $16,000
$81,000 TOTAL
[Figure #2 will be Figure #1 minus $81,000]

C —   [Figure #2] will be paid out in this manner :
EDDIE CROSBY    —  $10,000
KERRY LANG      —  $10,000
JEAN Anderson   —  $10,000
OLG Anderson    —  $32,000
MARDENGAD TRADING CO — $14,500
GARY MILO       —  $18,000  ($16,000)
(954) 764- Pete & Carole Walker — $12,000
     7157
Homer Earnest        2,000
Jim Anderson         2,000
$108,000 TOTAL

12/4/97
Gregory Olf Anderson

[Figure #3 will be Figure #2 minus $108,000]

D — [Figure #3] will be paid at in this manner:

| | |
|---|---|
| EDDIE CROSBY — | 16.6.% |
| KERRY LANE — | 30.0 % |
| JOAN ANDERSON — | 10.0 % |
| wc/mrs Homee Earnest — | 1.0 % |
| Chuck Fitzgerald. | 1.0 % |
| OLE ANDERSON | 41.4 % |
| | 100.0 % |

E — EDDIE CROSBY WILL BE PAID 16.6% in ADDITION TO his $11,000 payment in Section B

F — KERRY LANE WILL BE PAID $60,000 or 30% of FIGURE 3, whichever sum is greater. His initial payment of $60,000 in Section B will be deducted from his 30% should the 30% figure be greater than $60C.

G — JOAN ANDERSON WILL BE PAID $10,000 or 10% of Figure 3, whichever sum is greater. Her initial payment of $10,000 in Section B will be deducted from her 10% should the 10% figure be greater than $10K.

12/4/97

Peggy Ole Anderson

# Attachment II

1

1 - 53

IN THE UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
-v-                                ) DOCKET NO.
                                   ) 05-10192-WGY
ONE STAR CLASS SLOOP SAILBOAT      )
BUILT IN 1990 WITH HULL NUMBER     )
NAMED FLASH II,                    )
                                   )
          Defendant,               )
                                   )

THE ORAL/TELEPHONIC DEPOSITION OF HARRY E. CROSBY,

JR., scheduled to be held pursuant to Notice, and the

applicable provisions of the Federal Rules of Civil

Procedure, before MaryAnn Rossi, a Court Reporter and Notary

Public, within and for the Commonwealth of Massachusetts, at

the offices of the United States Attorney, 1 Courthouse Way,

Suite 9200, Boston, Massachusetts, on Wednesday, September

19, 2007, commencing at 1:23 p.m.

ORIGINAL

1   investment?

2        A    I do not think so.  I think I sent him maybe some

3   kind of financial proof that I sent it.  But, it was not a

4   personal check, I don't think.

5        Q    Who did you send it to?

6        A    I believe, that 5000 I actually sent to the

7   Marblehead Trading Company in Marblehead, Massachusetts to

8   put towards the boat rebuilding bill.

9        Q    Now, do you know how much the cost of Marblehead's

10  rebuilding was?

11       A    I know my part was 5000.  I have no idea what the

12  total bill was, no.

13       Q    And you didn't ask Ole for those bills?

14       A    No.

15       Q    Take a look at Harper 38.

16       A    Okay.

17       Q    And take a minute to look at, to read it.

18            (Pause.)

19       A    Okay.

20       Q    Is that your signature on the second page?

21       A    Yes, it is.

22       Q    Did you sign it before or after the strike outs?

23       A    Good question.  I don't know.  I signed it on

24  12-24-96.  I believe, I signed -- I believe, I might have

25  signed it before.  I'm not sure.  Really, I'm not sure.

40

1    Q    Is it possible that you signed a copy of this

2  before the changes were made?

3    A    Is it possible?

4    Q    Do you think you signed it with these strike outs

5  in it?  These things struck out?  Or do you think you might

6  have --

7    A    I said -- I said, I don't know.

8    Q    Okay.  Now, the strike outs in this document

9  eliminates Fitzgerald's interest?

10    A    Yes.

11    Q    And the stuff that is added at the bottom shows

12  who the other investors are, the bottom of the second page.

