UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Civil Action # 05-10192 |
| ONE STAR CLASS SLOOP SAILBOAT BUILT IN 1930 WITH HULL NUMBER 721, NAMED "FLASH II", | |
| Defendant. | |
| KERRY SCOTT LANE, | |
| Claimant. | |

**CLAIMANT'S RESPONSE TO THE GOVERNMENT'S
MEMORANDUM ON CROSBY'S INTEREST**

The government states on page one that "[u]nder any calculation, the amount paid by the government to Crosby was less than Crosby's proportional share of the value of the sailboat" – yet the government's memorandum fails to even consider the written contracts signed by Crosby and Dr. Lane on December 24, 1996. Those are the operative documents for computing the respective shares of the members of the consortium – not some handwritten computation made by Ole Anderson and signed by no one.

The government's calculation of Crosby's interest instead relies only on Anderson's handwritten document dated December 4, 1997, computing purported[1] outstanding expenses

---

[1] At the time Dr. Lane had no reason to question the purported outstanding expenses owed on Flash II, but, knowing what he learned in discovery and investigation, it is now clear that many of the purported expenses listed on the 12/4/97 itemization were questionable.

1

owed on Flash II and what the various members of the consortium (and others who were not members) would be paid. The December 4, 1997 document was not signed by the parties, and did not contain the legal elements of a contract. To the extent that document contained erroneous computations of the amounts owed the consortium members, it could not be considered a subsequent modification of the contracts since it was not signed by the parties. Indeed, Crosby claims he never saw it. The document is not relevant or helpful in computing ownership shares at some later date, since the boat did not sell at the March 1998 auction. After the auction Dr. Lane invested more money which was used to pay off Marblehead's bills and other purported debts which appeared on that itemization. Dr. Lane's subsequent investments[2] further increased his ownership share under the contract. Under clause 2 of Dr. Lane's contract, members of the consortium could increase their "participation" by contributing additional funds toward Flash II expenses. Clause 3 guaranteed the members double their investment back before anyone began sharing in the profits – even Ole Anderson. Dr. Lane has to date contributed $70,000.

Eddie Crosby's only signed contract,[3] also dated December 24, 1996 [Doc 82-3], is consistent with Dr. Lane's contract in that the investors were promised 200% of their investments back before anyone began sharing in profits. Crosby's written agreement shows he

---

[2] Dr. Lane ended up paying the hotel expenses of the consortium members when they attended the 1998 Guernsey's auction in New York City. He, and he alone, supplied the money to pay the other outstanding debts owed Marblehead and others for the refitting, storage, transportation, and other expenses relating to the 1998 auction.

[3] Dr. Lane never had a copy of Crosby's written contract. It first came to light after the bench trial on forfeitability, in response to the subpoena duces tecum served on Consortium attorney Robert Harper in connection with his deposition. Harper's files contained numerous drafts of the consortium agreement, but most of the drafts were not signed. The two contracts signed on December 24, 1996 are the latest contracts executed by consortium members.

promised to pay 25% of the costs of refitting and other expenses for Flash II. Crosby's deposition shows that he reneged on the promise to pay 25% of the expenses. In Crosby's words, after paying an additional $5,000 toward refitting and expenses, it was "cap city." Crosby depo pp. 18, 30, 42. Crosby knew the expenses would have to be paid in order to restore the sailboat to saleable condition, and accepted the benefits of Dr. Lane's picking up the tab for Flash II's expenses. If Crosby refused to sign a further written agreement[4] showing what his share would be after he reneged on his written agreement to pay 25% of the expenses, then certainly Crosby's negligence in protecting his investment should not enure to his benefit and Dr. Lane's detriment.

As Dr. Lane showed in his Memorandum on Crosby's Interest, Crosby's claim to an oral agreement whereby he was to receive a third of the proceeds at auction is not credible. Written documents, including the one signed by Crosby, show Crosby agreed to pay 25% of the expenses in order to retain 25% of the ownership. His refusal to pay anything further would only serve to diminish his share, and there would be no consideration for a secret verbal agreement with Anderson increasing Crosby's share to a third without any further investment.

