UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Civil Action # 05-10192 RWZ |
| ONE STAR CLASS SLOOP SAILBOAT BUILT IN 1930 WITH HULL NUMBER 721, NAMED "FLASH II", | CLAIMANT'S REPLY TO THE GOVERNMENT OPPOSITION TO PETITION FOR ATTORNEYS |
| Defendant. | FEES PURSUANT TO 28 U.S.C. § 2465(b)(1) |
| KERRY SCOTT LANE, M.D. | |
| Claimant. | |

Claimant, Kerry Scott Lane, M.D., through undersigned counsel, hereby responds to the

Government's Opposition to Claimant's Motion for Attorney's Fees (hereinafter cited as

"Opposition").

# TABLE OF CONTENTS

COUNTER-STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

"Facts related to fees". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Discovery. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Factual disputes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Valuation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Sovereign immunity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I.     "...The Fees Should Be Reduced to Reflect the Results Obtained...". . . . . . . . . . . . . . 12

II.    "...The Supreme Court Has Accepted Two Different Methods for Reducing Awards to Reflect Results...". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

III.   "...Lane's Fee Award Should Reflect the Limited award He Received...". . . . . . . . . . . 15

        A.    "... fees related to the issues on which Lane did not prevail...". . . . . . . . . . . . . . 16

               1.    "...a motion to vacate pursuant to Rule 60(b) that he wholly abandoned...". 16

               2.    "...a motion to compel discovery regarding the merits of Lane's claim prior to the Court having permitted him to file a claim...". . . . . . . . . . . . . . . . 17

               3.    "...research and litigation regarding depositions of government employees, when the government had already willingly provided all relevant information in response to discovery requests...". . . . . . . . . . . . . . . . . . . 19

               4.    "...litigation regarding the applicability of the CAFRA amendment to the Federal Tort Claims Act and the discretionary function exception, in order to justify a claim for ten times the Auction Proceeds...". . . . . . . . . . . . . 19

               5.    "...litigation regarding the amount paid to Crosby under his settlement with the government exceeded Crosby's pro-rata share...". . . . . . . . . . . 22

        B.    "...Alternatively, the fees and expenses requested should be reduced by 75% to reflect the value of the award, as compared to the relief sought...". . . . . . . . . . . 22

IV.    "...Counsel's Rate Should Not Exceed the Rate Actually Charged...". . . . . . . . . . . . . . 25

V.    Additional arguments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    A.    There is no authority for the government's but-for test. . . . . . . . . . . . . . . . . . . . 27

    B.    There is no authority for disallowing or proportionalizing "costs". . . . . . . . . . . 28

    C.    There is no basis for disallowing billing by local attorney Eric Goldberg.. . . . . . 31

    D.    There is no basis for the myriad deductions from Ms. Grantland's fees . . . . . . . 32

    E.    There is no basis for the deductions from the paralegal's hours. . . . . . . . . . . . . 35

    F.    Claimant is entitled to supplemental fees for this fee litigation, and interest on the fee award. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# TABLE OF AUTHORITIES

## Cases

*Copeland v. Marshall*, 205 U. S. App. D. C. 390, 641 F.2d 880 (1980) (en banc). . . . . . . . . . . 18

*Marchello v. Chase Manhattan Auto Fin. Corp.*, 219 F.R.D. 217 (D. Conn. 2004) . . . . . . . . . 18

*Accusoft Corporation v. Palo*, 237 F.3d 31 (1ST Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Berkovitz v. United States*, 486 U.S. 531 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Blanchard v. Bergeron*, 489 U.S. 87 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Blum v. Stenson*, 465 U.S. 886 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25-27

*Bowen Investment Inc. v. Camiero Donuts, Inc.*, 490 F.2d 27 (1st Cir. 2007) . . . . . . . . . . . . . . 14

*Cartwright v. Stamper*, 7 F.3d 106 (7th Cir. 1993) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Cerqueira v. American Airlines, Inc.*, 484 F.Supp.2d 241 (D. Mass. 2007). . . . . . . . . . . . . . . . 26

*City of Burlington v. Dague,* 505 U.S. 557 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Coutin v. Young & Rubicam P.R.*, 124 F.3d 331 (1st Cir. 1997) . . . . . . . . . . . . 12, 13, 23, 24, 28

*Dolan v. United States Postal Serv.*, 546 U.S. 481 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Eleby v. American Medical Systems, Inc.*, 795 F.2d 411 (5th Cir. 1986). . . . . . . . . . . . . . . . . . . 17

*Farrar v. Hobby*, 506 U.S. 103 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 24

*Gay Officers Action League v. Commonwealth of Puerto Rico*, 247 F.3d 288 (1st Cir. 2001) . . . 32

*Hensley v. Eckerhart*, 461 U.S. 424 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 21, 24, 35

*Ignatiev v. United States*, 238 F.3d 464 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Maciera v. Pagan*, 698 F.2d 38 (1st Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Mogilevsky v. Bally Total Fitness Corporation*, 311 F.Supp. 2d 212 (D.Mass. 2004). . . . . . . . . 36

*Northcross v. Bd. of Educ.,* 611 F.2d 624 (6th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

iv

*Palmigiano v. Garrahy*, 707 F.2d 636 (1st Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Riverside v. Rivera*, 477 U.S. 561 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18, 22, 23

*Rodriguez-Hernandez v. Miranda-Velez*, 132 F.3d 848 (1st Cir. 1998). . . . . . . . . . . . . . . . . . . 32

*Systems Management Inc. v. Loiselle*, 154 F.Supp.2d 195 (D. Mass. 2001). . . . . . . . 24-26, 29, 34

*United States v. Gonzalez-Gonzalez*, 257 F.3d 31 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. One Star Sloop Sailboat*, 458 F.3d 16 (1st Cir. 2006). . . . . . . . . . . . . . . . . . 3, 28

*United States v. Procter & Gamble Co*., 356 U.S. 677 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Venegas v. Mitchell,* 495 U.S. 82 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*W. Va. Univ. Hosps. Inc. v. Casey*, 499 U.S. 83 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**Statutes**

28 U.S.C. § 1920. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

28 U.S.C. § 2465(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 28

§ 1988.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**Other authorities**

Cong. Rec. April 11, 2000, H2051. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

F.R.Civ.P. Rule 59(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

F.R.Civ.P. Rule 60(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Fed. R. Civ. P. 26(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

FRAP Rule 4(a)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## COUNTER-STATEMENT OF FACTS

The government prefaces its Opposition by baldly claiming:

> In this case, Claimant Kerry Scott Lane ("Lane") has sought fees expended in litigating unnecessary issues, vexatious motion practice, and issues on which he did not prevail.

Opposition p. 1.  The government did not point to a single example of "unnecessary issues" litigated by Claimant, nor of any "vexatious motion practice" by Claimant – nor could it.

It is impossible that Claimant litigated "unnecessary issues."  Prior to the appeal, Dr. Lane filed a motion to vacate default judgment and a motion for reconsideration of its denial. Both motions – and the appeal – were necessary to obtain his day in court.  His motion to stay the sale pending appeal should have been granted.  Had it been granted it would have obviated all of the litigation on sovereign immunity – and spared Dr. Lane the devastating loss of his sailboat.

On remand, all of Claimant's motions, save some minor discovery and housekeeping motions[1] were defensive motions, made in response to the government's motions[2] or in response

---

[1]  Claimant filed a motion to compel discovery on 11/26/2006, Doc. 36, which the government opposed on 12/8/2006, Doc. 37.  It was never ruled upon, but most of the information sought was eventually obtained through other sources.  On 5/18/2007 Claimant filed a motion for extension of discovery to obtain testimony of out of state witness, Doc. 65 - 66, which was denied that same day.  Claimant filed a Motion for Clarification on 5/21/2007, Doc. 68, which the court granted by electronic order the same day, holding discovery would close on June 7.

[2]  The government filed a motion for partial summary judgment on 3/22/2007, Doc. 53-54; Claimant filed a response & cross-motion for summary judgment on 4/5/2007, Doc. 55-56; both parties filed responses on 4/18/2007 – (U.S. - Doc. 58), (Claimant - Doc. 59-60).  On 5/10/2007, the government filed a supplemental memorandum raising sovereign immunity, Doc. 63.  Claimant filed a response the following day, Doc. 64, 5/11/2007.  The court ruled in the government's favor at a telephonic hearing.  At trial, the Court told Claimant he could file a motion for reconsideration of the telephonic ruling, which he did on 6/29/2007, Doc. 73.

1

to the Court's orders for further briefing.[3]  Claimant aggressively defended against every

argument raised by the government, but had he not done so, he would have lost.  Thus, these

were all "necessary" issues.

The government claims at Opposition p. 1, that Claimant engaged in "vexatious motion

practice" – without offering any legal support for its use of the term.  If the government had

researched that term[4] before recklessly applying it, it would have seen that nothing in Claimant's

motions remotely approached vexatiousness.

**"Facts related to fees"**

On page 2 the government claims it gave notice and only Crosby responded.  Undeniably

the government did *not* give notice of the pending forfeiture case to Dr. Lane.  The government

ignores the fact that the First Circuit reversed because the government had not shown it used

---

[3]  At the hearing on 1/4/2007, the court ordered both sides to brief the notice issue.  The government filed Doc. 41-42 on 1/4/2007; Claimant filed Doc. 44-45 on 1/23/2007; the government replied with Doc. 47 on 1/30/2007.  Both parties filed trial memoranda on evidentiary issues: Doc. 69 (Dr. Lane, filed 5/22/2007) Doc. 70 (U.S., filed 5/23/2007).  At the trial on 5/24/2007, the court ordered both sides to brief the issue of forfeitability.  Dr. Lane filed Doc. 76 and the U.S. filed Doc. 77 on 6/29/2007.  On 9/24/2007 the court ordered simultaneous briefs on Crosby's interest in Flash II.  Claimant filed Doc. 82 and the government filed Doc. 83 on 10/15/2007.  The government filed a response to Doc. 82 on 10/22/2007 (Doc. 84.)

[4]  "Vexatious motions" go "beyond mere litigiousness, " but are brought "only to vex, harass, and annoy." See *Castro v. United States*, 775 F.2d 399, 408-409 (1st Cir. 1985).  The phrase most often occurs in reference to courts' powers to regulate the conduct of abusive litigants, such as where a defendant had "deluged the court with at least sixty-four different motions." *United States v. Gomez-Rosario*, 418 F.3d 90, 102 (1st Cir. 2005). Vexatious motions most often involve meritless motions and pleadings brought as a vendetta in direct contravention of a court order or Rules (Id.), or in the face of adverse judgments. (See, for example, *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991); *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 646-647 (6th Cir. 2006) (where litigant continuously attempted to circumvent the district court's injunction, made several attendant misrepresentations to the court, and sent vexatious and harassing cease-and-desist letters concerning issues that would have been resolved through the regular course of litigation).

reasonable efforts to locate the doctor it knew owned an interest and give him notice.   On

remand, it was clearly shown the government made no effort to locate him – much less

reasonable efforts.

Also on page 2, the government makes much of the fact that default judgment was

granted and Dr. Lane's Rule 60(b) and 59(e) motions[5] were denied.   Claimant won these issues

on appeal.   The government's claim in the same paragraph that Dr. Lane did not appeal from the

denial of his Rule 60(b) motion is incorrect as a matter of law.   See section III-A-1 below.

The government incorrectly suggests on p. 2 that, after Dr. Lane filed his notice of appeal

and moved in the district court for a stay of the sale pending appeal, he abandoned that claim by

not separately appealing from the denial of the stay.   As he showed in Doc. 80-2 p. 4, F.R.A.P.,

Rule 18 would have allowed him to litigate the denial of the stay in the appeal he had already

filed notice of, but that appeal had not yet been docketed in the First Circuit when the

government auctioned the sailboat.   Until the appeal was docketed, there was no way to get the

issue before the Court of Appeals.   If he had filed a separate appeal from denial of the stay, that

would have been docketed even later.   The course the government says Dr. Lane should have

taken would have created more billable hours, while achieving nothing.

---

[5]  Judge Zobel denied the Rule 60(b) motion because Dr. Lane admittedly knew of the
seizure of the sailboat.  In his motion for reconsideration, Claimant pointed out that

> actual knowledge of the *seizure* is not sufficient to excuse the lack of service –
> only actual knowledge of the *forfeiture proceedings* suffices as a substitute.
> *United States v. Gonzalez-Gonzalez*, 257 F.3d 31, 38 (1st Cir. 2001) ("the actual
> knowledge required to defeat a notice-based due process challenge is advance
> notice-in-fact of forfeiture proceedings, as opposed to notice-in-fact of seizure.")

Claimant's Memorandum, Doc. 20 p. 5.   The First Circuit cited *Gonzalez-Gonzalez* as
controlling.  *United States v. One Star Sloop Sailboat*, 458 F.3d 16, 22 (1st Cir. 2006).

**Discovery**

Dr. Lane also disputes the government's characterization of what happened during discovery (Opposition pp. 2-3). The government did *not* fully respond to the discovery requests on the issue of notice as it claims,[6] and Judge Zobel had *not* bifurcated discovery into notice versus the merits or remedy.

Immediately after the First Circuit opinion was issued, Judge Zobel held a telephonic status conference. Later that day, September 14, 2006, the court, by electronic court notes, ordered that discovery was to be completed by 12/8/06, with a pretrial conference set for 12/13/06. See docket entry for 9/14/2006. No written order was attached, and, as the parties later learned, no court reporter was present at the conference. It appeared from that order that the case would be proceeding to trial very quickly, and that the discovery deadline was the deadline for all discovery – for vacating the default, the merits and the remedy. In propounding discovery – which claimant pursued promptly[7] – Dr. Lane focused on the notice issue, but included four questions that went to the remedy – e.g., valuation. See Exhibit 1. The government served discovery requests on Dr. Lane on 11/8/2006 – one month to the day before the discovery cutoff. The government's interrogatories and documents requests included discovery that went beyond the issue of the government's efforts to ascertain ownership and give notice. See Exhibit 2. On November 9, 2006 Claimant notified the government of his intent to depose four government agents with direct knowledge of the efforts the government made to locate owners and give them

---

[6] See Doc. 36 and exhibits thereto, and Exhibit 1.

[7] Claimant served his interrogatories and documents requests on 9/26/2006.

4

notice (paralegal Lisa Talbot, Agent Greg Willoughby, AUSA Wright[8] and AUSA Barclay).

Exhibit 3 pp. 3-5, 10. The government objected to the taking of *any* depositions of government

agents, citing the Touhey regulations. See Exhibit 3 pp 11-14. On November 9, 2006, during the

meet and confer process leading up to Claimant's motion to compel discovery, AUSA Rue first

raised the suggestion that the parties try to reach a stipulation of the facts. On November 14,

Claimant informed the government that if it intended to depose Dr. Lane, he would insist upon

the depositions of the government agents. After further emails showed the parties were at an

impasse over discovery,[9] Claimant filed a motion to compel on November 26, 2006. Counsel

was prepared to argue that motion at the telephonic pretrial conference Judge Zobel held on

December 13, 2006, but Judge Zobel stated that she would have to recuse herself. Later the same

day, the case was reassigned to this Court. It was only after the case was reassigned – after

Claimant's motion to compel was fully briefed – that this Court granted the government's request

to bifurcate the issues, holding discovery in abeyance on some issues.

Despite its refusal to fully comply with the discovery requests – even on the issue of

notice – the government aggressively pursued discovery against Dr. Lane. One month before the

December 8, 2006 discovery cutoff date, the government served interrogatories, documents

requests and requests for admission (which Claimant answered timely and fully). The

---

[8] During the telephonic status conference, Judge Zobel noted that AUSA Shelbey Wright
was a percipient witness to the key issues regarding the government's efforts to locate Dr. Lane
and give him notice, and sua sponte asked Claimant's counsel whether she would need to depose
Ms. Wright. Counsel stated that Claimant would need to depose her. Judge Zobel then ruled
that AUSA Wright could not represent the United States in this action, and ordered the U.S.
Attorney's Office to assign the case to another attorney – forthwith.

[9] See exhibit 3 pp. 17-27.

government's discovery questions went beyond the notice issues.  See Exhibit 2, interrogatories

8-9, 12-15, 17-18.  On December 4, 2006, the government notified Claimant that it had

subpoenaed records from all of Dr. Lane's banks,[10] and emailed counsel a notice of deposition of

Dr. Lane[11] to be held in Boston on December 8, the discovery cut-off date.  On December 5,

Claimant read the email and sent a reply email, objecting to the deposition of Dr. Lane because

the government had not given reasonable notice.  Exhibit 3 pp. 17-23.

The government makes much of the fact that the government had no trouble getting an

affidavit from Harry E. Crosby (Opposition p. 3 and footnote 4), implying that Claimant could

have easily obtained an affidavit from him.  To the contrary, Crosby's attorney Thomas Kerner

aggressively fought Claimant's every attempt to get *any* information from his client and

successfully moved to quash Claimant's subpoena duces tecum.  See Doc. 43 & Exhibit 4.

Marblehead Trading Company also refused to voluntarily give information to Claimant,

yet bent over backwards cooperating with the government.  Claimant's counsel made numerous

calls to Marblehead's attorney, Kenneth Lindauer, requesting permission to talk to Marblehead

employees and get copies of documents in their file.  The attorney stated he would pass on the

request to Marblehead's owner and then gave counsel permission to call Marblehead's owner,

but he never returned her phone calls.  When the government served a subpoena on Marblehead,

counsel called Kenneth Lindauer and asked that Marblehead serve Claimant with copies of all

---

[10]  If discovery was limited to the notice issues as the government claimed, why were they
subpoenaing Dr. Lane's bank account records?

[11]  What possible evidence regarding the government's reasonable attempts at notice
could be ascertained from a deposition of Dr. Lane?  The written discovery – which Dr. Lane
answered completely – already included these questions.  See Exhibit 2.

the records responsive to the government subpoena.  He agreed to do that, then called back and said that when the Agent appeared with the subpoena Marblehead gave the agent all of the originals and did not keep copies.  The Marblehead documents showed that the bills for restoration were being sent to Robert Harper, the consortium's attorney, with Harper's correct address.  Had the government checked these records it would have found Harper, and Harper would have told them Dr. Lane was the chief investor, and would have given his address.  See Doc. 45.

Opposition p. 3 note 2 claims "the government sought to come to stipulations as to the facts" – suggesting that the government was trying to cooperate with Claimant in lieu of forcing Claimant to drag the facts out of its agents through traditional discovery devices.  That is far from the truth.  As the emails and letters regarding the heated discovery dispute shows, the government strenuously resisted discovery.  AUSA Rue only began requesting that the parties stipulate to the facts (without telling Claimant what the alleged facts were) on November 9, in the meet and confer sessions prior to filing Claimant's Motion to Compel.  By then, the government had already responded to Claimant's written discovery with many objections and incomplete answers, and had flatly refused to allow depositions of the four government agents who were  percipient witnesses to the government's efforts (if any) to locate the owners and give them notice.  Since the government had not cooperated so far in providing the information requested in these traditional discovery requests, why should Claimant trust it to candidly supply information for the proposed stipulation of facts?  Dr. Lane had a right to discovery.  See part III-A-2 & III-A-3 below.

**Factual disputes**

      In footnote 2 on page 3, the government claims "[u]ltimately, this case was decided on essentially the facts submitted by the government." On page 4, the government claims that "[t]he facts related to forfeitability and ownership were not in dispute; the parties drew different legal conclusions from the facts." Neither contention is true. All of these issues were hotly disputed – factually and legally.

      The government never admitted that leads it should have employed to locate owners were readily at hand yet it made no attempt to follow up on those leads. Claimant's counsel had to assemble evidence of this through adversarial discovery devices and subpoenaes aimed at percipient witnesses Crosby, Marblehead & the CW, who were cooperating with the government but refusing to cooperate with Claimant's counsel. The government thwarted these efforts by refusing to allow depositions of government agents. Crosby successfully resisted giving up key information both as to notice and percentages of ownership, by moving to quash Claimant's subpoena, which was granted. See Exhibit 4 and Doc. 43. The CW's attorney refused to accept or return phone calls from Claimant's counsel, and ignored her faxes, emails and Fed Ex package. Eventually, these witnesses were forced to come forward. The Court ordered the government to produce the CW for live testimony at trial. See 5/24/2007 transcript. On 10/1/2007, the Court ordered testimony from Crosby (Doc. 81); only then did Crosby agree to provide a deposition, but put up a strenuous resistance. See Exhibit 4.

      Dr. Lane certainly disputed forfeitability. Never did he concede that the CW – or anyone – had invested drug money in the sailboat. To his knowledge, the money he paid to the

8

consortium fully covered all the expenses on maintenance, repairs, transportation, storage, etc.. In fact, clearly Dr. Lane supplied more than enough money to cover all of the expenses.

At trial, the government disputed Dr. Lane's ownership [5/24/2007 transcript p. 59], as it appears to be doing again in its Opposition to the Fee Petition.  The government claims on p. 4 that "the Court did not reach the question of ownership" – but clearly it did, because it awarded Dr. Lane the $100,000 received at auction minus a deduction for Crosby's interest. Doc. 81 p. 23. The finding that Dr. Lane owned the majority interest in the sailboat implicitly appears throughout the Court's opinion.

 In any event, the facts were uniquely in the hands and minds of government agents, the CW, Crosby, and Marblehead – and Claimant had a right to discovery of those facts before trial. The fact that he was resisted at every point by the government, CW, and Crosby should not reduce his right to fees.  See part III-A-2 and III-A-3 below.

**Valuation**

Dr. Lane's position that the Flash II was worth $800,000 to $1,000,000 was based on the government's own appraisal.  See Doc. 45-2 (Memorandum), p. 6 (cited by the government on page 4): "Here, the government's own appraisal shows the sailboat was worth between $800,000 and $1,000,000. [USDocReqResp pp. 124-25.]"

During the deposition of the appraiser, Arlan Ettinger, (owner of Guernsey's Auction House, which auctioned the sailboat), Ettinger produced documents showing that Guernsey's paid a $1,000 premium to insure the Flash II for the few days it would be in Guernsey's custody – insuring it for a stated value of $800,000.  Doc. 73-5 p. 5.  Ettinger's low value of $800,000 was based on the high bid for Flash II at the 1998 auction.  After Ettinger sold Flash II for a mere

9

$100,000 – a tenth of what he had certified it was worth – he aligned himself with the government, justifying his low sales price at the auction by saying the value of Kennedy memorabilia had declined, and that it was not certain that the high bidder in 1998 was legitimate.

Later, Crosby's deposition bolstered the validity of Ettinger's appraisal over Ettinger's post-auction recanting of the appraisal. Crosby testified that he was present at the 1998 auction, and observed bidding start at $300,000 and go up to $800,000, with four or five bids. The next highest bid was $700,000. Doc. 82-2, Crosby deposition p. 19.

Claimant and his counsel both tried – without success – to find an appraiser to use as an expert witness. There are apparently very few appraisers with expertise on Kennedy memorabilia as unique as this one – a sailboat the youthful JFK sailed to an unprecedented victory with a four minute lead. JFK and his brother Joe won a number of trophies with Flash II, making it a legend in sailing circles. Claimant and his counsel were unable to find anyone with expertise both in Kennedy memorabilia and sailboats. The auction houses, appraisers and appraiser referral associations counsel talked to all said no one would be willing to put a value on the sailboat without inspecting it. By selling the boat, the government effectively denied Dr. Lane the opportunity to obtain an independent opinion of its value.

**Sovereign immunity**

The government harps on its tentative victory, in the Court's oral ruling on sovereign immunity during a telephonic hearing on May 15, 2007, as an issue for which Claimant's attorneys fees should be denied. In fact, Claimant had no reasonable choice but to pursue the sovereign immunity issue – one of "a number of issues that the government raised for the first time at oral argument." Memorandum of Decision, Doc. 81, p.8 n1.

10

> Although the government moved first for partial summary judgment, it did not assert sovereign immunity until its reply brief. Even then, the government did not brief the discretionary function exception or quasi-judicial immunity, issues that it raised for the first time at oral argument. In the interest of fairness, the Court invited supplemental briefing, giving Lane an opportunity to respond to the government's arguments.

*Id.* Once the government asserted sovereign immunity it would have been unreasonable for Dr. Lane's counsel to fail to move to amend his answer to file a tort claim, or to decline this Court's invitation to brief issues raised by the government for the first time at oral argument.

The government claims at Opposition page 5 that this court denied Claimant's Motion for Reconsideration on the sovereign immunity issue. This Court never decided the motion because it found the auction proceeds to be the fair market value of the sloop – effectively mooting the motion for reconsideration of the sovereign immunity issue. See Docket entry for Doc. 81:

> Lane is entitled to recover from the government the $100,000 received at auction after subtracting the lesser of (1) the sum paid to Crosby, or (2) the amount of Crosbys ownership share in the Flash II. A prompt evidentiary hearing will be scheduled at which the government shall bear the burden of justifying this deduction. This Court also DENIES as moot Lanes motion to amend his complaint [Doc. No. 61] to add a counterclaim under the Federal Torts Claim Act and also DENIES as moot Lanes motion for reconsideration [Doc. No. 73] of the Courts holding that the discretionary function exception bars Lanes claim that the government negligently sold the sloop for below market value.

11

## ARGUMENT

**I.** **"...The Fees Should Be Reduced to Reflect the Results Obtained..."**[12]

In arguing that Dr. Lane sought fees for "issues on which he did not prevail" the government misconstrues *Hensley v. Eckerhart*, 461 U.S. 424 (1983)[13] – the case on which it purports to rely. *Hensley* set the parameters for reducing fees where the prevailing party prevailed on some but not all "claims" – not "issues." (Even then, *Hensley* counseled that "related claims" should be fully compensable because they involve overlapping issues of fact and law.) A faithful reading of *Hensley* and its progeny shows that "claims" means separate causes of action. "In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories...." *Hensley* , 461 U.S. at 435. "Many civil rights cases will present only a single claim," *Hensley* advises. *Id.* It is inconceivable that a civil rights case would present only a single "issue" – so the Supreme Court could not be talking about "issues" when it used the term "claims" – it is talking about causes of action. The First Circuit agreed in *Coutin v. Young & Rubicam P.R.*, 124 F.3d 331, 340 (1st Cir. 1997) ("In the fee-shifting context, a "claim" is an allegation of a legal injury comprised of various elements and equivalent to a cause of action").

Indeed, *Hensley* clearly stated that the prevailing party's fees should not be reduced just because he failed  to prevail on every issue.

---

[12]  When a heading appears underlined and in quotation marks, Claimant is using headings from government's Opposition. However, he is not agreeing with their contentions.

[13]  "[T]he standards set forth in [*Hensley v. Eckerhart*] are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.'" *Id.*, at 433 n7.

> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.  Normally this will encompass all hours reasonably expended on the litigation....  In these circumstances *the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit*.  Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee.  The result is what matters.

*Hensley*, 461 U.S. at 435 (emphasis added).

Dr. Lane's case presented a single claim – his claim to innocent ownership and non-forfeitability of the Flash II.  He completely prevailed on that claim.

The government argues that, because Dr. Lane asserted that Flash II was worth $800,000 to $1,000,000 – while the Court eventually found that its value to be the $100,000 it sold for at the 2005 auction – the court should deny Claimant any attorneys fees for work regarding valuation.  This contention is not supported by the Supreme Court precedent it cites.

The government relies on *Farrar v. Hobby*, 506 U.S. 103 (1992) – but *Farrar* is inapposite.  "The Farrars sued for $17 million in money damages; the jury gave them nothing.  No money damages.  No declaratory relief.  No injunctive relief.  Nothing."  506 U.S. at 107.  The jury awarded the Farrars only one dollar in nominal damages.  The Supreme Court held that

> When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all.

*Farrar v. Hobby*, 506 U.S. 103, 115 (1992) (citation omitted).

Dr. Lane's judgment for $73,898.76 plus interest from the date of seizure is a substantial judgment – a far cry from a nominal damages award.  *See Coutin*, 124 F.3d at 340 (finding a damage award of $45,000 to be "substantial in absolute terms").

13

More importantly, Dr. Lane's claim was not a claim for the recovery of money damages, as the government suggests at the bottom of page 6. Dr. Lane wanted his sailboat back and he won it back at trial – only the government cannot give it back because it sold it over Dr. Lane's objections. Had the government not precipitously sold the sailboat, Dr. Lane's claim would not have been forcibly converted into a claim for restitution for its fair market value. See section III-A-4 below.

