# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, |

     Plaintiff, |

     v. | Civil Action # 05-10192 WGY

        |

ONE STAR CLASS SLOOP SAILBOAT |
BUILT IN 1930 WITH HULL NUMBER |
721, NAMED "FLASH II", |

     Defendant. |

_____ |

        |

KERRY SCOTT LANE, M.D., |

        |

     Claimant. |

_____|

## MOTION TO ENFORCE CAFRA FEE AWARD AND ATTORNEY FEE LIEN

Claimant, Kerry Scott Lane M.D., through undersigned counsel, moves this Honorable

Court to enforce the judgment entered on January 15, 2008 (Doc. 93), awarding a merits

judgment of $73,898.76 with interest at the statutory rate from the date of the wrongful seizure,

and attorneys fees, pursuant to the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), in the

amount of $51,929.13.  Claimant further requests that this Court order the government to

forthwith pay both judgment amounts into the registry of the court pending the outcome of

litigation on this issue.  As grounds for this motion Claimant states the following:

### FACTS

1.  Prior to entry of judgment the government filed a notice of appeal, but later dismissed

its appeal.  Claimant filed a cross-appeal, which is still pending.

2.  On February 1, 2008, AUSA Rue and Attorney Grantland agreed that the judgment funds would be wired into Ms. Grantland's IOLTA trust account.  On March 5, Ms. Grantland inquired about the progress on the wire transfer, and AUSA Rue emailed her back asking for her bank routing information.  Exhibit 4.   Ms. Grantland provided the routing information that same day.

3.  On March 13, AUSA Rue emailed Ms. Grantland, stating that the government was seizing both the judgment amount and Ms. Grantland's attorney fee award to satisfy Dr. Lane's alleged tax debts.  See Exhibit 2.

4.  On March 14, 2008, Claimant's counsel filed a Notice of Attorney Fee Lien (Doc. 103), and on March 17, she filed a Corrected Notice of Attorney Fee Lien (Doc. 104).  On March 17, she served the Corrected Notice of Attorney Fee lien upon Mary Magna, U.S. Marshal Service.

5.  On March 18, 2008, both Dr. Lane and Ms. Grantland received a letter from Kevin McIntyre, Judgment Fund Branch, Department of the Treasury, stating:

> Please  be advised that Treasury's Financial Management Service (FMS) received an Internal Revenue Service (IRS) levy that attaches funds payable to Kerry Scott Lane.  The levy amount payable to the IRS is $584,084.31.  The amount awarded pursuant to the above described case is $51,929.13.  This amount will be forwarded to the Internal Revenue Service according to payment instructions received from Nancy Rue, Assistant U.S. Attorney.

6.  On March 19, Ms. Grantland faxed a letter to Kevin McIntyre, informing him that the $51,929.13 judgment was counsel's award of attorneys fees which was never the property of Dr. Lane and requesting that Treasury not disburse the funds, but instead pay them into the registry of the court pending the outcome of litigation on this issue.

2

7.   Neither Dr. Lane nor counsel have yet received any paperwork regarding the seizure of the funds from the merits judgment.  Dr. Lane has met with the IRS agent and is disputing the amount claimed in the levy.

8.   Ms. Grantland's retainer agreement [Exhibit 1], which Dr. Lane signed on August 26, 2005, contains the following provision, at paragraph 5:

> Client agrees that attorney may deduct all attorney's fees and expenses due under this agreement from any money or property received by client in settlement or payment of the client's claim; and attorney shall be paid out of, and have a lien upon, any and all such money or property to the extent of such fees or expenses as may become due hereunder.  In the event the attorney has to pursue legal action to collect the fee, client hereby agree[s] to pay reasonable attorneys fees and costs for the collection action.

This retainer agreement was served on AUSA Rue on November 27, 2007, and Ms. Rue filed it in the record at Doc. 88-14.

## ARGUMENT

The district court has jurisdiction to hear this motion.  See *McKee-Berger-Mansueto, Inc. v. Board of Education*, 691 F.2d 828, 831 (7th Cir. 1982). In *Venegas v. Skaggs*, 867 F.2d 527, 529 (9th Cir. 1989) the Ninth Circuit held that the district court abused its discretion in denying an attorney permissive intervention to confirm and enforce the attorney's contractual attorney fee lien.  The Supreme Court affirmed.  *Venegas v. Mitchell*, 495 U.S. 82, 86 (1990).  Here, it is not necessary for the attorney to intervene as a party to have this court confirm and enforce Ms. Grantland's contractual attorney fee lien, since she is still representing Dr. Lane on the pending appeal, and Dr. Lane joins Ms. Grantland here in seeking enforcement of Ms. Grantland's contractual attorney fee lien so that she will be able to continue representing him on his pending

3

appeal – and thereby seek to increase the amount of his judgment, which would be available to offset his IRS debts.[1]

A federal tax lien cannot extend beyond the property interest held by the delinquent taxpayer. *United States v. Rodgers*, 461 U.S. 677, 690-691 (1983). Here, Dr. Lane's entitlement to the proceeds of the judgment is subject to a contractual lien for all unpaid attorneys fees accrued. Pursuant to the contract's terms, the attorney's secured interest is superior to the client's – even if the fees exceed the recovery. Since the IRS is stepping into Dr. Lane's shoes, it "must go barefoot if the shoes wear out." *United States v. Bess*, 357 U.S. 51, 55-57 (1958).