13         Do you -- do you recall this being on there when

14  you signed it?

15    A    That must have been nine years ago, and I honestly

16  do not recall.  I really do not recall.

17    Q    Well, on the page that --

18    A    I don't think so though.  I don't know.  I don't

19  know.

20    Q    On the second page, the page that you signed, it

21  shows Crosby 16.6 percent?

22    A    Um-hmm.

23         REPORTER:  Yes or no.

24         BY MS. GRANTLAND:

25    Q    5500 purchase, 5000 refit, 10,500 total.

44

1      A      That's what Anderson told me yes.

2      Q      Who paid for your hotel room?

3      A      I have no idea.  I really don't.  I take that

4    back.  According -- according to some document I read here

5    in this FedEx you just sent me, possibly Dr. Lane.

6             But I don't know that to be a fact.

7             Which -- which document?  Did I read that in one

8    of these documents?

9      Q      Could you take a look at -- I'm sorry.  What?

10            Yes, you did.

11     A      Harper 313, I believe it said.

12     Q      Right.

13     A      It says also, Dr. Lane will be reimbursed --  and

14   I've never seen this document, I'd like to say too.  I've

15   never seen -- I've never seen this document.  I've never

16   seen this.

17            So, the answer is -- the answer is, I guess,

18   Dr. Lane.  And no, I did not know that.

19     Q      Could you look at Harper number 177?

20     A      Okay.

21     Q      Have you ever seen that document?

22     A      No, I have not.

23            MS. RUE:  And Brenda, I do need to interrupt.

24            Mr. Kerner says he has to go.  And I'm going to

25   have a couple of questions too.

45

1          So, I'm just going to walk him out and I will be

2  right back.

3               MS. GRANTLAND:  Okay.

4               MR. KERNER:  And Eddie, I will call you later on

5  today.

6               THE WITNESS:  Thank you.

7               REPORTER:  I am going off the record.

8               (Off the record from 2:26 p.m. to 2:29 p.m.)

9               MS. RUE:  I am back and we are back on the record.

10              THE WITNESS:  Okay.  I have Harper 177 in front of

11  me.

12              BY MS. GRANTLAND:

13       Q     Okay.  Have you looked it over?

14       A     I have.

15       Q     Are you familiar with this document?

16       A     Never seen it before in my life.

17       Q     Now, when you -- it's dated at the top December 3,

18  1997.

19          Did you talk to Ole about all the different

20  expenses that were owed on the rebuilding of the boat and

21  all of that?  Before the boat was put up for auction at

22  Guernsey's?

23       A     We talked about the boat.  We talked about a lot

24  of things.

25              I don't really remember having a specific

51

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS )
                                                            )   SS.
COUNTY OF SUFFOLK                         )

        I, MaryAnn Rossi, a Court Reporter and Notary

Public, within and for the Commonwealth of Massachusetts, do

hereby certify that there came before me (via telephone) on

this 17th day of September, 2007, the person hereinbefore

named, who was by me duly sworn to tell the truth, the whole

truth, and nothing but the truth, concerning and touching

the matter in controversy in this cause; that he was

thereupon examined upon his oath, and his examination

reduced to typewriting, under my direction, and that this

deposition transcript is a true and accurate record of the

testimony given by the witness.

        I further certify that I am not related to any of

the parties hereto or their counsel, and that I am in no way

interested in the outcome of said cause.

        Dated at Boston, Massachusetts, this 2nd day of

October, 2007.

                                MaryAnn Rossi
                                NOTARY PUBLIC
                                My Commission Expires:
                                September 12, 2008

*APEX Reporting*
(617) 269-2900

December 3, 1997

This Statement is a summary
of total investment dollars and terms of repayment
to all investors in FLASH II, STAR BOAT #721.
This statement supercedes any and all previous statements.