Further, any attempts by Ole Anderson to unilaterally modify the amounts owed Dr. Lane under his written contract would be invalid since they were not agreed to by Dr. Lane nor

---

[4] The draft contracts in Attorney Robert Harper's file show that Crosby was likely presented with the opportunity to sign an agreement like Dr. Lane's – rather than the scribbled out agreement with the handwritten notations. Indeed, Dr. Lane had signed an earlier version of the consortium agreement at the time he bought out Fitzgerald's interest, [see Exhibit 1 - LaneDocReqResp12] and Fitzgerald signed an identical agreement dated and notarized on July 26, 1996 – the day Dr. Lane bought out Fitzgerald. [See Exhibit 2 - Harper 214]. The superceding consortium agreement which Dr. Lane signed on December 24, 1996 showed Dr. Lane was increasing his investment of participation units, and that his promised return would be 200% of his investment, rather than the 150% promised in paragraph 3 of the earlier contract.

supported by consideration.

In part II of its Memorandum, the government makes an estoppel argument, but fails to cite any authority to support it. The memorandum does not even state what type of estoppel the government is attempting to invoke. Black's Law Dictionary has four pages of definitions of various types of estoppel. Under the circumstances the government should be estopped from raising such an estoppel argument. In any event the argument lacks merit.

The government states that the estoppel should be imposed under the principle of "equity." Memo p. 5. A party who invokes equity must do equity. Here the government has unclean hands. As the First Circuit noted on appeal, the government had an affirmative duty under the Due Process clause to take reasonable steps to ascertain the identity of owners of the sailboat and give them notice. *United States v. One Star Class Sloop Sailboat… "Flash II"*, 458 F.3d 16, 24 (1st Cir. 2006). At the time of the seizure of the Flash II, binding First Circuit precedent required the government to make reasonable efforts to give notice of pending judicial forfeiture proceedings even if the property owner knew about the seizure of the property, and even if the owner was a fugitive from justice. *Gonzalez-Gonzalez v. United States*, 257 F.3d 31, 36 (1st Cir. 2001). If the government had made reasonable efforts to find and notify Dr. Lane, but the reasonable efforts had not been successful due to circumstances not of the government's making, then the government could have taken advantage of the suggestion in footnote 10, that the court could take into consideration "any prejudice that [the goverment] may have suffered through delay or concealment by Lane."

Dr. Lane did not hide as the government claims on page 6. At all times, his current address and phone number were on file with the DEA, as is required of all doctors in order to

maintain their licenses to prescribe controlled substances. At all times Dr. Lane's name and contact information were known to Robert Harper, attorney for the Consortium; Harper's name and address were on the Marblehead invoices, in Marblehead's files – which the government could easily have obtained when seizing the sailboat from the shipyard.

  Claimant Eddie Crosby also knew Dr. Lane's identity. The government tries to excuse itself from the Court of Appeal's directive that the government could have at least asked Crosby who else owned interests in the sailboat, by arguing that Crosby was an adverse party with no incentive to assist the government in locating additional claimants. Not only does this ignore the First Circuit's admonition that the government should have at least asked Crosby, but it ignores the vastly superior might of the federal government. Had the government agents asked Crosby, and he lied about it, Crosby could be criminally prosecuted for making a false statement to a federal agent. Given that fact, the court cannot presume that Crosby would not have been forthcoming. Indeed, even the government's own informant told the agents about a doctor being the principal investor.

  The government's claim that it could not have located Dr. Lane through Crosby prior to settling with Crosby because Crosby did not have a copy of the December 4, 1997 itemization is nonsensical. Crosby admitted knowing Dr. Lane's name, and admitted meeting him at the 1998 auction. Crosby talks about Dr. Lane throughout his deposition.

  Crosby's double hearsay statement that Ole Anderson told him that Dr. Lane did not want to be involved – quoted by the government at p. 5 – is inadmissible hearsay.

  The First Circuit's opinion made it clear that the mere fact that Dr. Lane knew of the seizure of the sailboat did not excuse the government from its constitutional duty to make

5

reasonable efforts to locate interested parties and give them notice. The opinion did not strictly define what "reasonable efforts" would entail, but stated

> the government could at least have asked Crosby, with whom it was in contact, if he knew the names of his fellow investors, or it could have made similar inquires at Marblehead Trading (the locus from which the sloop was seized).