Moreover, these figures on value – $800,000 to $1,000,000 – did not originate from Dr. Lane's claim or other pleading, but from the government's own appraiser, who appraised the sailboat just weeks before the auction. Although claimant used the $1,000,000 as the estimated fair market value in computing the $310,000 settlement offer he made to AUSA Rue on October 20, 2006 (Exhibit.6), that figure was not incorporated into his Answer (Doc. 49) or the counterclaim in his proposed Amended Answer. Doc. 61-1.

The First Circuit cases cited by the government, *Accusoft Corporation v. Palo*, 237 F.3d 31, 61 (1ST Cir. 2001) and *Bowen Investment Inc. v. Camiero Donuts, Inc.*, 490 F.2d 27, 30 (1st Cir. 2007) were both tort cases between private parties where attorneys fees were sought under a contractual attorneys fee provision. These standards do not apply to fee-shifting statutes. See e.g., *Riverside v. Rivera*, 477 U.S. 561, 576 (1986) ("Because damages awards do not reflect fully the public benefit advanced by civil rights litigation, Congress did not intend for fees in civil rights cases, unlike most private law cases, to depend on obtaining substantial monetary relief.")

## II.  "...The Supreme Court Has Accepted Two Different Methods for Reducing Awards to Reflect Results..."

True, the Supreme Court has authorized the reduction of fees for limited success. However, neither of the methods the government cites apply here because Claimant did not have limited success. He completely prevailed on his sole claim opposing forfeiture of the Flash II.

## III.  "...Lane's Fee Award Should Reflect the Limited award He Received..."

In its argument on page 8 (section 3-A), the government again conflates "claims" with "issues" – branding "forfeitability" as a "discrete issue" and claiming it was the only "issue" on which Dr. Lane prevailed.

Since the government was the plaintiff here, the single "claim" obviously was the government's claim for forfeiture of Flash II. The government did not seek monetary damages or injunctive relief. Dr. Lane completely prevailed in defeating the government's claim to forfeitability. All of the other "issues" in this case were subsidiary issues Dr. Lane encountered along the road to complete success on his claim. He eventually won the important subsidiary issues over which the parties spilt the most significant quantities of ink: (1) whether the default judgment should be vacated for lack of due process notice; (2) whether Judge Zobel erred in denying Dr. Lane's Rule 60(b) motion based on his knowledge of the *seizure* – as opposed to the forfeiture proceedings – without requiring the government to prove it made reasonable efforts to give notice; (3) Dr. Lane's "ownership" interest (which the government disputed at trial – See 5/24/2007 Transcript p. 59.)

15

As Claimant shows below, with the exception of the government's de minimis victory on Crosby's interest, the government is simply wrong in its contentions that Dr. Lane lost the five issues bulleted on page 8 of its Opposition.  See below.

On page 9 the government raises a "but for" argument, which Claimant briefs in part V-A below.

A.    **"... fees related to the issues on which Lane did not prevail..."**

    1.    **"...a motion to vacate pursuant to Rule 60(b) that he wholly abandoned..."**

On page 8, the government argues that Dr. Lane abandoned his Rule 60(b) motion because he did not file the notice of appeal until after his Rule 59(e) motion for reconsideration was denied.  Gov. Opp. p. 2 and n. 1.  The government raised this issue before, in a FRAP Rule 28(j) letter filed in the Court of Appeals on July 26, 2006 – seven days before oral argument.  Exhibit 8. Claimant filed a response the following day.  See Exhibit 9.  As Claimant's response explains, FRAP Rule 4(a)(4)(A) clearly extends the deadline for filing a notice of appeal from denial of the F.R.Civ.P. Rule 60(b) motion until the F.R.Civ.P. Rule 59(e) motion to reconsider is decided.

> If a party timely files in the district court <u>any of the following motions</u> ... <u>the time to file an appeal runs</u> ... <u>from the entry of the order disposing of *the last such remaining motion*</u>:
>> (i) for judgment under Rule 50(b);
>> (ii) to amend or make additional factual findings under Rule 52(b), whether or not granting the motion would alter the judgment;
>> (iii) for attorney's fees under Rule 54 if the district court extends the time to appeal under Rule 58;
>> (iv) *to alter or amend the judgment under Rule 59*;
>> (v) for a new trial under Rule 59; or
>> (vi) *for relief under Rule 60 if the motion is filed no later than 10 days after the judgment is entered*.

16

> FRAP Rule 4(a)(4)(A) (emphasis added).  Here, the Rule 60 motion was filed within 10 days after the judgment was entered, and the Rule 59 motion was filed within 10 days after denial of the Rule 60 motion.  FRAP Rule 4 clearly contemplates that these motions may be filed in sequence, and that a sequence of timely filed motions extends the tolling ("if a party timely files... any of the following motions..."  the deadline for filing a notice of appeal is tolled until "...the entry of the order disposing of the last such remaining motion...")  Other courts have so held.  See *Eleby v. American Medical Systems, Inc.*, 795 F.2d 411, 412 (5th Cir. 1986).

Appellant's Rule 28(j) letter.  Exhibit 9.  Because the Rule 59(e) motion extended the deadline for filing an appeal from denial of the 60(b) motion, the one notice of appeal preserved the appeal from denial of both motions.

At oral argument, when Appellant's counsel began to address this issue, Judge Selya interrupted and said "you don't need to address that issue – they're wrong."

Now the government raises this unsupported argument a second time –  unnecessarily running up the bill on Claimant's legal fees.

### 2.    "...a motion to compel discovery regarding the merits of Lane's claim prior to the Court having permitted him to file a claim..."

As Claimant showed in his Counter-Statement of Facts at p. 4 above, Judge Zobel set the discovery deadline and a pretrial conference following closely on its coattails.  During the telephonic status conference the Court discussed the potential remedy if Dr. Lane were to win on the Rule 60(b) issue.  Counsel presumed from this that the discovery deadline was the deadline for all discovery.  It was not until this case was assigned to Judge Young that the government managed to get the court to truncate the proceedings into segments.  The motion to compel discovery was litigated long before that.  In fact, it was on the calendar for hearing on the day Judge Zobel recused herself.

The Claimant had a right to discovery. See *See, e.g., Marchello v. Chase Manhattan Auto Fin. Corp.*, 219 F.R.D. 217, 218 (D. Conn. 2004) ("Federal discovery rules 'make a trial less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.'" (quoting *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682, (1958)); *see also* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party….").

Although Claimant's motions to compel discovery sat undecided and his subpoena to Crosby was quashed, the information sought in those discovery devices eventually came out.  The Court eventually ordered Gary Milo and Harry Crosby to testify (Crosby thereafter agreed to be deposed in lieu of appearing live).  Most dramatic of all, the Department of Justice's *Guide to Interlocutory Sales*, which the government refused to turn over, claiming it was an internal document, was eventually obtained  from the Department of Justice's publications department by one of counsel's colleagues, who identified herself as a criminal defense attorney.  Thus, although many of Claimant's attempts at discovery were stymied or even denied, eventually he obtained almost everything he asked for, and it was all relevant.  Unfortunately, the government's attempts to resist discovery of this important information ran up counsel's bill.  Since the government ran up Claimant's attorney fee bill by fighting discovery at every turn, it should not be heard to complain now that it has to pay the attorneys fees.  "The government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." *Riverside v. Rivera*, 477 U.S. 561, 581 (1986) (citing *Copeland v. Marshall*, 205 U. S. App. D. C. 390, 414, 641 F.2d 880, 904 (1980) (en banc).

18

3.    **"...research and litigation regarding depositions of government employees, when the government had already willingly provided all relevant information in response to discovery requests..."**

The government had not in fact provided all of the relevant information that Claimant intended to obtain from the depositions by the time Claimant began litigating his motion to compel. AUSA Wright, Agent Willoughby and Lisa Talbot (and perhaps supervisor AUSA Barclay) were percipient witnesses. Only they knew what leads the government could have followed to determine who owned the sailboat and what efforts they made to follow these leads. Before Claimant filed his motion to compel discovery on this issue, Judge Zobel had already stated at the telephonic evidentiary hearing that AUSA Wright could be deposed. The government did not object.

Because Judge Zobel recused herself, and this Court, immediately after the transfer, truncated discovery, Claimant's motion to compel was never heard or decided. It was mooted by subsequent events. Deposing these four agents would have taken a few hours or maybe two days total. Instead, the government ran up Claimant's attorneys fees bill by requiring counsel to use more labor intensive means to get to this information. Again, the government should not now be heard to complain about the increase in attorneys fees and expenses it caused.

4.    **"...litigation regarding the applicability of the CAFRA amendment to the Federal Tort Claims Act and the discretionary function exception, in order to justify a claim for ten times the Auction Proceeds..."**

The government raised the discretionary function argument for the first time in oral argument on the government's motion for summary judgment. Doc. 81, p. 8 n. 1. The Court permitted the government to file a supplemental memorandum on the issue after oral argument. The government filed Doc. 63 on 5/10/2007. Running out of time before the Court was expected

19

to rule, Claimant filed a hasty response the following day (Doc. 64) – while counsel was still struggling to make sense of the complex discretionary function issue, which the government briefed only scantily, citing only a Supreme Court case which was not on point.

In Doc. 63, the government claimed the burden of proof was on claimant to show the discretionary function did not apply.  That is not the case in the Federal Tort Claims Act context. *Dolan v. United States Postal Serv.*, 546 U.S. 481, 491-492 (2006).  The discretionary function exception does not apply if the government agents had a mandatory duty, imposed by statute or internal policies or guidelines, which they violated.  *Berkovitz v. United States*, 486 U.S. 531, 536-39 (1988).

During the telephonic conference on May 15, 2007, the Court ruled in favor of the government – before the government produced portions of its policy manual governing DOJ policy on interlocutory sales.  See Doc. 73-9 p. 1.  After obtaining that manual, counsel saw a reference to the *DOJ Guide to Interlocutory Sales* which appeared to be directly on point, and requested a copy of that manual.  The government stubbornly resisted turning it over, even after the Court asked for it, sua sponte, at trial.  Finally another criminal defense attorney called the DOJ publications department and obtained the manual without protest.  As expected, the manual showed the government could not hide behind the discretionary function because of the mandatory duty exception – the government did not follow its own policies.  See Doc. 73-2.

The government had no right to hide behind the discretionary function exception while refusing to disclose its internal regulations. See *Ignatiev v. United States*, 238 F.3d 464, 466-67 (D.C. Cir. 2001) (internal policies and guidelines may constitute basis for mandatory duty; party

opposing discretionary function exception is entitled to limited discovery to determine existence of internal policies that show the government actions were nondiscretionary.)

After trial, "[i]n the interest of fairness, the Court invited supplemental briefing, giving Lane an opportunity to respond to the government's arguments." Doc. 81, p. 8 n. 1. Claimant filed a motion for reconsideration of the sovereign immunity ruling. Doc. 73-1. The court never ruled on the motion for reconsideration, but that does not prevent Claimant's counsel from being compensated for the work on that motion. [T]he court's... failure to reach certain grounds is not a sufficient reason for reducing a fee." *Hensley*, 461 U.S. at 435.

The government's comment at page 8 that all of this work was "to justify a claim for ten times the Auction Proceeds" rings hollow. The *government's appraiser* appraised Flash II at $800,000 to $1,000,000 only weeks before the auction. Doc. 73-4 p. 4. The appraiser, turned government auctioneer, showed his faith in the accuracy of his appraisal when he insured the Flash II for $800,000 – paying a premium of $1,000 just for the few days the boat would be in Guernsey's possession. Doc. 73-5 p. 5. Guernsey's contract with the Marshal Service to auction this sailboat gave Guernsey's a commission of 18% if the sailboat sold for $100,000 – gross income to Guernsey's of $18,000. Doc. 73-5 p. 3. Ettinger must have believed his appraisal was accurate or he would not have wasted so much money insuring the sailboat for $800,000.

Claimant still believes Ettinger's appraisal accurately reflected the fair market value. Unfortunately, Claimant's inability to find an expert appraiser willing to appraise the sailboat without inspecting it forced him to rely on Ettinger as the sole expert. See Exhibit 5. In the battle of experts, the question was, who should the Court believe – Ettinger the appraiser or Ettinger the auctioneer?

21

     5.     **"...litigation regarding the amount paid to Crosby under his settlement with the government exceeded Crosby's pro-rata share..."**

This is an issue which the Court ordered testimony on, and briefing. Doc. 81 p. 23, 10/1/2007.  Claimant applied contract principles in construing the consortium contracts, some of which – most notably Crosby's contract – were not obtained until after the trial (during the deposition of attorney Robert Harper.)  Doc. 82.

Although the Court adopted the government's contention about the value of Crosby's interest, this is not a "claim" much less a "separate claim" – so the government's victory on this issue does not affect his right to full recovery of his attorneys fees.

     B.     **"...Alternatively, the fees and expenses requested should be reduced by 75% to reflect the value of the award, as compared to the relief sought..."**

In Opposition part B, page 9, the government argues that "the fees and expenses requested should be reduced by 75% to reflect the value of the award, as compared to the relief sought."[14]

In *Riverside v. Rivera* the plurality rejected "the proposition that fee awards under § 1988 should necessarily be proportionate to the amount of damages a civil rights plaintiff actually recovers." Id., at 574.  Here, as in *Riverside v. Rivera*, the government argued

> that respondents' counsel should be compensated for only a small fraction of the actual time spent litigating the case. In light of the difficult nature of the issues presented by this lawsuit and the low pecuniary value of many of the rights respondents sought to vindicate, it is highly unlikely that the prospect of a fee equal to a fraction of the damages respondents might recover would have been sufficient to attract competent counsel.… Thus, had respondents had to rely on private-sector fee arrangements, they might well have been unable to obtain redress for their grievances. It is precisely for this reason that Congress enacted § 1988.

---

[14]  The government claims that "Lane effectively sought an award of $973,898.76." Opposition p. 10.  Never has Dr. Lane even mentioned that figure.  The one and only settlement offer Dr. Lane extended to the government was for $310,000.  See Exhibit 6.  The government's only settlement offer was for $26,127.  See Exhibit 7.

*Riverside v. Rivera* at 579-580.

Likewise, in enacting the attorney fee provision of the Civil Asset Reform Act of 2000, Congress was concerned about the increasing number of civil forfeiture cases in which innocent owners could not retain counsel because the costs of litigation exceeded the value of their seized property. In her speech before Congress, U.S. Rep. Jackson-Lee of Texas described CAFRA's attorney fee provision as one of the proposed reforms that "simply balance the scales so that innocent people have a level playing field on which to challenge improper seizures." (Cong. Rec. April 11, 2000, H2051.)

> A rule of proportionality would make it difficult, if not impossible, for individuals with meritorious civil rights claims but relatively small potential damages to obtain redress from the courts. This is totally inconsistent with Congress' purpose in enacting § 1988. Congress recognized that private-sector fee arrangements were inadequate to ensure sufficiently vigorous enforcement of civil rights. In order to ensure that lawyers would be willing to represent persons with legitimate civil rights grievances, Congress determined that it would be necessary to compensate lawyers for all time reasonably expended on a case.

*Riverside v. Rivera*, at 578 (1986).

In *Coutin v. Young & Rubicam Puerto Rico, Inc.*, 124 F.3d 331, 340 (1st Cir. 1997), the court rejected the proportionality theory presented by the government here.

> ...[W]hile a judge may not automatically reduce a fee award in proportion to a judgment that is significantly less than the plaintiff sought, the judge can take that small judgment into reasonable account in massaging the lodestar...
>
> *  *  *
>
> [I]t remains within the district court's discretion to reduce a fee award in response to limited relief even in the presence of complete claims-based success. See, e.g., *Cartwright v. Stamper*, 7 F.3d 106, 109-10 (7th Cir. 1993) (declining to award fees where plaintiff succeeded on all claims, but received only *nominal damages* for each). Here, however, the damage award is substantial in absolute terms – over $45,000 – and equals roughly three times the appellant's annual salary. On its face, such relief does not seem "limited" in any relevant sense.

>Moreover, to the extent – if at all – that the ratio of the damages requested to the judgment received may be taken into account in fixing an appropriate award, see *Foley* [*v. City of Lowell*], 948 F.2d [10,] 19-20 ("Often, when the amount sought is large but the actual recovery is small, fees may be reduced somewhat."); see also *Loggins v. Delo*, 999 F.2d 364, 369 (8th Cir. 1993), this proportion may be used only as one facet of the trial court's determination of the quality of the results obtained. *The court may not employ the derived ratio as an independent justification for a fee reduction.*

*Id.* (emphasis added).

"Since 1986, the Supreme Court repeatedly has stated that there is a 'strong presumption' that the lodestar figure represents a 'reasonable" fee.'" *Systems Management Inc. v. Loiselle*, 154 F.Supp.2d 195, 204 (D. Mass. 2001). Moreover, as this Court so thoroughly explained in *Systems Management Inc.*, the *Hensley* and *Farrar* "prevailing party" requirement, which "ostensibly requires a court to balance the claims won by the plaintiff against the claims lost to the defendant" in civil rights cases – where the attorney fee award is discretionary – is irrelevant in the RICO context, where reasonable attorney fees for prevailing plaintiffs are mandated, and "a court cannot award fees to a prevailing defendant." *Id.* at 206. As in RICO, the attorney fees provision under CAFRA is mandatory. 28 U.S.C. § 2465(b)(1). And, a court cannot award attorney fees to a prevailing plaintiff under CAFRA any more than a court can award fees to a prevailing defendant in the RICO context.

Therefore, as this Court reasoned at pages 206-207 of *Systems Management Inc.,* the "prevailing party" balancing requirement in *Hensley* and *Farrar* (where the "results obtained" may barely favor the plaintiff and the defendant may have prevailed almost as much as the plaintiff") does not apply in the CAFRA context where the court "*shall*" award attorney fees only to defendant *claimants* who substantially prevail – and never to the prevailing plaintiff government.

24

In passing CAFRA, Congress made attorney fees available to *all* claimants who substantially prevail – no matter the value of their property.  Congress enacted the reforms in CAFRA to "balance the scales so that innocent people have a level playing field on which to challenge improper seizures" (Congressional Record 4-11/2000 H.Rep., H2051). Congress clearly did not give courts discretion to reduce or deny attorney fees based upon the value of the  property that claimants successfully defend.

**IV.    "...Counsel's Rate Should Not Exceed the Rate Actually Charged..."**

The government argues that lead counsel should be limited to the hourly rate she initially agreed to charge Dr. Lane in her retainer agreement.  That argument has been rejected by the Supreme Court.  As counsel told the government in a phone call and email sent November 27, 1007 (See Exhibit 3 p. 50), the Supreme Court rejected the argument that an attorney who has taken on a case for less than prevailing rates in the community should have her attorneys fees limited to that rate.  See *Blum v. Stenson*, 465 U.S. 886 (1984) (holding a legal aid attorney was entitled to attorneys fees at the prevailing rate in the community).  See also *Blanchard v. Bergeron*, 489 U.S. 87 (1989) (holding contingency fee agreement does not limit attorney's rights to fees calculated under lodestar formula using prevailing rates of the community.)  The government raised this issue anyway.

"Nor has the Supreme Court looked to the actual fee agreement between the plaintiff and his attorneys to determine what is "reasonable." *Systems Management Inc.*, at 200-201, citing: *City of Burlington v. Dague,* 505 U.S. 557 (1992) (enhancement of fee award to reflect that attorneys were retained on contingent-fee basis); *Venegas v. Mitchell,* 495 U.S. 82 (1990) (allowing

25

contingent fee agreement to require prevailing plaintiff to pay his attorney more than fee award);

*Blanchard v. Bergeron,* 489 U.S. 87 (1989); *Blum v. Stenson,* 465 U.S. 886 (1984).

"Should a fee agreement provide less than a reasonable fee calculated [under the lodestar

method], the [losing party] should nevertheless be required to pay the higher amount." *Blanchard*,

489 U.S. at 93. The proper measure for the "reasonable" hourly rate is the hourly rate "prevailing

in the community for similar services by lawyers of reasonably comparable skill, experience, and

reputation." *Blum*, 465 U.S. at 896. "*Blum* instructs the Court to find the prevailing hourly rate in

Boston for persons with comparable skill, experience, and reputation as the persons who worked

on the plaintiff's case." *Systems Management Inc.*, at 209. See also *Cerqueira v. American*

*Airlines, Inc.*, 484 F.Supp.2d 241, 250 (D. Mass. 2007).

Since *Cerqueira* was very recently decided, and involved Boston attorneys in civil rights

litigation with comparable years of experience, Dr. Lane's counsel relies on the rates established in

that case.

The government claims that Dr. Lane "never chose to have a Boston attorney on this case."

Opposition p. 10. Though irrelevant, this statement is incorrect. Dr. Lane has consistently stated

in his Affidavits that when he discovered that forfeiture proceedings were being held in Boston, he

began looking for a Boston forfeiture specialist, but failing to find one, he retained Eric Goldberg,

who had no forfeiture experience. See Doc. 20-3. After his Rule 60(b) motion was denied he

began an internet search for a forfeiture specialist and found Ms. Grantland.

The case cited by the government, *Maciera v. Pagan*, 698 F.2d 38, 40 (1ˢᵗ Cir. 1983)

involved an out of town specialist, who sought *higher* rates than the prevailing rate in the

26

community. That case is not on point, and may not be good law since it was decided before *Blum*

*v. Stenson*.

The government's argument that $250 per hour is presumably the market rate for Ms.

Grantland – because that is the rate she agreed charged Dr. Lane – ignores counsel's statement in

her declaration, Doc. 87-4, that she gives discounted rates to forfeiture victims as part of her

commitment to public interest service in this area of the law. She should no more be penalized for

this altruism than the legal aid attorneys in *Blum*.

## V.    Additional arguments

### A.    There is no authority for the government's but-for test

The government states on page 9 of its Opposition that "Lane's motion regarding the

Court's default judgment and related appeal [] would have been wholly unnecessary had he simply

filed a timely claim." If "but-for" analysis were applicable in reducing an award of attorneys fees –

which it is not – the government's argument would still fail because its starting point puts the cart

before the horse. The government blames Dr. Lane for all of this litigation incurred in defending

his forfeiture claim because he did not come forward and file a timely claim. However, the

government had a duty to make reasonable efforts to locate Dr. Lane and give him notice. "The

government, however failed to provide adequate notice of the forfeiture proceeding and Lane did

not learn of the forfeiture proceeding until after a default judgment had been entered."

(Memorandum of Decision, Doc. 81 p. 1). The government's due process violation is the root

cause of this lengthy and expensive litigation – as well as the central issue in the successful appeal.

But for the due process violation, Dr. Lane would have promptly filed a claim, and would have

gotten Flash II back years ago – intact, and without running up such a large attorney fee bill.

27

The government also states at page 9 of its Opposition that "[t]he First Circuit affirmatively stated that this Court could factor Lane's decision to avoid the DEA into its ultimate relief." However, such "ultimate relief" concerned "the final outcome of the Rule 60(b) motion." The First Circuit did *not* say that fact had any relevance to subsequent issues on the merits, the remedy or attorneys fees. *United States v. One Star Class Sloop*, 458 F.3d 16, 25 n.10 (1st Cir., 2006).

Under First Circuit precedent, this issue is not grounds for reducing Dr. Lane's attorney fee award.

> [T]he time for a trial judge to express his doubts about the viability of a claim occurs when the judge rules upon the full panoply of motions for judgment as a matter of law and/or for a new trial. Once a case has scaled those barriers – and this case has – trimming attorneys' fees cannot be employed as a palliative to assuage lingering doubts about the legal viability of the claim. Indeed, if a plaintiff has a thin case but nonetheless manages, as here, to secure a verdict for three times the largest settlement offer, such a template suggests skillful advocacy, perhaps worthy of an award of full fees.

*Coutin v. Young & Rubicam* P.R., 124 F.3d 331, 341-342 (1st Cir. 1997) (citation omitted).

**B.    There is no authority for disallowing or proportionalizing "costs"**

"[I]n any civil proceeding to forfeit property under any provision of Federal law in which the claimant substantially prevails, the United States *shall* be liable for . . . reasonable attorney fees *and other litigation costs reasonably incurred by the claimant* . . . ." 28 U.S.C. §2465(b)(1) (emphasis added).

On its Opposition at pp. 9-10, the government argues that the Claimant's costs and his attorneys' out of pocket expenses should be proportionalized under its various proportionality theories. There is no authority for such a proposition.

28

As this Court noted in *Systems Management Inc.,* p. 204, in *W. Va. Univ. Hosps. Inc. v. Casey*, 499 U.S. 83, 87 n.3 (1991) the Supreme Court noted that the word "costs" in fee-shifting statutes should be given the same meaning as the word "costs" in 28 U.S. Code § 1920.  The Supreme Court went on to note, however, that reasonable out-of-pocket expenses incurred by the attorney and normally charged to the client could be awarded as part of the attorneys' fees. *Id.*, citing *Northcross v. Bd. of Educ.,* 611 F.2d 624, 639 (6th Cir. 1979) ("Reasonable photocopying, paralegal expenses, and travel and telephone costs are thus recoverable pursuant to the statutory authority of § 1988.")  The costs of transcripts are allowable under 28 U.S.C. § 1920(2).   Fees for printing are allowable costs under 28 U.S.C. § 1920(3).  In this Circuit an award for travel expenses for out of state attorneys with special expertise is proper.  *Palmigiano v. Garrahy*, 707 F.2d 636, 637 (1st Cir. 1983).  Food and lodging are ordinary and necessary travel expenses.

In the government's exhibits Doc. 88-9 and 88-10, the government disputes many of Claimant's and his counsel's out of pocket expenses.  The government's reasons for disputing these items are inadequate and/or not supported by law.

In Exhibit 88-9, the government seeks disallowance for Dr. Lane's airfare, lodging and meals incurred while attending court (line items 1, 3, 4, 5 and 13).  The government frivolously argues that "Lane's choice to move from Massachusetts after initiating litigation should not be charged to the government."  The government initiated litigation, not Dr. Lane.  It was merely fortuitous that he was living in Massachusetts for a few months in late 2004 - early 2005.  He has resided in Florida for decades except for that brief hiatus.  The government's choice to initiate litigation in Massachusetts had nothing to do with Dr. Lane – it was where the CW was being prosecuted.  The government also objects that Dr. Lane's presence was not required at oral

29

argument in the First Circuit. However, he traveled there to assist in the preparation for oral argument. Airfare, lodging and food are all necessary components of travel expenses.

In Doc. 88-9 line item 2 and line item 12, the government discounts counsel's need to stay two nights in a hotel surrounding a court appearance. Counsel did not stay an additional night after oral argument as the government claimed. She traveled to Boston a day early because her plane would be arriving late at night and she needed to confer with local counsel in preparing for oral argument, which started early in the morning. Due to a large high-tech convention in Boston on the week of oral argument, the hotels were booked up in advance, and they had to pay higher than usual rates ($347 - $412[15] per night for rooms downtown). When counsel arrived in Boston late that night, the hotel had already given away her room that was reserved on Dr. Lane's credit card. For that night the hotel sent her to another hotel which was billed to her credit card (at a slightly cheaper rate). For the night before oral argument she returned to the hotel where Dr. Lane had made the reservations on his credit card. Dr. Lane could not even find a hotel room in Boston, and had to commute from a hotel in the suburbs.

At trial, both counsel and Dr. Lane booked hotel rooms for two nights because they anticipated that the trial would last more than one day. Although trial only lasted a day, it was too late to change the flights in order to fly home that night. The next available flight for counsel was the following morning.

---

[15] Counsel notes that Doc. 88-9 line 2 says "Boston Park Plaza," but that is not the hotel she stayed at on the first trip. It was a chain hotel the Hyatt. (She stayed at Boston Park Plaza on the January 2007 trip to Boston, which Dr. Lane did not attend.) The hotel that she was sent to the first night was called Juries. It appears in Ms. Grantland's expenses at Doc. 88-10 line 7.

On Doc. 88-10, the government repeatedly objects to expenses relating to the appeal, sometimes while deducting nothing.  Certainly Claimant is entitled to costs for his appeal.  The government claims that the costs for the hotel and/or flights were excessive – but those were the amounts paid out of pocket.  The fact that many of these court dates were made on short notice increased dramatically the costs of the plane fare and hotel rooms.