## I.    The authority the government relies upon does not apply here

The government cites *Manning v. Astrue*, 510 F.3d 1246 (10th Cir. 2007) as authority for its argument that the government can seize an attorney's fee award to pay the IRS debts of the client. The *Manning* decision interprets the language of the Equal Access to Justice Act – which states that "a court shall award to a prevailing party... fees and other expenses... incurred by that party" – as implying that the fee award belongs to the client, not the attorney, and therefore be seized to pay the client's nontax debts (unpaid student loans) owed to the government. Id. at 1249-50. The Tenth Circuit also relied upon other provisions in the EAJA to buttress its

---

[1] Even though the judgment may come out of one federal pocket and go into another, Dr. Lane's benefit is clear: the elimination of debt is consideration just as much as a payment of money. If the court of appeals agrees with his argument that the Flash II was worth more than the amount awarded below, it would increase the funds available to cancel Dr. Lane's tax debts (an obvious benefit to him). Additionally, if the court of appeals rules that the CAFRA fee award should not have been reduced, the increased CAFRA award to counsel will offset the amount of fees Dr. Lane is personally liable for under counsel's retainer agreement – which will also free up attorneys fees paid under counsel's lien to apply to his IRS debts.

"admittedly... counter-intuitive"[2] interpretation of that statute as intending the fee award to be the property of the client rather than the attorney. Id. at 1251. However, CAFRA's fee-shifting statute does not have similar language. In interpreting fee-shifting statutes, "similar language is a strong indication that they are to be interpreted alike"[3] – however, by the same token, the absence of similar language is an indication that Congress intended that they not be interpreted alike.

The *Manning* decision was severely criticized in *Vargas v. Commisioner of Social Security*, 2008 U.S. Dist. Lexis 18964 (D.N.J. March 12, 2008), holding that treating the EAJA fee award as income to the client "mangles the intent" of the fee-shifting statute.

The strong public policy issues noted by the district court in *Vargas* as undermining the *Manning* decision also apply here. Allowing an attorney's hard-earned fees to be seized to satisfy the client's debts will chill the willingness of attorneys to represent forfeiture claimants in the future. This runs counter to Congress' intent of attracting counsel to represent forfeiture claimants, many of whom "exhaust his or her financial assets in attorney's fees to fight for the return of property." See 146 Cong. Rec. H2046, H2051 (remarks of Rep. Jackson-Lee of Texas on the passage of CAFRA, April 11, 2000).

The *Manning* decision is also severely flawed in that it relies upon mere dicta to the effect that "the award of attorney's fees belongs to the client, not the attorney." None of the Supreme Court cases it cited went so far as to hold that a client could literally decide to keep the attorney fee award or apply it to pay off his debts, and refuse to pay the attorney's fees. The *Manning*

---

[2]  Id. at 1255.

[3]  *Independent Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754, 758 n. 2 (1983).

court cited that dicta from two Supreme Court cases – *Venegas v. Mitchell* and *Gisbrecht v. Miller*[4] – yet the actual holdings of those cases support Dr. Lane's arguments here.

In *Venegas*, the Supreme Court upheld an attorney's contractual attorney fee lien that exceeded the fees awarded under a fee-shifting statute.   The Court stated:

> [N]either *Blanchard [v. Bergeron*, 489 U.S. 87 (1989)] nor any other of our cases has indicated that § 1988, by its own force, protects plaintiffs from having to pay what they have contracted to pay, even though their contractual liability is greater than the statutory award that they may collect from losing opponents.  Indeed, depriving plaintiffs of the option of promising to pay more than the statutory fee if that is necessary to secure counsel of their choice would not further § 1988's general purpose of enabling such plaintiffs in civil rights cases to secure competent counsel.

495 U.S. at 89.

In *Gisbrecht v. Barnhart*, 535 U.S. 789 (2002), the Supreme Court held that 42 U.S.C. §406(b) does not displace contingent-fee agreements, as long as the fee falls within the statutory ceiling. Id. at 808-09. In reversing the Ninth Circuit, the Supreme Court upheld "the primacy of lawful attorney-client fee arrangements" (Id. at 793), concluding that "the courts below erroneously read § 406(b) to override customary attorney-client contingent-fee agreements" (Id. at 808). Under *Gisbrecht v. Barnhart* attorneys are not limited to only one method of recovering fees.