A. — When FLASH II is sold and all Fees, Costs, and
any other expenses incurred by the sale have been
paid, MR. Robert A. Harper, Atty., will receive
5% of the net proceeds. The remainder will be [Figure #1]

B — [Figure #1] will be paid out in this manner:
      Eddie Crosby   — $11,000
      Kerry Lane   — $60,000
      Jean Anderson — $10,000
                    $81,000 TOTAL
[Figure #2 will be Figure #1 minus $81,000]

C — [Figure #2] will be paid out in this manner:
      EDDIE CROSBY   — $10,000
      KERRY LANE   — $10,000
      JEAN Anderson — $10,000
      OLE ANDERSON — $32,000
      MARBLEHEAD TRADING CO — $14,500
      GARY MILO   — $16,000 ($16,000)
(954) 764-7154 Pete & Carole Walker — $12,000
      Homer Earnest   2,000
      Jim Anderson   2,000
                    $108,000 TOTAL

EX 177
9/19/07 MAR
177

Harper177

[ Figure # 3 will be Figure # 2 minus $108,000 ]

D — [ Figure # 3 ] will be paid out in this manner :

     EDDIE CROSBY — 16.6 %
     KERRY LANE — 30.0 %
     JEAN ANDERSON — 10.0 %
     tnc/mx Homer Earnest — 1.0 %
     Chuck Fitzgerald — 1.0 %
     OLE ANDERSON    41.4 %
     ──────────
     100.0 %

E — EDDIE CROSBY WILL BE PAID 16.6 % in ADDITION TO his $11,000 payment in Section B

F — KERRY LANE WILL BE PAID $60,000 OR 30% of FIGURE 3 , whichever sum is greater. His initial payment of $60,000 in Section B will be deducted from his 30% should the 30% figure be greater than $60K.

G — JEAN ANDERSON WILL BE PAID $10,000 OR 10% of Figure 3 , whichever sum is greater. Her initial payment of $10,000 in section B will be deducted

Harper177

# Attachment III

# AGREEMENT

THIS AGREEMENT between ~~Charles Fitzgerald~~ of Ft. Lauderdale, ~~Florida, on behalf of himself personally and Sailorman Used Marine and Outfitters, Inc., (hereinafter Fitzgerald)~~, Edward Crosby (hereinafter Crosby) of Clewiston, Florida, and Gregory Olaf Anderson (Anderson) of Delray Beach, Florida, this undersigned date is to codify the previous oral understandings among the parties. These presents shall supersede any oral understandings to the contrary relative to the purchase of and distribution of the proceeds of the eventual sale of the sailing vessel, *Flash II*, Starboat #721, previously owned by former President of the United States, John F. Kennedy.

1. *Purpose of consortium.* ~~Fitzgerald~~, Crosby, and Anderson agree that the purpose of this agreement is to memorialize previous understandings and agreements, and that this agreement will supersede contrary verbal assertions or agreements. ~~Fitzgerald~~, Crosby and Anderson have pooled assets, funds, resources, and labor in an effort to purchase the sailing vessel *Flash II*. The reason the parties have come together is to obtain legal title to and possession of said vessel. The parties thereafter intend to sell the vessel at a profit. The vessel will be resold promptly upon completion of refitting and restoration to the satisfaction of Anderson ~~and Fitzgerald~~. The appropriate value of the vessel is not now known but may be agreed upon by the above parties after appraisal by a qualified appraiser. The vessel shall be sold at auction to the highest bidder.

2. *Contribution of funds for purchase.* ~~Fitzgerald will contribute seventy-five percent (75%) toward the purchase price~~. Crosby will contribute twenty-five percent (25%) of the purchase price. The purchase price is $18,000.00, plus auction premium of $1,800.00 for a total of $19,800.00.

3. *Cost of refitting.* ~~Fitzgerald will contribute seventy-five percent (75%) of the cost of refitting;~~ Crosby will contribute twenty-five percent (25%) of the cost of refitting. Verification of

such costs and expenses will be provided by receipts and invoices.