458 F.3d at 25. These were two obvious avenues of investigation which would have lead directly to Dr. Lane, but the government did not conduct any investigation at all to determine who owned the sailboat.

The government argues that Dr. Lane's failure to come forward and defend the case (even without notice) caused the government prejudice because the government could have addressed any dispute between Crosby and Lane as to their proportionate share pursuant to 28 U.S.C. § 2465(c). This argument misses the boat. This case has now been tried on the merits and the government lost. The sailboat was not forfeitable because the government could not prove that any of its confidential informant's money actually was invested in the refitting or upkeep of the sailboat. If Dr. Lane had been given notice and had litigated along with Crosby, there would not have been a forfeiture judgment and the sailboat would not have been sold over Dr. Lane's objection for a mere $100,000. The government had no business addressing any dispute regarding the relative shares of Crosby and Lane.

Finally, Crosby's assertions to the government regarding his ownership interest were not fully supported by contemporaneous records submitted to the government by Crosby's counsel, as the government claims on page 6. Crosby's only written documentation of his interest consisted of a wire transfer receipt for $5,250 sent to the auction house in 1996, and a newspaper article about the 1996 auction which stated that "Chuck Fitzgerald, owner of Sailorman Used

6

Marine Gear Emporium, Fort Lauderdale, Florida" purchased the sailboat, and that Ole Anderson bid on his behalf. There is no mention of Crosby in the article. Crosby's lawyer's letter contained unsworn hearsay allegations about the Crosby's ownership percentage, but those are not evidence. See Exhibit 3 - USDocResp103-108. The government apparently took Crosby's lawyer's word for it, rather than follow up on the obvious lead from the newspaper article. Had the government agents called Chuck Fitzgerald, named in the article as the purchaser at the auction, Fitzgerald would have told them that Dr. Lane bought out all but 1% of his interest, and would have given them Dr. Lane's contact information.

It is curious indeed that the government would be attempting to invoke equity here.

Respectfully submitted,
Kerry Scott Lane, MD,

By his attorneys,

/s/Brenda Grantland
Brenda Grantland, Esq.
Law Office of Brenda Grantland
20 Sunnyside Suite A-204
Mill Valley, CA 94941
(415) 380-9108
(Pro hac vice)

/s/Eric B. Goldberg
Jeffrey P. Allen (BBO# 015500)
Eric B. Goldberg (BBO# 564398)
Seegel Lipshutz & Wilchins, P.C.
Wellesley Office Park
20 William Street, Suite 130
Wellesley, MA 02481
(781) 237-4400

## AGREEMENT

This agreement is to codify all previous understandings between Gregory Olaf Anderson (Anderson) and ___K. LANE___. This agreement supersedes any previous understandings relative to the purchase, refurbishment, and eventual sale of the sailing vessel *Flash II*, Star Class Boat #721, previously owned by former President of the U. S., John F. Kennedy.

1. **Purpose of Consortium.** Anderson and ___K. LANE___ understand and agree that the purpose of the Consortium is to obtain legal title to and possession of said vessel, *Flash II*. It is intended that the vessel is to be refurbished to as new condition and then resold at a profit, either to a private party or at auction to the highest bidder. A minimum reserve figure may be agreed upon by consensus of the members. The vessel will be resold promptly upon completion of refitting and restoration to the satisfaction of Mr. Anderson. The appropriate value of the vessel is not now known, but may be determined after appraisal by a qualified appraiser. If a reasonable offer for the purchase of the vessel is received before refurbishment, or if after written disclosure of said offer and consultation with the contributors Anderson concludes such offer satisfies the terms of the investment prospectives of this agreement, Anderson is authorized on behalf of the parties to accept or reject such offer as will satisfy the investment distribution as further set forth below. Anderson has the sole discretion to reject any offer

2. **Contribution of Funds for the Purchase and Refit.** The Consortium shall consist of the two present members, Anderson and Mr. Eddie Crosby, and new members whose participation shall be the sum of $5,000.00 each. Any member may take more than one $5,000.00 position. The funds obtained from these members shall be used solely for the purchase, refurbishment, and related expenses to the vessel.