The government asks the court to disallow the expenses paid for transcripts and conference call service for telephonic depositions.  Once again, there is no legal basis for these deductions.  The objection to the Fed Ex expense to Sheketoff (the CW's lawyer) is also unsupported.  Claimant did not serve the subpoena duces tecum on the government because she was never able to serve the subpoena on the CW.  The Fed Ex package to his lawyer contained a written request asking the lawyer to consent to his client signing a declaration and/or to agree to accept service for the CW.  The package included the proposed subpoena duces tecum and a draft declaration.  Claimant could not locate the CW, and the CW 's counsel refused to respond to calls, faxes and the Fed Ex package.  Since Claimant did not know the CW's whereabouts, he was never able to serve the subpoena.  However unsuccessful Claimant was in getting documents or affidavits from the CW in the discovery stage, eventually the Court required the CW to appear and testify at trial.

**C.    There is no basis for disallowing billing by local attorney Eric Goldberg**

On Exhibit 88-2, the government apparently asks the court to disallow of all of attorney Eric Goldberg's time (see Exhibit 88-2, line for "Goldberg hours.")  The reasons given are unsupported by law.  The government's claim that the Rule 60(b) motion was abandoned was refuted in section III -A-1 above.  The fact that Mr. Goldberg conferred with a senior attorney at his firm who never entered his appearance in the case, and the fact that Mr. Goldberg sometimes

31

attended court or conferred with Ms. Grantland after she became lead counsel are not grounds for

disallowing his fees. See *Gay Officers Action League v. Commonwealth of Puerto Rico*, 247 F.3d

288, 297 (1st Cir. 2001) ("Effective preparation and presentation of a case often involve the kind of

collaboration that only occurs when several attorneys are working on a single issue"); *Rodriguez-*

*Hernandez v. Miranda-Velez*, 132 F.3d 848, 860 (1st Cir. 1998).

Mr. Goldberg's limited overlap with Ms. Grantland and with his senior attorney are

completely acceptable under the law, and his fees should be fully reimbursed.

> **D.    There is no basis for the myriad deductions from Ms. Grantland's fees**

In Doc. 88-6 the government seeks to disallow all of the work Ms. Grantland did on

11/1/2005 - 12/2/2005 because it related to the motion to stay the sale and supersedeas bond. This

is a procedural issue which Claimant lost, but should have won. It was not abandoned – Claimant

was prevented from litigating it in the court of appeals because of the delay having the appeal

docketed. See part III-A-1 above.

In Doc. 88-7, the government seeks elimination of 1 hour of Pacer research on 8/5/2006

complaining that it duplicates work done on 2/14/2006. However, there was no duplication. The

work done in August involved docket entries occurring after the February search, and documents

not downloaded in February. On 9/7/2006 counsel obtained some additional documents from

Pacer, but that only took a few minutes of the 2 hours of work done that day, and there was no

reason to disallow those two hours. On 12/19/2006 counsel again updated her Pacer research on

Milo, but that was a few minutes of the total 5.25 hours spent preparing for the telephonic hearing.

In Doc. 88-8, on 5/17/2007 counsel again updated the information from Pacer, but that was a minor

task among the materials reviewed in preparation for trial. Although the government managed to

thwart and delay Claimant's attempts to get discovery of this information – for a while – all of this effort was advance preparation for Milo's eventual testimony at trial.

The government objects to the discovery requests drafted on 9/19/2006 - 9/26/2006 saying the "interrogatories related to items outside the scope of remand." This was not a limited remand. If the district court concluded that the Rule 60(b) motion should be granted – as it did – the remand contemplated trial on the merits. See Counter-Statement of Facts at page 4, and section III-A-2 above.

There is no legal basis for the government's deduction of the time spent on 10/20/2006 preparing a settlement offer – because the Claimant did not settle. The government's best settlement offer was for $26,127 (Exhibit 7) about half of the amount Dr. Lane obtained in the judgment (not counting his interest on the judgment).

> Permitting a district court to reduce a fee award for failure to settle when the eventual judgment exceeds the best settlement offer previously made by the losing party would put too large a club in the district court's hands.

*Coutin*, 124 F.3d at 341.

The government disputes as excessive the calls on 12/15/2006 to local counsel, docket clerks and prosecutors. Actually that was a typo. In preparing in Ms. Grantland's itemization she inadvertently omitted part of the tasks performed on that date. The entry in her contemporaneous time records for that day says "Lane - calls to Eric, docket clerk, Rue, USAO, draft motion for telephonic hearing 2.0" in the time slot from 10:20 a.m. to 12:15; and "Lane motion for leave to reply, final draft reply memo, get docket 1.0" in the time slot for 5:30-6:30 p.m. The phone calls were just a small portion of the work billed that day.

In Doc. 88-8, between 1/2/2007 and 1/8/2007, the government seeks deductions for time spent on subpoenas Claimant attempted to use to obtain documents and/or declarations from witness Milo and Crosby – efforts that were thwarted in the short haul, but which eventually bore fruit, when the court ordered both of those witness to testify. See part III-A-2 above. Additionally, the government asked the court to throw out the entire billings for each of those days, even though the tasks billed primarily involved reviewing the government's motion for summary judgment and research and drafting for the response. (See entries for 1/4/2007 - 1/5/2007.) Obtaining the information necessary to refute the government's contentions on summary judgment is certainly compensable, even if the government managed to thwart those efforts temporarily.

The government's entries for 1/21/2007 - 1/22/2007, and for 3/31/2007 asks that all of the billable hours for those days be disallowed because the "Response to Govt Statement of Facts was not done in accordance with Local Rules. Counsel conceded facts that she later disputed at trial. See Docket 70." Doc. 88-8. As the Court found at trial, Claimant's counsel did not concede these facts. She was merely citing what the government's theory was, in order to argue that, even if the government could prove the theory it would not be enough as a matter of law. Transcript p. 9. Once again the government is raising an argument that has been raised and rejected.

On the entries for 1/30/2007, 1/31/2007, 5/23/2007, 5/25/2007, the government asks the court to cut counsel's travel time for travel to Boston in half, and also asks that the 8 hours billed the following day – the date of the hearing – be cut in half because it included some travel time. Apparently the government is using a "non-core" hours formula, which this Court has rejected. See *System Management*, 154 F.Supp.2d at 201-203.

34

On each trip to Boston, counsel spent her entire flight to Boston preparing for the court appearance. That time is totally preparation time, even though she is traveling simultaneously. On 1/31/2007, in addition to traveling home, the items billed for that day included the hearing itself, preparation for the hearing, a lengthy debriefing and strategy conference with local counsel, and conferences with the client. On at least two trips, icy weather, layovers and flight delays made the trip substantially longer than the usual 8-10 hours – door to door. Counsel only billed for a portion of the travel hours because she was not actually preparing for a hearing during the flight home.

The government asks the court to exclude most - if not all - of the fees incurred on 4/19/2007 through 5/23/2007, 5/17/1007 through 6/14/2007, and 6/17/2007 through 11/12/2007 – claiming these all related to issues on which Claimant did not prevail. This is not a proper ground for cutting fees. See part I and III-A-4 above.

### E.    There is no basis for the deductions from the paralegal's hours

In Doc. 88-2, and 88-11 the government contests $1235 of paralegal's fees – deducting 2 hours Guernsey contract review, 2.5 hours sailboat valuation review, 5.5 hours reply reconsideration edit, plus the whole of a 9 hour day billed as post-trial memo re forfeitability & reconsideration edit on 6/29/2007. In addition to our legal arguments that the reconsideration motion was fully compensable (the fact that the motion for reconsideration was never decided does not make the work on this issue non-compensable. *Hensley*, 461 U.S. at 435):

1) The majority of paralegal Judy Osburn's entry for two hours of work done on 5/27/2007 described as "Guernsey contract, billing review/payments breakdown" was spent sorting government exhibit receipts from Marblehead trading and comparing those with checks that had been entered into exhibit from Dr. Lane. The various dates of these receipts and payments helped

show Dr. Lane's investment and ownership interest, and established facts regarding the non-forfeitability of the Flash II, showing that almost none of Ole's expenses occurred after he received tainted money from Milo, and that Dr. Lane was the source for expenses and maintenance payments. Only a few minutes of those two hours were spent reading the "Guernsey contract." (See Declaration of Judy Osburn, Exhibit 10.)

     2)  The major portion of her 9-hour day June 29 was spent on the forfeitability memo that she I had been researching and working on 15 straight days.  She spent well under an hour of that 9-hour day proof reading the final draft of Ms. Grantland's reconsideration motion. (See Declaration of Judy Osburn, Exhibit 10.)

     **F.**    **Claimant is entitled to supplemental fees for this fee litigation, and interest on the fee award**

     Attorney Brenda Grantland and paralegal Judy Osburn submit supplemental itemizations of their time spent researching and preparing this Reply.  See Exhibits 11 and 12.

     A claimant is entitled to post-judgment interest on his fee award.  Since CAFRA attorneys fees are mandatory for all claimants who substantially prevail (28 U.S.C. § 2465(b)(1)), the entitlement to interest runs from the date of the merits judgment.  *Mogilevsky v. Bally Total Fitness Corporation*, 311 F.Supp. 2d 212, 225 (D.Mass. 2004).

                                      Respectfully submitted,
                                      Kerry Scott Lane, MD,

                                      By his attorneys,

/s/ Brenda Grantland
_____

Brenda Grantland, Esq.
Law Office of Brenda Grantland
20 Sunnyside Suite A-204
Mill Valley, CA 94941
(415) 380-9108
Pro hac vice


/s/Eric B. Goldberg
_____

Jeffrey P. Allen (BBO# 015500)
Eric B. Goldberg (BBO# 564398)
Seegel Lipshutz & Wilchins, P.C.
Wellesley Office Park
20 William Street, Suite 130
Wellesley, MA 02481
(781) 237-4400
Local counsel

37

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
|         Plaintiff, ) | |
| v. ) | Civil Action # 05-10192 RWZ |
| ) | |
| ONE STAR CLASS SLOOP SAILBOAT ) | |
| BUILT IN 1930 WITH HULL NUMBER ) | |
| 721, NAMED "FLASH II", ) | |
|         Defendant. ) | |

## UNITED STATES' ANSWERS TO INTERROGATORIES

The United States of America, by its attorney, Michael J. Sullivan, United States
Attorney for the District of Massachusetts, provides the following responses to the
interrogatories propounded by Kerry Scott Lane, M.D. (the "Interrogatories"), pursuant to
Federal Rules of Civil Procedure 26 and 33.

## GENERAL RESPONSES AND OBJECTIONS TO INTERROGATORIES

The following General Objections are incorporated into each of the responses as if set
forth in full, even if not repeated therein.

1.      The United States objects to the Interrogatories to the extent that they call for the
disclosure of information subject to the attorney-client privilege, work product protection,
investigatory privilege or any other privilege or protection recognized by applicable federal or
state law.  To the extent that any such privileged or protected information is disclosed, such
disclosure is not intended as, nor should it be deemed to be, a waiver of any privilege or
protection.

2.      The United States objects to the Interrogatories to the extent that they seek to
define terms and/or characterize the evidence in this matter.  To the extent that the United States

1

EXHIBIT 1 page 1

adopts any terms used by Kerry Scott Lane, M.D. in the Interrogatories, such adoption specifically is limited solely to these responses.

3.      Nothing herein shall be construed as an admission by the United States with respect to the admissibility of any characterization contained in the Interrogatories.  The United States' willingness to provide information pursuant to the Interrogatories is not an admission that the subject matter of that particular Interrogatory is discoverable.

4.      The United States provides the responses below without conceding the relevance or materiality of the subject matter of any response, and without prejudice to the United States' right to object to further discovery, or to object to the admissibility of any additional proof on the subject matter at the time of trial.

5.      Insofar as discovery in this matter has not been completed, the United States reserves the right to supplement its responses to the Interrogatories based on documents and/or information it receives, becomes aware of, or appreciates the significance of as a result of any depositions taken in this matter, answers to interrogatories, responses to document requests, or documents produced or otherwise gathered whether formally or informally.

6.      The United States objects to the "Instructions" section of the Interrogatories, to the extent that they cause the Interrogatories to be overbroad and unduly burdensome by expanding the definition of any term, and thereby broadening the scope of discovery, beyond what is permitted under Fed.R.Civ.P. 34(a) or Local Rule 26.5(C).

7.      The United States specifically objects to the definition of "you" on page 2 (subparagraph (a)) of the Interrogatories as including confidential informants, and states that it provides the following information on behalf of Assistant United States Attorney Shelbey

2

EXHIBIT 1 page 2

Wright ("AUSA Wright") and all other employees of the United States Attorney's Office who worked on this forfeiture case, and on behalf of the investigating officers from the United States Drug Enforcement Administration (the "DEA") who worked on the investigation leading up to this forfeiture case. The terms "DEA", "employee of the DEA," and/or "agent of the DEA" as used herein do not include confidential informants.

8. The United States objects to the time frame of the Interrogatories as overly broad. Specifically, the United States objects to all requests that extend beyond October 18, 2005, the date of the district court's judgment in this matter.

## SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES

### INTERROGATORY NO. 1

State whether you[1] interviewed Gregory Olaf ("Ole") Anderson, or his attorney Robert Augustus Harper, at any time between February 2004 and present, in which any mention was made of the Kennedy sailboat and/or ownership thereof. If the answer is yes, as to each and every such interview, please separately state the following:

> a. The date, place, time if known, and identities of all persons present or listening telephonically or through other means (e.g. wire or other listening device.)
>
> b. State with particularity every statement made by Anderson or Harper – whether spontaneously or in response to questioning – regarding the owners of interests in the sailboat, the identity of the doctor or dentist referred to on page 9 of the Complaint, or the location of any documents relating to the identities of the owners of interests in the sailboat.
>
> c. If the statements referred to in subpart b above were recorded or reduced to writing in a police report or contemporaneous notes, identify those documents.

### ANSWER TO INTERROGATORY NO. 1

Subject to and without waiving the General Objections, the United States responds as follows:

---

[1] The pronoun "you" is used collectively throughout these interrogatories. See instruction (a) above.

3

EXHIBIT 1 page 3

No employee of the United States Attorney's Office interviewed Gregory Olaf ("Ole") Anderson, or his attorney Robert Augustus Harper, at any time between February 2004 and October 18, 2005, in which any mention was made of the Kennedy sailboat and/or ownership thereof.

There were no communications directly between Gregory Olaf Anderson and the DEA.

## INTERROGATORY NO. 2

State whether you interviewed Ralph Anderson, or any employee or agent of Marblehead Trading Company (including its attorney Kenneth Lindauer) at any time between February 2004 and present, in which any information was requested or provided concerning the identities of the owners of the Kennedy sailboat.  If the answer is yes, as to each and every such interview, please separately state the following:

      a.  Identify the person interviewed and the interviewer(s);

      b.  State the date, place, time, and whether the interview was in person or by phone;

      c.  Identify each other person present or listening telephonically or through other means (e.g. wire or other listening device);

      d.  State what information or statements were given by the interviewee;

      e.  State whether the interviewer requested that the interviewee check Marblehead's records and books for information that might lead to the identities of the owners, and if so, the interviewee's response;

      f.  If the statements referred to in subpart d above were recorded or reduced to writing in a police report or contemporaneous notes, identify those documents.

      g.  If Ralph Anderson or any employees or agents of Marblehead turned over documents to you, identify those documents.

4

EXHIBIT 1 page 4

**ANSWER TO INTERROGATORY NO. 2**

Subject to and without waiving the General Objections, the United States responds as follows:

No employee of the United States Attorney's Office interviewed Ralph Anderson, or any employee or agent of Marblehead Trading Company (including its attorney Kenneth Lindauer) at any time between February 2004 and October 18, 2005 in which any information was requested or provided concerning the identities of the owners of the Kennedy Sailboat. I and/or other agents of the DEA interviewed Ralph Anderson, as set forth in the DEA Form 6 regarding that interview, produced herewith and incorporated herein by reference.

**INTERROGATORY NO. 3**

State whether you interviewed Harry E. Crosby or his attorney, J. Thomas Kerner, at any time between February 2004 and present, in which any information was requested or provided concerning the identities of other owners of the Kennedy sailboat. If the answer is yes, as to each and every such interview, please separately state the following:

> a. Identify the person interviewed and the interviewer(s);
> b. State the date, place, time, and whether the interview was in person or by phone;
> c. Identify each other person present or listening telephonically or through other means (e.g. wire or other listening device);
> d. State what information or statements were given by the interviewee;
> e. State whether the interviewer requested that Crosby check his records for information that might lead to the identities of the owners, and if so, the interviewee's response;
> f. If the statements referred to in subpart d above were recorded or reduced to writing in a police report or contemporaneous notes, identify those documents.
> g. If Harry E. Crosby or his attorney, J. Thomas Kerner, turned over any documents to you pertaining to the Kennedy sailboat, identify those documents. This request is not limited to documents pertaining to the identities of other co-owners.

**ANSWER TO INTERROGATORY NO. 3**

Subject to and without waiving the General Objections, the United States responds as follows:

At some point in late October 2004 or early November 2004, AUSA Wright received a telephone message from J. Thomas Kerner, an attorney representing Harry E. Crosby. AUSA Wright believes that she called Kerner back, and that there was no one else on the call from AUSA Wright's end. Kerner told AUSA Wright that his client, Crosby, was a part owner of the Kennedy Sailboat and had purchased his interest for $19,800. Kerner said that Chuck Fitzgerald had previously had an interest in the Kennedy Sailboat, but had sold or transferred that interest. Kerner wanted to know how Crosby could protect his claim to the Kennedy Sailboat. AUSA

5

EXHIBIT 1 page 5

Wright informed Kerner that he would receive a copy of the Complaint for Forfeiture *in rem* once it was filed and a Warrant and Monition was issued by the Court.  At that time, Crosby could file a claim with any documentation showing his ownership interest in the Kennedy Sailboat.  Kerner agreed to accept service of the Complaint and gave AUSA Wright his office address.  AUSA Wright told Kerner that she would pass Crosby's name along to the seizing agency for purposes of notice.  AUSA Wright has a brief notation in her running telephone log of that conversation.

On or about March 10, 2005, Kerner sent AUSA Wright a letter describing Crosby's interest in the Kennedy Sailboat, and attached documents showing transfer of $5,250 to Ole Anderson on or about July 1, 1996.

No employee or agent of the DEA interviewed Harry E. Crosby or his attorney, J. Thomas Kerner, at any time between February 2004 and October 18, 2005 in which any information was requested or provided concerning the identities of the owners of the Kennedy Sailboat.

## INTERROGATORY NO. 4

State whether you interviewed Jean Anderson, at any time between February 2004 and present, in which any information was requested or provided concerning the identities of other owners of the Kennedy sailboat.  If the answer is yes, as to each and every such interview, please separately state the following:

a.  Identify the person interviewed and the interviewer(s);
b.  State the date, place, time, and whether the interview was in person or by phone;
c.  Identify each other person present or listening telephonically or through other means (e.g. wire or other listening device);
d.  State what information or statements were given by the interviewee;
e.  State whether the interviewer requested that Jean Anderson check her records for information that might lead to the identities of the owners;
f.  If the statements referred to in subpart d above were recorded or reduced to writing in a police report or contemporaneous notes, identify those documents.
g.  If Jean Anderson or her agents or attorney turned over any documents to you pertaining to the Kennedy sailboat, identify those documents.  This request is not limited to documents pertaining to the identities of other co-owners.

6

EXHIBIT 1 page 6

**ANSWER TO INTERROGATORY NO. 4**

Subject to and without waiving the General Objections, the United States responds as follows:

No employee of the United States Attorney's Office or the DEA interviewed Jean Anderson, at any time between February 2004 and October 18, 2005 in which any information was requested or provided concerning the identities of the owners of the Kennedy Sailboat.

**INTERROGATORY NO. 5**

State whether you interviewed Gary Milo at any time between February 2004 and present, in which any information was requested or provided concerning the identities of other owners of the Kennedy sailboat. If the answer is yes, as to each and every such interview, please separately state the following:

   a. Identify the person interviewed and the interviewer(s);
   b. State the date, place, time, and whether the interview was in person or by phone;
   c. Identify each other person present or listening telephonically or through other means (e.g. wire or other listening device);
   d. State what information or statements were given by the interviewee;
   e. State whether the interviewer requested that Gary Milo check his records for information that might lead to the identities of the owners;
   f. If the statements referred to in subpart d above were recorded or reduced to writing in a police report or contemporaneous notes, identify those documents.
   g. If Gary Milo or his agents or attorney turned over any documents to you pertaining to the Kennedy sailboat, identify those documents.

**ANSWER TO INTERROGATORY NO. 5**

Subject to and without waiving the General Objections, the United States responds as follows:

No employee of the United States Attorney's Office interviewed Gary Milo at any time between February 2004 and October 18, 2005, in which any information was requested or provided concerning the identities of other owners of the Kennedy Sailboat. In interviews of Gary Milo conducted by myself and/or other agents of the DEA, information was requested or provided concerning the Kennedy Sailboat, as set forth in the DEA Form 6 regarding those interviews, produced herewith and incorporated herein by reference.

7

EXHIBIT 1 page 7

**INTERROGATORY NO. 6**

State whether you interviewed Pete Walker or Carole Walker at any time between February 2004 and present, in which any information was requested or provided concerning the identities of other owners of the Kennedy sailboat.  If the answer is yes, as to each and every such interview, please separately state the following:

>    a.  Identify the person interviewed and the interviewer(s);
>    b.  State the date, place, time, and whether the interview was in person or by phone;
>    c.  Identify each other person present or listening telephonically or through other means (e.g. wire or other listening device);
>    d.  State what information or statements were given by the interviewee;
>    e.  State whether the interviewer requested that the Walkers check their records for information that might lead to the identities of the owners;
>    f.  If the statements referred to in subpart d above were recorded or reduced to writing in a police report or contemporaneous notes, identify those documents.
>    g.  If the Walkers turned over any documents to you pertaining to the Kennedy sailboat, identify those documents.

**ANSWER TO INTERROGATORY NO. 6**

Subject to and without waiving the General Objections, the United States responds as follows:

No employee of the United States Attorney's Office or the DEA interviewed Pete Walker or Carole Walker, at any time between February 2004 and October 18, 2005, in which any information was requested or provided concerning the identities of other owners of the Kennedy Sailboat.

**INTERROGATORY NO.  7**

State whether you interviewed Homer Earnest at any time between February 2004 and present, in which any information was requested or provided concerning the identities of other owners of the Kennedy sailboat.  If the answer is yes, as to each and every such interview, please separately state the following:

>    a.  Identify the person interviewed and the interviewer(s);
>    b.  State the date, place, time, and whether the interview was in person or by phone;
>    c.  Identify each other person present or listening telephonically or through other means (e.g. wire or other listening device);
>    d.  State what information or statements were given by the interviewee;
>    e.  State whether the interviewer requested that Homer Earnest check his records for information that might lead to the identities of the owners;
>    f.  If the statements referred to in subpart d above were recorded or reduced to writing in a police report or contemporaneous notes, identify those documents.

8

EXHIBIT 1 page 8

g.  If Homer Earnest or his agents or attorney turned over any documents to you pertaining to the Kennedy sailboat, identify those documents.

## ANSWER TO INTERROGATORY NO. 7

Subject to and without waiving the General Objections, the United States responds as follows:

No employee of the United States Attorney's Office or the DEA interviewed Homer Earnest, at any time between February 2004 and October 18, 2005, in which any information was requested or provided concerning the identities of other owners of the Kennedy Sailboat.

## INTERROGATORY NO. 8

State whether you interviewed Jim Anderson at any time between February 2004 and present, in which any information was requested or provided concerning the Kennedy sailboat. If the answer is yes, as to each and every such interview, please separately state the following:

    a.  Identify the person interviewed and the interviewer(s);
    b.  State the date, place, time, and whether the interview was in person or by phone;
    c.  Identify each other person present or listening telephonically or through other means (e.g. wire or other listening device);
    d.  State what information or statements were given by the interviewee;
    e.  State whether the interviewer requested that Jim Anderson check his records for information that might lead to the identities of the owners;
    f.  If the statements referred to in subpart d above were recorded or reduced to writing in a police report or contemporaneous notes, identify those documents.
    g.  If Jim Anderson or his agents or attorney turned over any documents to you pertaining to the Kennedy sailboat, identify those documents.

## ANSWER TO INTERROGATORY NO. 8

Subject to and without waiving the General Objections, the United States responds as follows:

No employee of the United States Attorney's Office or the DEA interviewed Jim Anderson, at any time between February 2004 and October 18, 2005, in which any information was requested or provided concerning the identities of other owners of the Kennedy Sailboat.

9

EXHIBIT 1 page 9

## INTERROGATORY NO. 9

State whether, at any time since February 2004, you or your agents obtained information that Sailorman New And Used Marine Emporium, Fort Lauderdale Florida and/or Chuck Fitzgerald purchased the sailboat at auction in 1996, or that they previously or currently owned an interest in the sailboat. You should answer in the affirmative if you had information but the name or location was incomplete or incorrect. If the answer is yes, state the following:

> a. Identify each person who provided the information and the date it was provided.
> b. As to each person identified in subpart a state with particularity what that person told you about Sailorman and/or Fitzgerald.
> c. If your information about Sailorman and/or Fitzgerald was obtained from other sources, such as a database or newspaper articles, please identify each of those sources and produce such documents.

## ANSWER TO INTERROGATORY NO. 9

Subject to and without waiving the General Objections, the United States responds as follows:

On or about March 10, 2005, AUSA Wright received a letter from Attorney J. Thomas Kerner which enclosed a copy of a June 30, 1996, story from *The Tallahassee Democrat*, page 4B, by Bill Bergstrom titled, "Forgotten JFK Sailboat Fetches $18,500." Copies of the letter and article are being produced in response to the Request for the Production of Documents.

## INTERROGATORY NO.10

State whether you interviewed the Confidential Informant (referred to in the Complaint) or his attorney, at any time between February 2004 and present, in which any information was requested or provided concerning the identities of other owners of the Kennedy sailboat. If the answer is yes, as to each and every such interview, please separately state the following:

> a. Identify the person interviewed and the interviewer(s);
> b. State the date, place, time, and whether the interview was in person or by phone;
> c. Identify each other person present or listening telephonically or through other means (e.g. wire or other listening device);
> d. State in detail what information or statements were given by the Confidential Informant with regard to the identities and locations of the other owners, including vague and incomplete information.
> e. State whether the interviewer requested that the Confidential Informant check his records for information that might lead to the identities of the owners, and if so, the interviewee's response;
> f. If the statements referred to in subpart d above were recorded or reduced to writing in a police report or contemporaneous notes, identify those documents.
> g. If the Confidential Informant or his attorney turned over any documents to you

10

EXHIBIT 1 page 10

pertaining to the Kennedy sailboat, identify those documents.  This request is not limited to documents pertaining to the identities of other co-owners, but includes any documentation of the Confidential Informant's interest.  Any information identifying the informant may be redacted.

## ANSWER TO INTERROGATORY NO. 10

Subject to and without waiving the General Objections, the United States responds as follows:

No employee of the United States Attorney's Office interviewed the Confidential Informant or his/her attorney, at any time between February 2004 and October 18, 2005, in which any information was requested or provided concerning the identities of other owners of the Kennedy Sailboat.  In interviews of the Confidential Informant conducted by myself and/or other agents of the DEA, information was requested or provided concerning the Kennedy Sailboat, as set forth in the DEA Form 6 regarding those interviews, produced herewith and incorporated herein by reference.

## INTERROGATORY NO. 11

List and describe each and every database you or your agents checked to determine who owned interests in the Kennedy sailboat.  Such databases include, but are not limited to, Lexis Nexis and other newspaper article databases, Google and other internet search engines.

## ANSWER TO INTERROGATORY NO. 11

Subject to and without waiving the General Objections, the United States responds as follows:

No employee of the United States Attorney's Office checked any database to determine who owned interests in the Kennedy Sailboat.  I and/or other agents of the DEA performed numerous Google searches in an effort to locate information about the Kennedy Sailboat.

## INTERROGATORY NO. 12

State whether you or your agents – at any time prior to Dr. Lane's filing of his Rule 59(e) motion – came into possession of the handwritten contract,  dated 12/4/1997, which is set out at page 59 of the Appellant's Appendix in this case.  If so, state when you obtained it and from whom.