> Congress, we conclude, designed § 406(b) to control, not to displace, fee agreements between Social Security benefits claimants and their counsel. Because the decision before us for review rests on lodestar calculations and rejects the primacy of lawful attorney-client fee agreements, we reverse the judgment below and remand for recalculation of counsel fees payable from the claimants' past-due benefits.

Id. at 793.

---

[4]  535 U.S. 789 (2002).

6

Furthermore, we again emphasize, the lodestar method was designed to govern imposition of fees on the losing party. See, *e.g., Dague, 505 U.S., at 562.* In such cases, nothing prevents the attorney for the prevailing party from gaining additional fees, pursuant to contract, from his own client. See *Venegas v. Mitchell,* 495 U.S. 82, 89 (1990) ("[None] of our cases has indicated that [42 U.S.C.] §1988 . . . protects plaintiffs from having to pay what they have contracted to pay, even though their contractual liability is greater than the statutory award that they may collect from losing opponents. Indeed, depriving plaintiffs of the option of promising to pay more than the statutory fee if that is necessary to secure counsel of their choice would not further § 1988's general purpose of enabling such plaintiffs . . . to secure competent counsel.")

Id. at 806.

## II.    The CAFRA attorney fee award was never the property of Dr. Lane

The fee award in this case was not under EAJA, but under the Civil Asset Forfeiture

Reform Act of 2000 ("CAFRA"). The EAJA language construed in *Manning* is not found in

CAFRA. CAFRA's attorney fee shifting provision, 28 U.S.C. § 2465(b)(1), states:

Except as provided in paragraph (2), in any civil proceeding to forfeit property under any provision of Federal law in which the claimant substantially prevails, *the United States shall be liable for* – (A) *reasonable attorneys fees* and other litigation costs reasonably incurred by the claimant.

(Emphasis added). Nothing in this language can be construed to imply that the attorney's fees

are property of the client which can be offset against the client's debts to the federal government

instead of being paid to counsel. Under the plain meaning of § 2465, the United States *shall be*

*liable for counsel's attorney fee award.*

CAFRA's §2465(b)(2) delineates two exceptions: (1) if the claimant is convicted of a

crime for which the property could have been forfeited under a federal criminal forfeiture law

[§2465(b)(2)(B)], or (2) if there were multiple claims to the property and the government

promptly recognized the claimant's claim and returns claimant's interest in the property to the

claimant without incurring additional fees [§ 2465(b)(2)(C)].  Neither exception applies here.  If Congress intended to bar CAFRA attorney's fee awards when claimants have outstanding IRS debts, it would have included that exception in § 2465(b)(2).  Under the doctrine of *inclusio unius est exclusio alterius*, the inclusion of the two exceptions to the rule precludes the court from implying other exceptions.

**III.    Counsel's retainer agreement gave her an enforceable contractual security interest against the merits judgment for unpaid fees**

Paragraph 5 of counsel's retainer agreement created a security interest in the proceeds of any judgment or settlement in this case, which interest was superior to Dr. Lane's interest in the judgment or settlement.  That paragraph provides:

> Client agrees that attorney may deduct all attorney's fees and expenses due under this agreement from any money or property received by client in settlement or payment of the client's claim; and attorney shall be paid out of, and have a lien upon, any and all such money or property to the extent of such fees or expenses as may become due hereunder.  In the event the attorney has to pursue legal action to collect the fee, client hereby agree[s] to pay reasonable attorneys fees and costs for the collection action.

Clearly, the language contemplates that the judgment check or wire transfer would go directly to the attorney, and that the attorney would "deduct all attorney's fees and expenses due" before remitting the balance to the client. This retainer contract would not allow Dr. Lane to obtain any proceeds obtained in payment of the  judgment if outstanding attorneys fees exceeded the judgment amount. "In comparison, attorney's fees paid directly to an attorney under § 406 are not subject to offset, simply because they are paid directly to the attorney." *Manning* at 1256.

In counsel's 24 years of experience defending asset forfeiture cases, the settlement or judgment check has always, without exception, been paid directly to her.  See Exhibit 3 para. 10.

Indeed, AUSA Rue agreed to remit the amounts by wire transfer into Ms. Grantland's attorney trust account.  See Exhibit 4.

The retainer agreement made the full amount of the fees earned and costs incurred by counsel (minus any payments made on the account) deductible from the settlement or judgment check before any amounts became the property of Dr. Lane.  Dr. Lane's liability for the fees was not contingent on winning the lawsuit, or upon obtaining a fee award under CAFRA.  The fees due under the contract were not limited to the amount of recovery.  The provision specifically gives the attorney a lien upon any such money or property which is the proceeds of the attorney's litigation efforts.