4. *Distribution of proceeds upon sale.* The vessel will be sold as set forth in Paragraph 1. Upon closing, it is agreed that ~~Fitzgerald and~~ Crosby will ~~each~~ receive 200% of ~~their~~ *his* total investment which will include their pro rata purchase investment as well as their pro rata cost of refitting investment. Restated, ~~Fitzgerald and~~ Crosby will recoup twice ~~their~~ *his* out-of-pocket purchase investment and costs when the *Flash II* is sold. The parties agree that Anderson shall receive a percentage of the overage based on services rendered to date which services led to the successful procurement of the vessel, *Flash II*, No. 721, as set forth below. The overage shall constitute that sum in excess of the purchase investment and costs distributed ~~to Fitzgerald and~~ *to* Crosby and ~~such~~ *other investor*

~~Categories listed below.~~

a. ~~Fitzgerald - 50%~~
*a.*
b. Crosby - 16.6% — *$5500 PURCHASE , $5000 REFIT — $10,500 TOTAL*
   *(yields $21,000.00 )*

c. ~~Anderson - 33.4%~~
*d.*
ACCEPTED AND AGREED:

~~Charles Fitzgerald~~                    ~~Date~~

_Edward Crosby_ _12-24-96_ — *TO RECOVER $21,000 before overage*
Edward Crosby               Date

_Gregory Olaf Anderson_ _12/24/96_ — *TO RECOVER $20,000 before overage*
Gregory Olaf Anderson       Date

*OTHER INVESTORS ARE:*
  *DR. KERRY LANE    — 25%  — TO RECOVER $50,000 before overage*
  *JEAN ANDERSON     — 5%   — TO RECOVER $10,000 before overage*
  ~~Fitzgerald~~
  *CHUCK FITZGERALD  — 1%   — TO SHARE in overage only*
                    *TOTAL Recovery before overage — $111,000*
                    *(includes repayment of refurbishment*

# Attachment IV

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | )Civil Action No.05-10192-WGY |
| | ) | |
| ONE STAR CLASS SLOOP SAILBOAT | ) | |
| BUILT IN 1930 WITH HULL NUMBER 721,) | |
| NAMED "*FLASH II*," | ) | |
| Defendant. | ) | |

**AFFIDAVIT OF J. THOMAS KERNER**

I, J. Thomas Kerner, being duly sworn, depose and state as
follows:

1.    I am an attorney licensed to practice in Massachusetts.

2.    I was retained in the fall of 2004 by Harry E. Crosby, with
      regard to his interest in a Star Class Sloop Sailboat Built
      in 1930 with Hull Number 721, named Flash II, (hereinafter
      "Flash II") that had been seized by the DEA.

3.    During the course of representing Mr. Crosby, I received
      from Mr. Crosby information regarding his ownership interest
      in the Flash II.  Additionally, Mr. Crosby provided me with
      documentation to support his claim of partial ownership of
      the Flash II.

4.    In support of Mr. Crosby's claim that he contributed $5,250
      towards the purchase of the Flash II at auction in 1996, Mr.
      Crosby sent to me copies of receipts which demonstrated that
      on July 1, 1996 Mr. Crosby had his bank, The First Bank of
      Clewiston, wire $5,250 to Rowell Realty & Auction Co., Inc.,
      the auction house which handled the June 1996 sale of the
      Flash II by the estate of Don Ehler.

5.   Copies of the documents referenced in paragraph 4, which Mr.
     Crosby sent to me, were sent to the U.S. Attorney on March
     10, 2005.  They were sent to AUSA Shelbey Wright along with
     a letter explaining Mr. Crosby's initial $5,250 investment
     and his subsequent additional $5,000 investment in the Flash
     II, when one of the original investors, Chuck Fitzgerald
     expressed a desire to divest his ownership interest in the
     Flash II.

     Sworn to under the pains and penalties of perjury on this
12th day of October, 2007.

                                 _____
                                 **J.  Thomas  Kerner**

PAGE 04
10/12/2007 Case 1:05-cv-10192-WGY 5177200707 Document 83-5 Filed 10/15/2007 Page 4 of 8 0707
230 Commercial Street, First Floor | Boston, Massachusetts 02109 tel 617 720 5569 fax 617 720 0707

# J. Thomas Kerner

Attorney at Law

March 10, 2005

Ms. Shelbey D. Wright
Assistant United States Attorney
United States Courthouse
1 Courthouse Way
Suite 9200
Boston, MA 02210

> Re: *U.S. v. One Star Class Sloop Sailboat Built in 1930 with Hull Number 721, Named "Flash II,"* 05 CV 10192

Dear Ms. Wright:

Enclosed, please find the following documents:

1. a reprint of, *Forgotten JFK Sail Boat Fetches $18,500*, an A.P. story dated June 30, 1996, from The Tallahassee Democrat, page 4B, by Bill Bergstrom and

2. three pages of documents which demonstrated that on July 1, 1996, Mr. Crosby had the First Bank of Clewiston wire $5,250 to Rowell Realty & Auction Co., Inc.