3. **Distribution of Proceeds Upon Sale.** Each member shall be a primary recipient of $7,500.00 or 5 percent of the net sale proceeds after auction house and attorney fees are deducted, whichever sum is greater. Robert Augustus Harper Law Firm of Tallahassee, Florida, has been retained as exclusive agent for the consortium. Anderson's participation in the sharing of profits shall

LaneDocReqResp000012

not begin before each member of the Consortium has received $7,500.00 for each initial $5,000.00 investment. This $7,500.00 payment will be the first and primary obligation of the Consortium after Mr. Crosby's receipt of $10,500.

4. **Responsibility.** Mr. Anderson will be general director and general manager of this entire project from purchase through the refurbishment and eventual sale of the vessel. He shall be responsible for keeping an accurate accounting of all costs associated with the project, including receipts and records of all disbursements. These records shall be available for inspection by any member upon demand. Viewing of and access to the vessel shall be permitted to any member upon reasonable notification to Anderson.

It is agreed that Anderson will solely coordinate and be responsible for any and all media access to *Flash II*. This access will be administered in such a manner as to derive maximum sustained publicity and interest in *Flash II* culminating in a successful sale of the vessel.

Anderson will also be responsible for researching and obtaining any documents, film, correspondence, articles of historical significance pertaining to the vessel, and any other such memorabilia deemed useful to receiving maximum profit from the eventual sale of *Flash II*.

5. WE HEREBY AGREE to the above terms and conditions and hereby contribute $20,000.00 for 20% of net ~~participation units~~, receipt of which being hereby acknowledged.

_____
GREGORY OLAF ANDERSON

Investors Copy - #1 & 2 Total

Signature: *K Slane*
Printed Name: Kerry Lane
Address: 621 Andrews Ave, Delray
Telephone Number: 467 278 3060

2 of 2

11

LaneDocReqResp000013

# AGREEMENT

This agreement is to codify all previous understandings between Gregory Olaf Anderson (Anderson) and Charles B. Fitzgerald This agreement supersedes any previous understandings relative to the purchase, refurbishment, and eventual sale of the sailing vessel *Flash II*, Star Class Boat #721, previously owned by former President of the U. S., John F. Kennedy.

1. **Purpose of Consortium.** Anderson and Fitzgerald understand and agree that the purpose of the Consortium is to obtain legal title to and possession of said vessel, *Flash II*. It is intended that the vessel is to be refurbished to as new condition and then resold at a profit, either to a private party or at auction to the highest bidder. A minimum reserve figure may be agreed upon by consensus of the members. The vessel will be resold promptly upon completion of refitting and restoration to the satisfaction of Mr. Anderson. The appropriate value of the vessel is not now known, but may be determined after appraisal by a qualified appraiser. If a reasonable offer for the purchase of the vessel is received before refurbishment, or if after written disclosure of said offer and consultation with the contributors Anderson concludes such offer satisfies the terms of the investment prospectives of this agreement, Anderson is authorized on behalf of the parties to accept or reject such offer as will satisfy the investment distribution as further set forth below. Anderson has the sole discretion to reject any offer

2. **Contribution of Funds for the Purchase and Refit.** The Consortium shall consist of the two present members, Anderson and Mr. Eddie Crosby, and new members whose participation shall be the sum of $5,000.00 each. Any member may take more than one $5,000.00 position. The funds obtained from these members shall be used solely for the purchase, refurbishment, and related expenses to the vessel.

3. **Distribution of Proceeds Upon Sale.** Each member shall be a primary recipient of $7,500.00 or 5 percent of the net sale proceeds after auction house and attorney fees are deducted, whichever sum is greater. Robert Augustus Harper Law Firm of Tallahassee, Florida, has been retained as exclusive agent for the consortium. Anderson's participation in the sharing of profits shall

not begin before each member of the Consortium has received $7,500.00 for each initial $5,000.00 investment. This $7,500.00 payment will be the first and primary obligation of the Consortium after Mr. Crosby's receipt of $10,500.