## ANSWER TO INTERROGATORY NO. 12

Subject to and without waiving the General Objections, the United States responds as follows:

No employee of the United States Attorney's Office recalls coming into possession of the handwritten "contract," dated 12/4/1997, which is set out at page 59 of the Appellant's Appendix in this case, before Dr. Lane filed his Rule 59(e) motion, and the file maintained by the United States Attorney's Office does not contain any information to the contrary.  Paralegal Lisa Talbot

11

EXHIBIT 1 page 11

recalls having a telephone conversation with someone purporting to be Dr. Kerry Lane in June 2005, during which the caller stated that he had a hand written agreement on his stationery, but she does not recall seeing any such document prior to Dr. Lane filing his Rule 59(e) motion.  No agent of the DEA came into possession of the handwritten "contract," dated 12/4/1997, which is set out at page 59 of the Appellant's Appendix in this case, at any time prior to Dr. Lane's filing of his Rule 59(e) motion.

## INTERROGATORY NO. 13

Identify all documents or other evidence, including sworn and unsworn statements, you obtained from Harry E. Crosby to prove his interest in the sailboat and the proportionate share of its value he was entitled to.

## ANSWER TO INTERROGATORY NO. 13

Subject to and without waiving the General Objections, the United States responds as follows:

Harry E. Crosby filed a Verified Claim and Answer in this case on or about February 28, 2005.  Crosby provided further information via his attorney, J. Thomas Kerner, by letter on or about March 10, 2005.  Copies of the letter and enclosed documents are produced herewith.

## INTERROGATORY NO. 14

State whether you or your agents learned, from any source, that the Kennedy sailboat was purchased at an auction in June 1996.   If so, state the source of the information and describe what efforts were taken to follow up on that lead.

## ANSWER TO INTERROGATORY NO. 14

Subject to and without waiving the General Objections, the United States responds as follows:

The United States incorporates by reference its Answer to Interrogatory No. 9, and further states that no employee of the United States Attorney's Office or the DEA made efforts to "follow up on that lead," because based on the documents and information provided by Anderson to the confidential informant, as well as information supplied by Guernsey's auction house based on their 1998 aborted auction of the Kennedy Sailboat, the United States believed in good faith that Ole Anderson had purchased the Kennedy Sailboat and was the owner of it. Documents supplied by Attorney Kerner to the US Attorney's office were consistent with this information.

12

EXHIBIT 1 page 12

**INTERROGATORY NO. 15**
Identify the provenance or other documentation of ownership the government provided to the Guernseys auction house to establish that the U.S. owned the sailboat when placing the item up for auction.

**ANSWER TO INTERROGATORY NO. 15**
The United States objects to Interrogatory No. 15 on the grounds that it calls for information that is neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence concerning the government's attempts to identify any owner(s) of the Kennedy Sailboat. Subject to and without waiving this objection and the General Objections, the United States responds as follows:

The United States Attorney's Office forwarded a certified copy of the Final Judgment and Order of Forfeiture to the United States Marshals Service, along with a Form 285 requesting disposal of the Kennedy Sailboat pursuant to the Court's Order. Neither the United States Attorney's Office nor the DEA have any information about what additional documentation, if any, was provided to Guernseys.

**INTERROGATORY NO. 16**
State whether the United States informed Guernseys that the forfeiture litigation was still pending. If so,

    a. state with particularity what you told Guernseys regarding the status of Dr. Lane's attempt to vacate the default judgment to defend his interest in the property;
    b. identify the government agents and Guernseys employees who participated in each of the conversations mentioned in subsection 14a;
    c. identify any documents given Guernseys regarding Dr. Lane's attempt to vacate the default judgment to defend his interest in the property;
    d. state with particularity what you told Guernseys about Dr. Lane's request to set a minimum reserve.

**ANSWER TO INTERROGATORY NO. 16**
The United States objects to Interrogatory No. 16 on the grounds that it calls for information that is neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence concerning the government's attempts to identify any owner(s) of the Kennedy Sailboat. The United States further objects to Interrogatory No. 16 on the grounds that it incorrectly states that the forfeiture litigation was "still pending", when in fact the Court had entered a Final Judgment and Order of Forfeiture.

13

EXHIBIT 1 page 13

## INTERROGATORY NO. 17

State how the United States and Guernseys arrived at the following figures regarding the value and sale of the sailboat:

> a.  the estimated value;
> b.  the starting bid; and
> c.  the minimum reserve; and
> d.  identify any documents provided to Guernseys to document the estimated value, or relating in any way to the matters in subsection a through c.

## ANSWER TO INTERROGATORY NO. 17

The United States objects to Interrogatory No. 17 on the grounds that it calls for information that is neither relevant to, nor reasonably calculated to lead to the discovery of admissible evidence concerning, the government's attempts to identify any owner(s) of the Kennedy Sailboat.

## INTERROGATORY NO. 18

With regard to the Guernseys auction state the following:

> a.  the name and address of the person or entity who purchased the sailboat;
> b.  the price paid;
> c.  how many bids there were, and the amount of those losing bids; and
> d.  state whether the successful bidder is related  – either by blood, by marriage, or through a business partnership, agency or other business relationship – to any party in this case, including government agents on the case, the Confidential Informant, and Harry E. Crosby.

## ANSWER TO INTERROGATORY NO. 18

The United States objects to Interrogatory No. 18 on the grounds that it calls for information that is neither relevant to, nor reasonably calculated to lead to the discovery of admissible evidence concerning, the government's attempts to identify any owner(s) of the Kennedy Sailboat.

## INTERROGATORY NO. 19

Identify any and all documents in your possession documenting the matters in interrogatory 16.

## ANSWER TO INTERROGATORY NO. 19

The United States objects to Interrogatory No. 19 on the grounds that it calls for information more properly the subject of a document request.  The United States further objects to Interrogatory No. 19 on the grounds that it calls for information that is neither relevant to, nor reasonably calculated to lead to the discovery of admissible evidence concerning, the government's attempts to identify any owner(s) of the Kennedy Sailboat.

## INTERROGATORY NO. 20

EXHIBIT 1 page 14

State whether you spoke to Dr. Kerry Lane on the telephone prior to the filing of his Rule 60(b) motion.  If so,

> a.  State the date(s) of these conversations and who participated in the conversation other than Dr. Lane;
> b.  State with particularity the contents of the conversation, including statements made by you and by Dr. Lane;
> c.  Identify any notes made by you concerning the conversation, with the date and time the notes were made, if known; and
> d.  State what actions you took to notify the district judge that Dr. Lane was asserting an ownership interest in the sailboat.

## ANSWER TO INTERROGATORY NO. 20

Subject to and without waiving the General Objections, the United States responds as follows:

AUSA Wright does not believe that she spoke to Dr. Kerry Lane prior to the filing of his Rule 60(b) motion.  She did have at least one conversation with his attorney, Eric Goldberg, in July 2005.  During that conversation, Attorney Goldberg told AUSA Wright that he had been retained by the unnamed doctor.  Paralegal Lisa Talbot had a telephone conversation with someone purporting to be Dr. Kerry Lane in or around June 2005.  A memorandum regarding Ms. Talbot's memory of that conversation is produced herewith and incorporated herein by reference.  Also produced herewith is a memorandum regarding AUSA Kristina Barclay's memory of a conversation that she had with Ms. Talbot regarding that phone call, which had to have occurred before AUSA Barclay went on maternity leave on July 1, 2005.

## INTERROGATORY NO. 21

If you made any efforts to locate owners of interests in the sailboat other than those detailed in answer to the interrogatories above, please describe those efforts.

## ANSWER TO INTERROGATORY NO. 21

Subject to and without waiving the General Objections, the United States responds as follows:

All of the efforts made by employees of the United States Attorney's Office and the DEA to locate those with potential interests in the Kennedy Sailboat have been described in my answers to Interrogatories 1 through 20.

15

EXHIBIT 1 page 15

Signed under the pains and penalties of perjury this 26th day of October, 2006.


 /s/ per telephone
GREGG WILLOUGHBY
Special Agent
United States Drug Enforcement
Administration


Objections made by:

MICHAEL J. SULLIVAN
United States Attorney

By:    /s/ Nancy Rue
Nancy Rue
Assistant U.S. Attorney
U. S. Attorney's Office
John Joseph Moakley
United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA  02210
617 748-3100


## CERTIFICATE OF SERVICE

I hereby certify that the foregoing interrogatory responses were served upon Brenda Grantland, Esq., by email, this 26th day of October, 2006.

 /s/ Nancy Rue
NANCY RUE

EXHIBIT 1 page 16

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Civil Action # 05-10192 RWZ |
| ONE STAR CLASS SLOOP SAILBOAT BUILT IN 1930 WITH HULL NUMBER 721, NAMED "FLASH II", | |
| Defendant. | |
| KERRY SCOTT LANE, M.D. | |
| Claimant. | |

**CLAIMANT KERRY SCOTT LANE'S ANSWERS TO
THE UNITED STATES'
FIRST SET OF INTERROGATORIES**

*INTERROGATORY NO. 1:*
*Provide the following information about yourself:*
*(a) full name;*
*(b) marital status;*
*(c) if married, the identity of your spouse;*
*(d) if divorced, the date of the judgment of divorce and case number.*

ANSWER:  Kerry Scott Lane MD, a single man, never married.

*INTERROGATORY NO. 2:*
*Identify any person with knowledge of the ownership, at any time from 1996 to July 27, 2005, of the Flash II.*

ANSWER:  Persons with knowledge of ownership of Flash II:  Ann Kleinrichert, my then

girlfriend, who also invested in the Flash II;  Donna Bickmeyer Hoffner, (the woman who

1

EXHIBIT 2 page 1

introduced me to Mr. Anderson);  my brother Jeffrey Lane R.Ph.; my mother Peggy Welch RN;

my brother Robert Haarde; my sister Lisa Scarpa; all my Colleagues at Delray Medical Center

numbering in the hundreds (Drs. Colletta, Klein, Wideroff, Motta, Keusch, Buchalter, Ross,

Cohen, Owitz, et al); Sailorman of Ft. Lauderdale-Chuck Fitzgerald; Attorney Robert A. Harper,

who represented "the consortium" of owners in Flash II with regards to the 1998 auction;

employees at Marblehead Trading Company; co-investor Eddie Crosby; my accountant Vincent

Morrelli; Ann Wattlington; my lawyer Donald Dowling Esq.; my yardman Will Sasser; Jeff Teitz

(legislative aide to Senator Kennedy) - to name a few.  I also wrote a letter to John Kennedy Jr. in

an effort to interest him in our venture.


_INTERROGATORY NO. 3:_
_Describe every communication between you (or any agent or employee) and Gregory "Ole"_
_Anderson (or any agent or employee of Gregory "Ole" Anderson) from October 2004 to July 27,_
_2005, and for each communication:_
_(a)  state the date of the communication;_
_(b)  state whether the communication was oral or written;_
_(c)  describe in detail the substance of the communication;_
_(d)  identify any parties to the communication;_
_(e)  identify any persons present during any part of the communication;_
_(f)  identify the place(s) of the communication; and_
_(g)  identify any documents concerning any part of the communication._

ANSWER:   Ole Anderson called me at 7 a.m. on either October 13th, 14th or 15th, 2004 and told

me that the sailboat had been seized, but I did not understand the significance of that statement.  I

did not know about the asset forfeiture laws, and it did not occur to me that this seizure could

affect my ownership interest in the boat.  The phone call woke me up and I was too groggy and

startled by his call to ask Ole the significance of the seizure.  During that call Ole did not say

anything about forfeiture.  He was very upset.  He kept saying he had been "set up" and that the

2

EXHIBIT 2 page 2

police were going to prosecute him again, which would be double jeopardy. Basically my attitude was "I don't want to get involved in your problems." I did not want his problems to become my problems. It did not occur to me that his legal problems could affect my ownership interest in the sailboat. He said he was going talk to the newspaper, or had gone to the newspaper about it, and I told him I don't want my name in the press. I told him not to tell the police about me – at that time – because I did not want the police coming to my new job asking questions while I was trying to get through the credentialing process. I also did not want the newspaper publicity connecting my name to a drug dealer while my credentialing process was going on. A few weeks later, the credentialing process ended and after that it would not have bothered me if Anderson told the police about my interest in the sailboat. I told Anderson to keep me posted on any further developments, and expected him to do that. He had always been good about communicating with me about any matters affecting the boat. He may have called me back again that day or the next day, but I'm not sure. After that I never heard from him again, and could not reach him after that. There were no documents associated with this conversation. There were no other parties to the conversation.

_____

*INTERROGATORY NO. 4:*

*Describe in full every communication between you (or any agent or employee) and Harry Crosby (or any agent or employee of Harry Crosby from October 2004 to July 27, 2005, on any subject and for each communication:*

*(a)  state the date of the communication;*

*(b)  state whether the communication was oral or written;*

*(c)  describe in detail the substance of the communication;*

*(d)  identify any parties to the communication;*

*(e)  identify any persons present during any part of the communication;*

*(f)  identify the place(s) of the communication; and*

*(g)  identify any documents concerning any part of the communication.*

3

EXHIBIT 2 page 3

ANSWER:  I do not specifically recall if I spoke to Crosby at all during that period.  I recall

speaking to Crosby's attorney Thomas Kerner by  telephone during the week of June 27 to July 1,

2005.  No one else was on the call.  I may have talked to Kerner about the court documents

Marblehead's attorney faxed me [Doc. Req. pp. 31-33] if I talked to Kerner after I got them.

*INTERROGATORY NO. 5:*
*Describe any actions undertaken by you from October 2004 to July 27, 2005, to determine the*
*whereabouts of the Flash II, and for each action:*
*(a)  state the date(s) on which you took such action;*
*(b)  describe in detail the action taken;*
*(c)  identify any persons with knowledge of each action; and*
*(d)  identify any documents concerning such action.*

ANSWER:  Sometime after Flash was seized I contacted the Kennedy Library in Dorchester by

phone and spoke with the Assistant Curator. Anderson had told me in his October 2004 phone call

that he thought the seizure was a 'setup' and 'they' planned to put the Flash II in the Kennedy

Library. I was curious so I called the Kennedy Library and I was given strange answers. I asked the

curator at length if they would take the boat on loan while I retained ownership. I was told after

several calls they had no room inside for *Victura,* another Kennedy boat, so it seemed it would not

be a place for a second boat.  I don't know the dates or the names of the people I spoke to there.

There were no associated documents.

I set up a Google alert thinking that would keep me apprised of any legal action.  That Google

alert turned up numerous articles about unrelated topics, but none about the Flash II until late June

2005 - if then.  In trying to locate the article that alerted me to the possibility the boat would be

forfeited, I searched my hard drive and was only able to find an email from a girlfriend dated August

28, 2005, which had attached to it the October 13, 2004 Boston Globe article by Shelley Murphy.

EXHIBIT 2 page 4

In the week of June 27 to July 1, 2005, after my friend told me that the seizure of the boat might lead to a forfeiture of my interest in the sailboat, I contacted Marblehead, Marblehead's lawyer Kenneth Lindauer, Thomas Kerner, and Lisa Talbot at the U.S. Attorney's Office. Kenneth Lindauer faxed me some court documents [Doc. Req. pp. 31-33], and consulted several attorneys in the attempt to find a Boston lawyer experienced in forfeiture defense. After failing to find an experienced forfeiture attorney, I hired Eric Goldberg, and we filed a motion to vacate the default.

*INTERROGATORY NO. 6:*
*Describe any actions undertaken by you from October 2004 to July 27, 2005, to determine what would happen to the Flash II as a result of its seizure by DEA, and for each action:*
*(a)  state the date(s) on which you took such action;*
*(b)  describe in detail the action taken;*
*(c)  identify any persons with knowledge of each action; and*
*(d)  identify any documents concerning such action.*

ANSWER:  See 5 above. I set up a Google alert, but it did not turn up any articles about the seizure of the boat until late June 2005 (at the earliest).

During the week of June 19-26, 2005, I spent the week in Philadelphia and New Jersey. While there, on Saturday June 25, 2005, I met with my oldest childhood friend, Inspector Richard Heathwood of the New York State Police who has been with the Joint DEA, New York State Police and NYPD drug task force since about 1985. I told him that Flash II had been seized. He urged me to act immediately, warning me that the boat might be sold if I did not act quickly. I was not familiar with the forfeiture process before that. On Monday June 27 I called Marblehead and they referred me to their lawyer, Kenneth Lindauer, who faxed me the notice of default in the forfeiture case on July 1, 2005. I also called Thomas Kerner, then several lawyers, then Lisa Talbott at the U.S. Attorney's Office on Friday July 1, 2005. I told Lisa Talbot that I was the doctor mentioned in the

complaint who was the primary investor in the sailboat, she told me that she was a paralegal and couldn't give me any legal advice and that I would have to hire a lawyer.

*INTERROGATORY NO. 7:*
*Explain what you thought, believed or understood would happen to the Flash II, based on the seizure referred to in paragraph 12 of your July 27, 2005 Affidavit, prior to the time that you learned in June 2005 that the Flash II would be auctioned.  If that belief or understanding changed over the period described above, explain how and why it changed.*

ANSWER:   I thought the government might have seized the sailboat as evidence in the criminal case Ole Anderson believed they were about to file against him.  At the time I did not know that innocent owners' property could be taken in a forfeiture case.  I had never heard of "forfeiture"  in the context of the taking of property by the government.

I expected Ole Anderson to contact me if any new developments occurred regarding the sailboat.  He had always been reliable in keeping me informed about matters relevant to the Flash II.   I also expected the Google alert I had set up would turn up any new developments.

*INTERROGATORY NO. 8:*
*If you have ever been involved in any legal action, whether civil or criminal, as a plaintiff, defendant, or witness, provide for each such action:*
*(a)  a description of the nature of the action;*
*(b)  the identity of the court where the action was, or is pending;*
*(c)  the caption or title of such action; and*
*(d)  the docket number of such action.*

ANSWER: I was the defendant in a Medical Malpractice Case in Palm Beach County, Florida, *Gisela Taitel v. Delray Medical Center et al.*  It settled in January 2004, and the case was sealed. I was also involved in a case settled in the mid 1990s, *Brennan v. Delray Medical Center*.  It also settled and the case was sealed. I don't know the docket numbers.

6

EXHIBIT 2 page 6

*INTERROGATORY NO. 9:*

*Describe the ownership of the Flash II from 1996 through and including July 27, 2005, including without limitation:*

*(a)  the identities of any persons whom you allege had an ownership interest in the Flash II during the relevant time period;*

*(b)  a full description of any alleged transfer of ownership interest that occurred during the relevant time period, including the date of any such transfer, the identities of any parties to any such transfer, and the amount of consideration paid in connection with any such transfer;*

*(c)  the identity of any person with knowledge of the ownership of the Flash II during the relevant time period;*

*(d)  the identity of any document regarding any alleged ownership interest in the Flash II during the relevant time period.*

ANSWER: I was the primary owner of Flash II.  I purchased my interest on July 12, 1996 from Chuck Fitzgerald, who retained a 1% interest.  At that time, the only other members of the "consortium" that owned the sailboat were Ole Anderson (who invested sweat equity only) and Eddie Crosby.  We then had the vessel delivered to my home [See photo at Doc. Req. p. 12.]. I provided shelter to the vessel and underwrote, to the best of my knowledge, all the costs of restoration and storage from then on.  In  December 1997, we were planning on placing the restored boat up for auction, and Ole Anderson compiled a handwritten agreement listing all of the people who would be compensated from the proceeds of sale if the boat sold at auction, and how much each would be paid.  I did not know the other people on the list, but I believe most of them were not co-owners but people with mechanics lien.  The relevant documents are at Doc. Req. pp. 1-30.

*INTERROGATORY NO. 10:*

*Describe the newspaper article through which you learned that the Flash II was to be auctioned, including the date, the newspaper, and the edition.*

ANSWER: I don't recollect whether the article said the Flash II was to be auctioned, or whether it said the government was or would be pursuing a forfeiture action against the sailboat.  I am not

7

EXHIBIT 2 page 7

certain what this article was, and at this point my recollection is very hazy.  I had originally thought it was an article published in June 2005, but I was not able to find an article published then.  In looking on my hard drive, I found a copy of the Shelley Murphy article published in the Boston Globe dated October 13, 2004, on my hard drive, as an attachment to an email sent to me by a friend on September 28, 2005. [Due to a malfunction in my computer, I was not able to print this document or send it to my attorney in time to include it in the document production, but I will supplement it once I get my computer working right again.]  That is the only copy of the article I could find on my hard drive.  I am not even certain that this is the article I was thinking of.

*INTERROGATORY NO. 11:*
*Describe the circumstances under which you came to view the newspaper article referenced in Interrogatory No. 12.*

ANSWER: I read it on-line.  I don't know if I got it through the Google alert I had set up, or if I ran a Google search for all articles about the Flash II, or if a friend emailed it to me.

*INTERROGATORY NO. 12:*
*Identify the "then girlfriend" with whom you traveled in Summer of 1996, according to paragraph 3 of your Affidavit of July 27, 2005.*

ANSWER:  Ann Kleinrichert, as in Interrogatory 1 above.

*INTERROGATORY NO. 13:*
*Identify the "mutual acquaintance" through whom you met Gregory "Ole" Anderson, according to your Affidavit of July 27, 2005.*

ANSWER:  Donna Bickmeyer Hoffner, as in Interrogatory #1 above.

*INTERROGATORY NO. 14:*
*Describe any communications you had concerning your alleged ownership interest in the Flash II between October 2004 and July 27, 2005, and for each communication:*
*(a)  state the date of the communication;*

8

EXHIBIT 2 page 8

*(b)  state whether the communication was oral or written;*
*(c) describe in detail the substance of the communication;*
*(d)  identify any parties to the communication;*
*(e)  identify any persons present during any part of the communication;*
*(f) identify the place(s) of the communication; and*
*(g) identify any documents concerning any part of the communication.*

ANSWER:

Ole Anderson called me at 7 a.m. on either October 13th, 14th or 15th, 2004 and told me that the sailboat had been seized, but I did not understand the significance of that statement.  I did not know about the asset forfeiture laws, and it did not occur to me that this seizure could affect my ownership interest in the boat.  The phone call woke me up and I was too groggy and startled by his call to ask Ole the significance of the seizure.  During that call Ole did not say anything about forfeiture.  He was very upset.  He kept saying he had been "set up" and that the police were going to prosecute him again, which would be double jeopardy. Basically my attitude was "I don't want to get involved in your problems."  I did not want his problems to become my problems.  It did not occur to me that his legal problems could affect my ownership interest in the sailboat.  He said he was going talk to the newspaper, or had gone to the newspaper about it, and I told him I don't want my name in the press.  I told him not to tell the police about me – at that time – because I did not want the police coming to my new job asking questions while I was trying to get through the credentialing process.  I also did not want the newspaper publicity connecting my name to a drug dealer while my credentialing process was going on.  A few weeks later, the credentialing process ended and after that it would not have bothered me if Anderson told the police about my interest in the sailboat.  I told Anderson to keep me posted on any further developments, and expected him to do that.  He had always been good about communicating with me about any matters affecting the boat.  I never heard

9

EXHIBIT 2 page 9

from him again, and could not reach him after that because his phone was disconnected. There were no documents associated with this conversation.

As I explained in answer to interrogatory number 6, on June 25, 2005, I discussed my ownership of the boat and the seizure with my friend Richard Heathwood, and on June 27 I called Marblehead. Between June 27 and July 1, I also called Thomas Kerner and the U.S. Attorney's Office. See interrogatory 6.

I don't know the dates of most of these conversations, but I also discussed my ownership interest in the boat with the Kennedy Library, Mystic Seaport, Senator Kennedy's Aide in DC-Jeffrey Teitz, a woman banker at Fall River- Bank of America (Main Street and Route 6) Braga Bridge; the State of Florida, Tallahassee (seeking to secure title) and possibly others (friends).

_INTERROGATORY NO. 15:_
_Describe every business transaction of any kind between yourself and Gregory "Ole" Anderson prior to July 27, 2005, including without limitation:_
_(a) the date of the transaction;_
_(b) the nature of the transaction;_
_(c) the identity of any parties to the transaction;_
_(d) the identity of any persons with knowledge of the transaction;_
_(e) the identify of any documents concerning the transaction._

ANSWER:    In connection with the joint ownership of Flash II, I was involved in dozens of transactions with Anderson between 1996 and 2005. See the canceled checks at Doc. Req. pp. 17-26.

In approximately 1999, on Ole Anderson's suggestion, I invested in a software company called Wiznet, but my transaction was directly with the owner, Safwat Fahmy.

I had no contact with Anderson after his phone call in October, 2004.

10

EXHIBIT 2 page 10

*INTERROGATORY NO. 16:*
*Describe any communication between yourself and Harry Crosby prior to July 27, 2005, and for each communication:*
*(a) state the date of the communication;*
*(b) state whether the communication was oral or written;*
*(c) describe in detail the substance of the communication;*
*(d) identify any parties to the communication;*
*(e) identify any persons present during any part of the communication;*
*(f) identify the place(s) of the communication; and*
*(g) identify any documents concerning any part of the communication.*

ANSWER:  I believe Crosby was one of the people Ole Anderson brought with him to the auction

in 1998, but I'm not sure.  If so, we had conversations about the boat and auction, but I do not recall

what was said.  If not, I cannot recall if I ever spoke to Crosby at all. I believe I only spoke to Crosby

through Kerner.

*INTERROGATORY NO. 17:*
*Describe any communication between yourself and Gary Milo prior to July 27, 2005,  and for each communication:*
*(a) state the date of the communication;*
*(b) state whether the communication was oral or written;*
*(c) describe in detail the substance of the communication;*
*(d) identify any parties to the communication;*
*(e) identify any persons present during any part of the communication;*
*(f) identify the place(s) of the communication; and*
*(g) identify any documents concerning any part of the communication.*

ANSWER:  I do not know if I ever met or spoke to Gary Milo. There were several persons at the

auction in NYC in 1998 whom I did not know. Milo may have been there.  If he was there Anderson

kept me in the dark as to his identity.

*INTERROGATORY NO. 18:*
*Other than the items described previously, describe every interaction of any kind that occurred between 1996 and July 27, 2005 between yourself and any other person whom you believe or*

11

EXHIBIT 2 page 11

*believed had an ownership interest in the Flash II, and for each interaction:*
*(a) state the date of the interaction;*
*(b) state whether the interaction was oral or written;*
*(c) describe in detail the substance of the interaction;*
*(d) identify any parties to the interaction;*
*(e) identify any persons present during any part of the interaction;*
*(f) identify the place(s) of the communication; and*
*(g) identify any documents concerning any part of the interaction.*

OBJECTION: Overbroad.

ANSWER:  I had numerous conversations with Ole Anderson during that period – too many to recall.   We spoke on the phone and in person in Florida.   I do not recall the dates or other specifics about the conversations.   Documents we would have discussed included the letter from Senator Kennedy, documents filed in our attempt to get a title for the boat,

    As I said above, I am not sure whether I ever met or talked to Crosby or any of the other people listed on the handwritten contract (other than Marblehead).   Because Ole Anderson was the manager of the Flash II, everything went through him, and all of my communications were with him rather than the other investors.

*INTERROGATORY NO. 19:*
*Identify any person who assisted you in preparing answers to any these Interrogatories or the United States' Request for the Production of Documents, or who provided any information in connection with preparing answers to any of these Interrogatories, or whose files and/or documents were reviewed for the purpose of gathering or identifying documents potentially responsive to these Interrogatories or the United States' Request for the Production of Documents, and specify the information supplied by each such person.*

ANSWER: My attorney Brenda Grantland assisted me in preparing answers to these interrogatories.

12

EXHIBIT 2 page 12

**<u>Verification</u>**

I, Kerry Scott Lane, M.D., declare under penalty of perjury under the laws of the United States

and the state of Florida that the foregoing answers are true and correct.

Dated:                                                      _____

                                                            KERRY SCOTT LANE, M.D.

**<u>CERTIFICATE OF SERVICE</u>**

This is to certify that a true copy of the above document was served upon counsel for the
government, by email, as well as first class mail, postage prepaid, on this date.