Counsel drafted this retainer agreement clause early in her career as a forfeiture lawyer to insure that her attorneys fees would be protected in a situation such as this.  See Exhibit 3.  As Rep. Jackson-Lee noted in her remarks to Congress on the passage of CAFRA, *supra*, quite often the forfeiture claimant "exhaust[s] his or her financial assets in attorney's fees to fight for the return of property" – long before the forfeiture litigation is concluded.  Often civil forfeiture claimants are beset by the many-headed Hydra of the federal government.  Frequently the government commences a criminal investigation or prosecution against the client, necessitating the hiring of additional criminal counsel.  The IRS often launches an attack at the same time, assessing taxes based on issues raised in the forfeiture proceeding, and requiring the claimant to hire tax counsel or other professionals.  These spiraling financial problems often result in the client incurring massive debts, eventually resulting in bankruptcy.

Because of the chronic financial problems that traditionally beset forfeiture claimants during the pendency of litigation, Ms. Grantland redrafted her attorney-client retainer agreement

in the early 1990s to avail herself of the protections of the attorney fee lien upheld in *Venegas v. Mitchell*, 495 U.S. 82 (1990). See Exhibit 3. The security interest the retainer created against the judgment gave Ms. Grantland assurance that her fees would be paid from the judgment if she won, despite the client's indigence, and despite any fines, tax debts, other debts or bankruptcy of the client. Without this security agreement, counsel would not be able to continue representing a client who fell behind in his ability to pay attorneys fees, and would be forced to abandon the defense before the litigation came to fruition.

### A.    Holders of security interests are protected under the Code

The Internal Revenue Code, 26 U.S. Code § 6323(a) provides that the lien imposed by 26 U.S. Code § 6321 "shall not be valid as against any... holder of a security interest..." until notice pursuant to § 6323(f) has been filed by the Secretary. If notice *has* been filed pursuant to § 6323(f), the government has not revealed when that occurred. The notice of levy provided in relation to the seizure of Ms. Grantland's fees was dated February 13, 2008. Counsel's security interest was created on August 26, 2005, the date Dr. Lane signed the retainer agreement, and it was perfected by being served along with an itemization of fees due, upon the client, the government, and filed in the record – before entry of judgment.

Even if notice of a lien imposed by § 6321 had been filed by the government, "such lien shall not be valid... as against a holder of a security interest in such security who, at the time such interest came into existence, did not have actual notice or knowledge of the existence of such lien." 26 U.S.C. 6323(b)(1)(B).

The First Circuit holds that a government agency's transfer to the IRS of funds owed to a delinquent taxpayer should properly be characterized as a set off by the federal government even

if the transfer occurs pursuant to a formal notice of levy. *United States use of P.J. Keating Co. v. Warren Corp.*, 805 F.2d 449, 452-453 (1st Cir. 1986).

> The right of set-off is within the equitable power of a court to offset mutual debts running between two parties. n6 In the present context where the government owes a debt to a delinquent taxpayer, the government can apply the debt it owes to the taxpayer against the taxes owed by the taxpayer to the government. In principle, the party owed the greater debt is due the remainder of the debt owed him after offset of the debt he owes to the other party. *It goes without saying that neither party may offset moneys in its hands belonging to some other party.*

*Capuano v. United States*, 955 F.2d 1427, 1430-31 (11th Cir. 1992) (emphasis added). Here, the amount of Ms. Grantland's secured interest exceeds the entire amount this Court awarded for the wrongful seizure of the Flash II. Thus, Dr. Lane holds no property interest whatsoever in the judgment awarded by this Court for the improper seizure of the Flash II. If the government had completed its transfer of funds into Ms. Grantland's trust account in satisfaction of this Court's January 9, 2008, Memorandum and Order, Ms. Grantland would have "had the absolute right under state law... to compel the payment of the outstanding balances" pursuant to her retainer agreement with Dr. Lane. *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 724 (1985).[5]

## B.  Ms. Grantland's fees are also protected by § 6323(b)(8)

Alternatively, Ms. Grantland's attorney fee lien enjoys superpriority under 26 U.S.C. §6323(b)(8), which provides that a tax lien imposed by Section 6321 is not valid "with respect to a judgment or other amount in settlement of a claim or of a cause of action, as against an attorney who, under local law, holds a lien upon or a contract enforceable against such judgment or

---

[5] The First Circuit cited *United States v. Nat'l Bank of Commerce* as decisive authority in *United States v. Murray*, 217 F.3d 59, 65 (1st Cir. 2000) where, in stark contrast to the instant case, the delinquent taxpayer shared one-half interest in the trust and enjoyed the "ability to 'control' the property." Id. at 63.