It is my understanding that Mr. Harry Crosby was asked by Ole Anderson whether Crosby wanted to invest in the Kennedy sail boat. Crosby was told by Anderson that there was another investor, named Chuck Fitzgerald. Crosby agreed and, once Anderson won the auction for the boat, Crosby wired $5,250. Crosby was told that his funds were combined with $14,000 from Fitzgerald to purchase the boat. In addition to the $18,500 purchase price, a commission had to be paid to Rowell Realty & Auction Co.

Initially, Crosby's $5,250 bought him a one-quarter share in the boat. Subsequently Fitzgerald asked to be bought out and Crosby invested another $5,000. Crosby now owns one-third of the boat.

Crosby is willing to stipulate to an order forfeiting the boat to the government, provided the government agrees to sell the boat at auction and pay Crosby one-third of the net proceeds. He also would like an additional $15,000 for legal fees, but that's not a deal breaker. You may find it not surprising that Crosby is upset that Anderson turned down a reported $800,000 bid for the boat at an auction in, I believe, 1998.

Thank you.

Very truly yours,

J. Thomas Kerner

JTK:ms



Current Date:        November 15, 2004

Account Number:      24104063
Capture Date:        July 01, 1996
Item Number:         99990000007021
Posted Date:         July 01, 1996
Posted Item Number:  7691930
Amount:              $5,250.00
Record Type:         Debit



106

11-17-04 08:16  FROM-LYONS PRINTING    305-983-2607    T-652  P.007    F-808



Current Date:        November 15, 2004

Account Number:      111205490
Capture Date:        July 01, 1996
Item Number:         99990000006836
Posted Date:         July 01, 1996
Posted Item Number:  7690080
Amount:              $5,250.00
Record Type:         Credit

| CREDIT | Date 7-1-96 | | ACCOUNT NUMBER |
|---|---|---|---|
| Account _____ Peoples Bank of Florida | | | |
| DESCRIPTION | | AMOUNT | |
| WIRE — | | | |
| ROWELL RLTY & AUCTION | | | |
| H.E. CROSBY | | | |
| | | | |
| Approved By | TOTAL | 5,250.00 | |

⑆7003776⑆  0⑆ ⑈205490  903 ⑈00005250000⑈

617· 720 - 0707

107

Page 5

```
+-----------------------------------------------------------------+
| Domestic Wire Transfer                Date: 07/01/1996 Time: 10:00 AM |
|                                                                 |
|     Name                      ABA     Institution              |
| --------------------------------------------------------------- |
| :Orig: TUESDAY ORTEGA              067003778 First Bank of Clewiston |
| :Rcvr:                             000000000 GOLOMEI            |
|                                                                 |
| Re:                                    Trace: 199607011008067003778001 |
|                                                                 |
| Verified by: TUESDAY ORTEGA                                    |
+-----------------------------------------------------------------+
|                                                                 |
|   Sender ABA: 063111596  Name: I88F                            |
| Receiver ABA: 063100277  Name: NATIONS BANK                    |
|         City: TALLAHASSEE      State: FL                        |
|                                                                 |
|   Type Code: 1000 - Transfer of Funds                          |
|                                                                 |
|       Amount: $      5,250.00    Reference Number:             |
|   Sending Info: ORG=H.E. CROSBY, JR. 068=067003778 1ST BK CLEWISTON |
|   Receiving Info: BNF=ROWELL REALTY & AUCTION CO INC /AC-90612663 BB |
|                 I=ATTN: OLE ANDERSON, MARK MANLY              |
|                                                                 |
|                                                                 |
|                                                                 |
|   .s:                                                          |
|                                                                 |
+-----------------------------------------------------------------+
```

::: Report Process Complete :::

108