4. **Responsibility.** Mr. Anderson will be general director and general manager of this entire project from purchase through the refurbishment and eventual sale of the vessel. He shall be responsible for keeping an accurate accounting of all costs associated with the project, including receipts and records of all disbursements. These records shall be available for inspection by any member upon demand. Viewing of and access to the vessel shall be permitted to any member upon reasonable notification to Anderson.

It is agreed that Anderson will solely coordinate and be responsible for any and all media access to *Flash II*. This access will be administered in such a manner as to derive maximum sustained publicity and interest in *Flash II* culminating in a successful sale of the vessel.

Anderson will also be responsible for researching and obtaining any documents, film, correspondence, articles of historical significance pertaining to the vessel, and any other such memorabilia deemed useful to receiving maximum profit from the eventual sale of *Flash II*.

5. WE HEREBY AGREE to the above terms and conditions and hereby contribute $ 1.00 for 1% ~~participation units~~, receipt of which being hereby acknowledged.

_____    _____
GREGORY OLAF ANDERSON                 Signature

Consortium copy - #2 of 2 total

                                      Charles B Fitzgerald
                                      Printed Name

                                      2616 Barcelona Dr
                                      Address Ft. Laud, Fl 33301
                                      (954) 467-1251
                                      Telephone Number

Sworn to and subscribed before me this
26th day of July, 19 96.
by: Gregory Olaf Anderson
    Marsha L. Holm
Signature of Notary Public
**Marsha L. Holm**
Notary's Name, Printed, Stamped or Typed
Personally Known: ___ or Produced ID: ✓
Type of ID produced: FLDL A536-294-50-045-0    2 of 2

Sworn to and subscribed before me this
26 day of July, 19 96.
by: Chuck B Fitzgerald
    Marsha L. Holm
Signature of Notary Public
**Marsha L. Holm**
Notary's Name, Printed, Stamped or Typed
Personally Known: ✓ or Produced ID ___
Type of ID produced _____

OFFICIAL NOTARY SEAL
MARSHA L HOLM
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC444816
MY COMMISSION EXP. APR. 29, 1999

Harper214

# J. Thomas Kerner

230 Commercial Street, First Floor · Boston, Massachusetts 02109

March 10, 2005

Ms. Shelbey D. Wright
Assistant United States Attorney
United States Courthouse
1 Courthouse Way
Suite 9200
Boston, MA 02210

    Re:    *U.S. v. One Star Class Sloop Sailboat Built in 1930 with Hull Number 721, Named "Flash II,"* 05 CV 10192

Dear Ms. Wright:

    Enclosed, please find the following documents:

1. a reprint of, *Forgotten JFK Sail Boat Fetches $18,500*, an A.P. story dated June 30, 1996, from The Tallahassee Democrat, page 4B, by Bill Bergstrom and

2. three pages of documents which demonstrated that on July 1, 1996, Mr. Crosby had the First Bank of Clewiston wire $5,250 to Rowell Realty & Auction Co., Inc.

    It is my understanding that Mr. Harry Crosby was asked by Ole Anderson whether Crosby wanted to invest in the Kennedy sail boat. Crosby was told by Anderson that there was another investor, named Chuck Fitzgerald. Crosby agreed and, once Anderson won the auction for the boat, Crosby wired $5,250. Crosby was told that his funds were combined with $14,000 from Fitzgerald to purchase the boat. In addition to the $18,500 purchase price, a commission had to be paid to Rowell Realty & Auction Co.

    Initially, Crosby's $5,250 bought him a one-quarter share in the boat. Subsequently Fitzgerald asked to be bought out and Crosby invested another $5,000. Crosby now owns one-third of the boat.

    Crosby is willing to stipulate to an order forfeiting the boat to the government, provided the government agrees to sell the boat at auction and pay Crosby one-third of the net proceeds. He also would like an additional $15,000 for legal fees, but that's not a deal breaker. You may find it not surprising that Crosby is upset that Anderson turned down a reported $800,000 bid for the boat at an auction in, I believe, 1998.

Thank you.

                              Very truly yours,

                              *[signature]*
                              J. Thomas Kerner

JTK:ms

Tallahassee Democrat (FL)Tallahassee Democrat (FL)
June 30, 1996
Section: LOCAL
Page: 4B

# FORGOTTEN JFK SAILBOAT FETCHES $18,500
### Bill Bergstrom THE ASSOCIATED PRESS

When John F. Kennedy raced sailboats as a teen-ager, one of his prized boats was a Star Class sloop named Flash II.