Dated: _____ 2006                    /s/ Brenda Grantland
                                          BRENDA GRANTLAND

13

EXHIBIT 2 page 13

**Subject:** Kennedy sailboat case - interrogatories and documents requests
**From:** Brenda Grantland <bgrantland1@comcast.net>
**Date:** Tue, 26 Sep 2006 13:01:20 -0700
**To:** shelbey.wright@usdoj.gov, Brenda Grantland <bgrantland1@comcast.net>

```
Shelbey -

Attached are the interrogatories and documents requests.  I'm sending them in Word
Perfect so you can insert your answers without having to retype the questions.  If
you need Word instead, let me know.  I'm faxing them to you now as well.

Thanks,

Brenda
```

| DocumentsRequest.wpd | **Content-Type:** application/wordperfect<br>**Content-Encoding:** base64 |
| --- | --- |

| interrogatories.wpd | **Content-Type:** application/wordperfect<br>**Content-Encoding:** base64 |
| --- | --- |

EXHIBIT 3 page 1

**Subject:** Interrogatory responses and document request responses
**From:** "Rue, Nancy (USAMA)" <Nancy.Rue@usdoj.gov>
**Date:** Thu, 26 Oct 2006 20:08:39 -0400
**To:** bgrantland1@comcast.net

```
 <<document request.responses.pdf>>  <<Interrogatory responses.pdf>>
Attorney Grantland,

Please find enclosed the government's responses to your interrogatories
and document requests.  I will mail the hard copy responses tomorrow.

Very truly yours,
Nancy Rue
617/748-3260
```

| | |
|---|---|
| **document request.responses.pdf** | **Content-Description:** document request.responses.pdf<br>**Content-Type:**       application/pdf<br>**Content-Encoding:**   base64 |

| | |
|---|---|
| **Interrogatory responses.pdf** | **Content-Description:** Interrogatory responses.pdf<br>**Content-Type:**       application/pdf<br>**Content-Encoding:**   base64 |

EXHIBIT 3 page 2

**Subject:** Kennedy sailboat case - meet and confer session
**From:** Brenda Grantland <bgrantland1@comcast.net>
**Date:** Wed, 01 Nov 2006 11:59:58 -0800
**To:** "Rue, Nancy (USAMA)" <Nancy.Rue@usdoj.gov>, Brenda Grantland
<bgrantland1@comcast.net>

Nancy -

Your discovery responses were incomplete.  I have started working on a motion to
compel discovery and we need to have a meet and confer session -- by phone or
email.  The attached letter outlines the issues we need to resolve.  Please read
this over and call me to let me know which matters we can resolve informally.  I'll
need to file the motion to compel in the next few days because our close of
discovery date is rapidly approaching.

I intend to conduct at least 3 depositions, and would prefer doing them by phone if
you will consent to telephonic depositions.  (You of course are free to appear in
person.)  They will probably only take 1/2 hour each, or less.
Brenda

EXHIBIT 3 page 3

1 of 1                                                                    11/1/2006 6:55 PM

**Subject:** RE: Kennedy sailboat case - meet and confer session
**From:** "Rue, Nancy (USAMA)" <Nancy.Rue@usdoj.gov>
**Date:** Wed, 01 Nov 2006 15:12:35 -0500
**To:** bgrantland1@comcast.net

Brenda,

The letter is missing.  More importantly, we intended to fully and
completely answer your interrogatories, and I believe that we did, so I
would hope that we could truly confer before you start drafting motions.


On the question of telephone depositions, I'll give it some thought.  I
have concerns about whether misunderstandings and contentious situations
arise more easily when the human being on the other end is not visible.
That concern is not alleviated by learning that you've started drafting
a motion to compel as your first avenue reaction to what I believe were
complete responses.

Nancy

-----Original Message-----
From: Brenda Grantland [mailto:bgrantland1@comcast.net]
Sent: Wednesday, November 01, 2006 3:00 PM
To: Rue, Nancy (USAMA); Brenda Grantland
Subject: Kennedy sailboat case - meet and confer session

Nancy -

Your discovery responses were incomplete.  I have started working on a
motion to compel discovery and we need to have a meet and confer session
-- by phone or email.  The attached letter outlines the issues we need
to resolve.  Please read this over and call me to let me know which
matters we can resolve informally.  I'll need to file the motion to
compel in the next few days because our close of discovery date is
rapidly approaching.

I intend to conduct at least 3 depositions, and would prefer doing them
by phone if you will consent to telephonic depositions.  (You of course
are free to appear in person.)  They will probably only take 1/2 hour
each, or less.

Brenda

EXHIBIT 3 page 4

**Subject:** Re: Kennedy sailboat case - meet and confer session
**From:** Brenda Grantland <bgrantland1@comcast.net>
**Date:** Wed, 01 Nov 2006 13:13:13 -0800
**To:** "Rue, Nancy (USAMA)" <Nancy.Rue@usdoj.gov>, Brenda Grantland
<bgrantland1@comcast.net>

Nancy -

Most of your interrogatory answers appear complete.  I am contesting your
objections.  Also, you have not identified the documents, and I can't tell what
many of them are -- such as the handwritten notes.
Of course I was going to confer with you before filing the motion - that's why I
prepared the meet and confer letter which I forgot to attach.  I'm attaching it
this time.

If I conduct the depositions telephonically, my local counsel Eric Greenberg will
be present in person, since he lives in the Boston area.  I am trying to keep my
fees and litigation costs down -- which the government will likely have to pay
under CAFRA.  A round trip to Boston for the depositions will add two days of
travel time, which doesn't seem worth it given the fact that the depositions will
be fairly short.
Brenda

Rue, Nancy (USAMA) wrote:

Brenda,
The letter is missing.  More importantly, we intended to fully and
completely answer your interrogatories, and I believe that we did, so I
would hope that we could truly confer before you start drafting motions.


On the question of telephone depositions, I'll give it some thought.  I
have concerns about whether misunderstandings and contentious situations
arise more easily when the human being on the other end is not visible.
That concern is not alleviated by learning that you've started drafting
a motion to compel as your first avenue reaction to what I believe were
complete responses.
Nancy

-----Original Message-----
From: Brenda Grantland [mailto:bgrantland1@comcast.net] Sent: Wednesday, November
01, 2006 3:00 PM
To: Rue, Nancy (USAMA); Brenda Grantland
Subject: Kennedy sailboat case - meet and confer session

Nancy -

Your discovery responses were incomplete.  I have started working on a
motion to compel discovery and we need to have a meet and confer session
-- by phone or email.  The attached letter outlines the issues we need
to resolve.  Please read this over and call me to let me know which
matters we can resolve informally.  I'll need to file the motion to
compel in the next few days because our close of discovery date is
rapidly approaching.

I intend to conduct at least 3 depositions, and would prefer doing them
by phone if you will consent to telephonic depositions.  (You of course
are free to appear in person.)  They will probably only take 1/2 hour
each, or less.
Brenda

EXHIBIT 3 page 5

| **lettertoNancyRue061031.wpd** | **Content-Type:**     application/wordperfect |
|---|---|
| | **Content-Encoding:** base64 |

EXHIBIT 3 page 6

2 of 2                                                                                   11/1/2006 6:56 PM

# Brenda Grantland

Attorney at Law
20 Sunnyside Suite A-204
Mill Valley, CA 94941
(415) 380-9108
fax (415) 381-6105

October 31, 2006

AUSA Nancy Rue
1 Courthouse Way
Suite 9200
Boston, MA 02210

Re: U.S. v. Star Class Sloop "Flash II"
Meet and confer session re: motion to
compel discovery

Dear Ms. Rue:

I have reviewed the materials you turned over in discovery.   I am sending this list of discovery
issues to see if we can resolve these disputes informally.

1.  Neither your interrogatory answers nor the answers to the request for documents identifies the
specific documents responsive to each item.  I need to know what these documents are and who
provided them: Bates pages 1, 73-86, 92-98, 121, 123, 131-139, 140-143, 149, 152?  Whose
handwriting are on those pages?

2.  Interrogatory Objection 8 - objects to time frame of Feb. 24 - present, and only answers up to
date of default judgment - October 18, 2005.  This is not a valid objection.

3.  Interrog answer 2 is incomplete - it doesn't answer e-g.

4.  Interrog answer 3 is incomplete.  Which documents were turned over by Kerner (subpart g)?

5.  Interrog 5 doesn't answer e or g.

6.  Interrog 10 - doesn't answer d, e or g.

7.  Interrog 13 - doesn't identify which documents were supplied by Crosby

8.  Interrog 14 -  where are the documents supplied by Anderson to the CI?
- what documents were supplied by Guernsey's other than the appraisal?

1

EXHIBIT 3 page 7

9. Interrog 16 - 19 -  Your objections are improper.  The information concerning the Guernsey's auction, the valuation, minimum bid, selling price, notice to bidders of pending litigation regarding Dr. Lane's ownership, and successful bidder are all relevant to remedies for the due process violation – establishing fair market value of the sailboat and/or getting the auction sale voided.  If the judgment is void for violation of due process – as it appears given these interrogatory answers – the government didn't have good title).

Sincerely,


Brenda Grantland

2

EXHIBIT 3 page 8

**Subject:** Discovery
**From:** "Rue, Nancy (USAMA)" <Nancy.Rue@usdoj.gov>
**Date:** Wed, 08 Nov 2006 17:32:55 -0500
**To:** bgrantland1@comcast.net

```
Please find attached discovery requests.

With regard to your letter, I have prepared a response, but I wish to
review it with my colleagues before I send it.  I will email it
tomorrow.  Thank you. Nancy Rue <<Flash II First Ints.pdf>>  <<Flash II
First Doc Req..pdf>>  <<rfa.pdf>>
```

| | |
|---|---|
| **Flash II First Ints.pdf** | **Content-Description:** Flash II First Ints.pdf<br>**Content-Type:**       application/pdf<br>**Content-Encoding:**   base64 |

| | |
|---|---|
| **Flash II First Doc Req..pdf** | **Content-Description:** Flash II First Doc Req..pdf<br>**Content-Type:**       application/pdf<br>**Content-Encoding:**   base64 |

| | |
|---|---|
| **rfa.pdf** | **Content-Description:** rfa.pdf<br>**Content-Type:**       application/pdf<br>**Content-Encoding:**   base64 |

EXHIBIT 3 page 9

**Subject:** discovery in Kennedy sailboat case
**From:** Brenda Grantland <bgrantland1@comcast.net>
**Date:** Thu, 09 Nov 2006 12:14:35 -0800
**To:** "Rue, Nancy (USAMA)" <Nancy.Rue@usdoj.gov>, Brenda Grantland
<bgrantland1@comcast.net>, Eric Goldberg <egoldberg@slwpc.com>

```
Nancy -

I will be noting depositions in your case and need you to check for available
dates.  Eric Goldberg and I are available Nov. 20, 22, 27, 29, Dec. 5 (in the
afternoon), and Dec. 6.  The depositions will be held in Eric's office at 20
William Street, Suite 130, Wellesley, MA 02481.  Eric will be appearing in person
and I will be present by telephone.  If you have any objection to my appearing by
telephone, let me know by close of business Monday so I can file a motion asking
the court to order it.  If you consent to my appearing telephonically, we will
agree to hold the depositions at the US Attorney's Office to make it more
convenient for you and your witnesses.
I will be deposing, in this order:
Lisa Talbot
Gregg Willoughby
Shelbey Wright
Christina Barclay

These depositions will not take long -- we can probably do all of them in 1 to 3
hours total (depending on whether you have followup questions).

Don't forget, I need - by the close of business today - your response to my meet
and confer issues regarding the motion to compel.  You can email it to me.
Brenda Grantland
```

EXHIBIT 3 page 10

**Subject:** RE: discovery in Kennedy sailboat case
**From:** "Rue, Nancy (USAMA)" <Nancy.Rue@usdoj.gov>
**Date:** Thu, 09 Nov 2006 18:01:41 -0500
**To:** bgrantland1@comcast.net, Eric Goldberg <egoldberg@slwpc.com>

Brenda,

I am enclosing my responses, both to your letter regarding the
interrogatories and to the email indicating that you wish to depose DOJ
employees.

If we need to review these matters with the Court, I will work with you
to set up a reasonable schedule.  However, I think maybe if we talk this
through, we can find a way to proceed that meets everyone's needs.  I
will try to call you at 6:15 tonight (about 15 minutes from now).  If we
do not connect, perhaps we could schedule a time to talk by phone on
Monday. I propose 4:00 p.m. EST, which I believe is 1:00 p.m. your time.
If that does not work for you, and we do not connect tonight, perhaps
you could propose a different time.

Thank you.

Nancy Rue


-----Original Message-----
From: Brenda Grantland [mailto:bgrantland1@comcast.net]
Sent: Thursday, November 09, 2006 3:15 PM
To: Rue, Nancy (USAMA); Brenda Grantland; Eric Goldberg
Subject: discovery in Kennedy sailboat case

Nancy -

I will be noting depositions in your case and need you to check for
available dates.  Eric Goldberg and I are available Nov. 20, 22, 27, 29,
Dec. 5 (in the afternoon), and Dec. 6.  The depositions will be held in
Eric's office at 20 William Street, Suite 130, Wellesley, MA 02481.
Eric will be appearing in person and I will be present by telephone.  If
you have any objection to my appearing by telephone, let me know by
close of business Monday so I can file a motion asking the court to
order it.  If you consent to my appearing telephonically, we will agree
to hold the depositions at the US Attorney's Office to make it more
convenient for you and your witnesses.

I will be deposing, in this order:
Lisa Talbot
Gregg Willoughby
Shelbey Wright
Christina Barclay

These depositions will not take long -- we can probably do all of them
in 1 to 3 hours total (depending on whether you have followup
questions).

Don't forget, I need - by the close of business today - your response to
my meet and confer issues regarding the motion to compel.  You can email
it to me.

Brenda Grantland

Cor 9 Nov.pdf    **Content-Description:** Cor 9 Nov.pdf

EXHIBIT 3 page 11

| Touhy letter.pdf | Content-Description: | Touhy letter.pdf |
|---|---|---|
| | Content-Type: | application/pdf |
| | Content-Encoding: | base64 |

| Touhy Regs.pdf | Content-Description: | Touhy Regs.pdf |
|---|---|---|
| | Content-Type: | application/pdf |
| | Content-Encoding: | base64 |

EXHIBIT 3 page 12



**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*                    *John Joseph Moakley United States Courthouse*
                                                     *1 Courthouse Way*
                                                     *Suite 9200*
                                                     *Boston, Massachusetts 02210*

November 9, 2006

**By Electronic Mail**

Brenda Grantland, Esquire
20 Sunnyside Avenue STE A-204
Mill Valley, CA 94941

    Re: <u>United States v. One Star Class Sloop Sailboat, 05-10192-RWZ</u>

Dear Ms. Grantland:

    I have received your electronic mail message stating that you seek to take depositions of employees of the Department of Justice (either the United States Attorney's Office or the Drug Enforcement Administration). In order to seek information from the Department of Justice employees, you must comply with the DOJ Touhy regulations.

    The starting point under DOJ's Touhy regulations, 28 C.F.R. §§ 16.21 <u>et seq.</u>, is the prohibition on testimony by DOJ employees regarding the information they obtained in the course of their employment unless that testimony is authorized by the "responsible official," generally, the United States Attorney for the district in which the testimony is sought. 28 C.F.R. §§ 16.21.[1] The regulations set forth a procedure governing requests for Department of Justice employees. In essence, as alluded to above, the person seeking the testimony must provide the United States Attorney's office with an affidavit describing the requested testimony and why it is required. 21 C.F.R. § 16.23(c).

---

    [1]See generally <u>United States ex rel. Touhy v. Regan</u>, 340 U.S. 462, 468-69, 472 (1951); <u>Giza v. Secretary of HEW</u>, 628 F.2d 748, 751-52 (1st Cir. 1981); <u>Reynolds Metals v. Crowther</u>, 572 F. Supp. 288, 290-291 (D. Mass. 1982).

*Touhy letter.pdf*

EXHIBIT 3 page 13

Brenda Grantland, Esquire
November 9, 2006
page 2


     Please review these regulations and consider whether you can proceed without oral testimony.  If, after reviewing these regulations, you determine that oral testimony is the only means of proceeding, please provide me with as much detail as possible regarding the testimony that you will seek to elicit from each of the Assistant United States Attorneys' employees and the Drug Enforcement Administration Special Agent whom you named, and this will be reviewed consistent with the regulations.

     Please do not hesitate to contact me if you have any questions regarding your <u>Touhy</u> request.


                        Very truly yours,

                        MICHAEL J. SULLIVAN
                        United States Attorney

           By:  <u>/s/ Nancy Rue       </u>
                  Nancy Rue
                  Assistant U.S. Attorney

EXHIBIT 3 page 14



**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*                    *John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

November 9, 2006

Brenda Grantland, Esquire
20 Sunnyside Avenue STE A-204
Mill Valley, CA 94941

       Re: <u>United States v. One Star Class Sloop Sailboat, 05-10192-RWZ</u>

Dear Ms. Grantland:

       In response to your letter dated October 31, 2006:

       1.    Pages 1 and 121 are the notes of Shelbey Wright referred to in Interrogatory Response 3. Pages 73 through 86, as noted on the front of page 73, are DEA exhibit N-169. It is described in the DEA-6 associated with its acquisition, more specifically at page 58, ¶3. The remaining pages that you refer to were produced by DEA Special Agent Gregg Willoughby.

       2.    With regard to your assertion that our objection is invalid, we disagree. The First Circuit remanded this case for a limited purpose:

> Hence, we . . . remand for further proceedings to determine
> whether plainly indicated and easily accomplished efforts,
> undertaken with reasonable diligence *during the relevant time*
> *frame*, would have led the government directly to Lane.

458 F.3d 16, 25 (1st Cir. 2006) (emphasis supplied). Information that the government developed subsequent to the date we moved for the default order is simply, under the First Circuit's Order, irrelevant. If you wish to press this point, I concur that we are at impasse.

       3, 5, 6, 8. To the extent that you provided an Interrogatory with so many subparts that it exceeded the number of interrogatories permitted under the Rules, we supplied the answer to the question without breaking down our response into individual items. We do not have a transcript of the discussions with various individuals two years ago. Therefore it would be impossible to

EXHIBIT 3 page 15

Brenda Grantland, Esq.
November 9, 2006
Page 2

say in detail what specific questions were asked and what the responses, if applicable, were.
The substance of the United States' discussions with the persons inquired about in your
Interrogatories is contained in the United States' responses.

4, 7.    The documents turned over by Kerner on behalf of Crosby were produced in
connection with the document responses.    See pages 103-108.

9.    The United States disagrees with your reasoning.  First, from a procedural
standpoint, any determination of an amount with regard to your client is premature, pending the
resolution of the issue for which the First Circuit remanded this case.  See Item 2, above.

Moreover, your claim that the value of the boat was something other than the amount of
the sale has no merit. The United States sold the boat pursuant to a judicial order authorizing the
United States to sell the boat. Your client was aware of the sale. Your client had an opportunity,
in court, to seek a stay of the sale had he tendered a bond in the amount of its value. He instead
chose not to do so, stating that the value was "unknown."  Having tendered a supersedeas bond
in the amount of $100, the United States believes that your client is now judicially estopped from
claiming that the boat had a value in excess of that amount.

Moreover, when the district court exercised its discretion to deny the stay, your client had
the ability to seek review under Federal Rule of Appellate Procedure 8(a).   See Acevedo-Garcia
v. Vera-Monroig 296 F.3d 13, 15 (1st Cir. 2002).  He elected not to exercise that right. Having
failed to post a full supersedeas bond, or to seek review of the district court's order denying stay
without such bond, he is barred from revisiting the issue of the value of the boat. See Matter of
Combined Metals Reduction Co., 557 F.2d 179, 193 (10th Cir. 1977).  To state that due process
was violated is erroneous.  Due process was afforded.  He chose, as he had done in October of
2004, not to exercise it.

I trust this resolves your questions.

Very truly yours,

MICHAEL J. SULLIVAN
United States Attorney

By:    /s/ Nancy Rue
Nancy Rue
Assistant U.S. Attorney

EXHIBIT 3 page 16

**Subject:** conference call
**From:** Brenda Grantland <bgrantland1@comcast.net>
**Date:** Mon, 13 Nov 2006 12:00:51 -0800
**To:** "Rue, Nancy (USAMA)" <Nancy.Rue@usdoj.gov>, Brenda Grantland
<bgrantland1@comcast.net>

```
Nancy -

We were supposed to talk today about a possible resolution of the depositions by
agreeing to stipulated facts, but I have not finished putting together my draft of
them. When I was talking to my client today, he wanted a chance to read them over
and comment before I talked to you about them.  He is working today and will not be
able to review them until tonight.
So can we re-schedule the conference call for tomorrow or Wednesday?  Or we could
start by exchanging drafts by email and then talk.  What's your preference?

Brenda
```

EXHIBIT 3 page 17

**Subject:** RE: conference call
**From:** "Rue, Nancy (USAMA)" <Nancy.Rue@usdoj.gov>
**Date:** Mon, 13 Nov 2006 15:08:16 -0500
**To:** bgrantland1@comcast.net

That would be fine with me.  Why don't we try to exchange a draft by end
of day tomorrow, and then talk at 4P/1E Wednesday?

-----Original Message-----
From: Brenda Grantland [mailto:bgrantland1@comcast.net]
Sent: Monday, November 13, 2006 3:01 PM
To: Rue, Nancy (USAMA); Brenda Grantland
Subject: conference call

Nancy -

We were supposed to talk today about a possible resolution of the
depositions by agreeing to stipulated facts, but I have not finished
putting together my draft of them. When I was talking to my client
today, he wanted a chance to read them over and comment before I talked
to you about them.  He is working today and will not be able to review
them until tonight.

So can we re-schedule the conference call for tomorrow or Wednesday?  Or
we could start by exchanging drafts by email and then talk.  What's your
preference?

Brenda

EXHIBIT 3 page 18

**Subject:** Kennedy sailboat case
**From:** Brenda Grantland <bgrantland1@comcast.net>
**Date:** Tue, 14 Nov 2006 13:56:26 -0800
**To:** "Rue, Nancy (USAMA)" <Nancy.Rue@usdoj.gov>, Brenda Grantland
<bgrantland1@comcast.net>

Hi Nancy -

I am still working on my letters responding to your Touhy_letter.pdf and
Cor_9_Nov.pdf, as well as my questions for possible stipulation in lieu of the
depositions.   I hope to have it finished tomorrow, provided Dr. Lane does not have
any further issues after I make further revisions tonight.

In talking to my client today, we determined that if the government is intending to
depose Dr. Lane, there is no way we would forego our depositions of the four
government agents -  Lisa Talbot, Shelbey Wright, Gregg Willoughby or Christina
Barkley.   That's the bottom line.  So if you are planning on deposing my client,
we will not settle for stipulating the facts in lieu of those four depositions.

Let me know your response to that as soon as possible -- before I waste any more
time trying to draft a proposed stipulation.
Brenda

**Subject:** RE: Kennedy sailboat case
**From:** "Rue, Nancy (USAMA)" <Nancy.Rue@usdoj.gov>
**Date:** Tue, 14 Nov 2006 17:59:31 -0500
**To:** bgrantland1@comcast.net

For this stage of things, if we could come to agreed stipulations, it
was my understanding that we would be trying to agree to everything --
both as to your client and as to the govt actors. If we were able to
come to an agreement, that would obviate the need for your client's depo
and would obviate the need for the ones that you had identified.

If we come to an agreement on some things and not others, it would
narrow the scope of discovery that is in dispute. For example, I can
foresee a situation in which we come to an agreement as to what certain
govt actors would say, but dispute others. At that point, I think that
your Touhy demand would indicate the area of testimony that was in
dispute and we would evaluate under the Touhy regs whether there was no
alternative to oral examination of a particular individual. If we
agreed to what the govt actors would say, but disagree as to what Dr.
Lane would say, we would still want to proceed with his depo. But if we
are in agreement, we would forego that at this time.

Knowing that you and I have a different interpretation as to the scope
of the current discovery, I should amplify slightly. At this point, the
govt believes that the purpose of these proceedings is to determine
whether Dr. Lane should be permitted to file a claim. If Judge Zobel
finds in your client's favor, then at that point it is our understanding
(which I confirmed with AUSA Wright, since she attended the status
conference), that discovery would begin in the normal manner. Dr. Lane
would need to prove his claim, and that would usually include a
deposition of your client. However, if Judge Zobel were to reiterate
her previous ruling, at that point, the case would be terminated, and no
further discovery of any kind would be appropriate.

It sounds like we shouldn't try to exchange drafts tonight, but instead
talk tomorrow and see where we are? I'll plan to call you at 4pm my
time, 1pm your time, unless I hear differently.

Thanks. Nancy


-----Original Message-----
From: Brenda Grantland [mailto:bgrantland1@comcast.net]
Sent: Tuesday, November 14, 2006 4:56 PM
To: Rue, Nancy (USAMA); Brenda Grantland
Subject: Kennedy sailboat case

Hi Nancy -

I am still working on my letters responding to your Touhy_letter.pdf and
Cor_9_Nov.pdf, as well as my questions for possible stipulation in lieu
of the depositions.   I hope to have it finished tomorrow, provided Dr.
Lane does not have any further issues after I make further revisions
tonight.

In talking to my client today, we determined that if the government is
intending to depose Dr. Lane, there is no way we would forego our
depositions of the four  government agents - Lisa Talbot, Shelbey
Wright, Gregg Willoughby or Christina Barkley.    That's the bottom
line.  So if you are planning on deposing my client, we will not settle
for stipulating the facts in lieu of those four depositions.

Let me know your response to that as soon as possible -- before I waste

EXHIBIT 3 page 20

1 of 2                                                                        11/14/2006 3:38 PM

any more time trying to draft a proposed stipulation.

Brenda

EXHIBIT 3 page 21

**Subject:** Kennedy sailboat case
**From:** Brenda Grantland <bgrantland1@comcast.net>
**Date:** Wed, 15 Nov 2006 14:34:17 -0800
**To:** "Rue, Nancy (USAMA)" <Nancy.Rue@usdoj.gov>, Brenda Grantland
<bgrantland1@comcast.net>, "Dr. Kerry Lane" <KERRYSLANEMD@ATT.NET>

```
Hi Nancy -

I have discussed the discovery dispute with my client, and after reading the email
you sent last night we have concluded it would be a waste of time to try to
negotiate a stipulated set of facts with you, especially at this posture.  We're
entitled to discovery, and I intend to get it.

Attached is my letter responding to your two letters of November 9th and subsequent
emails.  It is my conclusion that we are at an impasse as outlined in my letter.

Brenda

Rue, Nancy (USAMA) wrote:

  I'll call you shortly.  Thank you.
```

| letter to Nancy Rue 061115.pdf | **Content-Type:** application/pdf |
|---|---|
| | **Content-Encoding:** base64 |

EXHIBIT 3 page 22

1 of 1                                                                    11/15/2006 6:24 PM

# Brenda Grantland

Attorney at Law
20 Sunnyside Suite A-204
Mill Valley, CA 94941
(415) 380-9108
fax (415) 381-6105

November 15, 2006

AUSA Nancy Rue
1 Courthouse Way
Suite 9200
Boston, MA 02210

Re: U.S. v. Star Class Sloop "Flash II"
Meet and confer session re: motion to
compel discovery

Dear Ms. Rue:

In response to your "Touhy" letter – I read over the regulations at 28 CFR § 16.21 et seq. and I don't see how that in any way restricts my right to seek deposition testimony from Lisa Talbot, Shelbey Wright, Gregg Willoughby or Christina Barkley about the issues relevant here. Because the US government is a party to this litigation, § 16.23 applies.

None of the conditions of § 16.26 (b) are present here. I have no intention of asking for the identity of your CI, since I figured out who is he is a long time ago through Pacer, by running all the names from the 1997 handwritten contract through the nationwide Pacer search. He was the only one with a pending federal criminal case – and that was a marijuana trafficking charge in Boston no less. I followed the docket and saw plenty of confirmation of my suspicion that he was the CI. I also saw that he got sentenced to time served recently after numerous continuance motions filed under seal by the government. I probably don't need any more information from the informant, since his admissions help us, but I do need to rule out the possibility that you have other information contradicting the CI's admissions. More about this later.

Also, I don't see how disclosure of the information I am seeking would reveal investigatory records or interfere with enforcement proceedings. We could care less about your case against Ole Anderson, and we have no information about that anyway. The case against your CI was resolved already, and my client didn't know him anyway. The other subsections of § 16.26(b) are not even arguably applicable.

The "Touhy regulations" do not require us to give you "an affidavit describing the requested testimony and why it is required" as you claim in your "Touhy letter". Section 16.23( c) only

1

EXHIBIT 3 page 23

requires "an affidavit, or, if that is not feasible, statement... setting forth a summary of the testimony sought." In your email dated November 14, you suggest that the Touhy regulations require some showing that "there was no alternative to oral examination of a particular individual." Nothing in those regulations requires that. Section 16.26 requires the DOJ officials to determine whether disclosure is appropriate under the rules of procedure and statutes. In short, the Touhy regulations do not give government agents any shield for relevant depositions in cases where the U.S. is a party and the matters inquired of on deposition are relevant and proper under the Federal Rules of Civil Procedure and applicable statutes. Judge Zobel has already stated that she will allow discovery including depositions.