11

amount, to the extent of his reasonable compensation for obtaining such judgment or procuring

such settlement." See also *United States v. Murray*, 963 F. Supp. 52, 57 (D. Mass. 1997) (citing

*Nebraska v. Richter*, 764 F.2d 517 (8th Cir. 1985), where attorney's lien had priority over lien of

IRS with respect to cash seized from taxpayer by police, where taxpayer's attorney was able to

secure return of money, and where he sent taxpayer bill for his services, thus perfecting his lien

under applicable state law, before IRS perfected its lien).

If the court relies upon the superpriority provisions, the "reasonableness" element of

§6323(b)(8) is not determined by the same criteria this Court used to substantially reduce

counsel's CAFRA award.

In reducing the award of reasonable attorney's fees under CAFRA, this Court agreed with

the United States that Dr. Lane should share responsibility for the fees incurred in litigating the

default judgment because he was aware the Flash II had been seized but failed to come forward

to state his interest. Accordingly, this Court ruled that

> "the United States only is liable for one-third of the fees and expenses arising out
> of the litigation to set aside the default judgment, as well as the fees and expenses
> arising from the litigation of the forfeitability issue. Thus, the time and expenses
> billed by Goldberg in this matter are denied. The hours billed by Grantland and
> Osburn are reduced to 236.62[6] and 109.5[7] respectively. Using this same
> methodology, the Court finds eligible expenses connected with Grantland's
> representation in the amount of $3404.13. See Table [Doc. 88 Ex. 1]. at 1 (listing
> $2693.14 in eligible fees paid directly by Lane and $710.99 in eligible fees paid
> by Grantland).

---

[6] Court's Note 2: "The court adopts the figures put forth by the United States Attorney's
Office. See Table [Doc. 88 Ex. 1] at 1."

[7] Court's Note 3: "This figure is arrived at by removing the hours billed on July 19, 2007.
In addition, the Court subtracted an additional two hours from the hours billed on June 29, as
Osburn indicates that at least a portion of her time that day was spent on Lane's motion for
reconsideration, on which he did not prevail. See Osburn Itemization at 1."

January 9, 2008, Memorandum and Order.

Ms. Grantland's retainer agreement, which created a lien against any judgment awarded to Dr. Lane, holds Dr. Lane responsible for *all* her fees – including those incurred in litigating the default judgment. This Court deducted two-thirds of the fees for litigating the default judgment from Ms. Grantland's CAFRA award. Those amounts remain Dr. Lane's unpaid debt secured by Ms. Grantland's retainer agreement. Likewise, regardless of this Court's substantial reduction of Ms. Grantland's hourly rate, Dr. Lane also remains responsible for his contractual agreement to pay her for *all* hours she billed to him at the contracted rate of $250 per hour, rather than the $175 this Court awarded to her under CAFRA. Dr. Lane has no property interest in the entire amount billed to him by Ms. Grantland

> A federal tax lien under Section 6321 of the Internal Revenue Code "cannot extend beyond the property interests held by the delinquent taxpayer." *Rodgers*, supra, 461 U.S. at 690-91, 103 S. Ct. 2132, 76 L. Ed. 2d at 251. If "a delinquent taxpayer shares his ownership interest in property jointly with other persons, rather than being the sole owner, his 'property' and 'rights to property' to which the federal tax lien attaches under [Section] 6321, and on which federal levy may be had under [Section] 7403(a), involve only his interest in the property, and not the entire property." Id. at 690.

*Strickland v. Daire*, 2002 U.S. Dist. LEXIS 20230, 17-20 (D. Fla. 2002).

For purposes of federal tax liens, the Government must step into the shoes of Dr. Lane, the taxpayer, and its rights to property can go no further than Dr. Lane's. *Rodgers*, *supra*, 461 U.S. at 691 n. 16 ("the tax collector not only steps into the taxpayer's shoes but must go barefoot if the shoes wear out").

Under Ms. Grantland's retainer agreement, and the bill that she presented to him perfecting her security interest (see *Nebraska v. Richter*, supra),  Dr. Lane has no property right to any portion of the Flash II judgment.

### C.    Counsel is entitled to interest and the costs of enforcement

Because the government's tax lien "shall not be valid...as against a holder of a security interest in such security who, at the time such interest came into existence, did not have actual notice or knowledge of the existence of such lien," pursuant to 26 6323(b)(1)(B), nor as against "an attorney who, under local law, holds a lien upon or a contract enforcible against such judgment or amount, to the extent of his reasonable compensation for obtaining such judgment," the undersigned counsel moves this court to additionally award "interest …upon the obligation secured" pursuant to 26 U.S.C. 6323(e) (1); as well as "reasonable expenses, including reasonable compensation for attorneys, actually incurred in collecting or enforcing the obligation secured" pursuant to 26 U.S.C. 6323(e)(3).