The future president skippered the sleek 22-footer to an Atlantic Coast Championship in 1936 as a 19-year-old member of the Nantucket Sound Star Fleet.
Six decades later, far from Cape Cod, its mast broken and white paint weathered, the boat brought $18,500 at auction Saturday.

The buyer, Chuck Fitzgerald, owner of Sailorman Used Marine Gear Emporium in Fort Lauderdale, will restore the 66-year-old wooden craft, said Ole Anderson, who bid on Fitzgerald's behalf.

The price didn't approach the $453,500 paid for Kennedy's oak rocking chair or $722,500 paid for his golf clubs at the auction of Jacqueline Kennedy Onassis' estate in April.

But it was a big jump from the $300 the late Don Ehler paid for the boat in 1963 in Clearwater - with no idea who the former owner was.

Ehler, who died in April, kept the boat in a shed since 1972 when he retired.

Despite the price, Ouida Enler, Don's wife, said, "It's kind of sad selling something that meant a lot to him."

Illustration:B&W photo

HUGH SCOGGINS/The Associated Press

Ole Anderson, who placed the winning bid for the boat's new owner, packs up the Flash II, which once belonged to John F. Kennedy.

Copyright (c) 1996 Tallahassee Democrat

11-17-'04 08:16  FROM-LYONS PRINTING        863-983-2607        T-652  P02    U-616



Current Date:      November 15, 2004

Account Number:    24104063
Capture Date:      July 01, 1996
Item Number:       99990000007021
Posted Date:       July 01, 1996
Posted Item Number: 7691930
Amount:            $5,250.00
Record Type:       Debit



106

USDocReqResp000106

11-17-04 08:16 FROM-LYONS PRINTING 863-983-2607 T-652 P.01



Current Date:       November 15, 2004

Account Number:     111205490
Capture Date:       July 01, 1996
Item Number:        99990000006836
Posted Date:        July 01, 1996
Posted Item Number: 7690080
Amount:             $5,250.00
Record Type:        Credit

CREDIT   Date  7-1-96

Account _____ Producers C... of Florida

| DESCRIPTION | AMOUNT |
|---|---|
| Wire — | |
| Rowell Rlty & Auction | |
| H.E. Crosby | |
| Approved By VW | TOTAL  5,250.00 |

⑃063700377⑃  0⑃ ⑃⑃⑃205490  903  /0000525000/

617-720-0707

107

USDocReqResp000107

11-17-'04 08:16   FROM-LYONS PRINTING       863-983-2607        T-652 P03   U-616



Page 5

```
+------------------------------------------------------------+
: Domestic Wire Transfer         Date: 07/01/1996 Time: 10:08 AM :
:                                                            :
:     Name                 ABA    Institution                :
:  ----------------------  -----  -------------------------  :
: Orig: TUESDAY ORTEGA    067003778 First Bank of Clewiston :
: Rcvr:                   000000000 GOLDNET                 :
:                                                            :
: Re:                            Trace: 199607011003067003778001 :
:                                                            :
: Verified by: TUESDAY ORTEGA                               :
+------------------------------------------------------------+
:                                                            :
:  Sender ABA: 063111594  Name: IBBF                         :
:  Receiver ABA: 063100277 Name: NATIONS BANK                :
:      City: TALLAHASEE      State: FL                       :
:                                                            :
:  Type Code: 1000 - Transfer of Funds                       :
:                                                            :
:       Amount: $      5,250.00   Reference Number:          :
:  Sending Info: ORG=B.E. CROSBY, JR. 068=067003778 1SI BK CLEWISTON :
:  Receiving Info: BNF=ROWELL REALTY & AUCTION CO INC /AC-90612663 BB :
:           I=ATTN: OLE ANDERSON, MARK MANLY                 :
:                                                            :
:                                                            :
:                                                            :
:  .s:                                            15.00      :
+------------------------------------------------------------+
```

*** Report Process Complete ***

108

USDocReqResp000108