Here is a summary of the testimony I would elicit from these witnesses I intend to depose. I see no reason to give you a sworn affidavit, since, if I go beyond the scope of these issues at the depositions, you can always tell the witness not to answer. If you have any objections to my asking these questions during the depositions of the federal employees, you should let me know now so I can add that to my motion to compel.

(1) whether the government made reasonable efforts to follow up on the leads it had readily at hand to serve notice on persons believed to own the sailboat;

(2) whether the U.S. Attorney's Office had any valid excuses for not following up on these leads;

(3) exactly what the government is claiming my client and his attorney told the U.S. Attorney's Office employees;

(4) whether the government ever notified Judge Zobel, before entry of the default judgment, that there was a doctor believed to own an interest in the sailboat who had not been served with the forfeiture complaint, and that he had in fact come forward and identified himself to the government;

(5) whether the government even had grounds to believe the sailboat was forfeitable at all, given the fact that the CW admitted that Ole Anderson had paid back the "loan" the CW made to him to purchase the sailboat, and the lack of evidence that Ole Anderson ever invested any drug money in the boat.

(6) Also, assuming our motion to compel discovery is granted, we will be asking about the circumstances of the auction and valuation of the sailboat by the federal government.

As for your claim that discovery should be limited to the narrow issue of the reasonableness of the government's failure to serve Dr. Lane with notice, I totally disagree with that, and will take that up in my motion to compel. We already had a status hearing before Judge Zobel in which we discussed discovery, and the judge asked what issues would be covered. I distinctly recall discussing our intention to get discovery relative to the remedy – fair market value of the sailboat and the circumstances surrounding the auction. Shelbey did not object and the judge seemed to agree those would be proper. I also indicated I would be deposing Shelbey and possibly other DOJ employees, and again neither Shelbey nor the judge stated any objections to that. In fact, as I recall, Judge Zobel asked me if I would be needing to depose Shelbey Wright, and when I said I would, the judge stated that Shelbey would have to be replaced as counsel of record and ordered

2

EXHIBIT 3 page 24

the government to appoint an new AUSA "forthwith." There was no suggestion at the status conference that the discovery would be piecemeal, and since the government did not object I believe you've waived the right to limit discovery in such a manner.

You are also wrong about the remand being "limited" to the issue of the reasonableness of the government's attempts/nonattempt to give Dr. Lane notice, as you claim in the 11/9 letter "Cor 9 Nov.pdf." The opinion states that

> If, however, the court finds that Lane had no notice in fact of the forfeiture action, that the government's efforts to identify him were nonexistent or otherwise insufficient under the circumstances, and that Lane has satisfied the other prerequisites for *Rule 60(b)* relief, n10 Lane's motion would have to be granted and the forfeiture judgment, as it pertains to his interest in the FLASH II, would have to be set aside.

458 F.3d 16, 26 (1st Cir. 2006). Obviously if the Rule 60(b) motion has to be granted, Dr. Lane will be able to litigate his innocent owner claim – and the forfeitability of the sailboat – and the remedy, given the fact that the boat sold at auction.

I'm not going to address your legal arguments about the valuation in detail, because that is premature, but your claims on page 2 of the November 9 letter "Cor 9 Nov.pdf" that Dr. Lane has waived his remedies by "failing to post a full supersedeas bond" is frivolous. Had you read our points and authorities in support of the motion to stay, you would have seen that we "tendered a nominal supersedeas bond in the amount of $100, pending further order from this Court" and that we asked the court to exercise its discretion to not require a bond at all, since the government would be detaining the sailboat pending trial – which would be adequate security if the stay was granted. We can argue the legal issues about this later – right now we're entitled to discovery of the facts, and intend to fully pursue it.

I don't see any point in trying to agree on a stipulated set of facts now in lieu of doing depositions. I can tell from you email that you intend to depose Dr. Lane no matter what, so we intend to depose your guys. Since we don't want to do the depositions twice, there is no reason to begin the depositions until our motion to compel is decided. That way I can ask about the valuation and auction issues during the one set of depositions.

Your objection to "all requests that extend beyond October 18, 2005" is improper. That quote from the First Circuit opinion on page 1 of your "Cor 9 Nov.pdf" letter does not support your objection. If government agents made phone calls and followed up leads after October 18, 2005 that they should have pursued earlier, those facts are relevant to the issue of what could be done if reasonable diligence was employed.

Your complaint that my interrogatories had so many subparts that you could pick and choose which ones to answer can also be used against the interrogatories you served on Dr. Lane.

3

EXHIBIT 3 page 25

So it appears to me that we are at an impasse right now. I intend to depose the four government agents, and to press for all the discovery we asked for and did not receive. If you see any issues in this letter which you are willing to concede, respond as soon as possible because I'm going to start work again on the motion to compel this afternoon.

                                        Sincerely,


                                        Brenda Grantland

4

EXHIBIT 3 page 26

**Subject:** Subpoenas and Notice of Deposition for Kerry Lane
**From:** "Rue, Nancy (USAMA)" <Nancy.Rue@usdoj.gov>
**Date:** Mon, 04 Dec 2006 17:44:30 -0500
**To:** bgrantland1@comcast.net

Brenda,

Please find attached service copies of subpoenas for records in US v.
One Star Class Sloop.

We have also noticed the deposition of Kerry Lane.  I have no objection
to postponing the deposition of Dr. Lane until after your motion to
compel is resolved if you prefer.    Just let me know.

I have submitted your Touhy letter for final decision, but I do not yet
have a final decision.  I will let you know as soon as I do.

Very truly yours,
Nancy Rue

From:     Talbot, Lisa (USAMA)
Sent:     Monday, December 04, 2006 1:47 PM
To:       Rue, Nancy (USAMA)
Subject:       Updated subpoenas, etc...

Hi Nancy,

Here are the updated subpoenas, notices, etc....I did not change the
language of the Marblehead Trading Company Attachment A, as that was
completely different from the information we are interested in from
the lending companies.  Also, the Certificate of Authenticity will
need to be sent with each subpoena, but I have only included one.  Let
me know if you need anything else.  Thanks.

Lisa

 <<Subpoena (Chase).pdf>>  <<Subpoena (Bank of America).pdf>>
<<Subpoena (BankUnited).pdf>>  <<Subpoena (Superior).pdf>>  <<Keeper
of Record Information Request (Superior).wpd>>  <<Keeper of Record
Information Request (Bank of America).wpd>>  <<Keeper of Record
Information Request (BankUnited).wpd>>  <<Keeper of Record Information
Request (Chase).wpd>>  <<Subpoena (Marblehead Trading).pdf>>  <<Keeper
of Record Information Request (Marblehead Trading Company).wpd>>
<<Notification letter to Atty. Grantland.wpd>>  <<Subpoena (Kerry S.
Lane).pdf>>  <<Notice of Deposition of Kerry Lane.wpd>>

| Subpoena (Chase).pdf | **Content-Description:** Subpoena (Chase).pdf | |
|---|---|---|
| | **Content-Type:** | application/pdf |
| | **Content-Encoding:** | base64 |

| Subpoena (Bank of America).pdf | **Content-Description:** Subpoena (Bank of America).pdf | |
|---|---|---|
| | **Content-Type:** | application/pdf |
| | **Content-Encoding:** | base64 |

| Subpoena (BankUnited).pdf | **Content-Description:** Subpoena (BankUnited).pdf | |
|---|---|---|
| | **Content-Type:** | application/pdf |
| | **Content-Encoding:** | base64 |

| Subpoena (Superior).pdf | **Content-Description:** Subpoena (Superior).pdf | |
|---|---|---|
| | **Content-Type:** | application/pdf |
| | **Content-Encoding:** | base64 |

EXHIBIT 3 page 27

| Keeper of Record Information Request (Superior).wpd | Content-Description: | Keeper of Record Information Request (Superior).wpd |
| | Content-Type: | application/octet-stream |
| | Content-Encoding: | base64 |

| Keeper of Record Information Request (Bank of America).wpd | Content-Description: | Keeper of Record Information Request (Bank of America).wpd |
| | Content-Type: | application/octet-stream |
| | Content-Encoding: | base64 |

| Keeper of Record Information Request (BankUnited).wpd | Content-Description: | Keeper of Record Information Request (BankUnited).wpd |
| | Content-Type: | application/octet-stream |
| | Content-Encoding: | base64 |

| Keeper of Record Information Request (Chase).wpd | Content-Description: | Keeper of Record Information Request (Chase).wpd |
| | Content-Type: | application/octet-stream |
| | Content-Encoding: | base64 |

| Subpoena (Marblehead Trading).pdf | Content-Description: | Subpoena (Marblehead Trading).pdf |
| | Content-Type: | application/pdf |
| | Content-Encoding: | base64 |

| Keeper of Record Information Request (Marblehead Trading Company).wpd | Content-Description: | Keeper of Record Information Request (Marblehead Trading Company).wpd |
| | Content-Type: | application/octet-stream |
| | Content-Encoding: | base64 |

| Notification letter to Atty. Grantland.wpd | Content-Description: | Notification letter to Atty. Grantland.wpd |
| | Content-Type: | application/octet-stream |
| | Content-Encoding: | base64 |

| Subpoena (Kerry S. Lane).pdf | Content-Description: | Subpoena (Kerry S. Lane).pdf |
| | Content-Type: | application/pdf |
| | Content-Encoding: | base64 |

| Notice of Deposition of Kerry Lane.wpd | Content-Description: | Notice of Deposition of Kerry Lane.wpd |
| | Content-Type: | application/octet-stream |
| | Content-Encoding: | base64 |

EXHIBIT 3 page 28

12/5/2006 7:37 PM

**Subject:** Re: Subpoenas and Notice of Deposition for Kerry Lane
**From:** Brenda Grantland <bgrantland1@comcast.net>
**Date:** Tue, 05 Dec 2006 12:47:14 -0800
**To:** "Rue, Nancy (USAMA)" <Nancy.Rue@usdoj.gov>, Brenda Grantland
<bgrantland1@comcast.net>


Nancy -

Rule 30(b)(1) requires "reasonable notice" in writing in advance of a deposition.
You emailed me the notice of deposition on December 4, and I just got it today when
I checked my email.  Three days notice is not "reasonable" especially when you're
noting a deposition in Boston and my client is located in Florida.

As the current schedule stands, discovery was to be completed by December 8.  In
order to note a deposition of Dr. Lane you will need to ask for an extension of
discovery, as I did in my motion to compel.

Brenda

Rue, Nancy (USAMA) wrote:

> Brenda,
> Please find attached service copies of subpoenas for records in US v.
> One Star Class Sloop.
> We have also noticed the deposition of Kerry Lane.  I have no objection
> to postponing the deposition of Dr. Lane until after your motion to
> compel is resolved if you prefer.    Just let me know.
>
> I have submitted your Touhy letter for final decision, but I do not yet
> have a final decision.  I will let you know as soon as I do.
> Very truly yours, Nancy Rue
>
>
>
> _____ From:    Talbot, Lisa (USAMA)
> Sent:    Monday, December 04, 2006 1:47 PM
> To:    Rue, Nancy (USAMA)
> Subject:    Updated subpoenas, etc...
>
> Hi Nancy,
>
> Here are the updated subpoenas, notices, etc....I did not change the
> language of the Marblehead Trading Company Attachment A, as that was
> completely different from the information we are interested in from
> the lending companies.  Also, the Certificate of Authenticity will
> need to be sent with each subpoena, but I have only included one.  Let
> me know if you need anything else.  Thanks.
>
> Lisa
>
> <<Subpoena (Chase).pdf>>  <<Subpoena (Bank of America).pdf>>  <<Subpoena
> (BankUnited).pdf>>  <<Subpoena (Superior).pdf>>  <<Keeper
> of Record Information Request (Superior).wpd>>  <<Keeper of Record
> Information Request (Bank of America).wpd>>  <<Keeper of Record
> Information Request (BankUnited).wpd>>  <<Keeper of Record Information
> Request (Chase).wpd>>  <<Subpoena (Marblehead Trading).pdf>>  <<Keeper
> of Record Information Request (Marblehead Trading Company).wpd>>  <<Notification
> letter to Atty. Grantland.wpd>>  <<Subpoena (Kerry S.
> Lane).pdf>>  <<Notice of Deposition of Kerry Lane.wpd>>

EXHIBIT 3 page 29

**Subject:** RE: Subpoenas and Notice of Deposition for Kerry Lane
**From:** "Rue, Nancy (USAMA)" <Nancy.Rue@usdoj.gov>
**Date:** Tue, 05 Dec 2006 16:47:07 -0500
**To:** bgrantland1@comcast.net

Brenda, obviously we disagree as to what is reasonable.  As to your
client's residence, the only information that we had was that he lived
in Fall River, MA, which was the address on file with his affidavit.
Nancy

---

From: Brenda Grantland [mailto:bgrantland1@comcast.net]
Sent: Tuesday, December 05, 2006 3:47 PM
To: Rue, Nancy (USAMA); Brenda Grantland
Subject: Re: Subpoenas and Notice of Deposition for Kerry Lane


Nancy -

Rule 30(b)(1) requires "reasonable notice" in writing in advance of a
deposition.  You emailed me the notice of deposition on December 4, and
I just got it today when I checked my email.  Three days notice is not
"reasonable" especially when you're noting a deposition in Boston and my
client is located in Florida.

As the current schedule stands, discovery was to be completed by
December 8.  In order to note a deposition of Dr. Lane you will need to
ask for an extension of discovery, as I did in my motion to compel.

Brenda

Rue, Nancy (USAMA) wrote:

>        Brenda,

>        Please find attached service copies of subpoenas for records in
> US v.

>        One Star Class Sloop.

>        We have also noticed the deposition of Kerry Lane.  I have no
> objection
>        to postponing the deposition of Dr. Lane until after your motion
> to
>        compel is resolved if you prefer.   Just let me know.

>        I have submitted your Touhy letter for final decision, but I do
> not yet
>        have a final decision.  I will let you know as soon as I do.

>        Very truly yours,
>        Nancy Rue


---

From:    Talbot, Lisa (USAMA)
Sent:    Monday, December 04, 2006 1:47 PM
To:      Rue, Nancy (USAMA)
Subject:        Updated subpoenas, etc...

Hi Nancy,

Here are the updated subpoenas, notices, etc....I did not change the
language of the Marblehead Trading Company Attachment A, as that was
completely different from the information we are interested in from
the lending companies.  Also, the Certificate of Authenticity will
need to be sent with each subpoena, but I have only included one.  Let
me know if you need anything else.  Thanks.

Lisa

<<Subpoena (Chase).pdf>>  <<Subpoena (Bank of
America).pdf>>  <<Subpoena (BankUnited).pdf>>  <<Subpoena
(Superior).pdf>>  <<Keeper
of Record Information Request (Superior).wpd>>  <<Keeper
of Record
Information Request (Bank of America).wpd>>  <<Keeper of
Record
Information Request (BankUnited).wpd>>  <<Keeper of
Record Information
Request (Chase).wpd>>  <<Subpoena (Marblehead
Trading).pdf>>  <<Keeper
of Record Information Request (Marblehead Trading
Company).wpd>>
<<Notification letter to Atty. Grantland.wpd>>
<<Subpoena (Kerry S.
Lane).pdf>>  <<Notice of Deposition of Kerry Lane.wpd>>

EXHIBIT 3 page 31

**Subject:** Re: Subpoenas and Notice of Deposition for Kerry Lane
**From:** Brenda Grantland <bgrantland1@comcast.net>
**Date:** Tue, 05 Dec 2006 16:18:54 -0800
**To:** "Rue, Nancy (USAMA)" <Nancy.Rue@usdoj.gov>, Brenda Grantland
<bgrantland1@comcast.net>

```
Nancy -

If you believe 3 days notice of a deposition is "reasonable notice" - you're
welcome to tell that to the judge.  We are objecting and will not comply with a
deposition on so little notice.  You've had several months to conduct discovery,
and I don't see any excuse for waiting until now to start.  So if you want to
depose Dr. Lane, you'll have to ask the judge for an extension of discovery.

If the judge extends discovery, we will of course cooperate with proper, reasonable
and timely discovery requests.  But I expect cooperation from the government as
well.  So far that has been completely lacking in this case.

Brenda

Rue, Nancy (USAMA) wrote:
```

> ```
> Brenda, obviously we disagree as to what is reasonable.  As to your
> client's residence, the only information that we had was that he lived
> in Fall River, MA, which was the address on file with his affidavit.
> Nancy
> ```
>
> ----
>
> ```
> From: Brenda Grantland [mailto:bgrantland1@comcast.net] Sent: Tuesday, December
> 05, 2006 3:47 PM
> To: Rue, Nancy (USAMA); Brenda Grantland
> Subject: Re: Subpoenas and Notice of Deposition for Kerry Lane
> ```
>
> ```
> Nancy -
>
> Rule 30(b)(1) requires "reasonable notice" in writing in advance of a
> deposition.  You emailed me the notice of deposition on December 4, and
> I just got it today when I checked my email.  Three days notice is not
> "reasonable" especially when you're noting a deposition in Boston and my
> client is located in Florida.
>
> As the current schedule stands, discovery was to be completed by
> December 8.  In order to note a deposition of Dr. Lane you will need to
> ask for an extension of discovery, as I did in my motion to compel.
>
> Brenda
>
> Rue, Nancy (USAMA) wrote:
> ```
>
> > ```
> >    Brenda,
> >    Please find attached service copies of subpoenas for records in
> > US v.
> >    One Star Class Sloop.
> >    We have also noticed the deposition of Kerry Lane.  I have no
> > objection
> >    to postponing the deposition of Dr. Lane until after your motion
> > to
> >    compel is resolved if you prefer.    Just let me know.
> >
> >    I have submitted your Touhy letter for final decision, but I do
> > not yet
> > ```

EXHIBIT 3 page 32

1 of 2                                                                    12/5/2006 7:41 PM

have a final decision.  I will let you know as soon as I do.
Very truly yours,    Nancy Rue


                                                    From:    Talbot,
Lisa (USAMA)         Sent:   Monday, December 04, 2006 1:47 PM
        To:    Rue, Nancy (USAMA)
        Subject:    Updated subpoenas, etc...

        Hi Nancy,

        Here are the updated subpoenas, notices, etc....I did
not change the
        language of the Marblehead Trading Company Attachment A,
as that was
        completely different from the information we are
interested in from
        the lending companies.  Also, the Certificate of
Authenticity will
        need to be sent with each subpoena, but I have only
included one.  Let
        me know if you need anything else.  Thanks.

        Lisa

         <<Subpoena (Chase).pdf>>  <<Subpoena (Bank of
America).pdf>>         <<Subpoena (BankUnited).pdf>>  <<Subpoena
(Superior).pdf>> <<Keeper
        of Record Information Request (Superior).wpd>>  <<Keeper
of Record
        Information Request (Bank of America).wpd>>  <<Keeper of
Record
        Information Request (BankUnited).wpd>>  <<Keeper of
Record Information
        Request (Chase).wpd>>  <<Subpoena (Marblehead
Trading).pdf>>  <<Keeper
        of Record Information Request (Marblehead Trading
Company).wpd>>          <<Notification letter to Atty. Grantland.wpd>>
<<Subpoena (Kerry S.
        Lane).pdf>>  <<Notice of Deposition of Kerry Lane.wpd>>

EXHIBIT 3 page 33

2 of 2                                                          12/5/2006 7:41 PM

**Subject:** RE: Discovery answers in Kennedy sailboat case
**From:** "Rue, Nancy (USAMA)" <Nancy.Rue@usdoj.gov>
**Date:** Fri, 08 Dec 2006 17:34:36 -0500
**To:** bgrantland1@comcast.net

Brenda, thank you for faxing as well as emailing. I have looked over
the responses very briefly, and I believe I have all the pages that were
faxed.

I will be out of the office next week. Obviously I will review the
responses more thoroughly when I return, but based on my preliminary
review, I think what I thought before - -that we are in substantial
agreement on the facts, and that where we disagree is on the conclusions
to be drawn from them. You believe we violated your client's right to
notice; we believe our actions were sufficient. I recognize that this
is a vast disagreement, but again, I believe it is a disagreement as to
the conclusions, and not as to the facts.

Accordingly, while I will be filing my response to your motion to compel
in a few moments, I would like to try once more to see if we can agree
to stipulated facts in this case. I will contact you on 12/18 or 12/19.

Thanks. Nancy

-----Original Message-----
From: Brenda Grantland [mailto:bgrantland1@comcast.net]
Sent: Friday, December 08, 2006 3:56 PM
To: bgrantland1@comcast.net; Rue, Nancy (USAMA)
Subject: Re: Discovery answers in Kennedy sailboat case

Oops - I forgot to attach the files. Here they are

Brenda Grantland wrote:

  Nancy -

  Attached are the pdf versions of our discovery responses. I didn't
  scan the documents, but I faxed everything to you already (documents
  included).
  Dr. Lane will be sending me his original signature pages, and I'll
  have to wait until I get it to send the hard copies to you. I should
  have his signature pages early next week.

  Brenda

EXHIBIT 3 page 34

**Subject:** RE: reply to your opposition to motion to compel
**From:** "Rue, Nancy \(USAMA\)" <Nancy.Rue@usdoj.gov>
**Date:** Tue, 19 Dec 2006 10:52:18 -0500
**To:** <bgrantland1@comcast.net>

Good morning.  I had over 400 emails from being out of town last week,
so I'm just getting to this.  I'm happy to talk with you before the
conference today if that works for you.  Otherwise, I can talk today
after 4pm my time (I have court after our status conference, but I
should be free by then).  Let me know.  Thanks.  Nancy

-----Original Message-----
From: Brenda Grantland [mailto:bgrantland1@comcast.net]
Sent: Friday, December 15, 2006 7:51 PM
To: Rue, Nancy (USAMA); Brenda Grantland
Subject: reply to your opposition to motion to compel

Nancy -

I was prepared to argue our motion to compel discovery at the hearing
before Judge Zobel, but didn't get the opportunity.

Now that we've changed judges and our new judge is not familiar with the
issues here, I've decided I need to file a reply to your Opposition to
my motion to compel.  You raised legal issues (pages 5-6) that I have
never had a chance to brief.

Because of that local rule, we are supposed to confer before I file a
reply.  Since you're still out of town until Monday, I'll wait until
Monday to confer on this.  I already had to talk to AUSA Jennifer Zacks
regarding the status hearing which Judge Young set for next Tuesday.  I
filed a motion today asking that it be converted to a telephonic status
hearing because I can't possibly travel there on such short notice
during the week before Christmas - plus I have a holiday guest coming
and next week and local counsel has a conflicting court appearance.
Jennifer stated that she didn't think you would object - as I stated in
my motion.

I didn't think Jennifer would be able to give me your consent on
something like filing a reply motion, so I'll wait until you get back.

Please email me Monday morning about the reply motion.

Brenda

EXHIBIT 3 page 35

**Subject:** reply to your opposition to motion to compel
**From:** Brenda Grantland <bgrantland1@comcast.net>
**Date:** Fri, 15 Dec 2006 16:51:19 -0800
**To:** "Rue, Nancy (USAMA)" <Nancy.Rue@usdoj.gov>, Brenda Grantland
<bgrantland1@comcast.net>

Nancy -

I was prepared to argue our motion to compel discovery at the hearing before Judge
Zobel, but didn't get the opportunity.
Now that we've changed judges and our new judge is not familiar with the issues
here, I've decided I need to file a reply to your Opposition to my motion to
compel.  You raised legal issues (pages 5-6) that I have never had a chance to
brief.
Because of that local rule, we are supposed to confer before I file a reply.  Since
you're still out of town until Monday, I'll wait until Monday to confer on this.  I
already had to talk to AUSA Jennifer Zacks regarding the status hearing which Judge
Young set for next Tuesday.  I filed a motion today asking that it be converted to
a telephonic status hearing because I can't possibly travel there on such short
notice during the week before Christmas - plus I have a holiday guest coming and
next week and local counsel has a conflicting court appearance.  Jennifer stated
that she didn't think you would object - as I stated in my motion.
I didn't think Jennifer would be able to give me your consent on something like
filing a reply motion, so I'll wait until you get back.

Please email me Monday morning about the reply motion.

Brenda

EXHIBIT 3 page 36

1 of 1                                                                    12/17/2007 2:57 PM

**Subject:** RE: subpoenas duces tecum
**From:** "Rue, Nancy \(USAMA\)" <Nancy.Rue@usdoj.gov>
**Date:** Tue, 19 Dec 2006 17:28:52 -0500
**To:** <bgrantland1@comcast.net>

Brenda, I had the documents scanned while I was on vacation, and I
believe that I can produce copies on a disk with Bates numbers. I will
verify tomorrow morning when my secretary returns, and we'll send it out
or email it. Nancy

-----Original Message-----
From: Brenda Grantland [mailto:bgrantland1@comcast.net]
Sent: Tuesday, December 19, 2006 3:05 PM
To: Rue, Nancy (USAMA); Brenda Grantland
Subject: subpoenas duces tecum

Hi Nancy -

After today's hearing, we don't need to talk about a reply on my motion
to compel.

Attached are my subpoenas duces tecum. Thomas Kerner has agreed to
accept service for Crosby. I left a message for Milo's appellate
attorney but haven't heard back from him yet.

I had left a message asking Marblehead's lawyer to send me copies of the
documents you subpoenaed from Marblehead, but he called back yesterday
and said that Marblehead had turned the originals over to Agent
Willoughby, and had not retained any copies. I need copies of those
documents as soon as possible.

Brenda

**Subject:** documents you subpoenaed from Marblehead
**From:** Brenda Grantland <bgrantland1@comcast.net>
**Date:** Fri, 29 Dec 2006 13:43:35 -0800
**To:** "Rue, Nancy (USAMA)" <Nancy.Rue@usdoj.gov>, Brenda Grantland
<bgrantland1@comcast.net>

Nancy -

I still have not received copies of the documents you subpoenaed from Marblehead.
I had asked Marblehead's attorney to send me copies of whatever they sent you, but
he found out that his client had turned the originals over to your agent without
making copies.  I will need them before you leave next week.

Brenda

EXHIBIT 3 page 38

**Subject:** RE: documents you subpoenaed from Marblehead
**From:** "Rue, Nancy \(USAMA\)" <Nancy.Rue@usdoj.gov>
**Date:** Fri, 29 Dec 2006 16:46:26 -0500
**To:** <bgrantland1@comcast.net>

Of course.  I'm sorry.  I thought they had been sent.  My secretary has
gone for the day, but I will have them sent as soon as she gets in.
Have a safe New Year's holiday.  Nancy

-----Original Message-----
From: Brenda Grantland [mailto:bgrantland1@comcast.net]
Sent: Friday, December 29, 2006 4:44 PM
To: Rue, Nancy (USAMA); Brenda Grantland
Subject: documents you subpoenaed from Marblehead

Nancy -

I still have not received copies of the documents you subpoenaed from
Marblehead.

I had asked Marblehead's attorney to send me copies of whatever they
sent you, but he found out that his client had turned the originals over
to your agent without making copies.  I will need them before you leave
next week.

Brenda

EXHIBIT 3 page 39

**Subject:** RE: Kennedy sailboat case
**From:** "Rue, Nancy \(USAMA\)" <Nancy.Rue@usdoj.gov>
**Date:** Fri, 16 Mar 2007 10:30:20 -0400
**To:** <bgrantland1@comcast.net>

Thank you.

I have a response from the DEA agent and from Shelbey Wright on the
interrogatories: They have no additional information.   However,
forfeiture sales go through the USMarshals Service, and so it is likely
that our deputy marshal will have something.  In the meantime, Arlen
Ettinger was identified in our document production as our Guernseys
contact.  He may have information that we do not have.  Since our
discovery cut off is not until 4/13, you would certainly have the
ability to subpoena Guernseys for additional information.  I may be
seeking to notice his deposition -- perhaps we could work out dates that
work for us.  I have not yet decided whether to take Lane's depo.  I
don't know if you would be interested in agreeing to hold open discovery
for that purpose until after the Court decides my motion.  If I prevail
on the value question, I would not wish to take it, but if I don't, I
would.

I will file an assented to motion regarding the deadline, and I will let
you know on the interrogatories as soon as I have heard from the DUSM.