Date: March 24, 2008

Respectfully submitted,
Kerry Scott Lane, MD,

By his attorneys,

_____s/Brenda Grantland_____
Brenda Grantland, Esq.
Law Office of Brenda Grantland
20 Sunnyside Suite A-204
Mill Valley, CA 94941
(415) 380-9108
(Admitted pro hac vice)

_____s/Eric B. Goldberg_____
Jeffrey P. Allen (BBO# 015500)
Eric B. Goldberg (BBO# 564398)
Seegel Lipshutz & Wilchins, P.C.

14

Wellesley Office Park
20 William Street, Suite 130
Wellesley, MA 02481
(781) 237-4400
(Local counsel)

# ATTORNEY EMPLOYMENT AGREEMENT

THE AGREEMENT MADE THIS 24th day of August, 2005, by and between Dr. Kerry Lane, hereinafter referred to as "client" and attorney Brenda Grantland is as follows:

1. The client hereby retains and employs said attorney to represent him, as co-counsel with local attorney Eric Goldberg, in the civil forfeiture case USA v. One Star Class Sloop Sailboat Built in 1930 ("Flash II"), U.S. Dist. Ct., D. Mass. Case number 05-10192 RWZ.

2. The attorney accepts this retainer and agrees to take whatever action is reasonably necessary and advisable to enforce the clients' rights in the matter described in paragraph 1. This retainer does not obligate attorney to pursue any appeals – except by subsequent oral agreement.

3. It is agreed that the attorney will receive compensation for her services at the rate of $250 per hour. Client will pay a minimum retainer of $5000, by wire transfer on August 25. Once hours expended exceed the minimum retainer, attorney will bill client for any excess fees. Interest at the rate of 12% per annum will be charged on all balances billed and unpaid for more than 30 days.

4. Client further agrees that in addition to the above attorney's fees, all court costs, investigator fees, court reporters fees, expert fees, witness fees, travel costs, photocopying, toll calls, and all other out-of-pocket expenses incurred in investigating or litigating this claim shall be paid by the client.

5. Client agrees that attorney may deduct all attorney's fees and expenses due under this agreement from any money or property received by client in settlement or payment of the client's claim; and attorney shall be paid out of, and have a lien upon, any and all such money or property to the extent of such fees or expenses as may become due hereunder. In the event the attorney has to pursue legal action to collect the fee, client hereby agree to pay reasonable attorneys fees and costs for the collections action.

AGREED:

_Brenda Grantland_
Attorney

AGREED:

_KS Lane MD_
Client
8/26/2005

**Lipomics**

Sailormax
954
Chuck Fitzgerald

www.lipomics.com

**Subject:** US v. One Star Class Sloop
**From:** "Rue, Nancy (USAMA)" <Nancy.Rue@usdoj.gov>
**Date:** Thu, 13 Mar 2008 14:46:47 -0400
**To:** <bgrantland1@comcast.net>

Brenda,

We have sent the paperwork through for both the payment of the judgment and the payment of the attorneys fees.

During processing of these claims, we learned that Kerry Scott Lane had an outstanding IRS levy in the amount of $584,084.31. Under Manning v. Astrue, , 510 F3d 1246 (10th Cir. 2007), this levy is applied to the fee award as well as the judgment.

I believe that you will be receiving a letter to this effect from the Asset Forfeiture Fund, which is responsible for payment of the judgment, as well as from the Judgment Fund, which is responsible for the payment of the fee award, but I wanted to advise you by email as well.

Nancy Rue

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,   |

                   |

         Plaintiff,   |

     v.            |    Civil Action # 05-10192 RWZ

                   |

ONE STAR CLASS SLOOP SAILBOAT |

BUILT IN 1930 WITH HULL NUMBER |    DECLARATION OF ATTORNEY

721, NAMED "FLASH II",     |    BRENDA GRANTLAND IN SUPPORT

                   |    OF HER MOTION TO ENFORCE THE

        Defendant.   |    CAFRA FEE AWARD AND HER

                   |    CONTRACTUAL ATTORNEY FEE LIEN
_____|

                   |

KERRY SCOTT LANE, M.D.     |

                   |

        Claimant.    |
_____|

     I, Brenda Grantland, depose and state as follows:

     1.     I have been defending civil asset forfeiture cases since 1984.  Forfeiture defense

has made up roughly half of my practice since 1987 or 1988.  Over the years I have experienced a

wide array of hazards of defending asset forfeiture victims – hazards that make it difficult to

impossible to be fully compensated for the work done defending such cases.