Thanks.  Nancy

-----Original Message-----
From: Brenda Grantland [mailto:bgrantland1@comcast.net]
Sent: Thursday, March 15, 2007 11:03 PM
To: Rue, Nancy (USAMA); Brenda Grantland
Subject: Re: Kennedy sailboat case

I don't mind giving you the 3 day extension on the brief, if I can have
the interrogatory responses by Monday.  I need that information to begin
preparing my memorandum on the measure of damages, and I may need to do
some follow up discovery, so I really need the discovery no later than
Monday.

Brenda

Rue, Nancy (USAMA) wrote:

> Brenda, would you object to my having an extension until March 23 to
> file my brief, instead of March 20?   I'm working on a brief on a
> criminal sentencing matter for 3/20, and feeling a bit squeezed.
>
> The DEA agent is reviewing the information for the interrogatory
> responses.  Do you object to me giving you that information tomorrow
> instead of today?
>
> Thanks.  Nancy
>
> -----Original Message-----
> From: Brenda Grantland [mailto:bgrantland1@comcast.net]
> Sent: Tuesday, March 13, 2007 6:05 PM
> To: Rue, Nancy (USAMA); Brenda Grantland
> Subject: Kennedy sailboat case
>
> Hi Nancy -
>
> I was just looking over the Joint Case Management Conference Statement,
>
> which Judge Young entered as a scheduling order on Feb. 22.  It's a bit

**EXHIBIT 3 page 40**

confusing.

In the caption, under the case number Judge Young stamped "so ordered
as the case management scheduling order.  Discovery due April 13, 2007.
Dispositive motions due April 15, 2007."

You had proposed in the joint CMC statement that you would file your
brief on valuation by March 20, with my responsive brief due 3 weeks
later.  Is that still your plan?  That would make my response brief
(and my cross-motion for summary judgment -- which I'll file together)
due approximately April 15.  Is that your understanding of what this
order means with these deadlines the judge added?

Also, I had stated on page 4 (item 3) that Dr. Lane seeks answers to
interrogatories 15-19 by March 15.  I just want to make sure that
you're working on that, because we need this discovery for our summary
judgment motion on valuation.  If you don't plan to submit that by
March 15, I'll need to file a motion to compel.

Brenda

EXHIBIT 3 page 41

**Subject:** Supplementary responses
**From:** "Rue, Nancy \(USAMA\)" <Nancy.Rue@usdoj.gov>
**Date:** Mon, 19 Mar 2007 17:38:09 -0400
**To:** <bgrantland1@comcast.net>

Brenda, please find attached our supplementary responses.  Please call me at 617 748 3260 if you have any questions.  Nancy

<<supplementary responses.mary magno.pdf>>

| **supplementary responses.mary magno.pdf** | **Content-Description:** | supplementary responses.mary magno.pdf |
| --- | --- | --- |
| | **Content-Type:** | application/pdf |
| | **Content-Encoding:** | base64 |

EXHIBIT 3 page 42

**Subject:** RE: Mary Magna deposition
**From:** "Rue, Nancy \(USAMA\)" <Nancy.Rue@usdoj.gov>
**Date:** Fri, 1 Jun 2007 16:22:25 -0400
**To:** <bgrantland1@comcast.net>

Brenda,

I cannot see how Mary Magno is a witness here.  The Court has ruled that
any actions by Ms. Magno were subject to the discretionary function
exemption, and therefore, no claim is at issue at which Ms. Magno would
have relevant testimony.  Perhaps if you comply with the Touhy
regulations and outline the items on which you believe that she would
have relevant testify, we would come to a different conclusion, but at
this point I cannot see how it is within the scope of issues potentially
remaining in this case.

Nancy Rue

-----Original Message-----
From: Brenda Grantland [mailto:bgrantland1@comcast.net]
Sent: Thursday, May 31, 2007 8:43 PM
To: Rue, Nancy (USAMA); Brenda Grantland
Subject: Mary Magna deposition

I haven't heard back from you about a suggested date to depose Mary
Magna.

EXHIBIT 3 page 43

12/14/2007 12:14 PM

# Brenda Grantland

Attorney at Law
20 Sunnyside Suite A-204
Mill Valley, CA 94941
(415) 380-9108
fax (415) 381-6105

June 5, 2007

AUSA Nancy Rue
1 Courthouse Way
Suite 9200
Boston, MA 02210

Re: U.S. v. Star Class Sloop "Flash II"
Demand for supplemental discovery

Dear Ms. Rue:

I am preparing a motion for reconsideration of the judge's oral decision on the discretionary function exception, as he stated I could do at the end of the trial.

In the last couple of days I did a lot of research on the discretionary function and found case law saying we're entitled to certain discovery because you are relying on that exception. See Ignatiev v. U.S., 238 F.3d 464, 467 (D.C. Cir. 2001).

Since you're objecting to my taking Mary Magda's deposition, I will forego the deposition if you will agree to provide me the following documents. We are entitled to discovery of these documents, even if they are internal guidelines, because they are relevant to your legal basis for asserting that the decision to auction the boat without a minimum reserve falls within the discretionary function exception.

I hereby my demand production of these documents:

     1. The DoJ guide to interlocutory sales, which you so far have refused to turn over (I want that whole guide, because I believe it is all relevant)

Relevant portions of any and all statutes, regulations, policy statements, manuals, or internal guidelines applicable to the Dept. Of Justice, US Attorney's Office and/or Marshal Service which govern the following:

     2. Any other regulation/policy defining "interlocutory sale"

     3. Any requirements that the government obtain a stipulation of the parties or a court

1

EXHIBIT 3 page 44

order before conducting an interlocutory sale

4. Any procedures for sales when there are owners the government knows were not served process in the forfeiture case

5. Any procedures for sales when the claimant has appealed the judgment

6. Any procedures for sales after default judgments that are contested

7. Any procedures, internal guidelines or policy statements the Marshal Service relied upon in deviating from the limitation on indemnification agreements in the Asset Forfeiture Policy Manual, p. 89 - specifically subsection (2) – when it signed the Guernsey's contract, section 10.

8. Any procedures, internal guidelines or policy statements the Marshal Service relied upon in representing in the Guernsey's contract, section 10, that "the Property is not 'confiscated Property' within the meaning of any United States federal or state laws."

9. If the Marshal Service complied with the requirement of the Asset Forfeiture Policy Manual, pp. 89-90, that any request to convey title through a special warranty deed with indemnification requires a written request to the Seized Assets Division, provide all paperwork submitted in relation to the 2005 Guernsey's auction of Flash II.

It may sound like a lot of stuff, but Mary Magna should know what regulations and policies she is required to apply. If there are no documents responsive to any of these categories of requests, you can just state so, with the paragraph number of the request.

If you object to any of these requests, let me know so I can file my motion to compel.

Sincerely,

Brenda Grantland

2

EXHIBIT 3 page 45

**Subject:** RE: Mary Magda discovery request
**From:** "Rue, Nancy \(USAMA\)" <Nancy.Rue@usdoj.gov>
**Date:** Tue, 5 Jun 2007 17:03:33 -0400
**To:** <bgrantland1@comcast.net>

```
Brenda, I am reviewing your letter with counsel for the Marshals
Service.  I should have a determination tomorrow of whether we will be
objecting to any of these items.  Thanks.  Nancy

-----Original Message-----
From: Brenda Grantland [mailto:bgrantland1@comcast.net]
Sent: Tuesday, June 05, 2007 4:31 PM
To: Rue, Nancy (USAMA); Brenda Grantland
Subject: Mary Magda discovery request


-----Original Message-----
From: Brenda Grantland [mailto:bgrantland1@comcast.net]
Sent: Tuesday, June 05, 2007 4:31 PM
To: Rue, Nancy (USAMA); Brenda Grantland
Subject: Mary Magda discovery request

I will forego deposing Mary Magda if you will agree to turn over the
documents I ask for in the attached letter.  Otherwise I'll prepare a
motion to compel discovery.

Brenda
```

EXHIBIT 3 page 46

**Subject:** supplemental responses to Jun 5 letter.pdf
**From:** "Rue, Nancy \(USAMA\)" <Nancy.Rue@usdoj.gov>
**Date:** Wed, 6 Jun 2007 13:02:53 -0400
**To:** <bgrantland1@comcast.net>

| supplemental responses to Jun 5 letter.pdf | **Content-Description:** | supplemental responses to Jun 5 letter.pdf |
|---|---|---|
| | **Content-Type:** | application/pdf |
| | **Content-Encoding:** | base64 |

EXHIBIT 3 page 47

1 of 1                                                                     12/14/2007 12:15 PM



**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

June 6, 2007

**By Electronic Mail**

Brenda Grantland, Esquire
20 Sunnyside Avenue STE A-204
Mill Valley, CA 94941

        Re:  United States v. One Star Class Sloop Sailboat, 05-
             10192-WGY

Dear Ms. Grantland:

        In response to your letter of June 5, 2007, the government
responds as follows:

        Items 1-3: Objection.  These items are irrelevant.  The sale
in this case was pursuant to a final order.  See Judgment and
Order of Forfeiture, Docket Entry 15, ("[T]his shall be and is
the full, final and complete disposition of this civil forfeiture
action.")  Interlocutory is defined by law as not final.
See Zayas-Green v. Casaine, 906 F.2d 18, 21 (1st Cir. 1990).
Therefore, rules related to interlocutory procedures are
irrelevant.

        Items 4-6: No specialized documents exist related to the
circumstances described in these items.  In the case of a
judicial order directing the Marshals Service to sell a forfeited
asset, the Marshals Service follows the directive of the Order.
To the extent that there are subsequent orders of the Court
regarding the sale, the Marshals Service follows the directive of
such orders.  No subsequent orders were received in this case.

        Item 7-8: Objection.  Paragraph 10 states: "The property is
being sold "as is", where is, with no guarantee or warantees
[sic] intended or implied."

EXHIBIT 3 page 48

Brenda Grantland, Esquire
June 6, 2007
page 2

     Item 9: Objection.  A deed is a conveyance of realty.  No
realty was conveyed here.  Provisions related to deeds are not
relevant.

                                Very truly yours,

                                MICHAEL J. SULLIVAN
                                United States Attorney

                    By:  /s/ Nancy Rue_____
                                Nancy Rue
                                Assistant U.S. Attorney

EXHIBIT 3 page 49

**Subject:** RE: Lane
**From:** "Rue, Nancy (USAMA)" <Nancy.Rue@usdoj.gov>
**Date:** Tue, 27 Nov 2007 16:22:21 -0500
**To:** <bgrantland1@comcast.net>

Thank you.

```
-----Original Message-----
From: Brenda Grantland [mailto:bgrantland1@comcast.net]
Sent: Tuesday, November 27, 2007 3:43 PM
To: Rue, Nancy (USAMA); Brenda Grantland
Subject: Lane

Nancy -

Here is my retainer agreement with Dr. Lane.

The Supreme Court case I was telling you about is Blum v. Stenson, 465
U.S. 886 (1984).

Brenda
```

EXHIBIT 3 page 50

AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

DISTRICT OF   **Massachusetts**

United States of America

**SUBPOENA IN A CIVIL CASE**

V.

One Star Class Sloop Sailboat Built in 1930 With Hull
Number 721, Named "Flash II"

Case Number:   **05-10192-RWZ**

TO:  Harry E. Crosby
c/o J. Thomas Kerner
230 Commercial Street, First Floor
Boston MA 02109

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to
testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition
in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
place, date, and time specified below (list documents or objects):

SEE ATTACHMENT "A"

| PLACE   Office of Seegal, Lipshutz & Wilchins, P.C., 20 William Street, Suite 130, Wellesley, MA 02481  (Attention: Attorney Eric Goldberg) 781-237-4400 | DATE AND TIME January 10, 2007  10 a.m. |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated,
the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Brenda Grantland attorney for claimant Kerry Lane* | 12/27/06 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Brenda Grantland, Attorney at Law, 20 Sunnyside Suite A-204, Mill Valley, CA 94941 (415) 380-9108

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

¹ If action is pending in district other than district of issuance, state district under case number.

EXHIBIT 4 page 1

**Harry E. Crosby subpoena duces tecum**
**Attachment "A"**

All records for the period January 1, 1996 to the present, whether in your possession or control or the possession or control of your attorneys or agents, relating to or concerning the following:

**ONE STAR CLASS SLOOP SAILBOAT, WITH HULL NUMBER 721, NAMED "FLASH II"**

The documents and records to be produced include, without limitation:

1.     All documents indicating ownership of the Flash II Sailboat, including all contracts between any of the parties holding an interest in the Flash II Sailboat;

2.     All documents, including correspondence, mentioning or relating to the storage of the Flash II Sailboat in Delray Beach, Florida, or its transportation to or from that location.

3.     All documents listing the name or address of Kerry Scott Lane (or "Dr. Lane");

4.     All documents relating to Sailorman New and Used Marine Emporium, or Chuck Fitzgerald, or the person(s) who purchased Sailorman's/Fitzgerald's interest in the Flash II;

5.     All documents relating to the 1998 (unsuccessful) auction of the Flash II;

6.     All correspondence, press releases or other documents to, from, or naming attorney Robert Harper.

EXHIBIT 4 page 2

# J. Thomas Kerner, Attorney at Law

230 Commercial Street, 2nd Floor ● Boston, MA  02109 ● (617) 720-5509 ● Fax: (617) 720-0707

# FAX

**TO:**      Brenda Grantland
**FAX NO:**  (415) 381-6105
**FROM:**    J. Thomas Kerner

**DATE:**    January 2, 2006

**RE:**      JFK Sailboat -- Flash II

### 6 Page(s) including Cover Sheet

**Message:**

Attorney Grantland:

Mr. Crosby does not wish to expend the resources to comply with your subpoena. He too was hoping the vessel would sell for more than $100,000.

It is my understanding that on January 31, 2007, Judge Young will determine whether Dr. Lane's claim was too late. It also is my understanding that discovery is closed for purposes of the January 31, 2007 hearing.

If Judge Young vacates Dr. Lane's default and permits him to litigate his claim, I'm pretty sure that the government will stipulate that Dr. Lane is entitled to some percentage of the proceeds. Mr. Crosby has told the DEA that he was informed by Anderson that Dr. Lane bought into the vessel when Fitzgerald demanded to be bought out.

I do not see the relevance of the requested documents to the issue which will be addressed on January 31, 2007. As the Court of Appeals ruled, If Judge Young rules against Dr. Lane, that will be the end of the matter. If he rules in favor of Dr. Lane, the government will settle. If they don't settle we will of course have to comply with the subpoena.

Thank you.

Very truly yours,

J. Thomas Kerner

EXHIBIT 4 page 3

**Subject:** Re: Kennedy sailboat case
**From:** "Thomas Kerner" <thomas.kerner@comcast.net>
**Date:** Fri, 5 Jan 2007 17:10:12 -0500
**To:** <bgrantland1@comcast.net>

Ms. Grantland:

Mr. Crosby was an original investor in the 1996 purchase of the Flash II. the vessel was purchased at auction for $18,500. He wired $5,250 to Rowell Realty & Auction Co, Inc., attention Ole Anderson, Mark Manly on 7/1/96. Mr. Crosby's original $5,250 purchased 25% of the Flash II.

Crosby believes that Fitzgerald gave Anderson $14,000, with the understanding that Anderson would find another source of funds in a short amount of time to buy out Fitzgerald at a handsome profit.

Subsequently Ole Anderson obtained another $5,250 from Crosby. At about the same time Dr. Lane bought into the ownership group. Presumably, Fitzgerald was bought out with money Anderson received from Crosby and Lane. Crosby was told that his second $5,250 increased his share in the vessel to one-third [33.3%].

I do not possess any documents which contain an address, phone number, fax or e-mail for Dr. Lane. I have seen your exhibit D, the 12/4/97 summary of money invested. Mr. Crosby never saw that document. He was not a signatory to that document.

I do not doubt that Ole Anderson told Dr. Lane that he owns 30% of the Flash II. Ole Anderson treated the Flash II like Max Bailystock and Leo Bloom treated the play, Springtime for Hitler.

One of the reasons I was glad that Dr. Lane was not permitted to file his claim is that I feared that once Dr. Lane was allowed in, half of Aligator Alley would be filing claims. Collectively, the shares Anderson has "sold" may constitute far more than 100%.

Thomas Kerner

EXHIBIT 4 page 4

**Subject:** Re: Kennedy sailboat case
**From:** Brenda Grantland <bgrantland1@comcast.net>
**Date:** Fri, 05 Jan 2007 16:49:09 -0800
**To:** Thomas Kerner <thomas.kerner@comcast.net>, Brenda Grantland <bgrantland1@comcast.net>

Mr. Kerner -

Your statement below -- that Crosby admits that Chuck Fitzgerald's interest was purchased at least in part with money from Dr. Lane is not what Crosby said in his affidavit. Paragraphs 3 and 4 suggest that Crosby bought out Chuck Fitzgerald's interest.
The only reason I still need these documents now is to establish that Crosby knows that Dr. Lane can trace his interest in the boat to Fitzgerald. You had told me that you had a document in your file that discussed Fitzgerald's interest, and that there was some kind of notation on the document showing Dr. Lane's name replacing Fitzgerald's. I may not be completely accurate about your description of the document.

Right now the only reason I need these documents is to establish that Crosby knew Lane's interest traces to Fitzgerald. (Because Fitzgerald knew how to reach my client.) If your client is willing to sign a declaration clarifying that fact, I will withdraw the subpoena for now -- although we may need these documents later in the remedy phase of litigation if there is a factual dispute about percentages of ownership. I don't see how that would really affect your client since he has already established his percentage of recovery by settling with the government.

Your fear that "half of alligator alley will be filing claims" is unlikely to occur. No one else filed a Rule 60 motion except my client, and since more than a year has passed since the judgment, it is too late for them to move to vacate under the usual Rule 60 grounds. They would have to prove the judgment was void for lack of notice. Unlike anyone else who might claim the government should have found them and given them notice, only Dr. Lane was described by the CI in the complaint, putting the government on notice that they needed to find the doctor or dentist the CI was talking about.
Let me know if your client is willing to settle this subpoena dispute by giving us an affidavit clarifying that he knew Dr. Lane purchased his interest from Fitzgerald. I will hold off filing a response to your motion to quash to allow your client to consider this proposal first.
Brenda

Thomas Kerner wrote:

Ms. Grantland:

Mr. Crosby was an original investor in the 1996 purchase of the Flash II. the vessel was purchased at auction for $18,500. He wired $5,250 to Rowell Realty & Auction Co, Inc., attention Ole Anderson, Mark Manly on 7/1/96. Mr. Crosby's original $5,250 purchased 25% of the Flash II.

Crosby believes that Fitzgerald gave Anderson $14,000, with the understanding that Anderson would find another source of funds in a short amount of time to buy out Fitzgerald at a handsome profit.

Subsequently Ole Anderson obtained another $5,250 from Crosby. At about the same time Dr. Lane bought into the ownership group. Presumably, Fitzgerald was bought out with money Anderson received from Crosby and Lane. Crosby was told that his second $5,250 increased his share in the vessel to one-third [33.3%].

I do not possess any documents which contain an address, phone number, fax or e-mail for Dr. Lane. I have seen your exhibit D, the 12/4/97 summary of money invested. Mr. Crosby never saw that document. He was not a signatory to that document.

I do not doubt that Ole Anderson told Dr. Lane that he owns 30% of the Flash II.

**EXHIBIT 4 page 5**

Ole Anderson treated the Flash II like Max Bailystock and Leo Bloom treated the play, Springtime for Hitler.

One of the reasons I was glad that Dr. Lane was not permitted to file his claim is that I feared that once Dr. Lane was allowed in, half of Aligator Alley would be filing claims.  Collectively, the shares Anderson has "sold" may constitute far more than 100%.

Thomas Kerner

EXHIBIT 4 page 6

**Subject:** Re: Kennedy sailboat case
**From:** "Thomas Kerner" <thomas.kerner@comcast.net>
**Date:** Fri, 5 Jan 2007 21:01:06 -0500
**To:** <bgrantland1@comcast.net>

Ms. Grantland:

Mr. Crosby only knows that Lane came on the scene when Fitzgerald cashed out.  He does not know whether Lane bought Fitzgerald's interest .  Crosby doesn't even know how much of an interest in the vessel Fitzgerald owned. Crosby believed that Fitzgerald was never supposed to be a long term investor like Crosby.

Anderson informed Crosby that Lane became an owner when Fitzgerald was divesting his interest in the vessel.  That is what Crosby stated in his Affidavit at paragraph 4.

Crosby was not aware, as Lane claims, that Lane and Fitzgerald dealt directly with each other.  As far as Crosby was concerned, Anderson controlled the vessel and what percentage interest in the vessel (other than Crosby's) was available to buy and at what price.  Based on what Dr. Lane has stated in his filings, Dr. Lane was charged much more by Anderson for his 25% or 30% interest than Crosby was charged for his 33.3% interest.

Back to the subpoena.  The government does not dispute that Lane was an owner.  Nor does the government dispute that if Crosby was interviewed, he would have told the government that Fitzgerald was an original investor but sold his interest soon after the vessel was purchased at auction.  About the time Fitzgerald was selling his interest Anderson told Crosby that Dr. Kerry Lane who lived somewhere in Florida, had become an owner.  Crosby isn't sure about the timing of Fitzgerald's divestiture, but knows that it occurred well before the first Guernseys auction.

Any documentation that Crosby may have will only become material if Lane is permitted to file a claim and the government disputes his contention that he owned 25% or 30% of the vessel.

Thomas Kerner

**Subject:** Re: Kennedy sailboat case
**From:** Brenda Grantland <bgrantland1@comcast.net>
**Date:** Fri, 05 Jan 2007 19:36:51 -0800
**To:** Thomas Kerner <thomas.kerner@comcast.net>, Brenda Grantland <bgrantland1@comcast.net>
**BCC:** "Dr. Kerry Lane" <KERRYSLANEMD@ATT.NET>

Mr. Kerner -

This is the first I'm learning your client's factual position - because we haven't
had discovery.
If we can work out an informal exchange of information (questions and answers over
the phone between you and me) and can get your client to sign a declaration
clarifying and expanding on his version of the facts for us -- as he did for the
government -- then we won't have to enforce the subpoena at this point.
Judge Young segmented discovery,  so at this point we're just looking for the facts
relevant to the reasonableness of the government's attempts or non-attempts and/or
leads they could have followed and where those leads would have led.  I need to tie
down what your client knew or could have learned from reviewing documents he has
(or had in his possession or control) regarding leads the government could have
followed had they interviewed him about other owners.  We need to know the facts
your client knows -- or could have determined based on documents he had in his
possession when the sailboat was seized -- that would have traced Dr. Lane's
ownership back to Fitzgerald.  (We have already established that Fitzgerald could
have told them how to find Dr. Lane if they had asked him.)
Incidentally - I disagree with your theory that Ole dispensed shares in the
sailboat willy-nilly.  By your client's own claims, Crosby only invested $10,250 in
the boat.  (I got this figure from his declaration, not from your email below.)
After buying out Fitzgerald's share of the sailboat, the consortium had an ongoing
series of expenses.  For example, I just got Marblehead's file and it's full of
invoices for repairs, storage, transportation, and other things.  My client
invested approximately $70,000 (as I recall the figure) in increments over the
years.  The relative investments of the consortium members in the overall project
caused the ownership percentages to change over time.  That's totally normal --
it's how business enterprises grow and expand.

Since you like analogies -- it may be that Mr. Hewlett and Mr. Packard each
invested $10,250 in their company when they were still working out of a garage, but
as they turned their fledgling start-up into a huge profitable corporation they had
to sell shares to others to raise the capital to make it happen.  When Hewlett
Packard became a publicly traded corporation, I'm sure Mr. Hewlett and Mr. Packard
would have loved to have split that money 50/50 -- as I'm sure your client would
love to keep his initial percentage of ownership from back when the consortium
purchased the raw, unrestored "Flash II".  But the fact is, had they turned around
and sold Flash II again without restoration, display at museums, publicity, etc.,
it wouldn't have generated any profit.  Crosby didn't contribute any of the
additional funds necessary to restore the boat, move it, store it, show it in
museums, advertise it, and otherwise prepare it for a much higher return than the
initial investment.  My client did.

We believe your client got a windfall in his 30% settlement with the government.
But it is a settlement, and not an adjudicated measure of Crosby's current interest
in the property.  Right now we don't believe that your settlement will limit the
amount of money my client is entitled to -- so we really don't have to be enemy
combatants here.  Certainly in any case with multiple claimants, the government is
free to give away more than 100% of the value in settlement.  Your settlement is
final, and probably can't be disturbed, so your client really shouldn't have
anything to worry about.

Thomas Kerner wrote:

  Ms. Grantland:

  Mr. Crosby only knows that Lane came on the scene when Fitzgerald cashed out.  He

**EXHIBIT 4 page 8**

does not know whether Lane bought Fitzgerald's interest . Crosby doesn't even know how much of an interest in the vessel Fitzgerald owned. Crosby believed that Fitzgerald was never supposed to be a long term investor like Crosby.

Anderson informed Crosby that Lane became an owner when Fitzgerald was divesting his interest in the vessel. That is what Crosby stated in his Affidavit at paragraph 4.

Crosby was not aware, as Lane claims, that Lane and Fitzgerald dealt directly with each other. As far as Crosby was concerned, Anderson controlled the vessel and what percentage interest in the vessel (other than Crosby's) was available to buy and at what price. Based on what Dr. Lane has stated in his filings, Dr. Lane was charged much more by Anderson for his 25% or 30% interest than Crosby was charged for his 33.3% interest.

Back to the subpoena. The government does not dispute that Lane was an owner. Nor does the government dispute that if Crosby was interviewed, he would have told the government that Fitzgerald was an original investor but sold his interest soon after the vessel was purchased at auction. About the time Fitzgerald was selling his interest Anderson told Crosby that Dr. Kerry Lane who lived somewhere in Florida, had become an owner. Crosby isn't sure about the timing of Fitzgerald's divestiture, but knows that it occurred well before the first Guernseys auction.

Any documentation that Crosby may have will only become material if Lane is permitted to file a claim and the government disputes his contention that he owned 25% or 30% of the vessel.

Thomas Kerner

EXHIBIT 4 page 9

# Brenda Grantland

**Attorney at Law**
20 Sunnyside Suite A-204
Mill Valley, CA 94941
(415) 380-9108
fax (415) 381-6105

January 5, 2007

J. Thomas Kerner
230 Commercial Street
1st Floor
Boston, MA 02109

Via fax to 617-720-0707

Re: JFK Sailboat Flash II case

Dear Mr. Kerner:

Based on your description of what your client would be saying in the declaration he gave the government, I told you I would forego enforcement of our subpoena duces tecum at this time. Now that I received the declaration and see that it not only does not state what you represented to me, but contradicts what we contend to be the facts, we are going to enforce our subpoena for documents. We want both the documents responsive to the subpoena in your file and in your client's possession – including the contract you described to me over the phone, that had both Chuck Fitzgerald's name and Dr. Kerry Lane's.

So go ahead and file your motion to quash. We can argue your motion at the hearing on January 31st.

Sincerely,

Brenda Grantland

EXHIBIT 4 page 10

# Brenda Grantland

**Attorney at Law**
20 Sunnyside Suite A-204
Mill Valley, CA 94941
(415) 380-9108
fax (415) 381-6105

January 5, 2007

J. Thomas Kerner
230 Commercial Street
1st Floor
Boston, MA 02109

Via fax to 617-720-0707

Re: JFK Sailboat Flash II case

Dear Mr. Kerner:

This is a postscript to the letter I sent you earlier today.

Upon rereading your client's declaration, I think we might be able to settle for a declaration from your client in lieu of enforcing the subpoena at this time.

His declaration would have to confirm that documents in Crosby's possession show that Dr. Lane purchased Chuck Fitzgerald's/Sailorman's interest in the boat. As it stands, his declaration suggests that Crosby purchased Fitzgerald's interest for $5,000, thereby becoming a 30% owner of the sailboat. You might remind your client that I have spoken to Chuck Fitzgerald, and he has given us documents and a declaration showing that Dr. Lane purchased his interest (minus 1%). Fitzgerald confirmed that Dr. Lane came with Ole Anderson to Sailorman New and Used Marine Emporium when Lane purchased Fitzgerald's interest. We even have a photo of Dr. Lane and Ole Anderson at Sailorman's facility.

Also, I want to see the document you described to me on the phone.