     2.     First, quite typically  the client is of limited means to begin with, and the value of

the property may be relatively small.  Because the property is either seized or has a lis pendens on

it to prevent its sale or alienation, the asset itself cannot be sold or used to secure a loan to

finance the defense.  Often the seized property is a car needed to go to work, leading to loss of a

job – or a bank account needed to fund other things, such as the payment of taxes and credit card

debts.  Frequently the government seizes multiple assets belonging to the same client, or even

ties up virtually all of the client's net worth, rendering them unable to keep up with the attorneys fees.

3.      Secondly, forfeiture claimants, as a class, are more likely than the typical litigant to be barraged by a slew of simultaneous attacks on other fronts. By virtue of the property being implicated in a crime, the client frequently is also investigated or even prosecuted by law enforcement, frequently requiring the client to also hire a criminal defense lawyer. It is not uncommon for the federal government to unleash regulatory enforcement actions, civil penalty actions and income tax investigations or prosecutions against the client at the same time. A client desperately struggling to stay afloat during the onslaught of several government actions at once frequently is unable to pay credit card and other bills on time, and his credit dissolves. Thereafter private creditors descend to jockey for a position in the feeding frenzy. The end result, even for a client who wins his case on the merits, is a ruptured pocketbook. Quite often the end result is the client's bankruptcy.

4.      In contrast to the claimant, the federal government has unlimited resources to prolong the litigation and make it more complex, even beyond the value of the property at stake. Unlike private litigants, the government has an incentive to run up defense attorneys fees beyond the limited value of the property seized in order to make (or defend against) case law that can be applied to entire classes of claimants.

5.      As a forfeiture defense lawyer who seeks to improve the lot of forfeiture claimants and to advance the protection of their constitutional rights, I take on a substantial percentage of cases because of their value as test cases on some constitutional issue. These cases, more than most, run the risk of the government overwhelming my client and me with litigation expenses far

2

greater than the value of the seized property, and beyond my client's ability to pay my fees.  In many of those cases – as happened here – my client eventually runs out of money to keep up the litigation and I am unwittingly put into the position, some years after being retained, of having to finance the continuation of my client's litigation out of my own pocket in order to continue the fight for return of my client's property and to protect the unpaid fees and expenses I have earned.

6.      By the early 1990s I had experienced more than my share of forfeiture clients rendered indigent mid-litigation, forcing me to either withdraw or continue representing them without pay, on the hope of a judgment sufficient to cover my fees and/or an attorney fee award.

7.      After the Supreme Court decided *Venegas v. Mitchell*, 495 U.S. 82 (1990) I redrafted my retainer agreement to include paragraph 5, which creates a secured interest in the expected judgment or settlement recovery.   I have used this same language in my retainer agreement ever since.

8.      If my retainer agreement and its lien clause ceases to be enforced by the courts, I will be hesitant to take on test cases that involve important constitutional issues but property of lesser value, clients of limited means, or clients with other financial problems.

9.      The government's tactics in this case are chilling on the forfeiture defense bar in general.  I have shared my recent travails in this case with several colleagues in the forfeiture defense bar.  They are similarly shocked by this latest government tactic aimed at deterring representation and/or zealous advocacy by forfeiture defense lawyers, and are watching this case, expecting it to happen to them next.  When attorneys begin to refuse to take cases with complex constitutional issues without payment of a huge up front retainer, most claimants will be unable to retain counsel at all.

10.     In my years of experience in forfeiture cases, the judgment checks have always –
without exception until this case – been mailed to me or wire transferred into my attorney trust
account, to disburse according to my retainer agreement with my client.

11.     On August 23, 2005, I was retained by Kerry Scott Lane, M.D., as co-counsel with
Eric Goldberg, Esq., in this civil forfeiture case.  At the time we entered the contract I had no
knowledge that Dr. Lane owed any tax debts. After winning the forfeiture case on the merits, I
submitted a motion for attorneys fees and costs on November 13, 2007, Doc. 87, which included
an itemization of my fees, my paralegal's fees, and my out of pocket expenses.  Claimant's Reply
to the Government's Opposition to the Fee Petition contained supplemental itemizations of my
fees, my paralegal's fees, and my out of pocket expenses.

12.     The government has delayed paying both the judgment amount owed Dr. Lane
and the attorney fees and costs award.  On March 13, 2008, AUSA Nancy Rue informed me that
the government was attempting to seize both the judgment amount owed Dr. Lane and my
attorney fee award  – to satisfy IRS debts allegedly owed by Dr. Lane.  See Exhibit 2, attached.
This is the first I learned of the IRS lien against Dr. Lane.

13.     On March 14, 2008, I filed a Notice of Attorney Fee lien (Doc. 103), and on
March 17 I filed a Corrected Notice of Attorney Fee Lien itemizing the unpaid attorneys fees and
expenses claimed under my attorney retainer agreement lien. (Doc. 104-4).