Sincerely,

Brenda Grantland

EXHIBIT 4 page 11

**Subject:** Crosby
**From:** "Rue, Nancy \(USAMA\)" <Nancy.Rue@usdoj.gov>
**Date:** Fri, 7 Sep 2007 10:46:42 -0400
**To:** <bgrantland1@comcast.net>

Brenda,

Thanks for your voicemail. I have not received anything further from Crosby, but I am attempting to contact him. I would certainly be interested in submitting on papers if we are able to. I expect to speak with his attorney today. Perhaps you and I can talk early next week and see if we can agree on a way to proceed.

Nancy

EXHIBIT 4 page 12

1 of 1                                                                                    12/14/2007 12:19 PM

**Subject:** Deposition of Harry E. Crosby
**From:** "Rue, Nancy \(USAMA\)" <Nancy.Rue@usdoj.gov>
**Date:** Wed, 12 Sep 2007 16:09:23 -0400
**To:** <thomas.kerner@comcast.net>
**CC:** <bgrantland1@comcast.net>

Tom,

As I mentioned in our telephone conversation, the Court has scheduled a hearing for Wednesday, September 26, 2007, in the sailboat case to determine the ownership interest of Harry Crosby.

Attorney Grantland and I have conferred, and we believe that we can obviate the hearing, and the associated travel, by doing a telephone deposition of your client.

Both Ms. Grantland and I are available on either Tuesday September 18 or Wednesday, September 19, 2007 – I would estimate that the deposition would take well under two hours.

Could you please confer with your client and determine when he would be available?

Thank you.


Nancy Rue

617 748 3260

EXHIBIT 4 page 13

**Subject:** RE: what's the deal on the Crosby deposition
**From:** "Rue, Nancy \(USAMA\)" <Nancy.Rue@usdoj.gov>
**Date:** Mon, 17 Sep 2007 15:00:52 -0400
**To:** <bgrantland1@comcast.net>
**CC:** <thomas.kerner@comcast.net>

Tom Kerner, his attorney, told me that he has been having difficulty
reaching him.  Kerner has also told me that they take the position that
he is no longer a party and therefore that he is not required to
participate.  Kerner is currently in federal court on another matter, so
we are planning to talk after he finishes.  I am hoping to be able to
get an agreement on Wednesday at 1pm for a telephone depo.  I assume
that you would notice him for depo?

Just got a call from reception that Kerner is here.  If we are having a
debate about this, I may seek to conference you in.   What telephone
number can you be reached at in the next twenty minutes?

Thanks.  Nancy

-----Original Message-----
From: Brenda Grantland [mailto:bgrantland1@comcast.net]
Sent: Monday, September 17, 2007 2:53 PM
To: Rue, Nancy (USAMA); Brenda Grantland
Subject: what's the deal on the Crosby deposition

Nancy -

Let me know by close of business today when we're having the Crosby
deposition.   I will probably be out most of the day, so leave a message

or email.

Brenda

EXHIBIT 4 page 14

1 of 1                                                                    12/14/2007 12:20 PM

**Subject:** RE: Flash II
**From:** "Rue, Nancy \(USAMA\)" <Nancy.Rue@usdoj.gov>
**Date:** Mon, 17 Sep 2007 16:38:03 -0400
**To:** <bgrantland1@comcast.net>, <Bonnie_Smith@mad.uscourts.gov>

Bonnie, Crosby's counsel has conferred with Crosby. They have agreed that Crosby will appear for a
telephonic deposition on Wednesday, September 19 at 1:00 p.m.
I believe that this moots Attorney Grantland's request for a status conference.

Brenda, I will email separately regarding the logistics.

Thank you.

**From:** Brenda Grantland [mailto:bgrantland1@comcast.net]
**Sent:** Monday, September 17, 2007 3:36 PM
**To:** Bonnie_Smith@mad.uscourts.gov
**Cc:** Rue, Nancy (USAMA)
**Subject:** Re: Flash II

Bonnie -

The parties are having a dispute over the evidentiary hearing/deposition of Crosby and may need the
judge to resolve it. We are still trying to negotiate with Crosby's attorney about it, and I will let you
know if we reach a resolution. I told Nancy Rue and Crosby's lawyer that if it is not resolved by the
close of business today I was requesting a telephonic status hearing with the judge, to be held
tomorrow or Wednesday if possible. Could you see if you could fit it into the schedule just in case?

Brenda

Bonnie_Smith@mad.uscourts.gov wrote:

```
Brenda,
Thank you for responding. I hope you and Nancy Rue can work things out so
the hearing will not be needed. Please let me know asap. Thank you.
BONNIE
```

```
          Brenda Grantland
          <bgrantland1@comc
          ast.net>                                                    To
                                      Bonnie_Smith@mad.uscourts.gov
          09/05/2007 03:51                                            cc
          PM                          nancy.rue@usdoj.gov, Brenda
                                      Grantland <bgrantland1@comcast.net>
                                                                 Subject
          Please respond to           Re: Flash II
          bgrantland1@comca
             st.net
```

EXHIBIT 4 page 15

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Civil Action # 05-10192 RWZ |
| ONE STAR CLASS SLOOP SAILBOAT BUILT IN 1930 WITH HULL NUMBER 721, NAMED "FLASH II", | DECLARATION OF ATTORNEY BRENDA GRANTLAND |
| Defendant. | |
| KERRY SCOTT LANE, M.D. | |
| Claimant. | |

I, Brenda Grantland, depose and state as follows:

1. I am the lead counsel on this case.

2. Dr. Lane and I both tried – without success – to find an appraiser to use as an expert witness. There are apparently very few appraisers with expertise on Kennedy memorabilia as unique as this one. We were unable to find an appraiser with expertise both in Kennedy memorabilia and sailboats. The auction houses, appraisers and appraiser referral associations counsel talked to all said no one would be willing to put a value on the sailboat without inspecting it.

3. The costs and out-of-pocket expenses I billed the court were the exact amounts my client and I had to pay out of pocket. I tried to keep down the expenses (primarily because I usually had to pay them out of my own pocket, since my client was so far behind in paying my

1

bill) by seeking telephonic hearings and telephonic depositions whenever possible. The government initially objected to telephonic depositions (See Exhibit 3 p. _).

    4.  The Fed Ex expense to Sheketoff (the CW's lawyer) was not the cost of serving process on the CW. I did not serve the subpoena duces tecum on the government because I was never able to get the CW's attorney to agree to accept service of the subpoena on the CW. The Fed Ex package to his lawyer contained a written request asking the lawyer to consent to his client signing a declaration and/or to agree to accept service for the CW. The package included the proposed subpoena duces tecum and a draft declaration. The CW 's counsel refused to respond to calls, faxes and the Fed Ex package. Since Claimant did not know the CW's whereabouts, he was never able to serve the subpoena.

    5.  The travel expenses in this case were often higher than usual because the travel reservations often had to be made on very short notice.

    6.  I did not stay an additional night after oral argument in the Court of Appeals as the government claimed. I traveled to Boston a day early because my plane would be arriving late at night and I did not want to go to do oral argument first thing in the morning Eastern time with jet lag and too little sleep. Also, I needed to confer with local counsel in preparing for oral argument, so I arrived the day before oral argument.

    7.  Due to a large high-tech convention in Boston on the week of oral argument, the hotels were booked up in advance, and we had to pay higher than usual rates ($347 - $412[1] per night for

---

[1]  Doc. 88-9 line 2 says "Boston Park Plaza," but I don't believe that is the hotel I stayed at on the first trip. It was a chain hotel the Hyatt or Marriott. (I stayed at Boston Park Plaza on the January 2007 trip to Boston, which Dr. Lane did not attend.) The hotel that I was sent to the first night was called Juries.

rooms downtown). When I arrived in Boston late that night, the hotel had already given away

her room that was reserved on Dr. Lane's credit card. The hotel sent me to another hotel which

was billed to my credit card (at a slightly cheaper rate). I returned to the original hotel for the

second night, which was charged to Dr. Lane's credit card. Dr. Lane could not even find a hotel

room in Boston, and had to commute from a hotel in the suburbs.

8. At trial, both Dr. Lane and I booked hotel rooms for two nights because we thought

the trial would last more than one day. Although trial only lasted a day, it was too late to change

the flights in order to fly home that night – the next available seats on my flight was first thing

the following morning.

9. The government disputes as excessive the calls on 12/15/2006 to local counsel, docket

clerks and prosecutors. Actually that was a typo. In preparing in my itemization I inadvertently

omitted part of the tasks performed on that date. The entry in my contemporaneous time records

for that day says "Lane - calls to Eric, docket clerk, Rue, USAO, draft motion for telephonic

hearing 2.0" in the time slot from 10:20 a.m. to 12:15; and "Lane motion for leave to reply, final

draft reply memo, get docket 1.0" in the time slot for 5:30-6:30 p.m.

10. On each trip, I spent the entire flight to Boston preparing for the court appearance.

On the way home on at least one trip, flight delays, stretched travel time to 10 - 12 hours – door

to door. It is my general policy to bill clients a flat 8 hour day when travel takes me away from

the office for an entire 8-hour day, preventing me from working on other cases – even if the

travel takes considerably longer.

11. My itemization of hours spent researching and preparing this Reply, Exhibit 12,

were compiled from contemporaneous records, and they truly and accurately reflect the actual

3

hours I spent on the task.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Dated: 12/17/2007                          _____/s/ Brenda Grantland_____
                                           Brenda Grantland, Esq.
                                           Law Office of Brenda Grantland
                                           20 Sunnyside Suite A-204
                                           Mill Valley, CA 94941
                                           (415) 380-9108
                                           Pro hac vice

4

# Brenda Grantland

Attorney at Law
20 Sunnyside Suite A-204
Mill Valley, CA 94941
(415) 380-9108
fax (415) 381-6105

October 20, 2006

AUSA Nancy Rue
1 Courthouse Way
Suite 9200
Boston, MA 02210

Re: U.S. v. Star Class Sloop "Flash II"
Settlement offer

Dear Ms. Rue:

I haven't received your entry of appearance yet, but thought it would be a good idea to go ahead
and give you our settlement offer.

My client is willing to settle for $310,000 plus his attorneys fees under CAFRA. I will get you
the current attorneys fees figure next week.

This figure is based on the formula from the handwritten document between the investors, signed
by Ole Anderson on December 4, 1997. See Appellant's Appendix pp. 59-60. Under that
formula, Dr. Lane was to get $60,000 plus $10,000, and 30% of the profit from the sale. If his
share of the profit was greater than $60,000, then the $60,000 (but not the $10,000) was to be
deducted from the 30% of the profits.

I based the value figure on what we estimate to be the fair market value of the sailboat –
$1,000,000. At the 1998 auction, the investors set a reserve of $1 million. Although they did not
meet the reserve, someone made an offer of $800,000 which they turned down. This is all
documented in the Complaint, page 10 paragraph 16. See Appellant's Appendix p. 17. With
inflation, the $800,000 offer which was turned down in 1998 would be closer to $1,000,000
today. Also, the Ebay live auction listing for the Guernsey's auction last December listed a value
of $200,000 to $1,000,000 – showing a million is in the ballpark range of value. I assume they
got these figures from the government.

The amount that the sailboat actually sold for at the auction last December is not the measure of
fair market value. This was a distressed sale. My client had been denied due process during the
forfeiture litigation, and was not permitted to defend his interest in the sailboat at all. He had
appealed from the denial of his motion to vacate default before the auction, and his case had

1

EXHIBIT 6 page 1

generated some publicity. With Dr. Lane's claim of denial of due process pending in court, anyone who purchased the sailboat was taking the chance that they wouldn't get good title – which turned out to be the case. This naturally discouraged most people from bidding on the sailboat. I tried to get the government to set a minimum reserve, but the judge told me to negotiate with Shelbey about it and Shelbey refused to set any minimum reserve.

Call me if you have any questions.

Sincerely,

Brenda Grantland

Brenda Grantland

2

EXHIBIT 6 page 2



**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*          *John Joseph Moakley United States Courthouse*
                                          *1 Courthouse Way*
                                          *Suite 9200*
                                          *Boston, Massachusetts 02210*

May 18, 2007

Confidential: For Settlement Purposes Only

**By Electronic Mail**

Brenda Grantland, Esquire
20 Sunnyside Avenue STE A-204
Mill Valley, CA 94941

        Re:  United States v. One Star Class Sloop Sailboat, 05-
             10192-WGY

Dear Ms. Grantland:

        On behalf of the United States of America, I am authorized
to offer Kerry Scott Lane one third of the net proceeds from the
sale of the above-named *res* in full settlement of his claim in
the above matter.  The net proceeds of the sale were $78,382;  a
one-third share is therefore $26,127.

        This offer will remain open until 5:00 p.m. Tuesday, May 22,
2007 EDT.

        Additionally, the United States would be open to mediation
of the remaining issues by a Magistrate Judge of this Court if
claimant wishes to participate in a settlement conference.


                         Very truly yours,

                         MICHAEL J. SULLIVAN
                         United States Attorney

             By:  /s/ Nancy Rue
                  Nancy Rue
                  Assistant U.S. Attorney


EXHIBIT 7





**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

*Main Reception: (617) 748-3100*
*Writer's Direct Dial: (617) 748-3147*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

July 26, 2006

Richard Cushing Donovan, Clerk of Court
United States Court of Appeals for the First Circuit
John Joseph Moakley United States Courthouse
1 Courthouse Way
Boston, Massachusetts 02210

> Re: United States, Plaintiff-Appellee v. Kerry Scott Lane, Claimant - Appellant
> Appeal No. 06-2089

Dear Mr. Donovan:

Plaintiff-Appellee United States submits this letter to the Court pursuant to FRAP 28(j) because it recently noted a jurisdictional issue omitted from its brief. The case is scheduled for argument on August 2, 2006. Kindly bring this letter to the panel's attention.

To the extent that Claimant-Appellant Dr. Lane seeks to appeal the underlying judgment of forfeiture, as is indicated in his notice of appeal but not entirely clear from his briefs, that appeal is untimely, and this Court lacks jurisdiction to review that judgment. Dr. Lane can pursue his appeal of the denials of his Rules 60(b) and 59(e) motions, but he cannot an appeal from the judgment. The pendency of a timely Rule 59(e) motion, which must be made within 10 days of the entry of judgment, tolls the running of the appeal period from the original judgment. See Fed. R. App. P. 4(a)(4); Fed. R. Civ. P. 59(e). Here, the Rule 59(e) motion was filed on August 29, 2005, within 10 days of the August 16, 2005, denial of the Rule 60(b) motion, but clearly not within 10 days of the July 15, 2005, entry of the judgment of forfeiture.

An appeal from the denial of a Rule 60(b) motion will not expose the merits of the underlying judgment to appellate scrutiny, neither is it a surrogate for a seasonable appeal of the underlying judgment. See Karak v. Bursaw Oil Corp., 288 F.3d 15, 18-19 (1st Cir. 2002); see also. Rodriguez-Antuna v. Chase Manhattan Bank Corp., 871 F.2d 1, 2 (1st Cir.1989).

EXHIBIT 8 page 1

Although Dr. Lane's intention to appeal the underlying judgment is not clearly articulated in his briefs, the United States submits that, for the reasons stated above, this Court lacks jurisdiction to review the underlying forfeiture judgment.

Respectfully submitted,

Michael J. Sullivan
UNITED STATES ATTORNEY

By: _Shelbey D. Wright_
SHELBEY D. WRIGHT
Assistant U.S. Attorney

cc.    Brenda Grantland, Esq.
       Law Office of Brenda Grantland
       20 Sunnyside
       Suite A-204
       Mill Valley, CA 94941
       **by fax: (415) 381-6105**
       **and first class mail**

EXHIBIT 8 page 2

# Brenda Grantland

Attorney at Law
20 Sunnyside Suite A-204
Mill Valley, CA 94941
(415) 380-9108
fax (415) 381-6105

July 27, 2006

Richard Cushing Donnovan, Clerk of Court
United States Court of Appeals for the First Circuit
John Joseph Moakley United States Courthouse
1 Courthouse Way
Boston, Massachusetts 02210

> Re: United States v. One Star Class Sloop Sailboat,
> Kerry Scott Lane, M.D., claimant/appellant
> App. No. 06-1089

Dear Mr. Donovan:

Appellant hereby responds to the letter filed yesterday by Assistant U.S. Attorney Shelbey
Wright, claiming that this Court lacks jurisdiction to review the original judgment under
F.R.A.P. Rule 4(a).

Raising this issue for the first time in a F.R.A.P. Rule 28(j) letter – without citing to any place in
its brief arguably raising the issue – is an improper use of Rule 28(j). That the government is
raising this issue for the first time just two business days before I travel to Boston for oral
argument is doubly disturbing. It reeks of the sharp practices that have repeatedly punctuated the
government's prosecution of this case.

However, since this Court must assure itself that it has jurisdiction before proceeding, Appellant
will address the argument.

The original judgment of default was entered on July 19, 2005. Appx. at 3. Dr. Lane filed his
F.R.Civ.P. Rule 60(b) motion on July 27, 2005 – just eight calendar days after the entry of
default judgment. The district judge denied the 60(b) motion by endorsed order entered August
18, 2005. Id. Dr. Lane filed a F.R.Civ.P. Rule 59(e) motion to alter/amend on August 29,[1]

---

[1] Appellant's opening brief erroneously states on page 3 that the Rule 59(e) motion was
filed on September 29. That was a typographical error. The docket (Appx. p. 3) shows it was
filed on August 29, 2005.

EXHIBIT 9 page 1

which was denied on October 18, 2005. The notice of appeal was filed on November 9, 2005. Appx. at 4. (Since the federal government is a party, the deadline for filing a notice of appeal was 60 days under FRAP Rule 4.)

Both the Rule 60(b) and 59(e) motions were timely filed. The Rule 60(b) motion was filed eight calendar days after entry of judgment – clearly within the 10-day Rule 4 deadline. The Rule 59(e) motion was filed 11 calendar days after entry of the order denying the Rule 60(b) motion – but it was still within the ten day rule. Pursuant to F.R.Civ.P. Rule 6(a), when the period is less than 11 days, Saturdays, Sundays and legal holidays are excluded from the computation. Also under Rule 6(a), when the last day of the period falls on a weekend, the deadline is the next business day. Under either of those provisions of Rule 6(a), the Rule 59(e) motion was filed within 10 days. The tenth calendar day was a Sunday, and the motion was filed on Monday, the seventh business day.

The government suggests that Rule 4(a)(4) requires that both the Rule 60(b) motion and the Rule 59(e) motion be filed within 10 days of the final judgment in order to toll the deadline for filing a notice of appeal, and thereby preserve the appeal from the final judgment.

FRAP Rule 4(a)(4)(A) clearly states otherwise.

> If a party timely files in the district court <u>any of the following motions</u> ... <u>the time to file an appeal runs</u> ... <u>from the entry of the order disposing of</u> **the last such remaining motion**:
>
> (i) for judgment under Rule 50(b);
>
> (ii) to amend or make additional factual findings under Rule 52(b), whether or not granting the motion would alter the judgment;
>
> (iii) for attorney's fees under Rule 54 if the district court extends the time to appeal under Rule 58;
>
> (iv) **to alter or amend the judgment under Rule 59**;
>
> (v) for a new trial under Rule 59; or
>
> (vi) **for relief under Rule 60 if the motion is filed no later than 10 days after the judgment is entered**.

FRAP Rule 4(a)(4)(A) (emphasis added). Here, clearly the Rule 60 motion was filed within 10 days after the judgment was entered, and the Rule 59 motion was filed within 10 days after denial of the Rule 60 motion. FRAP Rule 4 clearly contemplates that these motions may be filed in sequence, and that a sequence of timely filed motions extends the tolling ("if a party timely files... any of the following motions..." the deadline for filing a notice of appeal is tolled until "...the entry of the order disposing of the last such remaining motion...") Other courts have so held. See *Eleby v. American Medical Systems, Inc.*, 795 F.2d 411, 412 (5th Cir. 1986).

As support for its new jurisdictional argument, the government cited *Karak v. Bursaw Oil Corp.*, 288 F.3d 15 (1st Cir. 2002) and *Rodriguez-Antuna v. Chase Manhattan Bank Corp.*, 871 F.2d 1

2

EXHIBIT 9 page 2

(1st Cir. 1989). Those authorities do not support the government's argument.

*Karak* involved a Rule 60(b) motion which was timely filed under Rule 60(b) (which allows up to one year to file for relief in the district court from the original judgment) – but not timely under the 10 day rule of F.R.A.P. 4(a)(4)(A)(vi) (which would have tolled the time for appealing from the original judgment.) This Court held that Karak's appeal was perfected as to review of the Rule 60 decision, but the appeal of the final judgment was time barred. Thus, although Karak could challenge the decision on the Rule 60(b) motion on appeal, the appellate court could not reconsider the original judgment because he had not filed a timely notice of appeal, and his time for appealing from the judgment had not been tolled by Rule 4. *Rodriguez-Antuna* is distinguishable for the same reason. ("On July 22, 1988, well after the appeal period had expired, plaintiffs filed a request for relief from judgment in the district court.") 871 F.2d at 1.

In this case, both motions were filed within the 10 days after judgment or denial of the previous motion – so tolling was preserved and the notice of appeal was perfected against the original judgment as well as the subsequent rulings.

If the government is arguing that the Rule 59(e) motion was not timely filed because the denial of the Rule 60(b) motion was not itself a "judgment," courts have held otherwise in situations such as this. Here, Dr. Lane could not file an appeal from the original judgment because he was not then a party. His Rule 60(b) motion was properly brought as a means to reopen the default judgment and intervene to litigate his interest. When that motion was denied, it was a final judgment as to him. Although he could have appealed that denial immediately, instead he properly filed a motion to alter/amend the judgment, asking the district court to correct its errors of law. See *Bank of California, N.A. v. Arthur Andersen & Co.*, 709 F.2d 1174, 1176 (7th Cir. 1983) ("The district judge had the power under Rule 59(e) to vacate his order denying the Rule 60 motion -- such an order is a judgment for purposes of Rule 59(e),... -- and thus to modify his original judgment in accordance with the Rule 60(b) motion.") (citations omitted); *Morgan Guaranty Trust Co. v. Third Nat'l Bank*, 545 F.2d 758, 760 (1st Cir. 1976) ("a 'judgment' for Rule 59(e) purposes, [is an order that is] final and appealable as "the concluding judicial act or pronouncement of the court disposing of the matter before it").

Respectfully submitted,

Brenda Grantland

Brenda Grantland

cc: AUSA Shelbey Wright

3

EXHIBIT 9 page 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | \| |
| | \| |
| Plaintiff, | \| |
| v. | \|    Civil Action # 05-10192 RWZ |
| | \| |
| ONE STAR CLASS SLOOP SAILBOAT | \| |
| BUILT IN 1930 WITH HULL NUMBER | \|    DECLARATION OF JUDY OSBURN |
| 721, NAMED "FLASH II", | \|    REGARDING BILLING FOR |
| | \|    PARALEGAL SERVICES |
| Defendant. | \| |
| | \| |
| KERRY SCOTT LANE, M.D. | \| |
| | \| |
| Claimant. | \| |

I, Judy Osburn, declare the following:

1.    I work as a paralegal for attorney Brenda Grantland.

2.    The billing submitted to this Court by Ms. Grantland for my work done on *United States v. Flash II* is a true copy of the bill that I sent to her, and reflects the correct number of hours that I spent working on this case.

3.    I spent the majority of time for my entry for two hours of work done on 5/27/2007, which I described as "Guernsey contract, billing review/payments breakdown," sorting through the government's exhibit of numerous receipts from Marblehead Trading Company and comparing these receipts with checks from Dr. Lane that had been entered into exhibit.   I spent this time in order to show that almost none of Ole Anderson's expenses occurred after he received tainted money from the government's Cooperating Witness, and that Dr. Lane was the source for expenses and maintenance payments. Though I listed "Guernsey contract" first under my short

EXHIBIT 10 page 1

"description of duties" heading, in fact, only a few minutes of those two hours were spent reading the "Guernsey contract." The vast majority of those two hours reflect sorting through Marblehead Trading receipts and creating an exhibit that was filed as Doc. 76-4.

4.      The major portion of my 9-hour day on June 29, 2007 was spent finishing the Post-Trial Memorandum regarding forfeitability of the Flash II, which I had been researching and drafting under Ms. Grantland's guidance for 15 straight days.   At the end of this final long day of completing work on the Post-Trial Memorandum, I spent well under an hour proof reading the final draft of Ms. Grantland's Motion for Reconsideration.

5.      Unlike issues of forfeitability, I have no prior experience in the areas of sovereign immunity or federal tort claims. Therefore I had not done any research for Ms. Grantland's Motion for Reconsideration – an issue of first impression of which my understanding goes no further than what I learned reading her completed motion.   However, on July 19 and 20, 2007 I did some editing on Ms. Grantland's Reply to the government's response to her motion for reconsideration, solely for the purposes of perfecting the clarity and readability of her Reply, as reflected in my billing entries for these two dates.

6.      Attached is December 17, 2007 billing for my work done in reply to the Government's Opposition to Claimant's Motion for Attorneys' Fees, which is a true and accurate itemization of my hours spent responding to this Opposition by the government.

6.      I declare under penalty of perjury under the laws of the United States, that all the foregoing facts are true and correct.

December 17, 2007.

Judy Osburn

EXHIBIT 10 page 2

*Access Unlimited*
**Judy Osburn**
**343 West Lockwood Valley Road**
**Maricopa, CA  93252**
**661-347-0670**

4beatgait@gmail.com                          fax: 877-504-2067

| BILL TO: | Billing Date: Dec.17, 2007 |
|---|---|
| **Brenda Grantland, Esq.** | |
| 20 Sunnyside Suite A-419 | Billing period 12/4/2007 thru 12/17/2007 |
| Mill Valley, CA 94941 | |

| Date: | DESCRIPTION OF DUTIES | Units/Hours | Cost per unit | Total cost |
|---|---|---|---|---|
| 12/4/2007 | review Gov Opp to Attorney Fee Petition | 4.75 | $65.00 | $308.75 |
| | *above includes draft memo re issues to address* | | | |
| 12/6/2007 | intra-office memo re: attrny fee opposition issues | 1.75 | $65.00 | $113.75 |
| 12/10/2007 | research gov't "vexatious motions" & other response issues | 4.25 | $65.00 | $276.25 |
| 12/11/2007 | Response to Govt Opposition to Claimant's Mot Attrys Fees | 10.25 | $65.00 | $666.25 |
| 12/12/2007 | Response to Govt Opposition to Claimant's Mot Attrys Fees | 6.50 | $65.00 | $422.50 |
| 12/13/2007 | Response to Govt Opposition to Claimant's Mot Attrys Fees | 8.00 | $65.00 | $520.00 |
| 12/14/2007 | Response to Govt Opposition to Claimant's Mot Attrys Fees | 5.50 | $65.00 | $357.50 |
| 12/15/2007 | Response to Govt Opposition to Claimant's Mot Attrys Fees | 6.75 | $65.00 | $438.75 |
| 12/16/2007 | Response to Govt Opposition to Claimant's Mot Attrys Fees | 2.00 | $65.00 | $130.00 |
| 12/17/2007 | Response to Govt Opposition to Claimant's Mot Attrys Fees | 5.25 | $65.00 | $341.25 |

**Thank you!**

| | **Total Hours:** | **55.00** | | |
|---|---|---|---|---|
| | Total Amount Due | | | $3,575.00 |

**Please Send Payment To:**
**Judy Osburn**
**343 W. Lockwood Vlly. Rd.**
**Maricopa, CA 93252**

EXHIBIT 11

# Brenda Grantland

Attorney at Law
20 Sunnyside Suite A-204
Mill Valley, CA 94941
(415) 380-9108
fax (415) 381-6105

December 17, 2007

ITEMIZATION OF ATTORNEYS FEES FOR
RESEARCHING AND PREPARING THE REPLY TO
THE GOVERNMENT'S OPPOSITION TO FEE PETITION

| | | |
|---|---|---|
| 12/9/2007 | begin reviewing government Opposition, email to AUSA Rue re: consent to Motion to Reply | .75 |
| 12/10/2007 | read and respond to email from AUSA Rue, draft motion for leave to reply and for extension of time, begin research for reply | 6.25 |
| 12/12/2007 | research and drafting - Reply to Opposition to Fee Petition | 8.25 |
| 12/13/2007 | same as above | 8.7 |
| 12/14/2007 | same as above | 6.85 |
| 12/15/2007 | same as above | 6.25 |
| 12/16/2007 | same as above | 8.65 |
| 12/17/2007 | same as above | 7.75 |
| | Total hours | 53.45 |