15.     Pursuant to my retainer agreement, signed August 23, 2005, I earned or incurred
$248,767.15 in fees and expenses to date, itemized as follows:

4

a) Brenda Grantland's fees for 2005-2007 itemized in Doc. 87 Exhibits 4-5 -

| | |
|---|---:|
| 823.53 hours at $250 per hour | $205,882.50 |
| Grantland's out of pocket expenses | 2,621.90 |
| paralegal Judy Osburn's fees (Doc. 87-6) | 7,377.50 |

b) Grantland's supplemental itemization for fees (Doc. 90)

| | |
|---|---:|
| attorney's fees (itemized in Doc. 90-12) - 53.45 hours @ $250 per hour | 13,362.50 |
| paralegal Judy Osburn's fees (Doc. 90-11) | 3,575.00 |

c) Grantland's fees and expenses incurred to date on pending appeal

| | |
|---|---:|
| attorney's fees - 7.65 hours at $250 per hour | 1,912.50 |
| out of pocket expenses - appeal docketing fee, transcripts | 696.50 |

d) Grantland's fees and expenses to date for enforcing the lien

| | |
|---|---:|
| attorney's fees - 41.2 hrs. @ $250 per hour - | 10,300 |
| paralegal's fees - 46.75 hrs. @ $65 per hour) - | 3,038.75 |
| TOTAL | $248,767.15 |

16.     Dr. Lane has paid me a total of $31,250 to date, toward my outstanding bills for attorneys fees and expenses, itemized as follows – $29,250 paid up to and including 11-13-2007 (see Doc. 87-3), and $2000 paid between January and February 2008.  This leaves an outstanding balance of $217,517.15.

17.     Pursuant to paragraph 5 of my retainer agreement, I now have a contractual lien upon any settlement or judgment for $217,517.15.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Dated: 3/24/2008                          _____/s/ Brenda Grantland_____
                                          Brenda Grantland, Esq.
                                          Law Office of Brenda Grantland
                                          20 Sunnyside Suite A-204

Mill Valley, CA 94941
(415) 380-9108
Pro hac vice

**Subject:** RE: Notice of Withdrawal of appeal.pdf
**From:** "Rue, Nancy (USAMA)" <Nancy.Rue@usdoj.gov>
**Date:** Fri, 1 Feb 2008 17:38:09 -0500
**To:** <bgrantland1@comcast.net>

Sorry – you had raised that and we got sidetracked when I told you that the government was not going to appeal. I haven't done one of these settlement conference before, because all my appeals cases have been criminal. Could I get back to you Tuesday with a response? I'd like to talk with some colleagues about how these proceed mechanically so I understand how it would work by phone. I've done ADR before, and can't imagine it by phone, but I think this is a different circumstance.

In the meantime, I am also trying to process the paperwork to pay the judgment and fee award. I am assuming that we wire it to your IOLTA account, although I have not yet been able to get a firm answer. If so, I'll need the account details.

Thanks. Nancy

**From:** Brenda Grantland [mailto:bgrantland1@comcast.net]
**Sent:** Friday, February 01, 2008 5:21 PM
**To:** Rue, Nancy (USAMA)
**Subject:** Re: Notice of Withdrawal of appeal.pdf

Hi Nancy -

I still intend to ask to appear telephonically for the settlement conference, whenever it is held. Do you oppose that request or not?

Brenda

Rue, Nancy (USAMA) wrote:

Ms. Jane Wallace

Executive Assistant to Settlement Counsel

United States Court of Appeals for the First Circuit

Boston, MA 02210

RE: 08-1120 US v. One Star Class Sloop Sailboat, (Kerry Lane Claimant)

Dear Ms. Wallace:

Consistent with my voicemail yesterday, the government has withdrawn its notice of appeal in this case. The attached notice has now been filed in the Clerk's office.

I have conferred with Claimant's counsel, Brenda Grantland, and it is my understanding that Claimant intends to proceed with an appeal. However, that notice of appeal was certified to the Court much later than the instant one.

**Subject:** RE: U.S. v. Flash II
**From:** "Rue, Nancy (USAMA)" <Nancy.Rue@usdoj.gov>
**Date:** Wed, 5 Mar 2008 15:31:47 -0500
**To:** <bgrantland1@comcast.net>

```
Could you send me the wire info for an electronic funds transfer?
Thanks!  Nancy

-----Original Message-----
From: Brenda Grantland [mailto:bgrantland1@comcast.net]
Sent: Wednesday, March 05, 2008 2:53 PM
To: Rue, Nancy (USAMA); Brenda Grantland
Subject: U.S. v. Flash II

Nancy -

What did you find out about paying the judgment by wire transfer?  We
need to do it that way because my client and I live on different coasts,

and because we're feeling uneasy about a check that large going through
the mail.

Brenda
```